**No. 26-5060**

**United States Court of Appeals**
**for the Ninth Circuit**

SHAWN JENSEN, ET AL.,

*Plaintiffs/Appellees*,

v.

RYAN THORNELL, ET AL.,

*Defendants/Appellants*.

**On Appeal from the United States District Court for the District of Arizona, Phoenix, No. 2:12-cv-00601-ROS**

# EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL

**RELIEF REQUESTED BY SEPTEMBER 2, 2026**

KRISTIN K. MAYES
ARIZONA ATTORNEY GENERAL
Joshua D. Bendor (031908)
Luci D. Davis (035347)
2005 N. Central Avenue
Phoenix, Arizona 85004
(602) 542-8958
joshua.bendor@azag.gov
luci.davis@azag.gov
acl@azag.gov

Mary R. O'Grady (011434)
Andrew G. Pappas (034432)
John S. Bullock (034950)
Kimberly I. Friday (035369)
Daniel Bowman (038094)
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com
dbowman@omlaw.com

**Attorneys for Defendants/Appellants**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. Procedural History ........ 3

II. Post-Injunction History ........ 4

III. The Receivership Motion and Order ........ 6

ARGUMENT ........ 7

I. Defendants will likely succeed on the merits. ........ 8

A. Under the PLRA, relief must be the least intrusive means necessary, and a receivership is a remedy of last resort. ........ 8

B. The district court erred by ignoring the Department's substantial progress since the Injunction was entered three years ago. ........ 10

C. The district court erred by failing to allow Defendants a reasonable opportunity to achieve full compliance. ........ 11

D. The district court erred by bypassing intermediate measures to achieve compliance. ........ 13

E. No clear and convincing evidence shows that a receivership is the only viable remedy. ........ 15

II. Absent a stay, the Department will suffer irreparable harm. ........ 17

III. The balance of the harms and the public interest favor a stay. ........ 19

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................16

*Bracco v. Lackner*,
462 F. Supp. 436 (N.D. Cal. 1978) ....................9

*Brown v. Plata*,
563 U.S. 493 (2011) ....................9

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) ....................18

*Coleman v. Newsom*,
2024 WL 3385911 (E.D. Cal. July 12, 2024) ....................14

*Dist. of Columbia v. Jerry M.*,
738 A.2d 1206 (D.C. App. 1999) ....................8, 9, 15, 18

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ....................19

*Golden Gate Rest. Ass'n v. City of San Francisco*,
512 F.3d 1112 (9th Cir. 2008) ....................20

*Horne v. Flores*,
557 U.S. 443 (2009) ....................20

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ....................20

*L.A. All. for Human Rights v. City of Los Angeles*,
792 F. Supp. 3d 1049 (C.D. Cal. 2025) ....................8, 15

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) ....................8

*Lewis v. Casey*,
518 U.S. 343 (1996) ....................18

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .... 19

*Nken v. Holder*,
556 U.S. 418 (2009) .... 8, 19

*Nunez v. N.Y.C. Dep't of Corr.*,
782 F. Supp. 3d 146 (S.D.N.Y. 2025) .... 12, 14, 16

*Parker v. Hooper*,
171 F.4th 736 (5th Cir. 2026) .... 9, 11, 19

*Parker v. Hooper*,
95 F.4th 231 (5th Cir. 2024) .... 18

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) .... 4

*Plata v. Schwarzenegger*,
2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) .... 16

*Preiser v. Rodriguez*,
411 U.S. 475 (1973) .... 1

*Shaw v. Allen*,
771 F. Supp. 760 (S.D.W. Va. 1990) .... 14

*Stone v. City of San Francisco*,
968 F.2d 850 (9th Cir. 1992) .... 9

*Trump v. CASA*,
606 U.S. 831 (2025) .... 3, 17, 18, 19

*Turner v. Safley*,
482 U.S. 78 (1987) .... 18

*United States v. Ayres*,
166 F.3d 991 (9th Cir. 1999) .... 14

*United States v. Hinds Cnty.*,
2023 WL 1186925 (S.D. Miss. Jan. 30, 2023) .... 13, 16

*United States v. Hinds Cnty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) .......... 14

*United States v. Hinds Cnty. Bd. of Supervisors*,
No. 22-60203 (5th Cir. Dec. 28, 2022) .......... 18

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 17

**Statutes**

18 U.S.C. § 3626 .......... 2, 8, 9, 11

## INTRODUCTION

In April 2023, the district court imposed an injunction that required Arizona's Department of Corrections, Rehabilitation and Reentry to comprehensively overhaul healthcare services in state-run prisons to remedy constitutional deficiencies. Directing the Department to oversee compliance with the Injunction reflects the reality that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973). That traditional and federalism-respecting approach has borne fruit, as the Department has made significant improvements in the relatively short period since the 2023 Injunction. The Department has more than doubled its healthcare spending. It has grown its healthcare staff by over 50%. It has opened new healthcare facilities and improved existing ones. It has increased access to substance-use disorder treatment and specialty care. It has started implementing a model of care that relies on primary care providers and primary therapists. And it has improved critical systems, including its electronic healthcare record system, language-translation systems, and the system for monitoring compliance with the 2023 Injunction.

Despite that tangible progress, in February 2026—not even three years after imposing the 2023 Injunction and without holding state officials in contempt for specific shortcomings and giving them an opportunity to purge—the district court

took the concededly drastic step of appointing a receiver to run the healthcare system in Arizona's prison system for at least five years ("Receivership Order"). The court selected the receiver in July 2026 ("Appointment Order") and then promptly refused to grant a stay pending appeal. The upshot is that a single private individual will imminently assume sole responsibility for thousands of state employees and contractors, control hundreds of millions of public dollars, and oversee the provision of healthcare to roughly 25,000 inmates in nine prison complexes across Arizona.

The district court's decision to impose a receiver defies both statutory text and bedrock principles of federalism. Federal law is clear that prospective relief affecting prisons is impermissible unless it is the "least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). That demanding standard is reinforced by the longstanding equitable principle that a receivership is a remedy of last resort. The Department is not aware of a single instance in which a federal court has ever found receivership necessary when it comes to a federally run prison, and any such order would be difficult to square with the separation of powers. But a federal court's wresting authority over a state prison system raises equally serious federalism problems, and what has not been deemed necessary for the federal system cannot be found necessary for a state system without first exhausting every less-intrusive remedy. Here, the district court erred by resorting to the extreme remedy of a receivership without first finding the Department in contempt for specific

instances of noncompliance and giving Defendants an opportunity to purge. At minimum, the court should have allowed the State more time to achieve full compliance with the Injunction, especially given the Department's recent progress. Indeed, the court's decision to authorize a receivership for a (minimum) five-year term is a concession that achieving full compliance with the Injunction in under three years is impossible. In sum, the district court's precipitous decision to appoint a receiver contradicts the PLRA's text and bedrock federalism principles, not to mention the Supreme Court's recent caution against expansive equitable relief. *See Trump v. CASA*, 606 U.S. 831, 861 (2025). Defendants are likely to succeed on appeal.

All the other stay factors also strongly militate in Defendants' favor. The loss of sovereign control over the prison system is an irreparable injury. The public interest strongly favors having publicly accountable officials discharging distinctly public functions. And it certainly is not in the public interest to have compliance efforts restarted under a receivership, only for the receivership to later be reversed on the merits. This Court should grant a stay pending appeal.[1]

## BACKGROUND

### I. Procedural History

In 2012, a class of prisoners filed suit, alleging that the Department's healthcare and other conditions of confinement violated the Eighth Amendment. The

---

[1] Plaintiffs oppose this Motion.

district court certified a primary class of all inmates subjected to the Department's "medical, mental health, and dental care policies and practices." *Parsons v. Ryan*, 754 F.3d 657, 672 (9th Cir. 2014). The parties agreed to a stipulated settlement in 2014, which the district court approved in 2015. *See* APP145 (Stipulation). The parties agreed not to move to terminate the stipulation for four years "[t]o allow time for the remedial measures . . . to be fully implemented." APP159 ¶ 37. From 2015 to 2021, the stipulation resulted in frequent disputes between Plaintiffs and the Department's then-leadership, along with sanctions for noncompliance. *See* APP019.

In 2021, the district court revoked the stipulation and held a bench trial. *Id*. In June 2022, the court issued a lengthy order finding constitutional deficiencies in healthcare delivery. *See* APP214–413. The parties negotiated an Injunction intended to remedy those deficiencies, which the court entered in April 2023, shortly after a new Governor and Department Director took over. Most of the 67-page Injunction focused on the healthcare system with detailed requirements regarding all aspects of medical and mental health care. APP424–463.

## II. Post-Injunction History

The Department's healthcare system has improved dramatically since the Injunction was entered. Since 2022, the Department's healthcare contractor, NaphCare, has increased the number of full-time healthcare employees by 56%, mental health staff by 53%, full-time physicians by 46%, and midlevel providers—

who, under the Injunction, function as primary-care providers for many patients—by 93%. Doc. 4973 at 6.

Additionally, the Department has more than doubled its healthcare spending since 2022, Doc. 4818 at 3; Doc. 4973 at 2, yielding improvements beyond increased staffing, Doc. 4998 (Supplemental Evidence) at 103. The Department has increased the beds in its special needs unit and inpatient care units by 66%. Doc. 4818 at 5. It has completed new construction and renovations at five of nine correctional facilities to improve the delivery of medical care. *Id.* at 5–6. It created a treatment program for roughly 7,000 inmates with Opioid Use Disorder and spent over $60 million providing Hepatitis C treatments to approximately 4,500 inmates. *Id.* at 6–7. Offsite specialty-care appointments have increased significantly. *Id.* at 7. The Department has also increased capacity for residential mental health treatment by 31%; created an assistance and companionship program for inmates suffering from dementia or similar illnesses; established a task force to bolster suicide prevention efforts; and introduced programs to reduce self-injurious behaviors. *Id.* at 4–5. The Department made these changes within the limits of its appropriated budget.

The Department has also made significant progress implementing the Patient Centered Care Model ("PCCM"), a new "model of care involv[ing] extensive changes to many processes of care, clinical roles, and workflows." Doc. 4761 at 2. In June 2024, the district court authorized a staffing pilot program to test the PCCM's

efficacy and staffing demands, *see* Doc. 4637, and the pilot began that fall. In June 2025, the court approved a final Staffing Plan that required Defendants to increase staffing levels and implement the PCCM statewide. *See* Doc. 4916. Although Defendants have not yet reached the staffing levels required by the Staffing Plan, they have made measurable progress implementing the PCCM. By November 2025, the Department had implemented the PCCM at 13 units, including one each at all prison complexes. *See* Doc. 5315 (Dist. Ct. Stay Motion) at 8. As of June 2026, the PCCM had been rolled out at 31 of 45 units, with the goal of implementing the model at all units by the end of 2026. *See id.* at 8–9.

## III. The Receivership Motion and Order

In February 2025, Plaintiffs moved for appointment of a receiver, Doc. 4795, which the district court granted in February 2026 over Defendants' opposition, APP098. After the parties agreed on a receiver candidate, the court appointed a receiver on July 17, 2026, for a minimum five-year term. APP013. The court gave the receiver power "for formulating and establishing the annual [Department] health care budget." APP008. If the receiver determines budgeted funds in a given fiscal year "are inadequate to accomplish the Receiver's authorities and duties, the Receiver shall first consult the Director" and then "notify[] the Legislature and the Governor's Office of such deficiency." APP015. If additional funding is not provided, the parties or receiver "may prompt the Court to order the waiver of Arizona

State laws, regulations, and contracts that interfere with the requirements and desired outcome of the Receivership." *Id.*

The district court also gave the receiver "[a]ll duties and authorities vested by law in the [Department's] Director . . . relating to the health care of the class members." APP006. The receiver can "hire, fire, suspend, supervise, promote, transfer, discipline, and establish compensation for all [Department] employees and contract staff who perform services related to the health care of class members." APP006–007. And "[a]ll costs incurred . . . shall be borne by Defendants." APP011.

Defendants timely appealed the Receivership Order, and this Court stayed that appeal pending further district-court proceedings related to appointment of a receiver, or until further order of this Court. *See* No. 26-1746 (Doc. 10). After the district court entered the Appointment Order, Defendants immediately filed a motion to stay, Doc. 5315, which the district court denied on August 5, 2026. APP481. Defendants timely appealed from the Appointment Order, Doc. 5331, and have asked the Court to consolidate both appeals.

## ARGUMENT

Four factors guide the decision to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether . . . the stay will substantially injure the other parties interested in the

proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted). Here, all factors favor staying the Appointment Order.

## I. Defendants will likely succeed on the merits.

The first factor asks whether there is a "fair prospect" or a "reasonable probability" that the appellant will succeed on the merits, or whether the appeal raises "serious legal questions" demanding careful consideration. *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (citation omitted). The answer is yes.

### A. Under the PLRA, relief must be the least intrusive means necessary, and a receivership is a remedy of last resort.

Under the Prison Litigation Reform Act (PLRA), prospective relief affecting conditions in state or federal prisons "shall extend no further than necessary" and be "the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This demanding least-restrictive-means test is reinforced by the equitable principle that a receivership is a "remedy of last resort" imposed "only when absolutely necessary." *Dist. of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. App. 1999); *see also L.A. All. for Human Rights v. City of Los Angeles*, 792 F. Supp. 3d 1049, 1092 (C.D. Cal. 2025) (receivership related to homelessness would be premature). These standards limit a court's discretion to impose a receivership in at least four ways.

First, when a defendant is improving prison conditions and working toward compliance, a receivership is not "the least intrusive means necessary to correct the

violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A); *see Parker v. Hooper*, 171 F.4th 736, 757–58 (5th Cir. 2026) (reversing a remedial order under the PLRA because the court had ignored "significant medical care improvements").

Second, because it is a remedy of last resort, a court cannot impose a receiver without allowing the defendant a reasonable time to address unconstitutional conditions. This ensures that prospective relief reaches "no further than necessary" and that a receivership is "absolutely necessary." *Jerry M.*, 738 A.2d at 1213.

Third, if the district court did not carefully evaluate whether intermediate—that is, less intrusive—measures could redress the constitutional violations, then a receivership is not "the least intrusive means necessary" to achieve compliance. 18 U.S.C. § 3626(a)(1)(A); *Bracco v. Lackner*, 462 F. Supp. 436, 456 (N.D. Cal. 1978) ("Receivership is a remedy of last resort; a receiver should not be appointed if a less drastic remedy exists."). This principle reflects that the PLRA was enacted "to constrain the discretion of courts issuing structural injunctions," *Brown v. Plata*, 563 U.S. 493, 564 (2011) (Scalia, J., dissenting), and that a receivership is improper unless "other remedies are inadequate," *Jerry M.*, 738 A.2d at 1213.

Fourth, a district court must find, by clear and convincing evidence, that a receivership is "the only viable option to effectuate compliance with the laws and orders of the court." *Id.*; *see Stone v. City of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (civil contempt requires clear and convincing evidence); 18 U.S.C.

§ 3626(a)(3)(E) (same for prisoner-release order).

Consistent with these considerations, Defendants are aware of no court that has found a receivership necessary in the context of a federally run prison. Yet here the district court reflexively imposed a receiver without exhausting lesser equitable remedies and then gave the receiver almost twice as much time to achieve full compliance with the Injunction than the sovereign state was allowed.

### B. The district court erred by ignoring the Department's substantial progress since the Injunction was entered three years ago.

The Department's substantial progress in the three years since the Injunction demonstrates that a receivership is not "the least intrusive means necessary to correct" the constitutional violations the district court previously identified. Yet rather than credit this progress, the district court ignored it. This was legal error.

As explained, the Department has doubled its healthcare funding; increased overall staffing by over 50%; and increased the number of hospital beds, healthcare facilities, and addiction-treatment resources, among other improvements. But the district court noted only that the Department has "expended additional funds on healthcare, ha[s] made some improvements on certain types of healthcare in certain facilities, and [has] had success in the opioid use disorder program and Hepatitis-C treatment." APP038. The court did not discuss any other progress.

The court criticized Defendants throughout the Receivership Order for not achieving full staffing. Yet the court did not discuss the current, granular staffing

data Defendants submitted showing that since 2022, NaphCare has increased the overall number of full-time healthcare employees by 56%, the number of mental health staff by 53%, its midlevel providers by 93%, and full-time physicians by 46%. Doc. 4818 at 3–4; Doc. 4973 at 6.

This is substantial progress, and the court erred in finding that it would be futile to allow Defendants to continue to work toward full compliance. *See* APP075–079. Moreover, this progress demonstrates that a receivership is not "the least intrusive means necessary to correct" the constitutional violations the court identified. 18 U.S.C. § 3626(a)(1)(A); *Parker*, 171 F.4th at 757 (reversing because the district court neglected "significant medical care improvements").

### C. The district court erred by failing to allow Defendants a reasonable opportunity to achieve full compliance.

Next, the district court erred by not giving the Department reasonable time to achieve full compliance with the Injunction before appointing a receiver. The court appointed the receiver for a five-year term and stated it would extend the appointment "as necessary," APP013, apparently recognizing the enormity of the task of achieving full compliance with the Injunction. Yet the district court gave Defendants less than *three years* to comply. Giving a receiver more time to comply with the Injunction than the State had flouts the PLRA's requirement that prospective relief extend "no further than necessary." 18 U.S.C. § 3626(a)(1)(A).

Moreover, the Receivership Order focuses on events that occurred between

2014 and 2022. Although the court faulted Defendants for failing to achieve full compliance with the 2023 Injunction, its analysis relied on events and findings *before* that Injunction was entered, *before* the 2022 finding of unconstitutionality, and *before* the Department's current leadership assumed responsibility. APP070–72. That skewed focus was legal error and reflects the district court's refusal to acknowledge Defendants' progress and give Defendants a reasonable opportunity to achieve compliance. Indeed, by the district court's own description, the court's patience had "run out" by June 2024 (APP031)—a year after the Injunction was entered, and a year before the June 2025 staffing plan was finalized.

Three years—much less one year—is not a reasonable time to complete a total overhaul of the Department's healthcare system. The Injunction's reforms affect 25,000 inmates in prisons throughout Arizona with varied healthcare issues and different security challenges, and the changes must be implemented by thousands of healthcare and custody staff. Even the court's monitors recognized in 2025 that the PCCM was a "massive" project, and it was "difficult to overstate the complexity" of implementing it statewide. Doc. 4761 at 11. And with the proper chronological focus, this is simply not a case in which a remedial order—here, the Injunction—failed to produce change. *See Nunez v. N.Y.C. Dep't of Corr.*, 782 F. Supp. 3d 146, 161 (S.D.N.Y. 2025) (finding violence, "self-harm, and deaths in custody [were] demonstrably worse than when the Consent Judgment went into effect" ten years prior);

*United States v. Hinds Cnty.*, 2023 WL 1186925, at *5, *7 (S.D. Miss. Jan. 30, 2023) (approving receivership over "an institution 'where terror reigns'" and staffing was "getting worse"). To the contrary, the Department has increased funding and staffing, started implementing the PCCM, and improved facilities, programs, and patient care. The district court's decision to cut short this progress violates the PLRA's requirement that relief be the least intrusive possible.

### D. The district court erred by bypassing intermediate measures to achieve compliance.

Since the Injunction was entered in 2023, the district court did not attempt intermediate measures before ordering a receivership. Instead, the court found that because it imposed civil contempt fines during the pre-Injunction stipulation period, such intermediate sanctions would be unsuccessful now. *See* APP070–071. Conflating the pre-trial stipulation with the post-trial Injunction was error.

The stipulation was fundamentally different from the Injunction—it was based not on the court's written constitutional findings but on Plaintiffs' *allegations* about the Department's healthcare. *See* Doc. 1458 at 37 (acknowledging there was "litigation risk on both sides" during the stipulation period). At that point, Defendants had not conceded that there were unconstitutional conditions. And substantively, the stipulation was wholly different from the Injunction. *Compare* APP145–160 (16-page stipulated agreement attaching 103 performance measures), *with* APP414–480 (67-page Injunction imposing roughly 154 substantive provisions

governing staffing, models of care, mortality review, and compliance monitoring). The proper focus is Defendants' conduct and the effectiveness of alternative measures since April 2023, when the Injunction was entered. Since then, the district court has not tried intermediate measures to improve healthcare compliance.

The court, for example, never made specific findings that the Department was in contempt of particular provisions of the Injunction, let alone gave Defendants an opportunity to purge such contempt. *Cf. United States v. Ayres*, 166 F.3d 991, 997 (9th Cir. 1999) ("Civil contempt sanctions . . . are only appropriate where the contemnor is able to purge the contempt by his own affirmative act."). A contempt order would have forced the court to identify specific deficiencies and give the sovereign state a clear opportunity to remedy identified shortcomings. Courts cannot simply skip over the contempt and purge process—and all other intermediate remedies—to the drastic step of transferring state functions to a federal agent. *See, e.g.*, *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 622 (5th Cir. 2025) (affirming receivership where district court had twice held defendant in contempt); *Coleman v. Newsom*, 2024 WL 3385911, at *5 (E.D. Cal. July 12, 2024) (receivership after multiple contempt orders and money fines did not spur the defendants toward compliance); *Nunez*, 782 F. Supp. 3d at 156 (receivership after contempt orders proved insufficient); *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D.W. Va. 1990) (three prior contempt proceedings were "to no avail"). It was error here to begin with a

receivership, rather than employ "a gradual approach incrementally ramping up compliance measures." *L.A. All. for Human Rights*, 792 F. Supp. 3d at 1092.

### E. No clear and convincing evidence shows that a receivership is the only viable remedy.

The district court also erred because there is no clear and convincing evidence that a receivership is "the only viable option to effectuate compliance with the laws and orders of the court." *Jerry M.*, 738 A.2d at 1213.

First, to find an ongoing threat of harm, the court ignored the progress the Department is making and instead focused on the monitors' analysis of eight mortality reviews and other adverse examples of care. *See* Doc. 4968 at 4–15; APP049–070. In doing so, the court overlooked the corrective actions the Department has taken because of its mortality-review process and Defendants' substantive objections to the monitors' analysis. Doc. 4973 at 15, 23–26; *id.* at Ex. 8 ¶¶ 2–17. Among those objections: mortality reviews—i.e., "cases with an adverse outcome"—do not accurately describe whether there is a systemwide risk of grave harm to the tens of thousands of inmates under Defendants' care. Doc. 4973 at 25; *id.* Ex. 12 ¶¶ 7–10. In a large healthcare system, there will always be bad outcomes and even errors—that is true in the professional world, as malpractice law reflects, and in prisons as well. Considering only the worst outcomes necessarily excludes situations where things went right, and circularly paints the worst picture possible.

Second, the district court found a receivership necessary because Defendants

are supposedly acting in bad faith. APP086–091. But here too the evidence falls far short of the exacting clear-and-convincing standard. The court found it "duplicitous" and "border[ing] on bad faith" for Defendants to object that some of the monitors' recommendations went beyond their areas of expertise. APP041. But it was entirely appropriate for Defendants to object to the monitors' conclusions and qualifications to opine on specific matters: recommendations by court-appointed experts are "subject to review by the district court." *Armstrong v. Brown*, 768 F.3d 975, 987–88 (9th Cir. 2014). Nor does the Department's incomplete compliance with the Injunction establish bad faith. *See Hinds Cnty.*, 2023 WL 1186925, at *12 (no bad-faith finding despite years of noncompliance); *Nunez*, 782 F. Supp. 3d at 165 (same). A contrary rule would make a receiver appropriate whenever compliance is not immediate.

Third, there is no clear and convincing evidence that the Department's leaders are incapable of "turn[ing] the tide within a reasonable period of time." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005). Reforming a prison system to ensure "[t]he provision of adequate medical care . . . presents a classic example of a polycentric problem . . . with a number of subsidiary problem centers, each of which is related to the others, such that the solution to each depends on the solution to all the others." *Id.* at *25 (cleaned up). Where leadership has made meaningful progress, the court's finding that those same officials are incapable presents a serious question for review.

Fourth, the receivership over California's prisons confirms that while a receivership succeeds in transferring control of a distinctly sovereign function to a politically unaccountable private individual, it is not certain to remedy constitutional problems. Doc. 4818 at 21–25. Twenty years into its receivership, California has not achieved full compliance. *Id.* at 22. Staffing shortages persist. *Id*. at 24. California's inmate mortality rates are higher than Arizona's, overdose rates are up, and despite a one-half drop in California's total inmate population, its annual inmate healthcare budget is up 353%. *Id*. at 21, 23–24.

Finally, the Supreme Court has taken pains lately to warn courts away from ambitious equitable remedies with no grounding in traditional equitable principles. *CASA*, 606 U.S. at 856. The Judiciary Act of 1789 does not expressly authorize a federal court to transfer authority over a distinctly sovereign function to a private individual. Neither does the PLRA. That underscores why courts must be cautious when imposing receiverships, and make sure that they exhaust every other available option before imposing the most extreme remedy. The district court erred by not adopting this cautious, last-resort approach.

## II. Absent a stay, the Department will suffer irreparable harm.

"[I]rreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). ***First***, when a federal court gives a receiver control of a state function, "[p]rinciples of federalism and separation of powers

impose stringent limitations." *Lewis v. Casey*, 518 U.S. 343, 385 (1996) (Thomas, J., concurring). Thus, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *CASA*, 606 U.S. at 859 (internal citation omitted). Reflecting this concern, a receivership is reserved for "the most compelling circumstances," *Jerry M.*, 738 A.2d at 1213, because it is an assertion of federal control over an "inordinately difficult [state] undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 85 (1987). A receiver should not be allowed to assume control of Arizona's entire correctional healthcare system before this Court weighs in. *See Coleman v. Newsom*, 131 F.4th 948, 955 (9th Cir. 2025); *Parker v. Hooper*, 95 F.4th 231, 231 (5th Cir. 2024) (mem.); *United States v. Hinds Cnty. Bd. of Supervisors*, No. 22-60203 (5th Cir. Dec. 28, 2022), ECF No. 102-1.

***Second***, the costs of a receivership are not recoverable. "All costs incurred during the Receivership shall be borne by Defendants, including all the costs for establishing and maintaining the Office of the Receiver." APP011. Moreover, the district court gave the receiver authority over hundreds of millions in public funds, the ability to terminate and enter state contracts, and "[a]ll duties and authorities vested by law in the Director" of the Department. APP006. The State likely cannot recover the receiver's expenses, reverse all of the receiver's financial or contractual decisions, nor "recover the [] administrative time, resources, and costs expended in

complying with" the Appointment Order. *Parker*, 171 F.4th at 750. Allowing the receiver to assume control during the appeal will cause irreparable fiscal harm to the State. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("loss of money" is irreparable if it cannot be recovered). And this concern is amplified because the scope of the receiver's powers is at issue on appeal.

***Third***, transitioning the Department's healthcare system to a receiver will be disruptive by design. That disruption should not occur until this Court has reviewed these orders on the merits. Otherwise, there is a risk of two disruptive transitions—first to the receiver, and then another back to the Department.

**III. The balance of the harms and the public interest favor a stay.**

The third and fourth *Nken* factors merge when the government seeks a stay. *Nken*, 556 U.S. at 435. The public interest generally "lies with maintaining the status quo while the appeal is pending." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020). Doing so here will avoid multiple disruptive transitions in short order, which would be contrary to the public interest and even the interests of Arizona's inmates. Moreover, the Department's leadership is directly accountable to the public: Director Thornell was appointed by Governor Hobbs. Transferring control of a state function from these officials to a receiver before appellate review injures the public's interest in democratic accountability. *See CASA*, 606 U.S. at 861.

The balance of harms also favors Defendants. The federalism concerns at

issue require "federal courts of equity [to] exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Golden Gate Rest. Ass'n v. City of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) (citation omitted). Because this receivership "interfere[s] with a core constitutional power" retained by the State, reversal on appeal will not undo the "irreparable injury to the interests of the government and the public." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 994 (9th Cir. 2025). And denying a stay will increase the Department's costs, *see* APP011, which will necessarily divert "funds away from other important programs." *Horne v. Flores*, 557 U.S. 443, 448 (2009).

On the other hand, Plaintiffs face the harm of a delay in the appointment of a receiver. But that modest delay is entitled to only modest weight in the institutional-reform context, which progresses in years, not months. Moreover, Plaintiffs' asserted harm rests on an unsubstantiated premise: that a receiver can and will reach full compliance faster than Defendants. Such speculation cannot outweigh the concrete, irreparable harms to Arizona's interests that will occur absent a stay.

## CONCLUSION

The Court should stay the Appointment Order pending appeal.[2]

---

[2] Given the significance of these issues, Defendants respectfully request oral argument on this Motion, whether in person or virtually, if it would assist the Court.

Respectfully submitted this 12th day of August, 2026.

OSBORN MALEDON, P.A.

By s/ Andrew G. Pappas
Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Kimberly I. Friday
Daniel Bowman
2929 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

OFFICE OF THE ATTORNEY GENERAL
Joshua D. Bendor
Luci D. Davis
2005 N. Central Avenue
Phoenix, Arizona 85004

**Attorneys for Defendants/Appellants**

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

s/ Andrew G. Pappas
Andrew G. Pappas
Attorney for Defendants/Appellants

# APPENDIX
# TABLE OF CONTENTS


| Doc. No. | Description | Page Nos. |
|---|---|---|
| 5307 | Order Appointing Receiver (July 7, 2026) | APP002 – APP016 |
| 5123 | Order Granting Motion for Receiver (Feb. 19, 2026) | APP017 – APP144 |
| 1185 | Stipulation (Oct. 14, 2014) | APP145 – APP213 |
| 4335 | Order Granting Prospective Relief (June 30, 2022) | APP214 – APP413 |
| 4410 | Order and Permanent Injunction (Apr. 7, 2023) | APP414 – APP480 |
| 5330 | Order Denying Motion to Stay Pending Appeal (Aug. 5, 2026) | APP481 – APP484 |

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, et al.,<br>Plaintiffs,<br>v.<br>Ryan Thornell, et al.,<br>Defendants. | No. CV-12-00601-PHX-ROS<br>**ORDER** |

## I. Appointment of the Receiver

On February 19, 2026, this Court granted Plaintiffs' Motion for a Receiver finding the appointment of a Receiver to assume control of the delivery of health care services to the class of prisoners in the custody of the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) was required to conclusively eliminate the constitutional violations within ADCRR of health care pertaining to the class members.[1] (Doc. 5123.)

Both parties proposed the appointment of Ms. Annette Chambers-Smith. The Court conducted an interview and requested the Parties and the Monitors to conduct due diligence regarding the appointment. The interview and due diligence are complete. (*See* Docs. 5218; 5256, 5260.) Accordingly, the Court will appoint Ms. Annette Chambers-Smith as the Receiver.

Defendants have represented they intend to appeal the appointment of the Receiver.

[1] References to health care include only medical and mental health care.

*See Jensen v. Thornell*, CV 26-1746, Dkt 9.1 (9th Cir. May 21, 2026) ("Defendants-Appellants . . . anticipate appealing from a[n] . . . order . . . appointing a receiver and defining the receiver's powers and duties."). It appears Defendants also intend to seek a stay of the appointment pending appeal. The Court will delay the effective date of the Receiver's appointment pending resolution of a motion to stay if filed. If Defendants opt not to seek a stay, Defendants shall file that notice within five days of the date of this Order.

The Court ordered the parties to address "the proposed duties, powers, and authorities of the Receiver, [including] how each proposal will extend as far as[,] but no further than[,] necessary to correct Defendants' constitutional violations." (Doc. 5123 at 83.) The Court has evaluated the recommendations of the parties, and resolved what authorities, responsibilities, and duties are essential for the Receiver to accomplish the objectives of this Receivership. They are narrowly drawn and extend no further than necessary to remedy the ongoing constitutional violations and are the least intrusive means to correct the ongoing constitutional violations. *See* 18 U.S.C. § 3626(a)(1)(A).

## II. Authority, Duties, and Responsibilities of the Receiver

During this multi-year, interminable litigation, the Court has identified entrenched systemic failures in Defendants' administration of health care to the Plaintiff class, "including (1) chronic understaffing and failure to enforce contractual provisions with the third-party vendor, (2) the persistence of nurse driven care and inappropriate assignment of complex patients to advanced practice practitioners instead of physicians, (3) failures in the referrals process, (4) data collection and reporting failures, and (5) inadequate resources, including funding and facilities." (Doc. 5218 at 2-3.) Accordingly, the Court found that only a Receiver with the powers and authority necessary to address each of the systemic failures would adequately remedy the failure of health care. (*Id.*)

The Receiver's authority, duties, and responsibilities to administer and manage ADCRR's health care system to ensure constitutional health care for the class members are what follows.

### a. Leadership and Management

The Receiver shall provide leadership and management of the health care system including overseeing, supervising, and directing all ADCRR employees and contract personnel who perform administrative, financial, accounting, contractual, legal, and other operational functions required to ensure constitutional health care is provided to class members. In exercising these responsibilities, the Receiver may consult with the Director of ADCRR, and all relevant and knowledgeable ADCRR employees and contract personnel.

**b. Development and Implementation of Operational Plan**

1. Within 180 days of the effective date of the Receiver's appointment, the Receiver shall prepare and file the "Receiver's Operational Plan" (the "Plan") designed to remediate ADCRR's unconstitutional health care identified in all of the Court's Orders, and address the constitutional violations identified in the June 30, 2022 Order and Findings of Fact and Conclusions of Law (Doc. 4435). The Plan shall consider the compliance criteria set forth in the April 7, 2023 Order and Permanent Injunction (Doc. 4410), the March 31, 2025 ADCRR Health Care Staffing Analysis and Plan (Doc. 4963), the February 19, 2026 Order granting this Receivership (Doc. 5123), and the May 15, 2026 SNU and IPC Health Care Staffing Analysis and Plan (Doc. 5230).

2. The Plan shall address the findings of the Court Monitors and include a proposed schedule for completion and resolution of all identified solutions and remedies with measurements and gauges by which to periodically evaluate ADCRR's progress and success. Throughout the Receivership, the Receiver shall report ADCRR's benchmarks and milestones and modify the Plan as deemed essential and required by the Receiver and the Court to achieve the objectives.

3. Pending the final draft and implementation of the Plan, the Receiver shall initially implement short-term measures essential for immediately improving critical health care issues and begin the process of restructuring, developing, and implementing the constitutionally adequate health care system.

**c. Budgeting and Accounting**

On an annual basis, the Receiver shall establish the budget required for all ADCRR health care for the class members. The Receiver shall engage in essential efforts to secure adequate funding in consultation with Plaintiffs and Defendants, the Governor, and the Legislature, including their designated representatives. Consistent with the reporting requirements of II.d.ii below, the Receiver shall establish a calendar for periodically reporting to the Court the status of the ADCRR health care budget, including recommendations, and shall take all necessary steps to ensure transparency and accountability of budget information.

**d. Reporting**

**i. Permanent Injunction Audits**

Monthly audits of all Permanent Injunction requirements are not required of the Receiver. Rather, the frequency of such audits shall be determined by the Receiver with Court approval and based upon an assessment of (1) the significance of each requirement, (2) the time, resource, and costs of monitoring each requirement, and (3) the history of performance or failure of performance for each requirement. While no single factor dominates, the third factor is paramount.

**ii. Reports to the Court**

The Receiver shall file annual reports with a detailed analysis of the progress of ADCRR in resolving the unconstitutional health care of the class and achieving the requirements of the Plan. And as deemed necessary by the Receiver or the Court, the Receiver shall file additional reports with the Court. These reports shall include (a) the successes and failures achieved in implementing the Plan, including anticipated dates for completion of each requirement of the Plan, (b) the obstacles or impediments to implementing the Plan, and identifying any issue that has interfered with compliance, including but not limited to pinpointing individuals, agencies, or entities responsible for impeding compliance, (c) identification of the required expenditures, with detailed explanations, and (d) all other issues required to allow the Court's analysis, review and approval of the progress made regarding the Plan. The Receiver shall meet with the Court

following the issuance of each report and shall maintain direct communication with the Court throughout the Receivership.

### III. Powers and Authorities of the Receiver

#### a. General Powers

1. All duties and authorities vested by law in the Director of ADCRR relating to the health care of the class members as set forth in A.R.S. § 41-1604 and A.R.S. § 31-201.01 and other governing laws and regulations shall be vested in the Receiver. The Receiver's authority, actions, and decisions shall be subject to review of the Court.

2. All duties and authorities of the Director of ADCRR relating to the health care of the class members are enjoined for the duration of the Receivership. Upon termination of the Receivership, those duties and authorities shall be restored to the State and the Director. However, the Director is authorized to confer with the Receiver where the Receiver determines assistance would be advantageous to fulfilling her responsibilities.

#### b. Dental Care

The Receivership applies to medical and mental health care. However, a clear boundary distinguishing dental care from health care is often not possible in the prison context, particularly regarding contracts outsourcing health care. When this occurs, the Receiver and Director of ADCRR shall engage in efforts to collaborate to resolve the ambiguous dental issues that constitute health care. If the Receiver and the Director are unable to resolve such issues, they shall jointly advise the Court in writing with notice to Plaintiffs and Defendants, and the Court will determine the appropriate and best resolution.

#### c. Specific Authorities

Without diminishing the Receiver's broad authority set forth in paragraph III.a above, the Receiver shall have the specific authority to exercise the functions that follow, as deemed necessary to fulfill the Receiver's responsibilities and objectives under the Plan.

##### i. Personnel

1. The Receiver shall have the authority to hire, fire, suspend, supervise, promote, transfer, discipline, and establish compensation for all ADCRR employees and

contract staff who perform services related to the health care of class members. This includes implementing additional personnel policies and creating, abolishing, or transferring positions related to the health care of class members. *See* A.R.S. § 41-1604(A)(2),(B)(2)(a-d).

2. The authority includes utilizing all employees presently working within, or assigned to, ADCRR Health Services Division, and these employees shall remain in their positions within the Health Services Division as the Receiver determines they are essential for ensuring the constitutional health care of the class. This includes data collection, contract oversight, and coordination of health care to class members.

3. The Receiver shall have the authority to issue instructions to ADCRR employees and contract staff who perform services relevant to the delivery of health care to class members. Custody employees and staff are excluded from the Receiver's authority unless determined essential to the provision of adequate health care and administration of the Plan. The Receiver shall consult with the Director of ADCRR before finding custody employees and contract staff are within the Receiver's authority over health care for the class and the Plan. If the Receiver and the Director disagree, the Receiver shall seek resolution by the Court.[2] In resolving the issue, the Court will consider input from both Plaintiffs and Defendants and will determine the least intrusive and least disruptive means of providing adequate constitutional health care.

**ii. Policies and Procedures**

1. The Receiver shall formulate additional essential ADCRR policies and Department Orders, procedures, protocols, systems, and practices in accordance with the Plan as relevant to the health care of class members and necessary to establish and ensure adequate constitutional health care. *See* A.R.S. § 41-1604. As mandated by law, the Receiver shall "be responsible for the overall operations and policies of the department"

---

[2] It is contemplated the Receiver may supervise custody staff if, for example, the staff provide on-site escort and off-site transportation to and from health care activities. Past barriers to provision of health care regarding on-site escort and off-site transportation by custody staff have been identified by the Monitors and the Court. (Doc. 4968 at 27.)

related to the health care of class members, A.R.S. § 41-1604(A)(1), and "responsible for the development of policies and programs that shall be recommended to the Governor and the Legislature." A.R.S. § 41-1604(A)(5). The Receiver may "adopt rules to implement the purposes of the department and the duties and powers" of the Receiver. A.R.S. § 41-1604(B)(1).

2. The Receiver shall not be responsible for maintaining security at ADCRR. However, the Receiver shall formulate and implement procedures to provide the necessary and adequate security and control of prisoners that pertains to implementation of the Plan and that are required to maintain the health and safety of the class members.

**iii. Budgeting**

The Receiver shall be responsible for formulating and establishing the annual ADCRR health care budget that ensures the provision of constitutional health care to class members and shall have all authority vested by law in the Director of ADCRR relating to the financing of the prison health care system.

**iv. Contracts**

1. The Receiver shall have the authority as vested in the Director of ADCRR of all ADCRR's health care vendors. This includes the authority to negotiate, enforce, terminate, or renegotiate contracts related to the health care of class members in accordance with law and as necessary to achieve the objectives and requirements of the Plan, the provisions of the Permanent Injunction, and all other relevant Orders. *See* A.R.S. § 31-201.01(D) (The Director "shall provide medical and health services for the prisoners" and "may contract for professional services to assist the Director in carrying out this responsibility.").

2. The Receiver shall provide the Director of ADCRR and the Department of Administration with 30 days' notice before the Receiver implements an amendment to an existing contract or approves a new contract that may impact indemnification or insurance requirements. In an emergency, the Receiver shall provide the Director and the Department of Administration reasonable notice of not less than five days, before

implementing such action regarding contracts.

**v. Property, Equipment, and Tangible Goods**

The Receiver shall have the authority to manage, acquire, dispose of, increase, modernize, repair, and lease property, equipment, and other tangible goods relevant to the delivery of health care to class members. Upon request of the Receiver, ADCRR is required to assist in rectifying all issues relevant to property management, including installation and operation of such property. The Receiver shall work with ADCRR to ensure the allocation of sufficient space for class members to receive clinically appropriate health care and for health care staff to perform services related to the health care of class members. *See* A.R.S. § 41-1604(A)(2).

## IV. Office of the Receiver

### a. Compensation

The Receiver shall be compensated a salary of $500,000 annually.[3] The Receiver may seek the reasonable cost of living adjustments each year, and if the Receiver is granted increases, the Court will apply the Administrative Office of the United States Court's policy and Cost of Living Adjustments as the reference to determine the reasonableness of a request. If the Receiver is removed or resigns during the year, the amount of the salary will be prorated to the portion of the year completed prior to the end of the Receiver's contract for that year. If the Receiver does not reside in or near the Receiver's Office, she

---

[3] "It is settled . . . that a federal court appointing a receiver 'has full power to fix the compensation of such receiver.'" *Coleman v. Newsom*, 2:90-CV-0520 KJM SCR P, 2025 WL 1163350, at *3 (E.D. Cal. Apr. 22, 2025) (quoting *Drilling Exploration Corp. v. Webster*, 69 F.2d 416, 418 (9th Cir. 1934)); "A receiver's compensation must be 'reasonable.'" *Id.* "The court considers several factors in determining the receiver's compensation, including the benefits obtained by the receiver's work, the time and skills needed for 'proper performance' of the duties imposed 'and their fair value, measured by the common business standards; and the degree of activity, integrity, and dispatch with which the work of the receivership is conducted.'" *Id.* (quoting *Walton N. Moore Dry Goods Co. v. Lieurance*, 38 F.2d 186, 192 (9th Cir. 1930)). The Court has considered the salaries in other cases, the "great, if not incalculable" benefits to be derived from the Receiver's work, that the Receiver will not receive benefits, and the complexity of the task required of the Receiver. Thus, the Court finds the salary to be reasonable.

will be personally responsible for the costs of lodging in or near the Receiver's Office as well as travel to and from her permanent residence.

**b. Office and Staffing**

1. The Receiver shall establish the Office of the Receiver and shall have the authority to hire staff and consultants for discharging the duties and mandates of the Plan and this Order. The Receiver shall establish, with approval of the Court, reasonable compensation and terms of service for each member of the Receiver's staff. And the Receiver is authorized to enter into contracts with staff and consultants.

2. In order to facilitate the Receiver's duties and authorities, ADCRR and the Department of Administration shall work with the Receiver to obtain sufficient office space within ADCRR's operations center/headquarters, technological infrastructure, and Information Technology programming and software support. Sufficiency and suitability will be determined by square footage, location, and unity, *i.e.* space is deemed sufficiently suitable if the square footage, proximity to key ADCRR operations, and ability to maintain a physically unified operative space, ensure adequate performance of the Receiver's responsibilities pursuant to the Plan.

**c. Financial Operations and Reporting**

1. Within 30 days of appointment, the Receiver shall create an interest-bearing account, with the Receiver as the signatory and fiduciary. The Receiver may appoint a qualified person to perform this function when necessary. This account shall be designated the "Receiver's Office Fund Account" and shall be maintained solely for the reasonable and necessary expenses incurred and related to the functions and responsibilities of the Office of the Receiver, including, but not limited to, salaries, consulting fees, supplies, equipment, office space, transportation, and travel. The Receiver shall, jointly with Defendants, create a system for regular replenishment of the Receiver's Office Fund Account.

2. Within 60 days of appointment, the Receiver shall establish a budget for the Office of the Receiver for the first year of operation and shall propose a budget for each

subsequent year of operation, which will be due 90 days prior to the budget year. Throughout the Receivership, the Receiver shall include in each report required by this Order an accounting of all receipts and expenditures including the Receiver's Office Fund Account, and shall initiate an independent financial audit of the Receiver's Office Fund Account on an annual basis.

**V. Additional Terms of the Receivership**

**a. Costs**

All costs incurred during the Receivership shall be borne by Defendants, including all the costs for establishing and maintaining the Office of the Receiver.

**i. Initial Costs**

Because time is of the essence for implementation of the Plan, the Receiver shall, within 30 days of the effective date of appointment, submit a proposed order to the Court authorizing payment to the Receiver of the funds essential for establishing the initial operating fund for the Office of the Receiver. After the Court's approval, those funds shall be deposited in the Receiver's Office Fund Account established by Section IV(c) above.

**ii. Use of Contempt Funds**

Pursuant to agreement of Plaintiffs and Defendants, the funds assessed as a consequence of the findings of contempt during this litigation, and currently held by the Court, may be used as additional funding to support the Receiver in the execution of her duties. As of the date of this Order the available funds are estimated as approximately $2.2 million. The Receiver shall seek a Court Order for the release of funds as required to supplement the operation of the Plan.

**b. Access**

1. The Receiver and the authorized staff of the Receiver shall have unrestricted access as necessary for the Receiver to conduct a fiscal analysis and the Receiver shall have access to relevant records outside the ADCRR to accomplish this function.

2. The Receiver and the authorized staff of the Receiver shall have unrestricted access to all ADCRR facilities, with or without notice, as deemed necessary by the

Receiver to accomplish the Receiver's responsibilities pursuant to the Plan and this Order.

3. The Receiver shall have access to governmental records, *e.g.* records maintained by AHCCCS and all others as necessary for the Receiver to conduct a fiscal analysis and the Receiver shall have access to relevant records outside the ADCRR to accomplish this function.

**c. Ex Parte Communication**

The Receiver and the Receiver's authorized staff shall have authority, equal to that of the Monitors, to communicate ex parte and confidentially (without the presence of counsel) with all parties and each party's legal representatives, and with the Court and the Monitors.

**d. Subclass**

The Receiver shall not be responsible for monitoring Defendants' compliance with the provisions of the Injunction addressing relief for prisoners in isolation (paragraphs 19 through 31 of the Injunction) nor shall the Receiver exercise authority over ADCRR's custody operations related to the Subclass. Monitor Scott Frakes will continue his responsibilities regarding the Subclass and continue reporting to the Court.

**e. Governing State Laws, Regulations, and Contracts**

The Receiver shall endeavor to perform all responsibilities and duties in accordance with Arizona state laws, regulations, and contracts. If the Receiver determines compliance with state laws, regulations, or contracts will interfere with, or preclude, the Receiver from ensuring the provision of constitutional health care to class members or will otherwise inhibit the Receiver's fulfillment of the requirements of the Plan and this Order, the Receiver shall request the Court waive compliance with those laws, regulations, and contracts.[4] Upon receipt of any such request, the Court shall solicit input from Defendants

---

[4] This Court's expert in 2019, and again in 2025, identified two state laws as persistent barriers to provision of constitutional health care in the Arizona state prison system: (1) The law requiring the privatization of correctional health care, and (2) the law capping specialist compensation. *See* H.B. 2010, 49th Leg., 3d Spec. Sess. (Az. 2009); Ariz. Rev. Stat. § 41- 1608; Doc. 4755 at 22, 26-27 (Dr. Stern's 2025 report); Doc. 3379 at 102, 104-08 (Dr. Stern's 2019 report).

and Plaintiffs before rendering a decision.

**f. Immunity and Indemnification**

Defendants shall unconditionally defend and indemnify the Receiver and the Receiver's personnel, including but not limited to all personnel involved in the operation of the Office of the Receiver, in any litigation, causes of action, claims, liabilities, damages, losses, costs and expenses (including reasonable attorneys' fees and expenses), brought against the Receiver and/or the Receiver's personnel regarding activities arising out of, or conducted in the course of the Receiver's official duties and the operation of the Office of the Receiver. *See* A.R.S. § 31-201.01(F).

**g. Monitoring**

Upon appointment, the Receiver shall assume and undertake all authorities, duties, and responsibilities of ADCRR to provide health care to the class members and ensure compliance with the Permanent Injunction, including those duties of the Monitors, except as noted in paragraph V(d) above. The Receiver shall engage the assistance of the Monitors for a period of 6 months from the effective date of the Receiver's appointment. This period may be extended as the Receiver determines will be useful and is warranted.

**h. Length of Receivership**

1. The Receivership shall extend for five years. Due to the protracted history of this litigation and the substantial findings of the unconstitutional health care, this estimate may be too generous, and it shall be extended as necessary.

2. Any party is authorized to request the Court replace the Receiver for cause. The Court shall afford both parties the opportunity to be heard, and if the Court determines a change in the Receiver is warranted, the parties shall be authorized to recommend replacement candidates.

3. The Receivership was ordered by the Court as a last resort, and the Court in this Order has established the authorities of the Receiver with the utmost caution. The Court is in full alignment with the legal principle that a Receivership will not extend beyond what is essential to accomplish constitutionally adequate health care for the class. *See* 18 U.S.C.

§ 3626 ("Prospective relief shall not terminate if . . . that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation"); *see also WB Music Corp. v. Royce International broadcasting Corporation*, 47 F.4th 944, 953 (9th Cir. 2022) ("The decision on whether to terminate a receivership turns on the facts and circumstances of each case, including any relevant equitable considerations") (quoting 65 Am. Jur. 2d Receivers § 94 (2022)). Prior to a proposed order terminating the Receivership, the Receiver shall prepare a recommendation, supported by facts and data, in favor of or against termination and provide it to the Court.

4. The Court genuinely welcomes the eventual return to the State of Arizona of the operational control of the health care relating to the class members, upon a finding that the unconstitutional violations have been remedied and the unconstitutional health care existing in the State of Arizona prison system has ceased. The Receiver shall work closely with Defendants and the Director of ADCRR to develop effective leadership that generates and supports a seamless transition of health care operations back to ADCRR that will sustain permanent constitutional health care to all class members.

**i. Modification and Review**

This Order shall be modified upon request of the Receiver, or made to the Receiver, as required for the Receiver to accomplish the responsibilities and to effectuate the eventual return to ADCRR and the State of Arizona of the health care provided to the class members. The Receiver shall have the authority to recommend modification of the Receiver's Plan and the 2023 Permanent Injunction.

## VI. Cooperation

**a. General Requirements**

All Defendants and their employees, agents, and all persons acting under the direction Defendants, and their counsel, shall fully cooperate with the Receiver and the Receiver's staff, including promptly responding to all Receiver inquiries and requests and

Court orders. The Director of ADCRR shall cooperate and collaborate with the Receiver on all matters essential to the success of the Receivership, including securing funding, clinical and administrative space, adequate training of staff and contract workers, support of the custody staff necessary for providing constitutionally adequate health care, and ensuring, upon the termination of the Receivership, that ADCRR leadership is prepared and capable of adequately assuming control of all functions required to ensure adequate health care for the class members. Any person or entity interfering with the responsibilities and authority of the Receiver or who otherwise attempts to thwart the performance of the Receiver, pursuant to the Receiver's Plan and Orders of the Court, will be subject to a finding of contempt.

**b. Resolution of Budget Disputes**

Any time the Receiver determines the available funds in the fiscal year's ADCRR budget are inadequate to accomplish the Receiver's authorities and duties, the Receiver shall first consult the Director of ADCRR before notifying the Legislature and the Governor's Office of such deficiency. If the issue is not resolved, the Receiver or the Plaintiffs or Defendants may request resolution by the Court, which may prompt the Court to order the waiver of Arizona State laws, regulations, and contracts that interfere with the requirements and desired outcome of the Receivership.

**c. Notice**

Counsel for Defendants shall ensure Arizona state agencies are given prompt notice of this Order including the Governor's Office, the Joint Legislative Budget Committee, the Department of Administration, the State Personnel Board, and any other state agencies Defendants deem should be notified. Further, Defendants shall ensure all contractors, employees, and agents (including contract employees and staff) are given prompt notice of this Order. Defendants shall file documentation of their compliance with these notice requirements within 30 days of the date of this Order.

**IT IS ORDERED** Ms. Annette Chambers-Smith is appointed the Receiver in this case, effective 21 days following the resolution of any Motion to Stay.

**IT IS FURTHER ORDERED** the Receiver is authorized to and shall exercise and carry out the duties and authorities described herein.

**IT IS FURTHER ORDERED** if Defendants do not intend to seek a stay, they shall file such Notice within 5 days of the date of this Order.

Dated this 17th day of July, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Shawn Jensen, et al.,

Plaintiffs,

v.

Ryan Thornell, et al.,

Defendants.

No. CV-12-00601-PHX-ROS

**ORDER**

This litigation commenced almost 14 years ago. At the outset the Court engaged in a patient and comprehensive undertaking with the parties to find an agreed-upon solution to resolve the serious constitutional violations, which gave rise to the Joint 2014 Plaintiffs' and Defendants' Stipulated Agreement, also referred to as the 2014 Stipulation.[1] But within a short time, Defendants failed to abide by the Agreement. The violations persisted, and following a five-week trial in 2022, the Court issued extensive Findings of Fact and Conclusions of Law finding that there were pervasive and systemic unconstitutional violations in Defendants' provision of healthcare. Defendants chose not to appeal the Court's decision. Rather, they unreservedly agreed to abide by the terms and conditions of the Permanent Injunction jointly crafted by Defendants and Plaintiffs with the active participation of the Court and Court experts, who were selected and approved by Defendants, i.e., the Court Monitors (hereinafter referred to as "Monitors".)[2] Since

[1] The parties agreed to have the Honorable Magistrate Judge David Duncan preside over enforcement of the agreement.

[2] The Monitors include lead Monitor Dr. Marc Stern, board certified internist; Dr. Lara

agreeing to the injunction, Defendants have never been substantially compliant, have engaged in repeated, persistent violations, and the chronic unconstitutional prison healthcare has continued.

Before the Court is Plaintiffs' Motion for a Receiver (Doc. 4795.) All parties have submitted extensive briefing on the Motion. The Monitors provided comprehensive comments and opinions to which the parties fully responded. Oral argument was held on September 10, 2025.

To declare a government will not accept the constitutional responsibility to provide adequate healthcare is huge. Ordering the implementation of a receivership is extraordinary, and the Court has exercised caution and critical reflection in making the decision. But since the beginning of the case, the Court has forborne imposing the harshest penalties, opting instead to guide Defendants with the help of the Monitors towards comprehensive constitutional compliance. But now after nearly 14 years of litigation with Defendants having not gained compliance, or even a semblance of compliance with the Injunction and the Constitution, this approach has not only failed completely, but, if continued, would be nothing short of judicial indulgence of deeply entrenched unconstitutional conduct. Plainly, only the imposition of the extraordinary can bring an end to this litigation and the reasons it was brought. An end to unconstitutional preventable suicides. An end to unconstitutional preventable deaths. An end to unconstitutional failures to treat those in severe pain. The Motion for a Receiver will be granted.

## I. Background

Defendants operate ten prison complexes across Arizona. This action was filed in 2012 by a class consisting of all prisoners in Defendants' custody seeking healthcare and conditions of confinement in compliance with the Eighth Amendment of the United States Constitution. In March 2013, the Court certified the class of prisoners seeking injunctive relief in the form of constitutionally adequate medical, dental, and mental healthcare, and

---

Strick, board certified in Internal Medicine and Infectious Diseases; Dr. Bart Abplanalp, licensed clinical psychologist; Dr. Karie Rainer, licensed psychologist; and Donna Strugar-Fritsch, BSN, MPA, CCHP. *See* footnote 37 for further information.

a subclass of prisoners confined to their cells for more than 22 hours a day and subject to conditions including inadequate out-of-cell time, social isolation, inadequate nutrition, and inadequate mental health treatment.

In October 2014, the parties negotiated a settlement agreement, the Stipulated Agreement, which was approved by the Court in 2015 and was intended to resolve all claims. It contained 103 agreed upon healthcare and maximum custody requirements called Performance Measures, which, upon compliance, would free Defendants from monitoring and reporting (Doc. 1185) to establish the healthcare was constitutional.

However, what followed between 2015 and July 2021 were twelve motions, initiated by both the Court and Plaintiffs, to enforce the Stipulated Agreement, which were resolved against the Defendants. The Court held multiple, lengthy evidentiary hearings, status conferences, and issued dozens of Orders with clear guidance for mandating compliance with the Stipulation and the Constitution. Concomitantly, the Court issued three Orders to Show Cause why Defendants should not be held in contempt, appointed two investigative experts, and lengthy hearings were held to determine liability. Defendants were held in contempt twice, and ordered to pay millions of dollars in fines, which were upheld on appeal.[3]

Finally, after five years of refusals to comply; findings by the Court that Defendants' legal and factual theories were baseless; the imposition of substantial fines; threats of even more fees and sanctions; and the payment by Defendants of substantial attorney's fees, the Court rescinded the Stipulation and vacated the settlement under Rule 60(b) of the Federal Rules of Civil Procedure (Doc. 3921.) A fifteen-day bench trial followed (*See* Doc. 4335), and, in 2022, the Court issued a 200-page Order with Findings of Fact and Conclusions of

---

[3] "The Stipulation provides the district court the authority to 'enforce this Stipulation through all remedies provided by law,' subject to a few limitations. Ordering Defendants to comply with a specific subset of the Performance Measures they agreed to in the Stipulation is one such 'remed[y] provided by law,' namely, an Injunction requiring specific performance. We have previously upheld the district court's power to issue such Injunctions to enforce the Stipulation in this case." (Doc. 3577-1 at 15, Mandate of the Ninth Circuit Court of Appeals Case No. CV 18-16358 (alterations in original.))

Law identifying the same persistent, unconstitutional conduct by Defendants regarding healthcare, and housing certain prisoners in isolation. (*Id.*) The Court identified the overarching failures in the delivery of healthcare as seriously insufficient staffing, inappropriate use of nurses beyond the scope of their licensure, failure to manage complex patients or employ a differential diagnosis approach, substantially inadequate mental health treatment, and a deficient electronic health care record system. All these critical deficiencies were found to exist at every one of Defendants' complexes, rendering the healthcare delivery systemically unconstitutional.

Defendants chose not to appeal. Rather, they agreed to an Injunction that complied with the statutory limitations on injunctions addressing prison operations that was designed to end unconstitutional healthcare within Arizona's prisons. (Doc. 4335 at 180.) The parties proposed experts to assist with crafting the Injunction, and Dr. Marc Stern was strongly recommended by Defendants as "[dedicated] to the design, management, and operation of health services in corrections settings, [who would] provide this Court and the parties with valuable guidance in crafting an Injunction regarding the provision of medical care at ADCRR." (Doc. 4339 at 4.) It was uniformly agreed, and expressly by Defendants, that Dr. Stern's past work in this litigation uniquely qualified him to assist with drafting the Injunction requirements, and he was appointed.[4] (Doc. 4358 at 8.) Without objection, Dr. Stern's recommended additional experts for mental healthcare and custody conditions imposed on the subclass were also appointed.[5]

From January to March 2023, the Monitors, the Court, and Plaintiffs' and Defendants' counsel engaged in lengthy discussions; suggestions and objections were made and mutually resolved by both parties. (Doc. 4410 at 3.) Finally, a stipulated Injunction was filed with the Court by the parties with the tacit promise that compliance

---

[4] It is crucial to note Defendants recommended Dr. Stern despite his testimony in 2018 before Magistrate Judge Duncan reporting Defendants had serious problems that "precluded accurate monitoring" and that Defendants' poor compliance may actually "be worse" than what the experts found. (Doc. 3921 at 13.)

[5] The Court appointed Dr. Bart Abplanalp and John-Michael McGrath to assist Dr. Stern. (Doc. 4362.)

would bring an end to the system-wide unconstitutional healthcare and end the Court's involvement in the litigation. (Doc. 4402) The parties informed the Court:

> Since [the issuance of the draft Injunction], the parties have engaged in extensive negotiations with each other and the Court-appointed experts regarding the terms of the draft Injunction and **how best to expeditiously remedy the constitutional violations found at trial.** [*See* Doc. 4335.] **The parties are pleased to report that they have come to an agreement with each other and with the Court-appointed experts as to the terms of an Injunction**.[6]

(Doc. 4402 (emphasis added.)) On April 7, 2023, the Court signed the jointly agreed Injunction, stressing and underscoring the reasons that brought it about. (Doc. 4410 at 11-67.) The Court noted:

> **Defendants have fought every aspect of this case at every turn. Defendants entered into a settlement agreement where they claimed they would improve the care provided to prisoners. . . .Yet almost immediately Defendants failed to perform those obligations and continued in that failure.** Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage. During trial, Defendants presented arguments and witnesses that were manifestly unreliable and unpersuasive. And on some aspects, Defendants presented no meaningful defense at all. . . . **[T]rial established Defendants blatantly had not made any serious effort to remedy the flaws highlighted by this litigation.**

(*Id.* at 4-5 (emphasis added.))

To evaluate Defendants' performance throughout the Injunction, again with the mutual approval of the parties, the Court appointed the same experts to serve as neutral

[6] The parties agreed that "by filing this Stipulation [and if] the Court enters the Injunction attached as Exhibit A as an order of the Court, neither party will appeal the order, in whole or in part." (Doc. 4402 at 2.)

Monitors: Dr. Marc F. Stern[7] and Dr. Bart Abplanalp[8] (who had assisted in crafting the Injunction), Dr. Lara Strick,[9] and Mr. Scott Frakes.[10] The agreed fundamental imperative of the Injunction was that Defendants were required to monitor all elements of the Injunction on a monthly basis and make their findings available for inspection and analysis by the Monitors. (*Id.* at 7.) And, as also required by the Injunction, the Court appointed Dr. Stern and Ms. Donna Strugar-Fritsch to "conduct a staffing analysis and plan of health care positions at each location"[11] (*Id.* at 14.)

From the beginning, the mandate of the Injunction was that Defendants were to fill all required vacant staff positions. The Injunction expressly states, "increased salaries may be necessary to reach adequate staffing levels." (Doc. 4410.) Moreover, the Injunction anticipated the Staffing Plan would ultimately require hiring many more staff, and in particular, the Injunction required that vacant staff positions were to be filled no later than July 7, 2023. (Doc. 4445.) But on July 14, 2023, Dr. Stern sent a letter informing the Court that staffing as of July 7 was "markedly inadequate to meet the immediate requirements of the [Injunction]." (Doc. 4446 at 1.) This was a disturbing revelation in light of the June 2022 Findings of Fact Order in which the Court found one of the "core issues" was that

---

[7] Dr. Stern has been appointed as an expert pursuant to Rule 706 of the Federal Rules of Evidence to assist the Court in various aspects of this case since December 11, 2018. (*See, e.g.*, Docs. 3089, 3127, 3133, 4352.)

[8] Dr. Abplanalp has been appointed as an expert pursuant to Rule 706 of the Federal Rules of Evidence to assist Dr. Stern in addressing mental healthcare since May 30, 2019. (*See, e.g.*, Doc. 3269, 4362.) In April 2025, the parties stipulated to appoint Dr. Raner as a Rule 706 expert to assist with mental health monitoring. (Doc. 4859.)

[9] On March 17, 2023, the parties stipulated to appoint Dr. Lara Strick as a Rule 706 expert to assist the Court in monitoring Defendants' compliance with Injunction. (Docs. 4402, 4410.)

[10] On January 13, 2023, the Court appointed Scott Frakes as an expert pursuant to Rule 706 of the Federal Rules of Evidence to serve as an independent expert to the Court to address the maximum custody aspects of the Injunction, replacing former Rule 706 expert John Michael C. McGrath. (*See* Docs. 4381, 4362.)

[11] On May 9, 2023, Donna Strugar-Fritsch was appointed as a Rule 706 expert to assist in monitoring and performing a staffing analysis in compliance with the Injunction. (Doc. 4425.)

staffing levels "are so inadequate" that "the provision of constitutionally mandated care [was] impossible." (Doc. 4335.) In other words, within three months of the effective date, Defendants were already in violation of the Injunction. On July 20, 2023, the Court set an immediate hearing to develop a timeline for Defendants to achieve compliance, expressing alarm that "Defendants have been fully aware since at least January 9, 2023, they needed to begin hiring additional staff." (*Id.* at 1-2.)

On August 17, 2023, the Court held a status conference to address Defendants' staffing non-compliance, emphasizing, "there must be complete compliance with the Injunction to get the federal court out of the case." (Doc. 4469 at 4-5.) Plaintiffs pointedly expressed their concern regarding Defendants' failures but informed the Court they did not then intend to seek immediate sanctions. Plaintiffs reflected that Defendants appeared to be "making sincere" attempts to comply with the Injunction. (*Id.* at 5.) Defendants expressed solidarity with Plaintiffs, Dr. Stern, and his team, to reach compliance. However, it was also noted as very troubling that Defendants lacked, or at least failed to produce, critical information needed to discern exactly what staff existed and what was constitutionally required. (*See generally*, Doc. 4469.) However, it was clear, under any methodology, Defendants needed significantly more staff to achieve compliance with the Injunction and the Constitution.[12]

A follow-up status conference was held on December 1, 2023 (Doc 4510) where Plaintiffs' counsel repeated, without disagreement from Defense counsel, "I don't think there is any dispute about the fact that staffing in the prisons at the moment is grossly deficient."[13] (Doc. 4521 at 12.) Plaintiffs added their specific observations that while visiting Lewis Prison, it was obvious the significantly low staffing was impacting "patient care because there's no providers and not enough nurses to provide care." (*Id.* at 13-14.)

---

[12] Plaintiffs' counsel, the Monitors, and the Court also expressed strong concern about Defendants' excessive use of overtime and registry personnel in an attempt to meet staffing requirements, which were specifically prohibited by the Injunction. These temporary workers hired from healthcare employment agencies were specifically prohibited because of high turnover leading to significant risk to patients.

[13] Dr. Ryan Thornell, Director of ADCRR, was in attendance at this hearing.

Defendants provided a highly unacceptable response by first disavowing responsibility, repeatedly claiming the obligation for staffing was with the contractor, NaphCare. "We're not satisfied with the rate in which staffing has been increased. And we're continuing to put on---put on pressure on NaphCare to increase their hiring, to increase their salaries in order to successfully recruit and successfully retain good staff members."[14] (*Id.* at 8.) The most daunting revelation was Defendants' admission that existing staffing did not even meet the levels of the prior NaphCare contract, which required that at least 300 positions be immediately hired. This was appalling because the Court found in the June 2022 Findings of Fact that personnel at each of Defendants' facilities was "profoundly understaffed." (Doc. 4335 at 22.) Further, Defendants effectively admitted at trial in 2021 that their staffing levels were insufficient. (*Id.* at 24.) What is more, the evidence presented showed Defendants' former private contractor, Centurion, opined that even if all prisons were fully staffed under Defendants' calculation, such staffing would be insufficient to provide adequate healthcare. (Doc. 4335 at 22.)

Because of serious concerns about the nature and type of non-compliance with the Injunction, the Court ordered the Monitors to conduct an evaluation of Defendants' compliance and file a report early the next year. And on February 2, 2024, the Monitors filed the First Interim Report. Some very minor improvements in healthcare services were first noted, but otherwise the Monitors found Defendants "substantially noncompliant" and that Defendants' efforts to self-assess were totally "unreliable." The Monitors provided a written, detailed discussion of the specific deficiencies as they had done in response to the monthly reports and offered useful suggestions to Defendants for resolution. Of gravest concern, the report included comprehensive medical evaluations conducted by the Monitors of some patients, finding the patients had received very poor medical treatment, including a patient who committed suicide, which the Monitors deemed preventable and that occurred because of "wholly inadequate" care.[15] (Doc. 4539 at 15.)

---

[14] Precisely what pressure, if any, was ever brought to bear was never identified at the hearing or anytime thereafter.

[15] On February 2, at the joint urging of the parties because of the critical failure of staffing,

On February 16, 2024, Defendants filed a response to the Monitors report beginning with the astonishing complaint that "distinctively absent" was the Monitors' failure to provide Defendants with "a comprehensive plan of how to achieve compliance with the Injunction" or a "how-to guide." (Doc. 4553 at 2.) Such a bizarre undertaking by the Monitors was never contemplated by the Injunction or ordered by the Court.[16] Remarkably, despite having collaborated with the Monitors for well over a year, and having wholeheartedly recommended and approved them as highly competent, Defendants broadly and incomprehensively questioned whether the Monitors' opinions were too "subjective" and not "clinically appropriate." (*Id.* at 3-4.)

In contrast, Plaintiffs provided a very critical assessment of Defendants' quality of care: "Nearly one year after the courts issuance of the injunctive relief, and more than 18 months after it found the provision of medical and mental healthcare . . . violate the Constitution, the Court's monitoring team's Status report details widespread and substantial violations of the Injunction." (Doc. 4552 at 2.) Emphasizing the blatantly obvious, Plaintiffs added Defendants were already in violation of the Injunction:

> [The] failure to create a viable self-monitoring system, and inability to measure or demonstrate compliance, must be presumed to be noncompliance.

(Doc. 4552.)[17] Plaintiffs also declared Defendants did not deserve even the minor credit offered them by the Monitors.

---

the Court reluctantly granted the parties' Motion to Amend Section 1.16 of the Injunction to allow Defendants a very limited use of Registry and Agency staff to fill some portion of the full-time equivalent positions (FTE) in each job Category. (*Supra* footnote 12.)

[16] The total agreed upon fees and expenses paid to the Monitors for their work required by the Injunction is substantial. To date, the Monitors have cost in excess of $4 million on healthcare alone. Prior to agreeing to the specific parameters of the detailed Injunction, Defendants never indicated they required a tutorial as how they would comply. If the Monitors had also been ordered to undertake extensive tutoring to help Defendants achieve compliance, the cost to the Defendants would have skyrocketed. What is more, the Monitors informed the Court they readily offered oral or written training and assistance to Defendants, who expressed no interest in accepting it.

[17] Plaintiffs were specifically concerned: (1) Whether meaningful post-mortem plans were occurring; (2) that no English fluency assessments were being made; (3) with failures

In Reply, Defendants acknowledged the "excessive amount of time it has taken to obtain adequate healthcare staffing," but made the shocking argument that they should be excused because of Legislative "budget limitations," and offered "to submit a request for supplemental appropriation," but warned: "it might not be approved" and, worse yet, the "earliest the funds would be distributed (was) July 1, 2025," that is, one and a half years later. Finally, Defendants, in closing, made the startling request that the Court order non-party contractor, NaphCare, to increase salaries so Defendants could avoid "the necessity of engaging in the legislative budget approval process." (Doc. 4583 at 3-4.)[18]

On March 14, 2024, in advance of the next status hearing to assess compliance by the Defendants or to proceed with enforcing the Injunction, the Court, by Order, emphatically reminded Defendants that the Injunction had been in place for almost one year, and Defendants had not yet developed the fundamental and essential "mechanism for assessing compliance with 130 provisions." (Doc. 4570 at 1.) The Court categorically clarified the Monitors were never required to provide a "how-to guide" or train Defendants how to competently achieve compliance with the Injunction. And relying on the Monitors' reports and responses, the Court declared the healthcare system "remains fundamentally lacking, and the Monitor's report documents continued adverse outcomes that show

---

regarding specialty care; and (4) with lack of evidence supporting that mental health patients were not being placed in restraints.

[18] The Injunction terms and requirements were drafted and agreed upon, and presumably negotiated, in good faith by the Defendants, and then approved and ordered by the Court on April 7, 2023. (Doc. 4410.) The Injunction expressly states, "increased salaries may be necessary for Defendants to reach adequate staffing levels." (Doc. 4410.) And, if so, those increases by contract with NaphCare were explicitly to be borne by Defendants. (Docs. 4555; 4566; 4583.) At no time prior to the effective date of the Injunction was the Court informed by Defendants they were unable to, or unwilling to, comply with all terms of the Injunction for any reason, and particularly because funds were not, or would not be, available to ensure compliance. (*See also* Docs. 4555; 4410; 4583.) Defendants have been constantly reminded orally and in writing for the almost 14 years of this litigation of Ninth Circuit authority mandating "lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014.)

prisoners remain at risk." (*Id.*) Significantly, the Court made the express finding that Defendants were in violation of the Injunction because it mandated they "fill all positions required by the current contract with the healthcare vendor" no later than "July 7, 2023." (*Id.* at 2.) The Court voiced serious concern with Defendants' repeated ill-conceived requests that the Court engage in enforcing Defendants' contract with NaphCare by sanctioning NaphCare for not filling staff positions. Defendants were directed to the critical provision in the Injunction: "Defendants must comply with the Injunction and any disputes between Defendants and the private healthcare contractor are beyond the scope of the Injunction," and pointed to the very contract provisions with NaphCare that called for "staffing offsets/paybacks for unfilled hours of service" and the imposition of "monetary sanctions," and, of substantial significance, even "termination" of the contract if NaphCare failed to perform under the contract. (Doc. 4570 at 4.) This was to forcefully bring to Defendants' mind the abundant, viable contractual enforcement tools they had to force NaphCare's compliance with the Injunction and Constitution. And, most importantly, Defendants were warned if those remedies were not pursued, it would "be exceptionally difficult for Defendants to show they 'took *all* reasonable steps to comply with the [Permanent Injunction].'" *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016.)"[19] (Doc. 4570 at 4.) Finally, the Court warned of an Order to Show Cause why Defendants should not be held in contempt. (*Id.* at 2.)

On March 15, 2024, the Court held another hearing to determine if Defendants had reached compliance with the Injunction, and, if not, whether they were prepared to face the consequences. (Doc. 4581.) The Monitors, who had spent hundreds of hours evaluating Defendants' performance and engaging with Defendants to assist them with compliance, testified Defendants were plainly not in compliance and the healthcare they were providing was constitutionally deficient. (*See generally id.*) Again, the Monitors' greatest concern was the persistent understaffing and the numerous temporary positions, resulting in a lack

[19] Critically, the contract explicitly states: "NaphCare must "meet all federal and state constitutional amendments [and] court orders." (Doc. 4570.)



APP027

of continuity of care, and that the care was not patient-centered and lacked follow-up, particularly for those too sick to advocate for themselves. (*Id.*) Specifically, the Monitors reported from their review of documents and their many interviews of staff and patients, overall (1) documentation of care was "poor," (2) the electronic medical record had not been repaired, (3) there was a failure to pursue the fundamental change in the model of care which mandates "a patient centered model," and (4) because the prisons continue to be poorly staffed, it was impossible to reach that goal. (*Id.*) The Monitors called attention to some specific individual cases that demonstrated grave danger to prisoners. One patient was locked in a room without one-to-one monitoring; the patient was never allowed to leave his room and was always "on a mattress on the floor of his cell." (*Id.* at 24.) In mental health, there were patients who were too delusional and schizophrenic to be able to seek help through the telemonitoring system and confidential communications with patients were "nearly impossible." (*Id.* at 29-31) One patient committed suicide that likely could have been avoided, who had a known history of self-harm, but was only seen monthly, "cell-side," with a simple inquiry: "Are you okay?" The Monitor stated the "lack of care, in [his] opinion, likely contributed to [the patient's] death." (*Id.* at 47-48.) And it was reported there was an alarming "spate of suicides within the past several months." (*Id.* at 40.)

Plaintiffs reported they spent numerous hours evaluating healthcare compliance through conversations with staff and prisoners. Plaintiffs learned of reported failures to diagnose "serious problems," including cancer. Female prisoners stated they put in healthcare requests describing serious medical and mental health problems and received delayed and inadequate responses, such as "just drink more water." (*Id.* at 55.) And Plaintiffs reported those who complained of mental health problems were not given care. Rather they were advised "to go on suicide watch" in order to receive any type of individual care. (*Id.* at 56.)

Director Thornell offered a promise to attempt to "pressure" NaphCare to ensure it provided adequate salaries and adequate staffing to comply with the Injunction and the Constitution.[20] The Court addressed Director Thornell:

> THE COURT: And you're going to hear this again as long as—until it's solved, and you've heard it before. Have you discussed or considered increasing staff, increasing salaries? As you know, that is the footprint we've had as a problem in this case. And you know that, Director Thornell. Right?"
>
> DIRECTOR: "Yes, Your Honor, and we discuss it."
>
> THE COURT: "So you've heard it. Focus on staff, salaries, either within the contract you have now or whatever you're going to do in the future."
>
> DIRECTOR: "Yes, Your Honor."
>
> THE COURT: "Have I made myself clear?"

(*Id.* at 80.)

Plaintiffs and the Court accepted the Director's promise, and the Court again resisted imposing contempt sanctions, but warned continued failures would prompt severe consequences. (*Id.*) The parties agreed to attempt to offer the Court a stipulated order mandating Defendants comply with the Constitution by forcing NaphCare to provide full staffing and higher salaries. But a joint stipulated order was never filed. Rather, Defendants again advanced the startling proposal, contrary to law, that the Court issue an order that expressly mandated the Defendants order NaphCare to "pay wages in accordance with the contract if vacancies continued."[21] The Court flatly rejected the unwarranted request.

---

[20] Again, no further details were ever provided to the Court as to what measures were taken to ensure NaphCare's compliance other than Director Thornell mentioning sending "multiple letters" to NaphCare. (Doc. 4602.)

[21] NaphCare filed a Motion to Intervene, boldly claiming it had "significantly improved the healthcare system." Because the Motion was untimely, it did not meet the procedural requirements, and NaphCare implied it had no obligation to comply with the Injunction and thereby the Constitution, it was denied without prejudice, and never refiled. Particularly appalling was that Defendants did not object to the motion despite NaphCare's claim that NaphCare had significantly improved the healthcare system and NaphCare's

On April 18, 2024, the Court issued another order regarding Defendants' failure to address the lack of adequate staffing and reminded Defendants of the obligation to determine if NaphCare was in violation of the contract and, if so, to proceed to enforce it. (Doc 4602.) On April 16, 2024, Dr. Stern and Ms. Strugar-Fritsch submitted the ADCRR Health Care Staffing Analysis and Plan required by the Injunction, definitively establishing the staffing necessary to comply with the contract and the law and calling for significant increases.[22]

On May 16, 2024, the Court held the final status conference of the year, where the proposed staffing plan was discussed[23] (Doc. 4634), and the Monitors recommended a Pilot Project to thoroughly test the findings, stating: "We proposed shifting from a hundred percent implementation [of the staffing plan.]" (Doc. 4634 at 27-28.) The Pilot Project was designed to allow Defendants to evaluate and report to the Court precisely how significant of a staffing increase was necessary, and what specifically would be required for the statewide implementation of staffing. (*Id.* at 107.) Plaintiffs favored and endorsed the Pilot, and Defendants tentatively agreed, but demurred, again, complaining of lack of funding. In particular, Defendants stated "we're operating at a significant deficit . . . . Because for this fiscal year they're already many millions of dollars over budget because of the Injunction and the healthcare and the NaphCare contract."[24] (*Id.* at 112.) At the close of the hearing, the Court declared that after a careful review of "all of the paragraphs of the Injunction, it is likely 75 percent of them have been violated . . . the State is already clearly

---

statement that though it did not intend to relitigate the Injunction, it fully intended to engage in "tinkering" with provisions of the Injunction such as "staffing levels" in clear violation of the Injunction.

[22] The Plan was developed after "extensive collaboration and coordination with the Monitoring team . . . site visits to three complexes, consultation with Plaintiffs and Defendants including extensive consultation with the ADCRR Health Services Division, and conversations with NaphCare Facility Health Administrators, providers, mental health leads, and others." (Doc. 4599.)

[23] Director Ryan Thornell was in attendance.

[24] Defendants continued: "Well, here's the problem, Your Honor, we don't have the money to do this. It would require a new contract with NaphCare. It would require approval of the JLBC." (Doc. 4634 at 118.)

in violation of the Injunction." (*Id.* at 123-24.) Defendants did not respond. However, the Court opted to forgo issuing an order to show cause until the Pilot was completed because of the parties' joint agreement to implement the Pilot.

On June 3, 2024, with the agreement of all parties, the Court ordered implementation of the Pilot Project, but expressed serious concerns regarding Defendants' ongoing failure to aggressively undertake the dramatic improvements required by the Injunction:

> Finally, the Court notes its concern that over one year after the Permanent Injunction was issued and two years since entry of the Court's Findings of Fact and Conclusions of Law, much of the briefing regarding the staffing plan reflected Defendants' continued resistance to meaningful efforts to increase staffing to achieve constitutional levels and avoid catastrophic outcomes. At this point, **Defendants have admitted more staff is necessary and it is difficult to view their behavior as anything other than attempts to delay issuance of a statewide staffing plan. The Court's patience has run out**. **Too many individuals are needlessly suffering while Defendants have deployed many delay tactics. Defendants shall immediately establish the Pilot program and in a subsequent Order, Defendants will be required to establish they have taken all reasonable steps to comply with the Permanent Injunction.**

(Doc. 4637 at 8 (emphasis added).) The Court also traced Arizona's decades long history with numerous private healthcare companies' failure to provide adequate staffing and healthcare in accordance with the Constitution. The Court stated the jointly agreed-upon Injunction was intended to resolve understaffing and incompetent staffing by requiring Defendants to immediately fill the positions and Defendants refused. However, both Plaintiffs and the Court decided against urgently pursuing sanctions because Defendants promised they were committed to filling positions and engaging in the Pilot in good faith. The Pilot was initiated at two units selected by Defendants.[25]

On September 25, 2024, the Monitors filed their first Pilot report, stating Defendants

---

[25] The Arizona State Prison Complex–Yuma, Dakota Unit (Dakota), and the Arizona State Prison Complex–Perryville, San Carlos Unit (San Carlos).

showed a lack of will and no commitment to success. (Doc. 4681.) On October 7, 2024, Plaintiffs specifically identified numerous failures by Defendants to comply with the Pilot, including the failure to hire any of the critical positions, and to backfill those borrowed for the Pilot, and the failure to provide sufficient space. Plaintiffs reluctantly recommended the Pilot continue, but requested the Court consider imposing severe financial sanctions against Defendants for their substantial violations of the Pilot, and order full briefing on other remedies, including appointment of a receiver and declaring unconstitutional the privatization of prison healthcare. On November 15, 2024, a second Pilot report from the Monitors showed Defendants continued to resist and plainly refused to engage in good faith implementation of the Pilot (Doc. 4700.)[26] The Court declared once the Pilot concluded, the Court would order comprehensive briefing on all possible sanctions and appropriate remedies against Defendants. (Doc. 4699.)

In early October 2024, Monitor Dr. Abplanalp informed the Court of an investigation of a cluster of suicides and filed a report on October 17, 2024, revealing staggering deficiencies in Defendants' mental healthcare delivery. Not only were numerous specific Quality Indicators of the Injunction violated, but Dr. Abplanalp concluded if Defendants had adhered to the requirements in the Injunction, "it would have decreased the probability of, if not prevented, these deaths." (Doc. 4691.) Further, he emphasized the flaws were the same as those he had frequently observed since his evaluation began in April of 2023.[27] Defendants attempted to refute the Monitor's evaluation with the

---

[26] In particular, the Patient Centered Care Model ("PCCM") Pilot operations were indefinitely suspended at San Carlos; in short, Defendants unilaterally abandoned the Pilot at San Carlos. (*Id.*) The experts noted the project required additional space to be successful, and that allocating this space was the "highest priority," but Defendants refused. (Doc. 4800.)

[27] It was reported that one suicide patient had auditory hallucinations that did not prompt Defendants to consider undertaking a prompt comprehensive evaluation. Another patient's father called the day before the suicide and informed Defendants his son was not receiving medication and was in distress, but no action was taken. A third suicide patient had previous diagnoses of schizophrenia, antisocial personality disorder, psychosis, and anxiety disorder, but no record of a comprehensive mental health evaluation existed.

dismissive comment "they do not tell the full story," and offered beyond-the-pale excuses for their failures to comply with the Quality Indicators required by the Injunction that were designed to save lives. (Doc. 4818 at 11-12.)

On January 7, 2024, the Monitors filed the Second Interim Report dated December 20, 2024, reflecting evidence gleaned and analyzed since their work began on April 7, 2023. (Doc. 4755.)[28] The Monitors acknowledged improvements in the conditions of confinement for the subclass, but found the delivery of all healthcare was "poor" with little improvement since the Injunction became effective, placing prisoners at "significant risk of serious harm, including death." (*Id.* at 2.) And in fundamental violation of the core principle of the Injunction, they found advance practice practitioners—nurse practitioners and physician assistants—were still caring for the complex and emergency medical patients that mandate care by physicians. Further, there were numerous mentally ill patients still not receiving treatment necessary to ensure their safety. And still, over 100 positions that were compelled by the prior and existing contract with NaphCare had not been filled, reflecting lack of fundamental compliance with the Injunction. The Electronic Health Records ("EHR") were still "poorly adapted," thousands of consultations with off-site specialists were delayed, and "virtual visits [were] rampant." The report concluded in summary: "And patients are dying." (*See generally id.*)

In addition to the cluster of five suicides Monitor Dr. Abplanalp reported in October 2024, another, more recent suicide was identified and determined to have been "likely avoidable" because the patient had received incompetent care. And the Monitors identified four recent, newly discovered non-suicide related deaths that were determined to have been caused by "serious and pervasive systemic health care delivery failures." The report

[28] Significant reliance by the Monitors was always placed on Defendants' self-evaluations, Defendants' documents, including electronic health records, complaints by prisoners, concerns submitted by everyone involved, conversations with staff and Plaintiffs' attorneys, and site visits. Generously, the Monitors made mention of the efforts and devotion of the front-line and supervisory staff. The "systems are broken" but "they try hard" and have been "asked to do something beyond their capabilities or outside their expertise." (Doc 4755 at 1.)

concluded these deaths likely could have been avoided if there had been compliance with the Injunction. (Doc. 4755 at 2.)

Regarding Defendants' claim that "they are closing in on 100%" compliance, the Monitors found this patently false because Defendants' method of measuring compliance was wrong. (*Id.* at 3.) For example, Defendants alleged their mental health evaluations are "comprehensive" whereas the Monitors found Defendants' performance measure is "closer to 0%." (*Id.*) Regarding off-site specialist referrals, Defendants readily admitted from their self-evaluations the care provided "is often not clinically appropriate" (*id.* at 5), and in violation of the Injunction. And the Monitors emphasized the "degree to which [Defendants are] failing to comply . . . is hard to imagine." (*Id.* at 6.) For example, only 3% of the referrals outside the prisons were timely, meaning a shocking "7,140" or 97% of these critical, life and death referrals were "not timely" or never occurred at all. (*Id.*)

The mortality reviews have always been of vital significance, and the Monitors reported Defendants "missed critically important errors." (Doc. 4755 at 7.) The Monitors stated they repeatedly brought the overuse of nurses and LPNs in violation of the Injunction to the attention of Defendants, which in fact contributed to the cause of one patient's death. But when this failure was brought to the attention of Defendants, they flatly responded that it was a "one-off." (Doc. 4755 at 7.) As poor as the mortality reports were, the Monitors found, "almost all other reviews . . . were worse."[29] (Doc. 4755 at 8.) Despite the monitoring team having provided repeated feedback, there had not been systemic improvements through the "implementation of a sustainable remedial plan as required by

---

[29] The failures to correct mortality review reports is of great concern because when deficiencies were brought to Defendants' attention by the Plaintiffs in March 2024, Defendants first denied any problems, but also claimed they were aggressively making improvements: "[Defendants'] Medical Director, Dr. Phillips, is currently in the process of revamping the entire mortality review process to provide a greater transparency and ownership regarding the care provided. [Defendants] will work with NaphCare to ensure that the improved process is robust and thoughtful." (Doc. 4566 at 10.) The Court finds the mortality reports reviewed by the Monitors do not support that a review process was meaningfully completed.

the Injunction." (*Id.* at 71)[30]

The Monitors discovered medications had been maladministered, placing patients at serious risk of harm. The poor mental health treatment included one patient who "spent 15 minutes banging his head on a wall" that required an emergency response. Again, the fundamental underpinning of the Injunction for establishing a minimally safe mental health system has been substantially unmet because of the use of nurses and LPNs as first line healthcare, "over- and mis-use of telehealth" and the electronic health record was described as a "sprawling, disorganized warehouse."[31] (*Id.* at 15.) Fundamental to the Injunction has been Defendants' failure to fill critical staff positions in that there continue to be a dearth of physicians "medical APPs," and "nurses," and Defendants' recruitment remains poor.

One of the most urgent concerns expressed by the Monitors was that Defendants were still unable to accurately analyze Injunction-related data. The Monitors reported they have spent "hundreds of hours" providing detailed feedback, orally and in writing, and mentoring to Defendants regarding errors, analyses, and interpretation of the Injunction to assist them in first understanding and then reaching compliance. In fact, Dr. Strick specifically offered on more than one occasion to provide mentoring to nurses and others "to no avail." (Doc. 4755 at 96.) Initially after the Injunction, the Monitors reviewed Defendants' monthly reports and provided objections, comments, and instructions. The Monitors would meet with Defendants to enhance improvements. Over time, the meetings ceased because Defendants showed no interest in accepting advice from the Monitors.

---

[30] The Monitors reported in December 2024 they alerted Defendants more than a year earlier that the reports indicated significant medical equipment was available, but the inspection showed it "was missing," raising the possibility of "false documentation." (Doc.4755 at 9-10) Not until this same issue was raised again in the Monitors' Third Interim Report in August 2025 did Defendants provide any response. Their explanation, while alleviating the concern regarding false documentation, raised the issue that "emergency response bags are sealed without confirming that they are complete." (Doc. 5040 at 11.)

[31] The Monitoring Team in their evaluation "spent hours on individual patient records" to understand what were the "conditions and treatment." But even assuming a clinician would be better informed than the Monitors, the Monitors were "unable to piece together" necessary information that would allow for the safe care of a patient. (Doc. 4755 at 17.)

Finally, the Monitors expressed dismay about the leadership available in order to reach and maintain compliance with the Injunction. The primary reason was Defendants, through their leadership, maintain the system that embraces using nurses as the primary care givers supplemented by LPNs.[32]

Defendants offered objections to the Monitors' report, and the Monitors provided a detailed response on October 4, 2025, (Doc. 5040), emphasizing the essence of the violations.[33] Defendants still contend "there is no problem" with nurses providing "most of the care" in clear violation of the foundation of the Injunction. In fact, the Monitors reported Defendants have failed abysmally, emphasizing the failure of Defendants to aggressively enforce the contract with NaphCare by refusing to impose any of the numerous potential sanctions available, which is inexcusable. In fact, few sanctions have been imposed against NaphCare for healthcare violations.

The Monitors reflected on Defendants' false claim that the Monitors, for the first time in the report, provided them a detailed and understandable review of the Injunction requirements and methodology, which is startling and absurd. The Monitors have given significant feedback, which has been ignored or refused by Defendants. Remarkably, only since the Motion for Receiver was filed have Defendants, for the first time, offered, through declarations, detailed, specific comments, criticisms, and complaints concerning each requirement of the Injunction, the Quality Indicators. Regarding Defendants' response concerning a hypertensive patient, the Monitors correctly concluded the healthcare management was still "dangerously inadequate." (Doc. 5040 at 3.) Regarding another patient's death, the excuse offered by Defendants only strengthened the Monitors' conclusion that the mortality review process has failed. Regarding Defendants' attempt to excuse other mortalities, the Monitors found they remain inexcusable because they involve

---

[32] The Monitors found that Defendants do not have and, more importantly, have no system-wide imminent plan to acquire the space necessary to provide constitutional healthcare.

[33] For example, the Monitors addressed a correction to their calculation of backlogged appointments; Defendants were correct that the number of medical appointment backlogs is 61,479 rather than the initially reported 123,403, but the Monitors found this number still inexcusable and dangerous.

avoidable delays in care, care not consistent with required standards of care, failure to timely review tests, and gross mismanagement by nurses of a patient's condition. And concerning one particular patient identified by the Monitors: "If not for [Defendants'] mismanagement of the patient . . . [the patient] likely would not have needed the elective surgery . . . from which he died." Finally, the Monitors stated, "the specific problems with clinical care that led to one patient's death had still not been analyzed and remedied." (*Id.* at 16.)

In conclusion, the Monitors stated Defendants' remarks do not change "our conclusion that [Defendants'] mortality review process is flawed," which was supported by the Monitors' analysis of "three . . . deaths in 2023 and 2024 associated with the *same* clinical mismanagement." (*Id.* at 17 (emphasis in original).)

On January 3, 2025, the Monitors submitted the final report on the Pilot, referencing the fundamental requirement of the Injunction set forth in section 1.17 that mandates a "Patient Centered Care Model," that was to be achieved by the Pilot. (Doc. 4761 at 1.) But the Monitors reported Defendants "disagreed in writing with each of these assumptions at various times throughout the Pilot." (*Id.* at 3.) Consequently, the Pilot failed: it was never fully implemented at either location and operated for only 8 days at one of two locations. (*Id.* at 3-4.)[34]

On February 12, 2025, Plaintiffs filed the Motion for a Receiver. (Doc. 4795.) Defendants responded (Doc. 4818), and Plaintiffs replied. (Doc. 4878.) In combination with the Third Interim Report to the Court, the Monitors provided their response to the Motion (Doc. 4968.) On June 11, 2025, the Court ordered implementation of the Final Staffing Analysis and Plan (Doc. 4858) as modified by the Experts' Analysis of Parties' Responses to Staffing Analysis and Plan (Docs. 4900, 4916.)[35]

---

[34] The Monitors detailed repeated, direct violations of specific Court Orders without notice to them or the Court. In particular, the Pilot healthcare staff were to be permanent, but Defendants failed to ensure NaphCare complied with the requirements of the Pilot. (*See,* Doc. 4761 at 7.)

[35] Defendants appealed that Order on July 9, 2025 (Doc. 4935), which remains pending, but this Court's Order directing implementation has not been stayed.

On July 17, 2025, the Monitors filed their Third Interim Report (Doc. 4942; 4968 (revised)) and, on October 4, 2025, the Monitors filed their Analysis of Parties' Response to Monitors' Third Interim Report to Court (Doc. 5040.)

## II. Plaintiffs' Motion to Appoint a Receiver

Plaintiffs argue that given the systemic constitutional violations from the inception of the Injunction to the current day, the lack of substantive progress, and Defendants' obvious inability to recognize and remediate their mistakes, the least intrusive means of assuring prisoners within Arizona prisons receive constitutionally adequate healthcare is to appoint a receiver. (Doc. 4795.)

In Response, Defendants claim they have continued "to make progress across all aspects of the Injunction," (Doc. 4818 at 2), and argue a receiver is premature because the Injunction has been in place for less than two years, the current director has only been in place for two years, there have been additions to the numbers of full time equivalent employees (FTEs), NaphCare has only been contracted for the past two years, and Defendants have expended additional funds on healthcare, have made some improvements on certain types of healthcare in certain facilities, and have had success in the opioid use disorder program and Hepatitis-C treatment. Finally, Defendants claim NaphCare "has steadily increased staffing since the start of the Injunction." (Doc. 4818 at 15.)

In Reply, Plaintiffs argue that Defendants' argument against a receiver boils down to a meritless request for more time based on declarations of alleged virtuous good intentions. Defendants admit their contractor has not met even the staffing requirements of the current contract and offer no plan to achieve the necessary enormous increases anticipated in the final statewide staffing plan. Finally, Plaintiffs maintain Defendants' anecdotal examples of improvements are overcome by the ongoing, substantial noncompliance with the Injunction allowing systemic unconstitutional violations to persist for over 10 years.

### A. Legal Standard

"[A]ll prospective judicial relief (necessarily including the appointment of receivers) must be accompanied by findings that the relief is 'narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *Plata v. Schwarzenegger*, 603 F.3d 1088, 1095 (9th Cir. 2010.)

"Receiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Id.* at 1093-94. A receiver is "appointed by the court to take over the day-to-day management of a prison system or a segment of it" "where unconstitutional conditions persist despite repeated orders to remediate." *Id.* at 1094; *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 636 (5th Cir. 2025) (A receivership appointment is an appropriate sanction when necessary to remedy a prison's repeated failures to ensure constitutional prison conditions).

In determining whether appointment of a receiver is appropriate, the Court must consider (1) whether there is a grave and immediate threat or actuality of harm to plaintiffs; (2) whether the use of less extreme measures of remediation have been exhausted or would prove futile; (3) whether continued insistence on compliance with the Court's orders would lead only to confrontation and delay; (4) whether there is a lack of leadership to turn the tide within a reasonable period of time; (5) whether there is bad faith *or* repeated failure to implement changes; (6) whether resources are being wasted; and (7) whether a receiver is likely to provide a relatively quick and efficient remedy. *Hinds Cnty.*, 128 F.4th at 637; *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005.) The district court should consider each factor, but "the first two . . . are given predominant weight." *Plata*, 2005 WL 2932253 at *23.

**B. Discussion**

Ordering a receivership is a drastic remedy. The Court has sought and received extensive briefing and has carefully considered the law, arguments, and evidence presented by the parties and experts. The Court asked the Monitors to opine on Plaintiffs' request that a receiver be appointed. The Monitors filed a 306-page report (Doc. 4968) chronicling

Defendants' failure to comply with the Injunction and enumerating the ongoing unconstitutional medical care within the entire prison system, concluding: "The system changes required by the Injunction to protect human life and limb and prevent suffering are still broken." (Doc. 4968 at 5.) The Monitors posit this finding is brought to bear by the reality that Defendants are "still struggling to identify and prioritize the changes [they] need[] to make, let alone actually make those changes." (*Id.* at 5.)

Great weight has been placed on the factually well-supported, reliable opinions of the Monitors. "[T]he most important question a court must consider when deciding whether to appoint a neutral expert witness is whether doing so will promote accurate fact finding." *Gordon v Todd*, 793 F. Supp.2d 1171, 1179 (E.D. Cal. 2011.) Here, the Court appointed the Monitors as "its own experts to serve as neutral monitors to evaluate Defendants performance" under the Injunction (Doc. 4410 at 6.) And it is impossible to exaggerate the importance of Defendants' enthusiastic choice of the Monitors as revered experts, to assist in first drafting the elements of the Injunction, and then to function as Monitors to ensure Defendants' compliance. And it is particularly noteworthy that despite Dr. Stern's previous criticisms of Defendants' healthcare when he testified in this case as a witness in 2018, the Defendants nonetheless welcomed his selection as the Monitor. (Doc. 3921.)

The Injunction required Defendants to provide a monthly report on their compliance with all elements of the Injunction that were then thoroughly analyzed by the Monitors to determine Defendants' performance, and where Defendants specifically failed. As discussed above, the Monitors offered lessons and suggestions for improvement. In the beginning the Defendants were receptive to conversations and meetings with the Monitors, but, after a few months, Defendants refused the Monitors' overtures and rejected or ignored most of the Monitors' recommendations without providing explicit reasons. Now that the appointment of a receiver looms large, Defendants have become highly critical of the qualifications, expertise, and opinions of the Monitors, even proffering the astonishing position that the Monitors' qualifications and opinions fall far short of the requirements of

Federal Rule of Evidence 702.[36] Either the Defendants are amnestic, or duplicitous, or both. The Monitors' reports are thorough, amply supported, and their reasoning is fully explained. Defendants' contentions to the contrary border on bad faith.

---

[36] Dr. Stern is a board-certified internist with 25 years' experience as a correctional physician in a variety of settings, including as a jail medical director, a regional medical director for a state DOC, a regional medical director for a for-profit prison health care vendor, and as assistant secretary/medical director for the Washington State Department of Corrections. He has provided consultation and assistance on correctional health care to a variety of organizations and agencies including DHS, USDOJ, Bureau of Justice Statistics, Bureau of Justice Assistance, National Institute of Corrections, California Attorney General, Human Rights Watch, ACLU National Prison Project, Federal courts, and the Namibian Correctional Service, and currently serves as medical advisor to the American Jail Association and National Sheriffs' Association. Dr. Stern also conducts research and teaches at the University of Washington School of Public Health, serves on the editorial board of the Journal of Correctional Medicine, and is past chair of the education committees of the American College of Correctional Physicians and the Academic Consortium on Criminal Justice Health.

Dr. Strick is board certified in Internal Medicine and Infectious Diseases with almost 20 years' experience working in carceral settings. Her roles in the Washington State Department of Corrections have included Statewide Infectious Disease Physician, Chair of Infection Prevention, and Hepatitis C Director. She also established a reentry program to transition patients with HIV back to the community. She is the Carceral Director for the Mountain West AIDS Education & Training Center and travels throughout the 9-state Mountain West region to do education and technical assistance for carceral and community providers to improve the care of individuals in jails and prisons. Dr. Strick is also a Clinical Associate Professor at the University of Washington where she sees patients, conducts research, and teaches medical students and residents about the carceral healthcare system.

Dr. Abplanalp is a licensed clinical psychologist with over two decades of experience in carceral settings. He received his Ph.D. in Clinical Psychology from the University of Texas at Austin and completed postdoctoral forensic work at Court Diagnostic and Treatment Center in Toledo, Ohio and Dorothea Dix Forensic Hospital in Raleigh, North Carolina. He began working for the Washington State Department of Corrections as both a psychologist and clinical supervisor in 2001 and, in 2011, he became the first Chief Psychologist of the Department. During his tenure, he has worked as a clinician, supervisor, and educator and he developed the statewide curriculum for Suicide Prevention and Mental Illness, which he presented to health services, custody, and front-line staff in over 300 trainings. In the wake of Hurricanes Maria and Irma in 2017, Dr. Abplanalp was deployed as part of an Emergency Management Assistance Compact to assist in rebuilding and fortifying the mental health infrastructure in the U.S. Virgin Islands. He has also served on

The substantial evidence in the record and the factors required to be established strongly support granting the Motion for Receiver.

**1. Grave and Immediate Threat of Continuing Harm and Actuality of Harm**

There can be no credible disagreement by Defendants that this litigation was initiated because of a seriously inadequate healthcare system that imperiled the lives of the prisoners. If not immediately apparent to Defendants at the outset of the case, Defendants effectively conceded the healthcare was in need of substantial improvement because they jointly stipulated in 2014 to comply with the numerous terms and requirements (Performance Measures) of the Stipulated Agreement in response to Plaintiffs' compelling allegations of unconstitutional healthcare. And those requirements were strikingly similar

---

the Crisis Negotiation Team, has been involved in high-risk extraditions with specialized security teams, and is certified in performing Psychological Autopsies. Over the past decade, Dr. Abplanalp has been intensely involved in the development, implementation, monitoring, and improvement of a coordinated system of integrated mental health and medical care within the Washington Department of Corrections and has worked as a Correctional Mental Health Consultant in a variety of carceral settings, including prisons, jails, community mental health agencies, and ICE detention centers. Dr. Abplanalp also serves as the Mental Health Advisor on the Board of Directors of the American Jail Association.

Dr. Rainer has been licensed in Washington State as a psychologist for 32 years. She has worked 26 years as a correctional Psychologist in both direct care and leadership roles, to include the Director of Behavioral Health and Chief of Psychology. She consults with correctional agencies committed to improving the care delivered to incarcerated people.

Donna Strugar-Fritsch has more than 30 years of health care policy, administration, program development, research and evaluation and clinical nursing experience. As a consultant, she built a strong national consulting capacity in correctional health care over more than 20 years, and is a nationally recognized expert in the interface of the Affordable Care Act, Medicaid, and correctional settings; design and implementation of innovative models for staffing and delivering correctional health care services; and comprehensive addiction treatment including all FDA-approved forms of Medications for Addiction Treatment in prisons and jails. She has a deep understanding of health care staffing and operations in correctional health systems and has helped many prisons and jails improve access to care and vendor contracting for correctional health services.

to the requirements of the Injunction, i.e., the Quality Indicators. But as early as 2016, Defendants largely failed to perform across all Performance Measures and those violations uncannily resemble the same violations of the Injunction.[37] Defendants resolutely denied violating the Stipulated Agreement, just as they now deny violating the Injunction. And Defendants' excuses in 2016 mirror the same excuses they offer in response to their violations of the Injunction.[38]

The appalling healthcare conditions culminated in a two-week trial in 2021 where the dire threat of harm to prisoners was established. The Court found the healthcare "grossly inadequate" and held it "placed patients at a substantial risk of serious harm," staffing was incompetent, and the poor treatment and indifference to patients was "pervasive," and in some cases inhumane. (Doc. 4335 at 19-20, 69.)[39]

Instead of appealing, Defendants engaged with Plaintiffs, the Court, and the Monitors to devise an Injunction that would end "the unconstitutional substantial risk of serious harm to Plaintiffs." The Court declared because of Defendants' chronic defiance, the Injunction was Defendants' last resort to comply with the Constitution. (Doc. 4637 at 8.) And to maximize success, strict adherence was mandated. The Court stated, "The Court's patience has run out," (*Id.*) and it is clear the Court "cannot impose an injunction that is even minutely ambiguousb because Defendants have proven they will exploit any ambiguity to the maximum extent possible." (Doc. 4410 at 5). The Court demanded the "changes necessary to redress [Defendants'] failings be substantial." (Doc. 4410 at 4-5.)

---

[37] Those failures then included deficiencies in prescription medication, the medical record system, reviewing medical records, diagnostic and chronic care visits, mortality reviews, and failures regarding overall delays in providing access to care.

[38] Between 2016 and 2021, Defendants claimed they "barely missed compliance," "noncompliance was based on a technical violation," violations were "due to third parties'" "inaction or omissions," and Defendants claimed their overall compliance with the Stipulation was allegedly "77-94%." But the overall administration of healthcare was demonstrated in numerous hearings as extremely poor. (Doc. 3921 at 24.)

[39] "The Mortality reviews demonstrated that despite ten years of litigation, [Defendants have] never created . . . a policy to [find] systemic issues identified in mortality reviews and ha[ve] not taken steps to remedy them" and "this constitutes systemic, conscious disregard of the risk prisoners face." (Doc. 4335 at 3.)

Now almost three years after the effective date of the Injunction, Defendants have continuously violated the Injunction, perpetuating the same unconstitutional risk of grave harm to the prisoners that has persisted since the outset of the litigation.

The Monitors expressly found Defendants were non-compliant with 131 of 154 Quality Indicators relating to healthcare.[40] Corroborating the Monitors' opinions, Plaintiffs' investigators analyzed Defendants' self-compliance using their database, based on a recent two-month sample (December 2024 and January 2025), that substantiates the Monitors' compliance findings and methodology. (Doc. 4838.) And using Defendants' database, Plaintiffs' investigator found substantial support for the Monitors' conclusions and methodology regarding the percentage of Defendants' compliance. (*Id.*)

Defendants admit violating a number of the Quality Indicators, and, for many where they differ with the Monitor's findings of violations, Defendants often (a) acknowledge the Monitors may be correct; or (b) commit to investigate to determine if the Monitors are correct; or (c) claim it is impossible to comprehend what the Monitors contend, despite that the Quality Indicators were drafted by the Defendants and have been in existence since 2023; or (d) assert the objectives and problems identified by the Monitors will likely be resolved when the PCCM required by the Injunction is finally established, which is unimaginable because Defendants are nowhere close to attaining it; or (e) commit to continuing resolving issues with NaphCare.[41]

---

[40] The Court relies on the Monitors' Third Interim Report for the number of Quality Indicators. (Doc. 4968.)

[41] Defendants filed the Declaration of Micaela McLane, Director of Nursing, who has been assigned since April 2025, and who has the lead responsibility to ensure monthly Quality Indicator assessments align with all requirements and to recommend improvements, and the Declaration of Raymonda Matheka, who has been the Mental Health Director since 2024. Some examples of their comments in their declarations include:

> § 1.1 Medical acknowledges Monitors "disagreement of selection of cases and commits to following up with physicians responsible for the assessments."
>
> § 1.1(f) Regarding Monitors' findings that Defendants continue to use favored samples, Defendants "will determine if functionality can be improved and discuss issues with physician reviewed."
>
> § 1.22 Acknowledge Monitors' report says tests are not performed because of transportation issues. Defendants will "follow up" and this is a "priority project."

The Court finds the overwhelming evidence establishes Defendants are in violation of the Injunction perpetuating the grave and immediate threat of actual harm to prisoners.

The Monitors, in reaching their analysis, used information from a variety of sources. Pursuant to the Injunction, the Monitors were given substantial authority to investigate, evaluate, and verify compliance through access to the electronic health records, conducting visits, and analyzing the data collected by Defendants and their agents. The Monitors were permitted to use information from a variety of sources, including interviews of prisoners, Defendants' staff and contractors, complaints from prisoners and all other persons, Plaintiffs' counsel, random or purposive view of health records, clinical observations, site visits, papers, and videos. And Defendants were mandated to cooperate with the Monitors in data collection.

---

§ 1.22(d) Defendants acknowledge the error that offsite referrals have included those not completed and "will improve this."
§ 1.21(a) Defendants acknowledge Monitors' report questions the number of refusals and claims Defendants are "reviewing the process" and will "look whether improvements are feasible."
§ 7.4.7 Defendants recognize assessments of the Patient Center Care Model "has not captured all of the issues encompassed in the Quality Indicators," particularly the "role of PCCM."
§ 11.16 (testing and treatment) Defendants promise to collaborate to improve the testing.
§ 2.4.1 Regarding mental health: Significant work has been completed very recently in 2025 that "may address Monitors' concerns."
§ 6.2 and § 7.3, which criticize failure to assign a mental health therapist: Defendants state the "issue may change when PCCM is implemented."
§ 1.1 Regarding necessary Tech Care modifications, Defendants promise they "will work with NaphCare."
§ 1.1(b) Regarding urgent care and whether Defendants have not collected required data, Defendants admit they have "not successfully implemented the methodology to date and it is a priority."
§ 1.21(a) Regarding suicide prevention Defendants state they are "addressing the issue and anticipate improvements."
§ 3.4 Language interpretation: Defendants admit it "needs improvement."
§ 16.3.1 Comprehensive mental health evaluation "to the extent the Monitors are correct that the assessments are relying on initial assessment . . . rather than more comprehensive evaluations their criticism is well taken."

Apart from establishing serious non-compliance, the Monitors identify the substantive effects of non-compliance. Attached is a chart demonstrating where Defendants are non-compliant based on the Monitors' reliable assessments.[i]

The Monitors determined Defendants were non-compliant with the core of the Injunction at sections 1.1 and 1.3, which "describe the backbone of any health care system," and are inextricably included in the Injunction. *Id.* at 45-47. Section1.1 requires all healthcare and documentation thereof be clinically appropriate, "including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis." (Doc. 4410 at 11.) Section 1.3 provides "all prisoners with physical or mental illness that require regular follow-up shall be designated on the medical or mental health caseload and shall be seen in clinically appropriate timeframes." (*Id.*) Care that is non-compliant with these provisions "by definition places patients at significant risk of serious harm." (Doc. 4968 at 45-47.)[42]

The Monitors noted, according to the most recent contract with NaphCare, Defendants were required to have 18.8 full-time employee staff physicians and 9.0 full-time employed medical directors, for a total of 27.8 full-time employed physicians. (Doc. 4968 at 27.) Defendants' reporting and response to the Motion for Receiver demonstrate

---

[42] *See* Doc. 4968 at 48 (Defendants self-assess 96% compliance with urgent care provision in sub provisions 1.1b of Injunction, but Monitors assess as closer to 33%); *id.* at 49 (Defendants self-assess 79% compliance with non-urgent, episodic care in subprovision 1.1c of Injunction, but Monitors calculate 35% compliance); (*id.* at 52 (Defendants self-assess 86% compliance with chronic care provision in section 1.1d of Injunction, but Monitors assess closer to 35%); *id.* at 53-57 (Monitors assess noncompliance with inpatient care provision in 1.1e, but find percentage is inappropriate methodology); *id.* at 58-59 (Monitors assess non-compliance with off-site specialty referrals provision in section 1.1f of Injunction and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 65% compliance.); *id.* at 60 (Defendants self-assess 84% compliance with 1.1g of Injunction regarding action taken on post-hospital, post-emergency room, or specialist recommendations and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 10% compliance).

an inability to recognize their own failures and incompetence. Defendants have what they consider to be 11.5 FTE staff physicians positions filled by 18 physicians (approximately 61% filled), but only 11 of those physicians are board certified or board eligible as required by the Injunction. (*Id.*)[43] Likewise, although Defendants contend all 9 of the medical director positions are filled, because only 6 of the 9 physicians are board certified or board eligible, only 66% are actually filled. (*Id.*) And Defendants claim NaphCare is offering competitive salaries, but this is wrong. The Monitors correctly found the increase is "woefully insufficient,"[44] and continues despite the constant entreaties by the Court in the presence of the Director and his staff that this must be immediately cured. (*Id.* at 28, 273.)[45]

And it cannot be overemphasized that Defendants have been frequently told by the Court that their incompetent and inadequate staffing of healthcare is unconstitutional. When the case was filed, the Class certification order "identified longstanding staffing deficiencies." Then in May 2017, Magistrate Judge Duncan found a "a mere seven staff physicians and five psychiatrists for the entire ADC prisoner population" was seriously inadequate. Concomitantly, Defendants heard the shocking testimony of Defendant Richard Pratt, Interim Director of the Health Services Division, expressing the flagrant indifference of Corizon, the then-contractor, that: "[The contractor] may well have decided to pay a fine rather than fill staff positions." (Doc. 2071 at 85.) Then during the two-week

[43] These numbers have changed slightly while the Motion has been pending, but the underlying issue remains. (*See, e.g.*, Doc. 5040 at 3 (Monitors assert that "Defendants report that they currently engage 15.3 FTE staff physicians. In fact they only engage no more than 11 FTE. Second, Defendants focus on informing the Court where they are compared to where they were. We believe that the focus should be on where they are compared to where they should be. It is this latter comparison which is much more determinative of patient safety and led us to the conclusion that staffing remains dangerously inadequate.")).

[44] The Monitors state "based on [their] experience, employers must pay a premium to attract health care professionals to work in a prison" and point out that the software used to evaluate NaphCare's salaries cannot distinguish prison-based from community work settings or on-site from remote employment, and likely has little comparative data for the remote locations where ADCRR prisons are situated.

[45] The Director attended all hearings in 2023-2024 where the Court brought poor staffing to his specific attention.

trial in 2022, Defendants effectively agreed their current staffing levels were insufficient, and acknowledged their then-contractor, Centurion, admitted that "if [the contractually required] staffing levels could be obtained," it "would be insufficient" to meet healthcare standards. (Doc. 4335 at 22.) Finally, only three months after the effective date of the Injunction, the Court was compelled to order Defendants to immediately hire new staff because they were already in violation of the Injunction, but Defendants failed to comply with the Court's order. For Defendants to now suggest they be absolved of their staffing violations and even exalted with praise because today only 100 contract positions remain unfilled is preposterous and sustains that they are oblivious to their constitutional obligations.

The Monitors documented critical deficiencies in implementing the Injunction requirements relating to patient refusals and informed consent despite the Monitors' feedback on making relatively simple changes to the refusal process and documentation. (Doc. 4968 at 29-35.) The Monitors' investigation found these failures have resulted in dangerously misinformed refusals of treatment. (*See id.*)

Defendants, despite the Monitors' findings, claim there is no grave and immediate threat, or actuality of harm to the Plaintiff class. In making this assertion, they challenge the Monitors' methodologies and state they have a "difference of opinion" of what is appropriate prison healthcare, without offering a scientifically valid basis. And Defendants suggest that meeting a high percentage of the Quality Indicators is sufficient compliance. But it is unimaginable Defendants would disagree that delivery of clinically required healthcare in prison often presents emergencies and life and death situations for which a percentage of compliance is consistently inadequate.[46]

---

[46] For the most recent publication by the Bureau of Justice Statistics on inmate medical and mental health problems, *see* Laura M. Maruschak, Jennifer Bronson & Mariel Alper, *Survey of Prison Inmates: 2016: Medical Problems Reported by Prisoners* (2021) and Laura M. Maruschak, Jennifer Bronson & Mariel Alper, *Survey of Prison Inmates: 2016: Indicators of Mental Health Problems Reported by Prisoners* (2021); *see also* Jill Curran, Brendan Saloner, Tyler N.A. Winkelman & G. Caleb Alexander, *Estimated Use of Prescription Medications among Individuals Incarcerated in Jails and State Prisons in the US*, JAMA Health Forum (Apr. 14, 2023), doi:10.1001/jamahealthforum.2023.0482.

Moreover, the model of care established by the Injunction with all Quality Indicators, after months of negotiations, was jointly drafted by the Court, Defendants, Plaintiffs, and the Monitors. It was to be strictly enforced by the Court. (Doc. 4637 at 8.) Accordingly, nowhere in the language of the Injunction, or the Court's approval of it, is there the slightest implication that partial compliance, *i.e.*, a percentage, would be tolerated. And describing the Monitors' findings and analysis, which are supported by voluminous evidence, as a "difference of opinion" does not overcome their factually reliable evaluations and conclusions.[47]

Consistent with the Court's 2022 Findings (Doc. 4335), these violations were not then, and are not now, abstract. They are brought to life—or death—by the individuals who experienced profound delays in receiving treatment or who failed to receive treatment at all. The Findings included evaluations of fourteen mortality reviews that highlighted the deficiencies in the care the prisoners received. Those mortality reviews were appalling in their illustration of the callous, inhumane indifference displayed on a regular basis. But more than that, the Findings revealed not just that the care received was shocking but, in many instances, Defendants demonstrated they did not believe the care was in any way deficient. And it is this belief of Defendants that creates the catastrophic risk of harm to Plaintiffs.

The Court's finding that Defendants are in violation of the Injunction establishes a grave and immediate threat of harm to prisoners, but the same threat of harm is also independently manifested by the eight deaths reported in the mortality reports occurring in 2023 and 2025. Moreover, the grave continuing harm to the prisoners is separately demonstrated by the Monitors' identification in the 300-page report of numerous recent incidents of Defendants' maladministration of medical care, including inhumane treatment.

The Monitors evaluated Defendants' four most recent deaths (as of the date their report was drafted) and compared those deaths to Defendants' first four deaths following

---

[47] Again, it is inexcusable for Defendants to now falsely claim the Monitors, for the first time, provided them with "a detailed review of the healthcare Injunction requirements . . . for determining compliance and a critique of [Defendants'] performance."

issuance of the Injunction. The Monitors believe this comparison sheds light on whether progress has been made in the delivery of constitutional healthcare and whether Defendants have implemented the critically necessary self-review process required both by the Injunction and as necessary to identify problems and correct them so they do not recur.

The relevant facts are below and establish the prisoners experienced "a lack of timely access to appropriate care by the appropriately skilled professionals." (Doc. 4335 at 30.)[48]

**a. Death 1**

Patient 20 died on March 24, 2025 at the age of 78. He had a history of multiple stroke and seizure disorder (in addition to other serious issues.) He was seen by a neurologist on July 11, 2023, and was prescribed an antiseizure medication that improved his seizures. But on February 20, 2025, the Facility Medical Director saw Patient 20 and discontinued his seizure medication. The provider failed to review Patient 20's medical history because, if he had, the provider would have immediately identified Patient 20 had an ongoing seizure disorder. Two weeks after discontinuation of the medication, Patient 20 suffered a prolonged seizure requiring intubation and placement in the hospital intensive care unit. He eventually returned to the prison, and died four days later.

The Monitors acknowledged his co-morbidities contributed to his death, but the critical failure to review Patient 20's medical history and his removal from antiseizure medication "hastened his death" and the Monitors also noted numerous other deficiencies in Patient 20's care. Yet, Defendants' own mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 8.)

**b. Death 2**

---

[48] The Monitors outlined their analysis of the eight patients. (Doc. 4968.) In their response, Defendants submitted the declaration of Dr. Embrey, the Corporate Medical Director for NaphCare, who disputed some of the Monitors' factual assertions regarding the patients' care. (Doc. 4973, Ex. 12.) The Monitors then submitted a supplemental response to Defendants' response. (Doc. 5040.) In relevant factual recitations, the comments and disagreements from Dr. Embrey and the Monitors' responses are included where relevant.

Patient 21 was a 78-year-old male who also died on March 24, 2025. He had a history of cardiac issues, including high blood pressure, high cholesterol, and a cardiac arrhythmia. On February 9, 2025, he suffered a heart attack that required placement of a stent in his main coronary artery.

The Monitors "identified several issues of grave concern regarding Defendants' management of his condition upon return from the hospital." Specifically, Patient 21 was prescribed two new blood thinners and was instructed to discontinue his aspirin as the combination of the medications "greatly increases the risk of serious if not fatal bleeding." Yet Patient 21 continued to receive aspirin for an additional 10 days. Second, Patient 21 was referred for a specialty consultation with a cardiologist within one week (by February 21.) It was not scheduled to occur until April 17, at which time Patient 21 had been dead for nearly one month. Finally, Patient 21 experienced a hypertensive emergency, which requires emergent treatment, but that treatment was "inappropriately managed at the facility." By March 7, Patient 21's blood pressure had increased to 200/86, which, according to the Monitors, required emergency intervention. Instead, he was "seen on March 8 by an RN, acting independently, who failed to recognize the urgency of the situation."

Despite the serious errors in Patient 21's care, Defendants' mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 9.)

**c. Death 3**

Patient 22 was a 48-year-old male who died on March 12, 2025. He developed lung cancer, which was not diagnosed until it metastasized to the brain.

Patient 22's friend "was so concerned about the patient's health that he accompanied him to medical to help advocate for him to get urgent help." The friend communicated the symptoms to the nurse, that his symptoms were urgent, and that Patient 22 said he did not know how to communicate his symptoms on his own. When Patient 22's friend mentioned a possible mental health issue, the nurse—despite that Patient 22 was not on the mental health caseload—scheduled Patient 22 for a mental health follow-up. The Monitors

identify this as a "serious error" because the Permanent Injunction explicitly states patients not on the mental health caseload are required to see a medical provider before placement on the mental health caseload. The reasoning is straightforward: patients experiencing clinical symptoms who do not have a mental health diagnosis are frequently experiencing a physical condition. And here, the change in behavior experienced by Patient 22 was the result of metastatic brain lesions.

Thereafter, on January 16, medical staff witnessed Patient 22 experience urinary incontinence. The Monitors point out, this symptom in a 48-year-old male with no history of incontinence is alarming and suggestive of "a brain lesion or spinal cord damage requiring emergent treatment." Instead, the symptom was ignored and Patient 22's physical exam was deemed normal.

Patient 22 then received the appointment with the psychiatric provider, who diagnosed Patient 22 as experiencing "recurrent major depressive disorder" and "adjustment disorder" despite having had no mental health history and no new circumstances to which he was adjusting. The Monitors found both diagnoses were "nonsensical." The provider also attributed Patient 22's incontinence to his depression. The Monitors explained even if Patient 22's incontinence were attributable to a mental health condition (that he did not have), it "would be such an extreme symptom of depression that it should have resulted in immediate admission to a MH Inpatient Unit." But, instead, the practitioner gave Patient 22 an antidepressant.

Thereafter, while in the hospital, Patient 22 was diagnosed with metastatic lung cancer and had one brain lesion surgically resected. He was discharged back to the facility. Patient 22 was seen by a radiation oncologist on February 11, 2025, and additional imaging was ordered to prepare for ablative radiation to his brain metastases. The imaging done on March 10 revealed a "critical situation": patient 22's brain was swelling and was "about to destroy the brainstem." At that point, Patient 22's vital signs were "very abnormal," including a rapid heart rate of 120. The radiologist documented that the radiologist's "critical results team[]" attempted to notify Defendants by phone of Patient 22's status but

despite seven attempts, none were successful. According to the Monitors, Patient 22 needed emergency surgery—i.e. "within minutes to hours." And the "clinical results team" sent a fax to Defendants, which was reviewed, but Defendants took no action that day or the next day. They took no action until March 12, when "there was clinical evidence of actual herniation of the brain."

Despite the errors in Patient 22's care prior to his death, Defendants' mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 10.)

**d. Death 4**

Patient 23 was a 35-year-old male who died on March 21, 2025. Patient 23 had a history of bipolar disorder. The Monitors "identified several issues of grave concern regarding [Defendants'] management of his case." Patient 23 was seen by a nurse (acting independently) on February 12 for a cough and sore throat that lasted for four days. Patient 23's oxygen was low—93%—but the nurse ignored it. The nurse also did not do any testing or arrange for follow-up.

The Monitors explain Patient 23 was "brewing the infection or infections that would lead to his death . . . .[And] [h]ad the patient been seen by a competent practitioner at this point, his death would likely have been prevented." Instead, the nurse ordered over-the-counter medication and nothing else.

Patient 23 was seen again by a nurse (acting independently) on February 18. Patient 23 declined a physical exam, and he was not referred to a provider. Thereafter, on February 21, when seen at his cell-front for medication distribution, he was found in "acute respiratory distress." His cellmate reported Patient 23 had been "very ill for 3 to 4 days." Patient 23 "was pale, 'almost gray,' and his heart rate was fast (pulse 117.)" Patient 23's pulse oxygen was 45%; the Monitors explain levels below 75-80% are considered "critically low." The Monitors opine Patient 23 required "immediate evacuation to the hospital." But Patient 23 was sent to the medical clinic. Patient 23 died in the hospital of severe pneumonia. The Monitors conclude the "nine-day delay in the patient receiving appropriate care from Defendants for a brewing pneumonia erased any chance he had to

survive the infection."

Again, despite the errors in Patient 23's (a 35-year-old) care, Defendants' mortality review "did not identify a single error nor any room for improvement." (Doc. 4968 at 10.)

**e. Death 5**

Patient 24 was a 48-year-old male who died on July 10, 2023 from pneumonia. The Monitors identified "at least two significant errors in this patient's care." The first was Defendants' failure to offer an influenza vaccination, in violation of section 11.4 of the Permanent Injunction. Because "at least a third of severe cases of influenza can be prevented by vaccination, failure to provide vaccination likely contributed to his death."

The second failure was Patient 24 was evaluated by a nurse acting independently on July 6, 2023. The Monitors further opine that if Patient 24 had been evaluated by a competent practitioner, his death might have been avoidable.

Despite these two errors, Defendants did not identify any errors or opportunities for improvement. (Doc. 4968 at 12.)

**f. Death 6**

Patient 25 was a 60-year-old male who died on July 23, 2023 from metastatic liver cancer as a result of end stage liver failure due to hepatitis C and alcohol abuse. The Monitors identified at least three significant failures in Patient 25's care.

Despite a history of cirrhosis of the liver, Patient 25 was not appropriately screened for liver cancer. The second error occurred when a provider that saw Patient 25 on July 12, 2023 inappropriately referred him for an urgent paracentesis (procedure to remove excess fluid) without doing necessary laboratory testing first. This is dangerous according to the Monitors because of the risks associated with paracentesis without attempting to eliminate fluid in the abdomen through other means. Finally, the paracentesis was ordered on July 12, 2023 as "urgent," meaning it needed to take place within one month. But the electronic health record reflected it was not scheduled to take place until December 4, 2024, almost 18-months later and long after Patient 25 died. This erroneous entry reflected a software error when the original request was cancelled because Patient 25 died.

Defendants did not identify any errors in Patient 25's care. (Doc. 4968 at 12-13.)

**g. Death 7**

Patient 28 was a 69-year-old male who died on July 29, 2023 from a perforated stomach ulcer. The Monitors identified at least four significant errors in Patient 28's care.

Patient 28's platelet count was noted to be low (112,000; normal range is 150,000-450,000) on May 17, 2023. A low platelet count can result in bleeding and is concerning because of the possibility of serious disease. The Monitors noted that because there was nothing in Patient 28's electronic health record to explain this low platelet count, a workup should have been conducted to determine the cause, but it was not. Patient 28 did have repeat lab work on June 23, 2023. The low platelet count was still present, and in addition, Patient 28 was now anemic; his hematocrit dropped from 43 to 35.8 in approximately one month. According to the Monitors this "would raise concern the patient had internal bleeding." Moreover, the June 23 test results should have been reviewed within four days but were not reviewed until July 7, in violation of section 4.4 of the Permanent Injunction.

On the evening of July 4, 2023, Patient 28 was brought to the medical unit by custody staff. He presented with "low blood pressure, fast heart rate, fever, and low oxygen levels." He was sent to the hospital and discovered to have internal bleeding from a stomach ulcer. He underwent emergency surgery but did not recover. The Monitors also discovered that, starting in October 2022, Patient 28 was prescribed naproxen twice daily. Patient 28 had low platelets and cirrhosis, which means NSAIDs (like naproxen) are contraindicated unless absolutely necessary.

Defendants did not identify the first two errors but did identify the third. Their recommendation was that "patients with risk factors for gastrointestinal bleeding (e.g., cirrhosis and low platelets) should only be prescribed chronic NSAIDs when other treatment options have been explored and the patient has been provided with education about the risks and benefits of treatment. When chronic NSAIDs are prescribed, then appropriate treatment with gastro-protective medications (e.g., proton pump inhibitors) should be utilized." But the Monitors pointed out that Defendants did not take any action

with this recommendation; i.e. "analyze why the error occurred," "incorporate addressing of the error into the statewide improvement plan, and if remediation is called for, develop and execute an effective and sustainable remediation plan. Instead, their remediation plan amounted to just wishful thinking." (Doc. 4968 at 13-14.)

**h. Death 8**

Patient 29 was a 40-year-old male who died on July 30, 2023, from complications following surgery for a bowel perforation due to diverticulitis. Patient 29 was seen in the medical unit five times (four times by a nurse and one time by an advanced practice provider) for abdominal symptoms that began on December 29, 2022, including "severe abdominal pain, nausea, vomiting, and blood in the stool." No practitioner physically examined Patient 29 until January 3, 2023, and it was not until the afternoon of January 4, "after seven days of suffering severe abdominal pain that [Defendants] failed to control, that [Defendants] finally sent [Patient 29] to the hospital." Upon arrival at the hospital, Patient 29 had a perforated colon and surgery was performed immediately.

The Monitors opine that Patient 29's colon perforated hours or days before he was sent to the hospital, thereby greatly increasing the risk that surgery was not successful. This is on top of Defendants' failure to treat the severe pain Patient 29 experienced.

Defendants identified two errors in Patient 29's care: that severe abdominal pain should be escalated to a higher level of care and NSAIDs should be used cautiously in patients in a high risk of bleeding. But, like Patient 28, Defendants did not take any action with respect to the identified errors. And the Monitors determined three subsequent deaths contained the same recommendation regarding escalation of care for prisoners experiencing severe abdominal pain, thereby "highlighting that the issue had not been adequately addressed." (Doc. 4968 at 14-15.)

**i. Conclusions from Recent Mortality Reviews**

In the Court's 2022 Findings of Fact following the trial (Doc. 4335), the Court concluded from the mortality reviews:

> The mortality reviews illustrate the harm that routinely befalls prisoners

> because they do not receive timely and adequate health care. The common theme is nurses repeatedly are unable to properly diagnose health care issues and fail to refer prisoners to a provider.
>
> ***
>
> The deaths outlined above, some very recent, were not aberrations or corrective action would have been implemented. No such evidence was introduced because it does not exist. Defendants' failure to take any action in response to such obvious deficiencies up to the date of trial is evidence Defendants are content to continue using nurses
>
> ***
>
> Using nurses as the first line, and often last line, for providing care is medically unacceptable. While using nurses in this way is driven by a lack of higher-level staffing, that does not excuse Defendants from adopting a system that leads to preventable deaths.

(Doc. 4335 at 41-44.)

The Monitors' reviews of the deaths in 2023 and 2025 show not only has that practice continued unabated but, when performing mortality reviews, Defendants continue to fail to identify serious failures or take any action to prevent their recurrence. Moreover, Defendants have shown a complete inability or unwillingness, or both, to recognize and correct their failures, exacerbating the grave and continuing threat of harm and actual harm suffered by inmates. Further, it is important to note that in contrast to the numerous mortality reports presented as evidence at the 2021 trial, which were some of the most egregious examples of failures, the Monitors restricted their selection to a very few in 2023 and 2025. Notably, however, all eight selected demonstrated poor analysis and review. And it deserves repeating, Defendants represented to the Court in March 2024 that Dr. Phillips intended to "aggressively make improvements in the mortality reports." (*See, supra*, footnote 29.) Clearly Dr. Phillips was unsuccessful as four of the deaths reported in the Monitors' recent analysis occurred in 2025.[49]

---

[49] Defendants, in response to the Motion for Receiver, noted that the Mortality Review Committee has very recently made "several recommendations for corrective action" of poor treatment of patients, which is painfully overdue. (*See* Doc. 4973 at 15.)

In addition, the Monitors have pinpointed systemic failures that directly violate the Injunction and place prisoners at grave risk of imminent harm.[50] In evaluating whether prisoners are given enough information for informed refusals of medical care, the Monitors found common situations where prisoners' refusals were not informed in violation of the Injunction. This was exemplified by Patient 33, who decided to stop his medication to treat his opiate use disorder after an 11 ***second*** interaction with an LPN at his cell front in April 2025. (Doc. 4968 at 30.) The Monitors concluded there was no chance Patient 33 could have been informed of the serious harmful consequences of discontinuing medication for opiate use disorder during the 11-second interaction. Similarly, Patient 43 had a chronic care visit scheduled for April 30, 2025, but because he incorrectly believed he no longer had hepatitis-C, he signed a blank refusal form that was slipped under his cell door, which he signed at 10:07 a.m.; a medical assistant signed the document in the space under the patient's signature 53 minutes later ***falsely*** indicating that they were present to obtain the refusal from the patient, but at no point within the 3-day window required by the Injunction did any practitioner meet with Patient 43 to explain to him that he still had hepatitis-C or the consequence of refusing his visit for hepatitis-C treatment. (*Id.* at 31.)

Additionally, Patient 34 had an off-site appointment scheduled with a gastroenterologist on April 23, 2025 for a colonoscopy due to his familial history of colon cancer; Patient 34 was not told why he was being sent to a "stomach doctor" and when he refused the appointment, a nurse spent 15 ***seconds*** at his cell administering medication and the Monitors concluded she could not have obtained informed consent for the refusal while administering medication in that short period of time. (*Id.*at 33.) The refusal form was again signed 5 hours later by a medical assistant ***falsely*** indicating that the assistant was present to obtain refusal from the patient. (*Id.*)

In August 2024, Patient 37 reported to the Monitors that refusals are sometimes just

[50] Although the Court highlights some examples here, the Monitors have documented numerous examples of violations of the Injunction and the serious risks of harm posed to prisoners as a result of the noncompliance, as set forth in their Reports, in addition to their statistical analysis of non-compliance with the Injunction.

based on "word of mouth" from officers. (*Id.* at 34.) Patient 60 submitted an HNR on February 3 stating, "I recently fell from the top bunk directly on to my back. Not only was the wind completely knocked out of me, but I also may have dislocated a rib as I can't hardly move left to right, up & down. Struggling to climb to bunk." Though the patient only submitted one request, there are 3 separate entries closing out this request in the patient's EHR on February 7, two indicating that the appointment was cancelled and one that it was refused, but there is no evidence that he actually refused or that any health care staff member had a direct interaction with the patient to confirm he no longer needed to be seen. (*Id.* at 74.)

Patient 61 had an appointment to see a practitioner as a follow-up to a visit with an orthopedic surgeon who recommended the patient have surgery to repair a torn ligament in his knee. There is a document with the word "refusal" executed by a medical assistant who somehow heard from a correctional officer that the patient "did not want to come to medical." His visit was cancelled in direct violation of Injunction provision 1.21b. (*Id.* at 75.)

Patient 62 was referred to see a cardiologist on February 12, 2025 due to an abnormal EKG that raised concerns that he might have blockages of arteries in his heart. A refusal form indicates that the patient is refusing a "med run" with the reason given, "don't need it" and was signed by an LPN. The refusal does not address cardiology, but the referral to the cardiologist was cancelled by an unidentified person without explanation and without rescheduling in direct violation of Injunction provision 1.21c. (*Id.* at 76.)

Likewise, in evaluating whether emergent and urgent care is given in compliance with the Injunction, the Monitors noted examples of seriously deficient emergent and urgent care, in violation of the Injunction posing an obvious risk to the prisoner's health and safety.

Patient 44 has a history of coronary heart disease, high cholesterol, asthma, and gastric reflux disease. At 11:45 PM on February 19, 2025, he complained of acute, severe (7 to 10 out of 10) left-sided chest pain with left hand numbness, and initially accompanied

by nausea. Despite two dangerously high blood pressure readings, an EKG showing an electrical abnormality, abnormal skin color, and pain reproducible with palpation, a practitioner who neither saw or examined the patient made the decision to give a single dose of a blood pressure medication, a prescription for a stomach medication, and a drug test in the morning. (*Id.* at 46.) The Monitors concluded that "[f]ailure to arrange [the patient's] immediate evacuation put the patient at significant risk of death from a heart attack." (*Id.* at 47.)

Patient 45 is a 71-year-old male with 21 problems on his problem list, including asthma, hiatal hernia, gastric polyps, prediabetes, H. pylori infection, gastroesophageal reflux, traumatic brain injury, hyperlipidemia, seizure disorder, and a lumbar spine compression fracture for which he is on 12 medications. He had an acute episode of vomiting "coffee grounds" just past midnight on February 25, 2025, and was seen by an RN, acting independently, using a nursing protocol prohibited by the Injunction. The nurse ordered medication (without a legal physician's order) to stop the vomiting and ordered no further monitoring, and although the patient vomited again 5 more times, absent any instructions from the nurse, staff did nothing in response to additional vomiting. The Monitors concluded that "[t]his care put the patient as significant risk of massive blood loss and possible death" given that emesis described as coffee grounds is indicative of internal bleeding until proven otherwise requires, at a minimum, close observation for the next several hours and an emergent blood test to check for bleeding. (*Id.* at 48.)

The Monitors also detailed examples regarding non-urgent, episodic care creating grave harm to patients.

Patient 46 had 6 separate non-urgent encounters over a 6-month period starting in November 2024 that "all demonstrated a failure of multiple different professionals to fulfill the requirements of this provision to provide clinically appropriate episodic care, ultimately leading to a potentially life-threatening complication." (*Id.* at 49.) In his first visit, despite showing symptoms of a bladder obstruction, a practitioner, without seeing Patient 46 simply ordered antibiotics for a bladder infection, even though the patient's complaints

indicated a need for urgent treatment. In his second visit, a week later, Patient 46 reported his symptoms had not improved with the antibiotics and an RN acting independently (in direct violation of the Injunction) failed to examine the bladder, prostate, or kidneys. A week later, the patient was seen again by an RN reporting burning while urinating and back and flank pain; the RN again directly violated the Injunction and repeated the failures of the week before. Four months later, the patient was again seen by an RN for urinary symptoms, and the RN practicing independently (in violation of the Injunction) did not examine the prostate, bladder, or kidney and inappropriately ordered antibiotics. About two weeks later, the Patient reported incontinence and requested to be seen ASAP, but despite the emergent nature of his complaint, he was not seen until six days later; at which point, he had urinary incontinence for two weeks and a non-physician practitioner, in violation of the Injunction, who treated Plaintiff, did not conduct a prostate, bladder, or kidney exam, failed to appreciate the urgency of the situation, and instead ordered non-urgent blood tests, without including a blood test measuring kidney function, and ordered a non-urgent ultrasound of the patient's prostate, despite the urgency of the symptoms.

A week later, the patient was still incontinent, asked for the insertion of a foley catheter despite that the patient knew insertion of such catheter is extremely painful, which would have prevented future hospitalization, but the patient was instead placed on more antibiotics. Four days later, the patient exhibited acute changes in his mental status and was finally sent to the emergency room with the findings: "His mental confusion was a result of urinary retention resulting in acute kidney failure complicated by potentially life-threatening blood electrolyte abnormalities (hyperkalemia, hyponatremia, and acidosis), and a urinary tract infection due to a multidrug resistant organism, potentially the result of the misuse of several antibiotics." "Given the high degree of antibiotic resistance of this organism, infection prevention precautions should have been put in place upon return to ADCRR to prevent the spread of this very dangerous and difficult-to-treat organism to other sick patients, putting them at significant risk of serious harm. No such precautions were put into place." (*Id.* at 50-51.)

Patient 47 also suffered a kidney function that significantly declined in the latter half of 2024 and both an ultrasound on November 20, 2024 and then a CT scan on December 31, 2024 showed severe back-up of urine into his kidneys (hydronephrosis), but his providers failed to recognize the urgency of the problem, and "[d]ue to the delay in clinically appropriate care, the patient now has irreversible kidney damage that the kidney specialist thinks will likely require hemodialysis." "Despite the complexity of his case, the patient is assigned to an APP, instead of a physician (in violation of Injunction sections 6.2 and 7.3.) However, the assignment is meaningless because over the course of six primary care visits in nine months, the patient has never seen the assigned PCP, saw the same APP for only two of the visits, two different APPs for two other visits, a physician for one visit, and a different physician for a second visit." (*Id.* at 52.)

Patient 49 was undergoing treatment for opioid use disorder, and although a relapse was indicated from the inappropriate care he received in June 2024, in July 2024, a MOUD practitioner wrongly discontinued buprenorphine when the patient did not come to the appointment and an LPN and correctional officer subsequently signed a "refusal" form on July 22, 2024 (in violation of Injunction section 1.21) "which has no meaning nor value as neither actor is competent to conduct an informed refusal." "Thus, despite the ongoing significant risk of overdose associated with his opioid use disorder, ADCRR failed to engage this patient." On August 1, 2024, the patient presented with acute urinary symptoms and was diagnosed with a kidney infection, but though his urine also showed large amounts of glucose and ketones consistent with diabetes and possibly ketoacidosis, a life-threatening and urgent complication of diabetes and his kidney infection and diabetes required an examination by a provider and immediate blood testing, no further testing was done, and he was merely started on medications for diabetes and sent back to his living unit. On August 2, 2024, an ICS was triggered because the patient had worsening abdominal pain, he was sent to the ER and diagnosed with sepsis that had resulted in the kidney infection (pyelonephritis) and uncontrolled diabetes and he was started on intravenous antibiotics, but left the hospital against medical advice after two days. A blood

infection from MRSA requires a minimum of 10 days of antibiotics (ideally intravenously) and without proper treatment often causes secondary infection in the body (e.g., heart valve, organs, bone.) The remote APP, charged with reviewing his condition immediately upon return to the facility on August 4, 2024, failed to seek any records regarding his hospital stay until almost two weeks later on August 14, 2024. Due to this information vacuum, Defendants did not provide any effective antibiotics for his serious kidney and blood stream infection and never addressed with this patient the ongoing risk of inadequate treatment of his life-threatening infection. His diabetes also remained out of control (blood glucose greater than 400, extremely elevated.) Thus, he remained at ongoing risk of serious medical harm from both infection and diabetes. An on-site practitioner saw the patient on August 23, 2024, almost 3 weeks after he left the hospital, but failed to address the patient's blood infection or high sugars, which were urgent clinical issues. A different practitioner started long-acting insulin without seeing the patient. On September 1, 2024, the patient was first seen for neck pain by a nurse and told he was sleeping wrong. He was seen by nursing again on September 3 and 4, 2024 for ongoing neck pain and stiffness.

Each of these visits, conducted by a nurse practicing independently, were clear violations of the Injunction (section 7.4.7) and caused harm, as his untreated infection had now invaded the bones of his spine and required urgent management. An on-site practitioner saw the patient on September 6, 2024, and gave him muscle relaxants, warm compresses, and a referral to physical therapy. The practitioner noted needle marks on the patient's carotid veins, a sign he might still be using drugs intravenously, which increases his risk of re-infection of his blood and the ongoing risk from his inadequately treated prior blood infection. The practitioner should have, but did not, consider and evaluate the patient for serious infection based on his clinical history (in violation of Injunction section 1.1.) Nurses, acting independently, again saw the patient for ongoing head and neck pain on September 17, 23, and 24, 2024, when he was finally referred back to a practitioner. He eventually had blood tests drawn on September 26, 2024, which were reported back to Defendants on September 28, 2024, but were not reviewed until October 7, 2024 (in

violation of Injunction section 4.3.) On September 28, 2024 the patient was finally sent emergently to the hospital due to headache, decreased level of consciousness, incontinence, lethargy, rocking in pain, and shivering. His MRSA infection now involved his blood, heart valve, heart tissue, brain, and spine. The infection was so severe at this point, that it required not only intravenous antibiotics, but also antibiotics administered directly into the fluid around the brain. A note on October 19, 2024 documented a call between the doctor in the hospital and a practitioner at the prison in preparation for discharge that requested weekly labs results be faxed to the hospital for review until the patient was predicted to be off intravenous antibiotics (November 20, 2024) and follow-up with a heart specialist and an infectious disease specialist around the time antibiotics were to be ending. None of these necessary measures occurred as requested (in violation of Injunction section 1.1.)

Upon return from the hospital on October 22, 2024, Defendants placed the patient in an IPC or SNU bed (the medical records contain contradicting statements.) The patient had vital signs and nursing assessments conducted at haphazardly spaced intervals, sometimes going days without any vital signs or a nursing assessment which was not clinically appropriate based on the patient's clinical acuity (in violation of Injunction section 7.6.)

> Given his condition, this lack of adequate nursing care placed him at great risk for serious medical complications. In light of the patient's known serious heart, brain, and spine infection in the setting of poorly controlled diabetes, he also required daily examinations by a practitioner upon admission back to [Defendants], if not more frequent examinations, especially when he started complaining of worsening neck pain and new urinary incontinence on November 6, 2024. Instead, from the date of discharge from the hospital (October 22, 2024) until December 7, 2024, practitioner care was provided only via telehealth using remote personnel and only on the following dates: October 22, 23, 25, November 6, 19, 21, 26, 29, and December 1, 2024. During this time period, he was never once examined by a provider for changes in his heart, brain, or spinal cord function, despite their highly vulnerable status. His antibiotics were discontinued on November 20, 2024 without any clinical reassessment by an onsite provider

> or outside specialist to determine if this was still clinically appropriate. This was extremely dangerous as it is important to ensure a serious infection is improving based on clinical signs/symptoms and laboratory tests before stopping a course of intravenous antibiotics and to establish a long-term treatment plan (in violation of section 1.1.) In fact, this patient did not see an on-site provider until December 7, 2024, almost six weeks after his hospitalization, and only after going back to the hospital on December 1, 2024 for worsening symptoms. Due to the seriousness of the infection, even after completing a course of intravenous antibiotics, he was started on a year-long course of oral antibiotics at the hospital. The patient was not scheduled with a neurosurgical specialist until March 7, despite discharge from the hospital on October 22, 2024 with instructions to wear a cervical collar at all times due to concern about the stability of the bones in his neck and compression of his spinal cord. The cardiology consultation that was supposed to occur in late November 2024 for his serious heart infection was not scheduled to take place until February 10, and then was rescheduled to April 17 due to insufficient ADCRR transportation resources. The infectious disease consultation to follow-up on the overall management his life-threatening infection that was also supposed to occur in late November is still not scheduled as of June 23.

(*Id.* at 53-57.)

Patient 50 is a 41-year-old male with a number of serious conditions, including heart disease, was seen on February 19, 2025 complaining of intermittent chest pain and experiencing a discharge of the internal defibrillator. The APP did not obtain further essential history and examination and noted she was unable to conduct a physical exam due to telemedicine, but made no effort to have a physical examination scheduled. Despite that these symptoms required urgent or emergency referral to a cardiologist, the APP ordered a routine referral. This was the first time this patient saw this APP and over the course of six months since his arrival in early January 2025, Defendants assigned him a new PCP 18 times, only 2 of those assignments were to physicians, and only for a total of 5 days; the rest were all APPs (or indeterminate.)

Patient 51 was found to have an abdominal aortic aneurysm during a hospitalization

and incorrectly referred to a cardiologist rather than a cardiovascular surgeon. The Monitors concluded that "in light of the great delays ADCRR is experiencing in getting patients to the specialists they need to see on time due, in part, to caps on daily custody transportations . . . such inappropriate referrals exacerbate those delays, indirectly leading to a dangerous delay of more urgent and necessary consults." (*Id.* at 58-59.)

Patient 52 was diagnosed with multiple myeloma, a serious blood cancer, during a hospitalization, and upon discharge on February 20, 2025, hospital specialists recommended that he receive the next dose of chemotherapy the following day, and then see the oncologist two to three days later, but the patient did not have the chemotherapy for 5 weeks, and did not see the oncologist until March 14, and Defendants did not provide the oncologist the medical records. The Monitors opined that "[f]ailure to arrange timely continuation of the chemotherapy to bring the cancer under control started in the hospital, put the patient at significant risk of serious harm." (*Id.* at 60.)

Patient 53 has Type 2 diabetes and is on insulin; the order to have his blood glucose checked every morning expired on March 10, 2025 and, since then, he has received inconsistent blood tests. The Monitors conclude "This above continuing error in nursing care might have been noticed had the patient had a primary care practitioner and had been receiving chronic care for his diabetes. Instead, he was last seen on March 5 by an APP other than his assigned PCP (in violation of Injunction section 7.2) for diabetes. The APP's plan for management of the patient's diabetes was for him to return to the clinic if the patient felt it was necessary or had any concerns about diabetes. There was a chronic care clinic appointment scheduled for June 16, but that date has come and gone without a visit (in violation of Injunction section 1.22c.)" (*Id.* at 62-63.)

Patient 54 had an MRI ordered in response to a concern about a spinal cord mass on February 25, 2025. Defendants did not schedule the MRI to be completed until April 4, in part because of a failure to treat the situation with sufficient urgency and in part due to transportation being unavailable, which risked irreparable harm because a mass on the spinal cord could cause irreversible paralysis. The April 4, 2025 MRI did not occur;

although this was not the fault of the Defendants, it was not rescheduled immediately and was not completed until May 9, 2025. The Monitors opine that the 9-10 week delay posed a serious risk of harm to Patient 54. (*Id.* at 64-65.)

Patient 58 has Hodgkin's Lymphoma and was last seen by an oncologist in July 2024. Despite evidence of possible cancer spread and a recommendation from the oncologist that the patient see an oncologist specializing in lymphoma, the appointment was not made for more than 8 months, which caused "avoidable suffering due to inadequate pain management." (Doc. 4968 at 69-70.)[51]

Patient 59 has HCV-related liver cancer. On September 20, 2024, a surgeon recommended that Defendants refer him to an interventional radiologist to ablate two cancerous lesions in the liver and then obtain an MRI four months hence. The APP ordered the referral as "routine," i.e., within 2 months (in violation of the Injunction section 1.1.) The patient's assigned PCP was another APP (in violation of the Injunction, section 6.1-6.2.) The first APP's order was ignored (in violation of the Injunction, section 1.22) and he was not seen. The referral to remove the cancer, which, if completed as ordered, should have been completed by November 30, 2024 was not scheduled until January 3 (in violation of the Injunction, section 1.22d), but the removal of the cancer did not occur on this date, and instead, the patient was mistakenly sent for another MRI, which MRI showed the larger of the two cancers had grown by more than 50% from 42 mm to 66 mm. On January 23, an oncologist saw the patient and reiterated that the patient needed to be seen by the interventional radiologist STAT sending back a hand-written note with the patient. Due to his concern that the patient's care was not being addressed, he also followed up with a typed note containing the need for a STAT referral and stating "This was conveyed to the prison via notes, as well as, a phone call to the prison coordinator."

The handwritten note has been in the patient's chart since January 23, 2025, and as of July 2025 had not been reviewed by a clinician (in violation of Injunction section 4.4.2 requiring review within four days.) On April 28, 2025, an APP who was not the patient's

[51] This Patient had not yet been seen by the specialist at the time of the Monitor's report.

PCP saw the patient in a primary care visit (in violation of Injunction section 6.1/6.2 and in violation of Injunction section 6.3), noted the need for an urgent visit with an interventional radiologist to ablate the cancer lesion in the liver and ordered it with urgent priority, but it was not scheduled to take place until June 5 (in violation of the Injunction, section 1.22d.)

The Monitors opine that as a result of these numerous violations of the Injunction, a patient with potentially curable liver cancer that was first identified on September 20, 2024, for whom removal of the cancer should have taken place by the end of September, 2024, did not have that treatment until June 5, 2025 more than nine months later, resulting in progression of cancer, and decreased overall rate of survival. (*Id.* at 70-72.)

Patient 64 was seen for management of his diabetes on February 20, 2025. During the visit, it was noted a diabetes-related test from December was mild to moderately elevated; the practitioner ordered a repeat test, which was returned on February 22, 2025 showing that his diabetes was now much more poorly controlled. The practitioner did not review the result in a timely manner (in violation of Injunction section 4.4.2.) As a result, the patient had a very abnormal test result on February 22 that was not shared with the patient until April 22, not treated in the interim, and for which there was an intentional plan that the patient would not receive treatment until May 2, almost 3 months later (in violation of Injunction section 1.1) placing the patient at risk of serious harm. (*Id.* at 79.)

Patient 70, a 21-year-old Spanish-speaking male, was initially seen by a nurse on February 1, 2025 at approximately 9:30 a.m. without an interpreter (in violation of Injunction section 3.1) for a complaint of constant right upper quadrant abdominal pain with nausea and vomiting 15 times, starting that day. The patient was noted to be pale with abdominal pain on exam in the right upper quadrant. A remote practitioner prescribed fluids by vein and mouth and ordered anti-nausea medications, and directed the practitioner be updated in one hour, but no one ever did any follow up. The patient returned the next day with 9/10 abdominal pain and nausea. A nurse, practicing independently, cared for the patient using a disallowed Abdominal Pain or Injuries Nursing Protocol. The patient

was seen again by an RN on February 3, 2025 for continuing nausea and a loose stool, low-grade fever of 100.9, and abdominal pain 10 out of 10. The patient was put on a bland diet and full liquid diet simultaneously and told to drink fluids and rest, was given an antidiarrheal even though he said he only had one stool in the past 24 hours, and the nurse obtained an order for acetaminophen from a practitioner since it was not available in commissary, but a provider still never saw the patient and there is no indication that the nurse discussed the case with the practitioner beyond asking for permission to use stock acetaminophen.

On February 5, 2025, the patient was seen by yet another nurse because he now had fever, chills, headache, and dizziness. Although he had a fever, the nurse told him to come back if "any other [symptoms] return." On February 6, 2025, he was seen for the sixth time with intermittent right upper quadrant abdominal with chills all night, pain when his abdomen was pressed and a fever of 102. He was given acetaminophen and a practitioner ordered laboratory tests and an abdominal ultrasound without seeing the patient or sending the patient to the ER. The ultrasound was not done until the next day, February 7, resulting in the patient being sent immediately to the hospital due to a finding of acute inflammation of the gallbladder with a gallstone in the duct on ultrasound. He underwent urgent surgery. During the operation, the degree of inflammation present made the surgery difficult. The Monitors opine that the delay in care due to the repeated nurse visits could have led to sepsis and death, and likely increased the patient's risk of surgical complications due to the amount of inflammation present. There were numerous violations of section 1.1 of the Injunction throughout this patient's care. (*Id.* at 91-92.)

Patient 78 is a 29-year-old male with Type 1 Diabetes on insulin and has suffered 4 episodes of low blood sugar, only receiving insulin once he becomes delirious or unconscious, which could have been avoided by allowing him to have oral glucose in his possession in violation of Injunction provision 10.5.5. Allowing low blood sugar to the point of unconsciousness in Patient 78 presents a risk of permanent brain damage or death. (*Id.* at 112.)

All of the above examples identified by the Monitors in their report echo the same unconstitutional care presented during the 2021 trial. And they reflect, despite Defendants' promises to address them by strictly adhering to the requirements of the Injunction, prisoners still remain exposed to an intolerable grave and immediate threat of continuing harm and suffering because the systemic deficiencies pervade the administration of health care.

Accordingly, the first factor supports the appointment of a receiver. *See United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *12 (S.D. Miss. Jan. 30, 2023) (first *Plata* factor favors the appointment of a receiver where "the conditions have not improved, nor has the situation become any less unconstitutional since [defendant] was last directed to remedy the problems.") (internal quotations and citation omitted); *Nunez v. New York City Dep't of Correction*, 782 F. Supp. 3d 146, 161–62 (S.D.N.Y. 2025), *reconsideration denied,* No. 11-CV-5845-LTS-RWL, 2025 WL 2939046 (S.D.N.Y. Oct. 16, 2025) (same.)

**2. Exhaustion or Futility of Less Extreme Measures**

Since this litigation commenced, rather than imposing the most punitive sanctions, the Court has painstakingly sought to and imposed the least restrictive measures and requirements on Defendants to incentivize compliance with the Constitution. Magistrate Judge David Duncan was devoted to tirelessly working with both parties to design an agreement that created medical Performance Measures that Defendants unreservedly agreed to fulfill.

But between 2016 and July 2021, Plaintiffs, frustrated with Defendants' persistent unconstitutional conduct, filed twelve motions to enforce the Stipulation, followed by multiple evidentiary hearings and status conferences which resulted in dozens of orders with detailed directions mandating Defendants comply with the 2014 Stipulation. What followed was three Orders to Show Cause why Defendants should not be held in contempt, which required the Court appoint experts, resulting in Defendants being held in contempt twice. They were fined millions of dollars upheld on appeal. (*See, e.g.*, Docs. 2898, 3861.)

Finally, an exasperated Court found Defendants had blatantly refused to comply with the Stipulation, having offered baseless legal and factual reasons. The substantial fines, and threats of more, proved worthless as an attempt to bring Defendants into constitutional compliance. (Doc. 4335 at 4.)

The Court appointed many experts and held a bench trial in 2021, which disclosed even more shocking, unconstitutional healthcare, including what can only be described as cruelty. One prisoner suffering extreme pain at the end of life was refused palliative care by the private contractor, Centurion, because he had been designated "Do Not Resuscitate," which, as a matter of simple common sense, is irrelevant to palliative care. Consequently, "his cachectic body was racked with pain, and he wasted away with no reasonable assistance from medical science in the form of comfort or compassionate pain control." (Doc. 4335 at 53.)

The 200-page 2022 Order containing Findings of Fact identified with graphic detail that if Defendants had ever intended to abide by the 2014 Joint Agreement, they abjectly failed. Thus, the long and difficult history of Defendants' noncompliance throughout the litigation informed the Court that robust, stringent, firm barriers and requirements were necessary to compel Defendants to constitutional compliance. Thus, the uniformly agreed upon 2023 Injunction emphasized it was inspired by the many years of Defendants' recalcitrance and resistance to change such that the Court would demand strict compliance. The Court stated, "the changes necessary to redress the failures will be substantial." (Doc. 4410 at 4.) And "significant detail regarding medical care [and] mental healthcare" will be clearly articulated. (*Id.*)

Defendants offer the appropriate period for consideration for this motion is the time since the April 2023 entry of the Injunction because the Injunction "dramatically altered what the Department is required to do." (Doc. 4818 at 18.) This reflects Defendants' profound misunderstanding of the law and facts of this litigation. The alleged unconstitutional violations by the Defendants in the complaint are the same unconstitutional violations that have occurred throughout the long history of this litigation.

From the beginning, Defendants were alleged to have failed to provide medical and mental health care as required by the Constitution, and the Injunction, which Defendants helped draft and to which they stipulated in 2023, reflects the exact same violations that have persisted throughout this litigation. The preamble to the Injunction reads the "unusual scope of this Injunction is informed by Defendants' actions throughout the case . . . the Court cannot impose an Injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible." And the breadth of the Injunction is not a "dramatic" alteration of Defendants' obligations. Rather, it is a comprehensive elucidation of what has always been required of the Defendants. And the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation.

The 2023 Injunction—a much less extreme measure than receivership—was ordered with the manifest goal of offering Defendants a hoped-for final opportunity to remedy their constitutional violations. This less restrictive sanction designed to invite Defendants' compliance has failed again. (*See* Doc. 4410 at 2 n.1 ("The decision not to appoint a receiver was based on the Court's expectation that Defendants appeared willing "to cooperate" and "act in good faith" in monitoring their performance under an Injunction. . . . Any failure to act in good faith **or to meaningfully comply** with this Injunction will revive consideration of appointing a receiver.") (emphasis added).) The history of the Injunction bears briefly repeating.

As noted above, since entry of the Injunction, Defendants' paltry efforts to remedy the constitutional violations in the provision of healthcare have been in substantial conformity with their behavior throughout the litigation. Within three months of the effective date of the Injunction, in July 2023, Defendants were in fundamental violation because of serious lack of critical staffing. A series of lengthy hearings, attended by Director Thornell, were held from August 2023 to May 2024 to prompt Defendants into compliance. Plaintiffs and the Court refrained, at each of those hearings, from initiating immediate contempt sanctions and Defendants were repeatedly urged by the Court to find

ways to meet the requirements of the Injunction. Instead, Defendants, in violation of the Injunction and law, repeatedly placed the entire blame on the contractor, NaphCare. The Court emphasized to Director Thornell at the March 2024 hearing that compliance, including increasing staff, was essential. The Court inquired what he planned to which he responded: "[w]e discuss it" and he has "sent letters."

Also of significance is Defendants' startling response in 2024 to the Monitors' opinions in which Defendants stated that the Monitors failed to provide a "how-to" plan to achieve compliance, which was never contemplated by the Injunction. And Defendants have repeatedly attempted to excuse their conduct by arguing funds are not available and the legislative process to seek more funds is impractical, unworkable, and essentially nonfunctioning. In particular, regarding attempted funding of the Pilot project, the Defendants initially resisted and informed the Court the problem was not with Defendants but because of the "NaphCare contract" and the "healthcare" generally. Defendants stated: "Because for this fiscal year they're already millions of dollars over budget because of the Injunction and the healthcare and the NaphCare contract." (Doc. 4634 at 112.) Defendants added, "we don't have the money . . . . It would require a new contract with NaphCare. It would require approval of the JLBC." The mutually agreed upon Pilot was ordered to assist Defendants in shifting to the PCCM and to allow for a smaller initial implementation by Defendants, rather than requiring implementation of the entire, much larger staffing plan across all facilities. However, Defendants' participation was so deficient that it completely undermined any confidence in their ability to ever implement the PCCM and more widely.

Again, Defendants are non-compliant with 131 of 154 Quality Indicators of the Injunction. (*See* endnote 1.) Defendants have failed to accept the feedback, instruction, and coaching from the neutral Monitors. Although Defendants chose the Monitors, who "have been providing such feedback, heavily, in formal reports, in informal documents, and—over hundreds of hours—orally, since the inception of the Injunction (if not before), [and] have also offered numerous additional meetings with the Health Services Division staff to assist Defendants with reviewing and understanding the requirements of the Injunction and

[the Monitors'] methodology," Defendants "declined" "those offers." (Doc. 5040 at 5.) Defendants have nonsensically claimed that hiring "an individual or individuals with significant health care management experience to help Defendants reform the current system," though less extreme than a receivership, would be duplicative and unnecessary given their intent to receive recommendations from a consulting firm. (Docs. 4552 at 15; 4566 at 6-7.) Defendants never explained how this would accomplish something different or better than what the Monitors have already provided. Moreover, the consulting firm's eventual report produced no discernible change.

Defendants suggest a special master would be preferable to a receiver, but "[a] special master is primarily useful for conducting hearings and making recommended findings of fact [and Defendants have] not raised any factual issues to be addressed in such hearings, and [have] not asked for those hearings." *Plata*, 603 F.3d at 1098. Moreover, Defendants were already effectively provided a very well-qualified dedicated special master that they proceeded to squander. Magistrate Judge David Duncan, for six years, worked tirelessly, sometimes weekly, with Defendants and Plaintiffs to identify ways, and to design an acceptable plan, to allow Defendants to remediate the unconstitutional healthcare. It failed because Defendants chose to completely resist the terms and requirements of the Stipulation. There is no justifiable basis for a special master that would serve any purpose beyond that already fulfilled by the Court's Rule 702 experts and Monitors.

The Court's efforts have proven to be an exercise in futility. To date, and despite the repeated offers of assistance and advice from the Monitors, Defendants offer no concrete plan to achieve compliance other than to limp along with their continuing failure to comply with the Injunction. Accordingly, the second factor favors appointment of a receiver. *See Coleman v. Newsom*, No. 2:90-CV- 0520 KJM SCR P, 2025 WL 2475040, at *10 (E.D. Cal. Aug. 27, 2025) ("Notwithstanding the court's substantial effort, . . . the work is unfinished, the progress too slow and no end in sight if the current framework remains in place."); *Nunez*, 782 F. Supp. 3d at 162–63 ("The DOC has repeatedly failed to

incorporate the Monitoring Team's thoughtful recommendations, which are backed by years of expertise, experience and research, and 'has taken few concrete actions to adopt these recommendations (or devise reasonable alternatives)' to come into compliance with the Contempt Provisions . . . .This pattern has been well documented by the Monitoring Team for years . . . .There is no doubt that these less extreme measures have proven futile.".)

### 3. Effectiveness of Continued Insistence on Compliance

In issuing the Injunction, the Court stated:

> **Moreover, the unusual scope of this Injunction is informed by Defendants' actions throughout this case. Despite their agreement and promise to the Court to do otherwise, Defendants have fought every aspect of this case at every turn.** Defendants entered into a settlement agreement where they claimed they would improve the care provided to prisoners and improve the conditions of confinement for the subclass. Yet almost immediately Defendants failed to perform those obligations and continued in that failure. Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage. During trial, Defendants presented arguments and witnesses that were manifestly unreliable and unpersuasive. And on some aspects, Defendants presented no meaningful defense at all…Most importantly, trial established **Defendants blatantly had not made any serious effort to remedy the flaws highlighted by this litigation. Given this history, the Court cannot impose an Injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible.**

(Doc. 4410 at 4-5 (emphasis added).) Despite this finding of continuous resistance throughout this litigation, Defendants appear oblivious to the ongoing harm caused by their actions. Defendants persist in challenging the Injunction they approved. Many examples of Defendants' non-compliance with the Court's Orders and the Injunction have been mentioned, but some very recent instances particularly demonstrate the ineffectiveness of continued insistence on compliance with the Injunction.

During the staffing Pilot, Defendants' Health Services Division (HSD) PCCM Team, Pilot Front-Line Staff Teams, and Court Experts were required "to provide coaching to the front-line Pilot clinical teams, identify emerging issues and needs, and to build the HSD PCCM Team's experience with coaching, distilling team experience and applying it to other teams." (Doc. 4761 at 9.) Although the meetings should have begun on October 8, Defendants instructed the Monitors to not have any contact with the Pilot team staff without HSD and were told to only schedule these meetings with HSD. (*Id.*) Despite numerous requests from the Monitors, HSD ignored all of them with the exception of one meeting in November. (*Id.*) As a result, at the end of the Pilot, front-line teams, "reported needing far more hands-on support, especially during their early weeks of the Pilot," and the failure to schedule these meetings meant "the teams . . . did not receive support in using process improvement cycles, developing open scheduling, developing RN roles, strengthening daily huddles, . . . did not experience coaching and their skill set did not grow as intended, [and] did not gain experience with many of the components of the PCCM and are therefore not able at this time to serve as 'ambassadors' to other units and complexes on these components during the statewide implementation of the PCCM." (*Id* at 9-10.) This also meant the Monitors were left to try to gain data necessary to evaluate the Pilot from other sources. (*Id.* at 10.)

Again and throughout, Defendants repeatedly attempt to defend their behavior by claiming lack of resources—money, space, and the NaphCare contract. And they have repeatedly been reminded of binding authority[52] that money and space is required to be utilized to bring healthcare to prisoners into constitutional compliance.

The Pilot Program was designed to provide Defendants a significant opportunity to demonstrate they could comply with the Injunction on a smaller scale. Despite the Court's clear, specific orders, Defendants "were not able to secure staffing for all positions needed to fully implement the Pilot." (Doc. 4814 at 7.) As noted above, Defendants did not run the Pilot fully at either site, and it was terminated at one site after only eight days. The

[52] *See Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014.)

termination was attributed to insufficient space, even though Defendants had specifically selected the pilot sites, and had been on notice of the inadequacy of space at that site since at least July 2024.

Similarly, complex-wide communication about the Pilot was necessary "to build anticipation about the PCCM and staffing plan, quell rumors, and give staff a venue for asking questions." (Doc. 4761 at 11.) Despite the Court's instructions, the fact that Defendants' Facility Health Administrators welcomed and sought such communication as they were barraged with questions and rumors, and the Monitors "described a number of venues through which this could occur including newsletters, reports at staff meetings, email blasts, FAQs, discussion groups, staff and patient testimonials, and more," Defendants did not comply. (*Id.*) Indeed, the Court "required communication across the rest of the ADCRR complexes beginning in late September and continuing throughout December to prepare the other seven complexes for the statewide rollout of the PCCM and staffing plan." (*Id.*) Defendants did not do any of it; instead they created an unmonitored email address, which did not accomplish any goals. (*Id.*) Defendants did not implement any of the communications and failed to inform health care and custody staff at the other complexes of the PCCM or staffing plan. (*Id.*)

Defendants still have no plan to fully implement the PCCM and related staffing and space provisions of the Injunction, even though the Monitors "have been providing such feedback, heavily, in formal reports, in informal documents, and—over hundreds of hours—orally, since the inception of the Injunction (if not before) [and] have also offered numerous additional meetings with HSD staff to assist Defendants with reviewing and understanding the requirements of the Injunction and [the Monitors'] methodology, but have had those offers declined." (*Id.* at 5.)

Defendants offer and exalt heavy reliance on some improvements and promises of more as if they should be praised, not sanctioned. The Monitors readily credit Defendants where appropriate, but find Defendants significantly overrepresent their success in substance use treatment and HCV treatment. (*Id.*) In fact, the improvements are a small fraction of the Injunction and "taking into account the nature, number, and speed of

improvements, does not change [the] core findings" that non-compliance with the Injunction persists and poses serious risks of harm to the prisoners. (*Id.* at 38.)

Of equal concern is the substantial undermining tension between Defendants and NaphCare. Defendant Thornell, as Director, is tasked with providing constitutionally adequate healthcare to those in his custody. As noted above, the Court has repeatedly inquired of Director Thornell what provisions he has incorporated into the contract to ensure NaphCare provides constitutionally adequate healthcare in compliance with the Injunction and what sanctions have been implemented when NaphCare repeatedly breaches the contract. Despite the many years this action has been pending, four years since the trial, almost three years since the effective date of the Injunction, and the new leadership who claim to be committed to achieving constitutionally adequate care, the answers to these questions either do not exist or are unavailing. When the Court inquired, Defendants blamed the "NaphCare contract," the "cost of providing healthcare," and "the Injunction" as reasons they were unable to fully engage in the Pilot. (Doc. 4634.) Although the Court has, pursuant to the express terms of the contract, often inquired of Defendants about sanctioning their healthcare provider, Defendants have shown no cognizable interest in imposing sanctions that would result in actual change. Based upon a list provided by Defendants, as of September 22, 2025, Defendants have imposed $1,424,900 in sanctions since the inception of the Injunction.[53] Indeed, the CEO of NaphCare averred that "sanctions . . . have not in any way incentivized or influenced NaphCare's performance or compliance." (Doc. 4616-1 at 25 ¶ 10.) Although there is evidence in the record that Defendants' inability to directly control NaphCare interferes with implementation of the Injunction, the Director has never contended that he is unable to comply with the Injunction due to NaphCare's involvement in prisoner healthcare and, as the Court has previously

[53] "Of this, $645,000 was for 4 errors in patient care and 1 failure in a patient care process. The remainder appears to be for vacancies in mental health staff and failed inventory audits. Despite vacancies in mental health staff that existed consistently during the 28 months in question, Defendants only sanctioned NaphCare for vacancies that existed during 9 of those 28 months. Defendants did not sanction NaphCare for vacancies in medical staff during any month." (Doc. 5040 at 2.)

noted, Defendants have a non-delegable duty to provide constitutional healthcare to prisoners. (*See* Doc. 2898 at 16.)

Moreover, the Monitors document Defendants' unwillingness or inability to prepare NaphCare for implementation of the Injunction. (*See* Doc. 4761 at 11 (the Monitors "do not believe that any steps have been taken by [Defendants] to discuss the need to empanel and assign patients with NaphCare, to teach NaphCare how to run the empanelment program, or to otherwise plan to execute this first step in implementing the staffing model statewide.") Finally, as noted above and of substantial significance, Defendants did not object, or much less, even respond to NaphCare's Motion to Intervene despite NaphCare's bold assertion it had "significantly improved the healthcare system." Although NaphCare claimed it did not intend to relitigate the Injunction, NaphCare also stated in the Motion to Intervene it fully intended, in violation of the contract, to "tinker" with the Injunction provisions such as "staffing levels." It is not surprising NaphCare would be concerned about efforts to increase staff and raise their salaries because increasing staff might affect profits negotiated in the contract.

It is indeed "resoundingly clear" that rather than genuinely attempting to comply with the Court's orders and the Injunction or set forth any concrete plan of compliance, Defendants will continue to object to and fight each aspect of the Court orders, keep inaccurate records, unreasonably misread the Injunction's requirements to their advantage, offer unacceptable excuses for violations, and exploit any ambiguity to the maximum extent possible. *Plata*, 2005 WL 2932253 at *29; s*ee supra* at 37-38. It now falls to the Court to ensure that the Constitution is upheld.

The third factor supports the appointment of a receiver. *See Coleman*, 2025 WL 2475040, at *10 ("Even if there are finally a few signs of progress with respect to staffing, defendants do not appear close to achieving completion of the staffing remedy, let alone durably. . . . And staffing is but one aspect of the remedy long unfulfilled. Particularly if the court must continue to rely on contempt proceedings to obtain compliance with its orders, there is no indication defendants' reflexive practice of appealing the court's orders will cease."); *Nunez*, 782 F. Supp. 3d at 163 (finding that a persistent pattern of slow

compliance with Court Orders "despite support and guidance from the Monitoring Team reinforces the Court's conclusion that continued insistence on Defendants' proactive compliance with Court orders would only lead to further delay" and supports the third factor of receivership.)

**4. Lack of Leadership.**

Defendants assert the Department's leaders are committed to complying with the Injunction and making progress toward that goal and contend they should be allowed to continue these efforts, perhaps forever. However, the Monitors' reports reveal a stark lack of leadership able to effectively implement the requirements of the Injunction.

An additional, very recent example is instructive. In the wake of the staffing Pilot's abysmal conclusion, the Monitors opined that "[Defendants do] not have a plan for, nor the leadership expertise to, implement patient empanelment beyond the Pilot sites." (Doc. 4761 at 16.) HSD ignored the Monitor's repeated emphatic recommendation to designate a project manager, resulting in lack of organizational project management, revealing "[Defendants do] not have the project management capacity to roll the PCCM out statewide and implement the statewide staffing plan," or the "capacity to manage the schedule, marshal all assignments and deliverables, assign resources, track progress, effectively engage other ADCRR resources, and effectively interface with NaphCare." (Doc. 4761 at 13-14.) The Monitors further concluded that Defendants lack the technical expertise or tools to calculate the staffing of patient primary care or mental health teams based on panels and caseloads, or to modify staffing at some point in the future when patient complexity changes and Defendants have no mental health or medical leaders who have experienced or been trained in the PCCM model. (Doc. 4761 at 16.)

Defendants dismiss the grim performance of the staffing Pilot and its introduction of the PCCM as insignificant and not indicative of their leadership or seriousness. But Defendants either do not understand or have chosen to ignore the purposes of the Pilot and the importance of the PCCM, which is fundamental to the Injunction. The Pilot was a vital step toward constitutionally adequate care because adequately trained staffing is a

prerequisite for "successful fulfillment of the health care-related requirements of the Injunction" (Doc. 4539 at 16), and was, in many ways, the perfect opportunity for Defendants to demonstrate their willingness and ability to comply with the requirements of an Injunction. Defendants' abject failure to implement it at only two sites they themselves selected, comprising only 8% of ADCRR's inmate population, is clearly demonstrative of their inability to achieve full compliance.

Plaintiffs also point out that in March 2024, Defendants assured the Court that their Medical Director would fix the broken mortality review process (Doc. 4795 at 21), but the Medical Director position remained vacant from August 2024 until January 8, 2026, and, as noted above, the experts amply support their opinion that the mortality review process is still woefully insufficient. (*See, e.g.*, Doc. 5040 at 13-17 ("none of this changes [the Monitors'] conclusion that [Defendants'] Mortality Review process is flawed.").)

Furthermore, Defendants have consistently demonstrated a marked imbalance of priorities. (Doc. 4761 at 15-16 (finding that HSD leadership focused on "monitoring and enforcing standards that are not applicable to the staffing plan and are inappropriate when introducing large-scale clinical change.").) At every hearing for the last almost three years, Defendants have touted improvements with Hepatitis-C and opioid use disorder. As noted, there is some evidence that Defendants overrepresent their successes in these areas. The Monitors assert that Defendants present their treatment of opioid/substance use disorder as a success story, but "Defendants are compliant with only 3 of 7 requirements of the Injunction and have made little progress (and in fact may have regressed) in the treatment of Alcohol Use Disorder" and there are "seven ways in which treatment of TB at ADCRR remains unsafe and dangerous." (Doc. 5040 at 4.)

While any improvements are desirable, the continual emphasis on these few improvements presents two significant problems. First, simply improving in two areas does not ensure constitutional health care and mental healthcare for a substantial portion of the prison population. Additionally, it is extremely concerning that these are among the only improvements the Department continues to emphasize after pointing to these

improvements years ago. Indeed, the Court explained to the parties in its findings that "this case is not about particular diseases. Rather the focus must be on the overall provision of health and mental health care and whether there is a substantial risk of serious harm." Defendants tout their accomplishments with Hepatitis C and MOUD treatment but those were included in the Permanent Injunction at Defendants' behest and not because they related to the Court's findings. At the March 15, 2024 status conference, Director Thornell extolled the "progress" Defendants had made by commenting on MOUD and Hepatitis C treatments, unspecified progress in "the way that [Defendants are] approaching accountability," and a partnership with "external experts" at a consulting firm. (Doc. 4581.) As the Monitors note in their supplemental October 4 Report, "most of the consultant's recommendations and attendant improvements, while worthwhile, do not relate to the Court's Injunction regarding health care, or do so in a very indirect manner." (Doc. 5040.)

In contrast, the Monitors point to three areas with direct impacts on the prisoner population that could have been implemented soon after the Injunction was issued, but still have not been implemented. (Doc. 4968 at 25-26.) The Monitors demonstrate this in the 300-page report and, as reflected in the analysis of the mortality reports and many examples of systemic healthcare failures identified in this Order, the Monitors also establish Defendants have not discontinued the dangerous practice of having RNs independently manage episodic patient problems and the practice has not only continued, but is supported, by the EHR system that contains 45 protocols designed for independent practice by nurses, demonstrating to the RNs that is still acceptable for them to provide primary care. (*Id.*) Likewise, while the Injunction allowed RNs to independently manage a very small number of approved conditions, LPNs were wholly barred by the Injunction from any independent management, and yet the EHR still contains 35 protocols designed for independent practice by LPNs. (*Id.*) The Monitors make clear after the Injunction issued, it would have been relatively simple (and Defendants were advised and coached) to: (1) discontinue use of the protocols within the EHR that allowed RNs and LPNs to manage patients independently of provider involvement; (2) remove from the EHR the option of letting the nurse choose

an option not to contact a provider; and (3) identify errors in care of a deceased patient during mortality reviews. (*Id.*)

Defendants have demonstrated a pronounced tendency to actively avoid leadership and responsibility. There is ample evidence in the record that Defendants deflect responsibility to their vendor, "saying essentially, 'not me,'" in an "exercise of accountability hot potato." *Hinds County*, 2023 WL 1186925, at *11-*12 (finding lack of leadership in those circumstances.) This was consistent throughout the Pilot, when Defendants "would imply that certain tasks were NaphCare's responsibility, but did not require that NaphCare act on them." (Doc. 4761 at 13.) This behavior "contribut[ed] to the failure to fully implement the Pilot." (*Id.*) In the opinion of the Monitors, there is a "marked lack of clarity" regarding the responsibilities of Defendants and NaphCare and although the Monitors raised this as critical to the success of the Pilot, their entreaties were ignored by Defendants implying "that certain tasks were NaphCare's responsibility, but did not require that NaphCare act on them." (*Id.* at 13.) The Monitors assert "[a]s a result of these vagaries, multiple steps in implementation were skipped or dropped, contributing to the failure to fully implement the Pilot." (*Id.*) Despite the Court's emphasis at multiple hearings and in orders that increasing salaries was critical to fill positions, Defendants repeatedly contended "[Defendants are] currently paying wages over the average wages provided in the contract to get staffing levels to the appropriate level," but NaphCare "is not paying these wages." (Doc. 4566 at 3.)[54] It bears repeating, Defendants were in violation of the Injunction three months after it became effective, which begs the question of whether Defendants negotiated the terms of the Injunction in good faith.[55]

---

[54] *See* Doc. 4566 at 3 ("Defendants provide an example that the current contract requires certain mid-level providers be paid approximately $106.33 per hour, but NaphCare is paying these providers "between $80.00 and $95.51 per hour.").

[55] The Court expressly brought this to the attention of Director Thornell at many hearings and, in March 2024, the Director promised to engage in solving it. But at the end of 2024, 100 contract positions still had not been filled. Amazingly, Defendants appeared to seek praise in their subsequent filings for having only an additional 100 positions remaining. This shows an abject lack of foresight because the staffing report approved by the Court will require hiring significantly more staff.

When the Monitors taught HSD to convert a patient panel into primary care and mental health staffing using the staffing model tools, HSD indicated that "this should be NaphCare's responsibility," but made no efforts to discuss this with NaphCare, to have the Monitors work with NaphCare, or to otherwise "execute this first step in implementing the staffing model statewide." (Doc. 4761 at 12) Even when Defendants' staff person "developed an excellent program" for empanelment (assigning patients to providers), Defendants "indicated that empanelment 'should be NaphCare's responsibility,'" but took no steps "to discuss the need to empanel and assign patients with NaphCare, to teach NaphCare how to run the empanelment program, or to otherwise plan to execute this first step in implementing the staffing model statewide." (*Id.*) All the while, Defendants persist in using NaphCare as an excuse for delay. (*See, e.g.*, Doc. 4553 at 7 ("[Defendants have] moved as quickly as [they] could given the challenges associated with having to effect changes through third-party vendors.").)

Closely tied to Defendants' tendency to shrug and insinuate the problem is their private healthcare contractor is their apparent need for constant micromanagement. In fact, as noted above, rather than proactively taking steps to enforce their contract with NaphCare, Defendants insisted the Court "enter an order intended to get [NaphCare] to increase health care salaries within the bounds of the current contract," including ordering Defendants to order NaphCare to comply with their contract obligations. (Doc. 4566 at 3-4.) The Court was bewildered by such a suggestion, and at a March 15, 2024, status conference informed Defendants their relationship with NaphCare "is a contractual matter. If they have breached that contract, and you have made every effort to have them comply with the contract, then you can take the actions. You don't need the Court for that. This is basic common law contract law, not something that I need to get involved with." (Doc. 4581 at 61.) Despite Defendants' averment that they have sanctioned NaphCare through offsets from the contracted payment, as noted elsewhere in this Order, such efforts have been tepid and obviously ineffectual, [56] and their proposal that the Court violate the law

[56] The Monitors write that "the 5 errors for which Defendants have sanctioned NaphCare

and intervene by ordering sanctions reflects a continued outsourcing of responsibility and refusal to act independently.

It bears repeating that Defendants' Response to the Monitors' first Interim Report complained the report did not provide "a 'how-to-guide,' much less a comprehensive plan, on how [Defendants could] achieve compliance with the Injunction" and in particular, did not provide "detailed guidance on how to achieve compliance." (Doc. 4553 at 2.) Sadly, this suggests that when Defendants agreed to the terms of the Injunction, they had no knowledge of what was required. And the joint agreement was only reached after three intense months of negotiation. It is apparent Defendants chose not to take any initiative to independently maintain compliance with the Injunction. Rather, Defendants apparently secretly hoped for guidance and instructions from the Court. Such an undertaking would have required substantial briefing, additional work and effort by the Court and Court Monitors, and numerous status conferences, resulting in nothing other than a waste of time and resources rendering the implementation of the Injunction nearly impossible.

At Oral Argument on September 10, 2025, Defendants repeatedly asserted their "progress" and "commitment." (Doc. 4995.) But their focus on progress and commitment disavows their substantial failures and pervasive violations that persisted nearly four years after trial in 2021, and three-and-a-half years after the Court's Findings in 2022, and almost three years after entry of the Injunction. If the alleged progress had been made, prisoners would not still be suffering the adverse outcomes reflected in the Monitors' reports and the Court's Orders. If progress had truly been made, the PCCM would have been implemented immediately after issuance of the Injunction and not remain "at its infancy" as it is today. (Doc. 5040 at 2.) And the many additional hours to implement the staffing plan would be in place.

---

amount to a small percentage of the errors for which monetary sanctions could have been levied. As such, we estimate that the $1.4 million in monetary sanctions is a small fraction of the monetary sanctions that ADCRR *could have* imposed on NaphCare for failures to provide comprehensive healthcare services, misrepresentation or falsification of information in the EHR, or other non-compliance with contractually required (and, by extension, Injunction-required) performance." (Doc. 5040 at 3.)

In short, even if Defendants have some commitment to forthwith enforcing the Injunction, the record is rife with examples of their willful inability to institute constitutionally adequate healthcare in compliance with the Injunction. This factor favors receivership. *See Coleman*, 2025 WL 2475040, at *11 (where receiver-nominee identified multiple failures of leadership including not clearly identifying "who is ultimately responsible for delivery of constitutionally adequate mental health services"; "poor communication and lack of information" about what is required by the established remedies in this action; and "no uniform . . . mechanism for sharing best practices and lessons learned across institutions," this factor weighed in favor of finding a receiver); *Nunez*, 782 F. Supp. 3d at 163–65 (Although the Monitoring Team praised the relatively new DOC commissioner for working actively with the Monitors and providing some basis for hope of future sustained change, such change was not sufficient to tip this factor against the appointment of a receiver because "even a strong Commissioner with sound intentions can only make limited progress where, as here, the 'dedicated team' of competent senior leadership required for reform has been lacking for years" and "dangerous and unsafe conditions in the jails have persisted well into the second year of the Commissioner's tenure.").

**5. Bad Faith or Repeated Failure to Implement Changes**

Defendants assert there is no bad faith displayed by their current leadership and maintain they are committed to achieving compliance with the Injunction and delivery of constitutionally adequate healthcare.

However, instead of actually engaging with the Monitors; embracing and implementing their recommendations and complying with Court rulings, Defendants have spent most of their time attacking the Monitors and their methodologies, with no evidence—just a "difference of opinion"—to support their ad hominem attacks.[57] Again, it

[57] For example, when the Monitors requested the appointment of Ms. Donna Strugar-Fritsch as a Monitor to assist in the implementation of the staffing plan, Defendants sought to prevent her appointment and argued, in spite of her years of experience in health care, corrections, government agencies, and the implementation of organizational changes in

cannot be overstated that Monitor Dr. Marc Stern was the same expert who testified in hearings before Magistrate Judge David Duncan with criticisms of Defendants' healthcare, but Defendants welcomed his appointment as an expert to help draft and monitor the Injunction. Moreover, not until the Motion for Receiver was filed did Defendants officially or unofficially provide the Monitors or the Court in writing, or otherwise, with specific, detailed objections to the Monitors' opinions and direction. Now, however, Defendants have offered abundant disagreements, differences of medical opinions, and criticisms of the Monitors. This is entirely inconsistent with the Court's experiences with the Monitors, who have consistently and patiently explained their methodologies and have shown ample latitude and understanding in their recommendations, acknowledging the difficult hurdles faced by Defendants in making the changes required by the Injunction. The experts, like the Court, have without exception demonstrated that the main concern is that the prisoners in the custody of the State of Arizona receive constitutional healthcare. It is alarming that instead of sharing that concern and working with the Monitors, Defendants have engaged in unproductive and distracting litigation tactics.

The Monitors' purpose as defined by the parties and the Court was to monitor Defendants' compliance with the Injunction: the data and methodology that support their opinions are consistent with that purpose. The parties agreed "reports from the experts will help speed the remedial process by acknowledging areas of compliance with the Injunction and by bringing attention to areas in need of improvement," and "the experts' opinions are critical because they are independent, neutral, and are based on expertise that the parties themselves lack." (Doc. 4507 at 5-6.) Thus, Defendants' arguments in opposition to the Monitors' comments, opinions, and direction, made for the most part for the first time and after the Motion for Receiver was filed, reflect significantly their disagreement and dissatisfaction with the requirements of the Injunction. Further, Defendants' objections to the staffing plan submitted by Ms. Strugar-Fritsch largely amount to objections to the

---

medical operations and her key role in developing the staffing plan, Ms. Strugar-Fritsch lacked the "multi-faceted expertise . . . to play the most constructive role possible." (Doc. 4976.)

Injunction. After years of litigation, to quarrel so fixedly with the Injunction, which they helped draft, and to which they steadfastly agreed casts serious doubt on Defendants' averments of good faith. And it reflects a profound misunderstanding of the harm their conduct has caused over the past decade.

The staffing Pilot provides a particularly salient example: The Court declared in the Injunction "the core issue is that staffing levels are so inadequate that the provision of constitutionally mandated care is impossible." (Doc. 4335 at 21.) Despite Defendants' acknowledgement that "the pilot is necessary to provide important refining information for the staffing model and new model of care being developed" (Doc. 4686 at 2), their participation in the Pilot vanished after it was approved. Throughout the Pilot, Defendants argued with the requirements,[58] failed to comply with the necessary staffing provisions, provided minimal and inaccurate data, and implemented fewer than half of the enumerated steps and activities necessary for the Pilot. (*See generally* Doc. 4761.)

As noted above, the Pilot was to be implemented at two sites, housing only 8% of Defendants' prisoner population, but Defendants unilaterally ended the pilot at one of the two sites. Plaintiffs point out that "[t]he issue of space to accommodate new clinical staff and their patients was raised at the very first pilot meeting on July 8," and again in September, "HSD reported that space modifications had been approved, budgeted, and would be complete within 90 days," but Defendants, in their response to a draft of the report, disavowed knowledge of those comments and wrongly asserted "[t]he pilot never contemplated building additional space and should not be contingent on building additional space," despite the Injunction's requirement that Defendants "provide sufficient space" for healthcare delivery. (Doc. 4410 at 11-12 §§ 1.6-1.7.)

The HSD PCCM Team did not hire the required psychology associate, and the HSD Mental Health Director left during the Pilot. During three leadership meetings, the Monitors conveyed an urgent need for the Monitors to teach HSD's newly hired mental

[58] (*See, e.g.*, Doc. 4761 at 7 ("in its feedback to a draft of this report, with regard to requirements about the use of registry staff for the pilot, Defendants noted, 'These were impractical requirements from the beginning.'").)

health director about the Primary Therapist model, new clinical expectations for mental health care, and the staffing model for the mental health care Pilot, but they received no response from HSD. (Doc. 4761 at 12.) The Monitors noted that "HSD leaders' participation in Pilot activities waned throughout the pilot and [they] did not see any evidence of HSD leaders' attempting to invigorate the HSD PCCM Team to meet the work plan objectives or hold them to any expectations or accountability for doing so." (Doc. 4761 at 15-16.)

Despite the Injunction's terms as ordered by the Court that the staffing plan be implemented statewide after the Pilot, Defendants treated the Pilot as an incidental, insignificant, optional activity and the subsequent implementation of the plan as an unlikely potentiality. Although Defendants know that the PCCM must be implemented at all complexes (in 45 units of 9 complexes) pursuant to the Injunction, Defendants' HSD refused to respond to the Monitors' "numerous attempts to remind them that they must begin this work in order to comply with the Injunction and the Court's orders." (*Id.* at 11.) This failure is inexplicable and damning.

The Monitors reported that, in response to a draft of the Monitors' first Interim Report, Defendants suggested changing the phrase "experience from the pilot will inform amendments to the final staffing plan that will improve the outcomes of the model as it is implemented across ADCRR" with "experience from the pilot will inform amendments to the final staffing plan that will improve the outcomes of the model *if* it is implemented across ACDRR" and to adjust the statement that the Pilot is also intended to enable HSD clinicians to "train and support other units throughout ADCRR complexes as they implement the new model" to say that the pilot is intended to enable HSD clinicians to "train and support other units . . . *if* they implement the new model *in the future*." (Doc. 4681 at 1.) In short, Defendants were exclusively in control of implementing this vital part of the Injunction and made no effort, or refused, to do so, causing significant repercussions, not only in the implementation of the Pilot, but for a state-wide implementation of the Pilot.

Defendants' regular overstatement of their "progress," intransigence regarding key

aspects of compliance, and reporting of inaccurate data[59] reinforces the finding of bad faith and repeated failure to implement changes. In their Response to the Monitor's Third Interim Report, Defendants assert "the Department has implemented the Patient Centered Care Model (PCCM) at nine units across different complexes as part of the statewide roll out." This is flat wrong in that "at most units, that implementation is [in] its infancy," and critical components of the PCCM are not yet in place at all facilities, including assigning a primary therapist and/or primary care provider to every patient on the caseload and having the primary therapist or provider actually function as such. (Doc. 5040 at 2.) Defendants emphasize some modest successes in disease-specific areas, such as substance use disorders and treatment of tuberculosis, and yet "Defendants are compliant with only 3 of 7 requirements of the Injunction . . . in the treatment of Alcohol Use Disorder" and the Monitors have identified seven "ways in which treatment of TB at ADCRR remains unsafe"

Finally, as required by the Injunction and by the Court, and in countless other instances, by the Monitors, Defendants have been urged, ordered, advised, and coached to end the practice of nurse-driven care. (*See, e.g.* Doc. 4410 § 1.11, 7.4.7 ("LPNs and Behavioral Health technicians shall not independently assess prisoners or initiate a plan of care or treatment," "The initial care provider shall be the prisoner's primary care medical provider," "Pursuant to prisoner-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions")); (Doc. 4637 at 5 ("Let the Court emphasize what is obvious, nurse-driven care is over.")); (Doc. 4335 at 44 ("Using nurses as the first line, and often last line, for providing care is medically unacceptable.").) Despite this oft-repeated refrain, Defendants continue the practice. Indeed, Defendants assert that this alarming, continued use of RNs to provide initial care is acceptable because in the end "providers review and sign off on nursing protocols." (Doc. 4973-8 at 7.) This reads as if Defendants are bereft of an understanding of the

---

[59] *See supra* note 44 (noting "Defendants report that they currently engage 15.3 FTE staff physicians. In fact they only engage no more than 11 FTE.")

requirements of the Injunction, which they jointly drafted, requiring implementation of the PCCM. And it does not reflect a good faith effort to reach the minimum requirements of constitutionally adequate healthcare.

It is plain that conditions remain unconstitutional after "years of supervision and support." *See Hinds County*, 2023 WL 1186925 at *12. Regardless of assurances of good faith, Defendants have repeatedly failed to implement necessary changes as directed by the Court and the Monitors, both throughout the lengthy history of this case and since the issuance of the Injunction. Accordingly, this factor favors receivership. *See, e.g.*, *Nunez*, 782 F. Supp. 3d at 165 (the key question in deciding this factor is whether the unconstitutional conditions fall below the constitutional minimum despite years of supervision and support by the Monitor and his team.") (internal quotation omitted.)

**6. Waste of Resources**

Plaintiffs assert, as the Court has previously observed, the amount spent on this litigation is astronomical, and argue with a receiver, resources will be properly invested into making changes needed to improve healthcare and, ultimately end this case.

In Response, Defendants assert that they are "devoting substantial resources to complying with the Injunction and . . . achieving measurable success." (Doc. 4818 at 21.) Conversely, at the same time, for almost three years, they have complained they do not have the resources to fully engage in complying with the Injunction. Defendants assert that the appointment of a receiver will waste resources, pointing to the increase in the California Department of Corrections' spending and decline in prisoner population and the cost of the *Plata* receivership.

Defendants' argument is conclusory as Defendants do not proffer an estimated cost of a receiver. There will be costs for improvements to the healthcare system, but the entire point of almost 14 years of litigation and the remedy for many years of constitutional violations is to improve the healthcare system. As such, Defendants cannot use the cost of improvements already required under the Injunction to oppose the appointment of a receiver on the grounds of expense.

Moreover, Defendants' arguments based on the California Department of Corrections receivership are unavailing and ignore key facts: there, the Receiver has delegated oversight of the medical program at 31 of 35 institutions back to the Secretary as of August 2025, the decline in prisoner population was necessary for achievement of a remedy, and healthcare has been significantly improved under the receiver. *California Correctional Healthcare Services Fact Sheet*, at https://cchcs.ca.gov/factsheet/, permalink, https://perma.cc/T7ED-ZPJY; Gabriel Petek, Legislative Analyst's Office, *Overview and Update on the Prison Receivership* (Nov. 2023), at https://lao.ca.gov/Publications/Report/4813.

Defendants have not demonstrated that a receivership would be a waste of resources, but there is certainly evidence that resources will continue to be wasted in the absence of a receiver. Defendants spend more than $1 billion per year, and millions of dollars towards inmate healthcare. Defendants have proven completely incapable of reaching constitutional compliance, resulting in more than a decade of litigation without appreciable effect on the provision of healthcare. Allowing this to continue would waste enormous sums of money in compounded costs of ineffective care and litigation costs that do nothing to improve healthcare conditions.[60] And Defendants contract with NaphCare to provide healthcare to inmates, paying upwards of $300 million a year, but it makes little effort to enforce NaphCare's obligations.[61] As noted, the sanctions that have been imposed are sparse, in the form of "offsets" from the contractual amount and have totaled approximately

---

[60] Defendants have been ordered to pay $3,192,448.38 in attorneys' fees and costs, $2,545,000,00.00 in contempt sanctions, $4,186,940.00 in payments for the Monitors' work, and $9,140.00 in appellate filing fees. (See, e.g., Docs. 2902, 3245, 3576, 3841, 2898, 3861, 537, 1817, 1932, 1953, 2444, 2838, 2935, 2936, 2937, 2944, 2957, 3106, 3272, 3338.) Moreover, the attorneys' costs and fees of both Parties are in addition to the fees and costs reflected on the Court's docket and the Court's time and resources. In short, the cost to taxpayers has been enormous.

[61] The contract provides for sanctions "including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the contract" and explicitly states Defendants may impose immediate monetary sanctions, "cure notice" monetary sanctions, and performance offsets for violations of contractual Performance Measures. (Doc. 4507-1 at 41.)

$1,424,900. Absent the drastic measure of imposing a receivership, Defendants will continue to expend funds on inefficient and unconstitutional care.

The evidence before the Court shows that if the healthcare system is brought into compliance with the Injunction, the healthcare system will run more efficiently and waste less resources. Throughout this litigation, the Monitors have documented how denying prisoners a constitutional level of care not only harms the prisoners but is ultimately a massive waste of resources within the prison and to the State of Arizona. In discussing deaths that were, at least, contributed to by violations of the Injunction, the Monitors document numerous instances where appropriate healthcare would have saved practitioner time and money. (*See, e.g.*, Doc. 4968 at 6, 12 (proper diagnosis of a urinary tract infection would have saved patient from emergency trip to the hospital; telehealth visits and nurse-led triage led to dangerous treatment of patient with complicated medical history and allowed his unstable heart condition to be seen as stable; urgent request for catheter ignored for three months until patient was already hospitalized; sleep apnea evaluation delayed for a year when the patient ultimately died; delay of review of specialist medical records for months; patient never offered a flu shot in violation of Injunction and developed flu that likely contributed to his death.).)

Defendants also do not take accountability for these failures, instead arguing that certain *parts* of the Injunction were complied with, showing a deliberate misunderstanding of the vision of the Injunction. (*See, e.g.*, Doc. 4968 at 16 (Defendants argued that patient who committed suicide was seen multiple times, but the Monitors note that those sessions were conducted by different psychology associates, no primary therapist was assigned, more than half occurred at cell-front, and despite clear signs of suicide risk, none of the four psychology associates assessed dynamic suicide risk factors); *id.* at 18 (Defendants argued that a 65-minute encounter constituted an adequate initial health assessment when the encounter was actually an Intake Assessment for Max Custody Placement); *id.* at 18-19 (Defendants' arguments demonstrate confusion in difference between psychiatrist and therapist.).)

Additionally, in mid-2024, Plaintiffs requested the Court order Defendants to hire an individual or individuals with significant health care management experience to assist Defendants in reforming the current system, but Defendants claimed such an order would be "duplicative and unnecessary" because Defendants "already engaged . . . a nationwide correctional consulting and management firm" and anticipated the firm's recommendations for "system-wide improvement." (Doc. 4998 at 4.) Director Thornell asserts that this report was necessary "for a comprehensive, systemwide review of ADCRR's programs and systems as part of [his] vision for redefining and implementing modern correctional policies and practices in Arizona, and also to address the constitutional deficiencies identified in this Court's 2022 order." (Doc. 4998-3 at 17.) The Monitors opine that "most of the consultant's recommendations and attendant improvements, while worthwhile, do not relate to the Court's Injunction regarding health care, or do so in a very indirect manner." (Doc. 5040 at 4.) This undermines Defendants' initial contention that providing Defendants with help from an individual with significant health care management experience to assist Defendants in reforming the current system was duplicative and unnecessary. Indeed, the Monitors were already providing ample recommendations for "system-wide improvement" to no avail, making engagement of the consulting firm itself the "duplicative and unnecessary" expense. (Doc. 4998 at 4.)

In short, Defendants' continued violations of the Injunction and their conduct throughout this litigation are contributing to a waste of resources and there is no showing that appointment of a receiver would result in waste of resources. *See Coleman*, 2025 WL 2475040, at *11–12 ("It cannot reasonably be disputed that the amount of money being spent on the contentious litigation that has plagued remediation in this action for more than a decade is a significant waste of public resources, given that the litigation has not effected any material change in the court-ordered remedy but rather only served to delay implementation and the end of federal court oversight.").

**7. Relatively Quick and Efficient Remedy**

Defendants argue that appointment of a receiver would not be quick and efficient and would "dramatically increase the cost of compliance and cause further delay" (Doc. 4818 at 2.) Defendants also cite the appointment of a receiver in the California Department of Corrections as an example of a receivership that was purportedly inappropriate and not quick or efficient. However, as noted above, and in contrast to Defendants' purported efforts, the receivership in California has had marked success.[62]

This factor does not ask the Court to consider whether appointment of a receiver would be quick and efficient, but whether appointment would be *relatively* quick and efficient. This determination must be evaluated against the backdrop of this case. *See, e.g.*, *Plata*, 2005 WL 2932253, at *31 ("the speed of reform must be judged relative to the scale of the project.".) Defendants first promised to achieve constitutional compliance in October 2014. As amply detailed in this Order, Defendants continue to argue about the underlying requirements of the Injunction rather than bringing the medical and mental healthcare systems into constitutional compliance.

Even since the issuance of the Injunction, Defendants have failed for more than two years to implement relatively simple solutions.[63] Here, given more than 11 years of delays and the same arguments and non-compliance, the Court finds that appointing a receiver that is willing to implement the recommendations of the neutral experts would be relatively quick and efficient. *See Coleman*, 2025 WL 2475040, at *12 (finding "quick and efficient remedy" factor favored receivership because estimated 5-7 year receivership must be evaluated against "long-running remedial phase of th[e] case" "with some progress . . . but

---

[62] Progress was initially slow under the receiver in California. In 2011, the Supreme Court found that unless overcrowding was addressed, the receiver would be unable to achieve a remedy. Once the CDCR reduced the state prison population to acceptable levels in 2015, progress moved much more quickly. Between 2015 and 2017, the receiver returned authority over 16 prisons to the state. *See California Correctional Healthcare Services Fact Sheet*, (Aug. 2025), https://cchcs.ca.gov/factsheet/, permalink, https://perma.cc/T7ED-ZPJY).

[63] *See generally supra* (Noting relatively simple measures that could have been taken and to resolve issues with the refusal process and to make the shift away from inappropriate nurse-driven care, but were not).

no durable end otherwise in sight."); *Nunez*, 782 F. Supp. 3d at 165 (in evaluating quick and efficient remedy, finding in favor of receivership because "steady and much more rapid progress is possible under the guidance of a well-structured receivership.").

**8. Balance of Factors**

It is an unavoidable conclusion that the balance of factors favors a receivership in this action. The Court is cognizant that the appointment of a receiver is an extraordinary remedy that should be reserved for the most extreme circumstances. From the evidence compiled over the past decade, the Court is convinced the situation at ADCRR is such an extremity.

In their opposition to the appointment of a receiver, Defendants emphasize *District of Columbia v. Jerry M.*, a case in which the District of Columbia Court of Appeals reviewed the appointment of a receiver over the education system at the Oak Hill center for detained and committed children. The court concluded that "while the District's history of compliance with the orders of the court leaves much to be desired, we are not persuaded that the record reveals a sufficient basis for the imposition of this remedy of last resort under the circumstances existing at the time of the entry of the order."

*Jerry M.* presents a factual situation markedly different from that existing here. There, a receiver was appointed "just eight weeks after" the newly appointed superintendent of the District of Columbia Public Schools had agreed to take responsibility for education at the Oak Hill School and just days into the new school year, with "no notice that [the Court] intended to judge [the Superintendent] based on conditions during the first week of school." *Jerry M.* at 1212. DCPS had developed and presented a plan for running the facility in compliance with requirements. *Id.* at 1210. A new governmental body, the District of Columbia Financial Responsibility and Management Assistance Authority, had been created and issued a Directive taking various steps to address problems with public schools. *Id.* at 1210, 1213.

Here, Defendants argue that "the Department's current leadership has been at the helm for only a couple years" and, like the newly appointed Superintendent in *Jerry M.*,

"must be given an opportunity to 'turn the tide' before additional relief could be warranted" (Doc. 4818 at 17), but this opportunity has been given and proved fruitless. Here, the long history of this case has made evident that ADCRR's healthcare is deeply, systemically flawed. New leadership already in place for two years has failed to make headway in rooting out systemic issues or offer any concrete plan for achieving compliance.

Defendants are correct that alone, a historical failure to fully comply may not warrant the extraordinary remedy of a receivership. In reversing the order granting a receivership in *Jerry M.*, the court explained "the trial court relied principally upon only one of the factors essential for a reasonable exercise of its discretion" when it "focused upon the history of the District's failure to comply fully with the court's requirements." *Jerry M.* at 1213. This historical failure was "a compelling consideration," but could not be "the only factor for consideration." But here, the Court has not relied solely, or predominantly, on any one factor, but rather has conducted a holistic review.

The Court has exercised restraint for much of this litigation, to the point that anymore tolerance of unconstitutional healthcare becomes judicial indulgence. Defendants' healthcare delivery system continues to cause and threaten grave harm; the Court has attempted to resolve the issues through less extreme measures; Defendants have consistently dragged their feet, delayed, exploited ambiguity, and fought compliance at every turn, making continued insistence on compliance ineffective; Defendants lack the leadership capacity to complete the necessary systemic changes to achieve compliance; Defendants' repeated failures, repeated attacks upon the Injunction and the Monitors, and need for constant micromanagement undermine their avowals of commitment and good faith; resources are being wasted; and after fourteen years of litigation with little to change, continuing to employ the same approach would be wildly inefficient with no indication that improvement will accelerate. The Court finds no lesser measure will suffice to remedy the pervasive constitutional violations present in Defendants' healthcare delivery system.

## III. NARROWNESS OF THE REMEDY

As in its issuance of the Permanent Injunction in 2023, the Court embraces the rule that the remedy imposed must be narrowly drawn, extend no further than necessary to correct Defendants' ongoing violations of Plaintiffs' constitutional rights, and be the least intrusive means necessary to correct and prevent violations. 18 U.S.C. § 3626(a)(1)(A.) The Court finds the appointment of a receiver over Defendants' healthcare and mental healthcare system is such a remedy.

**IV. SCOPE OF ORDER:**

Plaintiffs request that the Court "assign to the receiver all authority granted to the receiver in *Plata*, given the success of the receiver in that case." (Doc. 4795 at 30.) In Response, Defendants assert that the relief requested by Plaintiffs is too expansive "particularly considering a lack of history of the Department's current leadership being unwilling to institute change." (Doc. 4818 at 25-26.)

In determining the scope of a receiver's powers, the Court should ensure that the receiver's powers "cover only the scope of the constitutional violations" and should give necessary explanation and justification to support the scope of those powers. *Hinds Cnty.*, 128 F.4th at 639.

Although the Court is inclined to propose that the Receiver be given powers consistent with the Receiver in *Plata*, the Court will allow the parties and the Monitors to weigh in on the proposed powers before issuing a final order as to the powers of the receiver. Both the parties and Monitors must address whether the proposed powers cover only the scope of the constitutional violations

**IT IS ORDERED** Plaintiffs' Motion for a Receiver (Doc. 4795) is **GRANTED**.

**IT IS FURTHER ORDERED** within 60 days of the date of this Order, the parties and the Monitors shall submit a list of up to five candidates each to serve as the Receiver over medical and mental health care in Arizona state prisons. Objections shall be filed no more than fourteen days later, and responses shall be filed no later than seven days thereafter.

**IT IS FURTHER ORDERED** within thirty days of the date of this Order, the Parties shall simultaneously file Motions setting forth the proposed duties, powers, and authorities of the Receiver, addressing how each proposal will extend as far as but no further than necessary to correct Defendants' constitutional violations.

Dated this 19th day of February, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge

i

| Section | Provision | Status | Description | Compliance |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.1 and 1.3 | **Non-compliant** | All care and the documentation supporting that care, delivered during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, report from a consultant, other external health record, shall be clinically appropriate including scheduled follow-up in an appropriate timeframe when applicable. Settings include, but are not limited to, those described in the subsections of these provisions below. | |
| Medical Services | Injunction Subprovision 1.1a | **Non-compliant** | Emergent care | Doc. 4968 at 46 (Defendants using flawed methodology even though Monitors consistently provide feedback since November 2023 that data collection is flawed.) |
| Medical Services | Injunction Subprovision 1.1b | **Non-compliant** | Urgent care | Doc. 4968 at 48 (Defendants self-assess 96% compliance with urgent care provision in sub provisions 1.1b of Injunction, but Monitors assess as closer to 33%); |
| Medical Services | Injunction Subprovision 1.1c | **Non-compliant** | Non-urgent, episodic care | Doc. 4968 at 49 (Defendants self-assess 79% compliance with non-urgent, episodic care in subprovision 1.1c of Injunction, but Monitors calculate 35% compliance) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Subprovision 1.1d | **Non-compliant** | Chronic care | Doc. 4968 at 52 (Defendants self-assess 86% compliance with chronic care provision in section 1.1d of Injunction, but Monitors assess closer to 35%) |
| Medical Services | Injunction Subprovision 1.1e | **Non-compliant** | Inpatient care | Doc. 4968 at 53-57 (Monitors assess noncompliance with inpatient care provision in 1.1e, but find percentage is inappropriate methodology) |
| Medical Services | Injunction Subprovision 1.1f | **Non-compliant** | Off-site specialty referrals | Doc. 4968 at 58-59 (Monitors assess non-compliance with off-site specialty referrals provision in section 1.1f of Injunction and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 65% compliance.); |
| Medical Services | Injunction Subprovision 1.1g | **Non-compliant** | (Additional reference 9.1) Action taken on post-hospital, post-emergency room, or specialist recommendations. This includes that the practitioner shall adopt and perform recommendations from outside providers unless a clinically appropriate basis exists to alter or forgo the off-site recommendations. | Doc. 4968 at 60 (Defendants self-assess 84% compliance with 1.1g of Injunction regarding action taken on post-hospital, post-emergency room, or specialist recommendations and that percentages do not fully capture methodology, Defendants self-assess at 96% compliance, but Monitors assess 10% compliance.) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.22 | (see individual sub-provisions below) | Orders from health care staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered. This includes, but is not limited to, those orders described in the subsections of this provision below. | |
| Medical Services | Injunction Subprovision 1.22a | **Non-compliant** | On-site diagnostic tests | See Doc. 4968 at 62-63 (Monitors find non-compliance with on-site diagnostic tests provisions in section 1.22a of the Injunction and that Defendants use improper methodology regarding compliance) |
| Medical Services | Injunction Subprovision 1.22b | **Non-compliant** | Off-site diagnostic tests | Doc. 4968 at 64-65 (Monitors find non-compliance with off-site diagnostic tests provisions in section 1.22b of the Injunction) |
| Medical Services | Injunction Subprovision 1.22c | **Non-compliant** | On-site follow-up visits with nurses or practitioners | Doc. 4968 at 66-67 (Monitors find non-compliance with on-site follow-up visits with nurses or practitioners provision in section 1.22c of the Injunction and include backlog chart showing extremely back-logged appointments) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Subprovision 1.22d | **Non-compliant** | (Additional reference 8.1) Off-site visits with specialist | Doc. 4968 at 68-72 (Defendants self-assess 28% compliance with 1.22d of Injunction regarding offsite visits with specialists, but Monitors assess probably much worse given certain data manipulation. Monitors also address substantive issues outside of percentages) |
| Medical Services | Injunction Provision 1.21a (a.k.a. “1.21”) | **Non-compliant** | All cancellations of patient-initiated visits shall be made directly to a health care professional by telephone, tablet, video, face-to-face, or in writing by the patient. If a patient will not voluntarily displace, health care staff will go to the patient’s location. | Doc. 4968 at 73-74 (Defendants self-assess 76% compliance with 1.21a of the Injunction regarding cancellation of patient-initiated, but Monitors assess 60% compliance) |
| Medical Services | Injunction Provision 1.21b (a.k.a. “1.1,1.21a") | **Non-compliant** | All refusals of provider-initiated on-site medical visits are made by telephone, video, or face-to-face with an RN or practitioner, within three days after the appointment. If a patient will not voluntarily displace, health care staff will go to the patient’s location. | Doc. 4968 at 75 (Monitors find non-compliance with refusals of provider-initiated on-site medical visits in section 1.21b of the Injunction) |
| Medical Services | Injunction Provision 1.21c (a.k.a. “1.1,1.21b) | Non-compliant | All refusals of off-site health visits are made by telephone, video, or face-to-face with an RN or higher at the time of the appointment. If a patient will not voluntarily displace, health care staff will go to the patient’s location. | Doc. 4968 at 76-77 (Monitors find non-compliance with off-site health visits in section 1.21c of the Injunction) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.23 | **Non-compliant** | Patients shall be informed in a timely manner of diagnostic test results. | Doc. 4968 at 78-79 (Defendants self-assess 88% compliance with 1.23 of the Injunction regarding timely conveyance of diagnostic test results, but Monitors assess 76% compliance) |
| Medical Services | Injunction Provision 5.1 | **Non-compliant** | For patients with any medical conditions and identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | Doc. 4968 at 80-81 (Defendants self-assess 96% compliance with 5.1 of the Injunction regarding healthcare information, but Monitors assess 20% compliance) |
| Medical Services | Injunction Provision 7.4.1 | **Compliant** | Patients shall be given on a daily basis an opportunity to indicate their need to be seen for a medicalclinic appointment at the next available clinic by one of the following mechanisms, depending on theirliving situation, freedom of movement, and access to electronics: affixing their name to a time slot on apaper list maintained on the living unit or in the medical unit; affixing their name to a time slot on anelectronic list via tablet or kiosk; informing the nurse who conducts daily (or more frequent) welfarechecks on that unit; an effective paper-based system in the event of temporary non-functioning of theelectronic system. | |
| Medical Services | Injunction Provision 7.4.2 | Unable to determine compliance | A reminder of the following rule is communicated via the medium the patients use to make requests (e.g., a statement placed on the paper or electronic sign-up list): Patients should only use the non-urgent system if they have a non-urgent need. Patients with urgent or emergent needs should notify a staff member. | |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 7.1 | **Non-compliant** | An RN or higher credentialed professional shall conduct an intake screening within four hours of a patient's arrival or, alternatively, a rapid screening shall be conducted immediately upon arrival, but the intake screening by an RN shall be conducted as soon as possible and before the patient proceeds to housing. If the rapid screening is conducted by a professional of lesser credential than an RN (e.g., LPN, certified medical or nursing assistant), then the screening shall not include a clinical assessment, and any abnormal response found by the LPN or similar staff shall result in immediate consultation with an RN (or higher credentialed professional.) | Doc. 4968 at 84-85 (Monitors find non-compliance with timely intake screening in section 7.1 of the Injunction) |
| Medical Services | Injunction Provision 7.2 | **Non-compliant** | A medical practitioner shall complete a history and physical examination of each patient by the end of the second full day after a new patient arrives in ADCRR. | Doc. 4968 at 86 (although Monitors agree with 96% compliance with 7.2 of the Injunction regarding complete history and physical exam, not achieving full compliance is dangerous and may be errors in data) |
| Medical Services | Injunction Provision 7.4.6 | **Non-compliant** | All non-urgent/non-emergent care at the request of a patient shall be completed in a reasonable time. | Doc. 4968 at 87-88 (Monitors find non-compliance with all timely non-urgent/non-emergent in section 7.4.6 of the Injunction noting that the data is erroneous, and Defendants are not performing this part of the Injunction properly) |



APP105

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 7.4.7a/b | **Non-compliant** | The initial care for non-urgent/non-emergent care and chronic care shall be provided by the patient's primary care provider (PCP) with the exceptions noted below. (1) The care may be provided by another medical practitioner or health care practitioner as directed by the PCP as clinically appropriate. (2) If the PCP is not on the premises or conducting telehealth visits at the time, the care may be provided by another medical practitioner of the same or higher credential. (3) Pursuant to patient-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the Monitors. | Doc. 4968 at 89-92 (Monitors find non-compliance with PCP initial care in section 7.4.7a/b due to three systemic problems) |
| Medical Services | Injunction Provision 1.5 | **Non-compliant** | Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff. | Doc. 4968 at 93 (Defendants self-assess 85% compliance with 1.5 of the Injunction regarding emergency response and care by custody staff, but Monitors assess 50% compliance) |
| Medical Services | Injunction Provision 1.8a | **Non-compliant** | Emergency response equipment (Emergency Response Bag, Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired. | Doc. 4968 at 94 (Defendants self-assess 86% compliance with 1.8a of the Injunction regarding emergency response equipment, but Monitors say there is no meaningful way to calculate a percentage performance, and there is evidence of non-compliance in 13 units) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.8b | **Non-compliant** | Emergency Response Bag checklists shall reflect the equipment was checked daily and inventoried monthly. The checklists shall also reflect medications are within their expiration date and equipment is operational. | Doc. 4968 at 95 (Defendants self-assess 79% compliance with 1.8b of the Injunction regarding emergency response bag checklists, but Monitors say there is no meaningful way to calculate a percentage performance, but Monitors found that checklists were inaccurate and therefore non-compliant) |
| Medical Services | Injunction Provision 1.8c | **Non-compliant** | Staff shall complete and document all AED manufacturer recommended checks (e.g., daily, monthly, annual.) | Doc. 4968 at 96 (Defendants self-assess 94% compliance with 1.8c of the Injunction regarding AED manufacturer checks, but Monitors found that they were 94% compliant only where a few units actually have AED) |
| Medical Services | Injunction Provision 1.8d | **Compliant** | Naloxone (Narcan®) is required to be kept on every living unit or with every AED. | |
| Medical Services | Injunction Provision 7.5 | **Compliant** | Build (or modify existing) living units to accommodate all patients requiring SNU housing, build theunits with per-patient floor space consistent with Arizona's Medicaid agency (AHCCCS) requirementsfor similar populations, equip and staff the units to meet the assisted living needs of the SNU patients atthe appropriate custody levels, and transfer all these patients to those beds. (Definition of SNU: elderly,physically disabled, or developmentally disabled, generally guided by the health/functional/physicalneeds criteria established by AHCCCS – see Pre-Admission Screening Tool) | |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 7.6.1 | **Non-compliant** | A medical practitioner shall be contacted and collaborate on the creation of a care plan immediately upon a patient being admitted to the IPC. | Doc. 4968 at 100-01 (Defendants self-assess 75% compliance with 7.6.1 of the Injunction regarding collaboration of medical provider for IPC patients, but Monitors assess 30% compliance) |
| Medical Services | Injunction Provision 7.6.2 | **Non-compliant** | An RN shall complete an admission nursing assessment immediately upon a patient arriving in the IPC. | Doc. 4968 at 102 (Defendants self-assess 75% compliance with 7.6.2 of the Injunction regarding nursing assessment upon arrival in IPC, but Monitors assess 65% compliance) |
| Medical Services | Injunction Provision 7.6.3 | **Non-compliant** | A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for patients who are going to remain beyond 24 hours. | Doc. 4968 at 103 (Monitors assert no more than occasional compliance with 7.6.3 of the Injunction regarding completion of admission history and physical within one day of IPC admission) |
| Medical Services | Injunction Provision 7.6.4 | **Non-compliant** | An RN shall complete an assessment in the IPC at the frequency ordered. The spacing of the assessments shall be clinically appropriate. | Doc. 4968 at 104 (Monitors assert non-compliance with 7.6.4 of the Injunction regarding RN completing an assessment in the IPC at the frequency ordered) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 7.6.5 | **Non-compliant** | The call buttons of all patients admitted to an IPC level bed are determined to be working on the day of admission and once per month. If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes. | Doc. 4968 at 105-06 (Defendants self-assess 88% compliance with 7.6.5 of the Injunction regarding working call buttons on IPC beds, but Monitors could not perform assessment based on "frequency of careless or erroneous nursing documentation") |
| Medical Services | Injunction Provision 8.4 | **Non-compliant** | If Defendants or their healthcare vendor utilize categorical referral timeframes, e.g., "emergency," "urgent," "routine," for which it applies default timeframes for completion of the referral, Defendants shall notify the Court of those categories and timeframes and shall notify the Court within fourteen days if any of those categories or default timeframes change. | Doc. 4968 at 107 (Monitors assert that Defendants added a category of referral time frames, but never notified the Court of this change or its meaning, even though this provision of the Injunction requires notification to the Court) |
| Medical Services | Injunction Provision 8.7 | **Non-compliant** | If a practitioner orders, or informs a patient there will be an order for an off-site test or referral, but circumstances change and the order is modified or rescinded, the patient shall be informed within one month of the change. | Doc. 4968 at 108 (Monitors assess non-compliance with 8.7 of the Injunction requiring that patient be informed within one month of change to order for an off-site test or referral because form does not tell patients what was cancelled); Defendants self-assessed 94% compliance, but Monitors assessed 50% compliance) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 9.2 | **Non-compliant** | Patients returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit. A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation. | Doc. 4968 at 109-10 (Defendants self-assess 80% compliance with 9.2 of the Injunction with requirements for patients returning from ER and Monitors agree Monitors suggest tools to remedy ongoing violations) |
| Medical Services | Injunction Provision 10.5.4 | **Non-compliant** | Patients with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. Exceptions may also be made for patients where the practitioner can document a significant and serious penological need to prohibit a particular patient from having such an inhaler. This exception must be patient-specific. | Doc. 4968 at 111 (Monitors find Defendants non-compliance with 10.5.4 of the Injunction requiring rescue inhalers) |
| Medical Services | Injunction Provision 10.5.5 | **Non-compliant** | Patients with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | Doc. 4968 at 112 (Monitors find Defendants non-compliant with 10.5.5 of the Injunction requiring KOP glucose for hypoglycemic prisoners) |
| Medical Services | Injunction Provision 10.5.6 | **Non-compliant** | Patients prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP. Exceptions may be made for patients living in a unit with 24-hour nursing and access to an emergency call button. | Doc. 4968 at 113 (Defendants self-assess 86% compliance with 10.5.6 of the Injunction regarding KOP nitroglycerin for patients with cardiac disease, but Monitors assess 83% compliance) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provisions 11.1.1.1 & 11.1.8 | **Non-compliant** | All patients are offered a screening blood test for HCV under opt-out conditions within a month of arrival. | Doc. 4968 at 114-15 (Defendants self-assess 100% compliance with HCV testing and opt-out in 11.1.1.1 & 11.1.8, but Monitors found that opt-out is not being enforced) |
| Medical Services | Injunction Provision 11.1.4 | **Non-compliant** | All patients with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date. | Doc. 4968 at 116-18 (Defendants self-assess 100% compliance with 11.1.4 regarding prioritized list for HCV infections, but Monitors find that list is not being maintained in accordance with Injunction "in significant ways" and this continues despite that Monitors have identified these problems previously) |
| Medical Services | Injunction Provision 11.1.7 | **Non-compliant** | All patients with HCV shall be offered education about HCV, whether they receive treatment or not. | Doc. 4968 at 119 (Monitors find non-compliance with 11.1.7 requiring HCV education for prisoners with HCV; Defendants self-assess 87% compliance) |
| Medical Services | Injunction Provision 11.1.5a | **Non-compliant** | All patients with newly diagnosed HCV are tested to determine if they have more advanced hepatic disease | Doc. 4968 at 120-21 (Monitors found greater compliance (96%) with 11.1.5a, requiring that HCV patients be tested for more advance hepatic disease, than Defendants self-assessed 88% compliance, but noted ongoing issues with informed consent for denial of treatment) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.1.5b | **Non-compliant** | All patients with fibrosis scores of F3 or F4 will be offered treatment for HCV. | Doc. 4968 at 122-23 (Defendants self-assess 100% compliance with 11.1.5b requiring that patients with F3 or F4 fibrosis scores be offered treatment for HCV, but Monitors assess 91% compliance) |
| Medical Services | Injunction Provision 11.1.5c | **Compliant** | At least the following number of patients will begin treatment for HCV monthly using the current standard of care medications: 110 patients plus 70% of the number of newly admitted patients who tested positive for HCV during the previous month. | |
| Medical Services | Injunction Provision 11.1.6 | **Non-compliant** | No patient who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment except for those patients with markedly reduced life expectancy who would not be expected to benefit from treatment, or patients who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort or there is a documented informed refusal. | Doc. 4968 at 124 (Defendants self-assess 79% compliance with 11.1.6 regarding treatment for prisoners with HCV released during ongoing treatment, but there are significant, recognized errors in methodology) |
| Medical Services | Injunction Provision 11.2 | **Compliant** | All newly admitted patients shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the seventh full day after admission into the ADCRR system, unless the patient refuses. | |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.3.1 | **Non-compliant** | All newly admitted patients shall be screened for, and if indicated then evaluated for, substance use disorder. Screening shall include assessment as to a history of opioid overdose. | Doc. 4968 at 127-29 (regarding 11.3.1 clinically appropriate evaluation after intake screening for substance use disorder (OUD), Monitors and Defendants agree on 100% compliance for screening, but Defendants self-assess 100% compliance with evaluations while Monitors assess 70% compliance due to five errors) |
| Medical Services | Injunction Provision 11.3.2 | **Compliant** | All newly admitted patients shall be offered to have current Medication for Opioid Use Disorder ("MOUD") (buprenorphine, naltrexone) continued. | |
| Medical Services | Injunction Provision 11.3.3 | **Non-compliant** | All pregnant or post-partum patients with diagnosed Opioid Use Disorder ("OUD") shall be offered to have current MOUD (buprenorphine, naltrexone, methadone) continued, or if not currently on MOUD, shall be offered to initiate treatment with buprenorphine or naltrexone. | Doc. 4968 at 131 (Monitors found Defendants non-compliant with 11.3.3 regarding treatment for pregnant or post-partem patients with OUD) |
| Medical Services | Injunction Provision 11.3.4 | **Compliant** | All patients who have a documented history of opioid overdose or who upon assessment are determined to be at imminent risk of an opioid overdose, shall be offered MOUD with methadone, buprenorphine or naltrexone. | |
| Medical Services | Injunction Provision 11.3.5 | **Compliant** | All patients offered treatment for HCV shall be evaluated for OUD and if found to have OUD, shall be offered MOUD with methadone, buprenorphine or naltrexone. | |
| Medical Services | Injunction Provision 11.3.6a/b | **Non-compliant** | Patients with OUD will be offered MOUD, including counseling, if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in MOUD, counseling, or alcohol treatment. | Doc. 4968 at 134-38 (Monitors find noncompliance with 11.3.6a/b requiring medication for patients with OUD and detail lack of leadership in roll-out) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 11.3.6c/d | **Non-compliant** | Patients with Alcohol Use Disorder will be offered medication treatment and counseling if appropriate. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in medication or counseling. | Doc. 4968 at 139 (Monitors find non-compliance with 11.3.6c/d requiring medication and counseling for patients with alcohol use disorder) |
| Medical Services | Injunction Provision 11.4 | **Non-compliant** | Patients shall be offered all immunizations recommended by the CDC's Advisory Committee on Immunization Practices. | Doc. 4968 at 140 (Monitors find non-compliance with 11.4 requiring offering vaccinations) |
| Medical Services | Injunction Provision 2.1.3 | **Non-compliant** | Following a medical-related death, if the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report. | Doc. 4968 at 141 (Monitors find non-compliance with 2.1.3 requiring follow-up after deaths) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 2.4.1 | **Non-compliant** | There needs to be a robust continuous quality improvement program to monitor the quality of clinicalcare. As part of this program, staff monitor the absolute number and trend of various parameters on amonthly basis. Where metrics or trends in metrics show room for improvement, staff make appropriateefforts to understand the underlying reason for deviation, take reasonable steps to effectuateimprovement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to itsimprovement efforts as needed. At a minimum, ADCRR will monitor the following parameters: • percentage of individuals (regardless of whether diagnosed with hypertension) whosesystolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90mmHg; • average hemoglobin A1C (regardless of whether diagnosed with diabetes); • percentage of individuals taking ten or more prescribed medications; • percentage of women receiving timely breast screening; percentage of women receivingtimely cervical cancer screening; • percentage of pregnant women who have the results of routine prenatal laboratory testsresults as recommended in current national guidelines (e.g., Guidelines for Prenatal Care,8th Edition, American Academy of Pediatrics and American College of Obstetricians andGynecologist, Table 6-2) documented within one month of diagnosis of pregnancy; • percentage of health care grievances which are appealed; percentage of health caregrievance appeal replies that are appropriate; • percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormalinvoluntary movement scale) assessments; • percentage of prisoners on antipsychotic medications receiving appropriate and timelymetabolic assessments; • percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; andpercentage of prisoners arriving at ADCRR for whom intake screening by an RN (orhigher credentialed professional) is completed more than four hours after arrival. | Doc. 4968 at 142-43 (Monitors find that Defendants have "completely failed to meet the requirements of any of the 12 domains listed" in 2.4.1 regarding a quality improvement plan and "and has failed to do so consistently for the past two years," which "increases the risk of harm to patients") |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 2.4.2 | **Non-compliant** | In addition to the parameters prescribed in 2.4.1, ADCRR will monitor other parameters as reasonably dictated by the other self-improvement activities described in the Injunction. | Doc. 4968 at 144-46 (Monitors find noncompliance with 2.4.2 regarding monitoring other parameters and "with regarding to systemic dangers to which patients are exposed and which have caused serious harm, Defendants are unable to identify, examine, remediate in a manner that is lasting, and monitor the effectiveness of its remediation of these dangers") |
| Medical Services | Injunction Provision 6.2a/7.3 | **Non-compliant** | All patients are assigned a Primary Care Practitioner (PCP.) Patients are appropriately assigned to a physician or APP based on the patient's medical complexity. | Doc. 4968 at 147-49 (Monitors find that "Defendants' practice regarding [6.2a/7.3 requiring that patients be assigned a primary care practitioner] has changed little since trial, causing a "significant risk of serious harm and causing serious harm") |
| Medical Services | Injunction Provision 6.2c | **Non-compliant** | Facility Medical Directors (FMD) at high intensity facilities shall be assigned up to 100 patients as the primary care provider and shall have no other scheduled patient care assignments including supervision of APPs or as the scheduled provider for specialized units such as Inpatient Component ("IPC") or Special Needs Unit ("SNU".) This does not limit FMDs from occasional unscheduled clinical supervision and care activities. | Doc. 4968 at 150 (Monitors find Defendants' non-compliance with 6.2c requiring that Facility Medical Directors (FMD) at high intensity facilities be assigned up to 100 patients and have no other scheduled patient care assignment, finding that one FMD has over 600 patients) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 6.4 | **Non-compliant** | All medical physicians–at hiring and during employment–shall be board certified in Internal Medicineor Family Practice, or board eligible if within 7 years of their completion of an ACGME approvedresidency in one of these 2 specialties, with the following exceptions: medical directors, shall be boardcertified at hiring and during employment; physicians providing obstetric and gynecologic services shallbe board certified or board eligible if within seven years of their completion of an ACGME approvedresidency in obstetrics and gynecology; and physicians who are currently employed and are not boardeligible may remain employed for no longer than one year after issuance of this Order. They may alsonot possess a restricted license if the restriction is related to clinical competency or is restricted topractice in a correctional facility. (Notify Court Monitors if there is a request for an exception) | Doc. 4968 at 151 (Defendants and Monitors agree with 64% compliance with 6.4 requiring certain qualifications for medical physicians, and Monitors note that NaphCare disagrees with the necessary qualifications set forth in the Injunction) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.11 | **Non-compliant** | Licensed Practical Nurse ("LPNs") shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401 (not independently assess patients or initiate a plan of care or treatment.) | Doc. 4968 at 152-54 (although Defendants self-assess at 100% compliance with 1.11 regarding practice limitations for LPNs consistent with Arizona law, Monitors find that Defendants are non-compliant finding that ADCRR allows LPNs to see patients independently and the EHR encourages this practice, while Defendants "make[s] a critical logic error in its analysis [of its compliance with this factor] despite repeated oral and written feedback") |
| Medical Services | Injunction Provision 1.12 | **Compliant** | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| Medical Services | Injunction Provision 1.9 | **Non-compliant** | Directors of Nursing (DON) at each complex may not spend more than 15% of their time providing scheduled or unscheduled patient care. | Doc. 4968 at 156 (although Defendants assert 71% compliance with 1.9 regarding Directors of Nursing spending no more than 15% of their time providing scheduled or unscheduled patient care, Monitors assert that Defendants remain non-compliant due to understaffing and a percentage is not an effective way of determining compliance) |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.4 | **Non-compliant** | Telehealth for medical care may be used only when clinically appropriate. | Doc. 4968 at 157-58 (Monitors find Defendants noncompliant with 1.4 regarding telehealth when clinically appropriate because Defendants use telehealth "well beyond its safe limits and without the availability of other proxies") |
| Medical Services | Injunction Provision 1.6 | **Non-compliant** | There is sufficient space, equipment (e.g., otoscopes, ophthalmoscopes), and supplies (e.g., dressings) to deliver medical care services appropriate to the location. | Doc. 4968 at 159-61 (Defendants self-assessed 83% compliance with 1.6 requiring sufficient space, equipment, and supplies to deliver medical care services appropriate to the location, but Monitors assert "performance . . . cannot logically be described by percentage" and noting that Defendants notes in its own monthly report that several facilities do not have enough space to adequately see patients) |
| Medical Services | Injunction Provision 3.5 | **Compliant** | The equipment used for interpretation shall allow for confidential communication in all medical health care circumstances (e.g., dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other patients or custody staff.)(As explained in more detail below in provision 1.7, the Injunction looks separately at whether, for this provision, ADCRR has the proper equipment to allow for confidential communication when interpretive services are needed. Whether or not that equipment is actually used to benefit is captured in provision 1.7.) | |

| | | | | |
|---|---|---|---|---|
| Medical Services | Injunction Provision 1.7 | **Non-compliant** | There is auditory and visual confidentiality during medical encounters or encounters that are not strictly medical or MH (confidentiality during MH encounters is addressed in section 16.7.) Breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach. | Doc. 4968 at 162-63 (Defendants self-assessed its compliance with 1.7 regarding auditory and visual confidentiality during medical encounters or encounters that are not strictly medical or MH as 73-100%, but Monitors assessed noncompliance and systemic failure) |
| Medical Services | Injunction Provision 1.10 | **Compliant** | All staff hired in clinical medical supervising positions must have at least two years clinical experience. | |
| Medical Services | Injunction Provision 1.13 | **Non-compliant** | Health care staff (Medical and Mental Health) responsible for direct patient care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8 hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday.(1.14. The limits on overtime may be extended during emergency situations. Time spent on-call is not included in the time limits.) | Doc. 4968 at 164 (Monitors assess non-compliance with 1.13 limiting hours for healthcare staff) |
| Mental Health | Injunction Provision 1.1 | See subprovisions below | All care and the documentation supporting that care, delivered to patients during: a MH (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, other external health record, shall be clinically appropriate. Settings include, but are not limited to those described in the subprovisions of these provisions below. | Doc. 4968 at 165 (Monitors assess noncompliance with 1.1 requiring clinically appropriate care for mental health encounters despite Monitors repeatedly highlighting the deficiencies) |
| Mental Health | Injunction Subprovision 1.1a | **Non-compliant** | Emergent care | Doc. 4968 at 168 (Defendants self-assess 80% compliance with 1.1a regarding emergent care, but Monitors assess 28% compliance) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Subprovision 1.1b | **Non-compliant** | Urgent care | |
| Mental Health | Injunction Subprovision 1.1c | **Non-compliant** | Non-urgent | Doc. 4968 at 170 (Monitors assess non-compliance with 1.1c regarding non-urgent care) |
| Mental Health | Injunction Subprovision 1.1d | **Non-compliant** | Care provided by psychology associates or psychologists in an outpatient setting (MH-3) | Doc. 4968 at 171 (Monitors assess noncompliance with 1.1d regarding care provided by psychology associates or psychologists in outpatient setting) |
| Mental Health | Injunction Subprovision 1.1e | **Non-compliant** | Care provided by psychiatric practitioners in an outpatient setting (MH-3) | Doc. 4968 at 172 (Defendants assess 100% compliance with 1,1e regarding care provided by psychiatric practitioners in outpatient setting, but Monitors assess only 94% compliance when using Defendants' dataset and noting that dataset is only one element in determining compliance) |
| Mental Health | Injunction Subprovision 1.1g | **Non-compliant** | Care provided by a psychology associate or psychologist in a MH Residential Unit (MH-4) | Doc. 4968 at 173-75 (Monitors assess Defendants noncompliant with 1.1g regarding care provided by psychology associate or psychologist in Mental Health Residential Unit) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Subprovision 1.1h | **Non-compliant** | Care provided by a psychiatric practitioner in a MH Residential Unit (MH-4.) This includes the requirements in 16.4.5 that the encounters are as often as clinically indicated, but no less often than every 14 days. | Doc. 4968 at 176-77 (Defendants self-assessed 93% compliance with 1.1h regarding care provided by psychiatric practitioner in Mental Health Residential Unit, Monitors found 50% compliance when using Defendants' dataset and noting that dataset is only one element in determining compliance) |
| Mental Health | Injunction Subprovision 1.1i | **Non-compliant** | Care provided by a psychology associate or psychologist in MH Inpatient Unit (MH-5) | Doc. 4968 at 178-79 (Monitors assess noncompliance with 1.1i regarding care provided by psychology associate or psychologist in mental health in patient unit) |
| Mental Health | Injunction Subprovision 1.1j | **Non-compliant** | Care provided by a psychiatric practitioner in a MH Inpatient Unit (MH-5.) This includes the requirement in 16.5.4 that a psychiatric practitioner shall conduct a clinical encounter as often as clinically indicated, but no less than once per week. | Doc. 4968 at 180-81 (Monitors assess noncompliance with 1.1j regarding care provided by psychiatric practitioner in mental health inpatient unit, noting that in 2/3rds of reviewed cases, psychiatric practitioner "failed to provide minimally necessary care." Defendants assess 88% compliance, but using the same dataset, the Monitors assessed 36% compliance "despite ongoing feedback and coaching from the Monitors") |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.3 | **Non-compliant** | All patients with mental illness who require regular follow-up shall be designated on the mental health caseload. | (Doc. 4968 at 182 (Defendants self-assess compliance with 1.3 regarding follow-up for patients with mental illness as 100%, but experts assess 88% using the same dataset and noting that dataset is only one element in determining compliance) |
| Mental Health | Injunction Provision 1.22 | **Non-compliant** | Follow-up visits with MH professionals are completed within the timeframe ordered. | Doc. 4968 at 183 (Monitors assert Defendants noncompliant with 1.22 regarding timely follow-up with mental health professionals) |
| Mental Health | Injunction Provision 1.21a | Unable to determine compliance | All refusals of patient-initiated visits shall be made directly to a health care professional by telephone, video, or face-to-face. If a patient will not voluntarily displace health care staff go to the patient's location. | Doc. 4968 at 184 (Defendants self-assess 80% compliance with 1.21a regarding handling of refusals of patient-initiated visits, but Monitors unable to assess due to flawed dataset) |
| Mental Health | Injunction Provision 1.21b | **Non-compliant** | All refusals of a MH professional-initiated health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment. If a patient will not voluntarily displace health care staff go to the patient's location. | Doc. 4968 at 185-86 (Defendants self-assess 80% compliance with 1.21b regarding handling of refusals for mental health professional-initiated health visits, but Monitors assess 60% compliance using same dataset and point to overuse of BHTs) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 5.1 | **Non-compliant** | For patients on the MH caseload with identified treatment providers in the community, if the patient consents, health care staff shall send each provider relevant health care information prior to the patient'srelease. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan. The patient's health record shall contain documentation of the above information that was provided, when, and to whom. | Doc. 4968 at 187-88 (Defendants self-assess compliance at 88% with 5.1 regarding sending community provider relevant mental health information with patient consent, but Monitors estimate 20% and note two errors in assessment of performance) |
| Mental Health | Injunction Provision 16.1 | **Non-compliant** | A psychology associate or psychologist conducts a mental health assessment of each patient within one business day of that patient first entering the ADCRR system. The intake mental health assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment; medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care. | Doc. 4968 at 189-90 (Monitors find Defendants noncompliant with 16.1 regarding psychology associate or psychologist conducting intake assessments because in one-third of patients, assessments are clinically inadequate) |
| Mental Health | Injunction Provision 15.8 | **Non-compliant** | For patients admitted to ADCRR on a psychotropic which is not on ADCRR's formulary, the medication shall be continued if, based on the patient's history, there is significant risk of worsening of the condition if a different medication is prescribed. If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications. | Doc. 4968 at 191 (Defendants self-assess compliance with 15.8 regarding non-formulary psychotropics as 96% and Monitors assert it may be 96%, but could be lower and Defendants will not produce formulary despite Monitors' request for it) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 15.3 | **Non-compliant** | Patients on the mental health caseload who believe they need mental health care shall submit HNRs. Theprimary therapist or, if necessary, another psychology associate shall triage HNRs within 24 hours ofreceipt. "Triage" in this context means determining whether the request requires immediate attention andresolution or whether the request can safely be deferred until the primary therapist can address it.Documenting the word "Triaged" is adequate evidence of triage. Primary therapists shall address theHNR within three business days of its submission. "Address" means evaluating the request, determiningthe clinical need, and if an action is required (e.g., face-to-face visit), planning that action to occur in aclinically appropriate timeframe. When the primary therapist is absent, another psychology associate ora psychologist completes these tasks in their stead within the same time. | Doc. 4968 at 192-95 (Defendants self-assess compliance with 15.3 regarding handling of mental health HNRs at 80%, but Monitors assess it at 50% using same data and Monitors identify issues with data) |
| Mental Health | Injunction Provision 15.4 | **Non-compliant** | If a patient's PT determines a visit is clinically appropriate following submission of an HNR, the patient shall be seen by the PT or referred to another professional as directed by the PT. | Doc. 4968 at 196-97(Defendants self-assess 80% compliance with 15.4 regarding PT visits after submission of HNR, but using same data, Monitors assess 50% compliance) |
| Mental Health | Injunction Provision 15.5 | **Non-compliant** | Patients who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care. | Doc. 4968 at 198 (Defendants self-assessed compliance with 15.5 regarding seeking initial mental health treatment as 100%, but using same data, Monitors found 25% compliance) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 15.6 | **Non-compliant** | When custody staff, families, or any other concerned party refers a patient for mental health assessment, there is a timely response to the concern by mental health staff. | Doc. 4968 at 199-200 (Monitors find non-compliance with 15.6 regarding responses of mental health staff to reports made by parties other than patient and that Defendants' methodology is flawed) |
| Mental Health | Injunction Provision 16.3.1.1 | **Non-compliant** | An MH-3 patient's assigned PT shall conduct an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the patient first entered the prison system. | Doc. 4968 at 201-203 (Defendants self-assess compliance with 16.3.1.1 regarding initial comprehensive mental health evaluation for MH-3 as 100%, Monitors found performance level to be close to 0%) |
| Mental Health | Injunction Provision 16.3.1.2 | **Non-compliant** | An MH-3 patient's assigned PT shall conduct an evaluation whenever there is a change in MH level of care designation. | Doc. 4968 at 204 (Monitors find Defendants noncompliant with 16.3.1.2 regarding PT assessment of MH-3 when there is a change in MH level) |
| Mental Health | Injunction Provision 16.3.1.3 | **Non-compliant** | An MH-3 patient's assigned PT shall conduct an evaluation at least once per year. | Doc. 4968 at 205-206 (Monitors find Defendants noncompliant with 16.3.1.3 regarding MH-3 PT evaluation once per year) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.3.3 | **Non-compliant** | A treatment plan meeting shall be conducted with MH-3 patients and their assigned PT. The treatment plan meeting shall occur at least once per year. A psychologist or psychiatric practitioner shall also be present for complex cases and in all other cases shall provide input to the PT prior to the treatment plan meeting. At that meeting, the patient's treatment plan shall be reviewed and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include adate for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year. | Doc. 4968 at 207-208 (Monitors find Defendants noncompliant with 16.3.3 regarding treatment plan meetings with MH-3 patients focusing on low-quality of treatment plans) |
| Mental Health | Injunction Provision 16.3.2 | **Non-compliant** | A psychiatric practitioner shall conduct an appropriate clinical encounter with all patients in anoutpatient level of care (i.e., MH-3) on psychotropic medications as often as clinically required, no less often than every three months. | Doc. 4968 at 209 (Defendants self-assess compliance with 16.3.2 regarding outpatient-care patients on psychotropic medications encounters with psychiatric practitioners as 100%, but Monitors find methodology to be flawed and that Defendants' failure to make a risk-benefit analysis "posed a significant risk to the patient of the potential side effects of his medications without commensurate benefits) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.4.1.1 | **Non-compliant** | An MH-4 patient's assigned PT shall conduct an evaluation whenever there is a significant change in the course of treatment, e.g., new type of treatment including medication, significant decompensation. | Doc. 4968 at 212-14 (Defendants self-assess compliance with 16.4.1.1 regarding PT evaluation when significant change in course of treatment for MH-4 patient as 91%, but Monitors assess at 30% with same dataset and note percentage is only element in measuring Injunction compliance) |
| Mental Health | Injunction Provision 16.4.1.2 | **Non-compliant** | An MH-4 patient's assigned PT shall conduct an evaluation at least annually, documenting the patient's need for residential level of care. | Doc. 4968 at 215-16 (Monitors find Defendants noncompliant with 16.4.1.2 regarding mental health evaluations, and noting that treatment can fall well below standard of care without compliance) |
| Mental Health | Injunction Provision 16.4.2 | **Non-compliant** | Patients in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan. | Doc. 4968 at 217-18 (Monitors assess that "Defendants continue to fail to provide clinically meaningful treatment to mentally ill patients" and are non-compliant with 16.4.2 regarding face-to-face encounters with PTs for patients in residential level of care) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.4.3 | **Non-compliant** | Patients in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted. | Doc. 4968 at 219-20 (Monitors find two deficiencies prevent compliance with 16.4.3 regarding review of treatment plans for patients in residential level of care) |
| Mental Health | Injunction Provision 16.4.4 | **Non-compliant** | A full Treatment Team meeting shall be conducted at least every 3 months by the primary therapist,psychologist, psychiatric practitioner, and any other staff as necessary. Patients shall be included in themeeting unless there is a clinical or legitimate and substantial safety and security concern documented inthe custody record. The meeting discussion shall include determination of adherence to treatment,efficacy of interventions, evaluation of their level of care needs, rationale for the need for residentialcare, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a lessrestrictive environment. | Doc. 4968 at 221-22 (Defendants self-assess 91% compliance with 16.4.4. regarding full treatment team meetings for mental health patients, but Monitors note 33% compliance and that compliance is not fully reflected by percentage; experts note "risk of significant harm from inadequate Treatment Plans) |
| Mental Health | Injunction Provision 16.5.1.1 | **Non-compliant** | The PT assigned to a patient in MH Inpatient care (MH-5) (or, if not already on the mental health caseload, the mental health provider assigned to the inpatient unit) shall conduct at least annually a comprehensive mental health evaluation reflecting the rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge. | Doc. 4968 at 223-24 (Monitors find Defendants noncompliant with 16.5.1.1 regarding annual comprehensive mental health evaluation for MH-5 patients) |
| Mental Health | Injunction Provision 16.5.1.2 | **Non-compliant** | The PT assigned to a patient in MH Inpatient care (MH-5) (or, if not already on the mental health caseload, the mental health provider assigned to the inpatient unit) shall upon discharge from inpatient care, prepare a discharge summary. | Doc. 4968 at 225 (Monitors find Defendants noncompliant with 16.5.1.2 regarding PT assignment to MH-5 patients) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.5.2 | **Non-compliant** | Patients in MH Inpatient care (MH-5) shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated. If the patient participates in the weekly treatment progress meeting described in Section 16.5.3, it may be counted as a daily face-to-face encounter. | Doc. 4968 at 226 (Monitors find Defendants noncompliant with 16.5.2 regarding MH-5 daily face-to-face encounters with PT) |
| Mental Health | Injunction Provision 16.5.3 | **Non-compliant** | Patients in MH Inpatient care (MH-5) shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (e.g., nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible. Patients shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented. At a minimum, the focus of treatment teams shall be to provide updates on patient progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit. | Doc. 4968 at 227 (Monitors find Defendants noncompliant with 16.5.3 regarding treatment teams for MH-5 patients) |
| Mental Health | Injunction Provision 16.6.1 | **Non-compliant** | If a patient's treatment team changes due to a change in the patient's mental health level of care the "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs. | Doc. 4968 at 228 (Defendants self-assess 76% compliance with 16.6.1 regarding changes in treatment team, but Monitors assess 50% and that compliance is not fully reflected in percentage) |
| Mental Health | Injunction Provision 16.6.2 | **Non-compliant** | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days; | Doc. 4968 at 229 (Monitors find Defendants noncompliant with 16.6.2 regarding timing of new PT after treatment plan change) |
| Mental Health | Injunction Provision 16.6.3 | **Non-compliant** | If a patient's treatment team changes due to a change in the patient's mental health level of care, if the transition is to residential or inpatient level of care, the PT meets with the patient as soon as possible, but no more than one business day after arrival, and the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a patient is admitted. | Doc. 4968 at 230 (Monitors find Defendants noncompliant with 16.6.3 regarding timing of new PT and psychiatric practitioner with treatment team change) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.6.4.1 | **Non-compliant** | If a patient's PT changes without a change in mental health level of care, if the transition is to anything other than to residential or inpatient, the "new" PT meets with the patient within seven calendar days. | Doc. 4968 at 231 (Monitors find Defendants noncompliant with 16.6.4.1 regarding timing of PT when PT changes without a change in mental health level of care) |
| Mental Health | Injunction Provision 16.6.4.2 | **Non-compliant** | If a patient's PT changes without a change in mental health level of care, because the patient is being moved but is remaining in residential or inpatient level of care, the "new" PT meets with the patient within one business day. | Doc. 4968 at 232 (Monitors find Defendants noncompliant with 16.6.4.2 regarding timing of new PT after transitions in mental healthcare) |
| Mental Health | Injunction Provision 18.1 | **Non-compliant** | Prior to release of any patient designated as Seriously Mental Ill ("SMI"), MH-4, or MH-5 who shall bereleased and who is presumptively eligible for federal or state assistance by virtue of their mental illness,ADCRR: (a) develops and documents an aftercare plan that reflects the patient's current symptoms andfunctional impairments, progress in treatment, and treatment plan; (b) facilitates evaluation for SMIdesignation and placement in the community, as clinically indicated; and (c) arranges follow-up carewith an appropriate community provider where possible. | Doc. 4968 at 233-35 (Defendants self-assess compliance with 18.1 regarding procedures for release of MH-4 and MH-5 patients as 94%, but Monitors assess as close to 0% using same dataset) |
| Mental Health | Injunction Provision 16.8.1 | **Non-compliant** | During normal business hours a patient who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psychology associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (e.g., return to current housing, placement in one-on-one observation, etc.) If the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the patient (which may or may not include constant observation.) If the patient is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional. | Doc. 4968 at 236-37 (Defendants self-assess compliance with 16.8.1 regarding suicide risk assessments as 78%, and Monitors assess at 72% using same dataset) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.8.3 | **Non-compliant** | Upon recommendation from a psychologist or psychiatric practitioner that housing a patient on suicide watch (a.k.a. MH Watch) in the same room with other suicide watch patients ("cohorting") would be clinically safer than housing each patient in isolation, Defendants shall cohort such patients, provided that based on the patients' custody classification (determined based on factors other than the fact that the individual is on suicide watch) such cohorting would not be contraindicated. | Doc. 4968 at 238-39 (Defendants self-assess compliance with 16.8.3 regarding cohorting of suicide risk patients as 82%, while Monitors assess compliance using same dataset as close to 0% identifying two flaws in ADCRR assessment) |
| Mental Health | Injunction Provision 16.9.2 | **Non-compliant** | Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter. Starting at ten days following placement in a Crisis Stabilization bed, the psychologist and or psychiatric prescriber shall document the justification for their continued assignment to the Crisis Stabilization bed rather than a Residential or Inpatient bed. (Additional reference 16.9.1) | Doc. 4968 at 240-43 (Monitors find Defendants noncompliant with 16.9.2 regarding continued treatment in Crisis Stabilization bed) |
| Mental Health | Injunction Provision 16.9.3 | **Non-compliant** | Patients in a crisis stabilization bed shall be evaluated at least daily in person by their PT (or another psychology associate if they have not yet been assigned a PT or have transferred from another yard.) Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting patient ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge. | Doc. 4968 at 241-43 (Monitors find Defendants noncompliant with 16.9.3 regarding daily evaluation by PT and treatment plans for patients in Crisis Stabilization beds) |
| Mental Health | Injunction Provision 16.9.4 | **Non-compliant** | The patient shall be assessed by a psychiatric practitioner as soon after admission to a crisis stabilization bed as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation. | Doc. 4968 at 244 (Defendants self-assess compliance with 16.9.4 regarding assessment by psychiatric practitioner when placed in Crisis Stabilization bed at 79%, but Monitors assess compliance at 55%) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.9.5 | **Non-compliant** | For patients placed in a crisis stabilization bed for suicidal concerns, a suicide risk assessment (SRA) shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care. | Doc. 4968 at 245-46 (Monitors find Defendants noncompliant with 16.9.5 regarding suicide risk assessments for patients in Crisis Stabilization beds) |
| Mental Health | Injunction Provision 16.9.6 | **Non-compliant** | A clinical note shall be entered whenever the level of suicide watch is changed. | Doc. 4968 at 247-48 (Defendants self-assess compliance with 16.9.6 regarding clinical notes when level of suicide watch changed as 96%, but Monitors assess 17% compliance using same dataset and note that they have explained to ADCRR the error in the procedure) |
| Mental Health | Injunction Provision 16.9.7 | **Non-compliant** | Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the patient's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the patient and treatment providers. | Doc. 4968 at 249 (Monitors find Defendants noncompliant with 16.9.7 regarding discharge suicide risk assessment on release from Crisis Stabilization bed) |
| Mental Health | Injunction Provision 16.9.8 | **Compliant** | "Safety contracts" (forms signed by patients, agreeing not to hurt themselves) shall not be used. | |
| Mental Health | Injunction Provision 16.9.9 | **Non-compliant** | When possible and safe, attempt to provide stabilization at the complex at which the patient has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the patient is maintained at the complex. | Doc. 4968 at 251-52 (Defendants self-assess compliance with 16.9.9 regarding stabilization at complex where patient is housed as 100%, but Monitors calculate 80% compliance with |

| | | | | |
|---|---|---|---|---|
| | | | | same dataset) |
| Mental Health | Injunction Provision 16.10 | **Compliant** | Restraints used by mental health clinicians for clinical purposes shall comply with the following 8 requirements: 1) Restraints shall be used only to prevent harm to oneself or to others and to ensure the | |
| | | | safety and security of the staff and other patients. They shall not be used for punishment. 2) Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist. 3) Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (e.g., patient and | |
| | | | staff safety, requisite transports, etc..) 4) Soft restraints shall be used whenever possible. 5) Restraints shall not be used for more than four hours at a time. Every effort shall be made to minimize the length of time in restraints. 6) Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee and must be renewed at intervals no longer than four hours. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use. The | |

| | | | | |
|---|---|---|---|---|
| | | | justification for continued use shall be documented in the patient's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist. 7) Patients shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care. Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the patient's medical records. 8) Patients in restraints shall be under direct observation at all times. If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately. | |
| Mental Health | Injunction Provision 13.2 | **Compliant** | A MH Duty Officer shall be available at all times when facility mental health staff are not available. The MH Duty Officer shall be a licensed psychology associate, psychologist, or psychiatric practitioner. | |
| Mental Health | Injunction Provision 14.1 | **Compliant** | All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order; they may also not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. (Notify Court Monitors if there is a request for an exception.) | |
| Mental Health | Injunction Provision 14.2 | **Compliant** | All psychologists and psychiatric practitioners shall have the appropriate state licenses. All psychology associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later, and may not possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.10 | **Compliant** | All staff hired in clinical MH supervising positions must have at least two years clinical experience. | |
| Mental Health | Injunction Provision 1.11 | **Compliant** | Behavioral Health Technicians shall not independently assess patients or initiate a plan of care or treatment. | |
| Mental Health | Injunction Provision 1.12 | **Compliant** | No one for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility. | |
| Mental Health | Injunction Provision 13.1 | **Compliant** | Outpatient psychologists supervise no more than eight psychology associates, and inpatient psychologists supervise no more than six psychology associates. | |
| Mental Health | Injunction Provision 15.1 | **Non-compliant** | Each patient on the mental health caseload, i.e., all patients in MH Levels 3, 4, and 5, are assigned aprimary therapist (PT; psychology associate or psychologist) who serves as the single point of contactand coordination for providing care to all patients designated MH-3 and above. When a patient'sassigned PT is unavailable, another psychology associate or psychologist acts on their behalf. | Doc. 4968 at 261-62 (Monitors state "[w]ith the current reports generated by Defendants, it is not yet possible to calculate an accurate count of the number of patients for whom [15.1 regarding assignment of PT to patients on mental health caseload] has been met," but that current conditions make it "impossible to provide meaningful safe MH care," which "underscores the need for immediate implementation of the PCCM and staffing plan.") |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 15.2 | **Non-compliant** | A psychologist shall review the records of each patient who is added to, or discharged from, the mental health caseload after intake. The psychologist shall approve or deny the level of care assignment and take appropriate action. | Doc. 4968 at 263-64 (Defendants self-assess 92% compliance with 15.2 regarding psychologist review of records after mental health intake, but Monitors assess approximately 30% compliance with same dataset) |
| Mental Health | Injunction Provision 1.4 | **Non-compliant** | Telehealth (video encounter with remotely located clinicians; TH) for mental health care may be used only when clinically appropriate. | Doc. 4968 at 264 (Defendants' compliance with 1.4 regarding telehealth for mental healthcare as 88%, but Monitors assert that "[d]espite our strong recommendations to the contrary, Defendants continue to rely heavily on, if not has increased its reliance on, remote mental health clinicians providing chronic care in mental health via video.") |
| Mental Health | Injunction Provision 15.9 | **Non-compliant** | There is sufficient space, equipment (e.g., computer, furniture), and supplies (e.g., assessment and treatment materials) to deliver mental health care services. This includes, but is not limited to, areas for mentally ill patients to be housed, engage in programming, and receive treatment (both individual and group) in an environment commensurate with that unit/facility's designated level of care. There is auditory and visual confidentiality during MH encounters. | Doc. 4968 at 266 (With regard to 15.9 regarding sufficient space, equipment, and supplies to deliver mental health services, Monitors state "Defendants cannot possibly comply with almost any of the requirements of the Injunction in the absence of sufficient space, equipment, and supplies.") |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 16.7 | **Non-compliant** | All mental health encounters with all patients shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented. | Doc. 4968 at 267-68 (Monitors find Defendants noncompliant with 16.7 regarding conducting MH encounters in confidentially, therapeutically appropriate setting despite Monitors' previous documentation of these issues in their Second Interim Monitors' Report) |
| Mental Health | Injunction Provision 1.15 | **Non-compliant** | There is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting patients to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations. Exceptions may be made for a declared emergency (e.g., prison riot, natural disaster.) | Doc. 4968 at 270-71 (Monitors find non-compliance with 1.15 regarding sufficient number of custody staff to support healthcare due to insufficient number of custody staff while noting that existing custody staff attempts to comply) |
| Mental Health | Injunction Provision 1.16a | **Non-compliant** | (Additional reference: Any Court orders related to staffing levels) All positions required by the current contract with the health care vendor including any modifications, addenda, or updates are filled. A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position and is not on long term leave, e.g., Family Medical Leave Act. An individual may not fill more than 1.0 FTE. | Doc. 4968 (Monitors find that "Defendants cannot possible fulfill the requirements of" 1.16a regarding staffing levels under current contract due to inadequate number of staff with proper credentials working at Defendants on a daily basis, and noting errors in staffing numbers and competitive salary compensation calculations) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 1.16b | **Compliant** | Up to 15% of staff described in 1.16a may be filled with registry staff. | |
| Mental Health | Injunction Provision 10.1 | **Non-compliant** | Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration. | Doc. 4968 at 275-79 (Monitors find Defendants noncompliant with 10.1 regarding prescribed medications for direct observation therapy (DOT)) |
| Mental Health | Injunction Provision 10.2a | **Non-compliant** | For a patient newly admitted to a facility (e.g., transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose. | Doc. 4968 at 280 (Monitors find Defendants noncompliant 10.2a regarding medication administration for newly admitted patients) |
| Mental Health | Injunction Provision 10.2b | **Non-compliant** | The first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications. | Doc. 4968 at 281 (Monitors find Defendants noncompliant with 10.2b regarding administration of newly ordered medications) |
| Mental Health | Injunction Provision 10.4.1 | **Non-compliant** | KOP medications shall be delivered to the patient before the medication runs out (based on the date of the previous fill.) A KOP medication shall be delivered either by providing the patient with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered. Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued, and the patient is so informed. | Doc. 4968 at 282 (Defendants self-assess its compliance with 10.4.1 regarding refills of KOP medications at 96% and Monitors agree, but note a high degree of harm from any deficiency in this area) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 10.3 | **Non-compliant** | When a patient refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate thecase to a higher authority and within a specified amount of time (which may differ by medication or class.) The decision rules described above should be incorporated into the medication administrationsoftware of the EHR such that the EHR automatically alerts the medication administrator when action isneeded and what action is needed. When medication refusals require escalation, an RN or higher willobtain an INFORMED refusal. | Doc. 4968 at 283-84 (Monitors find Defendants non-compliant with 10.3 regarding procedures for medication refusals due to uninformed refusals) |
| Mental Health | Injunction Provision 1.20a/b | **Non-compliant** | When a patient notifies a correctional officer that he/she has a need for health care (medical or mental health), the officer may not inquire as to the nature of the need or symptoms. The officer's inquiry is limited to asking whether the need is immediate, if the patient can wait to sign up for the next scheduled clinic, or if the patient is thinking of harming themselves. (If the patient is thinking of harming themself,the officer shall immediately ensure the patient's safety and contact health care staff in accordance with Section 16.8.1.) For other needs that are immediate, the officer shall contact health care staff immediately. An RN shall then immediately triage the patient, either by seeing the patient, or talking to the patient directly over the phone. Based on triage results, the RN shall discuss the patient with a medical practitioner (i.e., physician or APP) or, if the patient is already on the mental health caseload (i.e., MH-3, 4, or 5), a mental health professional in a clinically appropriate timeframe, not to exceed four hours. In this context, the mental health professional shall be a psychology associate, psychologist, or psychiatric prescriber. Based on that interaction the professional who was contacted shall: see and treat the patient the same day; or instruct the RN on treatment to provide, and, if necessary, schedule the patient for further evaluation or treatment in a clinically appropriate timeframe; or determine the health care need is not urgent and that a reasonable patient would not have considered the health care need to be urgent, defer treatment, and instruct the patient to access non-urgent/non-emergent care for treatment. | Doc. 4968 at 285 (Monitors find Defendants noncompliant with 1.20a/b regarding correctional officer information regarding healthcare needs noting that correctional officers "are still attempting to triage episodic complaints brought to them by patients," resulting in dangerous conditions) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 2.1.1 | **Non-compliant** | Following any death or suicide attempt, identify all significant health care and custody errors (i.e., near misses as well as preventable adverse events.) Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted and implemented within one month of the death. A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover. Monitor the | Doc. 4968 at 286 (Monitors find that "despite extensive feedback and coaching we have provided to Defendants' staff, both orally and in writing, little progress has been made by Defendants to comply" with 2.1.1 regarding identification of significant healthcare and custody errors following any death or suicide attempt) |
| | | | remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring. [2.1.3.] For each death, the plan in this section shall be crafted and implemented within one month whether or not the medical examiner's report is available. | |
| Mental Health | Injunction Provision 2.5.1 | **Non-compliant** | Staff capture errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by patients, grievances, the Court-appointed Monitors, staff reports, continuous quality improvement, etc. Staff maintain an active log of all such errors and problems to assist in deciding which issues to address, when, and at what level (complex and/or statewide), and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover. The remedial plan shall be monitored for effectiveness. Appropriate and timely modifications shall be made to the plan based on the monitoring. | Doc. 4968 at 287-89 (Monitors find Defendants noncompliant with 2.5.1 regarding staff capture of errors and problems stating that "[i]t is extremely difficult for us to describe in clear prose Defendants' non-compliance because of the chaotic nature of their work, documentation, and lack thereof.") |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 4.4a/b | **Compliant** | Imported or scanned documents (including but not limited to diagnostic test results, consultation reports,and hospital discharge summaries) in the EHR: shall be filed in a clear and usable manner, areaccurately labeled with meaningful titles/file names, are scanned right-side up, and are filed with anappropriate document date according to the following rules: Scanned documents are dated (and appearin any programmed or ad hoc list according to this date) based on the clinically relevant date of thedocument, not the date scanned. For example, the clinically relevant date of a lab test is the date the testwas reported by the lab; discharge summary is the date of discharge; a prior health record is the date it was received at ADCRR; an imaging study is the date of study; documents are scanned in the correctorientation and labeled with the correct date. (This provision only addresses whether a relevantdocument is eventually scanned into the EHR in some form, regardless of the timeliness, accuracy oflabeling, or readability.) | |
| Mental Health | Injunction Provision 4.4c | **Compliant** | Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other." | |
| Mental Health | Injunction Provision 4.4d/e | **Non-compliant** | Documents (including but not limited to diagnostic tests, consultation reports, and hospital discharge summaries) which are supposed to be manually scanned into, or electronically attached to (after receipt via email) the EHR have this completed within 2 business days of receipt. All imported documents are reviewed by the medical provider (for medical documents), or primary therapist or psychiatric prescriber (for MH documents) within 4 business days of receipt. | Doc. 4968 at 292-93 (Defendants self-assess its compliance with 4.4d/e regarding documents scanned or electronically attached to EHR 97%, but Monitors find errors in the samples, and that performance would be well below 97%, but even at 97% presents a considerable risk of harm) |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 4.5 | **Non-compliant** | Staff provide patients access to their own medical records as follows, unless a practitioner documents in the patient's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the patient or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the patient: (a) read-only access to patients wishing to read a copy of their health record; (b) orally sharing with a patient information regarding their diagnosis or any other information about their health care; (c) providing paper copies at a fee consistent with the updated policy; or (d) as an alternative to a paper copy, if the patient agrees, staff may provide the requested records, free of charge, in an electronic medium that the patient is able to access. | Doc. 4968 at 294 (Defendants self-assess compliance with 4.5 regarding providing patients access to their own medical records as 66-89%, and using same dataset Monitors assess at 60%) |
| Mental Health | Injunction Provision 4.3 | **Non-compliant** | The Problem List in a patient's health record shall have the following qualities: (1) It shall be accurate, complete, and easily usable. (2) Resolved or historical conditions or diagnoses are separated from current conditions. (3) The date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known. (4) Similar or identical diagnoses of current conditions are listed only once. For example, a Problem List should not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified." | Doc. 4968 at 295-302 (finding noncompliance with 4.3 regarding problem lists in health record and stating "In a half a year, and despite our detailed feedback to Defendants, nothing has changed – the patient Problem Lists are still horrible, continuing to pose a significant risk to patient safety, compounded by the fact that the majority of patient visits are still with practitioners who do not already know the patient well, making an accurate, usable Problem List that much more invaluable.") |

| | | | | |
|---|---|---|---|---|
| Mental Health | Injunction Provision 3.1 | **Non-compliant** | (Additional references: 3.2, 3.3, 3.4) The patient's preferred language is known, shown in all relevant screens of the EHR, and care is delivered in the language in which the patient is fluent at all times. For all individual and group health care encounters in all settings involving patients who are not fluent in English, interpretation shall be provided via: health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the patient; or in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law. Exception is made when use of the above methods is not feasible due to emergency circumstances. | Doc. 4968 at 303-305 (Defendants self-assess compliance with 3.1 regarding care and records in patient's preferred language as 99.5%, but Monitors note significant errors) |
| Mental Health | Injunction Provision 3.6 | **Non-compliant** | Written available notification (such as a poster) shall be hung in all housing units and medical clinics inall prisons advising prisoners, in the ten most common languages in Arizona, of the availability ofinterpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not alreadydocumented in their electronic health record. | Doc. 4968 at 306 (Defendants self-assessed compliance with 3.6 regarding posting of availability of interpretation services in ten most common languages as 89%) Monitors note that 5/43 living areas and 6/55 medical areas were missing the poster.) |

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
Brenna Durkin (Bar No. 027973)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
avarma@azdisabilitylaw.org
bdurkin@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-DJH<br><br>**STIPULATION** |

Plaintiffs and Defendants (collectively, "the Parties") hereby stipulate as follows:

**I. INTRODUCTION AND PROCEDURAL PROVISIONS**

1. Plaintiffs are prisoners in the custody of the Arizona Department of Corrections ("ADC"), an agency of the State of Arizona, who are incarcerated at one of the state facilities located in the State of Arizona, and the Arizona Center for Disability Law ("ACDL").

2. Defendants are Charles Ryan, Director of ADC, and Richard Pratt, Interim Division Director, Division of Health Services of ADC. Both Defendants are sued in their official capacities.

3. The Court has certified this case as a class action. The class is defined as "All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC." The subclass is defined as "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area."

4. The purpose of this Stipulation to settle the above captioned case. This Stipulation governs or applies to the 10 ADC complexes: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow and Yuma. This Stipulation does not apply to occurrences or incidents that happen to class members while they do not reside at one of the 10 ADC complexes.

5. Defendants deny all the allegations in the Complaint filed in this case. This Stipulation does not constitute and shall not be construed or interpreted as an admission of any wrongdoing or liability by any party.

6. Attached to this Stipulation as Exhibit A is a list of definitions of terms used herein and in the performance measures used to evaluate compliance with the Stipulation.

## II. SUBSTANTIVE PROVISIONS

### A. Health Care.

7. Defendants shall request that the Arizona Legislature approve a budget to allow ADC and its contracted health services vendor to modify the health services contract to increase staffing of medical and mental health positions. This provision shall not be construed as an agreement by Plaintiffs that this budgetary request is sufficient to comply with the terms of this Stipulation.

8. Defendants shall comply with the health care performance measures set forth in Exhibit B. Clinicians who exhibit a pattern and practice of substantially departing from the standard of care shall be subject to corrective action.

9. **Measurement and reporting of performance measures:** Compliance with the performance measures set forth in Exhibit B shall be measured and reported monthly at each of ADC's ten (10) complexes as follows.

a. The performance measures analyzed to determine ADC substantial compliance with the health care provisions of this Stipulation shall be governed by ADC's MGAR format. Current MGAR performance compliance thresholds used to measure contract compliance by the contracted vendor shall be modified pursuant to a contract amendment to reflect the compliance measures and definitions set forth in Exhibit B.

b. The parties shall agree on a protocol to be used for each performance measure, attached as Exhibit C. If the parties cannot agree on a protocol, the matter shall be submitted for mediation or resolution by the District Court.

10. The measurement and reporting process for performance measures, as described in Paragraph 9, will determine (1) whether ADC has complied with particular performance measures at particular complexes, (2) whether the health care provisions of this Stipulation may terminate as to particular performance measures at particular

complexes, as set forth in the following sub-paragraphs.

a. **Determining substantial compliance with a particular performance measure at a particular facility:** Compliance with a particular performance measure identified in Exhibit B at a particular complex shall be defined as follows:

i. For the first twelve months after the effective date of this Stipulation, meeting or exceeding a seventy-five percent (75%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9;

ii. For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9;

iii. After the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9.

b. **Termination of the duty to measure and report on a particular performance measure:** ADC's duty to measure and report on a particular performance measure, as described in Paragraph 9, terminates if:

i. The particular performance measure that applies to a specific complex is in compliance, as defined in sub-paragraph A of this Paragraph, for eighteen months out of a twenty-four month period; and

ii. The particular performance measure has not been out of compliance, as defined in sub-paragraph A of this Paragraph, for three or more consecutive months within the past 18- month period.

c. The duty to measure and report on any performance measure for a given complex shall continue for the life of this Stipulation unless terminated pursuant to sub-paragraph B of this Paragraph.

11. Defendants or their contracted vendor(s) will approve or deny all requests for specialty health care services using InterQual or another equivalent industry standard utilization management program. Any override of the recommendation must be documented in the prisoner's health care chart, including the reason for the override.

12. Defendants or their contracted vendor(s) will ensure that:

a. All prisoners will be offered an annual influenza vaccination.

b. All prisoners with chronic diseases will be offered the required immunizations as established by the Centers for Disease Control.

c. All prisoners ages 50 to 75 will be offered annual colorectal cancer screening.

d. All female prisoners age 50 and older will be offered a baseline mammogram screening at age 50, then every 24 months thereafter unless more frequent screening is clinically indicated.

13. Defendants or their contracted vendor(s) will implement a training program taught by Dr. Brian Hanstad, or another dentist if Dr. Hanstad is unavailable, to train dental assistants at ADC facilities about how to triage HNRs into routine or urgent care lines as appropriate and to train dentists to evaluate the accuracy and skill of dental assistants under their supervision.

14. For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service.

15. If a prisoner who is taking psychotropic medication suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness. If all other steps have failed to abate the heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit.

16. Psychological autopsies shall be provided to the monitoring bureau within thirty (30) days of the prisoner's death and shall be finalized by the monitoring bureau within fourteen (14) days of receipt. When a toxicology report is required, the psychological autopsy shall be provided to the monitoring bureau within thirty (30) days of receipt of the medical examiner's report. Psychological autopsies and mortality reviews shall identify and refer deficiencies to appropriate managers and supervisors including the CQI committee. If deficiencies are identified, corrective action will be taken.

**B. Maximum Custody Prisoners.**

17. Defendants shall request that the Arizona Legislature approve a budget to allow ADC to implement DI 326 for all eligible prisoners. This provision shall not be construed as an agreement by Plaintiffs that this budget request is sufficient to comply with the terms of this Stipulation.

18. Defendants shall comply with the maximum custody performance measures set forth in Exhibit D.

19. **Measurement and reporting of performance measures:** Compliance with the performance measures set forth in Exhibit D shall be measured and reported monthly as follows.

a. The performance measures analyzed to determine ADC substantial compliance with the Maximum Custody provisions of this Stipulation

shall be governed by the protocol used for each performance measure attached as Exhibit E. If the parties cannot agree on a protocol, the matter shall be submitted for mediation or resolution by the District Court.

20. The measurement and reporting process for performance measures, as described in Paragraph 19, will determine (1) whether ADC has complied with particular performance measures at particular units, (2) whether the Maximum Custody provisions of this Stipulation may terminate as to particular performance measures at particular units, as set forth in the following sub-paragraphs.

a. **Determining substantial compliance with a particular performance measure at a particular unit:** Compliance with a particular performance measure identified in Exhibit D at a particular unit shall be defined as follows:

i. For the first twelve months after the effective date of this Stipulation, meeting or exceeding a seventy-five percent (75%) threshold for the particular performance measure that applies to a specific unit, determined under the procedures set forth in Paragraph 19;

ii. For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific unit, determined under the procedures set forth in Paragraph 19;

iii. After the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that

applies to a specific unit, determined under the procedures set forth in Paragraph 19.

b. **Termination of the duty to measure and report on a particular performance measure:** ADC's duty to measure and report on a particular performance measure, as described in Paragraph 19, terminates if:

i. The particular performance measure that applies to a specific unit is in compliance, as defined in sub-paragraph A of this Paragraph, for eighteen months out of a twenty-four month period; and

ii. The particular performance measure has not been out of compliance, as defined in sub-paragraph A of this Paragraph, for three or more consecutive months within the past eighteen-month period.

c. The duty to measure and report on any performance measure for a given unit shall continue for the life of this Stipulation unless terminated pursuant to sub-paragraph B of this Paragraph.

21. Seriously Mentally Ill (SMI) prisoners are defined as those prisoners who have been determined to be seriously mentally ill according to the criteria set forth in the ADC SMI Determination Form (Form 1103-13, 12/19/12), which is attached hereto as Exhibit F and is incorporated by reference as if fully set forth herein. For purposes of this Stipulation, "intellectual disabilities," as defined by the current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), shall be added to the list of qualifying diagnoses on Form 1103.13. This definition shall govern this Stipulation notwithstanding any future modification of Form 1103.13 or ADC's definition of "Seriously Mentally Ill." All prisoners determined to be SMI in the community shall also be designated as SMI by ADC.

22. ADC maximum custody prisoners housed at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) units, shall be offered out of cell time, incentives, programs and property consistent with DI 326 and the Step Program Matrix, but in no event shall be offered less than 6 hours per week of out-of-cell exercise. Defendants shall implement DI 326 and the Step Program Matrix for all eligible prisoners and shall maintain them in their current form for the duration of this Stipulation. In the event that Defendants intend to modify DI 326 and the Step Program Matrix they shall provide Plaintiffs' counsel with thirty (30) days' notice. In the event that the parties do not agree on the proposed modifications, the dispute shall be submitted to Magistrate Judge David Duncan who shall determine whether the modifications effectuate the intent of the relevant provisions of the Stipulation.

23. Prisoners who are MH3 or higher shall not be housed in Florence Central-CB5 or CB7 unless the cell fronts are substantially modified to increase visibility.

24. All prisoners eligible for participation in DI 326 shall be offered at least 7.5 hours of out-of-cell time per week. All prisoners at Step II shall be offered at least 8.5 hours of out-of-cell time per week, and all prisoners at Step III shall be offered at least 9.5 hours of out-of-cell time per week. The out of cell time set forth in this paragraph is inclusive of the six hours of exercise time referenced in Paragraph 22. Defendants shall ensure that prisoners at Step II and Step III of DI 326 are participating in least one hour of out-of-cell group programming per week.

25. In addition to the out of cell time, incentives, programs and property offered pursuant to DI 326 and the Step Program Matrix for prisoners housed at maximum custody units specified in ¶ 24 above, ADC maximum custody prisoners designated as SMI pursuant to ¶ 21 above, shall be offered an additional ten hours of unstructured of out of cell time per week; an additional one hour of out-of-cell mental health programming per week; one hour of additional out of cell pyschoeducational programming per week;

and one hour of additional out of cell programming per week. Time spent out of cell for exercise, showers, medical care, classification hearings or visiting shall not count toward the additional ten hours of out of cell time per week specified in this Paragraph. All prisoners received in maximum custody will receive an evaluation for program placement within 72 hours of their transfer into maximum custody, including to properly identify all SMI prisoners.

26. If out of cell time offered pursuant to ¶¶ 24 or 25 above is limited or cancelled for legitimate operational or safety and security reasons such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, Defendants shall make every reasonable effort to ensure that amount of out of cell time shall be made up for those prisoners who missed out of cell time. The out of cell time provided pursuant to paragraph 24 above, may be limited or canceled for an individual prisoner if the Warden, or his/her designee if the Warden is not available, certifies in writing that allowing that prisoner such out of cell time would pose a significant security risk. Such certification shall expire after thirty (30) days unless renewed in writing by the Warden or his/her designee.

27. Defendants shall maintain the following restrictions on the use of pepper spray and other chemical agents on any maximum custody prisoner classified as SMI, and in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU).

a. Chemical agents shall be used only in case of imminent threat. An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance. A decision to use chemical agents shall be based on

more than passive resistance to placement in restraints or refusal to follow orders. If the inmate has not responded to staff for an extended period of time, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized.

b. All controlled uses of force shall be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The cool down period shall include clinical intervention (attempts to verbally counsel and persuade the inmate to voluntarily exit the area) by a mental health clinician, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a qualified health care professional (other than a LPN) shall provide such clinical intervention. This cool down period may include similar attempts by custody staff.

c. If it is determined the inmate does not have the ability to understand orders, chemical agents shall not be used without authorization from the Warden, or if the Warden is unavailable, the administrative duty officer.

d. If it is determined an inmate has the ability to understand orders but has difficulty complying due to mental health issues, or when a mental health clinician believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation, a mental health clinician shall propose reasonable strategies to employ in an effort to gain compliance, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a qualified health care professional (other than a LPN) shall propose such reasonable strategies.

e. The cool down period may also include use of other available resources/options such as dialogue via religious leaders, correctional

counselors, correctional officers and other custody and non-custody staff that have established rapport with the inmate.

28. All maximum custody prisoners shall receive meals equivalent in caloric and nutritional content to the meals received by other ADC prisoners.

## III. MONITORING AND ENFORCEMENT

29. Plaintiffs' counsel and their experts shall have reasonable access to the institutions, staff, contractors, prisoners and documents necessary to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation. The parties shall cooperate so that plaintiffs' counsel has reasonable access to information reasonably necessary to perform their responsibilities required by this Stipulation without unduly burdening defendants. If the parties fail to agree, either party may submit the dispute for binding resolution by Magistrate Judge David Duncan. Defendants shall also provide, on a monthly basis during the pendency of the Stipulation, copies of a maximum of ten (10) individual Class Members' health care records, and a maximum of five (5) individual Subclass Members' health care and institutional records, such records to be selected by Plaintiffs' counsel. The health care records shall include: treatment for a twelve (12) month period of time from the date the records are copied. Upon request, Defendants shall provide the health care records for the twelve months before those originally produced. In addition, Defendants shall provide to Plaintiffs on a monthly basis a copy of all health care records of Class Members who died during their confinement at any state operated facility (whether death takes place at the facility or at a medical facility following transfer), and all mortality reviews and psychological autopsies for such prisoners. The records provided shall include treatment for a twelve (12) month period prior to the death of the prisoner. Upon request, Defendants shall provide the health care records for the twelve months before those originally produced. The parties will meet and confer about the limit on the records that Plaintiffs can request once the ADC electronic medical records system is fully implemented.

30. In the event that counsel for Plaintiffs alleges that Defendants have failed to substantially comply in some significant respect with this Stipulation, Plaintiffs' counsel shall provide Defendants with a written statement describing the alleged non-compliance ("Notice of Substantial Non-Compliance"). Defendants shall provide a written statement responding to the Notice of Substantial Non-Compliance within thirty (30) calendar days from receipt of the Notice of Substantial Non-Compliance and, within thirty (30) calendar days of receipt of Defendants' written response, counsel for the parties shall meet and confer in a good faith effort to resolve their dispute informally.

31. In the event that a Notice of Substantial Non-Compliance pursuant to ¶ 30 of this Stipulation cannot be resolved informally, counsel for the parties shall request that Magistrate Judge John Buttrick mediate the dispute. In the event that Magistrate Judge Buttrick is no longer available to mediate disputes in this case, the parties shall jointly request the assignment of another Magistrate Judge, or if the parties are unable to agree, the District Judge shall appoint a Magistrate Judge. If the dispute has not been resolved through mediation in conformity with this Stipulation within sixty (60) calendar days, either party may file a motion to enforce the Stipulation in the District Court.

32. Plaintiffs' counsel and their experts shall have the opportunity to conduct no more than twenty (20) tour days per year of ADC prison complexes. A "tour day" is any day on which one or more of plaintiffs' counsel and experts are present at a given complex. A tour day shall last no more than eight hours. No complex will be toured more than once per quarter. Tours shall be scheduled with at least two weeks' advance notice to defendants. Defendants shall make reasonable efforts to make available for brief interview ADC employees and any employees of any contractor that have direct or indirect duties related to the requirements of this Stipulation. The interviews shall not unreasonably interfere with the performance of their duties. Plaintiffs' counsel and their experts shall be able to have confidential, out-of-cell interviews with prisoners during these tours. Plaintiffs' counsel and their experts shall be able to review health and other

records of class members, and records of mental health and other programming, during the tours. Plaintiffs' counsel and their experts shall be able to review any documents that form the basis of the MGAR reports and be able to interview the ADC monitors who prepared those reports.

33. With the agreement of both parties, Plaintiffs may conduct confidential interviews with prisoners, and interviews of ADC employees or employees of ADC's contractors, by telephone.

34. Defendants shall notify the Ninth Circuit Court of Appeals of the settlement of this case and of their intention to withdraw the petition for rehearing en banc in case number 13-16396, upon final approval of the Stipulation by the District Court. Defendants agree not to file a petition for writ of certiorari with the United States Supreme Court seeking review of the Ninth Circuit's judgment in case number 13-16396.

**IV. RESERVATION OF JURISDICTION**

35. The parties consent to the reservation and exercise of jurisdiction by the District Court over all disputes between and among the parties arising out of this Stipulation. The parties agree that this Stipulation shall not be construed as a consent decree.

36. Based upon the entire record, the parties stipulate and jointly request that the Court find that this Stipulation satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right of the Plaintiffs. In the event the Court finds that Defendants have not complied with the Stipulation, it shall in the first instance require Defendants to submit a plan approved by the Court to remedy the deficiencies identified by the Court. In the event the Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power to enforce this Stipulation through all remedies provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a

specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation. In determining the subsequent remedies the Court shall consider whether to require Defendants to submit a revised plan.

**V. TERMINATION OF THE AGREEMENT.**

37. To allow time for the remedial measures set forth in this Stipulation to be fully implemented, the parties shall not move to terminate this Stipulation for a period of four years from the date of its approval by the Court. Defendants shall not move to decertify the class for the duration of this Stipulation.

**VI. MISCELLANEOUS PROVISIONS**

38. Information produced pursuant to this Stipulation shall be governed by the Amended Protective Order (Doc. 454).

39. This Stipulation constitutes the entire agreement among the parties as to all claims raised by Plaintiffs in this action, and supersedes all prior agreements, representations, statements, promises, and understandings, whether oral or written, express or implied, with respect to this Stipulation. Each Party represents, warranties and covenants that it has the full legal authority necessary to enter into this Stipulation and to perform the duties and obligations arising under this Stipulation.

40. This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification.

41. This Stipulation shall be binding on all successors, assignees, employees, agents, and all others working for or on behalf of Defendants and Plaintiffs.

42. Defendants agree to pay attorneys' fees and costs incurred in the underlying litigation of the subject lawsuit in the total amount of $ 4.9 million. Defendants agree to deliver payment of $ 1 million within 14 days of the effective date of the Stipulation, and $ 3.9 million by July 15, 2015. The parties agree that payment of these fees and costs

represents full satisfaction of all claims for fees and costs incurred through the effective date of the Stipulation.

43. In the event that Plaintiffs move to enforce any aspect of this Stipulation and the Plaintiffs are the prevailing party with respect to the dispute, the Defendants agree that they will pay reasonable attorneys' fees and costs, including expert costs, to be determined by the Court. The parties agree that the hourly rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d).

44. Plaintiffs' counsel shall be compensated for work reasonably performed or costs incurred to monitor or enforce the relief set forth in this Stipulation up to $ 250,000 per calendar year. In exchange for Plaintiffs' agreement to a cap on the amount of fees, Defendants shall not dispute the amount sought unless there is an obvious reason to believe that the work was unreasonable or the bill is incorrect. The amount of $ 250,000 will be prorated for the portion of the calendar year between the effective date of the Stipulation and the start of the next calendar year. Plaintiffs' counsel shall submit an invoice for payment quarterly along with itemized time records and expenses. Defendants shall pay the invoice within thirty (30) days of receipt. This limitation on fees and costs shall not apply to any work performed in mediating disputes before the Magistrate pursuant to paragraphs 22, 29, and 31 above, or to any work performed before the District Court to enforce or defend this Stipulation.

Dated this 9TH day of OCTOBER, 2014.

**APPROVED:**

[signature] Date: 10.9.14

Charles Ryan,
Director, Arizona Department of Corrections

[signature] Date: 10/9/14

Richard Pratt
Interim Division Director, Division of Health Services,
Arizona Department of Corrections

**PRISON LAW OFFICE**

By: *s/ Donald Specter*
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Warren E. George (Cal. 53588)*
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
wgeorge@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@npp-aclu.org
afettig@npp-aclu.org
aquereshi@npp-aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

**STRUCK, WIENEKE, & LOVE, P.L.C.**

By: *s/ Daniel P. Struck*
Daniel P. Struck (Bar No. 012377)
Kathleen L. Wieneke (Bar No. 011139)
Rachel Love (Bar No. 019881)
Timothy J. Bojanowski (Bar No. 22126)
Nicholas D. Acedo (Bar No. 021644)
Ashlee B. Fletcher (Bar No. 028874)
Anne M. Orcutt (Bar No. 029387)
Jacob B. Lee (Bar No. 030371)
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Email: dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

Arizona Attorney General
Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried
Lucy M. Rand
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Email: Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

*Attorneys for Defendants*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 23966)
Kirstin T. Eidenbach (Bar No. 27341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
keidenbach@perkinscoie.com
jhgray@perkinscoie.com
mdumee@perkinscoie.com
jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
Dara Levinson (Cal. 274923)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com
aamiri@jonesday.com
daralevinson@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com
tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email: kmamedova@jonesday.com
jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email: kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: *s/ Sarah Kader*
Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
Brenna Durkin (Bar No. 027973)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
avarma@azdisabilitylaw.org
bdurkin@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email: jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2014, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ Delana Freouf

Index of Exhibits to Stipulation


Exhibit A: Definitions of Terms

Exhibit B: Health Care Performance Measures

Exhibit C: Health Care Performance Measures Protocol

Exhibit D: Maximum Custody Performance Measures

Exhibit E: Maximum Custody Performance Measures Protocol

Exhibit F: ADC SMI Determination Form

# EXHIBIT A

For purposes of the performance measures, the following definitions will be used:

| **TERM** | **DEFINITION** |
|---|---|
| Active labor & delivery | Contractions lasting 45-60 seconds and being 3 to 4 minutes apart |
| ASPC | Arizona State Prison Complex. ASPC- Safford includes Ft Grant. ASPC-Florence includes Globe. ASPC-Winslow includes Apache. |
| ATP | Alternate Treatment Plan |
| Chronic Disease | Chronic diseases include the following:<br>• diabetes<br>• HIV/AIDs<br>• cancer<br>• hypertension<br>• Respiratory disease (for example, COPD / asthma / cystic fibrosis)<br>• Seizure Disorder<br>• heart disease<br>• sickle cell disease<br>• Hepatitis C<br>• Tuberculosis<br>• Neurological disorders (Parkinson's, multiple sclerosis, myasthenia gravis, etc.)<br>• Cocci (Valley Fever)<br>• End-Stage Liver Disease<br>• Hyperlipidemia<br>• Renal Diseases<br>• Blood Diseases (including those on anticoagulants (or long term >six months))<br>• Rheumatological Diseases (including lupus, rheumatoid arthritis)<br>• Hyperthyroidism<br>• Crohn's Disease |
| Contracted Vendor | For purposes of this agreement, contracted vendor refers directly to Corizon Health and its subcontractors, or any successor contractor/subcontractor. |
| CQI | Continuous Quality Improvement |
| Diagnostic Service | Lab draws and specimen collections, X-rays, vision testing, and hearing testing |
| DOT | Direct-observation therapy (watch-swallow) (medications) |

| TERM | DEFINITION |
|---|---|
| Effective date of the Stipulation | The date on which the Court grants final approval to the Stipulation. |
| Encounter | Interaction between a patient and a qualified healthcare provider that involves a treatment and/or exchange of confidential information. |
| Healthcare staff | Includes QHCPs as well as administrative and support staff (e.g. health record administrators, lab techs, nursing and medical assistants and clerical workers). |
| HNR | Health Needs Request |
| HSCMB | ADC's Health Services Compliance Monitoring Bureau |
| IPC | Inpatient Component / Infirmary beds |
| IR | Incident Report |
| KOP | Keep-on-person (medications) |
| Licensed | Healthcare staff who hold an active and unrestricted license in the State of Arizona in the relevant professional discipline. |
| MAR | Medication Administration Record |
| Medical Provider | Physician, Dentist, Nurse Practitioner, Physician's Assistant-C. Any health care practitioner who has been duly empowered by the State of Arizona to write prescriptions. |
| Mental Health Clinician | Psychologist, Psychology Associate |
| Mental Health Provider | Psychiatrist, Psychiatry Nurse Practitioner |
| Mental Health Staff | Includes QHCP's who have received instruction and supervision in identifying and interacting with individuals in need of mental health services. |
| MH-1 (Mental Health 1) | Inmates who have no history of mental health issue or treatment |
| MH-2 (Mental Health 2) | Inmates who do not currently have mental health needs and are not currently in treatment but have had treatment in the past |
| MH-3 (Mental Health 3) | Inmates with Mental Health needs, who require current outpatient treatment. Inmates meeting this criterion will be divided into four (4) categories. These categories may change during each interaction with the inmate as their condition warrants. |
| MH-3A (Mental Health 3A) | Inmates in acute distress who may require substantial intervention in order to remain stable. Inmates classified as SMI in ADC and/or the community will remain a Category MH-3A (or MH-4 or MH-5 if in specialized mental health program). |
| MH-3B (Mental Health 3B) | Inmates who may need regular intervention but are generally stable and participate with psychiatric and psychological interventions. |

| **TERM** | **DEFINITION** |
|---|---|
| MH-3C<br>(Mental Health 3C) | Inmates who need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently. These inmates participate in psychiatric interventions only. |
| MH-3D<br>(Mental Health 3D) | Inmates who have been recently taken off of psychotropic medications and require follow up to ensure stability over time. |
| MH-4<br>(Mental Health 4) | Inmates who are admitted to a specialized mental health program as identified in the Mental Health Technical Manual outside of inpatient treatment areas. |
| MH-5<br>(Mental Health 5) | Inmates with mental health needs who are admitted to an inpatient psychiatric treatment program (Baker Ward and Flamenco). |
| Prenatal screening tests | GA/Preg, RPR, HIV, HEP, B & C, CBC, CMP (standardized lab panel), Urine, Rubella, ABO RH & Antibody |
| Psychology Associate | A mental health clinician who has a master's or doctoral-level degree in a mental health discipline, but is not a licensed psychologist. |
| Qualified Health Care Professional (QHCP) | Physicians, Physician Assistants, Dentists, nurses, nurse practitioners, dentists, mental health professionals, and others, who by virtue of their education, credentials/license, and experience are permitted by law to evaluate and care for patients. |
| Regular Business Hours | Monday through Friday, 0800 am -1600 pm or similar 8-hour time frame; excluding weekends and holidays. |
| "Seeing a provider"/ seen/ "seen by" | Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting. With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter |
| SMI | According to a licensed mental health clinician or provider, possessing a qualifying mental health diagnosis as indicated on the SMI Determination Form (#1103.13) as well as a severe functional impairment directly relating to the mental illness. All inmates determined to be SMI in the community shall also be designated as SMI in ADC. All inmates designated SMI (as defined in MHTM Chapter 2, Section 2.0) will be designated a MH-3A, MH-4, or MH-5 based on their current program placement. |
| SNO | Special Needs Order |

| **TERM** | **DEFINITION** |
|---|---|
| Specialized Medical Housing | Infirmary beds (IPC) |

# EXHIBIT B

**HEALTH CARE OUTCOME MEASURES**

| **Category** | **Measure #** | **Final Measure** |
|---|---|---|
| Staffing | 1 | Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week. |
| Staffing | 2 | Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times. |
| Staffing | 3 | Dental staffing will be maintained at current contract levels – 30 dentists. |
| Staffing | 4 | Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries |
| Medical Records | 5 | Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location. |
| Medical Records | 6 | Provider orders will be noted daily with time, date, and name of person taking the orders off. |
| Medical Records | 7 | Medical record entries will be legible, and complete with time, name stamp and signature present. |
| Medical Records | 8 | Nursing protocols/NETS will be utilized by nurses for sick call. |
| Medical Records | 9 | SOAPE format will be utilized in the medical record for encounters. |
| Medical Records | 10 | Each patient's medical record will include an up-to-date Master Problem list. |
| Pharmacy | 11 | Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT. |
| Pharmacy | 12 | Medical record will contain documentation of refusals or "no shows." |
| Pharmacy | 13 | Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication. |
| Pharmacy | 14 | Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication. |

| **Category** | **Measure #** | **Final Measure** |
|---|---|---|
| Pharmacy | 15 | Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals. |
| Pharmacy | 16 | Perpetual inventory medication logs will be maintained on each yard. |
| Pharmacy | 17 | The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature. |
| Pharmacy | 18 | Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN. |
| Pharmacy | 19 | Perpetual inventory medications will be signed off on the Inmate's individual MAR. |
| Pharmacy | 20 | Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record. |
| Pharmacy | 21 | Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor. |
| Pharmacy | 22 | Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber’s order. |
| Equipment | 23 | Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff. |
| Equipment | 24 | Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items. |
| Emergency Response | 25 | A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency. |
| Quality Improvement | 26 | Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance. |
| Quality Improvement | 27 | Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P-A-06 |
| Quality Improvement | 28 | Every medical provider will undergo peer reviews annually with reviews and recommended actions documented. |
| Quality Improvement | 29 | Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02. |
| Quality Improvement | 30 | The initial mortality review of an inmate’s death will be completed within 10 working days of death. |

| Category | Measure # | Final Measure |
|---|---|---|
| Quality Improvement | 31 | Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors, including CQI committee, and corrective action will be taken. |
| Quality Improvement | 32 | A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau for all mortalities within 10 business days of receipt of the medical examiner's findings. |
| Intake facility | 33 | All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility. |
| Intake facility | 34 | A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility. |
| Intersystem Transfers | 35 | All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption. |
| Access to care | 36 | A LPN or RN will screen HNRs within 24 hours of receipt. |
| Access to care | 37 | Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). |
| Access to care | 38 | Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call. |
| Access to care | 39 | Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointments will be seen within fourteen calendar days of the referral. |
| Access to care | 40 | Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. |
| Access to care | 41 | Emergent provider referrals are seen immediately by a Medical Provider. |
| Access to care | 42 | A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider. |
| Access to care | 43 | Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there. |

| **Category** | **Measure #** | **Final Measure** |
|---|---|---|
| Access to care | 44 | Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. |
| Diagnostic Services | 45 | On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine |
| Diagnostic Services | 46 | A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison. |
| Diagnostic Services | 47 | A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request. |
| Specialty care | 48 | Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record. |
| Specialty care | 49 | Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. |
| Specialty care | 50 | Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. |
| Specialty care | 51 | Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. |
| Specialty care | 52 | Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report. |
| Chronic care | 53 | Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease. |
| Chronic care | 54 | Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place. |

| Category | Measure # | Final Measure |
|---|---|---|
| Chronic care | 55 | Disease management guidelines will be implemented for chronic diseases. |
| Chronic care | 56 | Inmates with a chronic disease will be provided education about their condition/disease which will be documented in the medical record. |
| Prenatal Services | 57 | A Medical Provider will order prenatal vitamins and diet for a pregnant inmate at the inmate's initial intake physical examination. |
| Prenatal Services | 58 | Results of an inmate's prenatal screening tests will be documented in the medical record. |
| Preventative Services | 59 | Inmates will be screened for TB on an annual basis. |
| Preventative Services | 60 | All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination. |
| Preventative Services | 61 | All female inmates ages 21 to 65 will be offered a Pap smear , every 36 months after initial intake, unless more frequent screening is clinically recommended. |
| Preventative Services | 62 | All prisoners are screened for tuberculosis upon intake. |
| Infirmary Care | 63 | In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission. |
| Infirmary Care | 64 | In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission. |
| Infirmary Care | 65 | In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission. |
| Infirmary Care | 66 | In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours. |
| Infirmary Care | 67 | In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks. |
| Infirmary Care | 68 | In an IPC, Inmate health records will include admission orders and documentation of care and treatment given. |
| Infirmary Care | 69 | In an IPC, nursing care plans will be reviewed weekly documented with a date and signature. |
| Infirmary Care | 70 | All IPC patients have properly working call buttons, and if not, health care staff perform and document 30-minute patient welfare checks. |

| Category | Measure # | Final Measure |
|---|---|---|
| Medical Diets | 71 | Inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided the diet, if clinically indicated. When prescribing the special diet, the provider will include the type of diet, duration for which it is to be provided, and any special instructions. |
| Medical Diets | 72 | Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP. |
| Mental Health | 73 | All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every 30 days. |
| Mental Health | 74 | All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum. |
| Mental Health | 75 | A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC. |
| Mental Health | 76 | If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC. |
| Mental Health | 77 | Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners. |
| Mental Health | 78 | All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician. |
| Mental Health | 79 | If a prisoner's mental health treatment plan includes psychotropic medication, the mental health provider shall indicate in each progress note that he or she has reviewed the treatment plan. |
| Mental Health | 80 | MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician. |
| Mental Health | 81 | MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider. |
| Mental Health | 82 | MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician. |

| Category | Measure # | Final Measure |
|---|---|---|
| Mental Health | 83 | MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider. MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days. |
| Mental Health | 84 | MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider. |
| Mental Health | 85 | MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications. |
| Mental Health | 86 | MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication. |
| Mental Health | 87 | MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days. |
| Mental Health | 88 | MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days. |
| Mental Health | 89 | MH-5 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every seven days. |
| Mental Health | 90 | MH-5 prisoners who are prescribed psychotropic medications, shall be seen by a mental health provider a minimum of every 30 days. |
| Mental Health | 91 | MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily. |
| Mental Health | 92 | MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days. |
| Mental Health | 93 | Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody. |
| Mental Health | 94 | All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse. |

| Category | Measure # | Final Measure |
|---|---|---|
| Mental Health | 95 | Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch. |
| Mental Health | 96 | A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above. |
| Mental Health | 97 | A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider. |
| Mental Health | 98 | Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0. |
| Mental Health | 99 | Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0. |
| Dental | 100 | Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs. |
| Dental | 101 | Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist. |
| Dental | 102 | Routine dental care wait times will be no more than 90 days from the date the HNR was received. |
| Dental | 103 | Urgent dental care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received. |

# EXHIBIT C

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Staffing | 1 | Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week. | Monthly staffing report and Weekly staffing schedule. Any changes to the weekly staffing schedule will be documented and provided to monitors. | Contracted Vendor. |
| Staffing | 2 | Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times. | Monthly staffing report and Weekly staffing schedule. Any changes to the weekly staffing schedule will be documented and provided to monitors. | Contracted Vendor. |
| Staffing | 3 | Dental staffing will be maintained at current contract levels – 30 dentists. | Monthly staffing report and Weekly staffing schedule. | Contracted Vendor. |
| Staffing | 4 | Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries | Monthly staffing report and Weekly staffing schedule. Any changes to the weekly staffing schedule will be documented and provided to monitors. | Contracted Vendor. |
| Medical Records | 5 | Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nursing and Provider lines from the preceding 30 days. |
| Medical Records | 6 | Provider orders will be noted daily with time, date, and name of person taking the orders off. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Provider lines from the preceding 30 days. |
| Medical Records | 7 | Medical record entries will be legible, and complete with time, name stamp and signature present. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nursing and Provider lines from the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Medical Records | 8 | Nursing protocols/NETS will be utilized by nurses for sick call. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nurse lines from the preceding 30 days. |
| Medical Records | 9 | SOAPE format will be utilized in the medical record for encounters. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nursing and Provider lines from the preceding 30 days. |
| Medical Records | 10 | Each patient's medical record will include an up-to-date Master Problem list. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Provider lines from the preceding 30 days. |
| Pharmacy | 11 | Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Contracted vendor to provide list of NF medications ordered from the preceding 30 days. Follow up and confirmation of receipt of medications will be made through review of MAR's and eOmis. | Contracted vendor to provide list of NF medications ordered from the preceding 30 days, and MAR's and eOmis. |
| Pharmacy | 12 | Medical record will contain documentation of refusals or "no shows." | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | MAR's and eOmis from preceding 30 days. |
| Pharmacy | 13 | Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Contracted vendor Medication Expiration Reports and medication manifests from preceding 30 days will be reviewed, and corresponding MAR's will be reviewed to determine any lapses in medication. | Contracted vendor Medication Expiration Reports and medication manifests from preceding 30 days, and MAR's. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Pharmacy | 14 | Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Contracted vendor HNR logs from preceding 30 days will be reviewed to identify medication refills, and corresponding MAR's will be reviewed to determine any lapses in medication. | Contracted vendor HNR logs from preceding 30 days and MAR's. |
| Pharmacy | 15 | Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | MAR's from preceding 30 days will be reviewed for refusals and no shows, and medical records will be reviewed for follow up counseling. |
| Pharmacy | 16 | Perpetual inventory medication logs will be maintained on each yard. | Review of Perpetual Inventory Logs are to be confirmed in use on each yard. | Perpetual Inventory Logs from the preceding 30 days. |
| Pharmacy | 17 | The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | MAR's from the preceding 30 days. |
| Pharmacy | 18 | Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN. | Review of daily delivery manifests will be reviewed for appropriate signatures on each yard/complex. | Daily manifests from the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Pharmacy | 19 | Perpetual inventory medications will be signed off on the Inmate's individual MAR. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Medications documented in the perpetual inventory lists for individual patient use during the preceding 30 days will be followed up for appropriate documentation in the individual inmate's MAR. | Perpetual Inventory Logs and MAR's from the preceding 30 days. |
| Pharmacy | 20 | Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Any SNO's identified in the Provider's notes will be confirmed as a timely AIMS entry. | Scheduled Provider lines from the preceding 30 days. |
| Pharmacy | 21 | Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor. | At each facility, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. The Released Inmate Medication report from the contracted vendor from the preceding 30 days will be compared to an ADC report with inmate signature documenting receipt of appropriate medications. | The Released Inmate Medication report from the contracted vendor from the preceding 30 days and an ADC report with inmate signature documenting receipt of appropriate medications. |
| Pharmacy | 22 | Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order. | At each facility, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Non-formulary request / tracking log from the preceding 30 days will be provided by the contracted vendor. | Non-formulary request / tracking log from the preceding 30 days. |
| Equipment | 23 | Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff. | At each facility, a monthly physical inspection of all AED's will occur. | All AED's and Checklist Binder. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Equipment | 24 | Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items. | At each facility, a monthly physical inspection of all medical response bags will occur. Contents of bag will match inventory list. | All Emergency response bags. |
| Emergency Response | 25 | A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency. | At each facility, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. SIR's will be reviewed and compared with medical chart documenting the emergency response | Appropriate and pertinent SIR's. |
| Quality Improvement | 26 | Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance. | At each facility, a minimum of 10 grievances per month are randomly selected from the grievance logs. Grievances received during the preceding 30 days will be reviewed for timeliness of responses. | Grievance logs maintained by security staff (COIII-IV) at each yard. |
| Quality Improvement | 27 | Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P-A-06 | Monthly CQI meeting minutes. Monthly CQI minutes will be provided by the contracted vendor. | Monthly CQI minutes. |
| Quality Improvement | 28 | Every medical provider will undergo peer reviews annually with reviews and recommended actions documented. | Annual peer reviews will be documented for every medical provider who has been employed for at least one year. Documentation of required annual peer reviews will be provided by the contracted vendor. | Annual peer review. |
| Quality Improvement | 29 | Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02. | Annual clinical performance reviews will be documented for every nurse who has been employed for at least one year. Documentation of required annual clinical performance reviews will be provided by the contracted vendor. | Annual clinical performance review. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Quality Improvement | 30 | The initial mortality review of an inmate's death will be completed within 10 working days of death. | At each facility, all deaths that occurred in the preceding month are reviewed. Dates of completion of stages in the mortality review will determine compliance. | Mortality reviews for inmate deaths in the preceding month. |
| Quality Improvement | 31 | Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors, including CQI committee, and corrective action will be taken. | At each facility, all mortalities from the preceding month will be identified, and deficiencies identified in any mortalities where the final review has been completed will be documented in the minutes. Monthly CQI minutes will be provided by the contracted vendor. | Monthly CQI minutes. |
| Quality Improvement | 32 | A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau for all mortalities within 10 business days of receipt of the medical examiner's findings. | All final mortality reviews completed in the previous month are reviewed. Dates of completion of stages in the mortality review will determine compliance. | Health Services Contract Monitoring Bureau signed and dated mortality review. |
| Intake facility | 33 | All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility. | Minimum 10 records per month randomly selected per reception center. Records from reception center at ASPC Phoenix (male), ASPC Perryville (female), and if applicable, ASPC Tucson (minor males). | Medical records from inmates received during the preceding 30 days. |
| Intake facility | 34 | A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility. | Minimum 10 records per month randomly selected per reception center. Records from reception center at ASPC Phoenix (male), ASPC Perryville (female), and if applicable, ASPC Tucson (minor males). | Medical records from inmates received during the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Intersystem Transfers | 35 | All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Transfer logs (arrival departure) at each facility, and transfer screening form in the medical record will be reviewed for compliance. | Transfer logs (arrival departure) at each facility, and transfer screening form in the medical record from the preceding 30 days. |
| Access to care | 36 | A LPN or RN will screen HNRs within 24 hours of receipt. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. HNR date and time stamps will be reviewed for compliance. | HNR log from the preceding 30 days. |
| Access to care | 37 | Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line and eOmis from the preceding 30 days. |
| Access to care | 38 | Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Nurse line and eOmis from the preceding 30 days. |
| Access to care | 39 | Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |
| Access to care | 40 | Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Access to care | 41 | Emergent provider referrals are seen immediately by a Medical Provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |
| Access to care | 42 | A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |
| Access to care | 43 | Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Inmates identified in either the field briefing report or the hospital report will be reviewed for documentation upon return from the transport. | Field Briefing Report (ADC), hospital report, and eOmis. |
| Access to care | 44 | Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Inmates identified in either the field briefing report or the hospital report will be reviewed for documentation upon return from the transport. Physician acknowledgement/action will be reviewed for timeliness. | Field Briefing Report (ADC), hospital report, and eOmis. |
| Diagnostic Services | 45 | On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Radiology, vision, lab lines appointments within the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Diagnostic Services | 46 | A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Radiology, vision, lab lines appointments within the preceding 30 days and eOmis records. |
| Diagnostic Services | 47 | A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Appropriate HNR's will be tracked for completion. | HNR log from the preceding 30 days, Provider line, eOmis. |
| Specialty care | 48 | Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC and eOmis. |
| Specialty care | 49 | Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Specialty care | 50 | Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |
| Specialty care | 51 | Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |
| Specialty care | 52 | Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |
| Chronic care | 53 | Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Chronic care | 54 | Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |
| Chronic care | 55 | Disease management guidelines will be implemented for chronic diseases. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |
| Chronic care | 56 | Inmates with a chronic disease will be provided education about their condition/disease which will be documented in the medical record. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |
| Prenatal Services | 57 | A Medical Provider will order prenatal vitamins and diet for a pregnant inmate at the inmate's initial intake physical examination. | This is specific to Perryville intake inmates. At the facility, all pregnant prisoners' files from all intakes in the previous month are reviewed to confirm that vitamins are ordered. | Pregnant inmate list from Perryville within the preceding 30 days, Intake arrival logs and eOmis. |
| Prenatal Services | 58 | Results of an inmate's prenatal screening tests will be documented in the medical record. | This is specific to Perryville intake inmates. At the facility, all pregnant prisoners' files from all intakes in the previous month are reviewed to confirm that the tests were conducted. | Intake arrival logs and eOmis within the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Preventative Services | 59 | Inmates will be screened for TB on an annual basis. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Review for PPD history or appropriate signs and symptom follow up will be reviewed to determine timeliness. | eOmis. |
| Preventative Services | 60 | All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended. | This is specific to Perryville. At the facility, 10 records per month are randomly selected from all intakes in the previous month. | eOmis. |
| Preventative Services | 61 | All female inmates ages 21 to 65 will be offered a Pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended. | At each yard, 10 records per month are randomly selected to review the frequency with which subsequent Pap smears have been conducted. Chart review will determine compliance. | Medical records. |
| Preventative Services | 62 | All prisoners are screened for tuberculosis upon intake. | Minimum 10 records per month randomly selected from each reception center. Records from reception center at ASPC Phoenix (male), ASPC Tucson (minor males) and ASPC Perryville (female). Chart review will determine compliance. | Medical records from inmates received at intake during the preceding 30 days. |
| Infirmary Care | 63 | In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 64 | In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Infirmary Care | 65 | In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 66 | In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 67 | In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 68 | In an IPC, Inmate health records will include admission orders and documentation of care and treatment given. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 69 | In an IPC, nursing care plans will be reviewed weekly documented with a date and signature. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 70 | All IPC patients have properly working call buttons, and if not, health care staff perform and document 30-minute patient welfare checks. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. Monitor will walk through IPC once a month to confirm that all call buttons are working, and if the monitor discovers any nonfunctioning call buttons, will also review the medical records of the patient housed in that room. Patient welfare checks will be shown when required through a separate log. | IPC Census and eOmis. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Medical Diets | 71 | Inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided the diet, if clinically indicated. When prescribing the special diet, the provider will include the type of diet, duration for which it is to be provided, and any special instructions. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate documentation will be determined upon review. | Diet Roster and eOmis. |
| Medical Diets | 72 | Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Dietary liaison will advise regarding non-compliance, which will be followed up with nutritional counseling. Appropriate documentation will be determined upon review. | ADC dietary liaison and eOmis. |
| Mental Health | 73 | All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every 30 days. | An AIMS report will be run monthly by the HSCMB MH staff of all MH-3 minor prisoners. 10 records will be randomly selected from the report for review. | AIMS Report |
| Mental Health | 74 | All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum. | The HSCMB MH staff will review the hospital reports and review the records of all post-partum women from the previous 30 days. | Hospital Report |
| Mental Health | 75 | A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC. | An AIMS report will be run for the Phoenix and Perryville reception centers, and if applicable, the Tucson minor males reception center. 10 records (if available) will be reviewed from each reception center for compliance with this performance measure. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 76 | If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC. | Of the records reviewed in #74, if any of the initial MH evaluation was not completed by a licensed MH staff, then the record will be re-reviewed in 20 days for compliance with this performance measure. | AIMS Report |
| Mental Health | 77 | Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners. | An AIMS report will be run for all MH-3 and above prisoners at each Complex. 10 records will be reviewed per yard for compliance with the treatment plan time frames. | AIMS Report |
| Mental Health | 78 | All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician. | Each record that is reviewed for treatment plan compliance will also be reviewed for a face-to-face SOAPE note dated the same date. | AIMS Report |
| Mental Health | 79 | If a prisoner's mental health treatment plan includes psychotropic medication, the mental health provider shall indicate in each progress note that he or she has reviewed the treatment plan. | For all records reviewed for inmates on medications, it will be determined if this performance measure was complied with. | AIMS Report |
| Mental Health | 80 | MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician. | An AIMS report will be run for all MH-3A prisoners at each Complex. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 81 | MH3-A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider. | The records reviewed for performance measure #80 will also be reviewed for compliance if they are on medications. | AIMS Report |
| Mental Health | 82 | MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician. | An AIMS report will be run for all MH-3B prisoners at each Complex. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 83 | MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider. MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days. | The records reviewed for performance measure #82 will also be reviewed for compliance if they are on medications. | AIMS Report |
| Mental Health | 84 | MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider. | An AIMS report will be run for all MH-3C prisoners at each Complex. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 85 | MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications. | An AIMS report will be run for all MH-3D prisoners at each Complex. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 86 | MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication | The Records reviewed for Performance Measure #85 will also be reviewed for compliance with this performance measure. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 87 | MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days. | An AIMS report will be run for all complexes that have MH-4 prisoners. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 88 | MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days. | The Records reviewed for Performance Measure #87 will also be reviewed for compliance with this performance measure. | AIMS Report |
| Mental Health | 89 | MH-5 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every seven days. | An AIMS report will be run for the Phoenix Complex (MH-5 inmates). 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 90 | MH-5 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 30 days. | The Records reviewed for Performance Measure #89 will also be reviewed for compliance with this performance measure. | AIMS Report |
| Mental Health | 91 | MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily. | The Records reviewed for Performance Measure #89 will also be reviewed for compliance with this performance measure. | AIMS Report |
| Mental Health | 92 | MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days. | An MH-3 report will be run for all maximum custody yards. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 93 | Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody. | The Records reviewed for Performance Measure #92 will also be reviewed for compliance with this performance measure. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 94 | All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse. | The Contractor will develop and provide to HSCMB MH Staff a log weekly of all inmates currently on watch. A minimum of 10 records (if available) per Complex will be reviewed, except ASPC Eyman, where 20 records will be reviewed. | Suicide Watch Log |
| Mental Health | 95 | Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch. | The Contractor will develop and provide to HSCMB MH Staff a log weekly of all inmates discontinued off watch. A minimum of 10 records (if available) per Complex will be reviewed, except ASPC Eyman, where 20 records will be reviewed. | Suicide Watch Log |
| Mental Health | 96 | A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above. | An AIMS report will be run for those inmates releasing in the next 30 days. 10 records (if available) per yard will be reviewed. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 97 | A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider. | The Contracted Vendor will supply the Appointment Logs for the previous 30 days to the HSCMB MH staff. 10 records (if available) from each yard utilizing telepsychiatry will be reviewed for compliance with this performance measure. | Provider Line Appointment Logs |
| Mental Health | 98 | Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0. | The Contracted Vendor will provide each week an HNR log for each Complex. 10 records (if available) from each yard will be reviewed for compliance with this performance measure. | HNR Log |
| Mental Health | 99 | Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0. | The Contracted Vendor will provide a report on all required peer reviews for the Psychiatrists, Psychiatric Nurse Practitioners, and Psychologists to the HSCMB. | Contracted vendor report. |
| Dental | 100 | Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Dental HNR's will be reviewed and compared with medical record to identify any conflict or non-compliance. | Dental medical records and Dental HNR's. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Dental | 101 | Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | eOmis. |
| Dental | 102 | Routine dental care wait times will be no more than 90 days from the date the HNR was received. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Dental HNR's will be reviewed and compared with medical record to identify any conflict or non-compliance. | Dental medical records and Dental HNR's. |
| Dental | 103 | Urgent care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Dental HNR's will be reviewed and compared with medical record to identify any conflict or non-compliance. | Dental medical records and Dental HNR's. |

For any performance measure requiring a review of a minimum of 10 records per month per yard, in the event of an insufficient sample size of less than 10 records, the sample will be drawn from the entire complex.

Monitoring for medical, mental health and dental Outcome Measures specified herein will be conducted by ADC's Monitoring Bureau.

# EXHIBIT D

**MAXIMUM CUSTODY OUTCOME MEASURES**

| Measure # | Outcome Measure |
|---|---|
| 1 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week. Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week. |
| 2 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III. |
| 3 | All out-of-cell time that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation. |
| 4 | All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. |
| 5 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of-cell exercise time a week. |
| 6 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy. |
| 7 | No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB 5 or CB-7 unless the cell fronts are substantially modified to increase visibility. |

| Measure # | Outcome Measure |
|---|---|
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:<br>• 10 hours of unstructured out-of-cell time per week<br>• 1 hour of additional out-of-cell mental health programming per week<br>• 1 hour of additional out-of-cell psycho-educational programming per week<br>• 1 hour of additional out-of-cell programming per week |
| 9 | All use of force incidents involving prisoners who are designated SMI or housed in Florence-CB-1 or CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; or Phoenix (Baker, Flamenco, or MTU) conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation. |

# EXHIBIT E

**MAXIMUM CUSTODY OUTCOME MEASURE PROTOCOL**

| Final Measure # | Outcome Measure | Protocol | Source of Records/Review |
|---|---|---|---|
| 1 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week. Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week. | At each designated location, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form |
| 2 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III. | At each designated location, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners.<br><br>At each designated location, DI 326 Programming Attendance/Sign In Sheets | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form<br><br>Program Attendance/ Sign In Sheets |

| Final Measure # | Outcome Measure | Protocol | Source of Records/Review |
|---|---|---|---|
| | | for Step II and III are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | (containing prisoner signature) |
| 3 | All out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶26 of the Stipulation. | At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Max Custody Daily Out of Cell Time Tracking Form<br><br>Warden Certification of individual security risk necessitating limitation or cancellation where applicable to randomly selected prisoner |
| 4 | All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. | At each designated location, Monthly Max Custody Prisoner Food Services Menus are selected for each monitored month. | Max Custody Monthly Prisoner Meal Food Services Menu |
| 5 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of-cell exercise time a week. | At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Max Custody Daily Out of Cell Time Tracking Form |

| **Final Measure #** | **Outcome Measure** | **Protocol** | **Source of Records/Review** |
|---|---|---|---|
| 6 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy. | At each designated location, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners.<br><br>At each designated location, DI 326 Programming Attendance/Sign In Sheets are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners.<br><br>At each designated location, a minimum of 10 Prisoner Property Files are randomly selected and reviewed to identify access to allowable property consistent with Step Level under DI 326 for each monitored month. | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form<br><br>Program Attendance/Sign In Sheets (containing prisoner signature)<br><br>Prisoner Property Files |
| 7 | No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB 5 or CB-7 unless the cell fronts are substantially | At each designated location, the Housing Assignment Log for maximum custody prisoners with mental health classification of MH3 or higher is reviewed for one | Housing Assignment Log for maximum custody prisoners with mental health |

| Final Measure # | Outcome Measure | Protocol | Source of Records/Review |
|---|---|---|---|
| | modified to increase visibility. | randomly selected day of each monitored month and reviewed for: 1) any housing assignments in CB-5 and CB-7; and 2) if so housed, whether prisoner is housed in a cell with modified cell front. | classification of MH3 or higher |
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:<br>• 10 hours of unstructured out-of-cell time per week<br>• 1 hour of additional out-of-cell mental health programming per week<br>• 1 hour of additional out-of-cell psycho-educational programming per week<br>• 1 hour of additional out-of-cell programming per week | At each maximum custody unit where SMI prisoners are housed, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each maximum custody unit where SMI prisoners are housed, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week of each monitored month, for 10 randomly selected prisoners.<br><br>At each maximum custody unit where SMI prisoners are housed, DI 326 Programming Attendance/Sign In Sheets are reviewed for one randomly selected week of each monitored month, for 10 randomly selected prisoners.<br><br>At each maximum custody unit where SMI prisoners are housed, Mental Health Programming Attendance/Sign In Sheets are reviewed for one randomly selected | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form<br><br>DI 326 Program Attendance/Sign In Sheets (containing prisoner signature)<br><br>Mental Health Program Attendance/Sign In Sheets (containing prisoner signature) |

| **Final Measure #** | **Outcome Measure** | **Protocol** | **Source of Records/Review** |
|---|---|---|---|
| | | week of each monitored month, for 10 randomly selected prisoners. | |
| 9 | All use of force incidents involving maximum custody prisoners classified as SMI, and in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation. | At each designated location, Use of Force SIRs/Use of Force Review Packets (if applicable) are selected for each monitored month for maximum custody SMI prisoners where force utilized involved chemical agents and incident is reviewed for compliance with the procedures for use of force set forth in ¶ 27 (a)-(e) of the Stipulation | SIR Packet; Use of Force Review Packet (if applicable); incident video (if applicable) |

Monitoring for maximum custody Outcome Measures will be conducted by designated ADC staff at each location specified herein.

# EXHIBIT F

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Mental Health Seriously Mentally Illness (SMI) Determination**

Inmates with a Mental Health Score of 3 or greater will be assessed as clinically indicated to determine if the criteria for SMI is met. To be considered SMI in ADC the inmate must have a qualifying diagnosis [as indicated below] and present with at least one identified level of the severe functional impairment as the result of the mental illness [Reference MHTM 4-5.0].

☐ **Anxiety Disorders**
300.00 Anxiety Disorder NOS; 300.01 Panic Disorder without Agoraphobia; 300.02 Generalized Anxiety Disorder; 300.14 Dissociative Identity Disorder; 300.21 Panic Disorder with Agoraphobia, and 300.22 Agoraphobia without History of Panic Disorder, 300.03 Obsessive Compulsive Disorder; and 309.81 Post -Traumatic Stress Disorder.

☐ **Bipolar Disorder**
296.0x Bipolar 1 Single Manic Episode, 296.4x Bipolar I Most Recent Episode Manic, 296.5x Bipolar I Most Recent Episode Depressed, 296.6x Bipolar I Most Recent Episode Mixed, 296.7 Bipolar I Most Recent Episode Unspecified, 296.80 Bipolar Disorder NOS, and 296.89 Bipolar II Disorder.

☐ **Depressive Disorders**
296.2x Major Depressive Disorder, Single Episode; 296.3x Major Depressive Disorder, Recurrent; 296.90 Mood Disorder NOS; 300.4 Dys

☐ **Psychotic Disorders**
295.10, Schizophrenia Disorganized Type, 295.20 Schizophrenia Catatonic Type, 295.30 Schizophrenia Paranoid Type, 295.60 Schizophrenia Residual Type, 295.90 Schizophrenia Undifferentiated, 295.70 Schizoaffective Disorder, 297.1 Delusional Disorder, and 298.9 Psychotic Disorder NOS.

☐ **Personality Disorders**
301.0 Paranoid Personality Disorder, 302.20 Schizoid Personality Disorder, 301.22 Schizotypal Personality Disorder, 301.4 Obsessive-Compulsive Disorder, 301.50 Histrionic Personality Disorder, 301.6 Dependent Personality Disorder, 301.81 Narcissistic Personality Disorder; 301.82 Avoidant Personality Disorder; 301.83 Borderline Personality Disorder; and 301.9 Personality Disorder NOS.

________ The inmate does not meet any criteria listed above. The inmate is not eligible for SMI status.

The inmate posses a severe functional impairment as evidenced by [check as appropriate]:

☐ A serious and persistent inability to perform developmentally appropriate occupational or school functioning.

☐ Inability to live in General Population without supervision (self-care-basic needs): Impairment in the inmate's ability to function independently including the capacity to provide or arrance for needs such as food, personal hygiene, clothing, medical, dental and mental health care.

☐ Risk of harm to self or others.

☐ Risk of Deterioration: The individual does not currently meet any of the above functional criteria, 1 through 3, but may be expected to deteriorate to such a level without treatment. If the reviewer concurs with this statement, please document the reason below.

- ○ Diagnostic Category I diagnosis with probable chronic, relapsing and remitting course
- ○ Co-morbidities (like mental retardation, substance dependence, personality disorder)
- ○ Persistent or chronic factors such as social isolation, poverty, extreme chronic stressors (life-threatening or debilitating medical illnesses, victimization).
- ○ Other (past psychiatric history; gains in functioning have not solidified or are a result of current compliance only; court-committed; care is complicated; care is complicated and requires multiple providers.)

________ Inmate does not meet any of the criteria for functional impairment. The inmate is not eligible for SMI status.

________ Inmate meets the SMI diagnostic and functional impairment criteria above. The inmate is SMI in ADC.

| Mental Health Staff Name/Stamp | Mental Health Staff Signature | Date |
|---|---|---|

| Inmate Name *(Last, First M.I.)* | | ADC Number |
|---|---|---|
| Date of Birth | Facility/Unit | |

1103-13
12/19/12

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br>Plaintiffs,<br>v.<br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>Defendants. | No. CV 12-00601-PHX-DJH<br><br>**[PROPOSED] ORDER RE STIPULATION** |

Based upon the entire record in this case and the parties' Stipulation [Doc. ___], the Court hereby finds that the relief set forth therein is narrowly drawn, extends no further than necessary to correct the violations of the Federal right, and is the least intrusive means necessary to correct the violations of the Federal right of the Plaintiffs.

The Court shall retain the power to enforce this Stipulation through all remedies provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Shawn Jensen, et al.,

Plaintiffs,

v.

David Shinn, et al.,

Defendants.

No. CV-12-00601-PHX-ROS

**ORDER**

Prisoners held in government custody have a basic right to health care and humane conditions of confinement protected by the Eighth Amendment prohibiting cruel and unusual punishment.[1] These Eighth Amendment rights do not require the highest quality of health care, the community standard of health care, or the most pleasant accommodations possible. But the health care and conditions of confinement must reflect basic common decency and a recognition of the dignity the government must accord all human beings. This suit was brought by prisoners in the custody of the Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR"), alleging systemic violations in providing minimally sufficient health care and minimally humane conditions in maximum custody units.

While this case involves an unusually large amount of evidence, there are only two basic questions. Are Defendants violating the constitutional rights of Arizona's prisoners

[1] *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding government has "obligation to provide medical care for those whom it is punishing by incarceration").

through the existing medical and mental health care system? And are Defendants violating the constitutional rights of a subset of Arizona's prisoners by almost round-the-clock confinement in their cells? The answer is yes to both questions.

Defendants have failed to provide, and continue to refuse to provide, a constitutionally adequate medical care and mental health care system for all prisoners. Defendants' health care system is plainly grossly inadequate. Defendants have been aware of their failures for years and Defendants have refused to take necessary actions to remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference to the substantial risk of serious harm posed by the lack of adequate medical and mental health care affecting all prisoners.

Further, Defendants keep thousands of prisoners in restrictive housing units where they are not provided adequate nutrition, nor are they provided meaningful out-of-cell time for exercise or social interaction. Defendants' treatment of prisoners in restrictive housing units results in the deprivation of basic human needs. For years, Defendants have known of the deficiencies, highlighted by Court intervention and direction, and refused to take meaningful remedial actions. Therefore, Defendants are acting with deliberate indifference to the substantial risk of serious harm posed to prisoners in restrictive housing units.

Based on the 15-day bench trial that commenced on November 1, 2021, as well as the parties post-trial briefing, the Court makes the following Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52(a)(1).

## BACKGROUND

There are over 4,300 docket entries in this case, reflecting a wide variety of motions, hearings, and orders. A full recital of that background would be lengthy and would serve little purpose. However, some background information is necessary to place in context the events leading up to trial and to demonstrate Defendants' recognition, for over a decade, that they are systematically violating the constitutional rights of the prisoners.

### I. The Complaint and Class Certification

ADCRR operates ten prison complexes across Arizona. In 2012, a group of prisoners filed this class action, seeking only injunctive relief and challenging the provision of medical, dental, and mental health care throughout the prison system. Plaintiffs also challenged the conditions of confinement in "isolation units," where prisoners are confined to their cells for 22 or more hours each day. Plaintiffs named as defendants the Director of Arizona's prisons, currently David Shinn, and the Assistant Director of ADCRR's Medical Services Contract Monitoring Bureau, currently Larry Gann.

The complaint presented five claims for relief on behalf of what would subsequently be identified as a main class and one subclass. The class consisted of all prisoners at ADCRR's ten complexes. According to the complaint, Defendants were subjecting class members to a substantial risk of serious harm and injury from constitutionally deficient health care, dental care, and mental health care. The subclass consisted of all prisoners confined in their cells for 22 hours or more per day. Defendants allegedly were subjecting subclass members to a substantial risk of serious harm and injury from various policies, including constitutionally inadequate out-of-cell time, social isolation, nutrition, and mental health treatment.

The Court certified the class and subclass in March 2013. (Doc. 372). The Ninth Circuit affirmed certification of the class and subclass. *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). In doing so the court held the prisoners' claims had sufficient commonality because the class and subclass were allegedly subjected to practices that could be addressed "in one stroke." *Id.* at 678. In particular, the Ninth Circuit reasoned this Court could determine whether the "statewide [ADCRR] policies and practices to which all members of the class are subjected, and [particular] statewide [ADCRR] policies and practices which affect all members of the subclass" exposed the class and subclass to "substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Id.*

## II. Settlement and Stipulation

Before the mandate issued in the class certification appeal, the parties negotiated a settlement agreement—the Stipulation—that was intended by the parties to eventually

resolve all claims. (Doc. 1185). The Stipulation contained 103 health care and 10 maximum custody performance measures.[2] With respect to health care, performance measures were to be assessed pursuant to a "Monitoring Guide" and reported monthly for each of the ten prison complexes. (Doc. 1185 at 3). Under the Stipulation, a performance measure, for health care or maximum custody, could terminate (*i.e.*, free Defendants from monitoring and reporting) if Defendants achieved, and maintained, specified thresholds: 75% compliance the first 12 months, 80% the second 12 months, and 85% thereafter. The Stipulation was accepted by the Court in February 2015. (Doc. 1458).

**III. Stipulation Monitoring History**

In an Order dated July 16, 2021, the Court provided a detailed recital of the history of the monitoring and enforcement of the Stipulation for the five years from 2016 through 2021. (Doc. 3921). Rather than repeat the history, the Court incorporates the factual findings contained in the July 16, 2021, Order.

In brief, between 2016 and July 2021, Plaintiffs filed twelve motions to enforce the Stipulation, the Court held multiple evidentiary hearings and status conferences, the Court issued dozens of Orders with specific directions mandating Defendants comply with the Stipulation, the Court issued three Orders to Show Cause why Defendants should not be held in contempt, the Court appointed two experts, and the Court held Defendants in contempt twice, resulting in millions of dollars in fines, which were upheld on appeal. At the end of the five-year period, the Court concluded Defendants had consistently refused to perform the obligations under the Stipulation and had offered baseless legal and factual theories for their failures. Imposition of substantial fines, and threats of even more, did not prompt Defendants to make required efforts to perform as they agreed under the Stipulation.

Accordingly, as of July 2021, the Court resolved that attempting to enforce the

---

[2] As it happened, the Performance Measures were not comprehensive enough and under-evaluated the alleged constitutional violations. Defendants used this to their advantage to both subvert the Stipulation and continue violating prisoners' constitutional rights.

Stipulation had proven futile and rescission of the Stipulation was required.[3] (Doc. 3921 at 36-37). The Court vacated the settlement under Federal Rule of Civil Procedure 60(b) and set the matter for trial to begin November 1, 2021. (Doc. 3921).

## IV. Trial Procedures

The parties were given time after the Order vacating the Stipulation to engage in discovery and prepare for trial. (Docs. 4006, 4009, 4011, 4012, 4019, 4019, 4021). In early August 2021, Plaintiffs moved to present direct expert testimony by declaration to preserve trial time. On September 2, 2021, the Court granted the motion over Defendants' objection and directed both sides to present most of their experts' direct testimony by way of written declaration.[4] Defendants, however, if necessary, were allowed to file a motion seeking permission to present all their experts' testimony in-court instead of through written declarations. (Doc. 3952 at 3 n.1). Defendants chose not to file such a motion.

After considering the nature of the evidence for both parties, the Court directed the parties to plan on 50 hours of trial time for each side, with the caveat that "adjustments, as necessary" would be made to ensure "a fair trial to both parties." (Doc. 3952 at 3). Neither party objected to the 50-hour limit nor asked for additional time at the conclusion of the trial.

---

[3] Of significance, the Stipulation substantially favored Defendants because it expressly provided by its terms that the Court was precluded from ordering Defendants "hire a specific number or type of staff." (Doc. 1185 at 14-15). This provision was addressed in one of Defendants' appeals. The Ninth Circuit held the provision meant the Court could issue a "general staffing order" but could not issue an order requiring a "*specific* number and type of personnel." *Parsons v. Ryan*, 912 F.3d 486, 498 (9th Cir. 2018). This interpretation made enforcement difficult, and eventually completely impossible, because any effective staffing plan would necessarily address the specific needs of specific complexes. Further, the Court was consistently reminded Defendants placed great importance on this limitation and were unwilling to hire additional staff. As this Order demonstrates, failure to maintain adequate staff has been the fundamental cause of Defendants' unconstitutional actions.

[4] A similar practice was used in another case involving challenges to prisoner healthcare. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1158 n.5 (N.D. Cal. 1995) ("The direct testimony of all experts was submitted by way of declaration, supplemented by two hours of live testimony. The parties were also permitted unlimited live cross examination and redirect examination.").

Trial commenced on November 1, 2021 and proceeded for fifteen non-consecutive days. The parties filed lengthy written testimony for each expert and they testified at trial. Beyond the experts, the Court also heard testimony from class and subclass members, the named defendants, deputy wardens in charge of isolation units, and others.[5] Neither side had exhausted their allotted time on the last day of trial or asked the Court to continue the trial for additional days. The parties subsequently filed approximately 800 pages of proposed findings of fact and conclusions of law as well more than 350 pages of responses to the opposing side's filing. (Docs. 4308, 4309, 4314, 4315).

## V. Evidentiary Issues

Most of the evidentiary issues were raised and resolved during trial but a few are pending.

### A. Motion to Strike (Doc. 4219)

After trial, Defendants filed a motion seeking to strike "portions of Plaintiffs' experts' declarations." (Doc. 4219). That motion is confusing. For example, Defendants argue the written testimony of one of Plaintiffs' experts was incorrectly presented such that it must be excluded but then add, without explanation, that the expert's "entire trial testimony" should also be stricken. (*Id.* at 2). Defendants also claim there is hearsay within the experts' written testimony, that some offered legal conclusions, and maybe they offered undisclosed opinions. Defendants' motion is baseless because the motion was untimely and, as such, Plaintiffs were unable to cure any alleged deficiencies.

Defendants' motion was filed over a month after Defendants received the last written testimony by one of Plaintiffs' experts. Federal Rule of Evidence 103 requires

---

[5] The Court heard from the following witnesses: Prisoners Kendall Johnson, Ronald Slavin, Laura Redmond, Rahim Muhammad, Jason Johnson, and Dustin Brislan; Staffing Expert Robert Joy; Paralegal Jessica Carns; Deputy Wardens Travis Scott, Lori Stickley, and Anthony Coleman; Mental Health Care Expert Pablo Stewart; Solitary Confinement Expert Craig Haney; former Centurion Regional Mental Health Care Director Dr. Stefanie Platt; Corrections Expert Martin Horn; Medical Care Expert Dr. Todd Wilcox; Defendants ADCRR Director David Shinn and Assistant Director Larry Gann; ADCRR's Mental Health Director Dr. Bobbie Pennington-Stallcup; Yuma Site Director Dr. Elijah Jordan; Warden Jeffrey Van Winkle; ADCRR Medical Director Dr. Grant Phillips; Mental Health Care Expert Dr. Joseph Penn; Medical Care Expert Dr. Owen Murray; and Centurion vice president Tom Dolan.

objections or motions to strike be "timely." As a general matter, "[a]n objection is 'timely' if it is made as soon as the opponent knows, or should know, that the objection is applicable." *Jerden v. Amstutz*, 430 F.3d 1231, 1236-37 (9th Cir. 2005) (quotation marks and citation omitted). The Ninth Circuit has found an objection two days after a witness testified untimely. *Id.* In another case, the Ninth Circuit found untimely an objection "not raised until the end of the witness's direct examination." *San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters*, 125 F.3d 1230, 1238 (9th Cir. 1997). Defendants' objections raised a month or more after they learned of the testimony are not timely. Thus, the objections will be denied.

What is more, by waiting until the conclusion of trial to bring their belated motion, Defendants deprived Plaintiffs of an opportunity to cure the alleged flaws in the testimony. The Ninth Circuit made clear it is improper to exclude testimony based on an untimely objection when the proponents of the testimony lack an "opportunity to cure the objection." *Jerden*, 430 F.3d at 1238. Defendants' motion to strike will be denied. However, the Court's findings of fact are not reliant on patently inadmissible evidence, whether contained in written testimony or elsewhere.[6]

**B. Motions to Admit Evidence (Docs. 4215, 4225)**

Plaintiffs moved to admit numerous court filings by both sides, a report by a court-appointed expert, and previous reports by experts. (Doc. 4215). Plaintiffs also moved to admit a report from the "Arizona Auditor General" and an excerpt of a prisoner's electronic medical records. (Doc. 4225). Defendants objected to most of these exhibits but agreed that one exhibit, the electronic medical records, can be admitted provided additional information is included. (Doc. 4247).

It is unnecessary to consider the documents and objections in detail because the Court has not materially relied on the documents at issue. Plaintiffs' motion regarding court filings will be denied as moot but the motion regarding medical records will be

[6] It is self-evident that both the prisoners and Defendants cannot be considered completely neutral witnesses because prisoners as well as Defendants and their staff are obviously interested in the outcome of this case.

granted, subject to Defendants' request to include additional information.

**C. Joint Motion to Admit (Doc. 4224)**[7]

The parties have agreed to admit certain exhibits, admit with modifications other exhibits, and withdraw some exhibits. The stipulated motion will be granted and the exhibits admitted or withdrawn as agreed to by the parties.

**D. Admissibility of Expert Witnesses' Testimony**

"Under Rule 702 of the Federal Rules of Evidence, [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion, provided the testimony meets certain criteria." *United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014) (quotation marks and citation omitted). An expert witness may rely on information, such as hearsay evidence, that would not be admissible on its own. Fed. R. Evid. 703. The time to raise a challenge to an expert's testimony is before or occasionally during trial. "Failure to raise a *Daubert* challenge at trial causes a party to waive the right to raise objections to the substance of expert testimony post-trial." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012). Here, the parties waived any *Daubert* challenges to the opposing party's expert witnesses. But even if they had not, any such challenge would have failed.

Expert testimony is sufficiently "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of [the relevant] discipline." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (quotation marks and citation omitted). The test for admissibility "is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quotation marks and citation omitted). Here, all the parties' experts have relevant knowledge and experience. The parties disagree regarding the soundness of some experts' methodologies but those disputes, as well as the appropriate weight to assign to each expert's opinions, are addressed below. The Court has considered all the expert opinions

---

[7] Plaintiffs motion to exclude evidence and testimony due to Defendants' Rule 30(b)(6) designee's lack of knowledge is moot because no contrary testimony was offered during trial. (Doc. 4163).

as well as the manner and demeanor of every witness's testimony in assessing credibility.

## LEGAL STANDARD

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prisons officials "violate[] the Eighth Amendment only when two requirement are met." *Id.* at 834. "First, the deprivation alleged must be, objectively, sufficiently serious" such that it results "in the denial of the minimal civilized measure of life's necessities." *Id.* Second, "a prison official must have a sufficiently culpable state of mind." *Id.* That state of mind is "deliberate indifference," which requires a prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. A prison official's state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 843.

## HEALTH CARE

### I. Privatization and Current Contract

When this lawsuit was filed in March 2012, ADCRR[8] provided health services (medical and mental health care) directly to its prisoner population. But the Arizona State Legislature enacted legislation requiring "the privatization of all correctional health services, including all medical and dental services." Arizona 2011 HB 2154. That legislation took effect on July 1, 2012, when Wexford Health Services assumed responsibility for all health services. On March 4, 2013, Corizon Health Incorporated took over for Wexford. Centurion of Arizona became the third private health care contractor on July 1, 2019. That contract is valued at approximately $216 million per year. (Doc. 4274 at 32). In June 2021, ADCRR extended its contract with Centurion for an additional fifteen

---

[8] In 2019, the name was changed from "Arizona Department of Corrections" to "Arizona Department of Corrections, Rehabilitation, and Reentry." (Doc. 4279 at 31).

months. (Doc. 4274 at 96). ADCRR is currently soliciting bids for the health care contract to begin in August 2022. (Doc. 4287 at 25).

The current contract requires Centurion provide all health services at ADCRR's ten complexes in the state. The table below reflects the prisoner population at each complex as of September 30, 2021, the date discovery closed. The table also reflects the number of "full time equivalents" or "FTEs" (*i.e.*, employees working 40 hours per week) required by the contract and the number of filled FTE positions.[9] These FTE numbers cover all Centurion staff at that location, meaning medical, dental, and mental health staff as well as administrative staff.

**Prison Population, Contract FTE, and Actual FTE**

| Location | Population | Contract FTE | Actual FTE |
|---|---|---|---|
| Douglas | 1,524 | 33.75 | 32.10 |
| Eyman | 5,219 | 132.50 | 110.85 |
| Florence | 2,534 | 152.00 | 96.76 |
| Perryville | 3,318 | 136.75 | 109.35 |
| Phoenix | 468 | 88.05 | 67.93 |
| Lewis | 4,421 | 150.00 | 115.00 |
| Safford | 1,035 | 34.75 | 36.85 |
| Tucson | 4,420 | 180.50 | 141.75 |
| Winslow | 1,481 | 31.00 | 37.10 |
| Yuma | 3,374 | 86.50 | 104.25 |

These numbers show an obvious and crucial amount of understaffing at certain locations. For example, Tucson has approximately 40 fewer FTEs than required by the contract. Defendants claim understaffing is alleviated by employees working overtime or by recruiting temporary employees. Even if this occurred, the current staffing levels fall significantly beneath what Centurion and Defendants intended at the time they entered into

[9] The population figures are as of September 30, 2021, while the staffing figures are as of August 2021.

the contract.

## II. Differences Among Complexes

The health services at the ten complexes are structured the same, subject to a few caveats. Each complex has a medical unit staffed with Centurion medical personnel. (Doc. 4279 at 59). The medical units at every complex consist of exam rooms allowing for treatment of prisoners on something like an "out-patient" basis. That is, prisoners go to the medical unit, are seen by medical staff, and the prisoners then return to the housing units. Beyond the standard medical units, some complexes have intensive health units for prisoners with more significant medical needs. An inpatient care unit (also known as an "inpatient component" or "IPC") "is staffed 24/7 with a registered nurse" and is where prisoners requiring a high level of care are housed. (Doc. 4279 at 61). A special needs unit ("SNU") provides a lower level of care and may be staffed "on an LPN level." (Doc. 4279 at 61). The typical care in SNUs consists of care for prisoners who require assistance with activities of daily living, or who have mobility or memory issues that preclude their placement in the general population. (*Id.* at 61). In addition, seven of the complexes are considered "corridor facilities" because they are located near larger population centers where higher levels of off-site medical care are available. (*Id.* at 60). Finally, four complexes have "mental health units" where prisoners with intensive mental health needs are housed. The table below depicts the medical and mental health capabilities of each complex. (Doc. 4279 at 60-64); (Doc. 4172 at 40-41). Of the ten complexes, nine are for male prisoners and one, Perryville, is for female prisoners.

**Medical and Mental Health Capabilities of Complexes**

| Complex | IPC | SNU | Corridor | Mental Health Units |
|---|---|---|---|---|
| Douglas | No | No | No | No |
| Eyman | No | No | Yes | Yes |
| Florence | Yes | Yes | Yes | No |
| Perryville | Yes | Yes | Yes | Yes |
| Phoenix | No | No | Yes | Yes |
| Lewis | Yes | No | Yes | No |
| Safford | No | No | No | No |
| Tucson | Yes | Yes | Yes | Yes |
| Winslow | No | No | No | No |
| Yuma | No | No | Yes | No |

Based on the facilities and capabilities of each complex, male prisoners may be transferred between complexes depending on their needs. If a prisoner housed at Winslow were to develop a serious medical condition, it is unlikely Winslow would be capable of treating that condition. The prisoner might initially be transferred to a "corridor" facility to be closer to off-site medical resources. If the prisoner was transferred to a "corridor" facility without an IPC or SNU, but the prisoner deteriorated, the prisoner may need to be transferred again to a facility with an IPC or SNU. Similarly, if a prisoner at Yuma needed intensive mental health treatment, that prisoner would need to be transferred to a mental health unit at a different location.

The different capabilities and facilities between complexes provide significant support for examining the ADCRR medical and mental health care system as a whole, instead of on a complex-by-complex basis. For example, in order for a particular prisoner to receive adequate or critical care, transportation among complexes is often necessary, because of the health care diversification in facilities and the overall medical care provided

at ADCRR. A prisoner may become seriously injured or develop a serious medical or mental health care condition at any time. If that prisoner is male, he may be assessed at one complex, transferred to almost any other complex, and then transferred again if needed, depending on bed availability and proximity to relevant specialists. Insufficient care provided at the IPC in Lewis may, suddenly, be a matter of life or death to a prisoner previously housed at Douglas who develops a need for a high level of care.

## III. Process to Obtain Care

When a prisoner submits a "health needs request" ("HNR") form, the response typically informs the prisoner he is scheduled to be seen on the "nurse line," meaning he will be seen and evaluated by an RN. Alternatively, if the HNR requested mental health services, he will be seen by mental health staff. (Doc. 4276 at 70-71).

### A. Overview of Medical Care

When an RN sees a prisoner on the nurse line, the RN uses "protocols embedded in Nursing Encounter Tools (NETS)." (Doc. 4138 ¶ 163). The NETS are "templates for care that are supposed to guide the nurse's exam and assessment of the patient, and help the nurse formulate a plan of care, including whether to send the patient to a PCP [primary care provider]." (Doc. 4138 ¶ 163). As set forth in Defendants' policies, after examining the prisoner, the RN will determine "[i]f the situation requires that the inmate be seen by another discipline." (Ex. 1305 at 155). If the RN concludes additional care is needed, policy requires the RN "*immediately* initiate a referral to the appropriate area." (Ex. 1305 at 155) (emphasis added). Significantly, this first evaluation by an RN always occurs regardless of the seriousness of a prisoner's asserted symptoms and regardless of how many times the prisoner has previously been seen by an RN for the very same issue. (Doc. 4138 at 72 ¶ 171).

If the RN determines the prisoner's situation requires evaluation by a higher-level professional, the RN will arrange for the prisoner to see what the parties refer to as a "provider." As used by the parties, "provider" means a nurse practitioner, physician assistant, or physician. A provider may order further testing or prescribe medication. A

provider may also determine specialist care is needed. In that situation, the provider is required to send a referral to Centurion's Utilization Management department. (Doc. 4275 at 13). That department, however, does not examine or evaluate the prisoner but based on the medical records, it "look[s] at the clinical indication to make sure [the referral is] appropriate," which takes time. (Doc. 4279 at 84). If the referral is approved, the information is passed to one of Centurion's "clinical coordinators" who will arrange a specialist appointment for the prisoner. (Doc. 4279 at 84). If Centurion denies the referral, the Utilization Management department often states the provider should pursue an "alternative treatment plan." (Doc. 4138 ¶ 400).

The many prisoners who have chronic conditions are enrolled in ADCRR's Chronic Care Clinics. (Doc. 4206 ¶ 201). A policy defines a chronic condition as "an illness or condition that affects an individual's well-being for an extended interval, and generally is not curable, but can be managed to provide optimum functioning within any limitations the condition imposes on the individual." (Ex. 1305 at 151). Prisoners' chronic care conditions are monitored by chronic care appointments no less than every 180 days, unless a provider documents a longer time frame is appropriate. (Doc. 1185-1 at 27). These appointments are not on the "nurse line." Rather, they are supposed to be with a provider although the overall records do not make clear whether that occurs. (Doc. 4287 at 59-60).

Defendants created a medical classification system to identify the housing needs for individual patients. The designations range from M-1 through M-5 with M-1 being the lowest needs patient and M-5 being the highest needs patient. (Doc. 4279 at 65).[10]

---

[10] The scores are:

M-1: Maximum sustained physical capacity consistent with age; no special requirements.

M-2: Sustained physical capacity consistent with age; stable physical illness or chronic condition, no special requirements.

M-3: Restricted physical capacity; requires special housing or reasonable accommodations.

M-4: Limited physical capacity and stamina; severe physical illness or chronic condition; requires housing in a corridor institution.

M-5: Severely limited physical capacity and stamina; requires assistance with Activities of Daily Living (ADLS); requires housing in Inpatient Component or Assisted Living area.

(Doc. 4138 ¶ 484).

Defendants introduced testimony that as of trial there are approximately 22,000 prisoners classified as M-1 and M-2, 2,000 prisoners classified as M-3, between 400 and 500 classified as M-4, and approximately 20 classified as M-5. (Doc. 4279 at 65-66). Those numbers, however, are clearly approximations as their sum is less than the total number of prisoners in the ten complexes.

**B. Overview of Mental Health Care**

Defendants created a standardized scoring system for classifying prisoners according to their mental health needs. MH-1 reflects the lowest level of need, and MH-5 reflects the highest.[11] (Ex. 3025 (Mental Health Technical Manual "MHTM" Ch. 3 § 5.0)).

---

[11] The scores are the following:

MH-1: Prisoners who have no history of mental health issues or receiving mental health treatment.

MH-2: Prisoners who have received mental health treatment in the past but do not currently have any mental health needs and have demonstrated behavioral and psychological stability for at least six months.

MH-3: Outpatient Treatment. Patients who have current mental health needs that require outpatient treatment. There are five sub-codes to MH-3.

MH-3A: Patients in acute distress who may require substantial intervention in order to remain stable. All patients classified as seriously mentally ill ("SMI") are to be classified as MH-3A (unless admitted to a residential treatment or inpatient treatment program, and then classified as MH-4 or MH-5). Any patient under a Psychiatric Medication Review Board ("PMRB") order for involuntary administration of psychiatric medication are to be classified as MH-3A (unless admitted to a residential treatment or inpatient treatment program, and then classified as MH-4 or MH-5).

MH-3B: Patients who are generally stable but need regular interventions because they are receiving psychiatric and psychological services.

MH-3C: Patients who are stable, have adequate coping skills, and are able to manage their mental health symptoms through medication only, and who need infrequent intervention.

MH-3D: Patients who were recently taken off psychotropic medications and need follow-up for six months thereafter to ensure stability over time.

MH-3E: Patients who recently arrived to ADCRR custody and are generally stable but may benefit from regular contacts with mental health clinicians, or patients participating only in outpatient group psychotherapy.

MH-4: Residential Treatment. Patients who are admitted to a residential mental health program.

MH-5: Inpatient Treatment. Patients who are admitted to the inpatient mental health treatment programs licensed by the Arizona Department of Health Services.

(Ex. 3025 at 27-32).

These scores are assigned during "mental health intake assessments" which occur during prisoners' initial processing upon entering the system. (Doc. 4276 at 43).

Prisoners assigned a score of MH-3 or above are considered "on the mental health caseload," and must be housed at facilities with mental health staff. Prisoners assigned scores of MH-1 or MH-2 are eligible to be housed at Douglas, Safford, or Winslow, which each have a single staff person each to address any mental health needs that may arise.

In addition to learning of mental health needs through the HNR process, mental health staff may learn of a prisoner in need of services through the prisoner's friends or families, or through prison officials who observe the prisoner. (Doc. 4276 at 71). In theory, the system provides that if mental health services are requested through the HNR process, an "urgent concern" will result in the prisoner being seen the same day the HNR is processed. (Doc. 4276 at 70). If the HNR presents a "clinical mental health need," the prisoner is seen within five days. And if there is a "psychiatric concern" that is deemed "non-urgent," the prisoner is seen within 14 days. The record does not establish who is responsible for categorizing the mental health HNRs.

## MEDICAL CARE

It is undisputed the class members suffer from a wide variety of serious medical needs. In fact, Bureau of Justice Statistics data show people who are "incarcerated tend to be less healthy, to have more chronic illnesses including substance use disorder, and to have additional stressors in their lives than people who live in the general community." (Doc. 4138 ¶ 252). Dr. Elijah Jordan, the Site Medical Director for the Yuma Complex, testified prisoners often present unusual, and very serious, medical conditions. He explained working in correctional health care "afforded [him] the opportunity to see a lot of things that [he] read about and saw going through medical school that [he] was not able to see during medical school as well as residency, because [he is] able to – [he] take[s] care of patients that do not regularly go to the doctor. So these guys, when you do get a chance to evaluate and see them, they are really bad off." (Doc. 4277 at 56.) And Defendants readily admit approximately two-thirds of class members are prescribed medications, and

approximately one quarter receive medication for mental health conditions. (Doc. 4275 at 16, 18). As a general matter, the class consists of thousands of individuals with significant and very serious health needs requiring a high level of care to adequately manage and treat.

## I. Overview of Expert Testimony

The parties presented competing experts to address the overall adequacy of the medical care system. Dr. Todd Wilcox testified for Plaintiffs and Dr. Owen Murray testified for Defendants. Dr. Wilcox's testimony was persuasive and credible. Dr. Murray's overall opinions were generally unpersuasive though portions of his testimony confirmed the medical care system is grossly insufficient.

### A. Dr. Wilcox

Dr. Wilcox earned a bachelor's degree in biological psychology from Duke University in 1988 and a medical degree from Vanderbilt University School of Medicine in 1992. (Doc. 4138, Ex. A). After graduating from medical school, Dr. Wilcox completed a residency in orthopedic surgery. (Doc. 4270 at 82). During that residency, Dr. Wilcox began working as a staff physician for the Salt Lake County jail. In 1996, he became the medical director for the Salt Lake County Jail System, where he remains today. He has also performed other work, including serving as the Medical Director for the Maricopa County Jail System. He is board certified in Urgent Care Medicine and board certified by the American Academy of HIV Medicine. And he holds an advanced certification from the National Commission on Correctional Healthcare as a Certified Correctional Health Professional Administrator and Correctional Health Physician.

Dr. Wilcox has 27 years of experience in correctional health care and is well-qualified to provide expert opinions on the quality of Defendants' health care delivery. (Doc. 4138 ¶¶ 2, 4). He has served as Plaintiffs' expert since 2013, shortly after the lawsuit was filed. (*Id.* ¶ 6). Defendants did not file a pretrial motion contesting Dr. Wilcox as an expert witness, and he is qualified to offer expert opinions on the adequacy of the medical care provided.

Dr. Wilcox was requested to "evaluate the adequacy of the current medical care

delivery system in the ADCRR." (*Id.* ¶ 18). His current opinion is based on his experience serving in this case since 2013, having submitted multiple reports and declarations regarding the delivery of healthcare in the Arizona state prisons which document that since 2012 ADCRR's healthcare delivery system has been seriously deficient. In preparing for his testimony, he thoroughly reviewed many documents including the written policies and procedures of ADCRR as well as the Department Orders and Medical Service Technical Manual. He examined medical records for 120 patients. He visited all four IPCs and interviewed a number of patients in IPCs, special needs units, and other housing units.

Dr. Wilcox explained why he did not review a completely random sample of prisoners:

> I did not review a random sample of all patients in ADCRR custody. This is because when evaluating a healthcare delivery system, it is generally not as helpful to examine care for healthy people as it is to look at the treatment of sick patients, particularly those with complex or chronic conditions that require coordination, communication, and judgment. Healthy patients or those with minimal needs can more readily get their needs met even from systems that offer poor clinical care and lack basic organizational structures; examining their records tells us little. It is the complex patients who test the capacity of staff and systems alike.[12]

(Doc. 4138 at ¶ 25). However, Dr. Wilcox's tour of various locations and discussions with prisoners at those locations meant he did not dictate the exact prisoners he would review:

> I had no control over who was housed in those units. We tried to speak to everybody in those units who was willing to speak to us. So we got as big of a sample as we could with regards to those random patients who were housed in those units and then we went back and looked at their charts.

(Doc. 4270 at 12).

Overall, Dr. Wilcox attempted to evaluate the care provided to prisoners by looking to prisoners "at the sicker end of the spectrum." (Doc. 4270 at 11). He explained why this approach was useful:

> I also wanted to identify patients who are high-end utilizers of

[12] Dr. Wilcox elaborated on this point in his live testimony.

> the health care system. And the reason that those patients are important is because when you are doing a systems evaluation, what you really want to evaluate are patients who put a little strain on the system. They have a lot of transactions in their health care. It's not particularly informative about a system if you have a patient that has a one-time episodic visit for a sprained ankle and then they're never seen again. That doesn't give you very much data. But what does give you data is patients that have frequent and ongoing interactions with the healthcare system because you're able to see the coordination nation of care, you're able to see all the different elements of the system operating to care for that patient.

(Doc. 4270 at 11). Dr. Wilcox has used this methodology to evaluate care in other cases and other experts use similar methodology. (Doc. 4270 at 15).

In his written testimony, Dr. Wilcox stated ADCRR's health care system provides "grossly inadequate healthcare." (Doc. 4138 at ¶ 28). The entire health care system "continues to harm many patients and continues to place all at substantial risk of serious harm." (*Id.*). And "ADCRR has provided dangerously substandard care for years, both before and during the pandemic, continuing to the present day." (*Id.* at ¶ 27). He testified this problem stems from a variety of factors but the most fundamental being the lack of appropriate qualified staffing. "By design, healthcare decisions in the [ADCRR system] are pushed down to the lowest possible level – nurses who are practicing poorly and far outside the scope of their licenses." (*Id.* ¶ 28). In Dr. Wilcox's view,

> There is a clear pattern of failure by nurses to complete an adequate nursing assessment, take patient reports seriously, recognize dangerous symptoms, and elevate concerns to providers. Too often, nurses simply send patients back to their housing unit and tell them to submit another written sick call request if symptoms worsen.

(Doc. 4138 at ¶ 28).

ADCRR's system also results in care for complex issues being "scattered throughout the system so no one provider or physician is ultimately responsible for the patient, resulting in serious deficits in care." (Doc. 4138 at ¶ 29). In addition, the system lacks "the foundation of any credible healthcare practice: differential diagnosis." (Doc. 4138 at ¶ 30). Medical staff fail "to identify, test, and otherwise evaluate the underlying

cause of the symptom." (*Id.*). Staff order testing "without a diagnostic strategy" and they "fail to follow up on significantly abnormal results." (*Id.*).

In his written testimony Dr. Wilcox identified the cause of the system's failures:

> [ADCRR's] problems appear to the result of a combination of factors, including inadequate staffing, inadequate physician-level attention to problems, and poor attitude of medical staff,[13] which probably is itself related to inadequate staffing and demanding workloads. In addition, the electronic health record in use within the ADCRR is poorly designed and greatly impairs the clinician's capacity to synthesize a comprehensive picture of a patient's healthcare.

(*Id.* ¶ 31).

During his in-court testimony, Dr. Wilcox summed up his opinion of the medical care system in a simple and stark way:

> My opinion is that the system as it exists is terrible. There are so many blocks to care, barriers to care. There's so many areas where the care can get snagged up and not flow appropriately, and the end result of that is that some patients within the healthcare system, in fact many patients who have higher end needs, end up getting terrible care.

(Doc. 4270 at 20). To ensure it had understood, the Court asked Dr. Wilcox to clarify. Dr. Wilcox repeated prisoners "end up getting terrible care." (Doc. 4270 at 20).

**B. Dr. Murray**

Dr. Murray earned a bachelor's degree in biology from Boston College in 1983 and a doctor of osteopathy degree from Chicago College of Osteopathic Medicine in 1988. (Doc. 4206, Ex. 1). After medical school, Dr. Murray completed a residency in family practice. From 1991 to 1994, Dr. Murray worked as medical director at various locations in the Illinois Department of Corrections. From 1995 to the present, he has worked at the University of Texas Medical Branch. (Doc. 4285 at 104). At present, he is Vice President of Offender Health Services and oversees the provision of health care in the Texas

---

[13] Dr. Wilcox testified "[p]roviders' notes suggest over and over that patients are lying and malingering." (Doc. 4271 at 79). In Dr. Wilcox's opinion, this was evidence of "bias against patients" which often "interferes with the providers' capacity to recognize serious medical conditions."

Department of Criminal Justice and the Texas Juvenile Justice Department. (Doc. 4206 ¶¶ 3-4).

Dr. Murray understood he was to evaluate the "overall health care system" for prisoners in ADCRR custody and determine whether there are "systemic deficiencies which render the delivery of health care services below the community standard of care."[14] (*Id.* ¶ 10). He performed site visits at all ten complexes and focused his review on the following components of medical care: (1) staffing, (2) access to care, (3) diagnostic services, (4) records and facilities, (5) pharmacy services, and (6) quality monitoring. (*Id.* ¶¶ 15, 17). Dr. Murray reviewed charts for 80 prisoners, focusing on prisoners with at least two documented chronic care diagnoses. Dr. Murry evaluated those charts based on the quality of chronic care documentation, quality of chronic care, and quality of episodic care. (*Id.* ¶ 207). Dr. Murray's overall conclusion was that:

> ADCRR is delivering care that meets or exceeds the community standard. While I have identified some areas for improvement, most notably with eOMIS [the electronic medical records system], PM [performance measure] reporting, and the mortality review process, I did not find any systemic deficiencies with the provision of health care to ADCRR inmates. Even in the areas where I have noted opportunities for improvement, it is clear that ADCRR recognizes the issues and has been working towards improving them.

(*Id.* ¶ 1082). Thus, Dr. Murray believes the medical care provided to class members is the same or better than what members of the public receive from their medical providers. As set forth below, this opinion is contradicted by the evidence produced at trial.

## II. Staffing is Significantly Below Contract Levels

The core issue is that staffing levels are so inadequate that the provision of constitutionally mandated care is impossible. Dr. Wilcox testified "staffing is the root of the ADCRR's healthcare deficiencies" (Doc. 4138 ¶ 160), which opinion was established

[14] The relevant standard is the Eighth Amendment, not the community standard of care. *Balla v. Idaho*, 29 F.4th 1019, 1026 (9th Cir. 2022) (noting Eighth Amendment liability must be predicated on something "beyond malpractice"). However, "[t]he community standard of care outside of the prison context is highly relevant in determining what care is medically acceptable and unacceptable." *Id.* (quotation marks and citation omitted).

by the evidence at trial. The current staffing levels illustrate ADCRR does not have the ability to address the varied and often complex needs of Arizona's prisoners.

The contract between ADCRR and Centurion requires 1052.75 full-time staff members ("FTEs") to provide health care, mental health care, dental care, and perform all related administrative tasks. (Doc. 4287 at 17). Plaintiffs contend, and the evidence establishes, the contractually allotted staffing for each complex is definitely too low and, because of current vacancies, each facility is profoundly understaffed. In fact, the evidence establishes Centurion admitted staffing at the contractual level would be insufficient, even if such staffing levels could be obtained.

Although ADCRR claimed that 1052.75 FTEs were necessary at some point, Defendants failed to explain how they arrived at this number. Defendant Gann stated in his Rule 30(b)(6) deposition "the [staffing] model has been in place for a number of years, and it [is] not something that is negotiated by us ongoing." (Doc. 4146-1 at 221). In other words, the staffing model was already in place at the time Centurion began providing services. Defendant Gann also testified Centurion has been encouraged "to present an alternative [staffing] plan if they so desire." (Doc. 4146-1 at 228). But at trial, Defendant Gann incredibly contradicted his deposition testimony and claimed ADCRR relies on Centurion to report how many health care staff are needed. (Doc. 4275 at 89). The evidence establishes the staffing numbers were set by ADCRR, and it has refused to require increased staffing.

Centurion Vice President Tom Dolan testified that, in July 2019, Centurion performed its own staffing evaluation to determine the number and type of health care staff necessary to perform adequately under the contract and determined Centurion would need to increase the FTEs by 161.5 for a total of 1214.25 FTEs. (Ex. 2166). This was specifically communicated to ADCRR officials. (Doc. 4287 at 29). But ADCRR "was not open to amending the contract to add additional FTEs," despite the insufficiency noted by Centurion. (Doc. 4287 at 30). Of greater significance, Centurion has never even fulfilled the staffing level required by contract. (Doc. 4274 at 99). The current situation falls well

below the already-insufficient contract level.

The Court looks to the staffing levels of the most crucial personnel. The following positions are responsible for providing direct patient care: Assistant Director of Nursing, Director of Nursing, Licensed Practical Nurse/Medical Assistant, Medical Assistant, Medical Director, Midlevel Practitioner (nurse practitioners or physician's assistants), Nursing Assistant/Patient Care Technician, Registered Nurse, and Staff Physician. Using these positions, the tables at Appendix 1 set forth the contract level, the hired level, and the variance between the contract and hired levels as of August 2021. (Ex. 2167).

All told, there were 465.45 FTEs providing direct care as compared with the 601.75 FTEs required by the contract. The current staffing figures do not include overtime performed by current staff or temporary staffing. A Centurion employee claims use of overtime and temporary employees has allowed Centurion to work 90% of the hours contemplated by the contract. (Doc. 4287 at 17). But that does not indicate 90% of the hours contemplated by the contract for direct patient care were performed.

As established by the tables at Appendix 1, seven out of ten facilities are understaffed, and some are severely understaffed. The numbers at Tucson, for example, are striking. Tucson houses 4,420 prisoners. According to the Centurion contract, to provide medical care to that population, 40 licensed practical nurses are required but there are only 24.30. The contract requires 36 registered nurses but there are only 18.30. The contract requires 2 staff physicians but there is only 0.75. To be clear, there is not a single full-time physician to cover the 4,420 prisoners housed at Tucson. And even if there were the 2 staff physicians contemplated by the contract, the physician to prisoner ratio would be severely inadequate. Another court noted a physician to prisoner ratio of 1:1,166 was far too large. *Madrid v. Gomez*, 889 F. Supp. 1146, 1201 (N.D. Cal. 1995). Even if Tucson were "fully staffed" according to the contract, the physician to prisoner ratio would be 1:2,210.

Overall, there are 10 medical directors, 47.15 midlevel providers (who may only work under the direction of a physician), and 5.5 staff physicians for the entire prisoner

population of over 27,000. Three complexes do not require a staff physician at all (Douglas, Safford, and Winslow), two more do not have their staff physician positions filled (Lewis and Phoenix), and two more have their staff physician allocations understaffed by 50% (Florence and Tucson). These numbers, and the tables at Appendix 1, demonstrate the contract staffing levels require the vast majority of medical care be provided by nurses, nursing assistants, and medical assistants. Given these undisputed actual staffing numbers, Defendants' position that there is no cause for concern—and they are providing care that meets or exceeds the community standard—is incredible.

Defendants argue this overview does not account for the various site medical directors. Those positions are filled by physicians and Defendants claim they increase the number of physicians providing direct patient care. First, the increase is insignificant and trial testimony established the medical directors are ill-equipped to provide anything close to full time direct patient care. Dr. Jordan, the site medical director at Yuma, testified he spends between 40 and 50% of his time providing patient care, "because [he is] involved." (Doc. 4277 at 59-60). Dr. Jordan also confirmed he has acted as the site medical director for the Winslow complex in addition to his duties at the Yuma complex on more than one occasion for at least one month. But Dr. Jordan never provided direct patient care at Winslow. (*Id.* at 70-71). Dr. Wilcox also stated that, during his tours of various locations, he had learned "site medical directors did not do very much clinical work and they substituted in for vacations." (Doc. 4271 at 74).

Even if medical directors were not required, at times, to cover multiple locations, it is inconceivable that each site medical director could provide anything close to full-time direct patient care while supervising a staff of 20-100 and performing administrative responsibilities. As such, based on this record, any participation by the site medical directors in providing direct patient care is marginal and, therefore, inadequate.

Defendants effectively concede the current staffing levels are insufficient. In addressing whether the current staffing levels are adequate, Dr. Murray's opinion was based on information from "facility leadership teams" in terms of the hypothetical staffing

contemplated by the contract, not actual staff. They told Dr. Murray if "their vacancies were filled, the current workload would be manageable with the current number of healthcare positions." (Doc. 4206 ¶ 197). Because Centurion has never filled all its vacancies, it is completely unclear how the teams know full staffing would be sufficient. But, more importantly, these comments by "facility leadership teams" effectively admitted the current staffing levels are not sufficient. Moreover, the evidence establishes the contract staffing levels would not be sufficient, even if they could be obtained. Facilities currently considered "overstaffed" according to the contract level are unable to meet basic thresholds for providing care.

The Yuma complex illustrates the contract staffing levels are insufficient. Yuma is overstaffed by seventeen positions (nearly thirteen of which are nursing assistants, medical assistants, or LPNs). Despite being "overstaffed" as contemplated by the contract, Yuma was unable to perform numerous health care performance measures during the Stipulation's operative period. (Doc. 4277 at 75-76). From January 2021 through July 2021, Yuma was substantially noncompliant with PM 37, which requires a prisoner to be seen within 24 hours of submitting an HNR, and PM 44, which requires the prison to review a prisoner's hospital discharge instructions within 24 hours of their return from the hospital. In other words, even with Yuma substantially "overstaffed," it was unable to see prisoners within 24 hours or review discharge instructions within 24 hours, both tasks a well-staffed facility should be able to accomplish. It was these types of critical failures that ultimately destined the Stipulation to fail and mandated its rescission. (*Id.* at 78-83). In addition, Yuma is one of the only complexes where Defendants claimed use of the eConsults service, where prison providers can reach out virtually to specialists, explain a prisoner's symptoms and testing results, and seek specialized advice on how to proceed with a patient. (*Id.* at 60:8-21). While this may have been helpful, Yuma's performance in obtaining specialty consultations remained substantially noncompliant. (*Id.* at 75-76).

Significantly, Defendants offered no evidence the contract staffing levels, if achieved, would be sufficient. They did not offer a statistical analysis demonstrating the

staffing allocation contemplated by the contract would be appropriate to meet prisoners' needs. Instead, Defendants relied, almost exclusively, on their National Commission on Correctional Health Care ("NCCHC") accreditation. NCCHC accredits correctional facilities for compliance with NCCHC's standards regarding medical and mental health care. (Doc. 4172 ¶¶ 59-61; Doc. 4279 at 101; Doc. 4270 at 110-111). Correctional facilities initiate the accreditation process and the institution seeking accreditation pays an initial fee, as well as an annual fee to maintain accreditation. (Doc. 4289 at 133-134). NCCHC will accredit a facility if it finds that a facility meets all "essential" NCCHC standards and 85% of all "important" NCCHC standards. (Doc. 4270 at 114:6-15; Doc. 4275 at 61:24-70:11).

ADCRR is fully accredited. But the evidence established that accreditation is of very little value when determining actual performance of the ADCRR system. Dr. Wilcox testified "NCCHC has never and does not now purport to assess the adequacy of staffing levels as part of its accreditation process. In fact, the NCCHC has always declined to offer any guidance on staffing other than to provide an umbrella statement that "'[t]he responsible health authority (RHA) ensures sufficient numbers and types of health care staff to care for the inmate population.'" (NCCHC Standards for Health Services in Prison, 2018, pg 61); (Doc. 4138 ¶ 158 n. 7). This was corroborated by Defendant Gann who testified NCCHC will not provide a benchmark for staffing because every facility is different. (Doc. 4275 at 33). Further, while Defendants claim NCCHC surveyors are neutral and objective, the evidence established Centurion and Corizon are far from neutral because they are prominent NCCHC sponsors. (Doc. 4283 at 5).

The Court finds Dr. Wilcox's opinion that none of the NCCHC essential standards incorporate a substantive review of the health care administered by ADCRR is credible. Rather, these standards are exactly what Dr. Wilcox said they are—standards to ensure some policies and procedures are in place to create a health care delivery system. (Doc. 4138 at page 66 n.7). And those systems do, in fact, exist, so it is not surprising ADCRR was and remains accredited. But it has never been Plaintiffs' claim that Defendants do not

have policies or procedures to provide health care. Rather, Plaintiffs have always claimed the system was providing constitutionally inadequate health care.

If there were any remaining doubt about the utility of NCCHC accreditation, it is dispelled by looking at Defendants' PM compliance from 2018-2021. As the Court detailed in its July 16, 2021 Order, pervasive noncompliance with the Stipulation's performance measures justified rescission of the Stipulation. Indeed, just one example, PM 44 at Eyman—requiring prisoners returning from a hospital stay shall have the hospital's treatment recommendations reviewed and acted upon within 24 hours—has been noncompliant for years. Given that performance, it is implausible all ten complexes could be 100% compliant with each "essential" NCCHC standard if those standards were based on a qualitative assessment of the actual care provided to prisoners.

Ultimately, the evidence demonstrates current staffing is woefully insufficient. In addition, as Dr. Wilcox stated "[t]hese staffing problems persist and recur because neither the ADCRR nor Centurion adequately analyze, monitor, or take responsibility for addressing them." (Doc. 4138 at ¶ 160). Based on the testimony and evidence, the only reasonable conclusion is the current staffing level is inadequate, and even if all positions contemplated by the contract were filled, it is more probable than not the staffing would be insufficient. The Court need not decide the number of staff that would be necessary. It is enough to know that even Centurion has admitted the contract staffing level, which has never been achieved, is insufficient. The next issue is the impact that lack of staff has on the care provided to prisoners.

## III. Intersection of Inadequate Staffing and Nursing

The staffing levels contemplated by the contract tilt sharply toward support staff—licensed practical nurses, medical assistants, nursing assistants, and patient care technicians—and away from providers who can write orders and prescribe medication. All positions are not created equal. Several witnesses attempted to put the staffing numbers into context, and Dr. Wilcox's testimony was the most thorough and persuasive.

Dr. Wilcox explained the process by which prisoners seek care. The ADCRR

system requires every prisoner seeking medical care to be evaluated by a nurse who then uses the nursing encounter tools ("NETS") to formulate a plan of care, including whether to send the prisoner to a provider—nurse practitioner, physician's assistant, or physician. (Doc. 4138 ¶ 163).

Dr. Wilcox's undisputed characterization of ADCRR's health care hierarchy is that nurses are tasked with triaging prisoners but quite often prisoners do not obtain care beyond that provided by a nurse. And of greater significance, this system requires nurses to diagnose and treat far beyond their capabilities. Nurses are expected to work closely with higher-level providers, but given the relatively few higher-level providers on staff, that is simply not possible. In Dr. Wilcox's expert opinion, "the poor quality of clinical decision-making demonstrated by nurses and providers in the ADCRR harms patients and places them at an unreasonable and substantial risk of serious harm." (Doc. 4138 ¶ 17). During his in-court testimony, Dr. Wilcox elaborated on this point and pointed out the strangeness of ADCRR using nurses in this manner.

Dr. Wilcox was asked if he was "aware of any other health care settings where the nurse serves as final decider when someone seeks to access their doctor." He responded

> No. Considering that it's not really legal, you wouldn't expect to find any others. But, you know, can you imagine in the community if you schedule an appointment with your doctor and you're met in the lobby by the nurse who does a little assessment on you and then turns you around and sends you home and you're not allowed to see your doctor? That just doesn't exist in the scope of healthcare anywhere."

(Doc. 4270 at 74). ADCRR's decision to structure their system in this manner is, in Dr. Wilcox's credible opinion, an extreme outlier.

Dr. Murray attempted to counter Dr. Wilcox's opinion by stating "[t]he nurses and providers I interviewed felt comfortable with the supervision available, and I believe the ratio of providers to nurses in the ADCRR system allows for adequate supervision." But Dr. Murray does not identify a single provider who explained how supervision is adequate to protect prisoners. And with 5.5 staff physicians for the entire prison population of more than 27,000, the evidence does not support a finding that the ratio is sufficient for adequate

supervision.

In essence, it is Defendants' position that access to any care, no matter how poor, satisfies their constitutional obligations. In Defendants' view, prisoners have access to nurses, and those nurses can in theory escalate matters to higher level providers when appropriate. But the evidence shows that they do not do so. And in practice, it is never enough to provide prisoners with serious medical needs access to health care staff who lack the training and authority to address their needs. Access to health care necessarily involves access to health care performed by competent staff. The staffing levels detailed above make clear it would be impossible for nurses to meaningfully consult with or refer many prisoners to providers because there are simply not enough higher-level providers available to see them.

As credibly stated by Dr. Wilcox, "in a well-functioning system, a high percentage of patients should pass through the triage process to see a provider, who can then diagnose their condition and prescribe appropriate treatment." (Doc. 4138 ¶ 162). Instead, ADCRR relies almost exclusively on nurses to "function outside the scope of their licenses and act as providers." (Doc. 4138 ¶ 169). The basic staffing levels allow for nothing else.[15] The staffing levels require the vast majority of prisoners who submit HNRs to be seen by nurses, and nurses only. And even the nurse lines are cancelled due to lack of staffing. Defendant Gann admitted the nurse line was cancelled in Tucson more than twenty times in January and February of 2021 due to insufficient staffing. (Doc. 4275 at 100:25-101:3).

Dr. Wilcox opines the inadequacy of ADCRR's system, including the overreliance on nurses, is borne out by reviewing the numerous mortality reviews.[16] Those reviews—

[15] For example, at the Tucson complex there are 18.3 registered nurses, 7.00 midlevel practitioners and 0.75 staff physicians. There are 4,420 prisoners at that complex who submit 200-300 HNRs per day. (Doc. 4206 at 7). It is not remotely possible for each prisoner who submits an HNR to be seen by a midlevel practitioner or staff physician. The ADCRR system documented a total of 300,000 HNRs across all complexes in 2020. (Doc. 4275 at 145). The staffing levels systemwide mean only the tiniest fraction of those HNRs could possibly result in a visit with a midlevel practitioner or staff physician.

[16] Dr. Wilcox examined 94 mortality reviews of the 322 prisoners who died between January 1, 2019, and September 26, 2021. Dr. Wilcox "focused primarily on more recent deaths to gain the most accurate picture of the current state of affairs in the ADCRR healthcare system." (Doc. 4167 at ¶ 21).

which Defendants did not controvert—document a lack of timely access to appropriate care by the appropriately skilled professionals and they reflect numerous preventable deaths.

**A. Joseph Assyd**[17]

Joseph Assyd died on April 12, 2020, at the age of 64. On March 13, 2020, he became unresponsive due to hypoglycemia. A nurse measured his glucose at a very low level of 40, and Assyd reported abdominal pain, nausea, vomiting, and diarrhea. He was provided "glucose gel 3 times over the next hour." While he had "a fever of 102.3, hypoglycemia, and abdominal pain," he was transferred from the Lewis complex to the Tucson complex. Assyd was not seen by a provider on March 13. It was not until March 27, 2020, that he saw a provider for complaints of "generalized weakness and pneumonia." He had an altered mental state and was transferred to the hospital. Assyd tested positive for Covid-19 on April 7, 2020, developed sepsis, and died on April 12, 2020.

The mortality review reflected Assyd's vital signs were not properly documented on March 13, 2020, and, consequently, his assessment on that date did not prompt a referral to a provider. In addition, there was no "clear cut documentation" why he was transferred between facilities. Despite this, the mortality review found no issues with the care. Instead, officials merely made "recommendations" that transfers between facilities be accompanied by an explanation why the transfer was occurring and that referrals to providers "must be authorized timely based on level of urgency." (Ex. 155). In other words, the nurse responsible for the assessment on March 13, 2020, should have concluded Assyd needed to be seen by a higher-level provider.

**B. Kenneth Barker**

Kenneth Barker died on October 5, 2019, at the age of 68. He was housed in the Tucson complex. He was seen by a nurse on May 29, 2019, because of "foot pain with difficulty walking." There is no indication his feet were examined at that time, but he was referred to a provider. Before that provider visit, he was seen again by a nurse on June 10,

[17] The Court uses the full names of prisoners who died in ADCRR custody as their deaths are reported publicly. For prisoners who remain in custody, the Court will use their initials unless the prisoner testified at trial.

2019, for foot pain. Barker was told a provider visit had been scheduled but his feet were not examined.

On July 8, 2019, for the third time, he was seen by a nurse because of foot pain. This time, his right foot was examined. He was seen by a nurse for the fourth and fifth time on July 27 and August 6, with a note on August 6 as "unremarkable." Finally, at his sixth visit on August 21, 2019, a nurse examined his left foot and determined there was a 2.5 cm ulcer on the bottom of his left foot. He was referred a second time to a provider, but the examination did not occur until September 3, 2019, when the wound on his foot had become necrotic and he exhibited edema on his lower left leg between the knee and ankle.

Barker was sent to the hospital, where it was determined the ulcer may have been caused by several months of wearing ill-fitting shoes. Despite aggressive treatment, including amputation of his lower left leg, Barker died on October 5, 2019. His mortality review noted Barker should have been escalated to a provider in a "more timely manner" after two HNRs were submitted by him for the same complaint. (Ex. 159). The mortality review noted "[p]reventative measures not taken" and the diagnosis was "not timely." The mortality review recommended "[a]ll diabetic patients when seen for chronic care must have a visual assessment [of] the feet." The treatment of Barker illustrates the system relies on nurses to assess patients, even when the patient makes repeated complaints for the same issue.

**C. Cardinel Barnes**

Cardinel Barnes died on April 6, 2021, at the age of 37. He was housed in the Eyman complex. He had a chronic care visit on March 17, 2021 for asthma. The following week, on March 24, 2021, he saw a nurse for shortness of breath and an upper respiratory infection. He told the nurse he had three asthma attacks the previous day, his inhaler was not working, and he was so short of breath that it had taken him 30 minutes to get dressed. The nurse did not refer him to a provider. Instead, the nurse instructed him to call ICS[18] if

[18] Incident Command System, the health services' emergency response system. (Ex. 1305 at 30).

he had another asthma attack and his inhalers were not working. Barnes collapsed and became unresponsive on April 6, 2021. CPR was performed, but it was unsuccessful. The autopsy found evidence of valley fever. The mortality review questioned whether "the patient [should] have been referred to a provider for the complaints on shortness of breath and diffuse pain," but concluded "[t]he evaluation and recommendations by nursing were appropriate given the clinical presentation." (Ex. 160). Barnes is another example of a prisoner being unable to access a provider and instead being subjected to cursory treatment by a nurse.

**D. Andrew Barnhart**

Andrew Barnhart died on July 17, 2020, at the age of 72. He was housed in the Eyman complex. During the two years preceding his death, he lost over thirty pounds and had a body mass index of 15, demonstrating he was extremely underweight. A June 3, 2020, chest x-ray showed "near complete opacification [increased density] of the right upper [lung] lobe." Barnhart underwent a CT scan on June 26, 2020, which revealed a 14x10x12 cm mass. At that time, his blood pressure was 86/64, which was ignored. He was transported to the hospital on July 8, 2020 to evaluate abdominal and back pain with hypotension. He was taken into emergency surgery to address a perforated gastric ulcer, and a lung mass was discovered. Barnhart developed post-surgical complications and died. (Ex. 161). The mortality review stated the CT scan on June 26, 2020, presented "an opportunity for additional questioning, a blood pressure recheck, and elevation to the provider" regarding his blood pressure. But the record does not establish that the results of the CT scan and the low blood pressure were reviewed by anyone, which may or may not have resulted in a different outcome but certainly the lack of review presented a substantial risk of serious harm.

**E. James Edwards**

James Edwards died on January 1, 2020, at the age of 29. He was housed in the Eyman complex. He submitted his first HNR for leg and stomach pain on October 7, 2019 but did not see a nurse until November 8, 2019 and then a second time on November 17,

2019. It was noted he had a mass on his collar bone and an elevated heart rate. He was referred to a provider who did not see him until November 23, 2019. He complained of severe hip pain and the only diagnosis was mild osteoarthritis in his hip.

Twenty-four days later, on December 17, 2019, Edwards was seen by a provider after an ICS was activated for "shoulder pain," but the provider determined his shoulder was "normal." Another ICS followed on December 20, 2019, because Edwards felt "weakness and discomfort" and he was also "unable to keep water down." He was seen by a nurse who instructed "to drink more water in slow sips." Ten days later, Edwards became unresponsive and was transferred to the hospital where he died of valley fever. The mortality review accurately concluded nurses failed to recognize signs or symptoms, delayed access to care, and failed to follow clinical guidelines. (Ex. 229).

**F. Gabriel Figueroa**

Gabriel Figueroa died on December 11, 2020, at the age of 55. He was housed in the Tucson complex. He suffered from Hepatitis C and a variety of other conditions. He had a chronic care visit on November 27, 2020, and two days later, on November 29, he saw an RN because an LPN said he "did not sound good." Figueroa reported a cough that started the previous day, shortness of breath, and lethargy. His oxygen saturation was low at 92%. The nurse advised him to submit an HNR or initiate an ICS if he continued to experience shortness of breath. An ICS was initiated the next day when his oxygen saturation was recorded as 62%. He was transported to the hospital, where he died on December 11, 2020. His cause of death was listed as Covid-19 pneumonia.

The mortality review concluded the nurse who examined Figueroa on November 29 should have referred him to a provider "to determine the next steps" to determine the source of his illness (Ex. 241). This reflects another instance where a nurse did not accurately assess the prisoner's needs and prevented him from seeing a provider.

**G. Bruce Manthey**

Bruce Manthey died on December 31, 2019, at the age of 71. He was housed in the Tucson complex. He suffered from several preexisting conditions. An ICS was called on

November 29, 2019, because Manthey was experiencing painful edema bilaterally. Medical staff provided medication and advised him to keep his feet clean. Several days later, he saw health care staff to address a left shoulder abscess, but there was no mention of edema. Thirteen days later, Manthey had a nurse visit on December 12, 2019 for bilateral edema that began when he stood up in the morning. The record does not specify a diagnosis or treatment and the December 18, 2019 provider note does not mention edema or skin lesions. Another ICS was initiated on December 23, 2019, because Manthey could not sit in his wheelchair because of pain from his bilateral edema, which had grown to over 6mm of swelling. He was in pain, and open wounds on both feet were "draining foul discharge." No beds were available in the IPC unit, and he was sent to the emergency room. Manthey became septic, was admitted to the ICU, and he died on December 31, 2019 due to multiorgan failure secondary to sepsis. The mortality review set forth the obvious: Manthey's symptoms were not addressed according to the standard of care, and the documentation in his medical record did not reflect Manthey's actual condition. In particular, Manthey's "condition should have been elevated by nursing . . . due to obvious symptoms (edema, odor, drainage) of something wrong." There is no explanation how nurses could have missed these "obvious symptoms." (Ex. 327). This care illustrates the dangers of setting up the system such that nurses are the first, and often only, medical professional available to prisoners.

**H. Jose Miranda**

Jose Miranda died on August 4, 2019, at the age of 76. He had been housed in the Tucson complex infirmary or SNU since 2015. On July 25, 2019, after he returned from an off-site medical appointment, he was observed sitting up straight but seemed stiff on one side, flaccid on the other, and was not speaking. Despite these issues, staff did not send Miranda to a provider. The next day, he continued to have right side stiffness. He opened his eyes, but he was aphasic, had a weak left grip, and a minimal response to ammonia inhalant. He was sent to the hospital for stroke evaluation and died. The mortality review noted that when nursing evaluated him following his return from his

appointment on July 25, 2019, "his altered mental status and vital signs should have triggered the patient to be evaluated to the attention of a provider." (Ex. 344). This reflects yet another example of nurses missing obvious signs that merited referral to a higher-level provider.

**I. Gilbert Molina**

Gilbert Molina died on February 15, 2021, at the age of 73. He was housed in the Eyman complex. On January 11, 2021, he fell and was evaluated by nursing. At that time, Molina reported "10/10 pain." The nurse did not immediately contact a provider for diagnosis. Instead, an appointment was set and occurred two days later. The provider ordered x-rays, but not expedited and they occurred five days later. The x-rays revealed a fractured femur. Molina underwent surgery, but he contracted Covid-19, developed complications, and subsequently died. The mortality review noted "[a]n elderly patient with severe pain after a fall should be escalated to a higher level of care immediately." In addition, the x-rays should have been ordered "stat" not "routine." (Ex. 346). From the records, it appears the nurse was insufficiently trained and skilled to treat the condition Molina presented with on January 11.

**J. David Neville**

David Neville died on July 22, 2019, at the age of 59. He was housed in the Tucson complex. He had a history of squamous cell carcinoma at the base of his tongue for which he had received chemotherapy and radiation. In February 2017, a PET scan showed "lymph nodes suspicious for recurrence" of cancer. At that time, Neville complained of neck and throat pain. In October 2018, during a chronic care visit, he complained of "unrelenting pain in [his] throat." He was treated with pain medication for a short time, but the medication was discontinued because the pain "was not a result of cancer." Neville continued to have difficulty swallowing.

Neville hung himself on July 22, 2019. The mortality review noted it was "undetermined" if the death could have been prevented or delayed. The review also stated Neville submitted several HNRs due to unrelenting pain but "[n]ursing staff [did] not

appreciate the level and severity of pain symptoms and therefore no referrals [were] made to the health care practitioner." (Ex. 355). This reflects another example of nurses being insufficiently trained and skilled to fully diagnose and treat the presented condition.

**K. Pedro Rojas**

Pedro Rojas died on June 26, 2019, at the age of 51. He was housed in the Florence complex. On May 6, 2015, he reported he had been suffering from hemorrhoids and rectal bleeding for over a year. Results of three hemoccult tests ordered by a nurse were all positive for occult (hidden) blood, but there was no follow-up ordered. Rojas continued to complain of diarrhea and abdominal pain for years with no diagnosis. On April 19, 2017, hemoccult tests were repeated and, again, all were positive for blood. He was diagnosed with severe anemia and sent to the hospital.

At the hospital, a colonoscopy showed prominent hemorrhoids and a large fungating, nearly obstructing tumor of the colon. "Chemo radiation" was recommended. Rojas was transferred to Florence, and on May 17, 2017, he was seen by an oncologist. The record does not indicate the result of that examination but Rojas continued to complain of weakness. He was sent to the ER again and, upon his release, he was transferred to Lewis. He had been scheduled for radiation on June 21, 2017, but the appointment was overlooked. As of June 2017, his "abdominal pain continued to worsen" and he had to be sent to the hospital repeatedly "for blood transfusions for anemia due to blood loss from rectal bleed." Chemotherapy was finally started on August 7, 2017. He had additional hospitalizations for sepsis, pneumonia, and pyelonephritis, and underwent surgery in October 2017. At that time, he was noted to have Stage 4 cancer.

In April 2019, Rojas completed chemotherapy and radiation treatments and underwent a biopsy of a lung nodule, which showed necrotic adenocarcinoma consistent with metastasis. In May 2019, he developed a small bowel obstruction, and he was admitted to the infirmary on June 14, 2019. On June 21, 2019, Rojas developed hypotension and died. The mortality review noted that Rojas should have been referred to a health care practitioner in a timely manner after the initial positive hemoccult tests in

2015 and there were "significant delays from diagnosis to eventual treatment in addition to delays during treatment of the patient's cancer."

ADCRR and Centurion officials recognize the failures in Rojas' care. The mortality review notes that prisoner health care had "improved dramatically" in recent years and Rojas' death "most likely would not have taken place in the current health care delivery climate." It is unclear to what "current health care delivery climate" Defendants refer to as Rojas' case is relatively recent. (Ex. 398).

**L. Kamaka Solo**

Kamaka Solo died on September 15, 2019, at the age of 58. He was housed in the Tucson complex. On June 8, 2019, Solo began complaining of constipation. Solo's complaints worsened throughout June, and he complained of gastric distress, bloating, gas, abdominal pain, cramping, and continued constipation. He was seen by nurses and given laxatives. He returned in July 2019, complaining that "even drinking water causes pain," he was unable to eliminate despite trying and straining for hours, and he was unable to eat or sleep. He was referred to a provider, who did not see him until July 9, 2019. The provider ordered x-rays, which were deemed "normal." Again, on July 19, 2019, Solo returned with constipation, gas, bloating, constant pain due to abdominal cramps and inability to sleep or eat. As required, he was seen first by a nurse on July 20 and, after a referral, a provider saw him on July 25, who gave Solo medication for gas and heartburn as well as a laxative.

On August 1, 2019, Solo requested to see a specialist for unresolved pain. He stated, "I am in constant, excruciating pain, and all the treatment I have received so far has been totally ineffective." A nurse saw him and did nothing. On August 3, he submitted an HNR, which stated "[t]he pain is unbelievable, definitely a '10'. Could I please have an enema? I need help." Nursing diagnosed "constipation" and gave him "nothing."

On August 12, 2019, Solo submitted an HNR stating "[n]o human being deserves to endure the pain I am in 24 hours a day. Can you help me?" That resulted in a provider appointment on August 13, 2019. The provider repeated the x-ray order and ordered a

liquid diet but no diagnosis. Rather, on August 15, 2019, nursing again gave him a laxative. On August 18, 2019, an ICS was called due to Solo's chest pain. A hemoccult was ordered then cancelled, and a helicobacter pylori test was ordered. That same day, a nurse noted Solo's pain was "increasing" and he was sent to the IPC for observation.

While in the IPC, a provider requested a gallbladder ultrasound, but it was not authorized until September 3, 2019, and was never done. Solo was returned to his normal housing unit. On August 20, 2019, Solo reported to a provider that he had not eaten for 2 weeks. The provider once again gave a laxative and pain reliever.

Over the following days, ICS emergencies were called because of vomiting and extreme pain. Solo's heartrate was irregular, and an EKG was done and read with "sinus rhythm with occasional PVC, L anterior fascicular block and nonspecific T wave abnormalities." But Solo was sent back to his cell. On August 26, 2019, Solo was seen by nursing, who noted that Solo was "very uncomfortable, grimacing and moaning." On August 27, 2019, another ICS was called for chest pain, Solo's blood pressure was 96/64, and he was witnessed seizing and throwing up bile. Solo was finally sent to a hospital.

The emergency department performed a CT scan which revealed a large pancreatic mass and multiple hepatic lesions, likely metastatic. On September 10, 2019, Solo suffered a stroke while in the hospital. Solo was sent back to the prison on September 14, 2019 and died on September 15, 2019.

Solo's mortality review noted his "symptoms were worked up routinely and a diagnosis was attempted (as being H. pylori and constipation)." However, "[a]larming symptoms were missed and/or not elevated, and pain was not addressed adequately." The review recommended nursing staff "be provided education regarding multiple HNR[s] for the same complaint to be elevated to the practitioner."

From June 2019 through September 2019, Solo complained of unremitting and extreme pain. The response by nursing staff, on multiple occasions, was to do nothing. And even when elevated to a provider, diagnostic tests were ordered but not performed and Solo was given effectively no treatment for his pain. (Ex. 422).

**M. Macario Vela**

Macario Vela died on April 21, 2019, at the age of 43. He was housed in the Lewis complex. On April 6, 2019, Vela was seen by a nurse for pain in his left breast radiating to his back at the base of neck on the left side. The nurse identified a palpable lump in Vela's left shoulder. On April 10, 2019, Vela was scheduled to a see a provider, but the record states "refused." On April 14, 2019, he returned to a nurse complaining of increasing back pain in lumbar spine and radiating into left leg, stated he had not eaten in 3 days, and was walking stiffly. The nurse provided ice and "analgesic balm."

Vela was seen by nursing again on April 15, 2019, and after an abnormal urine dip, a urine drug screen was returned positive for opiates. At that visit, Vela had a temperature of 103 degrees. Vela was given fluids for some period but declined additional fluids and refused to see the provider. On April 20, 2019, an ICS was called for a suspected overdose and Vela died the next day.

Vela's autopsy revealed staphylococcus aureus sepsis due to chronic intravascular drug use. His mortality review noted failure to recognize symptoms or signs and patient non-adherence as contributing factors of Vela's death. But the review also noted Vela did not receive a timely diagnosis or treatment. Diagnosis could have potentially been made on the first visit given Vela's complaints, and the subsequent visits should have alerted the nurses that Vela was very ill. The mortality review noted poor documentation, there was no record of labs on April 15, 2019, and failure to closely monitor in that there was growing evidence of possible endocarditis. (Ex. 442). Vela may have refused to see a provider which is a complication, but given his symptoms, nurses should have been able to determine he was at very significant risk.

**N. Michael Voden**

Michael Voden died on June 16, 2019, at the age of 77. He was housed in the Florence complex. On intake on August 14, 2015, it was noted Voden had a history of hypertension and COPD. A heart murmur was detected and described as aortic valve dysfunction. On October 10, 2018, an ICS was initiated because Voden had "chest pain

10/10." Voden reported recurrent chest pain for two months with recurrent nausea. An EKG showed abnormalities and ischemia or subendocardial injury but no review by a provider. Voden was given antacids.

On December 28, 2018, a second ICS was initialed for "man down," and Voden reported generally feeling unwell and chest discomfort, but there was no record of calling a health care provider. On January 30, 2019, Voden reported chest pain with tightness and difficulty breathing to a nurse and a provider diagnosed COPD exacerbation, GERD, and pleuritic chest pain. On March 5, 2019, Voden had complained to a provider of a progressive leg edema for three years, and bilateral edema was noted, but the provider said it was due to sitting in a wheelchair. Voden's continued shortness of breath was attributed to COPD. On March 21, 2019, a third ICS was initiated for shortness of breath, crackles were heard in Voden's chest, and Voden had lowered pulse oxygen levels. Nursing staff noted shortness of breath on a subsequent appointment, and on March 26, 2019, a provider diagnosed possible congestive heart failure.

On April 14, 2019, Voden was seen by nursing for respiratory symptoms and edema and was instructed to "increase fluid intake." He was referred to a provider, who described him as frail but in no acute distress. The provider recommended that Voden "drink plenty of water," with no follow-up appointment. On April 18, 2019, a fourth ICS was initiated after prison staff witnessed Voden exhibiting labored breathing and nursing staff advised him to "hydrate and . . . be seen on nursing line." On April 20, Voden was seen on the nursing line and "diagnosed" with "poor air exchange secondary to Asthma." On April 29, 2019, the provider noted Voden had a "4+ edema" in his left leg with a loud murmur along with lung wheezes and assessed poorly controlled COPD and poor compliance with medication. On May 7, 2019, Voden reported "life threatening emergency respiratory, circulatory function" and requested to be seen by a provider outside of ADCRR. Nursing evaluated Voden and determined he had "fluid weeping from his [lower extremities] along with difficulty breathing and a 25 lb. wt. gain." Nursing referred him to a provider.

Voden was seen several times throughout May, and at the end of May, a cardiology

consult was requested. On June 5, 2019, Voden's condition had seriously deteriorated, and he was diagnosed with heart failure and pleural effusions, possible aortic stenosis, cellulitis of legs, and COPD, and was sent to the hospital. At the hospital, Voden was diagnosed with severe non-rheumatic aortic stenosis and deemed a poor candidate for surgery. He was also diagnosed with a number of other conditions, including acute renal failure. Voden died in the hospital on June 16, 2019, after he suffered cardiac arrest.

Voden's mortality review noted a pattern of nursing staff acting beyond their expertise and failing to recognize when referral to a provider was necessary. Nursing should have contacted a provider in October 2018 based on Voden's complaints of chest pains. Nursing should have contacted a provider on December 28, 2018, when Voden again complained of chest pain. The initial diagnosis of congestive heart failure in March 2019 should have been accompanied by other diagnostic tests, such as an echocardiogram, and further follow-up. The recommendation by nursing on April 14 to increase fluid intake very likely was inappropriate because of the serious edema. The provider's exam on April 15, 2019, was inadequate in that the provider failed to note the "significance" of the murmur accompanied by significant edema. Inexplicably, the provider also recommended that Voden increase his fluid intake. During the remainder of April and May 2019, medical staff repeatedly failed to properly diagnose Voden's condition. Overall, Voden's death was possibly avoidable. (Ex. 445).

Voden's case presents a situation where nursing staff ineffectively repeatedly attempted to treat him without referring him to a provider. In doing so, nursing staff missed obvious signs of other conditions and gave wrong treatment advice.

**O. Conclusions Derived from Mortality Reviews**

The mortality reviews illustrate the harm that routinely befalls prisoners because they do not receive timely and adequate health care. The common theme is nurses repeatedly are unable to properly diagnose health care issues and fail to refer prisoners to a provider. Despite these reviews, Defendants still maintain nurses act reasonably in evaluating prisoners. Dr. Wendy Orm, the statewide medical director, testified during her

Rule 30(b)(6) deposition that she is satisfied nurses appropriately assess patients and believes they accurately determine whether and when to refer patients to a provider for care. (Doc. 4148 at 46). Dr. Orm admitted, however, her opinion was not supported by any attempt on her part to validate nurses' assessments or prisoners' treatment. (Doc. 4148 at 47-49). Dr. Wilcox accurately found "Dr. Orm's failure to have conducted any quality assurance studies on the accuracy and appropriateness of the nursing assessments and on the limited throughput of patients to providers is an abrogation of her basic duties." (Doc. 4138 ¶ 146).

The reality that nurses do not, in fact, accurately assess prisoners and then refer them to providers is further supported by evidence from the Yuma complex. That facility conducted self-audits to determine whether nurses were selecting the correct NET assessment tool when evaluating a prisoner on the nurse's line. The numbers for selecting the correct assessment tool were as follows. At the La Paz Unit, the correct tool was selected between 0 and 20% of the time from May through August 2021. (Ex. 825 at 25); (Ex. 835 at 14); (Ex. 855 at 12); (Ex. 914 at 12). At other units, the correct tool was selected 43% and 58% of the time in September 2021. (Ex. 914 at 10); (Ex. 914 at 11).

This undisputed evidence shows nurses routinely selected the wrong NET when evaluating a prisoner. That does not necessarily establish the nurses reached inappropriate diagnoses. But if, as the evidence established, nurses are not using the diagnostic templates properly, it is likely the nurses are not properly assessing conditions.

ADCRR's response to the mortality reviews shows deliberate indifference of the deficient practice of placing nurses as the gatekeeper for diagnosis and treatment. Dr. Wilcox explained:

> It is clear, through my analysis of mortality reviews authored in the last two years, that there are still significant deficiencies in the process. I did not find the mortality reviews, on the whole, to be honest, thorough, or effective. They minimized the harm caused by healthcare staff, lacked the requisite specificity, failed to identify clear errors in care, failed to offer effective recommendations, and evidenced no staff accountability, even after identification of serious errors that led to a patient's death.

(Doc. 4138 ¶ 131). These reviews do not simply evaluate each prisoner's final interaction with ADCRR's health care. The reviews show systemic failures as well as ADCRR's failure to "identify and address the core cause of many of these problems: nurses practicing outside the scope of practice, insufficient physician-level oversight, and failure to refer the patient to someone qualified to diagnose and treat them." (Doc. 4138 at 56). Dr. Wilcox believes "the response and the write up for the mortality reviews are tepid, and I think they are very blunted and not really directive in any way to try to implement change that would prevent a case like this from happening again." (Doc. 4269 at 91). The mortality reviews demonstrate that, despite ten years of litigation, ADCRR has never created and then implemented a policy to identify systemic issues identified in mortality reviews and has not taken steps to remedy them.

Dr. Orm testified during her deposition if ADCRR identifies an "actionable" recommendation in a mortality review, then staff will develop a corrective action plan ("CAP"). But there was no evidence Defendants developed even one CAP through reviewing mortality reviews. Of significance, Dr. Murray agreed with the assessments of prisoners' care in the mortality reviews. (Doc. 4286 at 83). As part of his analysis, he also asked Defendants for data to evaluate whether recommendations in the mortality reviews were ever implemented but received none. (Doc. 4286 at 84). Dr. Murray was forced to admit "there remains some room for improvement in terms of consistently identifying and articulating actionable findings." (Doc. 4206 ¶ 1040). That is an understatement. The same failures arise in mortality reviews over and over and over—nurses not recognizing conditions, nurses not referring prisoners to providers, and diagnostic testing not being ordered or promptly obtained and reviewed—and yet not a single CAP was documented or identified. This constitutes systemic conscious disregard of the risk prisoners face.

The deaths outlined above, some very recent, were not aberrations or corrective action would have been implemented. No such evidence was introduced because it does not exist. Defendants' failure to take any action in response to such obvious deficiencies up to the date of trial is evidence Defendants are content to continue using nurses

inappropriately and failing to require medically appropriate follow-up treatment.

Using nurses as the first line, and often last line, for providing care is medically unacceptable. While using nurses in this way is driven by a lack of higher-level staffing, that does not excuse Defendants from adopting a system that leads to preventable deaths. Dr. Wilcox states—and Defendants do not contest—ADCRR's high ratio of physicians to mid-level providers is an extreme outlier among health care systems. Dr. Wilcox was unaware of any "healthcare systems that provide primary care to patients on a large scale where the physicians are overwhelmingly outnumbered by the mid-level providers." (Doc. 4167 at ¶ 224). In Dr. Wilcox's credible opinion, large systems do not have ratios similar to what ADCRR has because "large systems inevitably have numerous patients who require complex care beyond the scope of mid-level providers." (Doc. 4167 at ¶ 224). Indeed, ADCRR recognizes this deficiency by indicating the ratio of mid-level providers to physicians set forth in their pending Request for Proposal is 2:1. (Doc. 4206 ¶ 1071). It is obvious the present system of often allowing prisoners access only to nurses puts prisoners at a substantial risk of serious harm.

**IV. Mismanagement of Complex Cases**

Another failure that stems from lack of staffing is ADCRR's failure to employ a differential diagnosis approach. Symptoms are treated without developing a "diagnostic strategy" or attempting to test for the underlying cause. Recurring complaints by prisoners are often treated as "new" issues at each appointment without taking account of previous diagnoses and history. (Doc. 4138 ¶ 30). And Dr. Wilcox found "care for complex patients is scattered throughout the system so no one provider or physician is ultimately responsible for the patient[.]" (Doc. 4138 ¶ 29). Because it is impossible for providers with demanding caseloads (due to insufficient staffing) to assess prisoners' history and symptoms, practitioners miss "with alarming frequency" serious and urgent medical symptoms. (Doc. 4138 ¶¶ 29, 31). "That impossibility translates directly into inadequate care" for all prisoners but particularly for those with severe illness. (Doc. 4138 ¶ 29).

This leads to failures or delays in diagnosing serious conditions. What is entirely

absent from nearly every patient interaction is an objective approach to their symptoms. The absence of differential diagnoses is particularly problematic because prisoners often do not see the same health care provider. On top of this multi-provider problem, the electronic health records system used does not provide health care providers with information in an easily usable format to facilitate evaluation allowing an effective course of treatment. (Doc. 4138 ¶ 31). The lack of differential diagnoses and progression through ruling out ailments is pervasive and is shown through the treatment provided to many prisoners. Dr. Wilcox reviewed the following prisoners' care and made extensive findings. Defendants did not dispute any of them. Given Dr. Wilcox's ten years of experience in this litigation, his expertise and credibility, and Defendants' failure to address Dr. Wilcox's opinions, the Court adopts Dr. Wilcox's views that the care provided to the following individuals was grossly inadequate.

**A. Kendall Johnson**

Johnson began her incarceration in 2015. In September 2017, Johnson submitted an HNR complaining her feet and legs had been numb for weeks. (Doc. 4138 ¶ 100). A nurse practitioner assessed her and indicated Johnson should be evaluated to rule out multiple sclerosis vs. idiopathic neuropathy. (Doc. 4270 at 24:18-25). The nurse practitioner, however, did not document Johnson's history or order any diagnostic tests. (Doc. 4270 at 25:13-26:3). Johnson continued to submit HNRs for the next two years and reported her symptoms were getting worse. (Doc. 4138 ¶ 104; Ex. 931 at 1-2). In response, she saw nurses, a NP, and starting in September 2018 a physician, all of whom failed to do proper physical exams or necessary imaging. (Doc. 4138 ¶ 105).

Again, in May 2019, Johnson told a physician she would stumble and fall to the ground and was unable to catch herself. No MRI was ordered, and the physician concluded she did not have MS, which, in Dr. Wilcox's view, was obviously incorrect. (Doc. 4138 ¶ 106). In July 2019, Johnson saw a physician again and recounted an ICS in June when her knees locked up. The physician described her gait with "flopping feet almost as if foot drop" and concluded she was likely suffering from "conversion disorder," which, in

essence, means she is delusional. It is an "extraordinarily rare condition . . . where somebody believes that they have a disease and they act like they have a disease, but they don't really have the disease." (Doc. 4270 at 26).

Adding to the absurdity, in October 2019, a nurse's encounter note reflected inconsistently "steady and even gait" and "IM [inmate] gait was unstable, IM was holding onto anything she could while she was walking in." (Doc. 4138 ¶ 108). Two months later a physician ordered a diagnostic MRI after documenting that Johnson "walks almost as if you would see in a Frankenstein movie. Very awkward and needs her hands for balance." (Doc. 4138 ¶ 109). Three months later, Johnson received the MRI on January 23, 2020, which "strongly supported a diagnosis of MS." (Doc. 4138 ¶ 110).

Johnson did not see a neurologist until two months later, who recommended additional diagnostic imaging and lab tests and requested that Johnson return in one month. She did not return to the neurologist until November 2020, when she was finally diagnosed with MS. The neurologist recommended a follow up the following month, which did not occur. Rather, Johnson returned to the neurologist at the end of January 2021, who noted "mobility had progressively declined," requiring her to use a wheelchair, as well as urinary incontinence, and that she had not been given an MS medication. (Doc. 4138 ¶ 111). The specialist recommended she be sent to an MS center to develop a treatment plan. Her physician submitted a request to refer Johnson to an MS clinic, noting her "debilitating muscle spasms," but the referral was cancelled because Johnson was prescribed MS medication to be received in the prison. Johnson did not start the medication, Ocrevus, until May 28, 2021. (Doc. 4138 ¶ 108). Had that medication been started earlier, Johnson "might have staved off her more severe symptoms for months or even years." (Doc. 4138 ¶ 113).

Dr. Wilcox met with Johnson on August 31, 2021. He found her "profoundly disabled" and is unable to feed or wash herself, walk, write, and her vision is failing. She is entirely dependent on others to assist her with virtually every activity of daily living. Dr. Wilcox criticized the treating providers who indicated Johnson's symptoms were not

suggestive of MS and he opined they were classic MS symptoms. (Doc. 4138 at ¶¶ 100-108). He noted Defendants have Johnson classified as an M3 although she is unable to walk, feed, or care for herself. (Doc. 4138 ¶ 488). It is likely had Johnson received continuity of care by seeing a consistent provider with more ready access to her medical history, her repeated complaints would have resulted in a timely diagnosis and treatment, which would have "staved off her more severe symptoms for months or even years." (Doc. 4138 ¶ 113).

Johnson's testimony at trial was profoundly disturbing. She confirmed she is unable to perform any activities of daily living for herself. She cannot walk, brush her teeth, or wash herself. (Doc. 4256 at 11:19-12:4). She must wear diapers, her vision is impaired, and she can no longer read. (Doc. 4256 at 12:5-10). She testified she paid other prisoners to assist her with self-care activities by ordering things for them from the prison store until three days before her testimony when a medical employee first began to assist her. (Doc. 4256 at 12:11-13:11). Johnson explained she passes time in her housing unit by "count[ing] the ceiling tiles" because she does not go outside. (Doc. 4256 at 13:12-23).

Defendants defend their treatment of Johnson by claiming "ADCRR and Centurion were not, and are not, deliberately indifferent to Johnson's medical needs. To the contrary, they are actively and successfully treating Johnson's multiple sclerosis." (Doc. 4309 ¶ 236). According to Defendants, any delay in diagnosing Johnson was merely negligent.

Johnson's treatment was far from negligent. It was—and may continue to be—a paradigmatic example of the most callous and inhumane indifference. Defendants do not address Johnson's years of attempts without success to seek treatment for her progressing illness. Instead of securing necessary diagnostic treatment, health care staff ignored Johnson's obvious and progressing symptoms, including neglecting her needs up to the day of her pretrial deposition. Only after Johnson testified at her pretrial deposition that she had to pay other prisoners to help her did prison staff begin providing her assistance with her activities of daily living. To conclude that Johnson's treatment has been appalling substantially understates the pain and indifference she has suffered. And in the face of

unspeakable hardship, her testimony was clear and compelling. She could explain with precision the evolution of her disease, her futile attempts to receive treatment, and the permanent suffering she endures. Defendants' failure to rebut this testimony or to attempt to explain why it is an aberration is a clear admission of significant irresponsibility. If medical staff had tested differential diagnoses to evaluate the cause of her symptoms, Johnson's current situation likely would be different.

**B. Prisoner A.D.**

Last year before trial, in February 2021, A.D., a 44-year-old male, began complaining of severe neck pain. Verbal orders for an EKG, x-ray, and Toradol were noted along with prednisone, diazepam, capsaicin cream, and ibuprofen. (Doc. 4138 ¶¶ 116-117). Dr. Wilcox testified a combination of prednisone, ibuprofen, and Toradol is dangerous in that it could lead to a gastric ulcer or rupture. (Doc. 4138 ¶ 117). Although A.D. reported his pain at a 20 on a scale of 10, a provider, contacted by a nurse, denied the request for diazepam and Toradol and suggested an ice pack and ibuprofen, which he received. (Doc. 4138 ¶ 118). The next day, A.D. was back and seen by a different nurse who determined no referral to a provider or follow-up was needed. (Doc. 4138 ¶ 118). Six days later, an ICS was called for pain and A.D. was scheduled to a see a provider. The following day, A.D. was seen by a nurse practitioner, but she complained that he initiated an ICS "inappropriately." (Doc. 4138 ¶ 119). The nurse practitioner did not perform a neurological exam, did not test reflexes, and did not do an assessment for clonus—a neurological condition causing involuntary muscle contractions—despite A.D.'s claims of limited mobility and twinges of pain to the low back. (Doc. 4138 ¶ 119). On March 4, 2021, a rheumatoid panel was ordered, and the results showed acute inflammation, which strongly suggested infection. The nurse practitioner noted the inflammation but failed to note it was a sign of infection. Additional labs and studies should have been ordered after the test results were received, but the nurse practitioner noted only "[follow-up] in 1-2 wks." (Doc. 4138 ¶ 120).

On March 16, 2021, A.D. was transferred from Florence to Eyman. Over the next

two days, three ICSs were called for severe pain that affected his mobility. He was given two Toradol shots and had to be transported via wheelchair or gurney. (Doc. 4138 ¶ 121). On March 19, 2021, a nurse practitioner documented A.D.'s deterioration and increasing neurological dysfunction, including bladder incontinence and inability to ambulate for two weeks. That nurse practitioner sent A.D. by ambulance to a community hospital emergency room. (Doc. 4138 ¶ 122). At the hospital, A.D. was diagnosed with an epidural abscess, which was growing and compressing his spinal cord, causing all of his symptoms. A.D. had surgery and remained in the hospital for two months. (Doc. 4138 ¶ 123).

During the lengthy time the abscess had been allowed to grow, A.D.'s spinal cord was compressed and the nerves began to die. (Doc. 4138 ¶ 123). This resulted in long-term disability. As of September 2021, the close of discovery for trial, A.D. struggled to walk, even using a walker. He probably will never regain normal functioning and will be "substantially impaired the rest of his life." (Doc. 4138 ¶ 124). In Dr. Wilcox's unrebutted opinion, A.D.'s condition was preventable. If Defendants had diagnosed and treated A.D. competently, his disability could have been prevented. Instead, "all [A.D.'s] providers failed him." (Doc. 4138 ¶ 125). It is more likely than not that the failure to test differential diagnoses to understand what was happening with A.D. led to avoidable permanent injuries.

**C. Jesse Boldrey**

As of 2013, Boldrey weighed 190 pounds. At a chronic care appointment in 2015, he complained of weight loss and weighed only 146 pounds. The only treatment was to provide him a "wasting diet" and liquid supplements. (Doc. 4138 ¶ 33). In 2017, he complained of weight loss again and his records revealed that he had lost another 20 pounds (down to 126 pounds), despite eating all his meals. Boldrey told a doctor he feared he had cancer. Despite obvious warning signs for cancer, the physician ordered simple imaging, stool blood testing, and told him to stop smoking. (Doc. 4138 ¶ 33).

On June 18, 2018, Boldrey again complained of weight loss, but after a chest x-ray and HIV test, the nurse practitioner signed off on his case, continued his wasting diet and

ordered liquid nutritional supplements, and scheduled no follow-up. (Doc. 4138 ¶ 34). In December 2018, Boldrey had another chronic care appointment. The records from that appointment do not mention weight loss. (Doc. 4138 ¶ 35). In February 2019, Boldrey submitted an HNR complaining of vomiting, nausea, and bloody bowel movements. Boldrey complained he had lost 10 pounds in a week. When examined, his weight was down to 110 pounds. The nurse practitioner sent Boldrey to the hospital. (Doc. 4138 ¶ 36).

At the hospital Boldrey was diagnosed with a bleeding duodenal ulcer. The hospital obtained CT scan images of Boldrey's abdomen, which showed "scattered nodular opacities in the bilateral lungs concerning for metastatic disease." This was a "new and very serious finding" that demanded follow-up. (Doc. 4138 ¶ 36). When Boldrey returned to prison, a nurse practitioner noted the CT findings but failed to schedule a further consult or follow-up. (Doc. 4138 ¶ 37). And a few weeks later, a doctor discharged Boldrey to return to general population. Inexplicably, the doctor made a note that Boldrey was "doing well." The doctor made no mention of the abnormal lung findings. (Doc. 4138 ¶ 38).

In May 2019, Boldrey twice complained of a very sore throat. In response to the first complaint, the nurse noted his throat was red and neck glands were palpable. The nurse obtained a verbal order for an antibiotic from a nurse practitioner. The provider did not examine Boldrey and prescribing an antibiotic was wrong. (Doc. 4138 ¶ 39). At the second May visit, Boldrey complained of difficulty swallowing. The nurse noted the lung nodules documented in Boldrey's chart and referred him to the provider line on an urgent basis. (Doc. 4138 ¶ 40). On May 29, 2019, the doctor examined Boldrey and stated he suspected cancer. (Doc. 4138 ¶¶ 40-41).

A nurse attempted to schedule a CT of the chest, but the request was denied because "A CT of the chest was performed on 5/23/19," which was wrong. No CT had been ordered or given on 5/23/19. (Doc. 4138 ¶ 42). Likely the reviewing committee had mixed up patients. Despite that denial, somehow Boldrey was given CT scans on May 31 of his brain, abdomen, and neck. The provider who reviewed the results on June 19, 2019, noted probable metastatic disease. The provider noted Boldrey would be scheduled for the

earliest possible visit to review the CT results and develop a treatment plan. (Doc. 4138 ¶ 43). That visit did not happen. Instead, Boldrey and his obviously ominous diagnosis were ignored.

Boldrey was not seen until almost three months later when he complained that his throat hurt so badly he could not eat. (Doc. 4138 ¶ 44). At that appointment, Boldrey weighed 100 pounds. Despite the scan results in his file and the loss of 90 pounds from his original weight, the nurse practitioner instructed Boldrey to "eat slow and cut food into small pieces." (Doc. 4138 ¶ 45). The nurse practitioner did request a consult with an ear, nose, and throat specialist because there was a possibility of "neck injury, chronic pharyngitis/mass or tumor." (Doc. 4138 ¶ 45). There was no mention of the CT scan results. (Doc. 4138 ¶ 45).

On October 28, 2019, Boldrey was seen by a physician's assistant. The records from this encounter indicate the notes were completed in a "cut and paste" manner that made no sense. (Doc. 4138 ¶ 46). In one section the PA noted Boldrey allegedly denied weight loss, another section noted Boldrey had "significant weight loss," and yet another section reflected a box indicating "No" regarding "Recent weight/loss/cachexia." (Doc. 4138 ¶ 46). As Dr. Wilcox noted, this level of sloppiness in charting indicates "providers are just cycling patients through these visits as fast as possible with no intent to deliver thorough care." (Doc. 4138 ¶ 46). The lack of adequate staffing affects every interaction with every prisoner.

The ENT appointment requested on September 10, 2019, did not occur until November 5, 2019. At that appointment the ENT diagnosed Boldrey with an otopharyngeal mass suspicious for cancer, and recommended a CT scan, biopsy, and endoscopy. Due to Centurion's policy of not informing prisoners about recommended treatment and possible hospitalization for unidentified "security reasons," Boldrey was not informed of this diagnosis and was unaware of the recommended treatment. On his return to prison, Boldrey inaccurately told a nurse his complaint was throat pain and unintentional weight loss, not the throat and chest cancer he had just been diagnosed with. (Doc. 4138

¶ 47).

Boldrey was not seen again until November 25, 2019, when an ICS was called for coughing up blood. At that time, Boldrey's oxygen saturation was 77% and an ambulance was called. (Doc. 4138 ¶ 48). At the hospital, Boldrey was diagnosed with malnutrition, lung cancer, cervical lymphadenopathy, hypertension, anemia, and aortic aneurysm. The hospital recommended a referral to oncology for palliative care. (Doc. 4138 ¶ 49). Boldrey returned to prison on December 19, 2019. Upon his arrival, a nurse noted that the liquid nutrition would need to be held "until appropriate tubing is available." (Doc. 4138 ¶ 50). But strangely, a nurse practitioner significantly decreased the recommended pain management. The next day, the physician decided to put Boldrey back on ibuprofen four times a day without protection for his stomach, even though Boldrey previously had a life-threatening GI bleed from NSAIDs. At this time, Boldrey weighed 96 pounds. (Doc. 4138 ¶ 51).

Despite his inability to swallow because of the mass in this throat, Boldrey was prescribed pills (Tylenol #3) for pain. He was also started on another NSAID, Toradol. Thus, he was on ibuprofen and Toradol or "double NSAIDS." (Doc. 4138 ¶ 52). Because he could no longer swallow, Boldrey needed intravenous feeding. A patient receiving intravenous feeding needs weekly electrolytes testing. That testing was not done, leaving Boldrey subject to dangerous swings in electrolytes. (Doc. 4138 ¶ 52).

On December 25, 2019, a physician's assistant indicated Boldrey needed oncology and ENT consults for possible radiation therapy and again recommended palliative care. Centurion cancelled these referrals because Boldrey was designated "Do Not Resuscitate." (Doc. 4138 ¶ 53). This denial requires emphasis. A physician's assistant recommended a palliative care consult, but Centurion cancelled that referral because Boldrey had determined he did not wish to be resuscitated in the event he died. A "Do Not Resuscitate" directive has nothing to do with the need for palliative care. In other words, refusing extraordinary measures in the event of death is not a request to die suffering, in excruciating pain. In short, Centurion "cancelled palliative care for an end-stage cancer patient." (Doc.

4138 ¶ 53). The cruelty of Centurion's behavior is hard to fathom. As Dr. Wilcox testified,

> Mr. Boldrey's end of life care does not conform to any standard of care for palliative or hospice care. His cachetic body was racked with pain, and he wasted away with no reasonable assistance from medical science in the form of comfort or compassionate pain control. . . . [And it was] shocking to see how neglected he was in his end days when he was too weak to advocate for himself.

(Doc. 4167 at ¶ 57).

As of January 2020, Boldrey was still alive, but obviously wasting away. He continued to receive grotesquely inadequate pain medication. (Doc. 4138 ¶ 54). Eventually, on March 16, 2020, medical providers finally ordered IV morphine. (Doc. 4138 ¶ 55). That morphine arrived the following day, but the records show it was administered inadequately. Boldrey was supposed to receive doses four times per day. For the six days prior to his death, he received those four doses on only one day. On one day, he received only one dose. (Doc. 4138 ¶ 56). On March 22, 2020, Boldrey reported his pain was 9/10 and that he had "pain all over." Boldrey died on March 23, 2020. (Doc. 4138 ¶ 57). The mortality review determined the obvious: Boldrey's death could have either been prevented or delayed. (Doc. 4138 ¶ 58).

Unquestionably, Boldrey did not suffer from simple medical malpractice. Basic testing of differential diagnoses would have resulted in a much earlier determination of the cause for his complaints. A functioning health care delivery system would never suffer the magnitude of breakdowns reflected in Boldrey's seven-year odyssey of incompetence, cruelty, and eventual death.

**D. Walter Nusz**

Nusz, who had long-standing Hepatitis C, died on April 30, 2020 at the age of 60. (Doc. 4138 ¶ 60). On September 21, 2019, he had a lab test showing a fibrosis score of F-3, indicating severe liver scarring. (Doc. 4138 ¶ 61). This should have prompted medical providers to give Nusz liver ultrasounds and beta blockers, a pre-primary prophylaxis for upper GI bleeds, but Nusz was never given a liver ultrasound or beta blockers. (Doc. 4138 ¶ 61). Nusz also had a known platelet count of less than 150,00 per microliter, which

should have resulted in routine screening and surveillance for possible esophageal varices via an upper endoscopy at least once per year and to have any varices banded, which would prevent an upper gastrointestinal bleeding episode. Nusz was not given these screenings. (Doc. 4138 ¶ 61).

Nusz had complained of low back pain. (Doc. 4138 ¶ 73). The nurse practitioner overseeing his care managed those complaints with high doses of indomethacin, an NSAID. This medication "is one of the highest risk non-steroidals with respect to causing gastrointestinal bleeding." (Doc. 4138 ¶ 62). Given Nusz's underlying conditions, this medication "was the worst possible choice." (Doc. 4138 ¶ 64).

Between August 17, 2020 and January 15, 2021, Nusz's hematocrit level dropped from 46.3 to 38.2. This lab result suggested Nusz was bleeding internally after starting indomethacin. Nothing was done to address the lab result. (Doc. 4138 ¶ 62). Blood pressure readings also indicated his blood pressure was below the historical baseline, but the providers did not make any note of the issue. (Doc. 4138 ¶ 63). Although Nusz's pain increased after he was prescribed indomethacin, the nurse practitioner tripled the dose on March 23, 2021, without seeing him in person. (Doc. 4138 ¶ 64).

In the 42 days before his death, Nusz submitted five HNRs reporting severe pain, difficulty breathing, bleeding, an inability to eat, an inability to use the restroom, and an inability to walk. In a HNR dated March 24, 2021, Nusz complained he was in significant pain. He stated "This isn't a joke. It's my life [you're] playing with . . . Hurry before I die?? Hurry please." (Doc. 4138 ¶ 65). While Nusz recognized his condition was significantly worsening, all the health providers did not. Nusz was seen by at least six different registered nurses, who noted Nusz's troubling symptoms, but none referred him to a provider, and none identified the high dose of indomethacin was causing his symptoms. (Doc. 4138 ¶¶ 67-71). Nusz died on April 23, 2021, one month after the indomethacin was tripled, from a massive gastrointestinal bleed exacerbated by inappropriate indomethacin dosing in a patient with multiple contraindications. (Doc. 4138 ¶ 71).

Clearly Nusz's providers failed to monitor his fibrosis, failed to prescribe

preventative medications to minimize the chance of an esophageal bleed, failed to perform preventive upper endoscopies to identify and treat dilated blood vessels in the esophagus, failed to perform blood tests to monitor his coagulation state to see that his ability to clot was significantly impaired, worsened Nusz's conditions by prescribing him a contraindicated does of indomethacin, failed to notice the change in Nusz's lab results (his blood ammonia level was 350 (normal is 15-45) and his ability to clot was 2.06, (normal is less than 1.1)), and did not take action when Nusz repeatedly reported significant changes in his condition. (Doc. 4138 ¶¶ 72-74). Finally, despite the fact that Nusz's care was plainly outside a nurse practitioner's scope of practice, there was no physician level oversight. (Doc. 4138 ¶ 74).

The mortality review could not determine if Nusz's death was avoidable. In Dr. Wilcox's credible opinion, that was "absurd." Medical providers gave Nusz a medication "absolutely contraindicated for people with serious liver disease." Then, when that medication caused significant problems, they increased his dose until his completely predictable death resulted. (Doc. 4138 ¶ 75). Again, this is not a situation where a prisoner had a single interaction with a single provider who did not accurately assess the situation. Instead, Nusz had months of contact, with numerous providers, all of whom failed to identify an obvious problem. The lack of meaningful attempts to diagnose Nusz's ongoing complaints led to his death. Even a marginally functioning health system would not have caused so many providers to get so much so wrong.

**E. Timothy Ashing**

Ashing, a 30 year-old, submitted an HNR on August 5, 2020, complaining of a "super sensitive" lump on his left testicle that had been there for two months. The nurse who evaluated him used the "musculoskeletal NET assessment" which, obviously, "has nothing to do with the genitourinary system." (Doc. 4138 ¶ 76). Ashing complained of testicular pain, but the nurse engaged only in assessing his handgrip, posture, and whether his gait was symmetrical. She told Ashing to "go easy" on workouts and report if his symptoms worsened. The notes inconsistently indicated that no follow-up was needed and

that he would be referred to the provider line. He was not referred. (Doc. 4138 ¶¶ 76-78).

On October 3, 2020, Ashing submitted a HNR stating his left testicle was swollen and he reported severe abdominal pain. He was seen by a nurse a few days later who referred him to Dr. Hines. Upon examination, Dr. Hines documented a 3 cm x 2 cm mass on Ashing's left testicle with tenderness to palpation and swelling. The doctor entered an order for an ultrasound but delayed an entire week to enter the lab orders. (Doc. 4138 ¶ 79). On October 23, 2020, an ultrasound was completed. The notes for that indicated a 2.6 cm left intratesticular mass "highly concerning for testicular malignancy. Recommend an urgent urology consultation." (Doc. 4138 ¶ 80). Dr. Hines reviewed the ultrasound report but noted she would discuss the issue with Ashing "at his next chronic care visit." (Doc. 4138 ¶ 81). Dr. Hines' lack of urgency is "astound[ing]" and "unethical." (Doc. 4138 ¶ 81). Dr. Hines only ordered a urology consult on an urgent basis. (Doc. 4138 ¶ 82).

Ashing saw a urologist via telemedicine on November 25, 2020, who recommended a radical orchiectomy STAT. Dr. Hines then waited three weeks, until December 13, 2020, to order the orchiectomy on a *routine* basis. That order was cancelled on January 22, 2021, because the urologist was no longer available. (Doc. 4138 ¶ 82). On February 16, 2021, Ashing saw another urologist. That "visit was essentially worthless" because Centurion did not provide the urologist with the previous ultrasound results or labs. Thus, the new urologist recommended the tests be repeated. (Doc. 4138 ¶ 83).

After some delay, additional labs and another ultrasound were completed on March 16, 2021. A nurse practitioner reviewed a lab result and noted Ashing's Beta HCG level of 81065 mIU/ml was "normal." In truth, the normal range for a male is <6.51 mIU/ml. Thus, the test actually showed Ashing's result was "astronomically elevated" and "massively abnormal." (Doc. 4138 ¶ 85). In Dr. Wilcox's view, the nurse practitioner's determination the result was "normal" establishes "she did not understand anything about the patient or the disease she was managing."[19] (Doc. 4138 ¶ 85). The result suggested

[19] Dr. Wilcox also described the nurse's "determination that this is resolved is absolutely incorrect." (Doc. 4271 at 47-48).

advanced testicular tumor burden. The nurse practitioner, again showing she did not understand, submitted a request for another "possible" urology consult. (Doc. 4138 ¶ 85).

The consult request was cancelled on March 30, 2021, when the urologist, who had now obtained the test results, told Centurion that Ashing needed urgent surgery. Ashing had a radical orchiectomy on April 8, 2021, but Centurion did not send Ashing back to the surgeon for post-surgical follow-up. (Doc. 4138 ¶¶ 86-87). In May 2021, Ashing was seen with obvious signs of gastrointestinal bleeding. (Doc. 4138 ¶¶ 89-90). On May 26, he submitted a request saying his stomach was painful and his stools were "dark almost black." (Doc. 4138 ¶ 90). He was seen by a nurse who ordered an x-ray at some unspecified time in the future. (Doc. 4138 ¶ 90). On May 29, Ashing submitted another request stating he "puked up black bio 3 times so far today and my stools are liquid black." (Doc. 4138 ¶ 91). He was seen by a different nurse who documented black stools, dark brown or black vomit, abdominal pain, and elevated heart rate. The nurse noted Ashing looked "very pale, almost jaundiced" but the obvious signs of internal bleeding failed to prompt additional treatment. Rather, the nurse sent Ashing back to his housing with fecal occult blood tests and a container for vomit. (Doc. 4138 ¶ 91). Ashing returned the same day with the vomit container which had "watery vomit with what appeared to be coagulated blood in it." (Doc. 4138 ¶ 92). Given the obvious indications of internal bleeding, Ashing should have been sent to a hospital immediately. Instead, a follow-up nursing appointment was made for the next day. (Doc. 4138 ¶ 92).

The follow-up appointment did not happen on May 30. On May 31, 2021, an ICS was called. The nurse reported Ashing was vomiting, had watery stools "black in color" and Ashing looked "*more* yellow today than yesterday." (Doc. 4138 ¶ 93). The nurse called a provider, who ordered that Ashing be sent to the emergency room. (Doc. 4138 ¶ 93). At the hospital, Ashing was diagnosed with a widely metastatic tumor and metastasis to the stomach, causing gastrointestinal bleeding. Just a few months before trial, on June 10, 2021, Ashing died after internal bleeding could not be controlled. (Doc. 4138 ¶ 94).

The mortality review found Ashing's death was preventable, there were repeated

failures to recognize symptoms, a delay in access to care, and failure to follow-up/identify abnormal test results. (Doc. 4138 ¶ 96). The repeated failures and delays in treating Ashing's cancer "cost him his life." (Doc. 4138 ¶ 96). As explained by Dr. Wilcox, when caught early, testicular cancer "is one of the most curable cancers" and has a success rate of 99% (Doc. 4138 ¶ 96; Doc. 4269 at 78:5-9). The repeated failure to diagnose the obvious would not happen in a functioning health care system.

**F. Summary**

Defendants believe the treatment and outcomes for Johnson, A.D., Boldrey, Nusz, and Ashing are simply isolated occurrences that do not establish a pattern or practice of providing deficient health care. But the overwhelming evidence shows these cases indicate the opposite. Given the number of encounters each of these individuals had with the medical system, including many different personnel, it is impossible to conclude their treatment represented isolated occurrences. Rather, these outcomes show that if a prisoner develops a serious health condition while in ADCRR custody, he or she is at substantial risk of grievous harm or death due to medical personnel's inability to accurately assess and diagnose such conditions.

A prisoner such as Johnson may present with ongoing and consistent complaints that need expertise to accurately assess and diagnose. Instead, the complaints may be ignored until they are too serious not to require intensive intervention, often when it is too late. Or a prisoner may present with recurrent complaints of pain that, if properly diagnosed, could be remedied with no long-term effects. But such a prisoner may end up like A.D., suffering from lifelong disabilities because multiple providers failed to diagnose him accurately. A prisoner facing death might be in obvious need of pain medication. Instead of providing relief, that prisoner may be treated like Boldrey, ignored and left to waste away in extended horrifying pain. A prisoner might obtain inappropriate medication to treat a condition, such as Nusz did. When that medication causes obvious, life-threatening side-effects, providers might increase the dosage, ensuring death. Or a young prisoner may present with complaints of testicular pain, as Ashing did. Staff might then

inexplicably assess his grip strength and, even if some treatment is provided, they will ignore obvious signs of painful distress that merit emergency action. No legitimate humane system would operate in this manner.

## V. Defendants' Challenges to Dr. Wilcox's Opinions Fail

Defendants attempt to undermine Dr. Wilcox's conclusions regarding systemic failures by challenging his methodology. Defendants complain Dr. Wilcox did not perform a random sampling and review of care provided to prisoners.[20] As previously explained, Dr. Wilcox's methodology, while not random, was appropriate and consistent with the practice by other experts. Again, as Dr. Wilcox noted, healthy patients are not an indicator of a system's capabilities. "It is the complex patients who test the capacity of staff and systems alike." (Doc. 4167 ¶ 25). If the issue is whether prisoners are provided adequate medical care, it makes sense to look to prisoners with serious needs and, in particular, those who suffer adverse outcomes, not those prisoners who have no contact with the medical system.

Defendants further attempted to counter Dr. Wilcox's opinions through their own expert, Dr. Murray. To assess the quality of care provided to all prisoners, Dr. Murray relied on Healthcare Effectiveness Data and Information Set ("HEDIS") metrics, which were developed by the National Committee for Quality Assurance ("NCQA"). Dr. Murray reviewed data from eOMIS utilizing the HEDIS parameters so he could evaluate the quality of health care across the ADCRR system and make comparisons between ADCRR and other health care systems. (Doc. 4206 ¶ 998). Dr. Murray selected the HEDIS metrics regarding only blood pressure control and diabetic care for review because, in his view, they represent two of the largest patient populations in both correctional and non-correctional settings. (Doc. 4286 at 31:6-32:13, Doc. 4286 at 123:21-124:4). Dr. Murray determined ADCRR's performance on HEDIS measurements for diabetes and

---

[20] During cross-examination, Dr. Wilcox was asked "how many examples of delays in obtaining specialty care do you need to see in a system of 28,000 patients for you to make the determination that it's systemic?" Dr. Wilcox responded "Well, I don't know that there's an actual magic answer for that, but you certainly see patterns with regards to those delays in the medical records that I reviewed." (Doc. 4271 at 27).

hypertension are higher than those provided by private health plans. (Doc. 4206 ¶ 1077). Dr. Murray concludes these scores are "reflective of a health system operating efficiently and focused on best care for the patients." (Doc. 4206 ¶ 1077). In other words, Dr. Murray concludes allegedly adequate testing and treatment of diabetes and hypertension, once those conditions have been accurately diagnosed, establish the entire prison health care system is operating effectively.

There are two problems with Dr. Murray's method and conclusion. First there is no reliable evidence that selecting only these two criteria—treatment of hypertension and diabetes—establishes the overall capabilities of a health care system like ADCRR's. The second is more fundamental. Dr. Murray's assessment assumes ADCRR adequately diagnoses and tracks the prisoners who suffer from hypertension and diabetes. And Defendants offered no evidence to confirm this unique theory. Dr. Murray necessarily only looks to data on prisoners who have previously been diagnosed with diabetes and hypertension. There was no evidence showing this data represents the entire population of prisoners actually suffering from these ailments and of course there could be prisoners with undiagnosed hypertension or diabetes. Certainly Defendants could have attempted to prove they had identified all such prisoners. But Defendants did not do so. In fact, given the level of care provided to prisoners discussed previously, it is overwhelmingly likely Dr. Murray's data does not include the entire relevant population. Dr. Wilcox specifically addressed this possibility during his testimony, indicating

> My concern with the chronic care list and how they're derived and managed is that I found in my review of the medical records that there frequently were . . . critical diagnoses missing from the master problem list, which is most likely how they're generating the reports for the chronic care list.

(Doc. 4272 at 83:19-24). Further, every witness who testified, including Dr. Murray, agrees ADCRR's electronic health record system, eOMIS, is fatally limited and flawed. The inadequacy of eOMIS is yet another reason to conclude ADCRR's records do not accurately represent all relevant prisoners or accurately represent prisoner health care

provided.

If that were not enough, Dr. Murray's own opinions about care provided to prisoners establish HEDIS scores are not a valid basis for assessing ADCRR's system. In an attempt to "validate" his HEDIS findings, Dr. Murray performed a random review of medical records of ten prisoners with at least two chronic condition diagnoses at all complexes except for Phoenix and Florence. Prisoners' charts were evaluated for quality of documentation, quality of chronic care, and quality of episodic care. A consultant reviewed the charts using the scale set forth in Appendix 2.[21]

Dr. Murray created this unproven scale himself for evaluation of only ADCRR's health care system. Under this eccentric evaluation method, even "excellent" charts could reveal a lack of preventative health care and very good charts may show delayed treatment. Of greater concern are the charts considered "good, fair, or poor." In particular, the explanations for charts that were labeled "good" establish "good" was often profoundly insufficient. The following are several examples of chronic care considered "good" by Dr. Murray's consultant.

Patient 1 in Tucson is an 81-year-old male who suffers from multiple chronic conditions including hypertension, diabetes, coronary artery disease, peripheral arterial disease, and other serious conditions. The chart review reflects "chronic care visits sometimes addressed all of the patient's problems and sometimes did not." (Doc. 4206 ¶¶ 214-217). Further, his chart revealed a "notable lack of detailed foot exams . . . with (later) documented severe peripheral arterial disease." (Doc. 4206 ¶ 221). There are no notes of an exam of the prisoner's feet, although there is a note that he "has pedal pulses [pulse found on top of a patient's foot]," which Dr. Murray describes as "interesting." (Doc. 4206 ¶ 221). The Court interprets the chart as documenting a finding of pedal pulses when the health care provider did not actually perform an exam. Dr. Murray muses that "one could wonder if earlier foot exams would have identified an issue" before Patient 1 developed gangrene and lost a toe to amputation. (Doc. 4206 ¶ 221). The summary of

[21] Dr. Murray did not independently review the patient's medical records prior to preparing his expert report.

Patient 1's chronic care noted "a lag in treatment of some problems and a lapse in treatment of various issues." (Doc. 4206 ¶ 224). This is not "good" health care. Rather, this affirmatively documents health care that presents a substantial risk of serious harm to this patient. The failure to conduct foot exams for a patient such as this creates a possibility of a seriously adverse outcome.

Patient 4 in Yuma is a 78-year-old male with multiple chronic conditions. (Doc. 4206 ¶ 363). In 2015, the provider documented Patient 4 had been experiencing chest pains monthly. (Doc. 4206 ¶ 366). But despite an abnormal EKG, nothing shows follow-up on "a very great pre-test probability of having heart disease." (Doc. 4206 ¶ 366). Also in 2015, the provider noted Patient 4 needed colon cancer screening because of a positive fecal occult blood test and low hemoglobin readings but no follow-up ever occurred. (Doc. 4206 ¶ 367). This is not "good" health care because it overlooks obvious, potentially serious, conditions that might lead to death. In reviewing Dr. Murray's scale as applied to this prisoner, the failure to follow-up on potential heart disease or abnormal colon cancer screenings would "markedly increase" the risk of harm, indicating the score of "good" is inaccurate.

Patient 2 in Douglas is a 44-year-old man with hypertension and a prior history of lymphoma. (Doc. 4206 ¶ 459). Patient 2 was seen by a nurse practitioner in September 2020 to address persistent headaches following a head injury; the nurse practitioner noted his blood pressure was 135/95 and prescribed a low-dose calcium channel blocker to address his blood pressure without lowering his already-low heart rate. The medication prescribed, however, was "inappropriate" and "should be avoided" if there is a concern about bradycardia. (Doc. 4206 ¶¶ 461, 464). Hypertension was officially added to Patient 2's problem list a few weeks later, but an EKG was not ordered for another year. (Doc. 4206 ¶ 461). This is not "good" health care but merely another example of care that creates a substantial risk of serious harm.

Patient 3 in Winslow is a 55-year-old male with multiple chronic conditions including cirrhosis and thrombocytopenia (low platelet count). (Doc. 4206 ¶ 619). While

housed at Eyman, staff refrained from ordering NSAIDs, which are contraindicated for Patient 3. (Doc. 4206 ¶ 624). But when he was transferred to Winslow, Patient 3 was prescribed NSAIDs, despite the notations acknowledging cirrhosis, low platelets, and "needing to add [chronic kidney disease] as a diagnosis." (Doc. 4206 ¶ 624). Patient 3 soon developed gastrointestinal bleeding, fecal tests were positive for bleeding, but no rectal exam was performed. (Doc. 4206 ¶ 625). Obviously this is not "good" health care. Patient 3 is at substantial risk of serious harm.

Patient 7 in Perryville is a 59-year-old female with diabetes, hypertension, and alcoholic cirrhosis. (Doc. 4206 ¶ 757). A July 2020 ultrasound showed "coarse echotexture" of her liver, splenomegaly, and a slightly dilated inferior vena cava. She had emergency nurse visits for abdominal pain in 2020. (Doc. 4206 ¶ 759). The consultant notes that Patient 7 has "an elevated risk of esophageal variceal bleeding," but "she has not been referred to a gastroenterologist." (Doc. 4206 ¶ 762). This is not "good" health care but an example of a health care system that is affirmatively ignoring conditions that present a substantial risk of serious harm.

Patient 4 in Safford is a 42-year-old male with several chronic conditions. He is Hepatitis C positive but there is no "management plan [] for HCV." (Doc. 4206 ¶ 824). He "should be considered to have significant, active liver disease with fibrosis, if not cirrhosis," (Doc. 4206 ¶ 824), but that was not noted as a problem, and he was prescribed contraindicated NSAIDs. (Doc. 4206 ¶ 824). This is not "good" health care but another prisoner who is at risk of serious harm.

Patient 4 in Eyman is an 81-year-old male with multiple chronic conditions. (Doc. 4206 ¶ 915). He was diagnosed with rheumatoid arthritis during his incarceration. (Doc. 4206 ¶ 918). The consultant states Patient 4 should be referred to a rheumatologist and concludes his "RA has not been well-managed." (Doc. 4206 ¶ 923). This is not "good" health care. Instead, the system has consigned Patient 4 to live with pain and limitations that could, with treatment, be alleviated.

These examples from 7 out of 8 complexes reviewed do not "validate" Dr. Murray's

HEDIS findings or his conclusion that the chart reviews establish a functioning system. Rather, these examples show that "good" scores reflect patients in ill-health and receiving deficient chronic care treatment.

There are additional takeaways from these chart reviews. 54 of the 79 prisoners reviewed received scores of Good, Fair, or Poor—67% of the total.[22] By Dr. Murray's own scoring system, a rating of Good presents highly questionable care, as outlined above. And scores of Fair or Poor present care involving obvious substantial risks of serious harm.

Analyzing Dr. Murray's chart reviews does not reveal a functioning health care system. It reveals a system with an electronic records system that everyone agrees is abysmal and must be replaced, a system that does not allow referral of patients who exhibit serious symptoms to providers, and a system that administers contraindicated and potentially deadly medications. Accepting Dr. Murray's belief that his sample was representative of ADCRR health care as a whole, the only possible conclusion is the system puts prisoners at a substantial risk of harm.

In addition to inadvertently establishing the risk of harm to prisoners through the chart review evaluation he chose to conduct, Dr. Murray did not evaluate the core deficiencies Dr. Wilcox identified, including those related to medication administration, specialty care, hospitalizations, discharge after hospitalizations, sick call, nursing care, and access to providers. Dr. Murray testified:

> **Question**: So, Doctor, you didn't do a similar evaluation or study or what you can call -- what you -- what Dr. Baillargeon[23] called critically important analysis on a number of other components of the healthcare system, such as medication administration; correct?
>
> **Dr. Murray**: Not a direct study, no.

---

[22] The Court also discovered several errors in Dr. Murray's chart reviews. Tucson only listed nine patients instead of ten (Doc. 4206 ¶¶ 214-315); Patient 5 in Tucson received a rating of Poor for chronic health care, but the score of 2 did not match the rating (Doc. 4206 ¶ 272); and Patient 10 in Winslow was determined to be not-applicable because he did not have any chronic care diagnoses, which is puzzling because the criteria for review of a patient was active chronic care diagnoses. (Doc. 4206 ¶¶ 700-701).

[23] Dr. Jacques Baillargeon is an epidemiologist at the University of Texas Medical Branch with whom Dr. Murray works and consulted when developing his opinions for this case. (Doc. 4286 at 53).

**Question**: You didn't do one on specialty care either?

**Dr. Murray**: Other than what we came across in the medical records, but not a special -- not a special study on that, no.

**Question**: And you didn't do one on hospitalizations?

**Dr. Murray**: No.

**Question**: Or discharge after hospitalizations?

**Dr. Murray**: Not a special study, no.

**Question**: Sick call?

**Dr. Murray**: We did not do a special study on sick call.

**Question**: You didn't do a study about patients who didn't get to see a provider?

**Dr. Murray**: We didn't do a special study on that, no.

**Question**: Utilization review, you didn't do that either?

**Dr. Murray**: Not a special study, no.

**Question**: Language interpretation?

**Dr. Murray**: Not a special study, no.

**Question**: Emergency care?

**Dr. Murray**: Not a special study.

**Question**: Nursing care?

**Dr. Murray**: Not a -- not a specific study, no.

**Question**: Radiology?

**Dr. Murray**: No, not a specific study.

**Question**: Preventive care?

**Dr. Murray**: Not a specific study.

(Doc. 4286 at 65:21-66:21). Dr. Murray use of HEDIS scores and his chart reviews have not established a well-functioning health care system at ADCRR. And of crucial importance, by offering and relying on Dr. Murray as their sole witness to establish a functioning health care system, Defendants effectively demonstrate satisfaction with the existing, completely highly inadequate system.

Dr. Murray's view that the health care system is operating appropriately is further undercut by the scores for Defendants' Performance Measures on fundamental components of any functioning health care system. These scores were monitored and reported by Defendants and are therefore undisputed evidence of random samples drawn from the complexes during 2021. The following scores reflect the success percentage for the monitored files at each complex.

Performance Measure 50 required urgent specialty consultations and urgent specialty diagnostic services be scheduled and completed within 30 calendar days of the consultation being requested by the provider. (Doc. 1185-1, Ex. B at 11). The table below reflects failures across the system but establishes some locations where "urgent" specialty consultations repeatedly did not occur within 30 days. The highlighted numbers are those that were less than the 85% performance required under the Stipulation.

**Performance Measure 50**

| | Jan. 2021 | Feb. 2021 | March 2021 | April 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 85 | 100 | 100 | 100 | 100 | 100 | 100 |
| **Eyman** | 58 | 76 | 69 | 82 | 86 | 90 | 100 |
| **Florence** | 69 | 83 | 74 | 81 | 79 | 85 | 93 |
| **Lewis** | 65 | 70 | 64 | 88 | 77 | 87 | 88 |
| **Perryville** | 85 | 90 | 81 | 95 | 89 | 89 | 97 |
| **Phoenix** | 75 | 100 | 100 | 100 | 100 | 100 | 100 |
| **Safford** | 100 | 100 | 80 | 100 | 100 | 100 | 100 |
| **Tucson** | 59 | 93 | 89 | 92 | 97 | 95 | 100 |
| **Winslow** | 100 | 86 | 100 | 100 | 100 | 100 | 100 |
| **Yuma** | 57 | 88 | 84 | 77 | 77 | 97 | 58 |

(Ex. 1263).

Performance Measure 51 required routine specialty consultations be scheduled and completed within 60 calendar days of the consultation being requested by the provider. (Doc. 1185-1, Ex. B at 11). The table below establishes prisoners were waiting at least two

months to obtain even routine consultations.

**Performance Measure 51**

| | Jan. 2021 | Feb. 2021 | March 2021 | April 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 86 | 97 | 95 | 100 | 100 | 100 | 100 |
| **Eyman** | 76 | 68 | 92 | 92 | 98 | 96 | 90 |
| **Florence** | 63 | 90 | 87 | 93 | 88 | 96 | 95 |
| **Lewis** | 60 | 82 | 83 | 84 | 83 | 92 | 93 |
| **Perryville** | 81 | 76 | 72 | 83 | 86 | 89 | 88 |
| **Phoenix** | 84 | 100 | 88 | 100 | 100 | 95 | 100 |
| **Safford** | 87 | 97 | 97 | 93 | 100 | 97 | 100 |
| **Tucson** | 80 | 83 | 85 | 90 | 94 | 95 | 93 |
| **Winslow** | 97 | 90 | 90 | 96 | 77 | 97 | 79 |
| **Yuma** | 72 | 86 | 86 | 80 | 88 | 88 | 86 |

(Ex. 1264).

Performance Measure 44 required prisoners returning from the hospital have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. (Doc. 1185-1, Ex. B at 11). The failures on this measure reflected below are inexplicable if the system was properly functioning. This Performance Measure involved some of the sickest prisoners in the system. As illustrated by Eyman, at times, there was only approximately a 50% chance a prisoner's discharge recommendations would even be reviewed, much less acted on, within 24 hours.

**Performance Measure 44**

| | Jan. 2021 | Feb. 2021 | March 2021 | April 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 100 | 86 | 100 | 100 | 75 | 100 | 100 |
| **Eyman** | 52 | 56 | 69 | 78 | 56 | 68 | 57 |
| **Florence** | 88 | 66 | 71 | 61 | 87 | 53 | 71 |
| **Lewis** | 81 | 88 | 66 | 72 | 71 | 76 | 76 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Perryville** | 82 | 79 | 88 | 95 | 81 | 92 | 82 |
| **Phoenix** | 50 | 50 | 100 | 100 | 100 | 100 | 0 |
| **Safford** | 100 | 100 | N/A | 100 | 100 | 100 | 100 |
| **Tucson** | 74 | 60 | 59 | 67 | 65 | 34 | 66 |
| **Winslow** | 55 | 100 | 100 | 83 | 100 | 100 | 100 |
| **Yuma** | 40 | 80 | 38 | 80 | 85 | 65 | 70 |

(Ex. 1259).

Performance Measure 13 required chronic care and psychotropic medication renewals be completed such that there was no interruption or lapse in medication. (Doc. 1185-1, Ex. B at 8). The numbers reflected below establish Perryville, Tucson, and Yuma, in particular, were simply unable to provide medication refills in a timely manner.

**Performance Measure 13**

| | **Jan. 2021** | **Feb. 2021** | **March 2021** | **April 2021** | **May 2021** | **June 2021** | **July 2021** |
|---|---|---|---|---|---|---|---|
| **Douglas** | 97 | 100 | 100 | 100 | 93 | 96 | 96 |
| **Eyman** | 86 | 84 | 84 | 80 | 92 | 88 | 92 |
| **Florence** | 88 | 65 | 77 | 86 | 88 | 88 | 75 |
| **Lewis** | 69 | 95 | 93 | 99 | 86 | 91 | 77 |
| **Perryville** | 84 | 82 | 86 | 79 | 74 | 73 | 86 |
| **Phoenix** | 94 | 91 | 91 | 97 | 98 | 95 | 100 |
| **Safford** | 90 | 90 | 100 | 90 | 100 | 97 | 100 |
| **Tucson** | 90 | 94 | 94 | 82 | 67 | 70 | 79 |
| **Winslow** | 100 | 100 | 100 | 100 | 93 | 100 | 100 |
| **Yuma** | 64 | 74 | 78 | 74 | 68 | 76 | 96 |

(Ex. 1256).

Performance Measure 37 required prisoners be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). (Doc. 1185-1, Ex. B at 8). The numbers below

establish prisoners experienced significant delays in being seen by a nurse. Given that nurses are treated as a mandatory first step in obtaining care, any delay in seeing a nurse will necessarily result in a significant delay in seeing a higher-level provider.

**Performance Measure 37**

| | Jan. 2021 | Feb. 2021 | March 2021 | April 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 85 | 100 | 100 | 100 | 100 | 100 | 100 |
| **Eyman** | 58 | 76 | 69 | 87 | 86 | 90 | 100 |
| **Florence** | 69 | 83 | 74 | 81 | 79 | 85 | 93 |
| **Lewis** | 65 | 70 | 64 | 88 | 77 | 87 | 88 |
| **Perryville** | 85 | 90 | 81 | 95 | 89 | 89 | 97 |
| **Phoenix** | 75 | 100 | 100 | 100 | 100 | 100 | 100 |
| **Safford** | 100 | 100 | 80 | 100 | 100 | 100 | 100 |
| **Tucson** | 59 | 93 | 89 | 92 | 97 | 95 | 100 |
| **Winslow** | 100 | 86 | 100 | 100 | 100 | 100 | 100 |
| **Yuma** | 57 | 88 | 84 | 77 | 77 | 97 | 58 |

(Ex. 1258).

Dr. Murray did not address any of Defendants' own Performance Measure scores or explain why they do not undermine his claims of a functioning health care system.

## VI. Medical Care Conclusion

There is patently insufficient, and more often than not incompetent, health care staffing to adequately meet prisoners' needs. The majority of medical care staff do not have necessary training or licensure to provide the type of care that is necessary to provide constitutionally adequate care. This is a completely ineffective and toxic combination. The patterns of delay and indifference are pervasive in ADCRR's own mortality reviews. Defendants have refused to remediate these practices to comply with their constitutional obligations.

## MENTAL HEALTH CARE

In addition to serious medical care needs, it is undisputed Arizona's prisoners suffer from serious mental health needs. Defendants' records reflect 8,548 prisoners on the "mental health caseload," meaning they have scores of MH-3 or above and require ongoing treatment for an active mental health diagnosis. (Ex. 3326). This large population undoubtedly is difficult to manage. However, Defendants' failure to hire sufficient competent staff means prisoners with serious mental health needs are ignored.

As with medical care, the parties presented competing experts on the issue of mental health care. Again, Plaintiffs' expert was far more credible. He testified "it's hard for me to adequately express how significantly ill the individuals that I encountered are. They were among the most mentally ill individuals that I have seen throughout my 40 years of being a psychiatrist." (Doc. 4260 at 36:2-6). The evidence at trial established Defendants' system for the provision of mental health care creates a substantial risk of harm created by their refusal to hire adequate staff to provide necessary mental health care.

### I. Overview of Expert Testimony

#### A. Dr. Stewart

Plaintiffs' expert was Dr. Pablo Stewart. He earned a bachelor's degree in chemistry from the U.S. Naval Academy in 1973 and, after serving in the U.S. Marine Corps for five years, earned a medical degree from the University of California, San Francisco in 1982. (Doc. 4109 ¶ 2). After graduating from medical school, Dr. Stewart received the Mead-Johnson American Psychiatric Association Fellowship and became board-certified in psychiatry. (Doc. 4109 ¶ 2). Dr. Stewart currently serves as a clinical professor and psychiatrist at the Burns School of Medicine at the University of Hawai'i. (Doc. 4109 ¶ 1). He serves as an attending psychiatrist at the Oahu Community Correctional Center and supervises psychiatry residents. (Doc. 4109 ¶ 1). Dr. Stewart has served as Plaintiffs' mental health care expert in this case since 2013.

In preparing for his trial testimony, Dr. Stewart reviewed current ADCRR and Centurion policies, procedures, and practices; reviewed numerous documents and class

members' medical charts; and conducted on-site inspections and class member interviews in September 2021 at Eyman, Perryville, Phoenix, and Tucson. During those inspections, he visited housing units where people classified SMI are incarcerated, units designated for people with mental health needs (regardless of classification), mental health watch units, isolation units including maximum custody and detention units, and interviewed class members incarcerated in these units. (Doc. 4109 ¶ 8). Dr. Stewart also followed up with the people he originally evaluated in 2013. (Doc. 4260 at 16). All documents Dr. Stewart reviewed are listed in Exhibit 4 to his written declaration. (*Id.* ¶ 15; *see* Doc. 4109-1, Ex. 4).

**B. Dr. Penn**

Dr. Joseph V. Penn testified for Defendants as their mental health care expert witness. He earned a bachelor's degree in biology from the University of the Incarnate Word in San Antonio, Texas in 1987. (Doc. 4172-1, Ex. 1). He earned his medical degree from the University of Texas Medical Branch in 1992. (Doc. 4172 ¶ 9). After graduating from medical school, Dr. Penn completed a fellowship in Forensic Psychiatry from Yale University. (Doc. 4172 ¶ 9). Since 2008, Dr. Penn has served as the Director of Mental Health Services for UTMB Correctional Managed Care. (Doc. 4172 ¶ 12). Dr. Penn has served as Defendants' mental health care expert in this case since 2013. (Doc. 4172 ¶ 2).

Dr. Penn did not interview any class members.[24] Instead, he generated a random selection of charts from prisoners at ADCRR's facilities that house prisoners with a MH score of MH-3 or higher: Eyman (15 prisoners); Florence (15 prisoners); Lewis (15 prisoners); Perryville (30 prisoners); Phoenix (15 prisoners); Tucson (15 prisoners); and Yuma (15 prisoners). (Doc. 4172 ¶ 48; *see* Doc. 4174, Ex. 4). Dr. Penn also conducted tours of facilities that house prisoners on the mental health caseload: Phoenix, Eyman, Lewis, Perryville, Yuma, and Tucson. Dr. Penn met with each facility's health care

[24] Dr. Penn stated he "was not allowed to actually interview or evaluate any inmate[.]" (Doc. 4289 at 28:1-2). This is untrue. Upon cross-examination Dr. Penn explained Defendants' counsel told him he "was prohibited from speaking to inmates because they said the plaintiffs didn't want me talking to inmates unless they were present." (Doc. 4283 at 11:21-24). Dr. Penn chose not to speak to the prisoners in the presence of their counsel.

leadership. (Doc. 4172 ¶ 52). All documents Dr. Penn reviewed are listed in Exhibits 2 and 3 to his written declaration. (*Id.* ¶ 47; *see* Doc. 4174-1, Exs. 2-3).

**II. Staffing is Chronically Insufficient**

As with medical care, Plaintiffs' primary claim regarding mental health care is inadequate staffing. Therefore, the Court evaluated whether sufficient mental health care staff are employed to address Arizona's prisoners' serious mental health needs. As stated, the contract between ADCRR and Centurion requires 1052.75 FTEs. (Doc. 4287 at 17:11-12). This overall staffing allocation includes health care, mental health care, dental care, and administrative staff. Plaintiffs contend the mental health care staffing reflected in the contract is too low and, because of current vacancies, many complexes are substantially understaffed. Defendants contend current staffing levels, even though they are markedly beneath the levels contemplated by the contract, are sufficient to meet their constitutional obligations.[25]

Centurion provides the following mental health care staff positions: Behavioral Health Technician; Behavioral Specialist; Mental Health Lead; Mental Health Clerk; Mental Health Midlevel (NP/PA); Mental Health Registered Nurse; Psychiatrist; Psychologist; and Psychology Associate. The tables at Appendix 3 represent the number of mental health care staff required by the contract, the number of hired staff, and the difference between those two numbers. These figures are as of August 2021. (Ex. 2167).

As of August 2021, only 149.55 mental health care staff were hired in contrast with 199.00 required under the contract with Centurion, reflecting only 75% of positions are filled. Every location is understaffed except for Winslow and Safford, which each have only one psychology associate. Similar to medical care, Defendants have structured the system to have the vast majority of care provided by lower-level individuals. Thus, the majority of individuals providing mental health care are behavioral health technicians, nurses, or psychological associates.

[25] Defendants concede the staffing levels are too low and below contract requirements, but they argue they cover the deficiencies with overtime.

Based on the contract staffing level, at some point in time Defendants decided 199.00 mental health positions were actually necessary to provide adequate care to the prisoner population. That staffing level has never been achieved. (Doc. 4264 at 99:17-24). But the critical issue is not the contract staffing level. Rather, the issue is whether the actual staffing numbers, which are far below the contract staffing level, present a substantial risk of serious harm to prisoners. Dr. Stewart testified the number of filled positions "is abysmally low." (Doc. 4109 ¶ 20). In contrast, Dr. Penn concludes "ADCRR's contracted mental health services vendor, Centurion, has adequate numbers and types of mental health staffing." (Doc. 4172 ¶ 66). The Court first analyzes Dr. Penn's position.

Dr. Penn testified there is adequate staffing to meet the prisoner population's needs. But his opinion is not based on an accurate and careful analysis of the population's needs. Instead, Dr. Penn claimed it would be inappropriate to require a specific staffing formula because doing so would deprive the system of "flexibility." (Doc. 4289 at 40:16-22). He claims "staffing levels should be assessed for a particular system based upon a clinical determination that adequate mental health services may be, or are, provided by a particular number of various types of professional staff." (Doc. 4172 ¶ 65). In Dr. Penn's opinion, NCCHC's allegedly straightforward staffing standard makes "perfect sense"—the health care system or facility must merely have adequate staff to provide the services required or needed. (Doc. 4289 at 41:9-17). This theory is simplistic. When applied to ADCRR, it makes no sense.

According to Dr. Penn, because ADCRR created a specific staffing requirement of approximately 199 FTEs, that number should automatically be accepted as adequate without challenge. That is circular logic. Dr. Penn never testified to explain how ADCRR developed its staffing allocation or why that arbitrary number was deemed sufficient to "provide the services required or needed." Based on the evidence, it is nothing more than a number pulled out of thin air. This conclusion again encapsulates in one stroke the absurdity of ADCRR's reliance on NCCHC certification to establish the system is

functioning well. Under Dr. Penn's theory, if ADCRR decided that one mental health staff position was needed for the entire prisoner population, then that decision could not by challenged. But ADCRR's unexplained, unsupported, and unreliable opinion regarding the adequacy of staffing for the entire prison mental health care system is contrary to the evidence.

ADCRR failed to present evidence demonstrating that its contract staffing allocation was based on an actual reliable assessment of the need for services. In fact, many witnesses, including those from ADCRR, testified that more mental health care staff beyond the contract staffing level are needed to provide adequate mental health care. Dr. Stefanie Platt, Centurion's former regional mental health director for ADCRR, testified she raised this concern to her superiors.

> **Question:** And if even 100 percent of the contracted positions were filled, was there still more patient need than the staffing plan could meet?
>
> **Dr. Platt:** In my opinion, yes.
>
> **Question:** Did you raise your concerns about this, about the adequacy of the contract, with anybody?
>
> **Dr. Platt**: Yes.
>
> **Question:** With whom?
>
> **Dr. Platt:** Dr. Carr, Mr. Dolan.

(Doc. 4264 at 100:2-10). Dr. Antonio Carr is Centurion's Statewide Psychiatric Director and Tom Dolan is Centurion's Vice-President of Operations in Arizona. Dr. Platt further testified mental health staff at the "vast majority" of complexes, including Eyman, Phoenix, Lewis, Florence, Perryville, and Tucson, told her of their concerns about caseloads being too high. (Doc. 4264 at 105:4-96). During his Rule 30(b)(6) deposition Dr. Carr confirmed staff repeatedly told him additional staff were needed. (Doc. 4146-1 at 47:16-19 (testifying that "it's not uncommon for a mental health nurse or psychology associate to say, 'Hey, Carr, I think we need more staff'"). This was corroborated by Dr. Pennington-Stallcup, ADCRR's Mental Health Program Director.

During Dr. Pennington-Stallcup's cross-examination, Plaintiffs introduced an

August 27, 2020 email Dr. Pennington-Stallcup sent to Defendant Gann, wherein she expressed concerns about vacancies in mental health care provider positions. The staffing numbers reflected in Appendix 4 were referenced in the email.

Based on these numbers, Dr. Pennington-Stallcup noted there are "significant vacancies in clinical mental health staff who are primarily responsible for providing [] behavioral health contacts." (Doc. 4276 at 93:25-94:3). Later in another email to Dr. Platt on November 9, 2020, Dr. Pennington-Stallcup wrote, "I'm really concerned about the vacancies at Florence and Eyman given the high-need and high-risk patient populations." (Doc. 4276 at 95:15-19).

During her direct testimony, however, Dr. Pennington-Stallcup retreated from her original concerns about staffing, stating she was no longer concerned. (Doc. 4276 at 90:2-8). She attempted to explain by testifying that she performed a "new analysis" based on allocated staffing. Without explanation, she claimed during trial if all the positions were filled, mental health caseloads would be manageable. (Doc. 4276 at 100:21-24). This "new analysis" is incredible and nonsensical.

Comparing clinical mental health staffing levels from August 2020 until August 2021 shows the "significant vacancies" that originally concerned Dr. Pennington-Stallcup have not meaningfully changed, and some are worse. More importantly, Dr. Pennington-Stallcup never explained why it would be reasonable to rely on staffing levels that have never been achieved. Accordingly, Dr. Pennington-Stallcup's new opinion is unreliable and not supported by evidence. In contrast, Dr. Stewart's opinion which is based on analysis of the substantial evidence before the Court that "systemic deficiencies in the provision of mental health care are rooted, in whole or in part, in ADCRR's chronically inadequate health care staffing," is credible. (Doc. 4109 ¶ 32).

## III. Inadequate Staffing and Failure to Provide Adequate Mental Health Care

The lack of mental health staff negatively impacts the ability to provide adequate mental health care. The staffing allocation reflects only seven allocated psychiatrist positions for the entire ADCRR population, and the evidence reflects only two of them

physically work on-site. (Ex. 1531 May 2021 Staffing Report, Native Format at "All Staff" tab showing "Psychiatrist TH" [Tele-Health] at Eyman, Florence, Lewis, Perryville, Tucson, and Yuma, and two "Psychiatrists" (without the TH qualifier) at Phoenix and Yuma complexes). Dr. Stewart specifically referenced Eyman's two psychologists and stated he does not "see how one or two psychologists could even begin to address the needs at that [facility]." (Doc. 4260 at 21). The number of psychologists on staff varies from 0 (Douglas, Safford, Winslow, and Yuma), to 0.9 (Florence), to 1.75 (Perryville), to 2 (Eyman, Lewis), to 2.5 (Phoenix), to 3.9 (Tucson).

In addition to midlevel providers, psychology associates act as providers. But there are 14 psychology associates (out of 59) who are listed as not being licensed, including 4 at Eyman, 2 at Florence, 3 at Lewis, 1 at Perryville, 2 at Phoenix, and 2 at Yuma. Dr. Stewart explains that he observed a "disturbing pattern" of "mental health staff without pharmacological training serv[ing] as de facto gatekeepers of patients' access to psychiatric prescribers." (Doc. 4109 ¶ 22). Without sufficient mental health providers with appropriate training, the outcome is the inability to provide varying levels of support for mental health conditions.

**A. Inpatient Treatment Units and Inadequate Treatment at Existing Units**

Defendants have inpatient units for prisoners with the most serious and intensive mental health needs. Dr. Stewart's opinion is the current system reflects a lack of inpatient intensive mental health care. For example, ADCRR provides inpatient psychiatric treatment for prisoners with severe mental illness at the Phoenix complex. A review in September 2021 just before trial reflected only one-third of the beds at that complex were in use. (Doc. 4109 ¶ 46). Dr. Pennington-Stallcup testified the inpatient treatment units are operating below capacity because, allegedly, there are not enough "patients in the system who need those beds." (Doc. 4277 at 34:15-20). During trial, however, the evidence showed prisoners needing significant inpatient treatment who were denied such treatment.

Dr. Pennington-Stallcup was specifically asked about a prisoner housed in Eyman,

a non-mental health treatment unit. On October 15, 2020, a mental health provider indicated that the prisoner "appears to need more mental health resources than are available at this location. He is a good candidate for a referral to the [residential treatment unit]." (Doc. 4277 at 34:14-35:3). (Ex. 2401). While not entirely clear, it does not appear he was ever transferred to an inpatient facility. It was clear, however, that approximately one year later in 2021 this prisoner was housed in the same unit he had been housed in as of October 2020. And Dr. Stewart identified other prisoners that needed inpatient level care but were not being housed in such facilities or their transfer to an inpatient facility had been delayed. The explanation that follows of those prisoners' diagnoses as well as Dr. Stewart's opinion illustrates that Defendants have failed to provide inpatient treatment for those who seriously needed it.

T.A. is designated as seriously mentally ill and has a history of self-harm. Dr. Stewart interviewed him when conducting a tour of the Eyman complex in September 2021. T.A. was on continuous watch and was laying on the floor. Dr. Stewart noted he was "extremely disheveled and reported experiencing command hallucinations" telling him to hurt himself. In June and July 2021, T.A. had repeatedly cut or otherwise harmed himself with ICS responses being called on a regular basis. On one day, July 18, three ICS were called for self-harm. On July 26, 2021, T.A. was found hanging with both feet off the ground. After he was discovered, he was placed on suicide watch. The assessment and diagnosis sections of the notes were blank. (Doc. 4109 ¶ 51). Dr. Stewart reliably testified T.A. needed to be "urgently transferred to an inpatient hospital setting." (Doc. 4109 at ¶ 51).

D.V. was on suicide watch at the Eyman complex on September 8, 2021, when Dr. Stewart encountered him. D.V. informed Dr. Stewart he previously took the mood stabilizer Trileptal, but it was discontinued because staff told him "inmates abuse it." (Doc. 4162 at ¶ 52). D.V. has a history of cutting himself, with one incident requiring he be sent to an outside hospital because he lost a significant amount of blood. Dr. Stewart was so alarmed by D.V. that he requested Plaintiffs' counsel notify ADCRR and Centurion

immediately that D.V. required transfer to an inpatient mental health care. (Doc. 4109 ¶ 52). Dr. Stewart's urgent recommendation was ignored and the following week D.V. cut himself again. A psych associate prepared a treatment plan the next day that failed to address possible medication modification, or transfer to inpatient mental health care. (Doc. 4109 ¶ 53). Dr. Stewart credibly concluded the complexity of D.V.'s case exceeds the skills of a psych associate and D.V. needed to be transferred to a higher level of care.

M.S. is a 32-year-old prisoner at Eyman who Dr. Stewart interviewed. He has repeatedly hurt himself while on suicide watch. M.S. has had numerous hospitalizations for self-harming behaviors, including "cutting open his abdominal cavity" and "attempting to cut his own throat." His current diagnosis is Schizoaffective Disorder, bipolar type. His most recent hospitalization was "on September 4, 2021 [two months before trial], after cutting a 7-inch long by one-inch-deep laceration to his right arm, swallowing three razor blades, and inserting three spork handles into his abdominal scar – ***all while on continuous watch at Kasson***." (Doc. 4109 ¶ 54) (emphasis in original). The psychiatry midlevel staff member determined M.S. "does not respond to medications and continues to self-harm regardless of therapy and medication interventions." (Doc. 4109 ¶ 54). Absent from the record is any indication he was evaluated for inpatient care. Dr. Stewart credibly concluded M.S. needed inpatient care.

Finally, Dr. Stewart encountered K.C., a prisoner at Perryville on mental health watch. K.C. reported hearing voices instructing her to kill herself, and her medical record reflected multiple past diagnoses. ICS was initiated five times between September 3, 2021 and September 10, 2021 for bizarre behavior, including defecating and urinating on the floor. She was eventually transferred to inpatient treatment just before trial on September 16, 2021 but follow-up with a psychiatric provider was not scheduled for 30 days. (Doc. 4109-1 at 46). Dr. Stewart notes her persistent psychotic and mood symptoms were wrongly managed.

It is clear from the evidence these prisoners should have been placed in inpatient units or, for K.C., placed much earlier. There is no basis to conclude the inpatient units are

at only 36% capacity because there are not enough seriously mentally ill prisoners. What is more, though inpatient facilities are meant for the most challenging prisoners, those facilities also suffer from lack of sufficient staff, as illustrated by a prisoner named I.C. The following email to former ADCRR Interim Division Director of Health Services Richard Pratt and ADCRR Monitoring Bureau employee Vanessa Headstream on February 12, 2020, documents an appalling situation where ADCRR's own staff recognized urgent attention was needed for I.C. but the only trained mental health staff was "out of town."

> This mental health patient at Phoenix has been self harming by banging his head for the past several days resulting in multiple ICS events and the use of OC spray. Mental health appears to be at a loss on how to deal with this inmate.
>
> In an email sent today the Regional Director of Mental Health basically said to continue using OC spray as needed while the on site mental health team comes up with a treatment plan. We are told that Dr. Carr [the Regional Director of Psychiatry] has been consulted by phone but there is minimal documentation in the medical record to support any significant involvement by a psychiatrist. This inmate now has wounds on the back of his head and on his forehead from the head banging. There are staples holding the wound edges together on the back of his head but the forehead wound remains open as the two previous attempts to staple his frontal wound have failed because of the continuous head banging.
>
> We just received a copy of an I/R [incident report] completed by security staff from last evening indicating that the mental health RN was encouraging the inmate to bang his head so that the restraint chair could be used. At the time of this nurse/patient encounter, the patient was NOT participating in head banging but began banging his head after the nurse told him to do so . . . . which resulted in a Use of Force event. This entire event was captured on video.
>
> The FHA [Facility Health Administrator] and mental health apparently had a meeting this morning about this patient without having any input from Complex Operations. The FHA reported at the Warden Tracker meeting this afternoon that:
>
> - the patient has allegedly lost 30 pounds since December
> - Mental health staff and nursing staff are verbally reporting that the condition of this patient "is deteriorating" from his normal baseline standards
> - When asked at the Tracker meeting this afternoon why this situation has not (apparently) been escalated to a psychiatric emergency with a Psychiatrist coming to Phoenix to complete a comprehensive examination and

> evaluation of this patient, the FHA responded that Dr. Carr would be coming on **February 24** to assess the patient.
>
> Apparently Dr. Carr is out of town. When the Warden asked the FHA if there is another Psychiatrist in the system who can come to Phoenix to assess the patient, she did not know.
>
> The Warden and I share the concern that this particular issue is a true psychiatric emergency and that the response from the Centurion mental health leaders at the Regional level is inadequate. Warden Weiss is escalating this concern through his chain of command and I am doing likewise.

(Doc. 4109 ¶ 191). Dr. Stewart expressed understandable outrage at I.C.'s treatment at the Phoenix complex, ADCRR's inpatient treatment facility for the most acutely mentally ill prisoners. I.C. needed emergency care but a psychiatrist was "out of town" until twelve days later. Dr. Carr's response to this "true psychiatric emergency" was revelatory in its confirmation of systemic deficiencies.

> This unfortunate situation is a symptom of a larger problem.
>
> Numerous elements impede timely intervention, quality of care, implementation of a comprehensive treatment plan and psychiatric stability.
>
> Our inpatient unit needs a larger investment from Psychiatry, Nursing, Mental Health, ADC and Medical.
>
> As you know our inpatient unit is licensed by DHS. It is imperative we model our clinical program according to clinical guidelines and license rules/regulations.
>
> [I.C.] is the immediate focus. However, barriers to care, collaboration, education, training and communication need to be addressed in order to implement a solid care plan.

(Doc. 4109 ¶ 195).

Dr. Penn did not address I.C.'s treatment. Rather he concluded "I found no evidence that ADCRR or Centurion engaged in a planned or purposeful effort to effect inappropriate uses of force on any of the above individuals identified as having mental illness." (Doc. 4172 ¶ 275). This means either Dr. Penn did not have knowledge of I.C.'s treatment, including the email, or if he was aware of it, his opinion reflects a profound lack of concern. And Defendants have not addressed the email or Dr. Carr's assessment of inadequate

mental health care.[26]

The inadequate mental health staffing has led to prisoners who require inpatient levels of care not receiving such care. As Dr. Stewart testified, many prisoners in obvious need of competent intensive treatment are kept in other units that are ill-equipped to treat their conditions. The inadequate staffing of inpatient facilities creates a substantial risk of serious harm to prisoners.

### B. Inadequate Treatment for Suicidal Prisoners

Inadequate mental health care staffing is demonstrated in the records of prisoners who died by suicide in recent years. Dr. Stewart provided a review of some of the twenty-three prisoners who died by suicide from 2019 until the close of discovery for trial in September 2021. What follows are some of them.

#### 1. Reuben Neal

Neal died by suicide on August 27, 2020 at the age of 29. He had five visits with mental health staff in the months leading up to his death. On July 8, 2020, he had an eight-minute encounter with a midlevel provider where he was prescribed subtherapeutic levels of two medications to address his anxiety and insomnia. (Doc. 4109-1 at 103). He had another encounter with a midlevel provider on July 16, 2020. That encounter lasted ten minutes. Neal expressed his anxiety was causing a "racing heart" and he felt "backed up against a wall." He also reported feeling all alone. His medication was not adjusted, despite his obvious and urgent need. His follow-up was kept to every 90 days or as needed.

Neal had a visit with a psych associate on July 22, 2020. He reported having a lot of issues, but they were not addressed, and no follow-up plan was documented. His visit on August 17, 2020 lasted five minutes. While the clinician inquired about suicidal ideation, no therapy occurred. His final visit, on August 19, 2020, lasted ten minutes. The notes reflect it was a superficial visit where nothing of substance was discussed. (Doc.

[26] At times, Defendants attempted to tout telepsychiatry as an augment to the apparent inadequate number of psychiatrists on-site. But telepsychiatry was, for unknown reasons, not available for I.C.'s situation. If telepsychiatry could not help a situation as dire as this, there is no evidence that telepsychiatry is a viable alternative to on-site personnel.

4109-1 at 104). Neal died by suicide eight days later.

The psychological autopsy noted Neal had been transferred to a higher custody level unit eight days before his suicide. That transfer increased his anxiety level and negatively affected his sleep and concentration. Dr. Stewart concludes Neal received "exceedingly poor counseling care and psychiatric care in the weeks leading up to this death." (Doc. 4109-1 at 103). In particular, Neal had encounters with staff who were not qualified to accurately assess his needs. Neal needed "more frequent and thorough assessments" by higher level staff. (Doc. 4109-1 at 103).

**2. Eric Haag**

Haag died by suicide on September 13, 2020 at the age of 25. (Doc. 4109-1 at 105). The records from Haag's initial psychiatric evaluation when he entered prison in 2016 establish that evaluation was effectively useless given how carelessly it was conducted. The history indicated Haag admitted he had taken medications for paranoid schizophrenia, but he attributed the voices he heard not to schizophrenia but to "drugs." But the initial evaluation stated he had no history of drug abuse and no history of psychiatric hospitalization. Later records establish Haag began abusing drugs at age nine and had a history of psychiatric hospitalization.

The records immediately prior to Haag's death establish he was not on medication for schizophrenia. On July 11, 2020, Haag had a five-minute visit with a psych associate and reported being under a lot of stress at his prison job and requested to have his medication restarted. (*Id.*). It appears that was ignored. On July 20, 2020, a midlevel prescribing provider reported that Haag was experiencing irritability as well as depressive and anxiety symptoms. There is no indication this provider knew of Haag's earlier request to restart medication. On August 12, 2020, Haag had his last mental health visit prior to his suicide, which consisted of a three-minute visit with a psych associate who noted that Haag allegedly was not willing to engage. Assuming that was correct, the psych associate stated Haag was not at risk for self-harm. There is no explanation how that assessment was possible due to Haag's alleged unwillingness to engage.

Haag had a complicated mental health history and due to the abbreviated and the brief nature of the mental health visits attributable to staffing issues, Haag was not provided adequate care. Those brief visits combined with the lack of coordination between the counselor and midlevel provider, and incomplete initial psychiatric assessment and inconsistent medical records, contributed to Haag's suicide.

**3. Tracie Otero**

Otero died by suicide on September 22, 2020 at the age of 47. (Doc. 4109-1 at 107). As of July 2020, Otero was in severe pain, which staff attributed to fibromyalgia. On July 31, 2020, Otero had an encounter with an unlicensed psych associate. That encounter confirmed Otero was suicidal based on the amount of pain she was in. On August 6, 2020, an unlicensed psych associate documented a flat affect, low appetite, and that Otero reported she was "tired and in pain." Otero ended the session due to pain. On August 21, 2020, an unlicensed psych associate documented Otero was refusing medications and struggling with anxiety. Otero again ended the session due to pain. On September 14, 2020, Otero had her last visit with any mental health staff prior to her suicide. That visit with an unlicensed psych associate lasted three minutes before Otero ended the session due to pain. The psych associate said Otero "does not appear to be a danger to self or others at this time." But no explanation was given on how the psych associate, after a three-minute visit that was terminated due to extreme pain, came to that conclusion. In Dr. Stewart's view, a more experienced clinician would have recognized the extent of Otero's pain put her at risk for self-harm.

Otero was extremely undermedicated for her pain leading up to her death, leaving her in unremitting pain. Otero's risk of suicide due to pain was missed because of the inexperience of the unlicensed and unsupervised clinicians as well as the abbreviated nature of the visits. Sufficiently qualified staff able to spend the requisite amount of time with Otero would have recognized the gravity of her situation.

**4. Austin Georgatos**

Georgatos died by suicide on January 28, 2021 at the age of 20. (Doc. 4162-1 at

110). Similar to Haag, Georgatos also experienced an initial incompetent assessment upon arriving at prison. On January 14, 2021, Georgatos arrived from jail and had an initial mental health assessment. That assessment lasted five minutes and determined Georgatos had been on medications for anxiety and depression in jail, but those medications, without explanation, had been discontinued two weeks prior. The assessment also documented Georgatos' history of methamphetamine use and both sexual and physical abuse in childhood. He was wrongly assessed to have "no emergent [mental health] issues" and no subsequent mental health appointments were scheduled. (Doc. 4109-1 at 110).

On January 25, 2021, he submitted an HNR stating "I need to see psych doctor about the voices I am hearing in my head. They returned since I stopped taking medications." But Georgatos was never seen by health care staff. Instead, he committed suicide three days later. The mortality review determined the death was possibly avoidable, with a failure to recognize symptoms or signs and delay in access to care as contributing causes of the suicide. Dr. Stewart opined Georgatos suicide was preventable. The inadequate intake screening was far too brief, likely as a result of inadequate staffing. In addition, inadequate follow-up based on the reports at intake and the significant delay in care after reporting severe psychiatric symptoms contributed to Georgatos' death.

**5. Jason Rothlisberger**

Rothlisberger died by suicide on April 15, 2021 at the age of 45. His final week of life demonstrated he was at grave risk of self-harm. (Doc. 4109-1 at 113). On April 7, 2021, Rothlisberger attended a "sick call" where he reported depression, anxiety, and not sleeping for days. He also reported thoughts of harming others as well as concerns about his own safety. That same day an ICS was initiated after Rothlisberger's sister called and reported concerns that he may end his life. When asked, Rothlisberger admitted he had placed a rope around his neck to get the attention of staff due to fear for his life and said his anxiety was "10/10" as well as suicidal and homicidal ideations.

Between April 8, 2021, and April 12, 2021, Rothlisberger was placed on 10-minute and 30-minute watches. He continued to report concerns regarding his own safety but also

started reporting auditory hallucinations. At one point, Rothlisberger told the "mental health team" he was "genuinely terrified" of remaining in the suicide watch pod because "they were raping, torturing, and killing sex offenders at 3 or 4 in the morning." Inconsistently, the very next day, April 12, 2021, Rothlisberger allegedly "did not endorse significant psychiatric symptoms to the mental health worker." At some point between April 12 and April 15, Rothlisberger was discharged from crisis watch and there was no record this occurred or why.

The mortality review determined contributing factors to Rothlisberger's suicide included failure to recognize symptoms or signs and failure to follow clinical guidelines. In addition, there were no suicide risk assessments conducted upon placement or removal from crisis watch and no crisis treatment plan developed within one day of placement into crisis watch. In fact, the records established Rothlisberger's "mental status was significantly worse at the time of discontinuing [the] watch than when it was started." Rothlisberger did not receive an appropriate referral to a prescribing psychiatrist. In Dr. Stewart's opinion, because of "significant red flag symptoms" of psychosis, this suicide was avoidable.

**6. Failures Discovered in Psychological Autopsies**

Dr. Stewart expressed significant concerns regarding the care leading up to these suicides but his concerns were unrebutted by Defendants at trial. The Court asked Dr. Penn about whether he had examined the mortality reviews of prisoners who died by suicide and whether he had opinions about those prisoners' treatment. (Doc. 4283 at 46:5-17). He said he had reviewed some of them. (*Id.*). But Dr. Penn only pointed to his declaration where he found that ADCRR performs mortality reviews, which he concluded establishes an effective mental health care delivery system. He testified, "I noted, when rare suicides occur, psychological autopsies and administrative suicide reviews are conducted, morbidity and mortality reviews are completed. . . and I think that's the important take home point, is that all of the ADCRR facilities were found to be 100 percent compliant with the essential standard of NCCHC suicide prevention and intervention." (Doc. 4283

at 47:7-10, 47:19-23). Again, Dr. Penn, without credible explanation, appears to be relying entirely on the existence of certain ADCRR policies and the NCCHC policies. The NCCHC standard determines only whether ADCRR performs mortality reviews or has some suicide prevention policies. It is undisputed ADCRR performs reviews and has prevention policies. But the existence of those reviews and policies does not establish the reviews or policies are effective, thorough, or competent. And the evidence establishes they are not.

When the Court asked Dr. Penn about his evaluations of the psychological autopsies he said, "I definitely remember reviewing all of the morbidity and mortality reviews, but as far as writing a specific analysis of each and every single adverse patient outcome, I don't recall writing something separate." (Doc. 4283 at 48:22-49). What is more, Dr. Penn failed to take a single note during his chart and record reviews. Rather, he kept all the information "in [his] head." (Doc. 4283 at 45:15-18). It was obvious from his testimony that Dr. Penn did not retain sufficient information or conclusions about particular prisoners to discuss them in helpful detail. Rather, Dr. Penn simply concluded all treatment was appropriate. In effect, the Court has only Dr. Stewart's reliable testimony where he concluded the care was inadequate.

### C. Overburdened Staff Have Not Met the Demand Required

#### 1. Prisoners Receive Either No Treatment Plans or Inadequate Ones and Experience Long Term Symptoms Due to Insufficient Treatment

The overwhelming evidence demonstrates the lack of mental health staffing—both in terms of overall staffing and insufficient higher-level staff—demonstrates inadequate care. This results in prisoners receiving ineffective treatment leaving prisoners to remain potentially, and unnecessarily, profoundly symptomatic for extended periods of time. (Doc. 4260 at 54). This is established through instances of prisoners who remain symptomatic despite the availability of other treatment options. Thus, prisoners often have treatment options worthy of exploration but, due to staffing, they cannot be explored and implemented. Dr. Stewart highlighted a few of these prisoners.

A.C. is presently housed at the inpatient facility in the Phoenix complex. Dr. Stewart interviewed A.C. and assessed him as "extremely manic and agitated . . . yelling at the custody staff and running around his cell naked." (Doc. 4109 ¶ 115). A.C. had bruises on the left side of his torso where custody staff had fired a paint ball gun at him during a psychotic episode. He is prescribed Risperdal Consta, 37.5 mg every two weeks. Dr. Stewart noted it "takes up to ten weeks for this long-acting antipsychotic medication to reach therapeutic levels." Dr. Stewart explained it is not appropriate to "attempt to stabilize a highly agitated and psychotic patient using long-acting injectable antipsychotic medication." As a result, A.C. remains out of control and "is not receiving anything close to inpatient level of care." (Doc. 4109 ¶ 117).

D.W. is housed at Eyman. D.W. reported "persistent auditory hallucinations . . . command[ing] him to hurt himself and others." (Doc. 4109 ¶ 118). His medical records reflected he has been prescribed the same 15 mg dose of Abilify for sixteen months despite his ongoing auditory hallucinations commanding him to hurt himself and others. D.W. has not been referred to a psychiatrist for medication adjustment or any other treatment. Dr. Stewart noted 15 mg of Abilify is a "low dose" and a higher dose likely would be effective.

J.R. is housed at Eyman. When Dr. Stewart visited J.R., he was "overtly psychotic with very loose associations, disorganized and rambling speech, responding to internal stimuli and thought blocking." (Doc. 4109 ¶ 114). J.R. was not currently prescribed or taking a single medication despite a diagnosis of schizophrenia. In Dr. Stewart's opinion, J.R. represents "the ultimate example of deliberate indifference. That is, the staff acknowledge that [J.R.] is psychotic but are not doing anything to address it." (Doc. 4109 ¶ 114).

The appalling evidence regarding Rahim Muhammad's treatment is the strongest example of how prisoners receive inadequate treatment and, as a result, remain profoundly symptomatic for extended periods of time. Muhammad has been diagnosed with schizophrenia and schizoaffective disorder and has been placed on suicide and self-harm watch "dozens" of times. (Doc. 4109 ¶ 181). Dr. Stewart noted Muhammad was

repeatedly on suicide watch and had chemical agents used against him on July 5, 2021 (twice), July 7, 2021, July 8, 2021, July 9, 2021, July 12, 2021, and July 13, 2021 (twice). (Doc. 4109 ¶ 181). The Court observed some of these uses of force against Muhammad, and they were nothing short of shocking. It is clear Muhammad was profoundly mentally ill and Defendants only solution to his self-harming was to use chemical agents against him.

Moreover, Deputy Warden Van Winkle testified that even though Muhammad was housed in Florence-Kasson—a mental health unit—he approached mental health staff and told them Muhammad needed "more care than what we're able to provide here." (Doc. 4279 at 34). Muhammad remained at Florence-Kasson for seven months while exhibiting profoundly dangerous and symptomatic behavior. And because of the severity of his illness, Dr. Stewart planned to interview him just prior to trial during his September 23, 2021 tour, but found that Muhammad had been transferred to a different facility "earlier that very same morning." (Doc. 4109 ¶ 181).

Dr. Penn did not meaningfully address these prisoners' care. (Doc. 4172 ¶ 270). Dr. Penn offered only that Dr. Stewart's view of these prisoners was wrong because "psychotherapy and psychotropic medications require treatment compliance, initiative, time, and effort from the patient." (Doc. 4172 ¶ 270). But Dr. Penn offered no analysis of how his opinion applies to the unique illnesses for each of these prisoners. In short, Dr. Penn's opinion has no merit.

### 2. Drive-By Mental Health Encounters

Another consequence of insufficient staff is that mental health encounters are extremely short in duration, remarkably so. This issue was repeatedly litigated during the life of the Stipulation, without resolution. Defendants insisted extremely short encounters were sufficient while Plaintiffs claimed encounters were so short that they could not possibly have been efficacious. Eventually, because Defendants proved unreasonable, the Court imposed minimum durations for visits, subject to exceptions if a mental health clinician concluded visits of short duration were acceptable. (Doc. 3861 at 12). Defendants

refused to comply with that Court Order, which required another Order clarifying that durations shorter than the presumptive minimum were required to be assessed by a psychiatrist. (Doc. 3861 at 13). Defendants failed again to comply and ironically admitted they lacked sufficient qualified staff to conduct reviews of short-duration visits. (Doc. 3907 at 6; Doc. 3921 at 16-17).

At trial, Dr. Stewart testified that "[i]t is simply not possible to assess a patient and determine their risk of self-harm or suicide in an encounter lasting five, three, or two minutes. Such an assessment requires more than literally 'seeing' a patient; it first requires establishing a therapeutic relationship." (Doc. 4109 ¶ 60).[27] Dr. Penn insisted a mere one-minute encounter could be sufficient to determine if a prisoner was at risk of self-harm or suicide.

> **Question:** Could it be one minute?
>
> **Dr. Penn:** Yes, possibly.
>
> **Question:** To determine that the person was no longer a risk of harm to themselves or others?
>
> **Dr. Penn:** Yes, certainly, if the mental health staff member knows the inmate, has reviewed the chart, has spoken to staff, and is a qualified mental health professional, yes.

(Doc. 4283 at 100:12-18).

Dr. Penn went further, claiming a prohibition on extremely short visits would be counterproductive. In his view, "setting minimum required durations for mental health care encounters can hamper the clinician's ability to provide mental health care." (Doc. 4172 ¶ 139). Dr. Penn, however, spoke entirely in generalities and did not point to a single actual encounter and then explain why it nonetheless was enough. Moreover, the history of this issue involves repeated Court Orders expressing hesitation at imposing minimums

---

[27] Dr. Stewart also explained that when mental health care providers attempt to speak with prisoners at their cell fronts, the lack of confidentiality inhibited communication. And many prisoners refused to be moved to the cage where confidential encounters were held because "they were very psychotic and paranoid and they were afraid that if they were to be taken out of their cells, that they would be at risk of being attacked by others." (Doc. 4260 at 45).

and always including a simple uncomplicated procedure whereby a qualified individual could assess if a short encounter was appropriate. Finally, Dr. Penn's opinion that the extremely short encounters were sufficient is not credible for the simple reason that Dr. Pennington-Stallcup conceded such encounters were *never* sufficient in any circumstance.

> **Question:** But a one-minute encounter would never be sufficient to determine that a patient is not at risk of self-harm; correct?
>
> **Dr. Pennington-Stallcup:** Correct.

(Doc. 4276 at 125: 9-11).

The current prevalence of conducting extremely short duration mental health encounters is established by the numerous performance measures while the Stipulation was in effect. These performance measures required prisoners be "seen" at identified intervals. For example, Performance Measure 80 required a prisoner with a mental health score of MH-3A "be seen a minimum of every 30 days by a mental health clinician." As stated, "seen" was finally interpreted to require an encounter meeting minimum duration requirements, subject to the exception for short encounters later deemed clinically appropriate by a qualified individual. The table below reflects Defendants were consistently unable to meet the duration requirements for April through July 2021.

**Performance Measures for Mental Health Durational Requirements**

| Performance Measure | Complex | April 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|
| 80 | Lewis | 88% | 86% | 24% | 43% |
| 80 | Tucson | 99% | 87% | 17% | 42% |
| 85 | Eyman | 95% | 97% | 25% | 73% |
| 85 | Florence | 83% | 100% | 50% | 100% |
| 85 | Lewis | 97% | 97% | 24% | 69% |
| 85 | Perryville | 92% | 83% | 0% | 68% |
| 85 | Tucson | 98% | 100% | 6% | 69% |
| 85 | Yuma | 97% | 100% | 5% | 85% |

| | | | | | |
|---|---|---|---|---|---|
| 91 | Phoenix | 100% | 100% | 80% | 100% |
| 94 | Eyman | 94% | 100% | 82% | 91% |
| 94 | Florence | 93% | 100% | 80% | 93% |
| 94 | Tucson | 100% | 96% | 80% | 87% |

(Exs. 1729-1732).

### 3. Inconsistent Distribution of Medications

It is undisputed that psychotropic medications require a sophisticated medication distribution system. Many medications require timed distribution or must be taken with meals. Dr. Stewart testified the "failure to provide timely and consistent delivery and administration of psychotropic medication places patients at substantial risk of serious harm, including pain and suffering, withdrawal symptoms, or deterioration." (Doc. 4109 ¶ 136). Defendants' own evidence consistently demonstrates their staffing failures result in prisoners not receiving timely and consistent delivery of psychotropic medications.

Performance Measure 13 required chronic care and psychotropic medication renewals be completed such that there was no interruption or lapse in medication. (Doc. 1185-1, Ex. B at 8). The performance numbers found below show that, for most of 2021, Perryville and Yuma in particular were unable to provide medication refills in a timely manner.

**Performance Measure 13**

| | Jan. 2021 | Feb. 2021 | March 2021 | April 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 97 | 100 | 100 | 100 | 93 | 96 | 96 |
| **Eyman** | 86 | 84 | 84 | 80 | 92 | 88 | 92 |
| **Florence** | 88 | 65 | 77 | 86 | 88 | 88 | 75 |
| **Lewis** | 69 | 95 | 93 | 99 | 86 | 91 | 77 |
| **Perryville** | 84 | 82 | 86 | 79 | 74 | 73 | 86 |
| **Phoenix** | 94 | 91 | 91 | 97 | 98 | 95 | 100 |
| **Safford** | 90 | 90 | 100 | 90 | 100 | 97 | 100 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Tucson** | 90 | 94 | 94 | 82 | 67 | 70 | 79 |
| **Winslow** | 100 | 100 | 100 | 100 | 93 | 100 | 100 |
| **Yuma** | 64 | 74 | 78 | 74 | 68 | 76 | 96 |

(Ex. 1256).

Of significance, the failure to deliver medication when needed was well-known throughout the system, yet Defendants failed to prevent it. The Continuous Quality Improvement meeting minutes across multiple facilities document interruptions and delays in delivering medications to patients. And Dr. Stewart noted meeting minutes showed delays at Eyman, Perryville, and Tucson in March 2021. (Doc. 4109 ¶ 138). Similar issues also arose at the Phoenix inpatient complex in January and June 2021. (Ex. 905 at 13395 (Phoenix Complex January 2021: prisoners were erroneously given their medications at 4:00 p.m. and again at 8:00 p.m. "due to several breakdowns in communications . . . ."")); (Ex. 831 at 61889 (Phoenix Complex June 2021: "Medication errors were noted and discussed with individual staff."). For many years, the lack of staffing has meant prisoners do not receive medication when they need them to achieve or maintain mental health.

## IV. Defendants' Challenges to Dr. Stewart's Methodology and Opinions Fail

Dr. Stewart's opinions focused on the most seriously mentally ill prisoners. Dr. Stewart explained he "wanted to focus [his] attention on the more seriously mentally ill . . . [because] one of the best measures of [] evaluating a system's ability to care for mentally ill inmates is to look at the more serious mentally ill cases." (Doc. 4260 at 17). Dr. Penn claimed this approach was unscientific and argued a random approach was preferable. Dr. Penn purported to conduct a "rigorous and representative analysis" but in essence his analysis supports Plaintiffs' position.[28]

Dr. Penn testified he reviewed, with the assistance of four practicing correctional psychiatrists, 120 randomly selected charts in addition to the 155 charts Dr. Stewart

[28] It is difficult to overstate Dr. Penn's lack of credibility. He was evasive when asked direct, simple questions. He failed to take a single note during his medical records review. (Doc. 4283 at 21:16-19). His ignorance of fundamental aspects of Defendants' health care system was obvious and his testimony contradicted the undisputed evidence at trial.

reviewed. Dr. Penn instructed each consultant to determine whether "access to care" was provided for each of the prisoners reviewed.[29] Dr. Penn did not provide an entirely coherent explanation of "access to care." At one point, Dr. Penn said "access to care" required consultants determine if the prisoner was given "timely, appropriate" care that "met the standard of care." (Doc. 4289 at 33:18-21). Later, Dr. Penn redefined it such that a prisoner who had missed medications may or may not be labeled as having "access to care." (Doc. 4283 at 29:20-22). This method for defining "access to care" is far from objective, and much less scientific. Dr. Penn's methodology is further flawed because his "access to care" standard does not carefully analyze if the care was medically acceptable.[30] In essence, it was ambiguous, inconsistent and of no value.[31]

Altogether, Dr. Penn and his consultants reviewed a total of 275 prisoner records, consisting of 120 randomly selected prisoners and all of the 155 records reviewed by Dr. Stewart. Defendants argue that of the 120 randomly selected prisoners, only 5% did not have "access to care." And because Defendants adopted Dr. Penn's random selection, they

---

[29] Dr. Penn's consultants were not, however, provided copies of mortality reviews for prisoners who died by suicide. (Doc. 4283 at 30).

[30] For example, one prisoner who was placed on suicide watch for two weeks was designated as having "access to care" despite having never been seen by a psychiatric clinician during that time. Another patient's care was reviewed and the consultant noted "concern patient is not on meds and has diagnosis of schizophrenia or bipolar." (Doc. 4283 at 65). Dr. Penn did not share his consultant's "concern." The Court asked Dr. Penn, "But I am wondering in your report is there anything to indicate how you came about deciding that despite what the concerns were from your reviewer the treatment that this patient received was appropriate?" Dr. Penn only responded that because the patient continued to be seen, despite receiving no treatment, his care was acceptable. The table of various patients found at Appendix 5 shows those classified as not having access to care and those marked as having access but the accompanying notes for those patients demonstrate otherwise.

[31] During trial, Defendants attempted to address a patient, M.L., that Dr. Stewart highlighted in his declaration. (Doc. 4109 ¶ 35). M.L. told Dr. Stewart he experienced severe anxiety, depression, and auditory hallucinations, submitted multiple HNRs about his symptoms, but did not receive a response. (Doc. 4109 ¶ 35). Dr. Stewart reviewed his medical records and noted M.L. submitted an HNR on August 28, 2021, requesting to see someone about getting his medication changed, but did not see a midlevel provider until September 8, 2021. (Doc. 4109 ¶ 35). During trial, Defendants sought admission of Exhibit 5315(a) for the purpose of demonstrating that M.L. was seen by a behavioral health technician on August 30, 2021. (Doc. 4261 at 65-70). But as Plaintiffs noted, "There is absolutely no reason why a patient would tell a behavioral health tech, who has no training and no ability to help him, that he had put in an HNR the day earlier asking to see a psychiatrist about his medications." (Doc. 4261 at 69-70).

argue the Court should extrapolate that 5% to the entire prisoner population. Thus, they contend 5% of the mentally ill prisoner population without access to care is adequate.

This conclusion is erroneous. Even if only 5% of mentally ill prisoners do not have access to care, that is unconstitutional. But Dr. Penn's methodology is deeply flawed. In addition to the prisoners who were deemed not to have access to care at all, six additional prisoners' charts were reviewed and, despite being characterized as having "access to care," they died by suicide (Patients 12, 13, 52, 115, 120, and 228). Others went weeks or many months without seeing a provider (Patients 86, 95, and 272). And of significance, combining Dr. Penn's random selection with the charts reviewed by Dr. Stewart results in a total of 275 prisoners. Of those, 38—13.8%—did not have access to care as determined by Dr. Penn's consultants. For another 26 prisoners the consultants determined they had "access to care," but also found deficient treatment, sometimes with fatal consequences. Ultimately, 64 out of 275—23.3%—of the records reflect either an outright denial of access to care or serious deficiencies in mental health care administration.

A more fundamental flaw with Dr. Penn's analysis is that, in his opinion, the only outcome that should qualify as "bad" is "death."[32] And with death as the relevant threshold, Dr. Penn identified only one case where he had concerns about the care, where a prisoner submitted a request for mental health treatment, was not seen, and then committed suicide. Even there, however, Dr. Penn ultimately concluded the prisoner "was afforded appropriate mental health care." (Doc. 4285 at 61). As for the other 275 records reviewed, Dr. Penn saw no cause for concern:

> **Question:** Other than this particular patient [who committed suicide], did you find any issues with respect to any of the other 275 records that you reviewed?
>
> **Dr. Penn:** No, I did not find any gross deviations in standard of care or any access to care or continuity of care that fell below

---

[32] Dr. Penn testified "I reviewed all of these charts, I didn't find any of these patients to be -- to have death or morbidity or mortality resulting, so there wasn't a bad outcome with these patients." (Doc. 4283 at 61:11-14). Thus, Dr. Penn believes death is the appropriate metric for a "bad outcome." This establishes a callous indifference to the prisoners whose charts did reflect inadequate mental health treatment but did not die.

> the standard of care.
>
> **The Court:** So when you -- I don't have the testimony in front of me, but you said there was only one patient where you found that the standard of care had not been up to what it should have been; is this the one patient?
>
> **Dr. Penn:** Yes, Your Honor.

(Doc. 4285 at 63:23-64:7).

Dr. Penn's opinion that only a single prisoner received possibly deficient mental health care is appalling and overwhelmingly contradicted by the evidence at trial. Again, Dr. Penn's handpicked consultants reviewed 275 files. (Doc. 4283 at 75) (stating Dr. Penn chose the consultants). When testifying about the consultants' findings, Dr. Penn stated:

> I think the question was, was access to care provided, and [the consultants] opined no based on the document review. And you are right, it was 38 out of the 275 charts.

(Doc. 4238 at 73). Thus, 13.8% of the prisoners reviewed by Dr. Penn's consultants did not have access to care. Dr. Penn then attempted to claim that lack of access to care was of no concern because only one prisoner suffered the "bad" outcome of "death." It is unclear whether Dr. Penn truly believed that not a single prisoner other than the one he discussed received deficient care or whether Dr. Penn believed he was hired to convey that unsupported opinion. But, either way, that obstinance—and indifference—was devastating to his credibility and renders his opinions unworthy of any weight.

## V. Mental Health Care Conclusion

Excessively inadequate staffing pervades Defendants' lack of adequate mental health care treatment. Every single complex is understaffed, except for two complexes which have only a single individual to address prisoners' needs. Again, the consequences of this understaffing are dire, as reflected in the mortality reviews and psychological autopsies of prisoners who died by suicide. In Dr. Stewart's opinion,

> the chronic shortage of mental health staff, delays in providing or the outright failure to provide mental health treatment, the inadequacies in the provision of psychiatric medications, and the other deficiencies identified in this report

> are systemic problems, and incarcerated people who need mental health care have already experienced, and will experience, a serious risk of injury to their health if these problems are not addressed.

(Doc. 4260 at 18-19). And Defendants own evidence confirmed Dr. Stewart's opinion.

**SYSTEMIC PRACTICES THAT IMPEDE HEALTH CARE**

There are two overarching aspects of ADCRR's provision of medical and mental health care that merit separate discussion. First, ADCRR's health record system is difficult to the point of being impossible to use. As such, it is a significant impediment to constitutionally adequate care. Second, ADCRR's failure to provide reliable language interpretation services is another significant impediment to care.

**I. eOMIS Prevents Adequate Care**

It is undisputed that Defendants' electronic health record system ("eOMIS") is very inefficient. Defendants' expert, Dr. Murray, testified eOMIS "does not have the work flow efficiencies, logistical safeguards, and data reporting capabilities necessary to produce ADCRR's best care. Without exception, the facility management teams at every complex indicated that a new EHR or modernized eOMIS would drastically increase their ability to see more patients." (Doc. 4206 ¶ 1080).

Dr. Wilcox testified in detail how eOMIS' limitations prevents staff from seeing data in any usable format. eOMIS does not allow staff to view testing results or encounter notes over time. Rather, providers must manually review each lab result and provider note. Dr. Wilcox further testified lab results are reported alphabetically, but not by category. Similar inefficiencies exist for medication administration and x-rays. As a result, staff are not able to efficiently review a patient's history, creating a significant barrier to appropriate care.

This was demonstrated during trial. During Dr. Wilcox's cross-examination, counsel for Defendants struggled to maneuver through a patient's medical record to find the information they were seeking. To expect this from physicians who are expected to see 18-20 patients per day is unreasonable.

Dr. Murray elaborated about the problems when treating complex patients. "[T]he

more complex the patient, the more fragmented the documentation in eOMIS and the more challenging to follow their care plan. At times, it was difficult to discern what happened in that patient's care, and what was supposed to have happened." (Doc. 4206 ¶ 990). He continued, "[t]his fragmentation issue is due to using an EHR that does not support the flow of patient care, does not push desired behavior and care, does not contribute to ideal decision-making, and does not allow a rapid review of a patient's history and health care needs. In short, this EHR does not allow for the care of complex patients in a comprehensive way and has become an impediment to the timely and efficient care of these patients." (Doc. 4206 at ¶ 990).

Thus, it is undisputed the very foundation of the health care delivery system—the medical records—"does not allow" for "comprehensive" care. In terms of the relevant issue for this case, eOMIS substantially contributes to a substantial risk of serious harm.

## II. Defendants Do Not Provide Adequate Language Interpretation Services

Plaintiffs allege Defendants have a policy or practice of failing to provide adequate language interpretation services to prisoners receiving medical or mental health care. Plaintiffs' experts stated "[c]ommunication with patients is essential to providing adequate medical care." (Doc. 4138 ¶ 442). And "[e]ffective communication is a fundamental component of providing therapeutic [mental health] care" and mental health care encounters without effective interpreter services are "largely meaningless and superficial." (Doc. 4109 ¶ 89). Dr. Wilcox explained that, ideally, both medical and mental health care staff "who have been evaluated and determined to be qualified to conduct healthcare encounters in the patient's language would conduct the healthcare encounter in that language." (Doc. 4138 ¶ 443). Another option would be the use of "qualified interpreters with experience with medical terminology." (Doc. 4138 ¶ 443). It is not appropriate, however, to use other prisoners as interpreters because the prisoner patient "may not be comfortable disclosing sensitive, potentially embarrassing medical information" to the prisoner acting as a translator. (Doc. 4138 ¶ 449). It is also inappropriate to use custody staff as interpreters because prisoners may "self-censor or alter communications with the

provider" to prevent custody staff from learning sensitive information. (Doc. 4109 ¶ 91).

Defendants do not dispute that language interpretation services, in general, are a crucial aspect of minimally sufficient medical and mental health care. Dr. Pennington-Stallcup, agreed that "effective mental health diagnosis and treatment" requires "the clinician and the patient . . . be able to communicate." (Doc. 4277 at 21:1-5). But Defendants claim the "various policies and practices" already in place are sufficient. (Doc. 4315 at 50). But the evidence establishes those policies and practices are far from sufficient. Prisoners are routinely denied language interpretation services, necessarily resulting in the deprivation of appropriate medical and mental health care. The absence of interpretation services creates a substantial risk of serious harm.

The main policies Defendants cite as establishing adequate interpretation services are found in the MSTM. The MSTM requires, during the initial intake process, every prisoner be provided a handout, in both English and Spanish, that "outlines how they are to access health care." (Ex. 1305 at 122). Similar handouts must be provided whenever a prisoner is transferred to a new complex. In addition, the MSTM requires the posting of signs in the intake area of each complex explaining how to access health care. (Ex. 1305 at 122, 145). Per this policy, the information need only be in Spanish and English, meaning the information would be useless to prisoners who speak other languages. (Ex. 1305 at 123).[33]

In addition to those requirements, during the intake process each prisoner meets "with nursing providers, dental, [and] mental health." (Doc. 4231-1 at 97:2-3). During those meetings, the prisoner's primary language is identified and entered into the electronic medical record. (Doc. 4231-1 at 97:3-7). The medical record system is programmed so that, in the future, staff must always answer a question regarding the prisoner's language abilities before inputting any new information. The language question is a "hard stop," meaning the staff inputting information "cannot proceed any further until they answer the question of whether a patient needs interpreter services or not." (Doc. 4231-1 at 97:5-12).

[33] There was no evidence presented whether the handout and signage policies are followed in practice. The Court will assume they are.

The initial evaluation of language ability completed at intake is not governed by any written policies or procedures. (Ex. 1976 at 2-3 No. 3). Rather, determining the need for interpreter services apparently is left to the discretion of the intake personnel.

When a prisoner who is not fluent in English is seen by medical or mental health care staff, interpretation services are supposed to be available through a "telephone or any platform that has audio including a computer screen if [there is a] need [for] sign language interpretation and a visual communication cue." (Doc. 4231-1 at 100:6-10). This translation service is referred to as the "LanguageLine." Centurion "prefer[s]" that its staff use the LanguageLine even when the staff speaks the same language as the prisoner. However, that is not required, and staff may proceed without using the LanguageLine for any language the staff are "comfortable" using. It is very common for staff to do so. (Doc. 4231 at 101:21-102:3; Doc. 4277 at 68). Centurion does not have policies regarding assessing the language proficiency of its staff. (Doc. 4231-1 at 102:24-103:6). Centurion does not document or know if a staff member can, in fact, converse sufficiently in the language the staff member purports to speak and understand. (Doc. 4231-1 at 103:5-7).

In practice, the current policies and practices are ineffective and allow insufficient communication between prisoners and health care staff. First, the absence of any formal assessment process regarding prisoners' interpretation needs creates a situation where staff have no way of knowing "whether and how much a patient actually understands" when being told information in English. (Doc. 4138 ¶ 454). This may lead to staff concluding a prisoner understands when, in fact, he does not. An unknown language barrier may also lead to "misdiagnosis [and] failure to follow treatment plans." (Doc. 4138 ¶ 454). If, during intake, a prisoner is not assessed as needing interpretation services, no notation is made in the electronic medical record and future encounters likely will occur in English, whether or not the prisoner can understand.

The evidence establishes the lack of any assessment leads to prisoners being incorrectly identified as not needing an interpreter. Dr. Wilcox spoke with two monolingual Spanish speakers at Tucson who were labeled in their health records as not

needing interpretation services. Based on his discussion with them, it was "clear" these two prisoners could not have any "meaningful healthcare encounter in English." (Doc. 4138 ¶ 448). In fact, other portions of those prisoners' medical records made clear they needed interpretation services. (Doc. 4138 ¶ 448). According to these prisoners, they have not been provided interpreters for medical services and one of the prisoners stated a fellow prisoner had to act as an interpreter. (Doc. 4138 ¶ 449).

Even when the need for interpreter services is known, Defendants and Centurion may not provide one. A medical record for one prisoner showed staff had to use "google translation for interpretation of questions and responses." (Ex. 928 at 1). In addition, Dr. Stewart, Plaintiffs' expert on mental health care discussed in detail later, reviewed medical records of numerous hearing-impaired prisoners and concluded "they had gone months – if not years – unable to communicate meaningfully with health care staff." (Doc. 4109 ¶ 100).

The language difficulties for deaf prisoners are especially pronounced. Dr. Stewart referenced a "written exchange" between a psych associate and a deaf prisoner when that prisoner was placed on suicide watch after the death of his brother. Interpretation services should have been provided. Instead, the written exchange consisted of simple questions by the psych associate and responses by the prisoner. (The handwritten document makes clear who wrote which portion. For ease of reading, the prisoner's responses are bolded).

> Homicidal? Kill Others? **No**
>
> Hallucination **No**
>
> Eating ok **ok**
>
> Sleeping ok **ok**
>
> Feeling anxious **no**
>
> Depressed **no**

(Doc. 4109 ¶ 101). In Dr. Stewart's opinion, this "is an awkward, stilted, and slow way to communicate, and does not provide an appropriate or adequate medium to engage the patient in discussion of sensitive and important mental health matters." (Doc. 4109 ¶ 102).

That is an understatement. It is hard to believe Defendants think it was appropriate to determine the mental status of a prisoner on suicide watch by passing him a note asking if he felt "Homicidal? Kill Others?" and then accepting his monosyllabic answer.

Dr. Stewart also spoke with several monolingual Spanish speakers who had been classified as seriously mentally ill. Those prisoners recounted significant difficulties in communicating with mental health providers, including complaints about being unable to convey difficulties with their medications. (Doc. 4109 ¶¶ 105-106). One prisoner did not respond to Dr. Stewart's questioning in English but, when Dr. Stewart switched to Spanish, the prisoner "lifted his head off his bunk and look[ed]" at Dr. Stewart. (Doc. 4109 ¶ 109). That prisoner's medical records indicated he does not need interpretation services but there is a plausible basis to conclude that is inaccurate. (Doc. 4109 ¶ 111)).

Reliance on LanguageLine may, in theory, suffice. However, the actual implementation of LanguageLine establishes it does not solve the interpretation problems. LanguageLine is not available in every location and, at times, there are no interpreters available even when staff attempt to use LanguageLine. For example, when Dr. Wilcox visited the IPC at Tucson, he attempted to speak with two monolingual Spanish speakers. Dr. Wilcox asked to use the LanguageLine, but it could not be used where the patients were located. (Doc. 4138 ¶ 462). The only location where it was available was in an office, away from the prisoners. That office did not have an exam table and "would not have been appropriate for a healthcare encounter." (Doc. 4138 ¶ 462). Medical records also establish instances of the LanguageLine being ineffective because of "poor reception" or no interpreter being available when requested. (Doc. 4138 ¶ 466).

While Defendants seem to concede the need for interpretation services, they presented opinions from Dr. Penn, Defendants' expert on mental health care discussed in detail later. Dr. Penn suggested the status quo is sufficient. But Dr. Penn's testimony was so flawed on this topic that the Court cannot credit any of his opinions. At the outset, Dr. Penn began by misidentifying the issue. According to Dr. Penn, the "requisite standard of care within a correctional setting" does not mandate "use of certified translators for all

healthcare interactions and/or for group psychotherapy." (Doc. 4172 ¶ 171). Dr. Penn did not explain, however, why he was evaluating whether "certified translators" were necessary. Neither of Plaintiffs' experts opined "certified translators" were necessary or even possible. Rather, the issue is whether the current practice of having no interpreter services when needed is appropriate. Dr. Penn's initial opinion regarding the standard of care, even if accepted, is meaningless.

Next, Dr. Penn testified the correct "standard of care in the community and in correctional health care is for staff to assess their own level of comfort and proficiency before determining whether a separate translator/interpreter or translator service is required." (Doc. 4172 ¶ 174). This opinion makes no sense. Whether a staff member can communicate effectively in another language depends on an assessment by the prisoner, not the staff member. That is, a staff member may believe he has native speaker fluency while true native speakers cannot understand a word he says. The standard of care cannot plausibly be based on the staff's own subjective evaluation of their language skills.[34]

Dr. Penn further attempts to explain away the absence of effective interpretation policies and practices by opining the standard of care is that "use of an interpreter is dependent upon the nature and extent of the encounter." (Doc. 4172 ¶ 175). He gives the example that a blood pressure measurement may not require an interpreter but "[a]n interpreter would be necessary . . . where there are discussions regarding advance directives." (Doc. 4172 ¶ 175). At trial, Dr. Penn was asked to identify other types of encounters when an interpreter "would be necessary." Dr. Penn refused to do so:

> **Question**: And so what about individual health care counseling?
>
> **Dr. Penn**: I would say it would depend.

[34] Dr. Penn also testified it would be "unreasonable" to require interpreters because "in emergency situations, time is simply not available to have translators/interpreters and other services available." (Doc. 4172 ¶ 176). Plaintiffs' experts did not state the standard of care requires interpreters in "emergency situations." No one is faulting Defendants for not having interpreters available, at all hours, for every emergency. Dr. Penn's testimony that adequate interpreters need not be provided whenever possible because some emergencies might occur when they are not available defies logic.

> **Question**: Mental health groups?
>
> **Dr. Penn**: Again, it would depend.
>
> **Question**: Suicide watch checks?
>
> **Dr. Penn**: Again, it would depend.
>
> **Question**: Chronic care encounters?
>
> **Dr. Penn**: Same answer, it would depend.
>
> **Question**: Appointments with health care or mental health providers?
>
> **Dr. Penn**: It would depend.

(Doc. 4283 at 108:19-109:3). Dr. Penn explained he could not provide definitive answers whether an interpreter would be needed for these encounters because "[s]ome individuals are more fluent." (Doc. 4283 at 110:5-6). But Dr. Penn's testimony is nonsensical considering he testified an interpreter "would be necessary" for discussing advance directives without then stating that did not apply if the prisoner was fluent in English. The reason his testimony did not include an exception for prisoners fluent in English is because the relevant prisoner is one who is not fluent in English. Dr. Penn's invocation of the various degrees of fluency to avoid determining when interpreters should be provided was a way for him to avoid conceding the obvious: all but the simplest of health care encounters require an interpreter.

Finally, Dr. Penn testified that Dr. Stewart reported "he interviewed monolingual Spanish speakers" but Dr. Penn's review of their records "evidences [those prisoners'] ability to communicate in English." (Doc. 4172 ¶ 184). To reach this conclusion Dr. Penn explained:

> I base this -- and I am not questioning Dr. Stewart or his Spanish proficiency. My first language was Spanish also. But I reviewed the Health Needs Request from inmates, and many of them were able to write in English.

(Doc. 4283 at 114:14-15). When pressed on this point at trial, Dr. Penn's testimony became absurd.

Dr. Penn was presented with a HNR written in Spanish and asked if that was written

by the prisoner. Dr. Penn stated he is "not a handwriting expert" and, therefore, he could not tell if the prisoner identified in the HNR actually wrote that HNR. (Doc. 4283 at 115:17-19). Thus, Dr. Penn acknowledged his "opinion" based on reviewing HNRs may not reflect the named prisoners' fluency in English because the HNRs may have been drafted by someone else. In addition, one of the prisoners identified by Dr. Stewart as a monolingual Spanish speaker submitted an HNR in Spanish that, when translated, stated in relevant part "If you do not understand Spanish, please tell me and I will find a way to send this in English." (Doc. 4283 at 118:1-3). After reviewing that HNR, Dr. Penn stated

> So the patient is saying, I can find a way to get it translated to English. So as we sit here today, without reviewing the chart and without talking to the patient, I wouldn't be able to answer if the patient is fluent in English or not.

(Doc. 4283 at 118).

When pressed on how he had testified earlier that this patient could communicate in English, Dr. Penn stated

> So again, I would need to review the patient's record in its entirety and perhaps interview the patient to be able to determine that.

(Doc. 4283 at 119). In other words, Dr. Penn contradicted his earlier testimony that this prisoner could communicate in English. Instead, Dr. Penn stated he would need to review the prisoner's record and interview him before determining whether the prisoner can communicate in English. And in any event, Dr. Penn's testimony that this prisoner was able to write in English cannot withstand the slightest scrutiny. The prisoner submitted the HNR in Spanish and included a statement that he would "find a way" to send it in English, if necessary. It is not plausible the prisoner would try to "find a way" to submit his HNR in English if his own language abilities meant he could have submitted in English.

In general, Dr. Penn's testimony on the topic of language interpretation was unreliable and incredible. Dr. Penn's opinion—the status quo of interpretation services is sufficient—is rejected. The only credible evidence before the Court demonstrates Defendants' language interpretation policies and practices often lead to "largely

meaningless and superficial" health care encounters. And inability to communicate one's medical and mental condition creates a substantial risk of serious harm.

**LEGAL STANDARD FOR HEALTH CARE**

Eighth Amendment claims involving medical or mental health care requires a prisoner prove an "objective prong" as well as a state-of-mind element, or "subjective prong." *See Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1098-1099 (9th Cir. 2019). For systemic challenges of policies and practices, "[t]he first, objective, prong requires that the plaintiff show that the conditions of the prison pose a substantial risk of serious harm." *Id.* If the prison conditions present such a risk, "[t]he second, subjective, prong requires that the plaintiff[s] show that a prison official was deliberately indifferent by being aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw[ing] the inference." *Id.*

The "objective prong" involving a "substantial risk of serious harm" requires prisoners establish they might suffer "further significant injury" or experience the "unnecessary and wanton infliction of pain." *Id.* The "subjective prong" requires prisoners establish prison officials "knowingly and unreasonably disregarded" the risk of harm. *Farmer*, 511 U.S. at 846. Put differently, prison officials must know "about the risk to which prisoners were exposed" but then "deliberately choose to maintain the harmful policies" or practices. *Batista*, 930 F.3d at 1099. The subjective prong can be met when "prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988)).

**CONDITIONS IMPOSED ON THE CLASS**

In its Order certifying the class, the Court identified the following six medical care practices that allegedly exposed Plaintiffs to a substantial risk of serious harm in violation of the Eighth Amendment:

**(i)** Insufficient health care staffing;

**(ii)** Failure to provide timely access to health care;
**(iii)** Failure to provide timely emergency treatment;
**(iv)** Failure to provide necessary medication and medical devices;
**(v)** Failure to provide for chronic diseases and protection from infectious disease; and
**(vi)** Failure to provide timely access to medically necessary specialty care.

The mental health care practices that allegedly subjected Plaintiffs to a substantial risk of serious harm in violation of the Eighth Amendment were:

**(i)** Failure to provide mentally ill prisoners medically necessary mental health treatment (i.e., psychotropic medication, therapy, and inpatient treatment) and;
**(ii)** Failure to provide suicidal and self-harming prisoners basic mental health care.

The challenged practices significantly overlap. For example, "insufficient health care staffing" relates to and affects "failure to provide timely access to health care." That is, insufficient health care staffing results in the failure to provide timely access to care. As set forth above, inadequate staffing has resulted in a cascade of failures including other discrete practices, including inadequate access to necessary medication and inadequate access to specialty care. Similarly, the mental health care practices of failing "to provide mentally ill prisoners medically necessary mental health treatment" overlaps with failing "to provide suicidal and self-harming prisoners basic mental health care." Accordingly, some of the practices will be considered together to demonstrate Plaintiffs are being subjected to a substantial risk of harm.

**I. ADCRR does not have sufficient health care staffing to provide prisoners with timely access to health care, including emergency treatment, medication, treatment for chronic disease, and specialty care.**[35]

---

[35] This does not address some of the originally identified practices nor does it address particular health care conditions. For example, Plaintiffs did not establish Defendants failed to protect them from "infectious diseases" or that Defendants failed to provide access to "medical devices." And while Plaintiffs presented evidence regarding specific health care conditions like Hepatitis C or Medically Assisted Therapy, this case is not about particular diseases. Rather the focus must be on the overall provision of health and mental health care and whether there is a substantial risk of serious harm.

Long ago, the Ninth Circuit established the basic requirements for a constitutionally sufficient correctional health care system. It must "provide a system of ready access to adequate medical care." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (citation omitted), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). Prisoners must be able "to make their medical problems known to the medical staff." *Id.* And that staff must be competent because "[a]ccess to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems." *Id.* This requires staff be competent enough "to examine prisoners and diagnose illnesses" and then "treat medical problems or to refer prisoners to others who can." *Id.*

The evidence demonstrates Defendants operate a system lacking sufficient numbers of qualified medical staff to provide prisoners with "ready access to adequate medical care." *Id.* As discussed above, access to care necessarily requires access to competent health care. The standard of care in the community is higher than the constitutional minimum. But the "[a]ccepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019). The overwhelming evidence establishes the health care available to prisoners is well below the constitutional minimum, let alone the community standards. The current levels of staffing, including the type of staff, are far from adequate to meet constitutional requirements. Defendants' insufficient hiring and retention of qualified staff create a substantial risk of serious harm to all class members, which affects every aspect of health care delivery because there is simply not enough time to provide the level of care that is necessary. The broken electronic health record, the lack of time to employ differential diagnoses to properly evaluate prisoners' conditions, and nurses' failure to refer prisoners to providers are all predictable effects of a lack of staff.

**II. ADCRR does not provide mentally ill prisoners with medically necessary mental health treatment and suicidal and self-harming prisoners with basic mental health care.**

ADCRR and Centurion employees also confirmed insufficient staffing extends to the provision of mental health care. The lack of staff—specifically, again, licensed staff with the training to treat prisoners with serious mental health needs—impacts every aspect of the provision of mental health care treatment. The evidence reflects the prisoners with the highest acuity and most serious needs are not provided the medically appropriate level of treatment. Inpatient units remain unfilled, and Centurion's own officials confirmed the reason was a lack of staffing. Defendants' mental health care expert's chart reviews confirmed a lack of access to medically acceptable mental health care. And, again, psychological autopsies reflect systemic deficiencies, but no follow up action was taken to prevent such harm from reoccurring.

**III. Defendants Are Deliberately Indifferent**

The testimony from Dr. Wilcox and Dr. Stewart was credible while the testimony from Dr. Murray and Dr. Penn was not. Therefore, as detailed above, the medical and mental care available at ADCRR complexes presents a substantial risk of serious harm to every prisoner. Therefore, the "objective prong" of the Eighth Amendment analysis is met. The only remaining question is whether Defendants have acted, and continue to act, with deliberate indifference to that risk.

The overwhelming evidence demonstrates Defendants Shinn and Gann are both aware of insufficient staffing and the other conditions that present a substantial risk of serious harm to prisoners. Defendants, however, have not taken effective actions to remedy those conditions. Despite years of knowledge, driven by this litigation and Defendants' monitoring of their private healthcare contractors' performance, Defendants have in fact made no significant attempts to substantively change the health care system and compel sufficient staffing.[36] Thus, Defendants are acting with deliberate indifference to Plaintiff's

---

[36] Defendant Shinn, as ADCCR Director, is legally responsible for providing a constitutionally adequate health care system. Ariz. Rev. Stat. § 31-201.01(D); *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."). As the Court noted in Doc. 3940, when Defendant Shinn believes

serious medical and mental health care needs. The testimony from Defendants Shinn and Gann provides compelling evidence of knowledge of the failures but a refusal to take meaningful measures to correct systemic flaws.

During his testimony Defendant Shinn was asked about a letter he sent to the Chief Executive Officer of Centurion on February 14, 2020. (Ex. 2165). That letter was prompted by a Court Order that had threatened Defendants with contempt if they did not perform their obligations under the Stipulation. Defendant Shinn's letter informed Centurion of that Order and he identified the particular performance measures that were the subject of possible contempt fines. Defendant Shinn explained ADCRR was facing fines of up to $14.6 million per month if Centurion did not improve. The letter then stated "ADCRR expects and demands Centurion to immediately commit all necessary resources to achieve and maintain compliance on every Performance Measure at every specific location addressed in [the Court Order]." The letter further demanded Centurion "take all reasonable steps to substantially comply" with the Court Order and it listed ten specific steps Centurion had to take. Those steps included the relocation of existing "Arizona healthcare personnel to locations that face challenges in achieving compliance," temporary transfer of Centurion personnel from other states, scheduling additional meetings, filling all vacant positions, and drafting "remedial plans for root causes that hinder compliance." Defendant Shinn was asked about his actions after sending this letter.

When asked at trial if he knew "how many health care personnel Centurion reallocated from one facility to another" following his letter, Defendant Shinn responded "No, we were focused on outcomes." (Doc. 4274 at 90). And he failed to elaborate on which specific outcomes were his focus and were achieved. He was then asked if he knew "from which Arizona facilities Centurion reallocated health care staff" or "to which facilities Centurion reallocated health care staff within Arizona." Defendant Shinn knew neither. In fact, Defendant Shinn did not know if *any* health care staff had been reallocated within Arizona. Defendant Shinn was asked if he knew of any health care staff transferred

---

his chosen vendor must provide health care in a different manner, he must enforce his rights under the vendor contract.

to Arizona from other states. Defendant Shinn did not know. When asked if he knew where Centurion had increased telemedicine availability, Defendant Shinn did not know. On this point, Defendant Shinn volunteered his "expectation was [Centurion] get to 100 percent staffing across the board. I wasn't concerned with individual pockets." (Doc. 4274 at 93). When asked if he knew what actions Centurion had taken to recruit additional staff, Defendant Shinn deflected:

> What I am looking at is outcomes and are we moving the needle forward. That's exactly what I'm looking at, health care delivery. I'm not necessarily looking at, did you move one from this location to that location? I'm simply asking, provide the services that were asked for and contracted and the Court has demanded as well.

(Doc. 4274 at 94). When pressed, Defendant Shinn admitted he did not know of any efforts to recruit more staff, nor did he know how many vacancies Centurion filled as a result of his letter.

Based on Defendant Shinn's testimony, he somehow determined he had no obligation to follow-up with the demands he made in his letter. The only possible conclusion to draw is that Defendant Shinn had little interest in changing the underlying reality. Rather, his letter appears to have been nothing more than a half-hearted effort to generate a piece of paper he could cite to avoid contempt. Obviously, the Court expected Defendant Shinn to take more direct action than signing a letter. Defendant Shinn's disinterest in Centurion's response to his letter shows he is knowingly ignoring the reality of the fundamental problems with ADCRR's health care system.

Defendant Shinn also evidenced little curiosity about the conditions at issue in this case. Defendant Shinn agreed that if there were problems in ADCRR, he would want to know of them. (Doc. 4274 at 100). But Defendant Shinn admitted he had not read any of the expert declarations in this case. (Doc. 4274 at 100). There was no explanation why Defendant Shinn, if he was interested in potential problems, chose to make no effort to familiarize himself with Plaintiffs' factual contentions.

Another crucial aspect of Defendant Shinn's testimony that proved his knowledge

of ongoing systemic failures is found in the negotiation of an extension to Centurion's contract. In June 2021, ADCRR negotiated an extension with Centurion for another year. As part of that contract, ADCRR "agreed to cap the indemnification of Centurion at $2 million for court ordered sanction and fees related to [this case]." (Doc. 4274 at 97). That meant Centurion would be liable for no more than $2 million in Court-ordered fines and any amounts beyond that would be borne by ADCRR.

As explained by Defendant Gann, that indemnification cap was something Centurion "wanted in the contract." (Doc. 4275 at 144). Accordingly, it can only be assumed that it was clear to Defendant Shinn at the time of the contract renewal that Centurion had significant concerns regarding its performance. More specifically, Centurion apparently realized it would not be able to perform adequately and significant contempt fines were likely. To avoid catastrophic liability, Centurion ensured ADCRR would bear the brunt of nonperformance. Instead of looking into why Centurion was so concerned with additional sanctions, and taking action to address the potential for continued nonperformance, Defendant Shinn simply agreed to limit Centurion's liability and insulated it from meaningful consequences for its failures.

Defendant Shinn's testimony also made clear he has adopted a strategy of pretending the problems he knows about do not exist. According to Defendant Shinn, Centurion has "done some great work" and in the 24 months leading up to trial, Centurion "produced some extraordinary results." (Doc. 4274 at 101-02). When asked if "Centurion has done extraordinary work," Defendant Shinn responded "Absolutely." (Doc. 4274 at 102). And despite his February 2020 letter, and his ignorance regarding any responsive actions to that letter, Defendant Shinn was "overall" satisfied with Centurion's performance under the contract. (Doc. 4274 at 102). In other words, "overall," Defendant Shinn is satisfied with a system that presents a substantial risk of serious harm. That is almost a perfect illustration of "deliberate indifference."

The Court pressed Defendant Shinn on his strange nonchalance regarding his 2020 letter to Centurion and Centurion's response. The Court asked him if he thought the

demands in the letter were "necessary in order to comply with the court order at that time." Defendant Shinn stated he believed the demands were necessary. (Doc. 4274 at 111). But the Court then asked him about his testimony that he was only concerned with outcomes, not performance of his demands. Defendant Shinn agreed he was primarily concerned with outcomes, but he stated Centurion had experienced some limited success:

> [Centurion] experienced success in a number of -- in a number of performance measures at many locations throughout our system. Have they failed at certain locations? There's no question about that. That's not debatable. It's just math, and we are looking at that on a monthly basis. That's what I'm looking for, is for them to ultimately be 100 percent across the board with all measures. But we're looking in reductions of failure as well as moving the needle from a systemic perspective.

(Doc. 4274 at 112). That did not answer whether he continued to believe Centurion must perform the demands in his letter. Thus, the Court asked Defendant Shinn if he was still demanding Centurion perform. He responded "we are still asking for them to complete [the letter's demands]." When asked to clarify, Defendant Shinn admitted he "was less concerned about how they do this and more concerned about the results that they produce, in terms of delivery of health care." (Doc. 4274 at 113). In sum, Defendant Shinn believed the demands in his letter were important, except when that required him to follow up or take additional action. He further believed the demands were still in effect, except he actually only cared about "results." Defendant Shinn's actions are not the type of actions a concerned administrator would have taken if he was actually interested in ensuring the undisputed failures were being resolved.

Defendant Shinn's state of mind is further illustrated by testimony that can only be described as shocking.

> **Question**: And you believe that the health care that's currently provided to the ADCRR prisoner population meets and often exceeds the community standard of care?
>
> **Defendant Shinn**: In some aspects, yes.
>
> **Question**: And you believe that has been the case continuously since your arrival at the Department two years ago?

> **Defendant Shinn**: Yes.
>
> **Question**: Okay. And you believe that the access to care for Arizona prisoners exceeds access to care for people in the community?
>
> **Defendant Shinn**: In terms of timeliness and immediate access in person, I know that from a personal perspective with my provider. It is not even close as a private citizen.
>
> **Question**: You believe that in an overall sense, access to care for Arizona prisoners exceeds access to care for people in the community, correct?
>
> **Defendant Shinn**: I know it exceeds my personal experience in Arizona, yes, sir.
>
> **Question:** You believe that in an overall sense, access to care for Arizona prisoners exceeds access to care for people in the community, correct?
>
> **Defendant Shinn:** I know it exceeds my personal experience in Arizona, yes, sir.

(Doc. 4274 at 102-03).

The claim that prisoners' access to care "exceeds" the access to care enjoyed by people in the community is completely detached from reality. Given the overwhelming evidence and repeated instances of insufficient care leading to suffering and death, Defendant Shinn could not possibly believe prisoners have the same access to care as people in the community.[37] Defendant Shinn is acting with deliberate indifference to the substantial risk of serious harm posed by ADCRR's health care system.

Defendant Gann's testimony also contains overwhelming evidence he knows of ongoing systemic failures but refuses to take adequate remedial action. Defendant Gann

---

[37] There is no evidence of what medical conditions, if any, Defendant Shinn had at the time he testified. Charitably, Defendant Shinn's opinion would have modest validity if his assessment of ADCRR medical care was based on Dr. Murray's simplistic and incredible theory that the alleged periodic testing at ADCRR of blood pressure and sugar levels is adequate medical care. But Defendant Shinn's opinion would have overlooked the overwhelming evidence of prisoners suffering from disabling psychosis, fatal cancers, fatal bleeding ulcers, multiple sclerosis, fatal Hepatitis C, and severe drug addiction. Because Defendant Shinn was aware of this evidence when he gave his opinion, he could not have plausibly believed Arizona prisoners' access to care exceeds his own experience. And because he is responsible for ADCRR's grossly inadequate health care system, his answer was a blatant admission of his flagrant dereliction of responsibilities as the Director of the Arizona prison system.

testified he had "prepared numerous staffing plans in [his] career." (Doc. 4275 at 45). He stated those plans are "extremely complicated" and require detailed analysis of each facility, including physical layout, as well as determining the scope of services to be provided and the attributes of the prisoner population. (Doc. 4275 at 48-60). He further stated it is "impossible" to use a staffing analysis prepared for a particular facility and then "overlay that" analysis to another facility. (Doc. 4275 at 53). In brief, Defendant Gann testified that determining the health care needs of a particular prisoner population requires a tremendous effort, including application of specialized knowledge.

Despite knowing a valid staffing analysis is critical for the delivery of health care, Defendant Gann has not prepared any staffing analysis for the Arizona system as a whole or for any individual complex. (Doc. 4275 at 124). Instead, Defendant Gann and ADCRR have simply relied on Centurion to determine the appropriate staffing levels. (Doc. 4275 at 92). Defendant Gann admitted he did not know how Centurion "arrived at the current staffing levels that they needed." (Doc. 4275 at 92). Thus, there is no way Defendant Gann could have a meaningful understanding of how the staffing numbers were originally devised or why they were deemed sufficient. Despite his own knowledge that staffing analyses are crucial, Defendant Gann has been uninterested in assessing the adequacy of the current staffing levels.

Defendant Gann admitted ADCRR does not have any policies or procedures "regarding the number of needed healthcare staff at each prison." (Doc. 4275 at 92). Defendant Gann further admitted he knew Centurion was not paying its employees what they could command elsewhere. (Doc. 4275 at 97). But, at the same time, Defendant Gann professed he had "no idea" what Centurion was paying its employees. When asked if he had demanded Centurion increase employee pay, Defendant Gann responded "That's a no. That's their business." (Doc. 4275 at 97).

Defendant Gann testified insufficient staffing was not a "barrier" to complying with the Stipulation. (Doc. 4275 at 98). But he then agreed insufficient staffing often leads to cutting corners and inadequate documentation. He also agreed the complexes at Eyman,

Florence, Lewis, Tucson, and Yuma all had "compliance problems" with the Stipulation. (Doc. 4275 at 101). Tucson in particular had canceled the nurse line many days, had a backlog of HNRs, and was not delivering insulin to diabetics in a timely fashion. Defendant Gann admitted these issues "seem to be related to staffing." (Doc. 4275 at 109). Defendant Gann also identified other failures, such as "pre-pouring medications."[38] According to Defendant Gann, pre-pouring medications could be due to insufficient staff, "laziness or poor culture." (Doc. 4275 at 103-04). Given his acknowledgment that inadequate staffing can lead to cutting corners, the lack of adequate staffing is the most likely explanation for the pre-pouring problem.

When asked about specific staffing levels reported by Centurion, Defendant Gann offered some revealing testimony. The Court asked Defendant Gann whether it was within Centurion's discretion to hire more individuals in a certain position than what the contract specified. (Doc. 4275 at 115). Defendant Gann responded with a general overview of his approach to staffing:

> I think that [Centurion] really got into this contract in their best and final offer and they came back six months later and requested more staff. But you can't come back six months later and tell me – I'm just speaking --I wasn't here. But you can't tell me six months later you need more staff, and much of it's clerical related, not clinical . . . and expect the taxpayers to just go back and alter the contract by over 100 positions.

(Doc. 4275 at 115). In other words, Defendant Gann views the number of contracted positions as an absolute upper limit. If Centurion determines it needs more staff to provide adequate care, Defendant Gann is not interested. Rather than looking to the adequacy of care being provided, Defendant Gann is interested in ensuring the contracted-for staffing is not exceeded.

In addition to the testimony by Defendants Shinn and Gann, the undisputed evidence from the time the Stipulation was in effect establishes officials had no interest in

---

[38] This refers to a practice of staff removing medications "from the blister pack" and putting them into envelopes for delivery to prisoners in the housing units. (Doc. 4275 at 103). Defendant Gann agreed this was not an acceptable method of medication delivery.

taking sufficient actions to remedy known problems. During the Stipulation's life and beyond (discovery for trial went through September 2021), prison officials repeatedly claimed they could improve performance on their own. As explained by Dr. Wilcox, ADCRR identifies Corrective Action Plans allegedly as a mechanism to remedy deficiencies in health care. But Dr. Wilcox identified CAPs that repeated for months or years on end without improvement at Eyman (PM 13, PM 40, PM 44, PM 47, PM 52), Florence (PM 44, PM 50), Lewis (PM 44), Perryville (PM 13, PM 44, PM 51), Tucson (PM 37, PM 44, PM 47, PM 50, PM 51), Winslow (PM 44), and Yuma (PM 13, PM 37, PM 40, PM 51). In other words, ADCRR identified problems and identified solutions, but those solutions failed. Instead of trying different solutions, ADCRR simply repeated the already-failed "solutions" for months or years. This is evidence Defendants knew of failures but refused to take meaningful steps to those failures, often for years.

The foregoing evidence that Defendants Shinn and Gann knew of significant failures in the health care system builds on a unique aspect of this case involving the Stipulation. Defendants' failures during the Stipulation are undisputed. After all, the failures were based on Defendants' own records. Given that, Defendants cannot credibly claim they were unaware of the problems. Thus, Defendants only credible defense is to rely on legal, rather than factual, arguments. Those arguments fail.

**IV. Defendants' Legal Arguments are Unavailing**

One of Defendants' main arguments against a finding of liability is their belief that the "individual claims" brought by each of the named Plaintiffs fails. (Doc. 4309 at 98). Defendants do not provide a coherent explanation for this approach. In fact, Defendants even argue the named Plaintiffs' "allegations were not raised in the Complaint." (Doc. 4309 at 98). Defendants seem to believe this litigation consists of determining whether the medical care provided to the named Plaintiffs was constitutional. But this case raises the question of whether Defendants' policies and practices create a substantial risk of harm to all prisoners. As the Ninth Circuit stated when affirming class certification:

> The cases cited in the defendants' briefs, many of which involve individuals challenging particular instances of medical

> treatment or conditions of confinement, confirm that they (erroneously) view the plaintiffs' claims as ultimately little more than a conglomeration of many such individual claims, rather than as a claim that central policies expose all inmates to a risk of harm.

*Parsons v. Ryan*, 754 F. 3d 657, 675 n.17 (9th Cir. 2014). The Supreme Court has also stated cases raising "systemwide deficiencies" do not turn on the care provided to a single prisoner on any particular occasion.

In *Brown v. Plata*, the Supreme Court explained:

> Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay-or any other particular deficiency in medical care complained of by the plaintiffs-would violate the Constitution under *Estelle v. Gamble*, if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society.

*Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011). Defendants' insistence that discrete care provided to particular prisoners forecloses their liability is misplaced. This case is not about the care provided to, for example, Kendall Johnson. While Defendants maintain, absurdly, that the care provided to her did not violate the Eighth Amendment, this case does not turn on whether Ms. Johnson was mistreated. Rather, the question is whether the policies and practices create a risk of harm to Ms. Johnson and all other prisoners. There is no question they do.

Defendants also attempt to rely on the Ninth Circuit's recent decision in *Balla v. Idaho*, 29 F.4th 1019 (9th Cir. 2022). There, the district court had terminated an injunction that was ongoing since 1984 requiring the Idaho State Correctional Institution to make changes in the areas of food preparation, medical facilities, safety, and many other aspects of prison operations. In the years following the injunction's issuance, there was lengthy

litigation over Idaho officials' compliance with the district court's orders and an increased focus on medical care and overcrowding. In 2020, Idaho officials moved to terminate the injunction, maintaining there was insufficient evidence they remained deliberately indifferent to the prisoners' serious medical needs. The district court "found no current and ongoing constitutional violations" and terminated the injunction. The plaintiff appealed, arguing violations were continuing and the injunction should not have been terminated. The Ninth Circuit affirmed termination of the injunction.

*Balla* is distinguishable from the present case. Of significance, the plaintiffs' expert in *Balla* was asked by the district judge whether the existing medical care resulted in injury or the unnecessary and wanton infliction of pain. The expert answered, "I don't know if I can answer that." *Balla v. Idaho State Board of Correction*, 2020 WL 2812564, at * 16 (D. Idaho May 30, 2020). Here, the evidence of constitutional violations is substantial. Both Dr. Wilcox and Dr. Stewart made clear the current system for the provision of medical and mental health care exposes all prisoners to a substantial risk of serious harm. Their testimony was corroborated by chart reviews by Dr. Murray and Dr. Penn demonstrating systemic deficiencies. *Balla* does not help Defendants.

Defendants offer a case from the Seventh Circuit, *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022), where an injunction regarding mental health care in the Illinois Department of Corrections was vacated. The Seventh Circuit found the prison officials did not have the required mental state to show they had acted with "deliberate indifference." *Id.* at 710. The Seventh Circuit concluded the prison officials "made reasonable efforts to cure the deficiencies identified" by the plaintiffs." *Id.* While those "efforts fell short" of actually correcting the constitutional violation, the Seventh Circuit concluded "reasonable measures," even if "ultimately unsuccessful," meant the officials had not acted with deliberate indifference. *Id.* at 711.

It is important to note the extent of the "reasonable measures" undertaken in *Rasho*. After the suit was filed, prison officials "spent $45 million to build new residential treatment units at several facilities and $75 million to develop a new data system for intake

assessments; [they] procured another $150 million to construct a new inpatient facility; [they] delivered mental-health training to [their] entire staff; and [they] hired administrative personnel to coordinate inmate care." *Id.* at 707. There is nothing remotely similar in the present suit. Defendants did not present evidence of new units being built or of requests to the legislature for additional funding to ensure better medical and mental health care. Defendants cannot be viewed as pursuing "reasonable measures" to correct the known problems.

An additional reason to doubt the applicability of *Rasho* is that it adopts a view of prison officials' obligations that cannot be squared with existing Ninth Circuit law. In *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014), the en banc majority held a prison dentist could not be held responsible for money damages in his individual capacity for staffing conditions over which he had no control. But in prohibiting the award of money damages, *Peralta* made clear "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Id.* Accordingly, contrary to *Rasho*'s analysis that ineffective remedies may suffice, *Peralta* holds that in a suit for injunctive relief prison officials must remedy ongoing constitutional violations of which they are aware. *Peralta* is binding and it ensures adherence to constitutional standards. In the Ninth Circuit, state officials are not free to engage in ongoing violations of prisoner's constitutional rights merely because of policy decisions within the state officials' control, such as funding.

To be clear, the Court does not take issue with the uncontroversial principle that prison officials can avoid liability by responding reasonably to a risk, even if the harm is not ultimately averted. But that principle is primarily aimed at situations where the claim is being viewed retrospectively and there is no ongoing constitutional violation to remedy. In injunctive relief suits, it often will not be enough for prison officials to *attempt* to remedy constitutional violations. They must actually do so.

Defendants also rely on *Fraihat v. ICE*, 16 F.4th 613 (9th Cir. 2021). In *Fraihat*,

five immigration detainees with serious underlying medical conditions filed suit claiming ICE was acting with deliberate indifference to their medical needs and reckless disregard of known health risks. The plaintiffs claimed they were at increased risk if they contracted Covid-19 and they sought a nationwide preliminary injunction requiring ICE take actions to protect them from infection. *Id.* at 618. The district court certified two nationwide classes and issued a preliminary injunction that applied to all immigration detention facilities nationwide. *Id.* The injunction required ICE identify and track detainees with certain risk factors, required ICE issue a comprehensive performance standard regarding Covid-19 issues, and promulgate directives for release of detainees. The court later amended the preliminary injunction to impose more detailed requirements and procedures designed to result in the release of "substantial numbers of detainees from ICE custody. *Id.* The government appealed.

The Ninth Circuit set aside the injunction and held the plaintiffs had failed to demonstrate a likelihood of success on the merits of their claims. *Id.* It noted the plaintiffs had not sought individualized injunctive relief or relief specific to the conditions where they were housed but had instead challenged ICE's nationwide Covid-19 directives and essentially asked the district court "to assume control of top-level policies governing ICE's efforts" to combat the pandemic. *Id.* The plaintiffs had failed to present evidence of constitutional and statutory violations on a "programmatic, nationwide level." *Id.* The Ninth Circuit concluded "the slew of national guidance, directives, and mandatory requirements that [ICE] issued and then frequently updated in the spring of 2020" belied the notion that ICE had acted with "reckless disregard" necessary to support a finding of unconstitutional, system-wide deliberate indifference.

Defendants' reliance on *Fraihat* is misplaced. The ICE facilities in that case consisted of "a nationwide network of over 250 detention facilities." *Id.* at 620. Those facilities differed dramatically from each other:

> These facilities differ in various ways. ICE owns some of the detention facilities; others are operated under contract with state or local agencies or government contractors. Some of the centers are "dedicated" facilities,

> which hold only ICE detainees, whereas others are "non-dedicated" facilities, which also hold non-ICE detainees. … Facilities also vary based on who provides medical care. Government employees, as part of the ICE Health Services Corps (IHSC), provide direct medical care at twenty facilities, which together hold about 13,500 detainees. The remaining facilities employ medical staff that the federal government does not directly employ.

*Id*. at 620. This type of analysis does not apply to the present case involving facilities owned and operated by ADCRR.

Prisoners incarcerated in ADCRR's ten complexes are subject to the same failed practices, which expose all of them to a substantial risk of serious harm. Understaffing is pervasive at every complex and the manner in which prisoners are assessed is common systemwide. Moreover, prisoners are routinely transferred between ADCRR's complexes. A healthy prisoner at one location might be transferred to another location when he is diagnosed with an illness or when he needs specialty care. Unlike *Fraihat*, ADCRR's complexes cannot be viewed as meaningfully distinct from each other.

Defendants' legal arguments are no more persuasive than their factual arguments. Defendants know prisoners face a substantial risk of serious harm due to the policies and practices yet Defendants have refused for ten years to take the actions necessary to alleviate that risk.

**CONCLUSION ON HEALTH CARE**

The current policies and practices, of which Defendants are aware, require prisoners to repeatedly submit requests for treatment, with the response they will be seen on the nurse line. And while nurses are a vital component of any health care system, they are not substitutes for physicians, particularly for prisoners who develop serious conditions or sustain serious injuries (which could be any of them, at any time, in any location). Yet, despite these risks, Defendants provide no substantial explanation detailing why they have persisted in pursuing the same policies and practices regarding staffing. In particular, Defendants have not explained why they refuse to renegotiate the staffing matrix and, inexplicably, Defendants did not even explain how the staffing numbers were derived in the first instance.

Dr. Murray emphasized there is no evidence of indifference from individual health care staff, and Defendant Shinn noted their "tremendous will to succeed." (Doc. 4274 at 21:22-22:5). But this case is not about each individual health care provider's will to succeed. They are part of a system that is doomed to fail because, from the beginning, it was not designed to succeed. This case is about whether *Defendants* have a willingness to succeed. And Defendants remain deliberately indifferent not because they know about individual deficiencies in treatment but because they know of the widespread failures to provide care and still fail to take significant action. This has been evident since the inception of this action. Defendants' failure to comply with the Stipulation, failure to undertake meaningful remedial action when their own mortality reviews reflect preventable deaths, and failure to take any meaningful follow up actions to ensure Centurion's compliance is what transforms their knowledge into conscious disregard of the risk of harm prisoners face.[39]

The fundamental conclusion is that ADCRR prisoners who develop life-threatening medical and mental health conditions are at a significant risk of serious harm. The ones that do develop such conditions may die prematurely, suffer prolonged pain or symptoms, or survive with lifelong disabilities. This risk is applicable to all prisoners because anyone is susceptible to serious injury or illness at any time. Moreover, the medical and mental health care systems are treated as interconnected such that prisoners housed at one location often are transferred to other locations for treatment. No prisoner, at any location, is safe.

Defendants' refusal to acknowledge any shortcomings is foundational to these findings. If Defendants had admitted their obvious errors but attempted to demonstrate that, despite those errors, they were still capable of providing constitutionally adequate health care, that would have required a different analysis. If Defendants had acknowledged deficient care and attempted to demonstrate those were violations of existing policies, that

[39] Notably, the evidence demonstrates that the individual cases before the Court were the product of deliberate indifference to serious medical needs and the root cause of the deliberate indifference were the policies that prevented any substantive treatment of the serious medical needs of the individuals.

would have required a different analysis. Instead, Defendants stubbornly maintain that there is nothing amiss (other than the need for a new EHR). In a system that produces this many catastrophic outcomes, where its own health care expert's chart reviews reflect care that meets the definition of deliberate indifference, when its mental health care expert's chart reviews reflected at least 23.8% of charts reviewed showed seriously deficient or an outright denial of care, when not one witness could validate the existing staffing allocation, and when nearly everyone agrees that ADCRR is critically understaffed, it is simply not possible to draw any other conclusion than the health care delivery system poses a substantial risk of serious harm to all prisoners. These issues are pervasive at all 10 ADCRR complexes. The overarching policies of critical understaffing, nurse-led health care, lack of adequate interpretation services, and a disastrous EHR are system-wide.

## MAXIMUM CUSTODY

### I. Subclass Definition and Admissibility of Expert Testimony

The Court certified a subclass defined as:

> All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area.

Two aspects of this class definition were subsequently addressed by the Ninth Circuit. First, the definition's reference to particular locations did not mean all prisoners housed at those locations were automatically members of the subclass. As explained by the Ninth Circuit, "[t]he touchstone for inclusion in the subclass is . . . the amount of isolation experienced by inmates." *Parsons v. Ryan*, 912 F.3d 486, 503 (9th Cir. 2018). Thus, the crucial aspect is "the amount of time an inmate is 'confine[d] in a cell' each day," not where the prisoner is housed. *Id.* Those prisoners "who are confined in a cell for 22 hours or more each day (i.e., inmates who receive less than 14 hours of out-of-cell time each week)" are members of the subclass. *Id.* This clarification by the Ninth Circuit was important because some of the listed locations, such as Florence-Central and Eyman-SMU I, may house prisoners who receive offers to spend substantially more than 14 hours per week out

of their cells at varying levels of restrictive housing. *Id.* at 502.

The second aspect of the subclass definition addressed by the Ninth Circuit was a prisoner's choice whether to leave his cell did not dictate membership in the subclass. In the Ninth Circuit's view, "[c]onfinement . . . connotes a lack of control whether to leave a particular place." *Id.* Thus, if an inmate is "given an opportunity to participate in out-of-cell activities," he "cannot be considered 'confined' in a cell during that time even if the inmate may theoretically decide not to take advantage of the opportunity." *Id.* For example, if a prisoner were "offered 15 hours of out-of-cell time per week for education, but turn[ed] it down," he would be excluded from the subclass. *Id.* This clarification was useful to focus the subclass issues on whether prisoners were being "offered" out-of-cell time. It is "offers," not whether prisoners accept those "offers," that matter for determining out-of-cell time.

When the Ninth Circuit addressed "offers" for out-of-cell time, it was not asked to address, and did not address, what this Court has previously described as "unreasonable and unattainable offers" for out-of-cell time. (Doc. 3359 at 10). Offers for out-of-cell time conveyed in unreasonable ways or accompanied by unreasonable conditions or consequences could render such offers unavailable such that they cannot be used when determining membership in the subclass; nor can they be used when calculating how much out-of-cell time was available to prisoners. (Doc. 3359 at 9). For example, if a prisoner is offered fifteen hours of out-of-cell time in a given week, but all of the offers are accompanied by unreasonable consequences, the prisoner must be deemed as not being offered any out-of-cell time. Therefore, while recognizing it is "offered" out-of-cell time that matters, "offers" must be reasonable or else the offers are deemed not to have occurred.

Understanding the current conditions of confinement experienced by the subclass requires examining Defendants' numerous policies regarding prisoner classification and placement. Unfortunately, those policies are complex and difficult to understand. Moreover, those policies routinely bear little resemblance to actual practices. Before considering those policies, however, the Court must address the admissibility and

reliability of the testimony offered by two of Plaintiffs' experts.[40] Those experts, Martin Horn and Dr. Craig Haney, testified extensively regarding the policies, practices, and other conditions of confinement relevant to the subclass. Thus, it is essential to ensure the admissibility of the experts' testimony before making factual findings regarding the subclass.

**A. Martin Horn**

Martin Horn earned a bachelor's degree in government from Franklin & Marshall College in 1969 and a master's degree in Criminal Justice from John Jay College in 1974. In 1969, Horn began his career as a New York State Parole Officer. He worked in that position for six years. From 1975 to 1977 he worked as an assistant professor of criminal justice at the State University College in Utica, New York. From 1978 to 1985 he held various positions in the New York State Department of Correctional Services, including serving as Superintendent of the Hudson Correctional Facility. He then became the Director of Parole Operations for the New York State Division of Parole where he served from 1985 to 1991. He was that entity's Executive Director from 1991 to 1995. He then became Pennsylvania's Secretary of Corrections until 2000.

As of January 1, 2002, Horn became Commissioner of the New York City Department of Probation and, one year later, he became the Commissioner of the New York City Department of Corrections. In that role he was responsible for "literally everything that happened in the agency." (Doc. 4266 at 135). He was responsible for "the health, safety and welfare of the inmates [and] for the security of the city jails." (Doc. 4266 at 135). He held the two New York City positions until July 31, 2009. Over the course of his career, Horn has published articles, delivered lectures, and testified before state and federal legislative bodies as well as state and federal courts. (Doc. 4166 at 4-6).

In preparation for his testimony, Horn visited ADCRR facilities at Eyman and Lewis, and interviewed more than 60 prisoners. (Doc. 4166 at 4). He took photographs to document the conditions. Plaintiffs offered Horn as an expert regarding the conditions of

---

[40] Defendants did not offer any controverting expert testimony.

confinement and the operation of prisons. In particular, Horn was offered as an expert in the appropriate classification and housing of prisoners, including the impact of isolation on prisoners.

In their post-trial submissions, Defendants summarily argue "Horn does not have the requisite background, knowledge, or experience to provide opinions regarding the effects of isolation or other conditions of confinement on ADCRR inmates." (Doc. 4309). Without meaningful elaboration Defendants state only that Horn's "knowledge, skill, experience, training, or education" are insufficient to provide the opinions he offers.[41] Pursuant to Federal Rule of Evidence 702, Horn is qualified because he has sufficient knowledge, training, and experience such that his opinions are admissible. The Court may or may not credit those opinions, but that is irrelevant to the admissibility issue. *See Primiano*, 598 F.3d 558, 564-65 (9th Cir. 2010) ("Under *Daubert*, the district judge is a gatekeeper, not a fact finder.").

**B. Dr. Craig Haney**

Craig Haney, Ph.D., is a Professor of Psychology at the University of California, Santa Cruz. (Doc. 4122 at 3). He has a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in psychology and a J.D. degree from Stanford University. Dr. Haney describes his area of specialization as "psychology and law" which he defines as "the application of psychological data and principles to legal issues." (Doc. 4122 at 3). He has published numerous articles and book chapters in law and psychology, with some emphasis on "the nature and consequences of solitary or 'supermax'-type confinement." (Doc. 4122 at 3). Dr. Haney has served as a consultant to police departments, the California legislature, and the United States Department of Justice.

A special focus of his career has been "the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile

[41] Defendants also request the Court make strange findings regarding Horn's testimony. For example, Defendants request the Court find "Horn admits that per ADCRR's DO 812 governing maximum custody management, ADCRR maximum custody inmates are offered 7.5 hours a week of outdoor recreation." (Doc. 4309 at 340). There is no dispute what DO 812 clearly states and it is simply not true that Horn "admitted" prisoners in maximum custody were always being offered 7.5 hours each week of outdoor recreation.

facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and 'supermax'-type confinement)." (Doc. 4122 at 5). In performing his professional work, he has toured state prison facilities in twenty-nine states, multiple federal facilities, and international facilities in eight other countries. He has been qualified as an expert and testified in many state and federal courts. His work has been cited approvingly by the United States Supreme Court. *Brown v. Plata*, 563 U.S. 493, 518 (2011).

Dr. Haney has been involved in this case since 2012. Over the years, he has toured Arizona facilities multiple times and spoken with many prisoners. He often selected prisoners at random but, over the years, he has made efforts to interview the same prisoners previously interviewed if they were still housed in facilities he visits. (Doc. 4122 at 9). He also reviewed medical and mental health records of the prisoners he interviewed. Finally, during his tours he took photographs. During this case, Dr. Haney filed numerous declarations containing his opinions regarding Arizona's policies and practices. (Doc. 4122 at 7).

In September 2021, Dr. Haney toured the following housing units: Eyman-SMU I, Eyman-Browning, Lewis-Rast Max, Lewis-Barchey and Morey (medium security units), Lewis-Stiner detention, and Lewis-Sunrise. During these tours, Dr. Haney interviewed approximately 75 prisoners. Dr. Haney attempted to re-interview prisoners he had previously interviewed but his selection of other prisoners to interview was "quasi random." (Doc. 4306 at 58). Those interviews did not follow a rigid structure. Rather, Dr. Haney asked each prisoner "what your life is like and how you feel you're being affected by the conditions and the procedures and your treatment." (Doc. 4306 at 121). Plaintiffs offered Dr. Haney as an expert regarding the subclass's conditions of confinement and, in particular, whether those conditions present a substantial risk of serious harm to the subclass members' mental health.

As for Dr. Haney, Defendants again offered the summary argument that he "does not have the requisite background, knowledge, or experience to provide opinions regarding

the psychological effects of isolation," without any meaningful detail. (Doc. 4309 at 327). Given Dr. Haney's knowledge, training, and experience, this argument is preposterous. Pursuant to Federal Rule of Civil Procedure 702, Dr. Haney has precisely the qualifications to testify to the exact subject matter in which he offers his opinions.

Further, Defendants did not bring timely motions to exclude Horn or Dr. Haney and, therefore, they have waived such challenges. *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012). The Court finds both Horn and Haney were credible. As appropriate, the Court will rely on Horn and Haney's testimony to describe the policies and conditions of confinement imposed on the subclass.

## II. Policies Applied to Subclass

Defendants choose where to house prisoners, and the conditions at those locations, using five policies known as "Department Orders" ("DOs"). The five DOs relevant to the subclass issues are DO 801, DO 804, DO 807, DO 812, and DO 813.

### A. DO 801

DO 801 sets forth Defendants' "Classification Policy." (Ex. 1309). As explained by Horn, "classification is a term that is used very widely in prisons and jails all over the country" and it is "a fundamental building block of operating prisons and jails that are safe and secure." (Doc. 4266 at 159). The underlying premise of classification is to identify prisoners who can be placed in "the least restrictive situations" versus those prisoners who must be housed in more restrictive environments. (Doc. 4266 at 159-160). DO 801 requires each prisoner be assigned two scores, known as a "Custody Level" and an "Internal Risk Level." In general, the "Custody Level" "refers to that sort of gross discrimination between minimum custody and maximum custody and gradations in between." (Doc. 4266 at 163). The "Internal Risk Level" refers to "when an inmate is at a prison, how much independence of movement the inmate can have within that particular [prison]." (Doc. 4266 at 163).

#### 1. Custody Classification

DO 801 outlines "four custody levels": Maximum Custody; Close Custody;

Medium Custody; and Minimum Custody. (Ex. 1309 at 5). Determining a prisoner's custody level requires an individualized analysis using a document titled "Objective Classification: Custody & Internal Risk Technical Manual." (Ex. 1310). The criteria used in this process are:

**(i)** Most serious current offense;
**(ii)** Most serious prior/other offense;
**(iii)** Escape History;
**(iv)** History Institutional Violence;
**(v)** Gang Affiliation Status; and
**(vi)** Current Age.

(Ex. 1310 at 12). The technical manual assigns numeric "points" for gradations within each of the six criteria. The total number of points is then used to determine the appropriate custody level. For example, an inmate who scores a total of thirty-eight points under the six criteria likely will be assigned to maximum custody while an inmate who scores zero to nine points likely will be assigned to minimum custody. (Ex. 1310 at 60).

**2. Internal Risk Level**

A prisoner's "Internal Risk Level" is determined based on a process very similar to that regarding custody classification. The same six criteria used to determine the custody level are also used to determine the internal risk level. (Ex. 1309 at 15). And using those criteria, each inmate is assigned one of five risk levels. A score of 5 represents the highest risk and a score of 1 the lowest. (Ex. 1309 at 14-15). There are certain guidelines, however, that impose a particular internal risk level regardless of how the inmate otherwise scores. For example, a minimum custody inmate that has "a current or prior conviction for Murder or Kidnapping" must receive an internal risk level of no lower than 3. (Ex. 1309 at 15).

The custody classification and internal risk level scores are meant to address slightly different aspects of each prisoner's appropriate housing location but, given that they are using some of the same characteristics of each prisoner, the scores often overlap. Moreover, the internal risk level is secondary to the custody level in that a prisoner placed in maximum custody will have his movement drastically limited regardless of his internal

risk level. (Doc. 4266 at 164).

**3. Overrides**

The custody classification and internal risk level scores are both subject to "overrides."[42] "[O]verrides are basically exceptions," meant to address situations where the classification scheme may not be reliable. (Doc. 4266 at 165). For example, there may be "confidential information that is not reflected in the criminal history or in the crime itself" that should be considered when deciding how to classify a prisoner. (Doc. 4266 at 165). Overrides are either "discretionary" or "non-discretionary."

Discretionary overrides that increase custody level are appropriate "whenever the inmate's behavior or new information indicates increased security measures are appropriate to ensure the safety of the public, staff, and/or other inmates." (Ex. 1309 at 11). Discretionary overrides may be appropriate if an inmate is a high-profile individual, his crimes were "depicted as heinous," or if there is some "other major reason." (Ex. 1309 at 12). There was no testimony or evidence offered at trial how these determinations are made. For example, there was no explanation which crimes will be deemed "heinous" for purposes of a discretionary override.

In addition to discretionary overrides, DO 801 provides for "non-discretionary overrides." (Ex. 1309 at 6). The non-discretionary overrides impose simple bright-line rules based on particular characteristics. Thus, regardless of how the technical manual would score a death-sentenced prisoner, he must always be classified as either maximum or close custody. (Ex. 1309 at 6). Another non-discretionary override is that an adult male, regardless of crime, who is serving a life sentence must always serve the first two years in maximum custody. This is the default starting point, but reduction to close custody is, allegedly, possible "on a case-by-case basis." (Ex. 1309 at 6). However, it was undisputed at trial that as a matter of practice, prisoners beginning a life sentence are never eligible to be reclassified until they have served two years in maximum custody. (Doc. 4268 at 49).

Defendants' approach to overrides creates the possibility prisoners will be

[42] Pursuant to policy, internal risk level overrides may decrease, but not increase, a prisoner's internal risk level. (Ex. 1310 at 45).

"overclassifie[d] . . . based on who he or she is or who he or she harmed." (Doc. 4266 at 169). The classification and override processes also create the situation where a single characteristic is used repeatedly. For example, escape history is used when calculating a prisoner's custody classification as well as his internal risk level. But escape history can also be used to determine if an override is appropriate. (Doc. 4267 at 8). Defendants offered no evidence at trial explaining the reason their classification policies use the same characteristics over and over again. Overall, DO 801 is drafted and implemented with a strong predisposition towards housing prisoners in very restrictive housing.

**B. DO 804**

DO 804 sets forth Defendants' "Inmate Behavior Control" policy. (Ex. 1312). DO 804 "describes the operation of prison Detention Units as a means to temporarily or permanently separate inmates from the general population to preserve the safe, secure and orderly operation of an institution." (Ex. 1312 at 3). The policy allows for an inmate to be placed "in detention status" if certain criteria are met.[43] There was no evidence offered at trial to explain the exact meaning behind each of the seven criteria for placement in detention status. A Deputy Warden testified DO 804's reference to "observation status" is implicated when a prisoner is acting strange "but mental health does not place them on a mental health watch." (Doc. 4273 at 53). That Deputy Warden did not know, however, what "to fulfill disciplinary sanctions" meant because ADCRR allegedly does not have

---

[43] Detention may be merited:

1. To ensure the safe, secure and orderly operation of the institution/facility.
2. To ensure the integrity, and pending completion, of an ongoing investigation.
3. While determining eligibility for Protective Custody.
4. For observation status, to identify, minimize and intervene in the possibility of self-destructive behaviors.
5. Pending institutional review and classification placement, such as pending transfer to a higher custody level.
6. Pending revocation of parole, work furlough, home arrest, or temporary, mandatory or provisional release.
7. To fulfill disciplinary sanctions. (Ex. 1312 at 4).

"disciplinary detention." (Doc. 4273 at 54).

Detention status pursuant to DO 804 is technically distinct from being classified as maximum custody. However, they are very similar in practice. As explained by a Deputy Warden, "[p]eople who are in detention are treated like they're in max custody." (Doc. 4264 at 184-185). In fact, prisoners in detention are treated as having the highest possible custody classification as well as the highest internal risk level. (Doc. 4264 at 185).

Significantly, pursuant to DO 804, meals for prisoners in detention units should be provided at the same time, and of the same quality, as meals provided to prisoners in general population. In addition, DO 804 states prisoners in detention will be given the opportunity to shower three times per week and the opportunity to exercise outside of their cell for two hours on three different days each week. (Ex. 1312 at 5). Thus, if DO 804 were followed, prisoners in detention would be offered three showers and no less than six hours of out-of-cell recreation per week.

**C. DO 807**

DO 807 is the policy regarding "Inmate Suicide Prevention, Mental Health Watches, and Progressive Mental Health Restraints." (Ex. 1315). DO 807 sets forth the training requirements for correctional officials regarding suicide prevention and outlines the various types of "Mental Health Watches" an at-risk prisoner may be subjected to when appropriate. For example, depending on a prisoner's needs, he or she may be placed on "Continuous Mental Health Watch," "10-Minute Mental Health Watch," or "30-Minute Mental Health Watch." (Ex. 1315 at 12-15). Those watches require observation by a correctional officer either continuously or at the specified intervals (*i.e.*, ten or thirty minutes).

DO 807 states all prisoners on a mental health watch should be served meals "of the same quantity and nutritional quality as meals served to the general population." (Ex. 1315 at 11). And, "[u]nless determined contraindicated by a licensed mental health professional; [sic] showers, telephone privileges, recreation, and visitation shall be made available to the inmate." (Ex. 1315 at 12). DO 807 does not state the amount of recreation that should be

provided to prisoners on a mental health watch.[44]

**D. DO 812**

DO 812 is the "Inmate Maximum Custody Management and Incentive System." (Ex. 1318). It establishes "a system that requires inmates in Maximum Custody to work through a program, utilizing a step incentive system, providing the opportunity to participate in jobs, programs, and other out of cell activities." (Ex. 1318 at 3). Prisoners in maximum custody "begin the program in Step I, with Step I being the most restrictive, and Step III being the least." (Ex. 1318 at 5). There are many different varieties of "maximum custody" and some varieties are subject to different limitations.[45] For the most common type of maximum custody, a prisoner must spend a minimum of 30 calendar days at Steps I or II before being eligible for advancement to the next step. And prisoners who maintain "Step III for a minimum of 30 consecutive days, without incident, are eligible for consideration for placement in a Close Custody housing location." (Ex. 1318 at 6). DO 812 is effectively a program whereby prisoners in maximum custody are told they can earn their way into more privileges and, eventually, be placed in less-restrictive housing settings.

DO 812 specifies the exact privileges for prisoners at each step and those privileges vary slightly based on location. For example, prisoners in the Eyman-Browning unit who are at Step I are allowed one phone call per week as well as one non-contact visit. Prisoners at Step III at the same location are allowed three phone calls per week as well as three non-contacts visits. (Ex. 1318 at 11). The same limits apply to prisoners in the Lewis-Rast unit with the exception that Rast prisoners at Step III are allowed a weekly contact visit. (Ex. 1318 at 13). For present purposes, the most relevant aspect of DO 812 involves the amount

[44] Prisoners often "go back and forth between [mental health] watch and their maximum custody location." Those prisoners are called "frequent fliers." (Doc. 4273 at 110). One Deputy Warden knew of "between five and ten" prisoners who have gone back and forth between maximum custody and mental health watch. (Doc. 4261 at 114).

[45] DO 812 identifies one set of procedures and benefits for the "maximum custody population" and different procedures and benefits for prisoners in "restrictive/enhanced status housing program." (Ex. 1318 at 5). Because the vast majority of prisoners in maximum custody are not in the "restrictive/enhanced status housing program," the Court will focus on the policy's application to "maximum custody."

and type of recreation opportunities each prisoner is supposed to be provided. Pursuant to DO 812, the table at Appendix 6 identifies the recreation that should be offered to a maximum custody prisoner at a particular location and at a particular step. The most crucial aspect of DO 812 is that *no* prisoner in maximum custody should be offered less than 7.5 hours of recreation per week while prisoners may, some weeks, receive up to 12.5 hours of recreation in a single week.

When asked at trial about DO 812's requirements, a Deputy Warden stated, with the exception of Step II prisoners at Browning, recreation opportunities must be in the enclosures of the size specified.[46] (Doc. 4259 at 104-05). Thus, if DO 812 were being faithfully applied, a general population Step III prisoner at Browning would receive one 2.5-hour block in a 20x40 enclosure every month as well as, each week, one 2.5-hour block in a 10x10 enclosure and two other blocks in the standard enclosure or larger. (Doc. 4259 at 105). That would mean at least 7.5 hours of out-of-cell recreation every week, some of which would be with other inmates to allow for socialization.

DO 812 contemplates "periodic classification reviews of inmates . . . every 180 calendar days or less." (Ex. 1318 at 10). There was testimony explaining how these periodic reviews are conducted at Eyman-Browning as well as Eyman-SMU. At both locations, prisoners have their progression reviewed each month. To accomplish this, officials at both locations hold weekly meetings. (Doc. 4259 at 114, 117; 4273 at 22). Those meetings involve the deputy warden or the associate deputy warden, as well as other correctional officers. (Doc. 4264 at 150; 4273 at 22). Those officials review each prisoner, including that prisoner's "behavior, their participation in programming, their disciplinary and their overall interactions with staff." (Doc. 4264 at 150; Doc. 4273 at 22-23). At Eyman-Browning, each meeting lasts approximately 90 minutes, meaning approximately 360 minutes are spent on step reviews each month. (Doc. 4259 at 117). That means, because there are 700 maximum custody prisoners at Browning, on average each prisoner is reviewed for approximately thirty seconds each month. At Eyman-SMU, each meeting

[46] The Court reached the same conclusion regarding the mandatory nature of the enclosure sizes while the Stipulation was in effect. (Doc. 3861 at 10).

lasts between 30 and 60 minutes, meaning each month there is approximately 240 minutes spent on reviews. (Doc. 4273 at 23). Again that means, on average, each prisoner is reviewed for approximately 30 seconds each month.

Given the number of prisoners, the length of meetings, and that the relevant records can be incomplete and hard to read, it is not possible officials are conducting a careful and meaningful review of each prisoner each month. DO 812 contemplates step progression and eventual release from maximum custody but the evidence shows actual operation establishes DO 812 is not being applied in a systematic and consistent way. Prisoners sometimes change step levels or are reclassified to lower custody levels but those actions occur almost at random. Prisoners may remain at certain steps for lengthy periods, even though they have not been subject to any disciplinary actions. Prisoners also attain Step III and remain at that step for years. For an egregious example, one prisoner attained Step III in October 2015 and remained in maximum custody, at Step III at least through August 2020. (Ex. 1220 at 33).

DO 812 contemplates step progression but ADCRR does not calculate how long prisoners spend in maximum custody or how long prisoners spend at each step. (Doc. 4259 at 120). A Deputy Warden testified ADCRR does not track these figures, but ADCRR does maintain an electronic database containing information on when a prisoner entered maximum custody, when a prisoner had a change in his step level, and when officials conducted a review of his current step level. (Ex. 1220). The evidence indicates that database is used solely to record relevant dates and events, but ADCRR does not use that data to calculate the amount of time spent in maximum custody or at a particular step level for each prisoner. A conscientious effort to follow DO 812 would, at the very least, require ADCRR have a way of ensuring prisoners progressed through the steps on a timely basis.

**E. DO 813**

DO 813 outlines ADCRR's "Close Management" process.[47] (Ex. 1319). When a prisoner participates in one of five identified behaviors, such as being an active participant

[47] "Close management" is different from "close custody," one of the four custody classifications.

in a riot, he may be placed in "Close Management status." That status is designed for prisoners "unable to live in general population" but who do not merit "Maximum Custody placement." (Ex. 1319 at 3). DO 813 establishes three "phase levels" that prisoners may advance through but there was no evidence explaining how these phases work. All prisoners in close management status are eligible for six hours per week of outdoor exercise. (Ex. 1319 at 11).

**F. Summary of Restrictive Housing Policies**

Based on Defendants' classification and housing practices proven at trial, the following prisoners qualify as subclass members:

- **(a)** Formally classified as "maximum custody" pursuant to DO 801;
- **(b)** Housed in a detention unit pursuant to DO 804;
- **(c)** Placed on mental health watch pursuant to DO 807; and
- **(d)** Placed in close management status pursuant to DO 813.

## III. Subclass Population

In their post-trial submissions, the parties agree these four classifications cover the subclass population. Using these four classifications, and the population figures contained in Exhibit 1304, the subclass consists of the 2,667 individuals reflected in Appendix 7.[48] That number is slightly larger than either side offers but it is important to note the exact number is not crucial. Defendants concede the subclass consists of at least 2,472 prisoners and that number undoubtedly undercounts to some extent. Moreover, the subclass size fluctuates as prisoners move in and out of particular classifications or are released from custody. Thus, the Court will establish 2,667 as the subclass population while recognizing

---

[48] While both parties rely on Exhibit 1304 to calculate the size of the subclass, they have inexplicable disputes regarding the total numbers calculated from that exhibit. According to Defendants, Exhibit 1304 establishes there were 1,636 prisoners in maximum custody, 750 prisoners on detention status, 81 prisoners on mental health watch status, and 7 prisoners on close management status. (Doc. 4309 at 346). Thus, Defendants argue there were a total of 2,474 subclass members as of September 30, 2021. Plaintiffs counter that Exhibit 1304 shows 1,801 prisoners in maximum custody, 750 in detention, and 22 in close management for a total of 2,573 subclass members. (Doc. 4314 at 90). Plaintiffs do not reference prisoners on mental health watch and do not explain the omission.

the exact number on any given date might be slightly higher or lower.

Beyond disputing the precise number of subclass members, the parties disagree on the relevant total number of ADCRR prisoners to use when comparing the subclass population to the entire prison population. Defendants argue the Court should consider all prisoners "housed in both ADCRR-operated and contract prison complexes." (Doc. 4315 at 102). Doing so would mean a total prison population of 35,410. Plaintiffs argue the Court should consider only prisoners in the ten ADCRR-operated facilities, which would mean a total prison population of 27,794. (Doc. 4314 at 89). Given that this lawsuit challenges conditions in ADCRR-operated facilities, the population in those facilities will be used. In addition, using the population in ADCRR-operated facilities allows for a helpful comparison between Arizona and other states using one of Defendants' trial exhibits.

Defense exhibit 3530 is a report titled *Time-In-Cell 2019: A Snapshot of Restrictive Housing based on a Nationwide Survey of U.S. Prison Systems*. The report was published by The Correctional Leaders Association & The Arthur Liman Center for Public Interest Law at Yale Law School. The drafters of that report aimed to provide a statistical overview of the number of prisoners in each state's prison facilities and the number of those prisoners subject to "restrictive housing," defined as "in a cell for an average of twenty-two hours or more per day for fifteen days or more." (Ex. 3530 at ADCRR00231467). The drafters provided a definition for survey respondents to use that excluded individuals in privately run prisons. (Ex. 3530 at ADCRR00231472). At the time of the study, the average percentage of the prison population in restrictive housing across all responding states was 3.8%. As for Arizona, it reported a total prison population of 42,312 with 1,934 (4.6%) in restrictive housing. Arkansas reported the highest percentage in restrictive housing of 11% while Colorado, Delaware, North Dakota, and Vermont the lowest percentage of 0%. Arizona's percentage of 4.6% was the 14th highest. (*Id.* at ADCRR00231475).

Arizona's prison population decreased significantly since the 2019 report. Now, using the definitions provided by the study's authors, Arizona has 27,794 total prisoners.

However, as of 2021 there are more prisoners in restrictive housing (*i.e.*, 2,667) than what Arizona reported for the 2019 study. Using the current number of prisoners in restrictive housing and the number of prisoners in ADCRR-operated facilities means Arizona now has 9.5% of its prisoners in restrictive housing which is over double the 2019 national average. Because of the high percentage of its prisoners in restrictive housing the Court agrees with Horn that "the ADCRR overuses isolation. There are more inmates held in restrictive housing than are necessary." (Doc. 4166 at 101).

The number of prisoners in maximum custody (1849) and detention (746) dwarf the number of prisoners on mental health watch (50)[49] and close management status (22). Thus, the Court's findings and analysis will focus on maximum custody and detention. For those two statuses, the manner in which activities are tracked is different and the out-of-cell offers are quite different. The Court will analyze the treatment of these two statuses separately.

### A. Maximum Custody[50]

#### 1. Classification Policies and Practices Lead to Overclassification

Before examining the conditions in maximum custody, it is important to understand how prisoners are classified to see how classification procedures impact operations. As set forth earlier, DO 801 and its related practices and policies are designed such that large numbers of prisoners are classified as maximum custody, even when the prisoner's characteristics would support a lower custody level. Horn provided examples of the "overclassification" produced by DO 801 and related practices. These examples show how Defendants' policies and practices result in a large maximum custody population even when officials believe there is no penological justification that supports keeping certain prisoners at that custody level.

---

[49] Based on the evidence presented at trial, there likely are even more prisoners who should be on mental health watch.

[50] Maximum custody and close management are, in effect, the same. The trial evidence focused on the manner in which the activities of prisoners in maximum custody were tracked. But it is unclear whether the activities of the prisoners in close management are tracked using the same form.

Prisoner S.C. entered Defendants' custody on April 1, 2019, to begin serving a life sentence. (Doc. 4166 at 30). S.C. "scored" for placement in medium custody but, employing an override, S.C. was recommended to be placed in maximum custody because he had "currently served less than 2 years on a Life Sentence." (Doc. 4166 at 31; Exhibit 3611 at 3). S.C.'s placement was reviewed in October 2019. His classification score recommended minimum custody but he remained in maximum custody because he was "serving first two years in max." (Ex. 3611 at 19). S.C.'s placement was reviewed in March 2020 with identical results. (Ex. 3611 at 17).

S.C.'s placement was reviewed again in October 2020. At that time, an official erroneously stated S.C. had served two years. Based on that, and the lack of any disciplinary history, the official recommended S.C. be reclassified to the lower level of "close custody." (Ex. 3611 at 15). Two deputy wardens agreed S.C. could be managed at close custody. The "Classification Administrator," however, disagreed and, without explanation, decided S.C. was to remain in maximum custody. (Ex. 3611 at 14). For unknown reasons, officials completed forms on May 3, 2021, May 17, 2021, and June 16, 2021, recommending S.C. be reclassified to close custody based on his custody score and lack of disciplinary history. (Ex. 3611 at 8-12). All those recommendations were rejected. At some unknown time past the two-year period, S.C. was eventually reclassified to a lower custody level and left maximum custody. Overall, S.C. spent a significant amount of time in maximum custody despite multiple prison officials repeatedly recognizing a maximum custody placement was unnecessary.

Another prisoner, S.M., had a similar experience with the classification system. S.M. entered custody on June 14, 2019, to begin serving a life term. He was placed in maximum custody despite his custody scores showing he was eligible for medium custody. (Doc. 4166 at 34). His maximum custody placement was reviewed over the following years, with his custody score not changing, but S.M. remained in maximum custody because of his "sentence structure." (Doc. 4166 at 34). In June 2021, his placement was reviewed, and his scores justified minimum custody placement. But officials

recommended he be transferred to close custody which occurred on July 15, 2021. (Doc. 4166 at 35).

Regarding S.C. and S.M., Horn stated "there was no penological justification" for keeping both in maximum custody for two or more years. (Doc. 4166 at 33, 35). Horn further opined, in his "experience and [] opinion," there was no penological justification for the policy that all life-sentenced prisoners spend the first two years in maximum custody. (Doc. 4267 at 26). Horn was unaware of any prison system that has a similar requirement. (Doc. 4267 at 27). The only penological justification offered by Defendants for this policy was from Director Shinn who testified, without elaboration, the policy was "[t]o prevent harm in our facilities." (Doc. 4274 at 69). And when Director Shinn had been asked for the penological justification behind the policy at his deposition, he responded "I don't have that information with me." (Doc. 4274 at 70). Director Shinn's attempted justification was not credible given the documented instances of other correctional officials concluding individuals subject to the policy could safely be housed at lower custody levels (even minimum custody). In other words, officials with actual knowledge of the prisoners' behavior and risks believed the prisoners could be housed at lower custody levels without presenting a risk of harm.

Horn highlighted problems with other classification policies of Defendants. A prisoner, V.S., entered custody in August 2018, but the records regarding him were incomplete and reflected he was reclassified (maximum, close, medium) over a three-year period. (Doc. 4166 at 40). In July 2020, V.S.'s custody scores reflected medium custody and medium risk. But in September 2020 V.S. told officials he "did not feel safe" in the housing unit where he was living. (Doc. 4166 at 40). V.S. was then "approved for maximum custody because of 'exhausting all other housing options.'" (Doc. 4166 at 41). As correctly observed by Horn, "[n]ot being able to figure out how to keep a medium security inmate safe is not a justification for placing that person into isolation." (Doc. 4166 at 41).

Horn also referenced an inmate, J.J., who in 2012 committed a serious violation by

kidnapping an individual working at the prison for a private contractor and holding her hostage for 30-40 minutes. (Doc. 4166 at 36). As a result, J.J. was placed in maximum custody. His file included a note that he was "not to be removed from max custody without approval from the [Offender Standards Bureau Administrator]." (Doc. 4166 at 36). Over the following years, J.J.'s placement was reviewed and, while his scores reflected "medium custody and medium internal risk," he remained in maximum custody. Based on how Defendants' policies operate, despite that the 2012 kidnapping offense was included when calculating J.J.'s custody scores, he still scored the lower medium custody. (Doc. 4267 at 39). In April 2018, a classification officer stated J.J. had remained "disciplinary free since 2012" and he had "shown the ability to be managed at a lower custody unit." (Ex. 3616 at 64). J.J.'s custody scores at that time reflected medium custody and medium internal risk. The officer recommended J.J. be transferred to close custody. That recommendation was rejected, J.J. remained in maximum custody, and, at the time of trial, J.J. was still in maximum custody.[51]

While acknowledging the seriousness of J.J.'s 2012 offense, Horn stated there was "no rational basis for keeping [J.J.] in maximum custody" given the nine subsequent years of good behavior. (Doc. 4166 at 38). Defendants offered no evidence of a penological justification for keeping J.J. in maximum custody despite his custody scores and the recommendation by officials to reclassify him. Instead, Defendants merely stated, without record citation, that "J.J. poses a substantial risk of harm to staff and thus his classification is justified" despite their own internal seemingly valid recommendation that J.J. could be reclassified. (Doc. 4315 at 144).

Horn cited a similar situation involving inmate T.A. While in a lower custody level, T.A. received six disciplinary tickets and, in June 2019, he was reclassified to maximum custody. (Doc. 4166 at 38-39). In June 2020, a classification officer stated T.A. had "shown great improve[ment,] he can be managed at close custody." (Ex. 3671 at 14). T.A.

[51] The records indicate J.J.'s offense was sometimes noted as having occurred in 2015 instead of 2012. Horn noted the failure to keep accurate records could lead to overclassification because offenses may appear more recent than the reality. (Doc. 4267 at 33-34).

was approved to be reclassified as close custody on July 15, 2020. (Ex. 3671 at 14). Despite the reclassification, T.A. remained in maximum custody. T.A. subsequently committed another violation in April 2021 that again triggered maximum custody status. That violation was based on an incident where T.A. refused to return handcuffs after he was in his cell. (Ex. 3671 at 30). If T.A. had been treated according to his classification in "close custody," he would not have been restrained and the disciplinary incident would not have occurred.

Regardless of the April 2021 disciplinary charge, T.A. was meant to leave maximum custody in July 2020 but, inexplicably, he remained in maximum custody for the following nine months. Horn accurately described this situation as "evidence of the irrationality and unfairness of maximum custody in ADCRR." (Doc. 4166 at 39). During cross-examination, defense counsel asked Horn if he was aware that, as of the time of this trial, T.A. had been classified and was being housed in a close custody unit. (Doc. 4268 at 59). Why defense counsel thought it helpful that T.A.'s placement as of November 2021 had changed was not explained. Horn's point was that T.A. had remained in maximum custody for months after being reclassified. The reclassification of T.A. just in time for trial shows consciousness of guilt.

A final aspect of how DO 801 is being implemented involves prisoners who are classified as maximum custody, and subsequently classified to a lower level, but remain housed in maximum custody. The Deputy Warden at Eyman SMU, Lori Stickley, testified there are many prisoners currently housed in maximum custody at that location who have already been reclassified to a lower level and were merely waiting for "beds [to] become available." (Doc. 4264 at 192). At trial, Stickley testified there were approximately 150 prisoners in maximum custody at Eyman SMU who had not been classified as maximum custody. (Doc. 4264 at 193). Stickley did not know how long those prisoners had been waiting to be moved. The Deputy Warden at Eyman Browning, Travis Scott, testified there were 44 prisoners at that location "that were currently waiting to go to a close custody unit" but space was unavailable. (Doc. 4264 at 148-149). Scott did not know how long those

prisoners had been waiting. (Doc. 4264 at 172). Added together, Eyman SMU and Eyman Browning established approximately 200 prisoners being held in maximum custody despite officials conceding they should not be there.

Overall, DO 801 and its related policies and practices provide a mechanism for the classification of prisoners as maximum custody and housed in these restrictive settings without penological justification and even when DO 801 is correctly implemented and prisoners are reclassified to lower custody levels, they may well not leave maximum custody. In short, Defendants keep hundreds of prisoners in maximum custody housing despite all prison officials admitting there is no penological justification for doing so.

The Court does not question the wisdom or lawfulness of Defendants' policies regarding classification of prisoners and where prisoners are housed. Defendants may well have the authority to automatically place prisoners in maximum custody for the first two years of a life sentence, regardless of that prisoner's custody score. The basic wisdom of such a policy is not before the Court. However, the specific operation of the policies regarding who is placed in restricted housing are crucial to assessing the conditions imposed on the subclass. In particular, the policies and implementation of them regarding the subclass population establish the subclass does not consist solely of uniquely dangerous individuals. At trial, defense counsel suggested prisoners in maximum custody or other restrictive housing units are there because they were too dangerous to house anywhere else. (*See* Doc. 4263 at 41; Doc. 4268 at 54). That is simply not true for all subclass members. Defendants' own policies show many subclass members do not present such dangers. In fact, many subclass members are not even formally classified as "maximum custody" prisoners. Yet these subclass members remain in restrictive housing.

**2. Subclass Custody Conditions**

The two maximum custody housing locations with the largest populations are Eyman-SMU I ("SMU") and Eyman-Browning ("Browning"). Altogether, SMU and Browning house approximately 1,300 members of the 2,667 subclass members.[52] Plaintiffs

[52] At trial, Deputy Wardens testified Browning usually houses approximately 700 prisoners while SMU houses over 500. (Doc. 4259 at 92; 4264 at 179).

provided significant detail regarding these units. The descriptions of other facilities was not as detailed. Thus, the most detailed factual findings regarding physical conditions and general practices relate to SMU and Browning. There is sufficient evidence to make limited factual findings regarding other locations.

**(a) SMU and Browning**

Plaintiffs' experts testified there may be "subtle differences" between SMU and Browning but, in general, "[t]hey feel the same when you enter them." (Doc. 4306 at 43). SMU and Browning are "very severe, dehumanizing units." (Doc. 4306 at 42). The units were "designed to be maximally controlling" and are "maximally depriving" in practice. (Doc. 4306 at 42).

The cells in these units are "less than 8 feet by 12 feet" and do not have windows.[53] (Doc. 4306 at 42; 4122 at 61). Inside the cells are "a bare concrete box with a metal stool, shelf, toilet/sink and either a single or double slab for a bed." "The doors to the cells have no windows but are made of perforated steel." (Doc. 4122 at 61). Thus, the only natural light in the units comes from "gritty skylights in the ceiling outside the cells." (Doc. 4122 at 60). The cells "have 24-hour illumination" and prisoners often cover the light. (Doc. 4122 at 52). The constant illumination makes it "difficult to sleep." (Doc. 4263 at 44). The lack of natural light, combined with the constant illumination, "adds to [the] disorienting nature of the conditions." (Doc. 4122 at 52).

Evidence was not offered regarding the limitations on personal property for prisoners in these units other than that, when they are brought to the Browning "intake" unit, prisoners initially do not have any property. Officials "try" to get prisoners their property "in the first week" of arriving. (Doc. 4264 at 139).

The cells in these units are "infested with insects, roaches and crickets, and infested also with rodents." (Doc. 4306 at 44). During his visit, a prisoner showed Dr. Haney a rodent the prisoner had captured. (Doc. 4306 at 44). There is also mold growing on the

[53] The cells for subclass members were estimated at trial to be approximately 80 square feet. (Doc. 4268 at 90). Defense counsel hinted the cells are between 88 and 89 square feet. (Doc. 4268 at 90). It is undisputed the cells are somewhere between 80 and 90 square feet.

walls throughout the SMU unit.[54] Dr. Haney encountered "a large puddle of musty-smelling and moldy water outside one person's cell that came from a leak inside." (Doc. 4122 at 60). Overall, the "cells give a sense of being entombed in a small, concrete box" and are "barren, stark, and . . . dehumanizing." (Doc. 4122 at 61; Doc. 4306 at 42).

The cells have slots through which food trays are passed. Those food trays are "worn and dirty." (Doc. 4122 at 59). Prisoners are supposed to be fed twice per day. (Doc. 4273 at 55-56). This is not consistent with general industry practice, which suggests prisoners should receive three meals a day, at "regular mealtimes," including two hot meals. (Doc. 4166 at 77). Around 4 or 5 in the morning, prisoners receive a "mega sack" containing breakfast and lunch. (Doc. 4273 at 64-65). A mega sack is "mostly bread and served cold." (Doc. 4166 at 77). A mega sack may also contain milk, but if it is not consumed immediately, the milk will likely curdle. (Doc. 4166 at 77). Prisoners are supposed to receive a "hot dinner." (Doc. 4273 at 64); (Doc. 4278 at 29). The meals are "repetitive, unappetizing, and insufficient." (Doc. 4166 at 77). Prisoners "remain hungry most of the time." (Doc. 4122 at 52); (Doc. 4263 at 65) (prisoner testified he did not receive enough food while at SMU I). Prisoners often must supplement their meals by purchasing food, if they have funds to do so.[55] (Doc. 4166 at 77). The Warden of one complex, who had years of experience in maximum custody units, testified the "top complaint" made by prisoners was about "food, commissary." (Doc. 4278 at 36). In particular, prisoners complain "they're not getting the portions of food they're supposed to be getting." (Doc. 4278 at 36).

Prisoners in these units must be strip searched each time they leave their cells. (Doc. 4259 at 100). When out of their cells, most of the prisoners in Browning (and presumably SMU as well) must be handcuffed behind their backs and escorted by one officer. (Doc. 4259 at 99). However, if the prisoner is housed in a cell with another prisoner, two officers are required to remove the prisoner from the cell and to return him to the cell. (Doc. 4259

[54] The showers at both units also have mold growing in them and are in a state of "disrepair." (Doc. 4306 at 46).

[55] One prisoner testified he was unable to buy additional food because he could not afford to do so. (Doc. 4263 at 65-66).

at 99). Some prisoners must be escorted by three officers and wear leg irons and handcuffs in back. (Doc. 4259 at 100).

Prisoners in these units have effectively no regular social contact. The only "regular contact" prisoners have are "the brief, routinized 'interactions' that occur twice a day, when they receive their meals," assuming prisoners are fed that day. (Doc. 4165 at 53). Prisoners may have some contact with mental health staff, but that contact is rare. (Doc. 4165 at 53). For prisoners who are visited by mental health staff, those visits may occur through "cell-front encounters." Such encounters are not confidential and prisoners are often uncomfortable talking about their issues. (Doc. 4306 at 74). If a prisoner requests a "confidential, private setting," he will be taken to a small room and placed in a "small telephone booth-like cage, still in restraints." (Doc. 4122 at 47). Maximum custody prisoners are reluctant to request these individual sessions because they must be strip searched before leaving their cells, placed in restraints, and placed in the cage, still in restraints. The treatment cage is "obviously inhospitable" and it makes it "difficult" for a prisoner to "relax and develop rapport or express their . . . deep psychological concerns or fears or issues." (Doc. 4306 at 73).

In these units, a housing area, also known as a "pod" or "run," refers to an area comprised of "10 cells, five stacked on top of five."[56] (Doc. 4259 at 90-91). The term "cluster" refers to a group of pods. (Doc. 4259 at 91). Browning has six pods in each cluster and there are twelve clusters. (Doc. 4259 at 91). Each cluster has a "control room" that is intended to be staffed by an officer. Officers in control rooms are responsible for opening the doors in the cluster and documenting when certain activities occur. (Doc. 4261 at 120).

At the end of each pod is a recreation enclosure known as "the chute." (Doc. 4259 at 96). Each chute is "approximately 11 feet by 24 feet, with solid concrete enclosure walls approximately 15 feet high with a covering of metal mesh over the top."[57] (Doc. 4122 at

[56] Some pods may have eight cells "four on the lower tier, four on the top tier." (Doc. 4273 at 95).
[57] Chutes are "probably the size of at least two cells, maybe larger." (Doc. 4267 at 46).

62; Doc. 4259 at 96). A chute has "no exercise equipment in it, it's just sort of a barren area that [the prisoners] are allowed to go out in."[58] (Doc. 4306 at 42). There is very little breeze and, during warmer months, entering the chute "feels like stepping into an extremely hot sauna" and the chutes have insects in them. (Doc. 4122 at 62; Doc. 4306 at 45).

In addition to the chutes, there are recreation areas known as the "10 by 10s," a "20 by 40" enclosure, and a "50 by 90" enclosure. (Doc. 4264 at 152). The 10 by 10s are approximately ten "individual recreation cages." (Doc. 4122 at 63). Those cages are roughly the same size as a cell. (Doc. 4306 at 76). The cages have shaded portions and there is a misting system. (Doc. 4264 at 153). When viewed shortly before trial, the cages appeared to have been unused for a lengthy period, with some doors open and "rusted in place." (Doc. 4122 at 63). During four days of touring units in 2021, Dr. Haney did not observe the outdoor exercise cages being used. (Doc. 4264 at 57). Prisoners prefer the 10 by 10 enclosures to the chute because the 10 by 10s allow them to socialize.

The 20 by 40 enclosure has a basketball hoop and the 50 by 90 enclosure has a basketball hoop, a table, and an area for exercises such as pull-ups and push-ups. (Doc. 4264 at 152). There are water jugs available at some of the enclosures. (Doc. 4264 at 153).

Per ADCRR policy, officers are required to conduct periodic health and welfare checks, also known as "security checks" or "living, breath flesh checks" when prisoners are in their cells.[59] Those checks require an officer to walk through a pod to determine if there are problems with the facilities (e.g., doors working) and to ensure the safety of the prisoners. (Doc. 4273 at 33). As explained by one Deputy Warden, these checks require an officer "look inside of a cell" and determine if the prisoner is "alive" and "breathing." (Doc. 4265 at 29). Current policy requires these checks be performed every 30 to 59 minutes, at irregular intervals. (Doc. 4273 at 34). Previously, these checks were required to be performed every 30 minutes, but because of low staffing it has been reduced. (Doc. 4273 at 34-35). The industry standard is that prisoners in housing of this sort be observed twice per hour. (Doc. 4166 at 81).

[58] Dr. Haney did observe "a small, blue handball" in one enclosure. (Doc. 4122 at 62).
[59] The phrase "living, breathing flesh" is used in the formal policy. (Ex. 1742 at 1).

In addition to ADCRR adopting a policy permitting checks far less often than industry standards, records establish that when the checks do occur, they are often performed in remarkably little time. For example, a security check in a pod consisting of 8 or 10 cells may take only one minute. (Doc. 4273 at 38). According to one Deputy Warden, an officer spending only one minute on a security check was not cause for concern. (Doc. 4273 at 95). However, given the need to stop at eight or ten cells to determine the status of each prisoner and the need to climb the stairs to the upper tier, a one-minute status check would be exceptionally cursory.

The staffing levels at SMU and Browning are far below what prison officials acknowledge as necessary to operate the units safely. The Deputy Warden for Browning stated Browning has about 60% of the staff it needs. (Doc. 4261 at 115). The Deputy Warden for SMU agreed that some necessary positions and tasks are performed only because existing staff are willing to work overtime. (Doc. 4273 at 33). Plaintiffs cited the "Daily Post Sheet" for Browning on July 30, 2021, to illustrate staffing levels. Based on the Deputy Warden for Browning's reaction to this record, the day did not reflect an unusual level of staffing.

The "Daily Post Sheet" identifies each "required post" where a single officer should have been assigned. (Ex. 2131). The Deputy Warden for Browning described each of these posts as "critical." (Doc. 4261 at 117). On July 30, 2021, there was a total of "33 posts collapsed." "Collapsed means that the post wasn't staffed by a single person . . . or there wasn't one person assigned to that post." (Doc. 4261 at 123). The sheet shows no officer was assigned to a variety of positions. Four officers should have been assigned as "Recreation Escort." There were none. Seven officers should have been assigned as "Mental Health/Medical Programs." There was one. Four officers should have been assigned to "Recreation Officer." There was one. Six officers should have been assigned to "Rover." There was one. Finally, there was supposed to be an officer assigned to each of the twelve control rooms. (Ex. 2131). There were seven officers assigned to control rooms, leaving five control rooms unstaffed. But according to Defendants the control

rooms were not actually unstaffed because officers are assigned to multiple control rooms at once. (Doc. 4264 at 162). A single officer may be assigned to two control rooms during the day, and, at night, a single officer may be assigned to six control rooms at the same time. (Doc. 4264 at 176). With a control room in each cluster, and each cluster including six pods of 10 cells each, an officer in a control room is intended to be responsible for the housing area of 60 prisoners. When a single officer is assigned to six control rooms, that officer is responsible for the housing area of 360 prisoners. Inadequate staffing of control rooms happens "every day." (Doc. 4264 at 162).

**(b) Lewis**

Dr. Haney visited the Lewis complex which houses approximately five hundred subclass members. While there, he toured the Rast unit (maximum custody), the Barchey and Morey units (not maximum custody), the Stiner detention unit (maximum custody), and the Sunrise unit (juveniles). (Doc. 4306 at 41). The cells in the Rast unit are similar to those found at SMU and Browning. That is, the cells are "stark and largely barren," with no window. (Doc. 4306 at 47). Similar to SMU and Browning, being housed in the Rast unit subjects prisoners "to profound levels of deprivation." (Doc. 4122 at 65).

The Stiner detention unit is "a very stark, oppressive environment." (Doc. 4306 at 47). Unlike many other prisons, the Stiner detention unit does not have a day room or a common area where prisoners are allowed out of their cells to socialize. (Doc. 4306 at 47-48). However, at least some of the cells in this unit have a window. (Doc. 4122 at 67). The cells have a single or double bunk. (Doc. 4306 at 49).

The Sunrise unit houses juveniles. That unit consists of "windowless cells built of concrete blocks, with solid doors with one small window in the door." (Doc. 4122 at 67). One cell photographed by Dr. Haney shows a bunkbed, a sink, a toilet, and a small seat which is bolted to the ground. The hallway has no natural light. Instead, it is lit only by fluorescent lights. (Doc. 4122 at 67).

**(c) Other Locations**

Plaintiffs' experts toured the locations housing approximately 1800 subclass

members. Those experts did not tour the other locations housing the remaining subclass members,[60] most of which consisted of the mental health watch or detention units at smaller facilities. (Doc. 4315 at 104). Defendants argue the failure to tour, and present evidence describing, every location means Plaintiffs have "provided no evidence regarding conditions of confinement at" the facilities not toured. (Doc. 4315 at 104). Defendants even seem to fault Plaintiffs' experts for not touring and interviewing subclass members at locations such as the Florence Globe Unit and the Winslow Apache Unit. (Doc. 4315 at 104). But as of September 30, 2021, those units were empty. Complaining that the experts did not tour empty units is not the only problem with Defendants' argument regarding the conditions of confinement at every location.

Class actions often involve, to some degree, an amount of "representative evidence." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). Here, there is no evidence regarding the precise physical layout of cells at some of the facilities nor is there evidence regarding the exact recreation enclosures at those facilities. However, the precise physical layout or exact recreation enclosures are not the core issues in this case. Rather, it is the amount of out-of-cell time offered to subclass members and whether the amount of isolation experienced by subclass members creates a substantial risk of harm. Resolving those issues will require examining the policies and practices applied to all subclass members. The evidence at trial established that, as a matter of systemwide practice, subclass members are treated the same regardless of exact location. That is, the policies and practices applied to subclass members are the same at the toured facilities as well as the facilities not toured. To satisfy their burden of proof, Plaintiffs were not required to present evidence and proof of every cell and every prisoner. Instead, Plaintiffs established through testimony and corroborating evidence the same practices apply throughout the system. In fact, Defendants did not even dispute this point during trial nor offer countervailing evidence. For example, Defendants did not present evidence the policies and practices differed across facilities. Accordingly, less evidence regarding some

[60] The eight facilities that house subclass members but were not toured immediately prior to trial are Douglas, Florence, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.

locations does not overcome the preponderance of evidence establishing subclass members are treated the same.

**3. Maximum Custody Tracking**

The activities of prisoners in all maximum custody units are tracked using a form titled "Maximum Custody Daily Out-of-Cell Time Tracking." (Ex. 1290). That form is meant to reflect a prisoner's activities on a weekly basis. It requires officers fill in when a prisoner is offered recreation, the size of the enclosure where the recreation would take place, if the prisoner refused the offer, and, if the prisoner accepted the offer, the time spent at recreation. The form also requires officers document if the prisoner was offered and attended other out-of-cell programs or classes. Finally, if the prisoner was categorized as Seriously Mentally Ill, the form requires officers track any additional hours of out-of-cell time. (Ex. 1290). During the life of the Stipulation, the forms for twenty randomly selected prisoners in maximum custody units were compiled monthly into what the parties refer to as "maximum custody notebooks."[61] (Doc. 4264 at 126).

The forms purport to indicate the total amount of out-of-cell time offered to each inmate. But they do not. The form requires officers track all out-of-cell time that was offered, accepted, refused, or canceled. The out-of-cell time that was canceled, however, was still counted when determining the total amount of time offered to inmates. For example, the form found at page 112 in Exhibit 1681 identifies the prisoner as having been "offered" four, three-hour recreation periods during that week. Two of those offers allegedly were made but refused by the prisoner. The other two offers, however, were accompanied by a "C" notation, indicating those recreation periods were canceled. A separate form indicates those recreation periods were canceled "due to staff shortage." (Ex. 1681 at 41). Despite those cancelations, the bottom of the form states the prisoner was offered a total of 12 hours of out-of-cell time. This consciously-adopted practice of counting out-of-cell time that was not offered was the result of Defendants' inexplicable

[61] Those notebooks contained a variety of other documents as well, such as reports explaining which activities were canceled. (Ex. 1681 at 2). Each notebook contains hundreds of pages. For example, the June 2021 notebook for Eyman-Browning contains 302 pages. (Ex. 1681).

interpretation of the Stipulation.

The Stipulation required Defendants provide specific amounts of out-of-cell time. The Stipulation also provided:

> If out of cell time . . . is limited or cancelled for legitimate operational or safety and security reasons such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, Defendants shall make every reasonable effort to ensure that amount of out of cell time shall be made up for those prisoners who missed out of cell time.

(Doc. 1185 at 10). Defendants unilaterally, without Court authorization, interpreted this provision favorably as allowing them to include out-of-cell time canceled because of chronic staffing shortages when determining the total amount of out-of-cell time offered to inmates. In other words, a prisoner such as that found at page 112 of Exhibit 1681 was documented as being offered 12 hours of out-of-cell time, even though it is undisputed the prisoner was offered, at most, 6 hours. At trial a Warden explained ADCRR interpreted the Stipulation such that if a particular "cancelation was because of poor staffing that day and they did not have the staff to complete that class," it was to be included in the total recorded out-of-cell time offered. (Doc. 4277 at 132). If, however, the "staff just didn't want to do [the class or activity], that's not acceptable," and the time could not be included as out-of-cell time.[62] (Doc. 4277 at 132).

In February 2021, the Court by Order made clear Defendants could not rely on chronic "staff shortages" to justify cancellations of out-of-cell time. (Doc. 3861 at 9-10). However, as of June 2021 just prior to the repudiation of the Stipulation, Defendants were still invoking longstanding staff shortages as the reason for cancellation of some recreation and still counting non-existent recreation offers when determining the total amount of out-of-cell time. The fact that Defendants unilaterally decided indisputably unavailable recreation time should be counted as "offered," is a blatant illustration of how, throughout

[62] Deputy Warden Stickley also testified about the practice of counting out-of-cell time that was canceled. (Doc. 4273 at 48). She explained such time "counted" because it was not ADCRR that decided to cancel the class. Instead, "Centurion did not have the staff available to teach the class." (Doc. 4273 at 94). But Centurion is ADCRR's chosen agent to uphold ADCRR's commitments.

the ten years this case has been pending Defendants have not in good faith undertaken their obligations under the Stipulation, or compliance with Court Orders.

Given the manner in which Defendants calculated out-of-cell time, the numbers reflected on the maximum custody records for total out-of-cell time are inaccurate. To correct for Defendants' obvious miscalculation regarding the amount of out-of-cell time offered, Plaintiffs presented a summary document that compiled the information contained in maximum custody notebooks from four locations from 2019 through 2021.[63] (Ex. 1980). That document calculated the amount of recreation allegedly offered to prisoners, *i.e.*, canceled recreation was excluded. This summary document establishes a few critical points.

First, it establishes the total amount of weekly recreation allegedly offered to prisoners at the summarized locations from 2019 through 2021 varied from zero to over twelve hours.[64] For the most part, however, the total recreation allegedly offered to prisoners was between five and ten hours.

Second, the summary establishes recreation was routinely offered only in the "chute" or standard enclosure. For example, in Browning and SMU for the monitored week in January 2021, the only recreation offered was in the chute. (Ex. 1980 at 4-5). Thus, even before any Covid-based limitations, the chute was offered most of the time.[65]

Third, the rate at which prisoners were recorded as refusing offers for recreation was high, often so high as to render it impossible the recreation offers were legitimate. The table below shows the total recreation refusal rates at four units across ten points in time

[63] One of the locations included in the summary, Florence-Kasson, was closed in September 2021. (Doc. 4277 at 113). While the conditions at Florence-Kasson are no longer at issue, the information regarding conditions in that unit are included to provide additional evidence that practices are similar across multiple facilities.

[64] Eyman-Browning shows multiple inmates were offered no recreation in the monitored week for April 2020. (Ex. 1980 at 16). But the records for Eyman-Browning during the monitored week in October 2019 show one prisoner was offered over twelve hours of recreation. (Ex. 1980 at 24).

[65] Browning and SMU in January 2019 indicate the chute was the offered location well over 75% of the time. (Ex. 1980 at 36-37).

from 2019 through 2021.[66] The table shows the refusal rates were routinely above 80% and often above 90%.

**Recreation Refusal Rate Table**

| Month and Year | Lewis Rast | Florence Kasson | Eyman SMU | Eyman Browning |
|---|---|---|---|---|
| Jan-19 | 46 | 80 | 73 | 83 |
| Apr-19 | 38 | 71 | 80 | 84 |
| Jul-19 | 67 | 58 | 83 | 80 |
| Oct-19 | 78 | 63 | 86 | 93 |
| Jan-20 | 68 | 90 | 84 | 62 |
| Apr-20 | 80 | 87 | 95 | 68 |
| Jul-20 | 64 | 92 | 92 | 61 |
| Oct-20 | 70 | 73 | 90 | 56 |
| Jan-21 | 80 | 77 | 93 | 46 |
| Apr-21 | n/a | 63 | 90 | 29 |

As stated by Horn, recreation refusal rates over 80% are "striking." (Doc. 4166 ¶ 149). Based on Horn's expertise and pure common sense,

> inmates like the opportunity to get out in the fresh air. They like the opportunity and there are some circumstances which they have the opportunity to at least socialize with other inmates if they use what we refer to as the 10-by-10 enclosures. And people generally need fresh air and sunshine and a change of scenery and the opportunity to get out of their cell.

(Doc. 4267 at 44-45). Thus, refusal rates as high as reflected in the records indicate officers either did not actually make the offers or officers used "any excuse to record a refusal to take advantage of outdoor exercise." (Doc. 4166 ¶ 146). The tactic of interpreting certain behavior as a refusal of a recreation offer was explained by a sign posted in a maximum custody unit. It reads:

> Beginning 06-01-2020, All inmates and their Cells shall be in 704 Compliance before inmates will be allowed to go to Recreation. Also, the Inmates will be awake and ready to exit

[66] Allegedly due to Covid, at Browning "all programming, class group education, outside recreation, SMI classes, and education were cancelled . . . from March, 2020, through June, 2021." (Doc. 4261 at 115). During that time, the only recreation offered was in the chute and even that recreation was canceled at times. (Doc. 4261 at 116). As of June 2021, ADCRR started its "phase reopening" to restart some officer-led "programming and mental health programming" after Covid. (Doc. 4264 at 161). Despite reopening, the "SMI classes were canceled for July, August," and part of September 2021 because Centurion did not have sufficient staff available. (Doc. 4264 at 161).

> the cell when the officers arrive. Failure to be in compliance, or failure to be ready to submit to the strip search or any unreasonable delay once the officer arrives will be considered a refusal of Recreation and will be documented on the DO812 forms as such.

(Doc. 4166 ¶ 147). The term "704 Compliance" refers to Department Order 704 which is "essentially the rules of inmate behavior," such as personal grooming and cell cleanliness. (Doc. 4267 at 43-44). This policy is enforced such that a prisoner is documented as having "refused" recreation if, for example, the prisoner is not fully dressed or otherwise not "ready on the spot" when offered recreation. (Doc. 4267 at 43). Similarly, if a prisoner is asleep, that is documented as having refused recreation. (Doc. 4267 at 41). In short, "[o]fficers record things as refusals when inmates do not intend to refuse." (Doc. 4267 at 44).

While many offers for recreation may not actually be made or a prisoner is interpreted, inaccurately, as rejecting the offer, many offers are also accompanied by unreasonable consequences. Prisoners who accept an offer for recreation may be left in the recreation area for hours. (Doc. 4166 ¶ 148). That may happen even during hot temperatures in the recreation areas where prisoners lack access to water. (Doc. 4166 ¶¶ 148, 160). In addition, if a prisoner needs to use the restroom during the recreation time, officers may not take him to the restroom. Alternatively, the prisoner may be taken back to his cell, forfeiting the rest of the recreation time. (Doc. 4166 ¶¶ 148, 160).

Horn's testimony that the records do not indicate legitimate offers for recreation is credible and comports with common sense. Understandably at times, prisoners may have idiosyncratic reasons to decline recreation offers. But refusal rates of 80 to 95%—calculated based on Defendants' own documents—make it more likely than not the recreation offers were never given or offered on unacceptable terms. For example, it is not plausible that in April 2020, the monitored prisoners in SMU received 42 legitimate offers for recreation but only two prisoners accepted, and those prisoners accepted only one recreation period each. Put in terms of a refusal rate, it is not plausible these prisoners received legitimate offers for recreation but refused 95% of those offers. Equally

problematic is Defendants' failure to question refusal rates of 95%, strongly suggesting they are aware legitimate offers are not conveyed. In short, recreation offers recorded on the Maximum Custody Daily Out-of-Cell Time Tracking forms are not made, are not legitimate, or are accompanied by unreasonable consequences (*i.e.*, being left outside in the heat for 6 hours without water and/or restroom access).

**4. Detention Records**

Defendants do not track how long inmates remain in detention units. Some inmates spend less than a month in a detention unit while others may spend six months or more in a detention unit. The detention records in Exhibit 1694 establish many inmates remained in detention from February 2021 through August 2021. (Doc. 4308 at 130 n.60). Detention is not necessarily a short-term placement.

ADCRR uses a form titled "Individual Inmate Detention Record" to "document out-of-cell time and activities for people in detention." (Doc. 4273 at 56). Officers are expected to document when inmates in detention receive meals, are allowed to shower, or are offered recreation. (Doc. 4273 at 57). The form is the only way ADCRR tracks recreation offers to inmates in detention. (Doc. 4273 at 58). During trial, the Deputy Warden at SMU was asked about the contents of particular detention records. She conceded that "according to the sheet," one prisoner did not receive dinner on four nights from February 15, 2021, through February 22, 2021. (Doc. 4273 at 66; Exhibit 1694 at 539). During that same week, the record shows the prisoner was not offered any showers or any recreation time. (Doc. 4273 at 66-67). The records for two other prisoners, in the same cluster of cells for the same week, also showed no dinner for four nights, no showers, and no recreation offers. (Ex. 1694 at 541, 545). The record for yet another prisoner in the same cluster for the same week indicates no dinner on four nights but he was offered one shower and one recreation period. (Ex. 1694 at 547). Records for even more prisoners indicate a similar pattern of missed meals and, at most, one offer for shower and one offer for recreation. (Ex. 1694 at 551-570).

Another record for a prisoner in that cluster of cells contained a notation that the

prisoner "moved out," presumably meaning he left the detention unit in the middle of that week. However, the record also indicates this prisoner received meals in the detention unit, and also exchanged his laundry and linens, for two days after he left the unit. (Ex. 1694 at 583). Another form does not have a prisoner name or any other identifying information filled in but that form indicates two meals were delivered on all seven days, dinner was delivered on two days, and the inmate had laundry and linen exchanges multiple times. When asked if this particular record "could have just been filled out for no one," Stickley responded "I don't know." (Doc. 4273 at 79). Overall, the evidence establishes the detention forms often are pre-filled for the entire week and do not indicate what truly happened. (Ex. 1694 at 593).

In an attempt to summarize the conditions recorded by the forms at various locations, Horn analyzed 125 detention records at SMU detention unit for a week in February 2021. (Doc. 4166 ¶¶ 190-191). Based on his expert review, "fewer than half reflect 2 offers of recreation, about half reflect a single offer of recreation, and about a tenth reflect no offers of recreation." (Doc. 4166 ¶ 191). Those records do not "reflect[] any person actually went to recreation" at this location during this week. (Doc. 4166 ¶ 191). The records regarding showers were similar, with the majority of prisoners offered showers one or two times but a few prisoners were not offered any showers. While there was a high rate of purported refusal of showers, the records indicate that if prisoners accepted, they would be left in the shower for approximately an hour. (Doc. 4166 ¶ 192).

After the Stipulation was repudiated and during preparation for trial, the September 2021 records for SMU showed some improvement but still "not a single person went to recreation." (Doc. 4166 ¶ 196). In addition, the records again had entries for a prisoner who left the unit midweek, indicating the records are pre-filled. (Doc. 4166 ¶ 197).

The records for the Yuma Cheyenne detention unit for a week in February 2021 show prisoners were given three offers to shower and either two or three offers for recreation. However, not a single prisoner went to recreation that week. (Doc. 4166 ¶ 199). The records for this location in July 2021 indicate about half of the prisoners were offered

two recreation periods, but not a single prisoner went to recreation. (Ex. 1700-2 at 2234-2283).

The records for the Lewis Morey detention unit in July 2021 show approximately half of the prisoners received either no or one offer for recreation, and about half received two offers, with a few prisoners receiving three offers. (Doc. 4166 ¶ 204). Three prisoners went to recreation during this week and the recreation time is listed as less than one hour. (Doc. 4166 ¶¶ 207-208). The prisoners were offered two or three showers. (Doc. 4166 ¶ 204). And the records show some prisoners did not receive three meals every day, including one prisoner who was documented as receiving no meals on one day, one meal on one day, and two meals on two days. (Doc. 4166 ¶ 205). The September 2021 records for this location show most prisoners received two shower offers and most prisoners were offered recreation twice but almost all offers were recorded as refused. The two prisoners who accepted recreation offers received 45 minutes of recreation. (Ex. 1697 at 1773, 1775).

The records for the Lewis Bachman detention unit for July 2021 are, as characterized by Horn, "alarming." (Doc. 4166 ¶ 215). The records document profoundly cruel treatment of prisoners this week. The weekly record for one prisoner indicates he was offered a shower once, which he accepted, as well as recreation once, which he refused. But for the seven-day period, this prisoner allegedly received only nine meals. (Ex. 1697 at 1275). But that prisoner was one of the lucky ones. A different prisoner that week was not offered a shower, not offered recreation, and received only seven meals. (Ex. 1697 at 1277). Other prisoners received no offers for out-of-cell time and only received one or two meals for the entire week. (Ex. 1697 at 1315-1319). Thus, officials at this unit affirmatively documented they confined many prisoners in their cells for 168 straight hours and provided them with only a few meals for the entire week. That affirmative acknowledgment is shocking enough. But the fact that no supervisory official took any action in response to this level of inhumane disregard for even feeding the prisoners indicates a profound disinterest in caring for the prisoners.

The records for the Lewis Bachman detention unit for August 2021, which was during trial preparation, are mildly better than for July 2021. Again, many prisoners were not offered any out-of-cell time. (Doc. 4166 ¶ 219). The records also indicate the prisoners routinely did not receive three meals per day. Many records show days prisoners had no meals. (Doc. 4166 ¶ 220). It is incomprehensible that prison officials were not concerned when their own records admitted at trial established blatant violations of policy regarding recreation and nutrition.[67]

Based on the evidence presented at trial, the treatment of prisoners in detention units is shocking. According to Defendants' own records, prisoners in detention units are routinely offered no out-of-cell time and are routinely denied meals. In their post-trial briefing, Defendants argue the detention records simply reflect "deficient documentation," and the prisoners must have at least been fed.[68] (Doc. 4315 at 130). Defendants even steadfastly claim if officials had "determined that inmates actually were not fed or that there was a pattern of deficient completion of paperwork by a particular officer, corrective action would be taken." (Doc. 4315 at 129-130). Defendants offered no explanation, however, how the records recounted above do not reflect either a pattern of not feeding prisoners or a "pattern of deficient completion of paperwork." Defendants did not present any evidence they took corrective action in response to their own unrefuted documentation, which reflected weeks of denying prisoners in detention units any out-of-cell time and adequate nutrition.

**5. Mental Health Watch**

When a prisoner is placed on mental health watch, all his or her activities are tracked on a form known as an "Observation Record." When Plaintiffs' expert reviewed the

[67] The records for other locations and other time periods establish it was commonplace for prisoners to not receive three meals per day. (Exhibits 1696, 1697, 1699, 1700). Plaintiffs accurately summarize this information. (Doc. 4308, pages 85-87).

[68] Defendants blithely also argue "Plaintiffs' reliance on cherry picked detention records for only seven out of seventeen detention units across the state proves nothing." (Doc. 4315 at 123). Records showing Defendants, across multiple locations, deprive prisoners of recreation and food certainly prove more than "nothing." It establishes their constitutional rights are being violated.

Observation Records for the mental health watch unit at SMU, he noted none of the forms reflected the prisoners were receiving recreation. (Doc. 4166 at 51). The Deputy Warden at Browning testified that individuals on mental health watch at that location are supposed to be provided recreation opportunities but there are no facilities at Browning that would allow for recreation. (Doc. 4261 at 114).

**6. Expert Opinion Regarding Subclass Conditions**

Plaintiffs offered the expert opinions of Horn and Dr. Haney that the conditions imposed on the subclass members lack a penological purpose and present a substantial risk of serious harm. Defendants did not offer their own experts. Nor did they offer any remotely credible lay opinions contradicting Plaintiffs' expert opinions. Thus, the Court did not have the opportunity to critically examine competing views from qualified experts and then determine which view is more credible. Rather, the Court was left with either crediting Plaintiffs' experts who have spent their entire careers studying these issues, or rejecting those experts based solely on the unsubstantiated arguments presented by defense counsel. Based on careful review of written testimony, as well as in-court observation of direct and cross-examination, the opinions offered by Horn and Dr. Haney are credible.

**(a) Horn**

Horn credibly testified ADCRR "overuses isolation." (Doc. 4166 at 101). ADCRR keeps more prisoners in isolation than almost any other state and often there is no rational basis supporting placement of a particular prisoner in isolation. For example, ADCRR places numerous prisoners in isolation who, according to ADCRR's own policies, merit a lower level of custody placement. ADCRR has promulgated policies that purport to provide a path for prisoners to earn their way out of isolation. However, those policies are "unusually and unnecessarily complicated," leaving prisoners and officials confused regarding their implementation. (Doc. 4166 at 102). Indeed, the evidence reflects that ADCRR houses prisoners in isolation because it lacks lower custody cells and staff as evidenced by the hundreds of prisoners awaiting transfer out of maximum custody.

ADCRR keeps prisoners in isolation for years, including prisoners who have "been

free of any discipline for years." (Doc. 4166 at 103). ADCRR claims to review the isolation placement for many prisoners on a monthly basis but those "reviews are brief to the point of perfunctory." (Doc. 4166 at 104). Prisoners are not involved in the review process and do not receive information regarding what he should do in the future to merit a lower classification. (Doc. 4166 at 104). The step-progression system contained in DO 812 "offers inmates the promise of advancement if they maintain a good disciplinary record and participate in prescribed programs, and [officials] do not meet that promise. [Officials] do not fulfill that promise" because prisoners have no way of knowing when, or if, they will be able to advance. (Doc. 4268 at 68).

The units housing subclass members do not have sufficient staff to operate in a safe manner. Staff are not available to conduct sufficient security checks "to properly determine whether an inmate is in distress or not." (Doc. 4166 at 104). The staffing shortage is exacerbated by the physical layout of the many units which preclude staff from having adequate "sight lines" or the "ability to hear inmates." (Doc. 4166 at 104). On cross-examination, defense counsel asked Horn whether New York and Pennsylvania had "the staffing luxury" such that sufficient staff could respond to an emergency without leaving critical posts vacant. (Doc. 4268 at 104). No doubt to defense counsel's surprise, Horn responded he "wouldn't call it a luxury" for the prison to have adequate staff to handle emergencies without leaving critical posts abandoned. (Doc. 4268 at 104). When pressed on this point by defense counsel, Horn explained other systems ensure sufficient staffing so any emergency response will not require staff involved in "direct supervision of inmates" abandon their posts. (Doc. 4268 at 105).

The lack of staff is also the obvious explanation for why prisoners do not receive the out-of-cell time promised by ADCRR policy. Based on the "actual practices," prisoners "do not get to leave their cells for the one hour per day five days a week recommended by the profession" nor do they get the hours promised by ADCRR policy. (Doc. 4166 at 105). Staff use "a variety of means to obscure the reality of what is happening." (Doc. 4166 at 105). Despite what may be indicated on the forms, prisoners "are often recorded as

refusing recreation when they have not" and, in any event, out-of-cell time is "often cancelled." (Doc. 4166 at 105). On cross-examination, Horn explained prisoners should be allowed outside recreation even if they "are not following the rules and don't have their cells in compliance." (Doc. 4268 at 109). When asked whether staff should accommodate any prisoner who is not immediately ready to accept an offer for recreation, Horn stated "outside exercise, the ability to get fresh air when you're confined in these conditions, is so important that it is worth some level of effort" by the staff. (Doc. 4268 at 111).

In contrast, Defendants did not present any meaningful evidence or testimony casting doubt on Horn's conclusions. Defendants did not justify why they keep prisoners in isolation who, by their own policy and their own admission, should be housed elsewhere. Defendants did not explain why the policy regarding step-progression is implemented in a random and chaotic way nor did Defendants explain why individuals may remain at particular steps for years on end. In addition, Defendants concede they lack sufficient staff to operate the facilities as contemplated by ADCRR's own policies. Defendants' own deputy wardens acknowledged they lack sufficient staff to have officers posted at all "critical" locations and rely on existing staff who agree to volunteer to work overtime shifts even to meet the present staffing levels. (Doc. 4261 at 117). And Defendants did not dispute that out-of-cell time is routinely canceled because of staffing shortages nor did Defendants offer evidence that the out-of-cell offers are, in fact, legitimate ones that prisoners in isolation can accept. Horn's testimony and opinions were credible and incontestable.

**(b) Dr. Haney**

Based on his training and experience, Dr. Haney explained "we now know that isolated confinement is painful. People who are exposed to it suffer when they experience it." (Doc. 4306 at 18). The amount of suffering, however, "[d]epends upon the conditions and the length of time that people are [in isolated confinement]." (Doc. 4306 at 18). And while some people experience harm that appears "to be reversible," others experience "very severe" harm that "can be life threatening." (Doc. 4306 at 18).

In Dr. Haney's view, the most "widespread" reaction to isolated confinement is "depression. People become despondent." (Doc. 4306 at 21). This is especially pronounced when prisoners are placed in isolated confinement for an indeterminate amount of time. (Doc. 4306 at 21). In addition to depression, prisoners placed in isolated confinement may become "unpredictably and inexplicably anxious, nervous, on edge."[69] (Doc. 4306 at 21). Alternatively, prisoners may get "angry and irritable," sometimes leading to "explosive behavior." (Doc. 4306 at 22). Isolated confinement may lead "to self-harm and it can lead to suicide." (Doc. 4306 at 23).

"Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality." (Doc. 4122 at 26). Deprivation of social contact "is psychologically destabilizing" and "[i]t undermines a person's sense of self or social identity and erodes his connection to a shared social reality." (Doc. 4122 at 26). Individuals deprived of social contact "are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones." (Doc. 4122 at 26).

While Dr. Haney believes isolated confinement presents a substantial risk of harm to all prisoners, those prisoners with mental illness "are more vulnerable to the pains and stresses of solitary confinement." (Doc. 4306 at 25). Dr. Haney further opined prisoners under the age of 18 are especially susceptible to harm from being placed in isolated confinement. (Doc. 4306 at 25). Dr. Haney believes that even during the time the present litigation has been pending, there has developed a "broader and deeper consensus, scientific consensus," that isolated confinement is harmful. (Doc. 4306 at 26).

The American Psychiatric Association believes "[p]rolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the

[69] Travis Scott, a Deputy Warden with twenty years' experience, was asked whether out-of-cell time was important. He responded "Yes. Very important." (Doc. 4264 at 151). The Deputy Warden then went on to explain "When inmates are occupied or have out-of-cell time or classroom, it helps decrease tension amongst the inmates. It makes the unit a safer place to work. The inmates are less agitated. It makes it safer for the staff for when they're interacting with those inmates. We want them to be able to get out to do their exercises or to go to class. Keeps them occupied." (Doc. 4264 at 151).

potential for harm to such inmates." (Doc. 4306 at 28). The American Psychiatric Association takes a similar position regarding solitary confinement of juveniles. (Doc. 4306 at 31). The National Commission on Correctional Health Care takes the position:

> **(i)** Prolonged, greater than 15 consecutive days, solitary confinement is cruel, inhuman, and degrading treatment and harmful to an individual's health.
>
> **(ii)** Juveniles, mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration.

(Doc. 4306 at 36).

Based on his experience studying approximately 29 state prison systems, Dr. Haney credibly testified Arizona's system is "among the most severe and the most depriving solitary confinement units that [he has] encountered." (Doc. 4306 at 56; Doc. 4264 at 65). The conditions in Arizona "place[] the mental health of even psychologically strong incarcerated persons in jeopardy and creates especially high risks of harm for those whose mental illness makes them especially vulnerable." (Doc. 4122 at 67). He stressed this opinion was taking "into account not what the regulations provide for, but what [he] learned is actually being delivered" in Arizona. (Doc. 4306 at 56). Dr. Haney found the requirements of DO 812, in particular the amount of out-of-cell time set out in that policy, were not being followed. (Doc. 4263 at 31).

The physical attributes of the units combine with the "deprivation of social contact" to impose "severe" limitations. And "[t]he amount of out-of-cell time the prisoners are getting is severe by any measure." (Doc. 4306 at 56). While there were a few improvements shortly after the parties entered into the Stipulation, those improvements began to disappear "within a year or two." (Doc. 4122 at 91). The conditions are now the same, or worse, than the conditions present at the outset of this litigation in 2013. (Doc. 4122 at 91). The only exception is that prisoners now have tablets, which they still have to pay to send emails from. (Doc. 4306 at 78). Even then, not every prisoner is entitled to a tablet and use of the tablets is not free. (Doc. 4264 at 51-52).

On cross, Dr. Haney noted the better state systems provide "at least two hours a

day" out-of-cell time. (Doc. 4306 at 99). When pressed on how long would be "too long" to spend in maximum custody, Dr. Haney noted the United Nations believes 15 days is the limit. He did not agree with that specific limit, but he noted a "month or years" is "too long." (Doc. 4263 at 16). Defense counsel asked if keeping someone in isolation longer than 15 days would mean "there is going to be psychological harm to that person." (Doc. 4263 at 17). Dr. Haney explained that causation is not that simple. Rather, when keeping individuals in isolation, "[t]here's risk of harm. There is risk of harm. So all of this is about risk of harm. And the longer somebody's exposed to these kind of conditions, the greater the risk of harm." (Doc. 4263 at 17).

Of particular concern to Dr. Haney is the Sunrise unit which houses "juveniles who have been committed to the adult prison system." (Doc. 4306 at 50). On the day of his visit, the unit contained one girl and approximately twelve boys. (Doc. 4306 at 50). Dr. Haney opined, in extremely strong terms, that the conditions in this unit were intolerable for juveniles. Dr. Haney was "shocked" that Defendants would house juveniles "in such gratuitously harsh" and "abominable" conditions. (Doc. 4122 at 67). Doing so "is singularly inappropriate and highly dangerous." (Doc. 4122 at 67). Dr. Haney noted Defendants had "learned nothing" from a previous tragic suicide with which he was personally involved.[70] (Doc. 4122 at 68). Dr. Haney opined that continuing to subject juveniles to harsh isolation practices is "playing with fire." (Doc. 4122 at 69). And the conditions in the Sunrise unit "create[] a very substantial risk of harm." (Doc. 4306 at 81).

Defendants offered no contrary opinions or testimony. Defendants did not offer an expert stating isolated confinement creates no concerns. Nor did Defendants even proffer a penological purpose for keeping many prisoners in isolated conditions. Thus, for purposes of this case, it is undisputed isolated confinement is harmful for all subclass

---

[70] During a visit in 2016, Dr. Haney noted a 17-year-old girl had been held in solitary confinement for more than two months. (Doc. 4122 at 68). Dr. Haney requested defense counsel be informed that this girl was at "serious risk of self-harm due to the prolonged period of time she was held in solitary." (Doc. 4122 at 68). Shortly after his visit, the girl turned 18 and was transferred to a different maximum custody unit. The girl committed suicide a few weeks later. (Doc. 4122 at 68). Dr. Haney believes Defendants' "learned nothing from that young woman's tragic and preventable death." (Doc. 4122 at 68).

members. The conditions specific to this case, both the physical layout of the cells and the amount of out-of-cell time actually available to subclass members, present a substantial risk of serious harm to the mental health of every subclass member.

If ADCRR were following its own policies, including the amount of out-of-cell time promised and required by DO 812 and the chance to leave isolated confinement, the situation might be different. Dr. Haney's testimony cannot be read as prohibiting isolated confinement regardless of the circumstances. And the Court recognizes the need and value of isolated confinement in some circumstances. However, the actual practices imposed on the subclass and analyzed by Dr. Haney present a substantial risk of harm. That risk of harm is elevated for prisoners with a mental illness. And the risk of harm is extremely high for juveniles.

## IV. Legal Standard for Subclass

The legal standard and inquiry applicable to subclass members is somewhat different from that applicable to the class. "The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). *See also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (noting "[t]he Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones"). "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" *Morgan*, 465 F.3d at 1045 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Under this standard, the conditions of confinement "must not be devoid of legitimate penological purpose, or contrary to evolving standards of decency that mark the progress of a maturing society." *Id.* (citation and quotation marks omitted).

"Where the conditions of confinement are challenged rather than the confinement itself, a plaintiff must make two showings. First, the plaintiff must make an objective showing that the deprivation was sufficiently serious to form the basis for an Eighth Amendment violation. Second, the plaintiff must make a subjective showing that the

prison official acted with a sufficiently culpable state of mind." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

**A. Objective Prong**

Restrictions or deprivations "inherent in the prison setting" cannot "satisfy the objective prong of an Eighth Amendment inquiry." *Johnson*, 217 F.3d at 731. Only restrictions or deprivations of "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quotation marks and citation omitted). The "life's necessities" include, among others, "adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Id.* When a prisoner is denied a necessity, "[t]he circumstances, nature, and duration of [the] deprivation . . . must be considered in determining whether a constitutional violation has occurred." *Id.* In general, "[t]he more basic the particular need, the shorter the time it can be withheld." *Id.* (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982), *overruled on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995)). For example, forcing prisoners to lie "motionless in the dirt in subfreezing temperatures for five to nine hours" could be sufficient to establish a deprivation of the "basic human need[]" for shelter. *Johnson*, 217 F.3d at 732. But housing prisoners for "short periods of time" in a padded cell that was "dark, scary, and smelled bad" containing a "pit toilet encrusted with excrement and urine" will not qualify as deprivation of the basic human need for shelter or sanitation. *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995). *See also Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue'[71] might be tolerable for a few days and intolerably cruel for weeks or months.").

**B. Subjective Prong**

Conditions of confinement such as those challenged here require Plaintiffs establish the deprivations "occurred with deliberate indifference to [their] health or safety." *Foster*

[71] "Grue" was described as "a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking the mixture in a pan." *Hutto*, 437 U.S. at 683.

*v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). This "involves a two part inquiry." The first part requires Plaintiffs show Defendants "were aware of a substantial risk of serious harm to [their] health or safety." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Whether Defendants "had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. And Defendants' knowledge of a substantial risk may be established "from the very fact that the risk was obvious." *Id.*

**V. Conditions Imposed on the Subclass**

In the class certification order, the Court identified the seven practices subclass members were allegedly being subjected to contrary to constitutional requirements. Those seven practices were:

- **(i)** Inadequate psychiatric monitoring because of chronic understaffing;
- **(ii)** Use of chemical agents against inmates on psychotropic medications;
- **(iii)** Lack of recreation;
- **(iv)** Extreme social isolation;
- **(v)** Constant cell illumination;
- **(vi)** Limited property; and
- **(vii)** Insufficient nutrition.

When assessing whether Plaintiffs have carried their burden of proof regarding these practices, the Court cannot combine various practices to conclude the "overall conditions" violate the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 305 (1991). As explained by the Supreme Court, "*[s]ome* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Id.* at 304. Thus, the Court can only combine various conditions when, together, they deprive prisoners of a "single, identifiable human need." *Id.* The challenged practices involve some well-established "human needs"

such as the need for exercise, ability to sleep, and sufficient food. But the subclass also challenges practices involving matters that have not yet been widely recognized as "human needs," such as extreme limitations on social contact or limited property.

It is important to note Defendants admit keeping all subclass members in the restrictive environments at issue is not justified. There are approximately 200 subclass members who Defendants' employees admitted at trial should no longer be held in maximum custody units. In other words, there simply is no penological justification for holding those subclass members under harsh and restrictive conditions. Defendants' concession they house prisoners in these restrictive conditions without penological justification means Defendants should have remedied it long ago. *See Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012) (finding conduct "totally without penological justification" satisfies the objective prong of the Eighth Amendment analysis).

Further, policies allow prisoners to be placed in isolated confinement without penological justification. As recounted earlier, the policy requiring prisoners start serving life sentences in maximum custody is not supported by a valid penological interest. In addition, Defendants' policies that some prisoners must remain in maximum custody because of misconduct years ago is not supported by a legitimate penological interest.

Despite the subclass including many prisoners who obviously should not be housed in isolated confinement, the Court will conduct the practice-by-practice analysis on the subclass as a whole. Thus, the Court will not analyze separately the practices and policies as applied to prisoners who everyone agree do not merit isolated confinement. The Court will assess whether Plaintiffs have carried their burden of proving certain policies or practices, as applied to members of the subclass Defendants believe should be in isolated confinement, violate the Eighth Amendment.

**1. Defendants do not have a policy or practice of using chemical agents against inmates on psychotropic medications.**

Neither at trial nor in their post-trial submissions did Plaintiffs identify the exact contours of the practice they were attempting to prove. While the class certification order

described the practice as use of chemical agents against prisoners on particular medication, Plaintiffs' response to Defendants' proposed findings of fact describes the challenged practice as "widespread and indiscriminate use of force on people who engage in self-harm." (Doc. 4314 at 109). That was not the practice certified. Plaintiffs have not proven Defendants have a policy or practice of using chemical agents against inmates on psychotropic medications that violates the Eighth Amendment.

In reaching this conclusion, the Court notes Plaintiffs presented disturbing evidence of the use, and overuse, of chemical agents against prisoners with obvious mental health needs. For example, the February 12, 2020, email between medical providers quoted earlier involved I.C., a "mental health patient" at the Phoenix facility, who had been "self harming by banging his head for the past several days resulting in . . . the use of OC [pepper] spray." (Doc. 4109 at 79). The "Regional Director of Mental Health" recommended officials "continue using OC spray as needed while the on site mental health team comes up with a treatment plan." (Doc. 4109 at 79). Using pepper spray in lieu of immediate psychiatric treatment was obviously inappropriate. And this was not the only evidence of such practices.

During trial, as discussed above, Plaintiffs presented multiple videos and other evidence that Rahim Muhammed was repeatedly subjected to OC spray when he was experiencing mental health crises. The evidence established prison officers did not know how to handle Muhammed and they were unable to convince him to stop his self-harming behaviors. Given Muhammed's behavior, it was obvious prison officials should have arranged for much more attention from mental health providers.[72] Once Muhammed

[72] During trial, the Court asked the Deputy Warden about the failure to obtain additional mental health care for Muhammad. (Doc. 4279 33-36). The Deputy Warden claimed "mental health" personnel were involved with Muhammad "every single time" Muhammad was subjected to OC spray. (Doc. 4279 at 33). But there was no evidence establishing such interventions. The Deputy Warden stated Muhammad first had an "issue" approximately "three or four weeks" after he arrived. (Doc. 4279 at 36). After repeated instances of self-harm and OC spray, the Deputy Warden reported to the "mental health lead" that Muhammad needed "more care than what" was available at his location. (Doc. 4279 at 34). Muhammad was transferred "shortly thereafter." (Doc. 4279 at 34). Muhammad was at that location for approximately seven months. (Doc. 4279 at 37). Thus,

received additional mental health care, and was transferred to a more suitable location, he was able to function at a much higher level as shown by his trial testimony being coherent and convincing. The treatment of Muhammed might have violated the Eighth Amendment, but that treatment does not prove the existence of a general policy regarding using OC spray against prisoners on medication.

The evidence regarding I.C. and Muhammed make it more likely than not that prison officers overuse chemical agents. Those chemical agents are used because adequate mental health care is not available. With appropriate mental health care, the need for chemical agents would be significantly reduced. Accordingly, remedying the patently insufficient mental health resources will reduce the need for interventions by officers involving chemical agents and likely provide the relief Plaintiffs sought regarding the use of chemical agents.

**2. Subclass members do not receive adequate recreation and exercise opportunities.**

The Ninth Circuit has recognized, repeatedly, "exercise is one of the basic human necessities protected by the Eighth Amendment." *Norbert v. City & Cty. of San Francisco*, 10 F.4th 918, 929 (9th Cir. 2021). The amount of exercise that must be offered to prisoners, as well as whether that exercise may be indoors or outside, "must be evaluated on the full extent of the available recreational opportunities." *Id.* at 930. In other words, "[d]etermining what constitutes adequate exercise requires consideration of the physical characteristics of the cell and [prison] and the average length of stay of the inmates." *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1212 (9th Cir. 2008) (quotation marks and citation omitted). For example, in a case where prisoners were held in "continuous segregation, spending virtually 24 hours every day in their cells with only meager out-of-cell movements and corridor exercise," they were entitled to "one hour per day, five days a week" of outdoor exercise. *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). By

---

the Deputy Warden knew of Muhammad's difficulties after approximately one month, but waited five or six months to speak to the "mental health lead" about arranging additional services.

contrast, prisoners were not entitled to outdoor exercise when they were held in a far less restrictive setting that allowed out-of-cell "recreation time" of at least one hour every day. *Norbert v. City and County of San Francisco*, 10 F.4th 918, 934 (9th Cir. 2021).

In general, prisoners must be provided sufficient time and access to locations such that they enjoy "meaningful" recreation opportunities. *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018). The Ninth Circuit has noted offers for recreation in a room with "space constraints" that lacks "appropriate equipment" may not "constitute an exercise opportunity." *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1212 n.22 (9th Cir. 2008).

The Court is not assessing the constitutionality of the amounts of recreation set forth in DO 812. If subclass members were receiving legitimate offers for recreation in the amount and locations set forth in DO 812, and prisoners were able to progress through the step program set forth in DO 812, it is unlikely prisoners would have a viable claim based on inadequate recreation. A minimum of 7.5 hours of recreation per week, with the promise that additional and better recreation offers could be earned, would present a very different situation from what is presented here. Instead, the actual practice is that DO 812 is not followed. Subclass members are routinely denied recreation of even 7.5 hours per week and, even when prisoners should be provided recreation in different enclosures, recreation is routinely offered in the chute which is only marginally better than their cells.

The tracking forms for individuals in maximum custody establish it is more probable than not the subclass members are routinely receiving legitimate offers for five hours or less of recreation per week. Even five hours is an overstatement based on the implausibly high refusal rates and the practice to interpret, whenever possible, responses to offers as denials. The detention forms establish it is more probable than not that prisoners in detention units routinely receive no recreation offers. While the forms sometimes indicate recreation offers, every single prisoner is often recorded as refusing recreation. That indicates it is more probable than not the offers for recreation, even if documented on the form, are overstating the offers actually made.

Beyond the insufficient amount of recreation time actually offered to subclass

members, the offered location is insufficient under the particular facts of this case. Here, maximum custody units are "barren, stark, and . . . dehumanizing." (Doc. 4122 at 61; 4306 at 42). When allegedly given the opportunity to leave their cells, the offer is merely to be placed in one of the chutes for a potentially extended period. The chutes are only marginally larger than the cells, contain no exercise equipment, and have no toilet. The chutes are open to the sky, meaning they are stifling in the summer and attract insects. And prisoners are taken to the chute one at a time, precluding any socialization. Accordingly, the chutes are a better location for prisoners to obtain some amount of exercise, but exercise in the chute is not sufficiently "meaningful" on a long-term basis.

Prisoners often spend years or decades in maximum custody. Prisoners may spend months in detention units. Given the length of time prisoners remain in isolated confinement, the physical conditions of the cells (*i.e.*, cell size and pest infestations), and the stark conditions of the chute, the amount of recreation offered to subclass members deprives them of the essential human need to exercise. *See Pierce v. Cty. of Orange*, 526 F.3d 1190, 1212 (9th Cir. 2008) (noting courts have held prisoners "are ordinarily entitled to daily exercise, or five to seven hours of exercise per week, outside their cells"). The objective prong of the Eighth Amendment test is met.

The subjective prong is easily met. It is undisputed the records for maximum custody as well as detention establish subclass members routinely receive few, if any, recreation offers. Even if accurate, the records show prisoners refusing recreation at implausibly high rates. Officials must have known prisoners were not being offered legitimate opportunities to exercise. And because it has been established for decades that prisoners in long-term housing must be provided some meaningful amount of recreation, the failure to provide that exercise must have been done with deliberate indifference to the subclass members' rights. *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018).

**3. Subclass members are subject to unconstitutional amounts of social isolation.**

Plaintiffs claim that subclass members are subject to profound levels of social

isolation. The evidence established prisoners are subject to "extreme social isolation" creating a substantial risk of serious harm. (Doc. 4165 at 93). No other conclusion is possible.

Subclass members may be celled individually or with one other person.[73] Beyond a cellmate, subclass members often have effectively zero social contact. For many, the only interactions that might be described as social contacts are when meals are delivered. (Doc. 4165 at 53). Beyond meal delivery, subclass members may remain in their cells with absolutely no interaction with another human for days at a time. Some additional interaction may occur on the days when subclass members are offered showers or recreation. But even if those offers are accepted, there likely will be no opportunity for meaningful social interaction.

Individuals who accept an offer to shower or to go to recreation will have brief interactions with one officer while the prisoner is searched, handcuffed, and escorted to and from the shower or recreation enclosure.[74] Both showers and recreation, if offered in the chute, are done alone. The amount of social isolation that may be enforced on subclass members is illustrated by a Detention Record covering the week beginning July 11, 2021. (Doc. 1697 at 1277). During that seven-day period, prisoner M.H. received only seven meals. Thus, M.H. interacted with prison staff for a few seconds, seven times, when receiving his meals. That was the entirety of M.H.'s social contact that week. M.H. did not receive a single offer to shower nor did he receive a single offer for recreation. M.H. was kept in his cell for at least the seven straight days reflected in the record, receiving minimal food, and experiencing no contact with another person.

The record for M.H. is on the extreme end of the conditions experienced by subclass

[73] As noted by Dr. Haney, having a cellmate "does not mitigate, and indeed may exacerbate, the psychological impact of" living in a maximum custody unit. (Doc. 4165 at 54). Living in such close proximity to a single other individual is not "meaningful social contact" and "may become an additional stressor" because those relationships may create "tension and even conflict" between prisoners. (Doc. 4165 at 54). "[C]onstant, forced, inescapable, and unremitting contact with another person in such a small and enclosed space" can become "intolerable." (Doc. 4165 at 55).

[74] Some prisoners might require more than one officer be present during this process. But, at most, there will be three officers.

members. But all subclass members are subjected to profound deprivations of social interaction. Subclass members have interactions when they receive meals and when they receive offers for showers or recreation. But those interactions are with one or two staff members. And because recreation is often offered in the chute, no social interactions will occur during the recreation beyond the interaction with the staff member while being transported to and from the chute.

The deprivation of social contact imposed on subclass members places all subclass members "at significant risk of serious psychological harm." (Doc. 4165 at 50). Defendants did not present any evidence, expert or otherwise, questioning this conclusion. Presumably because it has been established for decades that profound levels of social isolation are harmful. As one court noted almost thirty-five years ago, it "seems pretty obvious . . . that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total." *Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988). Another court noted in 1995 that "conditions of extreme social isolation and reduced environmental stimulation . . . will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods."[75] *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995). And yet another court noted, in 2020, "the substantial risks of prolonged solitary confinement are obvious, longstanding, pervasive, well-documented, [and] expressly noted by prison officials in the past." *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 445 (3d Cir. 2020) (quotation marks and citation omitted). In reaching that conclusion, the Third Circuit quoted approvingly from an earlier case that had concluded prolonged deprivation of social contact creates a situation where a prisoner's "very identity is at risk of disintegration." *Id.* (quoting *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017).

---

[75] The *Madrid* court found the lack of social isolation and environmental stimulation were not "per se violative of the Eighth Amendment." *Id.* Instead, those conditions violated the Eighth Amendment rights of only those prisoners with existing mental illness or similar conditions. The conditions in *Madrid*, however, differed from those here. For example, prisoners in *Madrid* were entitled to "an exercise period five times each week" and were generally out of their cells for 90 minutes every day. 889 F. Supp. at 1156, 1230.

Social contact is a need protected by the Eighth Amendment. That does not mean the same amount of social contact is required for all prisoners or that, in some circumstances, it cannot be denied for periods of time. For purposes of the subclass, the only issue is whether all prisoners in isolated confinement can be deprived of effectively all social contact for an indeterminate amount of time, up to years and decades. Requiring subclass members go decades without meaningful social contact presents a substantial risk of serious psychological harm. The objective prong is satisfied.

The subjective prong is also satisfied given the decades-long recognition by academics, prison administrators, and courts that social isolation of the sort imposed on the subclass creates a significant risk of serious harm. The risk is so obvious that Defendants must have known their practices were creating a risk of harm.

**4. Subclass members are not subjected to unconstitutional cell illumination practices.**

"Adequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (quotation marks and citation omitted). Requiring prisoners live "in constant illumination" can be unconstitutional. *Id.* Existing caselaw links excessive lighting to sleep deprivation. *See, e.g., id.* at 1091 (holding excessive cell lighting allegedly caused "grave sleeping problem"). The Court will assume Plaintiffs challenge the cell illumination practices as a deprivation of their right to adequate shelter or sleep.[76]

Plaintiffs presented very little evidence regarding the cell illumination experienced by subclass members. Dr. Haney stated there was constant illumination in certain cells. (Doc. 4122 at 52). And one prisoner testified that, while on mental health watch, his cell was illuminated "24/7" that made him feel "insane." (Doc. 4263 at 89). But Dr. Haney noted prisoners often cover the lights in their cells, presumably reducing the amount of light to at least some degree. (Doc. 4122 at 52).

[76] Plaintiffs repeatedly reference that subclass members do not experience "natural light." (Doc. 4308 at 38). If Plaintiffs' theory was the deprivation of natural light, that theory fails because Plaintiffs did not prove deprivation of "natural light" violates the objective prong of the Eighth Amendment.

Plaintiffs presented no evidence regarding how bright the lighting in the cells actually is nor did they present evidence establishing subclass members, in general, experience negative effects such as sleeping problems because of the lighting. *See Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014) (reversing grant of summary judgment because record did not indicate how bright the lighting in cells was). In addition, it is undisputed Defendants have a legitimate penological interest in lighting the subclass members' cells so officers "can actually look in the cell and make sure that the inmate is alive and okay." (Doc. 4263 at 46).

Without evidence regarding how bright each cell is, the impact of lighting on subclass members, and the existence of a penological purpose for some amount of lighting, Plaintiffs have not carried their burden of providing the current cell illumination practices violate the objective prong of the Eighth Amendment. *See Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013) (holding cell illumination claim failed because there was undisputed penological purpose).

**5. Subclass members are not subjected to unconstitutional limitations on their property.**

Plaintiffs did not present evidence regarding the exact limitations on property they are challenging. At trial, there was evidence that entitlement to property varies significantly across the subclass. For example, subclass members in detention, close management, and in an intake facility are permitted very little, if any, property. (Doc. 4264 at 139; Doc. 4165 at 52). Similarly, subclass members in a mental health watch unit are not entitled to any "personal property." (Doc. 4122 at 72). But there is no evidence regarding deprivation of property in the general maximum custody units. Plaintiffs have not established, on a subclass-wide basis, any practice or policy regarding property that violates a basic human need.

**6. Subclass members are subjected to practices resulting in inadequate nutrition.**

"Adequate food is a basic human need protected by the Eighth Amendment," but

that "food need not be tasty or aesthetically pleasing." *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (quotation marks and citations omitted). In one case, the Ninth Circuit addressed an Eighth Amendment claim by an inmate who alleged he had been "denied 16 meals in 23 days." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). The Ninth Circuit concluded that, if true, that was a sufficiently serious deprivation of a life necessity. *Id.* at 813. Moreover, the knowing denial of food easily meets the subjective prong because "[t]he risk that an inmate might suffer harm as a result of the repeated denial of meals is obvious." *Id.* at 814.

As with other aspects of the subclass's claims, the issue is not whether Defendants' policies require prisoners receive nutritionally adequate food. It is undisputed the menus and policies contemplate the delivery of meals that would be nutritionally adequate. (Ex. 4406). In other words, if Defendants implemented their own policies, there would likely be no plausible claim for relief. But the evidence establishes Defendants' actual practices differ dramatically from its policies.

Subclass members routinely receive less food than policy requires and less food than appropriate. Subclass members routinely report they are receiving insufficient food. The "top complaint" by prisoners regarding their conditions of confinement is that they do not receive the portions of food outlined in Defendants' policies and menus. (Doc. 4278 at 36). In addition, the detention records show prisoners are routinely denied meals. Some of those records establish prisoners were denied far more than the "16 meals in 23 days" the Ninth Circuit found to be an obvious constitutional violation. *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). For example, one prisoner received nine meals over a seven-day period. (Ex. 1697 at 1275). Another prisoner received only seven meals over a seven-day period. (Ex. 1697 at 1277).

Defendants claim the records are inaccurate. Defendants argue they are not correct because prisoners would "report if they were not being fed." (Doc. 4315 at 129). But they do and the "top complaint" from prisoners regarding their conditions of confinement was insufficient food. Next, Defendants argue Plaintiffs merely "cherry picked examples of

deficient documentation" of meals. (Doc. 4315 at 130). According to Defendants, there are "thousands of pages" showing prisoners received their meals and only some records establish prisoners were fed the appropriate number of meals. (Doc. 4315 at 130). However, the records across locations proved subclass members, as a matter of practice, routinely do not receive adequate meals. At the very least, the records show every subclass member is subject to food practices that create a substantial risk of harm. And because the failure to deliver adequate food is so obvious in the records, Defendants are deliberately indifferent in denying prisoners a basic human need.

## INJUNCTIVE RELIEF UNDER THE PRISON LITIGATION REFORM ACT

Because the Court has determined by a preponderance of the evidence that Defendants are deliberately indifferent to a substantial risk of serious harm, it must fashion an appropriate remedy. As noted at the beginning of its decision, the Court is mindful of its responsibilities in light of the PLRA's requirements, namely that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

In this case, there is no question remedial measures are necessary to correct constitutional deficiencies and the Court will meet its constitutional obligations. Thus, the Court will employ an expert to assist with crafting an injunction that remedies the constitutional violations—no more and no less.

**IT IS THEREFORE ORDERED** that the Court finds in favor of Plaintiffs and against Defendants as to their claims in Counts One, Count Two, Count Four, and Count Five. Count Three is dismissed.

**IT IS FURTHER ORDERED** that the Court finds in favor of Plaintiffs and against Defendants as to the following certified class practices:

- Failure to provide timely access to health care;

- Failure to provide timely emergency treatment;
- Failure to (timely) provide necessary medication;
- Insufficient health care staffing;
- Failure to provide care for chronic diseases;
- Failure to provide timely access to medically necessary specialty care;
- Failure to provide mentally ill prisoners medically necessary mental health treatment (i.e., psychotropic medication, therapy, and inpatient treatment); and
- Failure to provide suicidal and self-harming prisoners basic mental health care.

**IT IS FURTHER ORDERED** that the Court finds in favor of Plaintiffs and against Defendants as to the following certified subclass practices:

- Inadequate psychiatric monitoring because of chronic understaffing;
- Lack of recreation;
- Extreme social isolation; and
- Insufficient nutrition.

**IT IS FURTHER ORDERED** within 14 days of this Order the parties are invited to nominate proposed experts to assist the Court with crafting an injunction that complies with 18 U.S.C. § 3626(a)(1)(A). The Court will consider the proposals and will appoint a qualified expert on or before **August 15, 2022**.

…

…

…

…

…

…

…

…

…

…

**IT IS FURTHER ORDERED** Plaintiffs' Motion to Exclude Evidence Due to Rule 30(b)(6) Designee's Lack of Knowledge (Doc. 4163) is **denied as moot**; Plaintiffs' Motion in Limine Re: Admission of Exhibits (Doc. 4215) is **denied** except as explained herein; Defendants' Motion to Strike Portions of Plaintiffs' Experts' Declarations (Doc. 4219) is **denied**; the parties' Joint Motion to Admit Exhibits (Doc. 4224) is **granted**; and Plaintiffs' Motion in Limine to Admit Exhibits 556 and 941 (Doc. 4225) is **denied** except as explained herein.

Dated this 30th day of June, 2022.

Honorable Roslyn O. Silver
Senior United States District Judge

## Appendix 1

**Medical Staffing**

| Douglas Complex[77] | | | |
|---|---|---|---|
| **Population: 1,524** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 1.00 | 1.00 | |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 4.00 | 4.00 | |
| **Medical Assistant** | - | 0.00 | |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 1.50 | 2.00 | **0.50** |
| **Nursing Assistant/Patient Care Technician** | 4.00 | 4.00 | |
| **Registered Nurse** | 8.00 | 7.30 | **(0.70)** |
| **Staff Physician** | N/A | N/A | |
| **TOTAL** | 20.50 | 20.30 | **(0.20)** |

| Eyman Complex | | | |
|---|---|---|---|
| **Population: 5,219** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 6.00 | 3.00 | **(3.00)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 30.00 | 19.70 | **(10.30)** |
| **Medical Assistant** | - | 3.00 | **3.00** |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 5.50 | 5.00 | **(0.50)** |
| **Nursing Assistant/Patient Care Technician** | 9.00 | 9.35 | **0.35** |
| **Registered Nurse** | 20.00 | 9.90 | **(10.10)** |
| **Staff Physician** | 1.00 | 1.00 | |
| **TOTAL** | 73.50 | 52.95 | **(20.55)** |

[77] Does not include Administrative Assistant, Assistant Facility Health Administrator, Clinical Coordinator, Facility Health Administrator, Healthcare Delivery Facilitator, Inventory Coordinator, Lab Technician, Lead Inventory Coordinator, Medical Records Clerk and Supervisor, Physical Therapist, Release/Discharge Planner, Scheduler, X-Ray Technician, Mental Health care staff (addressed in Part Two), or Dental staff. "N/A" means the position does not exist at the facility. Medical Assistant, Education Coordinator, Physical Therapist, Clinical Coordinator, and Recreation Therapist positions exist in excess of the staffing allocation, even though they may not be filled.

| Florence Complex | | | |
|---|---|---|---|
| **Population: 2,534** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 6.00 | 4.00 | **(2.00)** |
| **Director of Nursing** | 1.00 | 0.00 | **(1.00)** |
| **Licensed Practical Nurse/Medical Assistant** | 30.00 | 15.90 | **(14.10)** |
| **Medical Assistant** | - | 0.00 | |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 6.00 | 6.75 | **0.75** |
| **Nursing Assistant/Patient Care Technician** | 20.00 | 14.90 | **(5.10)** |
| **Registered Nurse** | 36.00 | 20.25 | **(15.75)** |
| **Staff Physician** | 2.00 | 1.25 | **(0.75)** |
| **TOTAL** | 102.00 | 64.05 | **(37.95)** |

| Lewis Complex | | | |
|---|---|---|---|
| **Population: 4,220** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 6.00 | 2.00 | **(4.00)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 34.00 | 17.30 | **(16.70)** |
| **Medical Assistant** | - | 0.90 | **0.90** |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 6.00 | 5.50 | **(0.50)** |
| **Nursing Assistant/Patient Care Technician** | 14.00 | 12.70 | **(1.30)** |
| **Registered Nurse** | 30.00 | 24.35 | **(5.65)** |
| **Staff Physician** | 2.00 | 0.00 | **(2.00)** |
| **TOTAL** | 94.00 | 64.75 | **(29.25)** |

| Perryville Complex | | | |
|---|---|---|---|
| **Population: 3,318** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 6.00 | 2.00 | **(4.00)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 24.00 | 18.50 | **(5.50)** |
| **Medical Assistant** | - | 0.00 | |
| **Medical Director** | 0.80 | 1.00 | **0.20** |

| | | | |
|---|---|---|---|
| **Midlevel Practitioner** | 5.00 | 6.00 | **1.00** |
| **Nursing Assistant/Patient Care Technician** | 14.00 | 12.60 | **(1.40)** |
| **Registered Nurse** | 30.00 | 15.10 | **(14.90)** |
| **Staff Physician** | 1.20 | 1.50 | **0.30** |
| **TOTAL** | 82.00 | 57.70 | **(24.30)** |

| **Phoenix Complex** | | | |
|---|---|---|---|
| **Population: 468** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 3.00 | 0.00 | **(3.00)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 3.00 | 4.80 | **1.80** |
| **Medical Assistant** | - | 0.00 | |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 4.00 | 5.00 | **1.00** |
| **Nursing Assistant/Patient Care Technician** | 5.75 | 1.90 | **(3.85)** |
| **Registered Nurse** | 12.00 | 9.65 | **(2.35)** |
| **Staff Physician** | 1.00 | 0.00 | **(1.00)** |
| **TOTAL** | 30.75 | 23.35 | **(7.40)** |

| **Safford Complex** | | | |
|---|---|---|---|
| **Population: 1,035** | | | |
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 2.00 | 2.00 | |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 6.00 | 2.80 | **(3.20)** |
| **Medical Assistant** | - | 0.00 | |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 1.00 | 2.00 | **1.00** |
| **Nursing Assistant/Patient Care Technician** | 4.00 | 4.00 | |
| **Registered Nurse** | 8.00 | 12.80 | **4.80** |
| **Staff Physician** | N/A | N/A | |
| **TOTAL** | 23.00 | 25.60 | **2.60** |

| **Tucson Complex** |
|---|
| **Population: 4,420** |

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Assistant Director of Nursing** | 8.00 | 4.00 | **(4.00)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 40.00 | 24.30 | **(15.70)** |
| **Medical Assistant** | - | 0.00 | |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 8.00 | 7.00 | **(1.00)** |
| **Nursing Assistant/Patient Care Technician** | 19.00 | 16.80 | **(2.20)** |
| **Registered Nurse** | 36.00 | 18.30 | **(17.70)** |
| **Staff Physician** | 2.00 | 0.75 | **(1.25)** |
| **TOTAL** | 115.00 | 73.15 | **(41.85)** |

| Winslow Complex<br>Population: 1,481 | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 2.00 | 1.00 | **(1.00)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 4.00 | 1.90 | **(2.10)** |
| **Medical Assistant** | - | 1.00 | **1.00** |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 2.00 | 2.00 | |
| **Nursing Assistant/Patient Care Technician** | 3.00 | 5.60 | **2.60** |
| **Registered Nurse** | 6.00 | 11.10 | **5.10** |
| **Staff Physician** | N/A | N/A | |
| **TOTAL** | 19.00 | 24.60 | **5.40** |

| Yuma Complex<br>Population: 3,374 | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Assistant Director of Nursing** | 5.00 | 4.80 | **(0.20)** |
| **Director of Nursing** | 1.00 | 1.00 | |
| **Licensed Practical Nurse/Medical Assistant** | 10.00 | 12.00 | **2.00** |
| **Medical Assistant** | - | 2.00 | **2.00** |
| **Medical Director** | 1.00 | 1.00 | |
| **Midlevel Practitioner** | 4.00 | 5.90 | **1.90** |

| | | | |
|---|---|---|---|
| **Nursing Assistant/Patient Care Technician** | 6.00 | 14.75 | **8.75** |
| **Registered Nurse** | 14.00 | 16.55 | **2.55** |
| **Staff Physician** | 1.00 | 1.00 | |
| **TOTAL** | 42.00 | 59.00 | **17.00** |

## Appendix 2

**Dr. Murray's Scale**

A rating of **5—Excellent** was assigned to care that was timely and reflected good decision-making. The care may not have been perfect in all instances, but the imperfections found did not affect the outcomes. This rating may allow for a lack of preventive health care. Regarding documentation, this rating was used if the notes were clear and comprehensive (usually free-typed instead of utilizing the template).

A rating of **4—Very Good** may represent care that was mostly solid, but there may be some important care that was delayed slightly or a decision that should have been made a bit earlier eventually got made and there was no harm to the patient by the delay.

A rating of **3—Good** may represent a mix of care that was sometimes poor and sometimes great. However, if there was a problem with care that markedly increased risk to a patient, a lower score was assigned, since it does not help to provide excellent care for some problems and to not address a problem that had a significant risk of causing an adverse outcome.

A rating of **2—Fair** would be assigned if the decision-making represented a lack of basic practice rules or put the patient at some risk. It may represent good decision-making regarding referrals, with delay in the referral. Often this rating reflected that there was some good care, but it was overshadowed by the presence of care that put the patient at risk and could not be overlooked. Using this rating for documentation would represent incomplete notes where the reader cannot follow the care very easily at all.

A rating of **1—Poor** represents care that cannot be excused or overlooked. It represents risk to patients, lack of basic knowledge or follow through, or a timeline that does not realistically apply to the patient's problem. In documentation, this rating might be used when the patient's care was fragmented, to a point where one cannot follow what should happen. This may be due to the shortcomings of eOMIS or may be due to a lack of comprehensive documentation by the provider.

(Doc. 4206 ¶¶ 209-213).

# Appendix 3

**Mental Health Staffing**

| Douglas Complex[78] | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| **Behavioral Health Technician** | N/A | N/A | |
| **Behavioral Specialist** | N/A | N/A | |
| **Mental Health Lead** | N/A | N/A | |
| **Mental Health Clerk** | N/A | N/A | |
| **Mental Health Midlevel (NP/PA)** | N/A | N/A | |
| **Mental Health Registered Nurse** | N/A | N/A | |
| **Psychiatrist** | N/A | N/A | |
| **Psychologist** | N/A | N/A | |
| **Psychology Associate** | 1.00 | 0.00 | **(1.00)** |
| **TOTAL** | 1.00 | 0.00 | **(1.00)** |

| Eyman Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| **Behavioral Health Technician** | 4.00 | 7.00 | **3.00** |
| **Behavioral Specialist** | N/A | N/A | |
| **Mental Health Lead** | 1.00 | 1.00 | |
| **Mental Health Clerk** | 1.00 | 0.00 | **(1.00)** |
| **Mental Health Midlevel (NP/PA)** | 3.50 | 4.00 | **0.50** |
| **Mental Health Registered Nurse** | 2.00 | 0.90 | **(1.10)** |
| **Psychiatrist** | 1.00 | 1.00 | |
| **Psychologist** | 3.00 | 2.00 | **(1.00)** |
| **Psychology Associate** | 13.00 | 8.00 | **(5.00)** |
| **TOTAL** | 28.5 | 23.9 | **(4.60)** |

| Florence Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| **Behavioral Health Technician** | 4.00 | 0.00 | **(4.00)** |

---

[78] Does not include Administrative staff, Health Care staff, or Dental staff. "N/A" means the position does not exist at the facility. Behavioral Specialist positions exist in excess of the staffing allocation, even though they may not be filled.

| | | | |
|---|---|---|---|
| Behavioral Specialist | 0.00 | 0.00 | |
| Mental Health Lead | 1.00 | 0.00 | (1.00) |
| Mental Health Clerk | 1.00 | 1.00 | |
| Mental Health Midlevel (NP/PA) | 3.50 | 3.00 | (0.50) |
| Mental Health Registered Nurse | 1.00 | 0.00 | (1.00) |
| Psychiatrist | 1.00 | 1.00 | |
| Psychologist | 3.00 | 0.90 | (2.10) |
| Psychology Associate | 8.00 | 2.00 | (6.00) |
| TOTAL | 22.50 | 7.90 | (14.60) |

| Lewis Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Behavioral Health Technician | 4.00 | 3.00 | (1.00) |
| Behavioral Specialist | N/A | N/A | |
| Mental Health Lead | 1.00 | 0.00 | (1.00) |
| Mental Health Clerk | 1.00 | 1.00 | |
| Mental Health Midlevel (NP/PA) | 3.50 | 3.00 | (0.50) |
| Mental Health Registered Nurse | 2.00 | 1.00 | (1.00) |
| Psychiatrist | 1.00 | 1.00 | |
| Psychologist | 3.00 | 2.00 | (1.00) |
| Psychology Associate | 12.00 | 10.25 | (1.75) |
| TOTAL | 27.50 | 21.25 | (6.25) |

| Perryville Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Behavioral Health Technician | 3.00 | 2.00 | (1.00) |
| Behavioral Specialist | N/A | N/A | |
| Mental Health Lead | 1.00 | 1.00 | |
| Mental Health Clerk | 1.00 | 0.00 | (1.00) |
| Mental Health Midlevel (NP/PA) | 3.50 | 3.20 | (0.30) |
| Mental Health Registered Nurse | 5.20 | 4.70 | (0.50) |
| Psychiatrist | 1.00 | 1.00 | |
| Psychologist | 2.00 | 1.75 | (0.25) |
| Psychology Associate | 10.00 | 9.00 | (1.00) |
| TOTAL | 26.70 | 22.65 | (4.05) |

| Phoenix Complex |
|---|

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Behavioral Health Technician** | 5.00 | 2.00 | **(3.00)** |
| **Behavioral Specialist** | N/A | N/A | |
| **Mental Health Lead** | N/A | N/A | |
| **Mental Health Clerk** | N/A | N/A | |
| **Mental Health Midlevel (NP/PA)** | 3.50 | 3.50 | |
| **Mental Health Registered Nurse** | 15.80 | 8.80 | **(7.00)** |
| **Mental Health Registered Nurse Charge** | 1.00 | 0.90 | **(0.10)** |
| **Psychiatrist** | 1.00 | 1.00 | |
| **Psychologist** | 4.00 | 2.50 | **(1.50)** |
| **Psychology Associate** | 11.00 | 9.00 | **(2.00)** |
| **TOTAL** | 41.30 | 27.70 | **(13.60)** |

| Safford Complex | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Behavioral Health Technician** | N/A | N/A | |
| **Behavioral Specialist** | N/A | N/A | |
| **Mental Health Lead** | N/A | N/A | |
| **Mental Health Clerk** | N/A | N/A | |
| **Mental Health Midlevel (NP/PA)** | N/A | N/A | |
| **Mental Health Registered Nurse** | N/A | N/A | |
| **Psychiatrist** | N/A | N/A | |
| **Psychologist** | N/A | N/A | |
| **Psychology Associate** | 1.00 | 1.00 | |
| **TOTAL** | 1.00 | 1.00 | **0.00** |

| Tucson Complex | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Behavioral Health Technician** | 6.00 | 4.00 | **(2.00)** |
| **Behavioral Specialist** | 0.00 | 0.00 | |
| **Mental Health Lead** | 1.00 | 1.00 | |
| **Mental Health Clerk** | 1.00 | 1.00 | |
| **Mental Health Midlevel (NP/PA)** | 3.50 | 4.50 | **1.00** |
| **Mental Health Registered Nurse** | 2.00 | 2.00 | |
| **Psychiatrist** | 1.00 | 0.00 | **(1.00)** |
| **Psychologist** | 4.00 | 3.90 | **(0.10)** |

| | | | |
|---|---|---|---|
| **Psychology Associate** | 14.00 | 11.00 | **(3.00)** |
| **TOTAL** | 32.50 | 27.40 | **(5.10)** |

| **Winslow Complex** | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Behavioral Health Technician** | N/A | N/A | |
| **Behavioral Specialist** | N/A | N/A | |
| **Mental Health Lead** | N/A | N/A | |
| **Mental Health Clerk** | N/A | N/A | |
| **Mental Health Midlevel (NP/PA)** | N/A | N/A | |
| **Mental Health Registered Nurse** | N/A | N/A | |
| **Psychiatrist** | N/A | N/A | |
| **Psychologist** | N/A | N/A | |
| **Psychology Associate** | 1.00 | 1.00 | |
| **TOTAL** | 1.00 | 1.00 | **0.00** |

| **Yuma Complex** | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Behavioral Health Technician** | 3.00 | 3.00 | |
| **Behavioral Specialist** | N/A | N/A | |
| **Mental Health Lead** | 1.00 | 1.00 | |
| **Mental Health Clerk** | 1.00 | 1.00 | |
| **Mental Health Midlevel (NP/PA)** | 3.00 | 3.00 | |
| **Mental Health Registered Nurse** | 1.00 | 1.00 | |
| **Psychiatrist** | 1.00 | 1.00 | |
| **Psychologist** | 1.00 | 0.00 | **(1.00)** |
| **Psychology Associate** | 9.00 | 6.75 | **(2.25)** |
| **TOTAL** | 17.00 | 16.75 | **(3.25)** |

# Appendix 4

## Pennington-Stallcup's Email

| Eyman Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Psychology Associate | 13.00 | 7.5 | (5.50) |

| Florence Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Psychologist | 3.00 | 0.90 | (2.10) |
| Psychology Associate | 8.00 | 3.00 | (6.00) |

| Lewis Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Psychologist | 3.00 | 2.00 | (1.00) |
| Psychology Associate | 12.00 | 9.0 | (3.00) |

| Perryville Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Psychologist | 2.00 | 1.75 | (0.25) |
| Psychology Associate | 10.00 | 8.00 | (2.00) |

| Phoenix Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Psychologist | 4.00 | 1.50 | (2.50) |
| Psychology Associate | 11.00 | 10.00 | (1.00) |

| Tucson Complex | | | |
|---|---|---|---|
| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
| Psychologist | 4.00 | 2.0 | (2.00) |
| Psychology Associate | 14.00 | 11.00 | (3.00) |

| Yuma Complex | | | |
|---|---|---|---|
| **POSITION** | **CONTRACT FTE** | **HIRED FTE** | **FTE VARIANCE** |
| **Psychologist** | 1.00 | 0.00 | **(1.00)** |
| **Psychology Associate** | 9.00 | 7.50 | **(1.50)** |

(Ex. 2141).

# Appendix 5

Dr. Penn's Chart Reviews

| Patient No. | Access to Care? | Notes | Trial Tr. Page |
|---|---|---|---|
| 1 | No | | 3102 |
| 6 | No | | 3102 |
| 11 | No | | 3103 |
| 12 | Yes | "death by probable suicide, possible problems with medical access to care'";[79] patient submitted HSRs on 9/2 and 9/12 but was not seen until 9/16 | 3103 |
| 13 | Yes | patient died by hanging while in segregation; "many late entries but seen regularly by mental health for . . . health and welfare rounds"; "possible medical access to care problem" | 3103 |
| 14 | No | | 3104 |
| 16 | No | | 3104 |
| 17 | No | | 3104 |
| 21/22[80] | No | | 3104 |
| 27 | No | | 3104 |
| 28 | No | | 3105 |
| 29 | No | | 3105 |
| 30 | No | | 3105 |
| 34 | No | | 3105 |
| 38 | No | | 3106 |
| 49 | No | | 3106 |
| 52 | Yes | died by suicide by hanging; "ambulance team refused to go to the patient's location due to their policy and he was brought to medical on a gurney" | 3106-07 |
| 55 | No | | 3106 |
| 56 | No | | 3107-08 |

[79] Direct citations to Exhibit 3 to the Penn Report appear in quotation marks.
[80] "Patient 21" and "Patient 22" referred to the same individual.

| | | | |
|---|---|---|---|
| 61 | No | | 3108 |
| 62 | No | | 3108 |
| 72 | No | | 3108 |
| 80 | No | | 3108 |
| 81 | No | | 3109-10 |
| 82 | No | | 3109-10 |
| 86 | Yes | "two weeks on [suicide] watch but didn't see psychiatric clinician" | 3110 |
| 87 | No | | 3109-10 |
| 90 | No | | 3110 |
| 92 | No | | 3110 |
| 95 | No | patient waited almost three weeks to have psychotic complaints addressed | 3111 |
| 97 | No | | 3110 |
| 98 | Yes | "'on [suicide] watch 6-21-19 through 7-8-19 but saw no psychiatric provider under 7-18-19'"; patient was on olanzapine, an anti-psychotic medication | 3111, 3114 |
| 100 | No | | 3111 |
| 114 | Yes | "Depakote prescribed at too low a dose as revealed by disturbed behavior in lab." | 3116 |
| 115 | Yes | patient committed suicide on a date early in 2021; "[patient] might have benefited from a prison inpatient unit" | 3116 |
| 118 | No | | 3116 |
| 120 | Yes | patient had died by suicide before the relevant time for this review; "answered yes only so I could submit the review" | 3117 |
| 129 | Yes | "lithium continued at low 600 milligram daily dose despite low level of .3 and a suicide attempt on this dose" | 3122-23 |

| | | | |
|---|---|---|---|
| 131 | Yes | "health care request written in Spanish, yet most mental health meetings say no interpreter was used and do not state whether interview was conducted in Spanish" | 3123 |
| 136 | Yes | "has inexplicably been prescribed clonidine for depression[/]anxiety" | 3123 |
| 140 | No | | 3122 |
| 145 | Yes | "low dose of Risperdal consta 12.5 mg [every two] weeks despite chronic auditory hallucinations" | 3126 |
| 146 | Yes | "patient was taken off of Risperdal but had to be returned due to resurgent psychosis"; "decision to stop Risperdal was probably a mistake, but the reasoning was documented" | 3126 |
| 147 | No | | 3122 |
| 148 | No | | |
| 151 | No | | 3128 |
| 152 | Yes | "low dose haloperidol, 1 milligram [twice daily] by psych APN is inadequate as evidenced by symptoms. May have catatonia, which would benefit from benzo or [electro-convulsive therapy]." | 3128 |
| 153 | No | | 3128 |
| 155 | Yes | "lithium was increased prescribed once daily at night, which is not optimal"; diagnosis of bipolar I was not well substantiated | 3129 |
| 156 | Yes | "marginally adequate care" | 3129 |
| 158 | No | | 3130 |
| 159 | Yes | "marginal adequate [sic] | 3130 |

| | | | |
|---|---|---|---|
| | | access to care” | |
| 160 | Yes | “concerns about polypharmacy and combining Cogentin with Zyprexa” | 3130 |
| 167 | Yes | “access to care adequate but concerns about medication decisions” | 3132 |
| 168 | Yes | “access to care adequate but concerns about decision-making” | 3132 |
| 169 | No | | 3135 |
| 179 | Yes | AIMS examination (a physical examination for possible neurological side effects of psychotropic medications) is performed only once a year | 3135 |
| 228 | No | patient died by suicide | 3137 |
| 235 | Yes | “It is concerning that patient is not on meds and carries a diagnosis of schizophrenia or bipolar DO”; patient has been on involuntary medication in the past; “unmedicated, [patient] is likely going to have difficulties functioning” | 3137 |
| 252 | Yes | “documentation is poor” | 3141-42 |
| 258 | No | | 3142 |
| 259 | No | | 3142 |
| 271 | Yes | “admission in 2006 but encounters only go back to January 2020, limited documentation available” | 3143 |
| 272 | Yes | “no scheduled visit with the psychiatric midlevel since August 2020” | 3143 |

## Appendix 6

**Recreation per Step/Location**

| | Step I | Step II | Step III |
|---|---|---|---|
| **Browning** | Three, 2.5-hour blocks per week in the standard[81] enclosure | Three, 2.5-hour blocks per week, one of which can be in the 10x10 enclosure | For GP – One, 2.5-hour block per month in 20x40 basketball enclosure (up to eight inmates)<br><br>For GP and STG - Three, 2.5-hour blocks per week, to include one-time per week, in the 10x10 enclosures<br><br>For Condemned Row – Four, 2.5-hour blocks per week of outdoor recreation - All can be in the 10x10 interactive enclosures<br><br>For all inmates: In pod recreation;[82] Recreation with another inmate in accordance with Department Order #704, Inmate Regulations |
| **SMU I / Rast** | Three, 2.5-hour blocks per week to include 10x10 enclosure (two inmates) | Three, 2.5-hour blocks per week 10x10 enclosure (two inmates), and;<br><br>One, 2.5-hour block per month in 20x40 basketball enclosure (up to eight inmates) | Three, 2.5-hour blocks per week to include one-time per month in 10x10 enclosure (two inmates), and;<br><br>One, 2.5-hour block per month in 20x40 basketball enclosure (up to eight inmates), and;<br><br>One, 2.5-hour block per month in 50x90 (up to 32 inmates) |

[81] The "standard enclosure" is also referred to as the "chute." (Doc. 4259 at 104).

[82] "In pod recreation" refers to time when prisoners may be out of their cells in their pods without restraints. (Doc. 4259 at 105-106).

# Appendix 7

**Maximum Custody Population**

| Location | Max | Detention | M/H Watch | Close Management |
|---|---|---|---|---|
| **Douglas** | | | | |
| Complex Detention | | 31 | | |
| **Eyman** | | | | |
| Rynning Detention | | 25 | | |
| Rynning Close Mgt. | | | | 15 |
| SMU I | 350 | | | |
| SMU I SO | 130 | | | |
| SMU I P.C. | 16 | | | |
| SMU I Detention | | 153 | | |
| SMU I M/H Watch | | | 13 | |
| Browning Intake | 31 | | | |
| Browning Unit | 435 | | | |
| Browning STG | 144 | | | |
| Browning D/Row | 15 | | | |
| Browning M/H Watch | | | 3 | |
| Browning BMU | 11 | | | |
| Browning Enhanced | 31 | | | |
| Browning RSHP | 6 | | | |
| Browning Close Management | | | | 0 |
| **Florence** | | | | |
| Housing Unit 8 | 36 | | | |
| Health Unit | 12 | | | |
| Globe Detention | | 0 | | |
| **Perryville** | | | | |
| Perryville Watch Cells | | | 7 | |
| Santa Maria Detention | | 9 | | |
| **Phoenix** | | | | |
| Reception | 212 | | | |
| B-Ward | 32 | | | |
| Flamenco Ida Watch M | | | 0 | |
| **Lewis** | | | | |
| Morey Detention | | 73 | | |
| Rast PC | 311 | | | |

| | | | | |
|---|---|---|---|---|
| Rast Close Management | | | | 7 |
| Stiner Detention | | 64 | | |
| Bachman Detention | | 67 | | |
| **Safford** | | | | |
| Miles Detention | | 18 | | |
| Tonto Detention | | 0 | | |
| **Tucson** | | | | |
| Cimarron Detention | | 77 | | |
| Rincon MH Watch | | | 27 | |
| Rincon MH Program II | 77 | | | |
| Rincon MH Watch II | | | 0 | |
| Manzanita Detention | | 3 | | |
| Winchester Detention | | 22 | | |
| Complex Detention | | 69 | | |
| **Winslow** | | | | |
| Complex Detention | | 23 | | |
| Apache Detention | | 0 | | |
| **Yuma** | | | | |
| Cheyenne Detention | | 52 | | |
| Dakota Detention | | 60 | | |
| **TOTALS** | **1849** | **746** | **50** | **22** |

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, *et al.*<br>Plaintiffs,<br>v.<br>Ryan Thornell, *et al.*,<br>Defendants. | No. CV-12-00601-PHX-ROS<br>**ORDER AND PERMANENT INJUNCTION** |

On June 30, 2022, the Court issued its Findings of Fact and Conclusion of Law identifying constitutional violations in the provision of health care and in housing certain prisoners in isolation. (Doc. 4335). In that Order, the Court required the parties "nominate proposed experts to assist the Court with crafting an injunction that complies" with the statutory limitations on injunctions addressing prison operations. (Doc. 4335 at 180). The parties subsequently nominated their preferred experts. In their list, Defendants nominated Dr. Marc Stern. (Doc. 4339). Defendants in writing informed the Court "Dr. Stern's dedication to the design, management, and operation of health services in corrections settings [would] provide this Court and the parties with valuable guidance in crafting an injunction regarding the provision of medical care at ADCRR." (Doc. 4339 at 4). After reviewing the parties' lists, the Court solicited additional briefing. (Doc. 4340). In that additional briefing, Plaintiffs made no objection to the appointment of Dr. Stern.

On August 4, 2022, the Court held a hearing with the parties and Dr. Stern. (Doc. 4351). During that hearing the Court noted Dr. Stern's past work in this case made him

experienced and therefore an "attractive expert" to assist with crafting an injunction.[1] (Doc. 4358 at 8). Dr. Stern stated he could address medical care aspects of the planned injunction, but he would need additional assistance on the topics of mental health care and conditions imposed on the subclass. Dr. Stern stated he had individuals in mind who may be able to assist him on those topics.

After finding Dr. Stern was a qualified expert, the Court discussed with Dr. Stern and the parties the type of communications the Court's experts could have with the Court and the parties. Both sides agreed the experts could have ex parte communications with Defendants, defense counsel, Plaintiffs' counsel, and the Court. (Doc. 4358 at 19-20). Accordingly, the Court held the experts could have ex parte conversations as they deemed appropriate. The Court stated it would keep general notes regarding the contents of its communications with the experts.

The day after the hearing, the Court formally appointed Dr. Stern and shortly thereafter the Court appointed two additional experts to assist Dr. Stern to which the parties had no objection. (Doc. 4352, 4362). Those three experts then began crafting recommendations for the final injunction. In doing so, the experts had extensive back and forth communications with individuals who had relevant information. Thus, Dr. Stern and Dr. Bart Abplanalp spoke with Plaintiffs' trial experts, Plaintiffs' counsel, Defendants' counsel, Defendants, ADCRR personnel, Centurion personnel, and NaphCare personnel. John McGrath spoke with some of the same individuals, but he also spoke with wardens, deputy wardens, and other custody staff. Mr. McGrath visited some of the facilities to gain a better understanding of possible solutions to the flaws identified by the Court. The experts also explained some of their recommended changes to the Court. Altogether, the Court-appointed experts spent close to 500 hours investigating and identifying appropriate

---

[1] That hearing included some discussion of appointing a receiver. The Court stated it was "not prepared to consider, at [that] time, a receivership. That doesn't mean it's off the table forever in this case, but not now." (Doc. 4358 at 4). The decision not to appoint a receiver was based on the Court's expectation that Defendants appeared willing "to cooperate" and "act in good faith" in monitoring their performance under an injunction. (Doc. 4358 at 7). Any failure to act in good faith or to meaningfully comply with this injunction will revive consideration of appointing a receiver.

solutions to the unconstitutional findings outlined in the Court's Findings of Fact.

The back-and-forth between the parties and the Court's experts included discussions regarding specific recommendations the experts might propose. And the experts incorporated some recommendations made by the parties or their agents that the experts may not have otherwise included. In other words, the experts made extensive efforts to assess the possible solutions to the unconstitutional conditions and they paid close attention to the solutions proposed by Defendants and their agents. Over the approximately four-month period of the experts' work, the parties or their representatives had ample opportunity to explain to the experts why particular solutions were not feasible or why the experts should recommend some solutions over others.

On January 9, 2023, the Court issued a Draft Injunction. The Court instructed the parties to review the Draft Injunction and file any objections. If the parties identified provisions with which they disagreed, the Court also required the parties to confer and see if they could reach agreement on proposed alternatives. The Court noted agreements between the parties would "have substantial weight" when the final terms of the injunction were established. (Doc. 4380 at 2).

After issuance of the Draft Injunction, the parties and the experts engaged in extensive communications regarding possible modifications. Pursuant to those discussions, the parties proposed changes to the experts' staffing models. Instead of a caseload-based staffing model for medical and mental health personnel, the parties proposed a specific number of key personnel that must be hired. Thus, the parties proposed within three months of the date of this Order, Defendants be required to hire all required staff in the current contract with the private health care provider (NaphCare) as well as an additional seven physicians, two psychiatric prescribers, ten psych associates, and three psychologists. The experts agreed these additional targeted staff members would be acceptable for the short term. Therefore, the Court will not require the caseload-based model but will mandate Defendants immediately hire the number of specific personnel.

The number of immediate hires may ultimately be insufficient to remedy the

unconstitutional substantial risk of serious harm identified in the Court's decision. Therefore, the Court will require a further staffing analysis be completed within six months of this Order. The results of that analysis may require that the Court order Defendants hire additional staff or staff with different qualifications.

The parties also proposed other smaller modifications to the Draft Injunction. The experts agreed adoption of those changes would continue to alleviate the unconstitutional conditions set forth in the Court's findings. Based on the experts' opinions, and recognizing the Court should attempt to defer to Defendants' expertise when possible, the Court will require the parties comply with the additional modifications proposed by the parties.

**Need for Specifics**

The Court's Findings of Fact and Conclusions of Law established Defendants' basic model for medical and mental healthcare and staffing decisions that flow from that model create an unconstitutional substantial risk of serious harm to Plaintiffs. Therefore, the changes necessary to redress the failings will be substantial. As significant, the insufficient staffing and a wide variety of conditions of confinement combine to create an unconstitutional substantial risk of serious harm to subclass members. Again, the changes necessary to alleviate the risk of harm to the subclass will be substantial. Given the substantial dysfunction in Defendants' operations, the Court will provide significant detail regarding medical care, mental health care, and conditions imposed on the subclass to remedy the egregious constitutional violations.[2]

Moreover, the unusual scope of this injunction is informed by Defendants' actions throughout this case. Despite their agreement and promise to the Court to do otherwise,

---

[2] As expressed multiple times throughout the almost ten years this case has been pending, the Court has no interest in micromanaging Defendants' operations. At the hearing on August 4, 2022, the Court stated: "I am not -- and I have said this a number of times, I don't know how many -- but the Court is not in a position, and never should be in a position of running the prison. That's not my job." (Doc. 4358 at 16). In addition, Defendants have a constitutional responsibility to care for the prisoners in their custody. Therefore, this injunction is addressed to Defendants, not their private healthcare contractor (presently NaphCare). Defendants must comply with the injunction and any disputes between Defendants and their private healthcare contractor are beyond the scope of this injunction.

Defendants have fought every aspect of this case at every turn. Defendants entered into a settlement agreement where they claimed they would improve the care provided to prisoners and improve the conditions of confinement for the subclass. Yet almost immediately Defendants failed to perform those obligations and continued in that failure. Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage. During trial, Defendants presented arguments and witnesses that were manifestly unreliable and unpersuasive. And on some aspects, Defendants presented no meaningful defense at all. For example, Defendants did not present any expert testimony that the conditions imposed on the subclass were appropriate. Most importantly, trial established Defendants blatantly had not made any serious effort to remedy the flaws highlighted by this litigation. Given this history, the Court cannot impose an injunction that is even minutely ambiguous because Defendants have proven they will exploit any ambiguity to the maximum extent possible.

Despite Defendants' unsatisfactory past behavior, the Court embraces the rule that the injunction is required to be narrowly drawn, extend no further than necessary to correct Defendants' ongoing violations of Plaintiffs' constitutional rights, and be the least intrusive means necessary to correct and prevent violations. 18 U.S.C. § 3626(a)(1)(A). In addition, the injunction must "describe in reasonable detail" what Defendants must do and must be specific and definite to allow for accurate monitoring and, if necessary, enforcement. Fed. R. Civ. P. 65(d)(1)(C); *United States v. DAS Corp.*, 18 F.4th 1032, 1039 (9th Cir. 2021) ("Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply."). In light of these requirements, the Court reviewed the experts' recommendations created in close contact with the parties and the original proposed injunction sought to impose only those requirements necessary to correct the constitutional violations at issue.

**Quantitative and Qualitative**

The extended history of this case mandates a need for the Court to impose both

quantitative and qualitative measures.[3] Defendants' performance under the quantitative performance measures required by the settlement revealed the quality of the underlying care often was abysmal, even when Defendants reported compliance with quantitative benchmarks. That is, history has established reliance on quantitative performance measures was not adequate or suitable because of the enormous endemic structural problems at ADCRR that were not immediately apparent. Thus, the only plausible solution is to require a significant number of qualitative benchmarks that assess whether the underlying care provided is constitutional.

**Monitoring**

Unlike the attempt at monitoring under the parties' settlement, the Court has appointed its own experts to serve as neutral monitors to evaluate Defendants' performance. The Court appointed Dr. Marc F. Stern, Dr. Bart Abplanalp, Dr. Lara Strick, and Mr. Scott Frakes to assist the court in monitoring Defendants' compliance with this Order. Dr. Stern was granted authority to identify additional appropriately qualified and credentialed staff as needed to assist the aforementioned monitors in their work. Dr. Stern subsequently identified, and the Court appointed, two individuals to assist with administrative tasks.

To ensure accurate monitoring, Defendants shall provide the monitors and additional staff remote access to the electronic health record ("EHR") and other electronic records (*e.g.*, EOMS) that are available by remote access and necessary for monitoring. Monitors will generally provide advance notice prior to visits of facilities, however, they may make unannounced visits as needed. Monitors and their staff may bring into facilities cell phones, computers, tablets, and cameras necessary to conduct monitoring activities. The monitors and staff will be responsible for securing such equipment and following rules with regard to the materials. Monitors may record any still or video images within all

[3] As used here, "quantitative" refers to measuring only the quantity of certain events or actions. "Qualitative," on the other hand, refers to measuring the appropriateness of the events or actions. The Stipulation's performance measures were "quantitative" in that they merely reflected a tabulation of acts or events. The performance measure scores did not require a "qualitative" inquiry and did not reflect whether any of the acts or events that occurred were medically appropriate under the circumstances.

facilities necessary to document conditions relevant to this Order. Monitors will make every effort to avoid including the face of any individual (staff or prisoner) unless it is necessary for monitoring purposes and the individual agrees. In the event an image includes a face and the image is filed with the Court, the face will either be blurred to distort the image or the document itself sealed. The monitors will submit written reports to the Court as they deem necessary.

Despite the appointment of monitors, much of the monitoring will depend on data collected by Defendants and their agents. Therefore, Defendants shall use reasonable judgment in selecting methodologies for monitoring compliance and shall exercise care in the underlying measurements. As part of Arizona's ongoing decision to outsource prisoner healthcare, Defendants are constitutionally required to monitor the performance of their healthcare vendor. Monitoring of this injunction will use that preexisting monitoring apparatus as much as possible. Defendants will be required to collect monthly data and perform analyses beyond what they are doing now. To do so Defendants are required to employ sufficient staff with appropriate levels of professional credentials and experience to conduct the monitoring described in this Order. For example, physicians will be required to conduct qualitative review of the work of all physicians. Defendants may not delegate such monitoring to the contractor (*e.g.*, NaphCare) providing health care services to prisoners, if there is one.

Defendants shall monitor all elements of this order on a monthly basis. Monitoring shall be completed and available for inspection by the monitors by the last day of the month following the monitored month. Defendants shall maintain adequate supporting evidence for their monitoring results.

The Court's monitors may rely on monitoring conducted by ADCRR and any additional information that the monitors obtain. Such additional information may come from a variety of sources including but not limited to: interviews with class members, Defendants' staff, or contractors; complaints from prisoners or others on their behalf; Plaintiffs' counsel; random or purposive review of health care records; direct observation;

site visits; review of paper or electronic records; and review of video records.

In general, where performance can be measured by automated systems, a 100% sample will be required. Unless otherwise noted, where performance must be measured by review of individual cases, reports, health records, events, etc., Defendants will sample at least 50 items statewide, chosen in an accurate and reasonable manner. As used here, "reasonable" means that the minimal sample is drawn from a relevant population at high risk if performance is poor and is drawn from venues roughly in proportion to relevant items at that venue. For example, if half of all maximum custody prisoners are held at Complex A and half at Complex B, minimal samples regarding maximum custody would be drawn in roughly equal numbers from Complexes A and B; samples beyond the minimum, however, may be drawn from anywhere.

As an additional way to monitor compliance with this Order, the Court-appointed monitors will create a confidential mechanism for current prisoners, former prisoners, friends and family of prisoners, prison staff, contract staff (included the contracted health care vendor), and the public, to notify the Court of problems or complaints of unsafe and unsound health care conditions or conditions of confinement. As the monitors deem appropriate, the mechanism may receive submissions by postal mail or electronically. Within two months of this Order, Defendants shall design and implement a mechanism for prisoners to submit communications to the Court-appointed monitors. Submissions are solely for the purpose of providing relevant information to the monitors. The monitors will not necessarily investigate a submission or take action on behalf of a prisoner. Monitors may or may not provide a direct response to a submission. Defendants' implementation shall inform prisoners and staff that this confidential mechanism does not replace any existing system by which prisoners or others are expected to inform Defendants of problems for which they require a resolution, such as the prisoner grievance process or staff reporting mechanisms.

This injunction has not set forth the full extent of the data that must be collected, analyzed, and made available to the Court-appointed monitors. Other data may be

determined necessary during monitoring. Defendants shall cooperate with the monitors in devising all appropriate methods of data collection and data transmission.[4] If unforeseen changes in conditions or operations render any of the requirements in this Order obsolete, unnecessary, or impractical, the monitors will recommend to the Court appropriate alterations to the injunction. The parties may also petition the Court to modify or annul requirements. Defendants will be allowed a reasonable amount of time to implement any modification.[5]

**Plaintiffs' Monitoring**

While the Court-appointed monitors will be a valuable source of information, Plaintiffs and their counsel will still have primary responsibility for assessing Defendants' performance and, if Defendants do not perform, it will be Plaintiffs' duty to seek additional appropriate relief. This will require Plaintiffs' counsel and their experts to have ongoing access to class members, medical records, and the locations where class members are housed. That access shall include:

- Plaintiffs' counsel will have read-only access to class members' electronic health records;
- Plaintiffs' counsel will receive monthly data reports already being produced by Defendants and Plaintiffs may demand the gathering of additional data and production of reports, as necessary to enforce all terms of this injunction;
- Plaintiffs' counsel will be able to conduct visits to speak to class members and staff and tour units. Those visits will be no more than 40 days per calendar year; and
- Defendants will provide substantive and timely responses in writing to concerns raised by Plaintiffs' counsel regarding individual treatment or systemic issues.

**Defendants' Policies**

All new policies and procedures or any modifications to existing policies and

---

[4] Defendants and their agents shall not take any retaliatory actions against anyone who gathers or produces information relevant to Defendants' performance under this injunction. Doing so will be a contempt of Court.

[5] These will be implemented in accordance with the limitations set forth in 18 U.S.C. § 3626(b)(1).

procedures that are implemented to comply with the requirements of this Injunction shall be provided to Plaintiffs' counsel and the monitors at least 30 days before the new or modified policy becomes effective. These policies and procedures may be implemented immediately on an interim basis if the Director certifies that there are exigent circumstances. Any objections to these policies and procedures shall be subject to negotiations between the parties. If negotiations fail, Defendants shall seek Court approval of the new or modified policies.[6]

Accordingly,

**IT IS ORDERED** all parties shall comply with the terms of the permanent injunction that follows.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment in favor of Plaintiffs.

Dated this 7th day of April, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge

[6] It has long been settled the Court will automatically retain jurisdiction to monitor and enforce the terms of the Permanent Injunction. *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) (noting power to enforce injunction is "inherent in the [Court's] jurisdiction"). To avoid any ambiguity, the Court expressly retains jurisdiction to monitor and enforce the terms of the Permanent Injunction.

## Permanent Injunction

## Medical and Mental Health Overall Requirements

**1. General Requirements**

**1.1.** All health (physical and mental health) care (including but not limited to: emergent; urgent; non-urgent episodic; chronic; palliative; scheduled; inpatient; residential; outpatient; referrals to other on-site professionals; off-site specialty referrals; modifications of specialty referral requests; action taken on post-hospital, post-emergency room, or specialist recommendations), and the documentation supporting that care, delivered to Plaintiffs during a medical encounter (primarily face-to-face encounters), in response to an inquiry from a nurse or patient, during a chart review or chart-based triage decision, or upon receipt of results from a test, a report from a consultant, or other external health record, shall be clinically appropriate, including, where relevant to the circumstance and professional's credential, but not limited to, the conducting of the history and physical examination, forming and testing a differential diagnosis, arriving at a diagnosis, and ordering treatment for that diagnosis.

**1.2.** Defendants shall document all aspects of care to allow for monitoring of these requirements.

**1.3.** All prisoners with physical or mental illness that require regular follow-up shall be designated on the medical or mental health caseload and shall be seen in clinically appropriate timeframes.

**1.4.** Telehealth medicine may be used only when clinically appropriate.

**1.5.** Emergency response and care provided by custody staff shall be appropriate given the skill level and knowledge expected of custody staff.

**1.6.** Defendants shall provide sufficient space, equipment, and supplies for health care staff to deliver the health care services described in this Order, regardless of housing assignment, including housing assignments with restricted liberty.

**1.7.** The space provided for clinical encounters shall be sufficient to allow for auditory and visual confidentiality from other prisoners or non-clinical staff. Visual confidentiality requirements apply at those times when an examination reveals portions of the prisoner's body or the prisoner is touched in ways that would not be visualized or touched, respectively, in the typical prison environment. Exceptions may be made for encounters where providing such confidentiality would legitimately jeopardize safety, including emergency situations. In those cases, breaches of confidentiality are limited to the measures required to ensure safety, and all staff shall maintain the confidentiality of any information they acquire as a result of the breach.

**1.8.** Emergency response equipment ("Man Down Bag," Automated External Defibrillators ("AEDs"), oxygen) shall contain all items required by policy, all equipment shall be in working order, and all medications shall be unexpired. Naloxone is required to be kept on every living unit or with every AED. Emergency Response bag checklists shall reflect the equipment was checked daily and inventoried monthly. The checklists shall also reflect medications are within their expiration date and equipment is operational. Staff shall complete and document all AED manufacturer recommended checks (*e.g.*, daily, monthly, annual).

**1.9.** Directors of Nursing may not spend more than 15% of their time providing scheduled or unscheduled prisoner care.

**1.10.** All staff hired in clinical supervising positions must have at least two years clinical experience.

**1.11.** Licensed Practical Nurse ("LPNs") shall practice within their scope of practice set forth in Arizona Administrative Code § 4-19-401. LPNs and Behavioral Health Technicians shall not independently assess prisoners or initiate a plan of care or treatment.

**1.12.** No one hired for whom a health professions license is required may possess a restricted license if the restriction is related to clinical competency or is restricted to practice in a correctional facility.

**1.13.** Health care staff responsible for direct prisoner care shall not be mandated to work beyond the following limits: more than 12 hours in any 24-hour period; less than 8 hours off between any two shifts; more than 60 hours in a calendar week defined as Sunday through Saturday.

**1.14.** The limits on overtime may be extended during emergency situations in which a prisoner's safety is in jeopardy and no reasonable alternative can be found or during a declared emergency (*e.g.*, prison riot, natural disaster). Time spent on-call is not included in the time limits. For purposes of the overtime limits, "emergency situations" are defined as unforeseen events that could not be prudently planned for and do not regularly occur. Failure to hire or retain adequate staffing is not an emergency situation.

**1.15.** Within three months of this Order, Defendants shall ensure there is a sufficient number of custody staff to support the functioning of the health care operation, including but not limited to: transporting prisoners to on-site and off-site clinical encounters and appointments; administration of medications; and providing security in the venues of health care operations. Exceptions may be made for a declared emergency (*e.g.*, prison riot, natural disaster). Chronic understaffing does not qualify as a declared emergency.

**1.16.** No later than three months after issuance of this Order, Defendants shall fill all positions required by the current contract with the health care vendor including any modifications, addenda, or updates and the additional positions defined in sections 6.1 and 12.1. A filled position is one in which there is an incumbent receiving a salary for the full intended time commitment of the position and is not on long term leave, e.g., Family Medical Leave Act. An individual may not fill more than 1.0

full-time equivalent ("FTE"). Defendants may use registry staff to fill up to 15% of these FTE in each job category.

**1.17.** To determine the number of staff necessary to care for patients, the Court will appoint an expert to conduct a staffing analysis and plan of health care positions at each location. The parties shall attempt to reach agreement on the expert, but if no agreement is reached, the parties shall submit the names and qualifications of proposed experts within 14 days of this Order. The Court will appoint an expert from the lists provided by the parties, unless the Court finds the proposed expert unqualified. The appointed expert may appoint additional appropriately qualified and credentialed staff to assist the expert. The expert's services shall be paid by Defendants. The staffing analysis and plan shall be filed with the Court within six months from the date of this Order. The plan shall contain recommendations that shall be reviewed by the Court and, if approved, ordered by the Court. Any objections to the staffing plan and recommendations shall be filed by the parties within ten days and a response to the objections shall be filed within ten days thereafter.

**1.18.** Defendants shall hire additional staff, above the minima described in this section, as necessary, to provide constitutionally adequate health care.

**1.19.** A staff position may be filled by persons employed by ADCRR, its health care vendor, or under temporary contract.

**1.20. Urgent Care**

**1.20.1.** When a prisoner notifies a correctional officer that he or she has a need for health care (medical or mental health) the officer may not inquire as to the nature of the need or symptoms. The officer's inquiry is limited to asking whether the need is immediate or if the prisoner can wait to sign up for the next scheduled clinic, or if the prisoner is thinking of harming him/herself. If the prisoner is thinking of harming him/herself, the officer shall immediately ensure the prisoner's safety and contact health care staff in accordance with

Section 15.8.1. For other needs that are immediate, the officer shall contact health care staff immediately. A Registered Nurse ("RN") shall triage the prisoner immediately, either by seeing the prisoner, or talking to the prisoner directly over the phone. Based on the triage results, the RN shall discuss the prisoner with a medical practitioner (i.e., physician, nurse practitioner, or physician assistant) or mental health professional in a clinically appropriate timeframe, not to exceed four hours. In this context, the mental health professional shall be a psych associate, psychologist, or psychiatric prescriber. Based on that interaction the professional who was contacted shall:

**1.20.1.1.** see and treat the prisoner the same day; or

**1.20.1.2.** instruct the RN on treatment to provide, and, if necessary, schedule the prisoner for further evaluation or treatment in a clinically appropriate timeframe; or

**1.20.1.3.** determine the health care need is not urgent and that a reasonable prisoner would not have considered the health care need to be urgent, defer treatment, and instruct the prisoner to access non-urgent/non-emergent care for treatment.

**1.20.2.** Nothing in the model of urgent care is meant to limit a correctional officer from making self-initiated inquiries to a prisoner when the officer has a concern about the prisoner's condition or safety.

**1.21.** A prisoner may refuse any on-site or off-site provider-initiated health visit and cancel any prisoner-initiated visit. All cancellations of prisoner-initiated visits shall be made directly to a health care professional by telephone, video, or face-to-face. All refusals of provider-initiated on-site health visits are made by telephone, video, or face-to-face with an RN or practitioner for medical visits or a masters level therapist, psychologist, or psychiatric practitioner (psychiatrist, psychiatric nurse practitioner, psychiatric physician assistant) for mental health visits, within three days after the appointment. All refusals of off-site health visits are made by

telephone, video, or face-to-face with an RN or higher at the time of the appointment. If a prisoner will not voluntarily displace him/herself to participate in the direct communication with health care staff required here, health care staff shall go to the prisoner's location.

**1.22.** Orders from health care (medical and mental health) staff in the outpatient and inpatient arenas shall be completed within the timeframe ordered. This includes, but is not limited to, diagnostic tests, follow-up visits with nurses or practitioners, requests for outside records, and treatments.

**1.23.** Prisoners shall be informed in a timely manner of diagnostic test results and of any request staff make for additional consultation (*e.g.*, off-site specialists).

**1.24.** When prisoners on suicide watch, or in a crisis stabilization bed for suicidal concerns, are removed from a cell for a healthcare-related visit, including mental health encounters conducted in or near the living unit, they shall not be restrained or strip-searched unless the Warden or designee has determined and documented the temporary need for such measures due to exigent circumstances.

**1.25.** Defendants shall take all reasonable steps to fill all staffing vacancies. Presently, the Court will not mandate an increase in compensation to fill vacancies. However, the Court will do so in the future should chronic understaffing continue.

**2. Improvement Programs**

**2.1. Mortality or suicide attempt review**

**2.1.1.** Following a prisoner death or suicide attempt, Defendants shall identify all significant health care and custody errors (*i.e.*, near misses as well as preventable adverse events). Based on prioritization of all errors identified, a root cause analysis shall be conducted if clinically appropriate, from which an effective and sustainable remedial plan shall be crafted. A sustainable plan is one which outlives staff memory from a single training after the review or staff turnover. Defendants shall monitor the remedial plan for effectiveness and make appropriate and timely modifications to the plan based on the monitoring.

**2.1.2.** The sustainable plan shall be implemented within one month of the death or suicide attempt.

**2.1.3.** For each death, the plan in this section shall be crafted and implemented whether or not the medical examiner's report is available. If the medical examiner's report was unavailable, the plan shall be revisited and modified, if necessary, within one month of receipt of the report.

**2.2. Near-miss reporting**

**2.2.1.** Defendants shall implement an appropriate near-miss error reporting policy. Defendants are encouraged, but not required, to incorporate the following elements in this policy:

- Only errors which caused no (or minimal) harm to a prisoner may be reported through this system.
- Reporting is voluntary.
- Anyone can report (including prisoners).
- The reporter is immune from discipline, punishment, or retaliation related to the error unless the following are all true: the reporter is a staff member, the error is one they made themselves, and the error is one for which they have a current disciplinary or other performance improvement plan that addresses such errors.
- Reporting is easy and fast for staff with a minimal amount of information required of the reporter initially, so that the reporting process itself is not a barrier to reporting.
- Because minimal information is required initially, reports are confidential but not anonymous, so that the reporter can be contacted to obtain more and complete detail later if needed.
- Reporters receive feedback about reports and their impact. While individual feedback might be optimal, even feedback to the whole

workforce about specific prisoner safety changes that resulted from reporting can be valuable.

**2.3. Preventable adverse event reporting**

**2.3.1.** Defendants shall implement a preventable adverse event reporting policy that includes the following elements:

**2.3.1.1.** The policy requires reporting of errors which cause more than minimal harm to a prisoner.

**2.3.1.2.** All such errors shall be reported, not just medication-related errors.

**2.3.1.3.** Reporting is mandatory for all staff.

**2.4. Continuous Quality Improvement program**

**2.4.1.** Defendants shall implement a robust continuous quality improvement program to monitor the quality of clinical care. As part of this program, Defendants shall monitor the absolute number and trend of various parameters on a monthly basis. Where metrics or trends in metrics show room for improvement, Defendants shall make appropriate efforts to understand the underlying reason for deviation, take reasonable steps to effectuate improvement, evaluate the effectiveness of these steps in a reasonable time, and make adjustments to its improvement efforts as needed. At a minimum, Defendants shall monitor:

- percentage of individuals (regardless of whether diagnosed with hypertension) whose systolic blood pressure exceeds 140 mmHg or diastolic blood pressure exceeds 90 mmHg;
- average hemoglobin A1C (regardless of whether diagnosed with diabetes);
- percentage of individuals taking ten or more prescribed medications;
- percentage of women receiving timely breast screening;
- percentage of women receiving timely cervical cancer screening;

- percentage of pregnant women who have the results of routine prenatal laboratory tests results as recommended in current national guidelines (*e.g.*, Guidelines for Prenatal Care, 8th Edition, American Academy of Pediatrics and American College of Obstetricians and Gynecologist, Table 6-2) documented within one month of diagnosis of pregnancy;
- percentage of health care grievances which are appealed;
- percentage of health care grievance appeal replies that are appropriate;
- percentage of prisoners on antipsychotic medications receiving timely AIMS (abnormal involuntary movement scale) assessments;
- percentage of prisoners on antipsychotic medications receiving appropriate and timely metabolic assessments;
- percentage of prisoners receiving punishment for a rule violation, for whom a mental health intervention would have been more clinically appropriate than punishment; and
- percentage of prisoners arriving at ADCRR for whom intake screening by an RN (or higher credentialed professional) is completed more than four hours after arrival.

**2.4.2.** ADCRR shall monitor other parameters as reasonably dictated by the other self-improvement activities described in this Order.

**2.5. Overall System Improvement**

**2.5.1.** Defendants shall evaluate errors, system problems, and possible system problems that come to their attention through sources, including but not limited to the near-miss and preventable adverse event reporting systems, mortality reviews, litigation filed by prisoners, grievances, the Court-appointed monitors, staff reports, continuous quality improvement, etc. Defendants shall address these errors and problems at a complex or statewide level, as

appropriate. To prioritize analysis and remediation of errors and other system problems, Defendants shall maintain an active log of all such errors and problems to assist in deciding which issues to address and when, and to monitor progress in resolution. Based on this prioritization, either at the complex or state level, root cause analysis shall be conducted as appropriate, from which an effective and sustainable remedial plan is implemented in a timely manner. Such plan is one which outlives staff memory from a single training after the review or staff turnover. The remedial plan shall be monitored for effectiveness. Appropriate and timely modifications shall be made to the plan based on the monitoring.

**3. Language Interpretation Services**

Within three months of issuance of this Order Defendants shall implement the following to ensure adequate interpretation services are available for every material encounter where needed.

**3.1.** Defendants shall develop and implement policies to assess the English fluency of prisoners and, if not English-fluent, determine a language in which the prisoner is fluent at the following times:

**3.1.1.** during intake;

**3.1.2.** upon request by a prisoner at any time;

**3.1.3.** whenever staff have reason to believe a prisoner is not fluent in English;

**3.1.4.** whenever a prisoner's primary language of communication is not documented in the medical record.

**3.2.** A prisoner's language of choice shall be visible on all relevant screens of the prisoner's electronic health record.

**3.3.** For all individual and group health care encounters in all settings involving prisoners who are not fluent in English, interpretation shall be provided via:

**3.3.1.** health care staff whose name appears on a list maintained by Defendants of people who, pursuant to written policies Defendants develop, is proficient in the language understood by the prisoner; or

**3.3.2.** in-person or via video interpretation service (for sign language) or audio language interpretation service that is compliant with federal law and uses licensed interpreters, where required by state law; or

**3.3.3.** in an emergency and if the above is not feasible, by other available means, *e.g.*, health care staff whose name is not on the above-cited list, non-health care staff, or other prisoners.

**3.4.** The method of interpretation for all encounters (or, in the event interpretation consistent with this Order could not be provided) shall be documented in the electronic health record.

**3.5.** The equipment used for interpretation shall allow for confidential communication in all circumstances (*e.g.*, dual hand- or head-set device in locations where a speaker phone or computer can be seen or overheard by other prisoners or custody staff).

**3.6.** Written available notification (such as a poster) shall be hung in all housing units and medical clinics in all prisons advising prisoners, in the ten most common languages in Arizona, of the availability of interpretation services and that they may inform healthcare staff orally in any language, in sign language, or in writing in any language that they are not fluent in English, if that is not already documented in their electronic health record.

**4. Electronic Health Records ("EHR")**

**4.1.** An EHR shall be used for prisoner medical and mental health care. Defendants' chosen healthcare vendor, NaphCare, currently uses TechCare. If Defendants discontinue use of TechCare, Defendants shall transition, without gap, to another EHR.

**4.2.** In selecting an EHR, Defendants shall conduct a comprehensive needs assessment by seeking sufficient input from leaders, managers, and front-line users regarding essential functionality, and select an EHR that maximizes fulfillment of essential functions. The EHR shall include a computerized prescription order entry, electronic medication administration record, and electronic prisoner identification system (*e.g.*, ID card bar scan, biometric scan). The EHR shall include, at a minimum, all functionality of TechCare unless Defendants can justify why any non-included functionality is non-essential. Upon transition to another EHR, all existing data shall be transferred from the existing EHR to the next EHR retaining the same titles, metadata, and usability in the next EHR as it had in the existing EHR.

**4.3.** The problem list in a prisoner's health record shall be accurate, complete, and easily usable. "Easily usable" includes, but is not limited to the following qualities:

**4.3.1.** Resolved or historical conditions or diagnoses are separated from current conditions.

**4.3.2.** The date of onset or resolution of resolved or historical conditions or diagnoses is indicated, if known.

**4.3.3.** Similar or identical diagnoses of current conditions are listed only once. For example, a problem list would not simultaneously list "heart disease," "heart failure," and "congestive heart failure, not otherwise specified."

**4.4.** Imported or scanned documents (including but not limited to diagnostic test results, consultation reports, hospital discharge summaries) in the EHR shall be filed in a clear and usable manner, including, but not limited to:

**4.4.1.** Paper documents are scanned within two business days of receipt.

**4.4.2.** Documents are reviewed by a physician, physician assistant, or nurse practitioner within four business days of receipt.

**4.4.3.** Documents are scanned right-side up.

**4.4.4.** Documents are accurately labeled with meaningful titles/file names. Fewer than 1% of files are labeled/titled with names beginning with "Miscellaneous" or "Other."

**4.4.5.** Scanned documents are dated (and appear in any programmed or ad hoc list according to this date) based on the clinically relevant date of the document, not the date scanned. For example, the clinically relevant date of a: lab test is the date the test was reported by the lab; discharge summary is the date of discharge; a prior health record is the date it was received at ADCRR; an imaging study is the date of study.

**4.5.** Defendants shall provide prisoners access to their own medical records as follows, unless a practitioner documents in the prisoner's EHR how disclosure of such information would jeopardize the health, safety, security, custody or rehabilitation of the prisoner or others or the safety of any officer, employee or other person at the correctional institution or of a person who is responsible for transporting the prisoner:

**4.5.1.** Granting read-only access to prisoners wishing to read a copy of their health record;

**4.5.2.** Orally share with a prisoner information regarding their diagnosis or any other information about their health care.

**4.5.3.** Defendants may charge a reasonable per-page fee to non-indigent prisoners for paper copies, but no fee may be charged to indigent prisoners. A reasonable fee is one that has the same or lower ratio to the prevailing prisoner wage as the ratio of the prevailing fee in the Arizona medical community to the prevailing Arizona community wage. Alternatively, if the prisoner agrees, Defendants may provide the requested records, free of charge, in an electronic medium that the prisoner is able to access.

## 5. Release Planning

**5.1.** For prisoners with identified treatment providers in the community, if the prisoner consents, Defendants shall send each provider relevant health care information prior to the prisoner's release. This includes, at a minimum, a problem list, list of active medications, current symptoms, functional impairments, a summary of relevant care provided during incarceration, any necessary care or follow-up care, one or more points of contact if a community provider requires further information, and, in addition, for mentally ill prisoners, name and contact information of the primary therapist, an aftercare plan that reflects progress in treatment, and a current treatment plan. The prisoner's health record shall contain documentation of the above information that was provided, when, and to whom.

**Medical**

**6. Staffing**

**6.1.** Within three months of this Order, Defendants shall hire an additional seven physicians to be allocated at the six corridor facilities based on patient need. Defendants may utilize locum tenens to hire these positions, but will be required to have no more than 15% locum tenens for this job category after six months of the signing of the order. "Physician" refers either to an M.D. or D.O. "APP" refers to advanced practice practitioners with titles of nurse practitioner or physician assistant.

**6.2.** Facility Medical Directors ("FMD") in low intensity facilities shall be assigned as the primary care provider for patients who need physician level care. Only APPs will be assigned patients who do not require a physician as their primary care provider. FMDs in high intensity facilities shall be assigned up to 100 patients as the primary care provider and shall have no other scheduled patient care assignments including supervision of APPs or as the scheduled provider for specialized units such as Inpatient Component ("IPC") or Special Needs Unit ("SNU"). This does not limit FMDs from occasional unscheduled clinical supervision and care activities. A "low intensity" complex is one where the average

number of prescription medications, measured by the same method used by Defendants and shared with the Court-appointed monitors in November 2022, is no more than 1.75 active prescribed medications on average per complex prisoner. All other complexes are "high intensity." At present, the low intensity complexes are Douglas, Winslow, and Safford. That may change, however, based on population and prescription changes at each complex.

**6.3.** Prisoners are assigned to the APP caseload in a clinically appropriate manner, *i.e.*, prisoners with multiple or complex medical conditions are only assigned to physician caseloads.

**6.4.** All medical physicians–at hiring and during employment–shall be board certified in Internal Medicine or Family Practice, or board eligible if within 7 years of their completion of an ACGME approved residency in one of these 2 specialties, with the following exceptions:

**6.4.1.** medical directors, shall be board certified at hiring and during employment;

**6.4.2.** physicians providing obstetric and gynecologic services shall be board certified or board eligible if within seven years of their completion of an ACGME approved residency in obstetrics and gynecology; and

**6.4.3.** physicians who are currently employed and are not board eligible may remain employed for no longer than one year after issuance of this Order.

**7. Model of Care**

**7.1.** A registered nurse ("RN") or higher credentialed professional shall conduct an intake screening within four hours of a prisoner's arrival or, alternatively, a rapid screening shall be conducted immediately upon arrival, but the intake screening by an RN shall be conducted as soon as possible and before the prisoner proceeds to housing. If the rapid screening is conducted by a professional of lesser credential than an RN (*e.g.*, LPN, certified medical or nursing assistant), then the screening shall not include a clinical assessment, and any abnormal response found by the

LPN or similar staff shall result in immediate consultation with an RN (or higher credentialed professional).

**7.2.** A medical practitioner shall complete a history and physical examination of each prisoner by the end of the second full day after a new prisoner arrives in Defendants' custody.

**7.3.** All prisoners shall be assigned a medical primary care practitioner. Assignment to physician or mid-level practitioner shall be based on the complexity of the prisoner's health conditions.

**7.4. Non-Urgent/Non-Emergent Care**

**7.4.1.** Prisoners shall be given on a daily basis an opportunity to indicate their need to be seen for a medical clinic appointment at the next available clinic by one of the following mechanisms, depending on their living situation, freedom of movement, and access to electronics:

- affixing their name to a time slot on a paper list maintained on the living unit or in the medical unit;
- affixing their name to a time slot on an electronic list via tablet or kiosk;
- informing the nurse who conducts daily (or more frequent) welfare checks on that unit;
- an effective paper-based system developed by Defendants in the event of temporary non-functioning of the electronic system.

**7.4.2.** Prisoners should only use this system if they have a non-urgent need. Prisoners with urgent or emergent needs should notify a staff member. A reminder of these rules shall be communicated via the medium the prisoners use to make requests (*e.g.*, a statement placed on the paper or electronic sign-up list).

**7.4.3.** Defendants shall retain for the monitors to access all lists, paper or electronic, for their review.

**7.4.4.** To allow for effective monitoring of healthcare staffing levels, any appointment made that does not occur shall not be erased but shall be notated as not completed.

**7.4.5.** Defendants may continue to allow prisoners to submit Health Needs Requests ("HNR") for administrative requests that do not require a clinical encounter or clinical judgment, such as, but not limited to: a medication refill request; inquiring about the date of an appointment; a request for health records, etc.

**7.4.6.** All non-urgent/non-emergent care at the request of a prisoner shall be completed in a reasonable time. In addition to other qualitative indicators, "reasonable time" means that on average, there shall be at least three unused appointment slots per week on each medical practitioner's schedule who is expected to carry a full prisoner caseload for their job category; one unused appointment slot if the practitioner is scheduled for one day or less of prisoner visits; and two unused appointment slots if the practitioner is scheduled for more than one day but less than a full prisoner caseload.

**7.4.7.** Except as noted in this paragraph, initial care shall be provided by a medical practitioner, or another health professional as directed by a physician or APP, as clinically appropriate. The initial care provider shall be the prisoner's primary care medical provider unless that provider is not on the premises nor conducting telehealth visits at the time. Pursuant to prisoner-specific direction provided by the medical practitioner, RN may provide initial care for a limited number of conditions that are simple, rarely serious, rarely confused with serious conditions, and appropriately treatable with self-care and/or over-the-counter medications provided that the RN operates under clinically appropriate protocols approved by the monitors. This paragraph does not have any impact on the protocols LPNs or RNs use in the first few minutes of an emergency while waiting for contact with a practitioner or arrival of emergency services.

Defendants shall track and report the number of initial care visits completed by RNs.

**7.4.8.** Within six months of the issuance of this Order, Defendants may seek the Court's permission to introduce nursing triage. "Triage" refers to the practice of assessing priority amongst those to be seen by a provider that day.

**7.5. Special Needs Unit ("SNU")**

**7.5.1.** By February 1, 2024, Defendants shall build (or modify existing) living units to accommodate no less than 200 prisoners needing SNU housing, build the units with per-prisoner floor space consistent with AHCCCS requirements for similar populations, equip and staff the units to meet the assisted living needs of the SNU prisoners at the appropriate custody levels, and transfer no less than 200 SNU prisoners to those beds.

**7.5.2.** By August 1, 2024, Defendants will build (or modify existing) living units to accommodate all remaining prisoners requiring SNU housing, build the units with per-prisoner floor space consistent with AHCCCS requirements for similar populations, equip and staff the units to meet the assisted living needs of the SNU prisoners at the appropriate custody levels, and transfer all these prisoners to those beds.

**7.5.3.** Prisoners needing SNU housing are prisoners who are elderly, physically disabled, or developmentally disabled, exclusive of those who have acute health care needs requiring placement in an inpatient component and exclusive of those whose assisted living needs are minimal enough to be met by the support normally provided to prisoners in general population, such as assistance with self-administration of medicines. To determine which prisoners need SNU housing, Defendants will be generally guided by the health/functional/physical needs criteria established by the Arizona Health Care Cost Containment System ("AHCCCS") for individuals to receive

Elderly and Physically Disabled services as defined in Arizona Administrative Code R9-28-304, e.g., the Pre-Admission Screening Tool.

**7.6. Inpatient Component ("IPC") Care**

**7.6.1.** A medical practitioner shall be contacted and collaborate on the creation of an immediate care plan immediately upon a prisoner being admitted to the IPC.

**7.6.2.** An RN shall complete an admission nursing assessment immediately upon a prisoner being admitted to an IPC.

**7.6.3.** A medical practitioner shall complete an admission history and physical within one calendar day of admission to the IPC for prisoners who are going to remain beyond 24 hours.

**7.6.4.** An RN shall complete an assessment in the IPC at the frequency ordered. The spacing of the assessments shall be clinically appropriate.

**7.6.5.** The call buttons of all prisoners admitted to an IPC level bed are determined to be working on the day of admission and once per month. If a call button is not working health care staff shall perform a welfare check at least once per 30 minutes.

**7.7. Observation Beds**

Defendants shall discontinue the use of Observation Beds. Prisoners requiring monitoring or medical care beyond that normally available and safely used in non-medical living units shall be admitted to an IPC.

**8. Referrals**

As used in this section, "specialty referral" or "referral" includes any request for a consultation, intervention, test, provision of materials, or other service, that is performed or fulfilled by someone other than employees of ADCRR or than persons filling FTE positions described in the contract and amendments with Defendants' health care vendor. Defendants shall comply with the following regarding specialty referrals:

**8.1.** All specialty referrals shall be completed within the ordered timeframe, notwithstanding any time required for processing, reviewing, or consideration of alternative treatment plans.

**8.2.** Unavailability of referral services shall not be a certain, acceptable defense for non-performance, however it may be considered when evaluating Defendants' performance. In other words, unavailability of referral services, such as not being able to find a specialist willing to see the prisoner, the specialist not having an open slot, or the specialist canceling the appointment, are situations over which Defendants might have had some control. Therefore, the onus remains on Defendants to complete the referral in the time period contemplated by the practitioner. In situations where Defendants prove they exhausted all reasonable measures, non-performance will be excused.

**8.3.** The referral order shall be completed when the referral or modified plan is completed or the referral is canceled. The referral shall be completed in the timeframe established in the practitioner's order. If the timeframe is extended by the practitioner, the referral completion is timely as long as it is completed within the extended timeframe and the extension was ordered before the original timeframe expired.

**8.4.** If Defendants or their healthcare vendor utilize categorical referral timeframes, *e.g.*, "emergency," "urgent," "routine," for which it applies default timeframes for completion of the referral, Defendants shall notify the Court of those categories and timeframes and shall notify the Court within fourteen days if any of those categories or default timeframes change.

**8.5.** If a practitioner orders a referral to be completed in a specific timeframe (including any free text notation), that order supersedes any categorical classification of the referral. For example, if a practitioner orders a referral to be completed in ten days, and the referral request is classified as "routine" which normally indicates a longer period, the referral still shall be completed in ten days.

**8.6.** The ordering practitioner's order is the controlling order and is not merely a request for authorization. While suggestions or recommendations may be made by others, *e.g.*, utilization management personnel, to modify the order, the order is only modifiable by the ordering practitioner, their direct clinical supervisor, or, in the ordering practitioner's absence, another practitioner covering for them. The practitioner writing, modifying, or cancelling the order has a patient-practitioner relationship with the prisoner and assumes clinical responsibility for the decision.

**8.7.** If a practitioner orders, or informs a prisoner there will be an order, for an off-site test or referral, but circumstances change and the order is modified or rescinded, the prisoner shall be informed within one month of the change.

**9. Post-Referral Appointment, Post-Hospital Stay, Post-Emergency Room Management**

**9.1.** Defendants shall adopt and perform off-site orders from outside providers as soon as the records are available, unless a clinically appropriate basis exists to alter or forgo the off-site orders.

**9.2.** Prisoners returning from a hospital stay or emergency room visit shall be evaluated by an RN or higher prior to returning to their living unit. A discharge summary, physician report, or documentation of this information received via phone shall be available for this evaluation.

**10. Medications**

**10.1.** Prescribed medications intended for directly observed therapy ("DOT") administration shall be administered as ordered or there shall be documentation of a valid reason for non-administration. Documentation shall include the identity of the administrator.

**10.2.** For purposes of the preceding requirement, "as ordered" means:

**10.2.1.** For medications ordered as weekly, every other day or certain days of the week, daily ("q.d."), twice daily ("b.i.d."), thrice daily ("t.i.d."), four times daily ("q.i.d."), or every 12 hours (q. 12 hrs"), within two hours of a specific

time, set in policy, procedure, or orders, for administration. These set times shall be at reasonable times of the day.

**10.2.2.** For medications ordered at an hourly frequency of every eight hours ("q. 8 hrs.") or more frequently, or intermediate acting insulin, within one hour of a specific time, set in policy, procedure, or orders, for administration.

**10.2.3.** For regular insulin, within thirty minutes of serving a meal, and for fast-acting insulin within fifteen minutes of the serving of a meal.

**10.2.4.** For all other medications, at the times of the day ordered.

**10.2.5.** For a prisoner newly admitted to a facility (*e.g.*, transfer from another facility, return from a hospital stay, admission from a jail) and already on a medication in their previous venue, the first dose of a medication shall be delivered keep-on-person ("KOP") or administered ("DOT") in time for their next regularly scheduled dose.

**10.2.6.** For all other prisoners, the first dose of a newly ordered medication shall be delivered ("KOP") or administered ("DOT") within the timeframe ordered, or if no timeframe is specified, within twelve hours for antibiotics and pain medications, and within three days for all other medications.

**10.3.** Unavailability of the prisoner (*e.g.*, "no-show") or unavailability of the medication (*e.g.*, gap due to delayed refill or renewal) are not valid reasons for non-administration. Refusal is a valid reason, but only if the refusal is expressed, face-to-face between the prisoner and the health care staff, and if the medication refusal policy is followed. Defendants shall have a medication refusal policy containing the following elements:

**10.3.1.** When a prisoner refuses a medication (or classes of medication), based on the specific medication or class and the number and pattern of refusals, the medication administrator shall be triggered to escalate the case to a higher authority and within a specified amount of time (which may differ by medication or class). Defendants should use clinical judgment in setting the

refusal pattern for each medication or class and timeframe for escalation. The decision rules described above should be incorporated into the medication administration software of the EHR such that the EHR automatically alerts the medication administrator when action is needed and what action is needed, rather than relying on administrators' memory.

**10.3.2.** The higher authority referenced in the preceding paragraph shall be an RN or appropriately licensed practitioner who is then responsible for: determining the reason for the refusal and securing the prisoner's adherence with the medication, or finding a clinically appropriate alternative treatment, or assuring that the prisoner is making an informed refusal, or assuring the execution of whatever clinically appropriate action is ordered by a prescriber.

**10.3.3.** Signed refusals by the prisoner are not required.

**10.4. KOP Medication**

**10.4.1.** When prisoners request approved refills or renewals of a KOP medication, the medication shall be delivered to the prisoner before the medication runs out (based on the date of the previous fill) provided the prisoner attempted to submit the request within the required timeframe. A KOP medication shall be delivered either by providing the prisoner with the KOP supply or by staff administering the medication from stock, dose by dose, to bridge the gap until the KOP supply is delivered. Additional medication need not be delivered before the previous fill runs out if a clinically appropriate and documented determination was made by a prescriber that the medication should not be continued and the prisoner is so informed.

**10.5. Other Medication Provisions**

**10.5.1.** To decrease staff time spent on medication delivery, Defendants are encouraged, but not required, to modify their medication management practice by establishing a list of medications which are, by default, provided to prisoners as KOP. The list would be developed by health care staff in

collaboration with custody staff to account for both medical and penological needs. Policy exceptions could be made for certain classifications or housing of prisoners, for example, prisoners in an inpatient medical or mental health unit, prisoners at high mental health level, etc. For all other prisoners, prescribers would be required to write a specific order and justification if they wanted a prisoner to receive a medication by DOT. Such orders would require renewal periodically. The policy could address the need for certain prisoners on DOT medications to learn how to manage and self-administer medications as they prepare for re-entry.

**10.5.2.** To decrease staff time spent on medication delivery, Defendants are encouraged, but not required, to make some of the over-the-counter medications its practitioners prescribe available, free-of-charge and upon request, from living unit officers or health care staff in FDA-approved unit dose packaging.

**10.5.3.** Prisoners released to the community shall receive a supply of medication sufficient to ensure either (a) the prisoner has medication available for a sufficient length of time to allow the prisoner to obtain and attend an appointment with a community practitioner qualified to order a new supply, or (b) to complete the course of therapy, whichever is shorter.

**10.5.4.** Prisoners with asthma who are at significant risk of serious respiratory impairment if they do not use their rescue inhaler immediately, shall be provided a rescue inhaler KOP. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button. Exceptions may also be made for prisoners where Defendants can document a significant and serious penological need to prohibit a particular prisoner from having such an inhaler. This exception must be prisoner-specific and Defendants cannot apply a policy prohibiting KOP inhalers for all prisoners.

**10.5.5.** Prisoners with diabetes who are at significant risk of hypoglycemia shall be provided a source of glucose KOP. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button.

**10.5.6.** Prisoners prescribed rapid-delivery nitroglycerin for cardiac disease shall be provided the medication KOP. Exceptions may be made for prisoners living in a unit with 24-hour nursing and access to an emergency call button.

**11. Disease Specific Requirements**

**11.1. Hepatitis C**

**11.1.1.** Prisoners shall receive treatment for hepatitis C infection ("HCV") according to the following requirements:

**11.1.1.1.** All prisoners are screened (by blood test) for HCV within a month of arrival, and periodically, based on risk, in accordance with CDC recommendations.

**11.1.1.2.** Defendants may wait up to six months after the date of first confirmation of the current infection (or a month after learning such date if infection was established prior to admission to prison) to begin treatment to those with sustained infection who agree to treatment, regardless of degree of fibrosis, except for those with advanced or decompensated cirrhosis.

**11.1.2.** Exceptions to treatment may be made for those prisoners:

**11.1.2.1.** with markedly reduced life expectancy who would not be expected to benefit from treatment, or

**11.1.2.2.** prisoners who cannot complete treatment within the timeframe of their incarceration and linkage to care in the community for continuation of treatment cannot be established despite a good faith effort.

**11.1.3.** Within two months of issuance of this Order, all current prisoners who have not been screened for HCV shall be offered screening, and all who screen positive, have viremia based on an RNA test, and indicate willingness to be

treated shall receive treatment within the time parameters set out within this Order.

**11.1.4.** All prisoners with HCV infection shall be placed on a single list prioritized according to a scheme that considers degree of fibrosis, relevant comorbidities, likelihood of transmitting infection to others in the prison, and release date.

**11.1.5.** Within six months of issuance of this Order, using the prioritized list, Defendants shall begin treatment each month of at least the following number of prisoners: 110 prisoners plus 70% of the number of newly admitted prisoners who tested positive for HCV during the previous month.[7] For example, if 100 prisoners admitted during the month of January tested positive for HCV, Defendants shall begin HCV treatment of the next 180 prisoners on the prioritized list, during the month of February. Defendants may calculate the number of newly admitted prisoners testing positive during January based on the date of admission or the date of the test results (because prisoners may not be tested during the month of arrival and test results may not be completed during the month of arrival). Once Defendants have chosen a method of calculation, they shall continue to use the same method. Until they begin treating prisoners on the prioritized list, Defendants shall continue their current practice of initiating treatment of all prisoners identified as having more advanced hepatitis C, i.e., scores of F3 and F4. Once Defendants begin using the prioritized list, Defendants may include all prisoners, including those with scores of F3 and F4, in the calculation of the number of prisoners treated monthly.

[7] This requirement is based on three assumptions using the best data currently available: (1) 83% of newly admitted prisoners with HCV remain in the nine publicly operated facilities and 17% move to one of the seven privately operated facilities; (2) 85% of prisoners diagnosed with HCV will agree to treatment; and (3) it is necessary to treat 100 current prisoners with HCV in the public facilities who have not yet been treated in order to complete treatment of this population within approximately four years. If these assumptions prove significantly incorrect, from time to time the Monitors may adjust the required level of treatment.

**11.1.6.** No later than one year after issuance of this Order, no prisoner who is released on their planned release date shall release without having been screened for HCV and if positive and they accept treatment, without having completed treatment except as identified in 11.1.1.2 and 11.1.2.2.

**11.1.7.** All prisoners with HCV shall be offered education about HCV, whether they receive treatment or not.

**11.1.8.** All HCV screening is offered under opt-out conditions.

**11.1.9.** All HCV treatment shall use the current standard of care medications.

**11.2. Tuberculosis**

Unless ADCRR, as a system, is determined by the monitors to be at minimal risk with regard to tuberculosis according to CDC guidelines, all newly admitted prisoners shall have a completed test for tuberculosis (skin test, blood test, or chest x-ray) by the end of the third full day after admission into the ADCRR system, unless the prisoner refuses. The men's and women's facilities may be considered separately in determining the CDC-based system risk level.

**11.3. Substance Abuse Disorder**

**11.3.1.** All newly admitted prisoners shall be screened for, and if indicated then evaluated for, substance use disorder. Screening shall include assessment as to a history of opioid overdose.

**11.3.2.** All newly admitted prisoners shall be offered to have current Medication for Opioid Use Disorder ("MOUD") (buprenorphine, naltrexone) continued.

**11.3.3.** All pregnant or post-partum prisoners with diagnosed Opioid Use Disorder ("OUD") shall be offered to have current MOUD (buprenorphine, naltrexone, methadone) continued, or if not currently on MOUD, shall be offered to initiate treatment with buprenorphine or naltrexone.

**11.3.4.** No later than two months after issuance of this order, all prisoners who have a documented history of overdose or who upon assessment are determined to

be at imminent risk of an opioid overdose, shall be offered MOUD with buprenorphine or naltrexone.

**11.3.5.** No later than two months after issuance of this Order, all prisoners offered treatment for HCV shall be evaluated for OUD and if found to have OUD, shall be offered MOUD with buprenorphine or naltrexone.

**11.3.6.** Within six months of the issuance of this Order, and every six months thereafter, the Department will offer MOUD in three new facilities, including counseling, if appropriate, and including medication treatment for alcohol. The Department will take the necessary steps to ensure that any patient transferring to another facility will not experience an interruption in MOUD, counseling, or alcohol treatment.

**11.4. Immunization**

Prisoners shall be offered all immunizations recommended by a mainstream evidence-based national guideline.

**Mental Health**

Based on the credible trial testimony, the mental health treatment regime Defendants employ is profoundly lacking and results in grossly insufficient care, creating an unconstitutional substantial risk of serious harm. Similar to the medical care requirements, the central aspect of relief regarding mental health care will be a mandate that Defendants increase staffing. To ensure adequate staffing, and to allow for monitoring, Defendants shall adopt a caseload-based staffing formula. The staffing formula and other requirements are based on Defendants' mental health scoring system already in place. (Doc. 4335 at 15 n.1). Any changes to that scoring system will necessitate changes to the staffing formula. Defendants shall inform the monitors immediately upon any changes to the scoring system.

**13. Mental Health Staffing**

**13.1.** Within three months of this Order, Defendants shall hire an additional two psychiatric prescribers, ten psych associates and three psychologists to be allocated at the six corridor facilities based on patient need. Defendants may use registry and locum tenens to hire these positions, but will be required to have no more than 15% locum tenens and registry in each of these job categories within six months of the signing of the order. "PP" refers to psychiatric practitioner while "PT" refers to primary therapist (*i.e.*, psych associate or psychologist):

**13.1.1.** Pending the outcome of a staffing analysis and plan, outpatient psychologists shall supervise no more than eight psych associates, and inpatient psychologists shall supervise no more than six psych associates.

**13.2.** A MH Duty Officer shall be available at all times when facility mental health staff are not available. The MH Duty Officer shall be a licensed psych associate, psychologist, or psychiatric practitioner.

**14. Staffing Qualifications**

**14.1.** All psychiatrists–at hiring and during employment–shall be board certified in psychiatry, or board eligible if within 7 years of their completion of an ACGME

approved residency in psychiatry, with the following exceptions: 1) supervising psychiatrists shall be board certified at hiring and during employment; 2) psychiatrists who are currently employed and are not board eligible may remain employed for no longer than one year of issuance of this Order.

**14.2.** All psychologists and psychiatric practitioners shall have the appropriate state licenses. All psych associates shall be licensed or become licensed within one year of hiring or within one year of this Order, whichever is later.

**15. Model of Care**

**15.1.** Each prisoner on the mental health caseload, *i.e.*, all prisoners in MH Levels 3, 4, and 5, shall be assigned a PT who serves as the single point of contact and coordination for providing care for that prisoner. PTs shall be psych associates or psychologists. When a prisoner's assigned PT is unavailable, another psych associate or psychologist acts on their behalf. Except as noted elsewhere, generally a new PT shall be assigned when a prisoner's living unit changes and the current PT does not cover that unit, *e.g.*, when the prisoner's yard or MH Level of Care changes.

**15.2.** A psychologist shall review the records of each prisoner who is added to, or discharged from, the mental health caseload. The psychologist shall provide appropriate documentation of this review in the prisoner's health record.

**15.3.** Prisoners on the mental health caseload who believe they need mental health care shall submit HNRs. The primary therapist or, if necessary, another psych associate shall triage HNRs within 24 hours of receipt. "Triage" in this context means determining whether the request requires immediate attention and resolution or whether the request can safely be deferred until the primary therapist can address it. Documenting the word "Triaged" is adequate evidence of triage. Primary therapists shall address the HNR within three business days of its submission. "Address" means evaluating the request, determining the clinical need, and if an action is required (*e.g.*, face-to-face visit), planning that action to occur in a

clinically appropriate timeframe. When the primary therapist is absent, another psych associate or a psychologist completes these tasks in their stead within the same time.

**15.4.** If a prisoner's PT determines a visit is clinically appropriate, the prisoner shall be seen by the PT or referred to another professional as directed by the PT.

**15.5.** Prisoners who are not yet on the mental health caseload but request mental health treatment shall submit requests to be seen through the procedures for seeking medical care.

**15.6.** Defendants shall modify their policies to create a formal process for custody staff, families, or any other concerned party to refer a prisoner for mental health assessment and for timely response to the concern by mental health staff.

**15.7.** Defendants are encouraged, but not required, to allow MH-3C and MH-3E prisoners who would otherwise meet the custody classification requirements, to be housed at the Douglas, Winslow, and Safford Complexes. Telehealth may be used.

**15.8.** Defendants shall ensure the formulary for psychotropic medications is no broader than the formulary used by AHCCCS. For prisoners admitted to ADCRR on a psychotropic which is not on ADCRR's formulary:

**15.8.1.** The medication shall be continued if, based on the prisoner's history, there is significant risk of worsening of the condition if a different medication is prescribed.

**15.8.2.** If no such risk exists, the medication shall be continued long enough to allow a safe transition to a different medication or medications.

**15.9.** Defendants shall ensure there is sufficient physical space to meet the treatment requirements of the mental health care system. This includes, but is not limited to, areas for mentally ill prisoners to be housed, engage in programming, and receive treatment (both individual and group) in a confidential environment commensurate with that unit/facility's designated level of care.

**16. Content of Care**

**16.1.** Defendants shall ensure a psych associate or psychologist conducts a mental health assessment of each prisoner within one business day of that prisoner first entering the ADCRR system. This assessment shall occur in a confidential therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented.

**16.2.** The assessment shall identify and document sufficient relevant information regarding the presence and severity of mental health symptoms; current impact on functioning; past hospitalization/treatment including response to treatment; medications; suicide risk; behavioral observations of staff; and a preliminary designation of level of care.

**16.3. Outpatient**

**16.3.1.** Prisoners at an outpatient level of care (*i.e.*, MH-3) shall have the following evaluations by their assigned PT:

**16.3.1.1.** an initial comprehensive mental health evaluation within one month of arriving at the assigned facility if not already completed when the prisoner first entered the prison system;

**16.3.1.2.** whenever clinically indicated to reflect a change in service delivery;

**16.3.1.3.** at least once per year.

**16.3.2.** A psychiatric practitioner shall conduct an appropriate clinical encounter with all prisoners in an outpatient level of care (*i.e.*, MH-3) on psychotropic medications as often as clinically required, but no less often than every three months.

**16.3.3.** A treatment plan meeting shall be conducted with the prisoner and their PT. A psychologist or psychiatric practitioner shall also be present for complex cases and in all other cases shall provide input to the PT prior to the treatment plan meeting. At that meeting, the prisoner's treatment plan shall be reviewed

and updated to determine adherence to treatment, efficacy of interventions, evaluation of the level of care needs, diagnostic impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment, if applicable. The timing of the treatment plan meetings should be based on the needs identified in the treatment plan, but no less often than once a year. The treatment plan shall include a date for next review based on the content of the plan. If no timeline is identified, a treatment plan meeting shall occur at least once per year.

**16.4. Residential**

**16.4.1.** All prisoners in residential level of care (*i.e.*, MH-4) shall have the following evaluations by their primary therapist:

**16.4.1.1.** whenever there is a significant change in the course of treatment, *e.g.*, new type of treatment including medication, significant decompensation;

**16.4.1.2.** at least annually, documenting the prisoner's need for residential level of care.

**16.4.2.** Prisoners in residential level of care shall have face-to-face encounters with their assigned PTs as determined by the treatment plan.

**16.4.3.** Prisoners in residential level of care shall have their treatment plans reviewed and updated as clinically indicated but no less often than every three months when the full team meeting described in the next section is conducted

**16.4.4.** A full team meeting shall be conducted at least every three months to include: primary therapist, psychologist, psychiatric practitioner, and any other staff as necessary. Prisoners shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented in the custody record. That meeting shall include: determination of adherence to treatment, efficacy of interventions, evaluation of their level of care needs, rationale for the need for residential care, diagnostic



APP456

impressions, progress to date in treatment, and steps taken toward moving to a less restrictive environment.

**16.4.5.** Prisoners in residential level of care shall have an appropriate clinical encounter with a psychiatric practitioner as often as indicated, but no less than every fourteen days.

**16.5. Inpatient**

**16.5.1.** All prisoners in inpatient level of care (*i.e.*, MH-5) shall have the following evaluations conducted by their PT if already on the mental health caseload (otherwise by the mental health provider assigned to the inpatient unit):

**16.5.1.1.** at least annually a comprehensive mental health evaluation reflecting rationale for inpatient placement including but not limited to current symptoms and functional impairment, timing and pattern of decompensation, interventions attempted, diagnostic impressions (including potential substance-related impacts), progress in treatment to date, goals for treatment in the inpatient setting, anticipated length of stay, and criteria for discharge;

**16.5.1.2.** upon discharge from inpatient care, a discharge summary.

**16.5.2.** Prisoners in inpatient level of care shall have a daily face-to-face encounter with their PT unless such an encounter would be clinically contraindicated. If the prisoner participates in the weekly treatment progress meeting described in Section 15.5.3), it may be counted as a daily face-to-face encounter.

**16.5.3.** Prisoners in inpatient level of care shall have their treatment progress reviewed daily, and teams shall meet at least weekly with all providers (*e.g.*, nursing, psychiatry, mental health, social work, custody/unit staff, behavioral health technicians) and providers from the prisoner's previously assigned unit whenever possible. Prisoners shall be included in the meeting unless there is a clinical or legitimate and substantial safety and security concern documented. At a minimum, the focus of treatment teams shall be to provide

updates on prisoner progress, the type and efficacy of interventions used, treatment adherence, potential obstacles to recovery, and rationale for continued placement in the inpatient unit.

**16.5.4.** A psychiatric practitioner shall conduct a clinical encounter with all prisoners in an inpatient level of care (*i.e.*, MH5) as often as indicated, but no less than once per week.

**16.6.** Mental health care shall continue without interruption despite non-clinical events or conditions. If a prisoner's treatment team changes due to a change in the prisoner's mental health level of care:

**16.6.1.** The "original" PT shall provide the "new" mental health team with the rationale for the change in mental health level and the anticipated treatment needs;

**16.6.2.** If the transition is to anything other than to residential or inpatient, the "new" PT meets with the prisoner within seven calendar days;

**16.6.3.** If the transition is to residential or inpatient level of care:

**16.6.3.1.** the PT meets with the prisoner as soon as possible, but no more than one business day after arrival;

**16.6.3.2.** the psychiatric practitioner is contacted and collaborates on the immediate care plan as soon as a prisoner is admitted.

**16.6.4.** If a prisoner's PT changes without a change in mental health level of care:

**16.6.4.1.** If the transition is to anything other than to residential or inpatient, the "new" PT meets with the prisoner within seven calendar days;

**16.6.4.2.** If the transition is to residential or inpatient level of care, the "new" PT meets with the prisoner within one business day.

**16.6.4.3.** If the change is due to a change in assignment of personnel, not a transition of the prisoner, the newly assigned PT shall meet with the prisoner in accordance with the scheduled follow-up established in the prisoner's treatment plan by the previous PT, but no later than the

following interval after the assignment of the new PT: one business day for prisoners in inpatient level care, 14 calendar days for prisoners in residential care, and three months for prisoners in all other levels of care.

**16.7.** All mental health encounters with all prisoners shall occur in a confidential, therapeutically appropriate setting unless there is a clinical or legitimate and substantial safety and security concern that is documented.

**16.8. Suicide Prevention**

**16.8.1.** During normal business hours a prisoner who presents as a suicide risk shall have a formal in-person suicide risk assessment completed by a licensed psych associate, psychologist, or psychiatric practitioner to determine the acute suicidal risk and the level of protection that is needed (*e.g.*, return to current housing, placement in one-on-one observation, etc.). If the concerns are raised after normal business hours or on holidays, the on-duty mental health officer shall be consulted regarding the disposition of the prisoner (which may or may not include constant observation). If the prisoner is placed on suicide watch as a result of the concerns raised, they should be placed under constant observation until they are able to have an in-person assessment of suicide risk by a mental health professional.

**16.8.2.** Defendants are encouraged, but not required, to engage appropriately trained and supervised Behavioral Health Technicians to substitute for correctional officers as the individuals responsible for providing safety observation of, and engagement with, an individual (or cohort of individuals) on suicide watch depending on staffing needs of a particular location.

**16.8.3.** Upon recommendation from a psychologist or psychiatric practitioner that housing a prisoner on suicide watch in the same room with other suicide watch prisoners ("cohorting") would be clinically safer than housing each prisoner in isolation, Defendants shall cohort such prisoners, provided that based on the prisoners' custody classification (determined based on factors other than the

fact that the individual is on suicide watch) such cohorting would not be contraindicated.

**16.9. Crisis Stabilization**

**16.9.1.** Crisis stabilization beds shall be used for short term (typically only a few days) management of prisoners who require acute care, *e.g.*, suicide watch.

**16.9.2.** Continued treatment in a crisis stabilization bed requires review and approval by a psychologist initially at seven days and every three days thereafter. Starting at ten days following placement in a Crisis Stabilization bed, the psychologist and or psychiatric prescriber shall document the justification for their continued assignment to the Crisis Stabilization bed rather than a Residential or Inpatient bed.

**16.9.3.** Prisoners in a crisis stabilization bed shall be evaluated at least daily in person by their PT (or another psych associate if they have not yet been assigned a PT or have transferred from another yard). Treatment providers shall document their intervention efforts, including but not limited to: assessing mental status; behavioral observations; documenting prisoner ability to independently care for activities of daily living; type(s) of treatment provided; response to interventions (including medication efficacy and compliance); anticipated length of stay; and criteria for discharge.

**16.9.4.** The prisoner shall be assessed by a psychiatric practitioner as soon after admission as possible but no longer than one business day, in order to ensure there is not a medication issue or a question of medication appropriateness that contributed to suicidal ideation.

**16.9.5.** For prisoners placed in a crisis stabilization bed for suicidal concerns, a suicide risk assessment shall be completed upon admission that identifies risk and protective factors and items/privileges they are allowed (based on treatment needs) while in crisis care.

**16.9.6.** A clinical note shall be entered whenever the level of suicide watch is changed.

**16.9.7.** Prior to being released from a crisis stabilization bed if placed there due to suicidal concerns, a discharge suicide risk assessment shall be completed which documents: the change/reduction in suicidal risk; the prisoner's identified protective factors; and plans for follow-up treatment, and aftercare including a safety plan developed in collaboration between the prisoner and treatment providers.

**16.9.8.** "Safety contracts" (forms signed by prisoners, agreeing not to hurt themselves) shall not be used.

**16.9.9.** Transferring a prisoner in crisis to a different yard or complex can be clinically disruptive. When possible and safe, Defendants shall attempt to provide stabilization at the complex at which the prisoner has been housed unless there is documented clinical justification for transfer based on the low likelihood of stabilization and/or clinical danger if the prisoner is maintained at the complex.

**16.10.** Restraints used by mental health clinicians for clinical purposes shall comply with the following:

**16.10.1.** Restraints shall be used only to prevent harm to oneself or to others and to ensure the safety and security of the staff and other prisoners. They shall not be used for punishment.

**16.10.2.** Restraints shall be ordered and reviewed only by a psychiatric practitioner or psychologist.

**16.10.3.** Restraints shall only be applied for the minimum amount of time necessary to accomplish the stated need (*e.g.*, prisoner and staff safety, requisite transports, etc.).

**16.10.4.** Soft restraints shall be used whenever possible.

**16.10.5.** Subject to the following section, restraints shall not be used for more than four hours at a time. Every effort shall be made to minimize the length of time in restraints.

**16.10.6.** Renewal of restraints beyond four hours shall be approved by the Facility Medical Director/designee and must be renewed at intervals no longer than four hours. If the Medical Director/designee are not available, a licensed mental health provider may approve continued use. The justification for continued use shall be documented in the prisoner's medical records. Renewals occurring after hours shall be done in collaboration with the Facility Medical Director/designee, a psychiatric practitioner, or a psychologist.

**16.10.7.** Prisoners shall be restrained only in settings that allow nurses sufficient access to perform wellness checks and provide necessary medical care. Nurses shall ensure that the restraints do not impair any essential health needs, such as breathing or circulation to the extremities. These checks shall be documented in the prisoner's medical records.

**16.10.8.** Prisoners in restraints shall be under direct observation at all times. If an observer notes any ill effects of the restraints, every effort shall be made to remedy the ill effects and a psychiatric or medical practitioner shall be notified immediately.

**17. Training**

**17.1.** The Court recommends, but does not require, Defendants provide additional training for all custody staff regarding mental illness and suicide prevention and response.

**17.2.** Additional training would be conducted in-person at orientation/CORE training, annual in-service, and whenever clinically indicated at any given facility.

**17.2.1.** Topics would include, but not limited to: signs and symptoms of mental illness and decompensation patterns; working with mentally ill prisoners; suicide risk detection, prevention, and response; individualized Behavior

Management Plans; de-escalation techniques; additional training for staff assigned to living units that house sub-class members, those in isolation, and those in Crisis Stabilization/Suicide Watch regarding therapeutic intervention strategies specifically suited to this population.

**18. Release to Community**

**18.1.** Defendants shall comply with the following regarding any prisoner designated as Seriously Mental Ill ("SMI"), MH-4, or MH-5 who shall be released and who is presumptively eligible for federal or state assistance by virtue of their mental illness:

**18.1.1.** Defendants shall develop and document an aftercare plan that reflects the prisoner's current symptoms and functional impairments, progress in treatment, and treatment plan;

**18.1.2.** Defendants shall facilitate evaluation for SMI designation and placement in the community, as clinically indicated; and

**18.1.3.** Defendants shall arrange follow-up care with an appropriate community provider where possible.

**19. Involuntary Medication**

**19.1.** Defendants are encouraged, but not required, to modify their policy to include grave disability as an indication for involuntary antipsychotic medications.

**Relief for Prisoners in Isolation**

The subclass consists of "[a]ll prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day." (Doc. 4335 at 123). This definition is broader than those prisoners housed at particular complexes or those prisoners with particular classifications (*e.g.*, maximum custody). The evidence at trial, however, established the members of the subclass were those prisoners:

(a) Formally classified as "maximum custody" pursuant to DO 801;

(b) Housed in a detention unit pursuant to DO 804;

(c) Placed on mental health watch pursuant to DO 807; and

(d) Placed in close management status pursuant to DO 813.

(Doc. 4335 at 136). It is possible prisoners outside of these four classifications will become subclass members. For example, if Defendants restricted minimum custody prisoners to their cells for more than 22 hours each day, such prisoners would become members of the subclass. However, there was no evidence at trial of this actually occurring. For purposes of the injunction, the subclass will be construed as encompassing the four classifications outlined above as well as those possible additions referenced in Section 27.1. For purposes of the following sections only, "prisoners" will refer to members of the subclass.

As with the medical care and mental health care, the unconstitutional conditions imposed on prisoners can be attributed in large part to the lack of adequate staffing. The Court found the staffing levels at two locations housing prisoners were "far below what prison officials acknowledge as necessary to operate the units safely." (Doc. 4335 at 148). The lack of adequate staffing resulted in Defendants performing fewer welfare checks on prisoners and the checks actually performed were perfunctory. (Doc. 4335 at 147-48). The lack of adequate staffing also meant offers for out-of-cell time were "not made, [were] not legitimate, or [were] accompanied by unreasonable consequences." (Doc. 4335 at 156).

Connected to the lack of staffing, the Court found Defendants' recordkeeping practices were haphazard and often unreliable. The Court found Defendants knowingly

created documents in a false or misleading manner. (Doc. 4335 at 152). The Court also found Defendants "pre-filled" forms for entire weeks, meaning there was no evidence of "what truly happened." (Doc. 4335 at 157). Even when documentation was generated indicating unconstitutional treatment, there was no evidence Defendants took corrective action.

Finally, the Court found Defendants' initial classification decisions are not supported by legitimate penological interests. In addition, Defendants place or keep prisoners in restrictive conditions even when Defendants agree those prisoners should be housed elsewhere. For example, two Deputy Wardens admitted there were prisoners being held in maximum custody who should have been housed in less-restrictive environments. (Doc. 4335 at 142-43). While Defendants have a policy allowing prisoners to "earn their way" into placement in less-restrictive environments, that policy is administered "in a random and chaotic way." (Doc. 4335 at 162). Thus, Defendants' administration of their policies for placing, keeping, and removing prisoners from the most restrictive environments were not supported by legitimate penological purposes.

The unconstitutional treatment of prisoners can be directly attributed to inadequate staffing, unreliable or nonexistent records, Defendants' failure to review their records indicating there were problems, Defendants' classification policies, and Defendants' failure to implement their own policies. These basic findings support the expert's recommendations for the following requirements.

**19. Basic Requirement**

**19.1.** Defendants shall ensure all custody decisions and reviews made by correctional officers, supervisors, and committees are reasonable and consistent with legitimate penological interests.

**19.2.** Every prisoner is housed in the least restrictive level that is safe for them and others.

**19.3.** No prisoner shall be confined in a cell for 22 hours or more each day for more than two months unless there are extraordinary documented legitimate penological

interests. Defendants shall implement a system to facilitate the return to lower levels of custody for those prisoners who have been in the subclass for longer than two months[8], and document their efforts.

**19.4.** No prisoner under the age of 18 shall be placed into maximum custody, detention, or close management, or otherwise kept in a cell for more than 22 hours each day.

**19.5.** Within sixty days of this Order, no prisoner designated as Seriously Mentally Ill ("SMI") shall be housed in maximum custody, detention, or close management, or otherwise kept in a cell for more than 22 hours each day.

**20. Staffing**

**20.1.** To determine the minimum number of staff to safely operate the locations where prisoners are held, including sufficient staff to allow for out-of-cell time, the Court will appoint an expert, Mr. Scott Frakes, to conduct a staffing analysis and plan of custody positions at each location. Mr. Frakes may appoint additional appropriately qualified and credentialed staff to assist in his work. The experts' services shall be paid by Defendants. The staffing analysis and plan shall be filed with the Court within six months from the date of this Order. The plan shall designate each post as Mandatory, Essential, or Important. The plan shall contain recommendations that shall be reviewed by the Court and, if approved, ordered by the Court. Any objections to the staffing plan and recommendations by the parties shall be filed within ten days and a response to the objections shall be filed within ten days thereafter.

**20.2.** Upon receiving the staffing analysis and plan from the expert, the Court anticipates ordering Defendants to comply with what follows.

**20.2.1.** Defendants shall staff all Mandatory Posts at all times; Essential Posts shall be staffed at least 75%; Important Posts shall be staffed at least 50%. If ADCRR falls below these levels, it shall inform the Court within seven days.

[8] If Defendants transfer members of the subclass to private prisons, the members of the subclass shall not be treated inconsistently with this order. At present, Defendants house prisoners in seven private facilities (Central Arizona Correctional Facility, Florence West, Kingman, La Palma, Marana, Phoenix West, and Red Rock Correctional Center).

The failure to maintain the required staffing levels will not be an acceptable excuse for any other failure to meet requirements in this Order.

**20.2.2.** Defendants shall document on an annual basis an assessment of the operative staffing plan and document any requests for necessary adjustments to the plan. The assessment shall be filed with the Court on the last business day of January each year.

**20.2.3.** Whenever Defendants fail to comply with the staffing levels, Defendants shall file with the Court a "Deviation from Staffing Plan Report" by the tenth day of the following month. That report shall specifically identify the deviation(s) that occurred and provide reasonable and adequate justifications for the deviation(s).

**20.3.** While awaiting the expert's staffing analysis and plan, Defendants shall begin compiling data such that they can submit the following information:

**20.3.1.** Beginning on May 1, 2023, and every quarter thereafter (*i.e.*, March 31, June 30, September 30, December 31), Defendants shall file with the Court a "Correctional Staffing Report." Each quarterly report shall include:

- the number of correctional staff assigned to each facility.
- the number of correctional staff still employed by each facility at the end of the quarter.
- the turnover rate, that is, the number of voluntary and involuntary terminations during the quarter divided by the total number of correctional staff assigned at the end of the quarter, including each figure in the calculation in addition to the ultimate result.
- the retention rate, that is, the total number of correctional staff at a facility who have worked for that facility for twelve months or longer divided by the total number of correctional

staff assigned at the end of the quarter, including each figure in the calculation in addition to the ultimate result.

- the total number of overtime hours for correctional staff at each facility for the quarter; and the vacancy rate (number of vacant positions at the end of the quarter divided by the total number of correctional staff and vacant positions at the end of the quarter).

**20.4.** Increased salaries may be necessary for Defendants to reach adequate staffing levels. The Court will not order increased salaries at this time. Defendants are warned that if they are unable to recruit and retain sufficient staff, the Court will consider mandating salary increases.

**20.5.** At a later date, the Court will consider ordering custody staff be afforded at least 8 hours of rest between shifts and that staff who are required to commute more than 130 miles shall not be subjected to additional work assignments that occur before or after their normal working hours. Imposition of these limits may occur if Defendants are deemed overly reliant on overtime to perform critical duties. Reliance on overtime can be a temporary solution but it creates a grave risk of staffing shortages should individuals discontinue volunteering for overtime.

**21. Recordkeeping**[9]

**21.1.** Defendants shall install and fully implement an electronic offender management record keeping Web-based software application ("EOMS") that is accessible via standard Web browsers.

**21.2.** Within one month of the issuance of this Order, Defendants shall retain a communications engineer to conduct an assessment of the technical requirements to install the EOMS at the designated sites.

[9] Normally, requiring data collection in whatever form Defendants deem appropriate would be the less intrusive way of tracking compliance. However, Defendants' documented inability to generate reliable and accurate paper records requires the Court mandate installation of an electronic recordkeeping system that ensures against falsification of records.

**21.3.** By July 1, 2023, Defendants shall activate the current EOMS pilot program at the Browning Unit and shall evaluate its functionality over the ensuing two months.

**21.4.** By September 1, 2023, Defendants shall issue a Request for Proposals to install the EOMS at the designated sites.

**21.5.** By December 31, 2023, Defendants shall award a contract for the installation of EOMS at the designated sites.

**21.6.** By December 31, 2024, Defendants shall have installed and fully implemented the EOMS at all designated sites.

**21.7.** In the interim before full installation of the EOMS at the designated sites, Defendants shall implement a formal process and tracking protocol to manually accomplish the functions of the EOMS, subject to monthly review by the Warden of each facility.

**21.8.** The EOMS chosen by Defendants shall have the following capabilities.

**21.8.1.** Ability to automate key operational workflows, tasks, and reporting requirements such as: tracking prisoner movement out of cell, via passive, radio frequency identification ("RFID") cards, and mobile devices and/or fixed RFID readers; logging cell checks and security checks via fixed RFID Tags; store photographs and video with audio, automating prisoner activity logging, and automating whether prisoner services such as meal delivery, recreation, medications, supplies, laundry and bedding, have been completed or refused, as well as functionality Defendants believe will help validate their actions;

**21.8.2.** Ensure that all electronic log entries as well as other electronically captured data cannot be edited, deleted, or altered in any way;

**21.8.3.** Support a real-time or near real-time interface with ADCRR's electronic prisoner management system to share prisoner demographics information and housing assignments;

**21.8.4.** Use portable devices that support Wi-Fi and an embedded high-resolution camera capable of taking photographs and recording videos;

**21.8.5.** Use RFID tags that are high-frequency and capable of near-field communication. RFID tags shall contain a unique identification number that cannot be duplicated or altered, support secure mounting, be enclosed in a tamper-proof, shatter-proof unit, and have the ability to identify prisoners by name when scanned;

**21.8.6.** Support digital incident codes that can be customized by system administrators and used by end users to collect observations of prisoners and other activities;

**21.8.7.** Enable users to create a unique PIN to authenticate login privileges or login via RFID fob or ID card;

**21.8.8.** Support Web browsers, such as Chrome, Firefox, or Microssoft Edge, that is password protected;

**21.8.9.** Support prisoner level documentation where log entries positively identify prisoners by name and housing assignment;

**21.8.10.** Generate prisoner level reports that identify prisoners by name and identification number;

**21.8.11.** Support the ability to log meals, movements, recreation, refusals, headcounts, medications, supply passes, security checks, and other appropriate information by prisoner name, officer ID, and time/date;

**21.8.12.** Automatically visually distinguish between log entries created by RFID scan versus those manually recorded without an RFID scan or "read";

**21.8.13.** Include a real-time module that tracks system usage to display the date, time, and location of completed activities; and

**21.8.14.** Support electronic signature captures.

**21.9.** To ensure accurate monitoring, the EOMS chosen by Defendants shall support the following reporting capabilities:

**21.9.1.** Export data into multiple file formats, such as PDF, Excel, HTML, and XML to be printed and/or saved to a local area network;

**21.9.2.** Retain data in accordance with required state record-retention laws and rules;

**21.9.3.** Automatically generate and send reports via email to select recipients; and

**21.9.4.** Filter reports by date, time, housing unit, prisoner name, booking number, and officer ID.

**21.9.5.** Produce the following:

- Prisoner Activity Report
- Housing Activity Report
- Round Compliance Report
- Meals Report
- Recreation Report
- Movement Report
- Population Report
- Use of Confinement Report
- Maintenance and Equipment Report

**22. Access to Staff**

**22.1.** Defendants shall not house any prisoner in a housing location where a prisoner lacks the ability to effectively contact a staff member immediately, either via in-person or via a call button/intercom system.

**22.2.** The installation of call buttons or an intercom system in every cell housing a prisoner is an ideal that requires significant expenditures. At present it does not appear required to be ordered. The Court strongly recommends but will not require, installation of such a system.

**23. Building Conditions**

**23.1.** Within three months of this Order, all showers used by prisoners found in disrepair (e.g., rusted, leaking, broken pipes) shall be repaired and, if needed,

resurfaced, professionally painted after appropriate preparation, and/or new shower pans installed.[10]

**23.2.** Defendants shall maintain all showers used by prisoners in good operational state. Showers shall be sanitized daily or more often if necessary and shall be free of filth and mold/mildew. Showers shall be resurfaced and/or painted on an as-needed basis and all new paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew.

**23.3.** Recreation areas used by prisoners shall be cleaned at least daily and kept free of dirt, filth, rubbish, garbage, rodents, vermin, insects, or other matter detrimental to health (e.g., mold/mildew). A log entry shall be made in the EOMS application for each housing unit at the time a recreation area is cleaned.

**23.4.** Defendants shall, within three months of this Order, take the following actions regarding cells and areas used by prisoners:

**23.4.1.** repair or replace essential equipment or structures in cells found in disrepair (e.g., rusted, leaking or broken pipes, sinks and toilets);

**23.4.2.** cells found in need of painting shall, after appropriate preparation, be professionally painted. New paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew.

**23.5.** Defendants shall, at all times after three months of this Order, ensure the following regarding cells or other areas used by prisoners:

**23.5.1.** maintain all cells in a serviceable, good operational state, ensuring the cells are kept free of filth, mold, mildew, rust, vermin, and insects.

**23.5.2.** professionally re-paint cells after appropriate preparation as needed. New paint shall be mixed with a mildewcide additive to reduce the presence and growth of mold and mildew.

---

[10] As a matter of common decency, an Order should not be required to prompt Defendants to repair leaking pipes, repair inoperative toilets, or collect trash. However, Defendants' conduct throughout this litigation demonstrated Defendants cannot be relied upon to perform such basic tasks.

**23.5.3.** All areas used in conjunction with prisoners to include, but not limited to, dayrooms, showers, recreation areas, classrooms, etc., shall be kept in a clean and sanitary condition, free from any accumulation of dirt, filth, rubbish, garbage, rodents, vermin or other matter detrimental to health (e.g., mold/mildew).

**23.5.4.** Housing unit staff shall daily ensure the removal of trash and garbage from all areas. Each unit's housekeeping program shall include a daily general sanitation inspection by a supervisor. The inspector shall make a log entry in the EOMS application for each housing location inspected.

**23.6. Access to Cleaning/Sanitation Supplies**

**23.6.1.** Prisoners shall have access to effective cleaning and sanitizing supplies necessary to properly clean and sanitize their own living area. Supplies shall include, as consistent with operational safety, access to tools and cleaning agents, e.g., cleaning detergents, rags, sponges, scrub brushes, mops, mop bucket, broom, dustpan. A log entry shall be made in the EOMS application for each housing location that includes the date and time the supplies were provided and the date and time the supplies were collected.

**23.7. Pest Control**

**23.7.1.** Defendants shall engage a pest control contractor on a semi-monthly basis to eliminate vermin, insects, and rodents by safe and effective means in all common areas used by prisoners. The pest control service shall be completed in all cells where the prisoner occupying the cell agrees to the service. A log entry shall be made in the EOMS application indicating the location, date, time, name of the company representative performing the pest control service, and the service performed.

**24. Subclass' Members Access to Services**

This Order contemplates most prisoners will be able to submit requests for medical services and other matters via electronic tablets. Therefore, Defendants shall ensure the

following:

**24.1.** Within six months of this Order, prisoners' tablets shall allow them, in a language they understand, to make direct requests for services including medical/mental health services, file a letter or other request required before filing a grievance, file a grievance, file an appeal, access and send electronic mail (both personal and professional), check their commissary account balance, obtain current program schedules and curriculum, purchase commissary items, access case notices regarding letters and grievances, access the prisoner handbook, access disciplinary documents, access hearing documents, access appeal decisions and access current classification level and progress towards the next step down. The tablet should also allow access to entertainment such as books, educational materials, music and movies, consistent with a prisoner's classification and step levels. Until tablets are issued with the above functionality, and thereafter for prisoners who are not permitted to have electronic tablets or who do not have access to an electronic tablet due to tablet malfunction, Defendants shall provide paper or other means for prisoners to access documents and make requests consistent with the prisoner's custody level.

**25. Body Scanners**

Evidence at trial established prisoners undergo routine strip searches. The Court-appointed expert recommended Defendants use full-body scanners to reduce the use of and reliance on strip searches. Full-body scanners are preferable but, at this time, the Court will not mandate the installation of full-body scanners at all locations housing prisoners.

**26. Food Service and Meals**

**26.1.** All prisoners shall be provided a minimum of three separately provided meals a day (breakfast, lunch, dinner) consisting of two hot meals and one cold meal with no more than 14 hours between dinner and breakfast. Breakfast and lunch may be served together on weekends and holidays, provided one is a hot meal and

nutritional needs are met. These meals shall be of the same quality and have the same nutritional and caloric content as meals served in general population.[11]

**26.2.** When a prisoner refuses three meals of any kind in a seven-day period or displays a significant change in eating habits (*e.g.*, accepts meals but does not consume them; does not consume significant portions of a meal; refuses meals intermittently, etc.,) corrections officers shall immediately notify medical staff.

**26.3.** The following log entries shall be made for prisoners:

**26.3.1.** when a meal is provided or refused, an entry that includes the type of meal (regular diet, therapeutic, religious) and, if the meal was refused, a video recording of the refusal;

**26.3.2.** when a therapeutic or religious diet begins and/or ends, an entry that includes the type of diet and the reason for the beginning or ending of the diet (which, for medical diets may be that the order from a medical provider began or ended).

**27. Out-of-Cell Activities**

**27.1.** Prisoners, including any prisoners who do not qualify under one of the four categories outlined above, shall be offered 14 hours or more per week of out-of-cell time to include opportunities for recreation, showers, individual/group therapy where eligible for such services, visitation, phone calls, or other offered activities.

**27.1.1.** If the prisoner is offered out-of-cell time, but the prisoner voluntarily refuses, the time the prisoner would have been out-of-cell counts towards out-of-cell time.

**27.1.2.** If out-of-cell time is scheduled but not available, not offered, or offered at unreasonable times (*e.g.*, 4:00 A.M.), that time shall not count towards out-of-cell time.

---

[11] The Court-appointed expert recommended Defendants have food service areas inspected by a health department official and that Defendants ensure there is an emergency meal plan to cover situations where food or water is temporarily unavailable. Oddly, Defendants contested these requirements. The Court will not order them at this time but will consider ordering it, if necessary.

**27.1.3.** When out-of-cell time must be canceled, reasonable efforts shall be made to re-offer it.

**27.1.4.** A log entry shall be made in the EOMS application that includes the type of activity, the time the activity began and ended, or, if the prisoner refuses, a video recording of the refusal.

**27.1.5.** Defendants must continue to perform and monitor their obligations under this Order even after prisoners are offered more than fourteen hours of out-of-cell time in one week. Defendants shall continue to document activities of those locations housing prisoners on the date of this Order until such time as this Order is terminated.

**27.2.** All prisoners shall be provided regular access to showers, at a minimum of three times per week with no more than three days between showers.

**27.2.1.** For each prisoner who takes a shower or refuses to take a shower, a log entry shall be made in the EOMS application that includes a video recording of the refusal.

**27.2.2.** When a prisoner refuses to shower on a continual basis or displays a significant change in hygiene habits, medical staff shall be immediately notified.

**27.3.** Within one month after issuance of this Order, all prisoners shall be provided the following:

**27.3.1.** Regular access to outdoor recreation areas at least consistent with the prisoner's classification and, for those in Maximum Custody, their step level as described in Department Order 812 as of November 21, 2022; at a minimum each prisoner shall have no less than 10 hours per week in blocks of no longer than 3.5 hours in enclosures of at least 100 square feet and, for all those not in Maximum Custody Step 1, some ability to socialize with others.

**27.3.2.** Prisoners will be allowed to use the restroom during recreation periods as needed, without forfeiting the remainder of the recreation period.

**27.3.3.** Recreation areas shall have constant supervision, in-person, by qualified staff members and have available shade and clean drinking water.

**27.3.4.** A log entry shall be made in the EOMS application for each housing unit when a portable beverage cooler of clean drinking water for a recreation area is provided.

**27.3.5.** For each prisoner who refuses to recreate, a log entry shall be made in the EOMS application that includes a video recording of the refusal.

**27.3.6.** Prisoners may voluntarily request to end their recreation period at any time, and will be returned to their cell within 15 minutes of making the request. Any remaining time for that recreation period is forfeited.

**28. Personal Property**

The expert recommended Defendants take steps to ensure the proper distribution and laundering of clothing, the proper distribution of bedding supplies, and the proper distribution of personal care items such as soap and toilet paper. Defendants object to this recommendation and at this time the Court will not order Defendants to distribute and track these items but the Court may reconsider if necessary.

**29. Classification**

**29.1.** Defendants shall assign a full-time qualified staff member ("Classification Monitor"), with no other collateral duties, to each individual unit housing prisoners to ensure all classification reviews, step progression (up or down) and movements to an appropriate new housing location are processed and completed within ten days. The reasons and evidence considered shall be documented in the prisoner's classification record.

**29.2.** Defendants are required to provide prisoners in maximum custody, detention, or close management a written or electronic copy of their individualized case plan, in a language the prisoner understands that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing).

**29.2.1.** Defendants are required, at intervals not to exceed one month, to conduct and document an evaluation of each of the prisoner's progress under an individualized plan. The evaluation should also consider the state of the prisoner's mental health; address the extent to which the prisoner's behavior, measured against the plan, reasonably justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of evaluation; and recommend full classification review when appropriate. The documentation shall be sufficiently detailed to show the basis for any decisions made in the evaluation (including increasing, decreasing, or maintaining privileges).

**29.2.2.** Defendants are required, at intervals not to exceed six months, to conduct a full classification review including a meeting with the prisoner and the classification committee, except in exceptional circumstances justified by legitimate safety concerns, the prisoner need not attend. At that meeting it shall be determined whether the prisoner's progress toward compliance with the individual case plan or other circumstances warrant a reduction of restrictions, increased programming, or a move to a lower level of custody. If a prisoner has met the terms of the individual case plan, there should be a presumption in favor of releasing the prisoner from maximum custody or close management. The documentation shall be sufficiently detailed to show the basis for any decisions made in the classification review (including increasing, decreasing, or maintaining privileges or classification). A decision to retain a prisoner in maximum custody or close management following consideration by the classification review committee should be reviewed by the facility warden or deputy warden, and approved, rejected, or modified as appropriate. If the facility warden or deputy warden rejects or modifies the decision of the classification committee, the basis for the rejection or modification of the decision shall be documented with sufficient detail to allow review. When the

warden or deputy warden disagrees with the classification committee's recommendation, the Regional Operations Director shall review the matter and make a final determination. The basis for the Regional Operations Director's decision shall be documented with sufficient detail to allow review. Any decision by the warden, deputy warden, or Regional Operations Director must be reasonable and consistent with legitimate penological interests.

**29.3.** Defendants are required to ensure enough beds are available for the number of prisoners placed in each classification level. When a higher or lower classification level is achieved, the Classification Monitor shall within ten days re-house the prisoner into a location associated with their new classification level and step as well as afford the appropriate privileges associated with the new classification level and step.

**30. Detention Unit Supervision**

Defendants shall assign a full-time qualified staff member, with overall unit authority and no other duties, to each detention unit to ensure all services, assessments, programs and activities in the detention unit are completed as required and shall ensure those prisoners who are eligible to leave the unit are re-housed within ten days.

**31. Disciplinary Process**

Evidence at trial established prisoners that are placed in detention units, often remain there indefinitely, and the disciplinary system was "irrational[] and unfair[]." (Doc. 4335 at 142). The Court's expert made many reasonable recommendations for how Defendants should restructure their disciplinary processes. The Court will not require Defendants implement them at this time but may reconsider at a later date. The other limitations Defendants are ordered to comply with are intended to ameliorate the harm caused by Defendants' irrational and unconstitutional disciplinary policies and procedures.

**Findings Required by 18 U.S.C. § 3626(a)(1)(A)**

**32.** The Court finds that this Injunction is narrowly drawn, extends no further than necessary to correct the violation of the constitutional rights of the Plaintiff class and subclass, and is the least intrusive means necessary to correct the violation of the constitutional rights.

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, et al.,<br>Plaintiffs,<br>v.<br>Ryan Thornell, et al.,<br>Defendants. | No. CV-12-00601-PHX-ROS<br>**ORDER** |

Pending before the Court is Defendants' Motion for Stay of Order Appointing a Receiver Pending Appeal (Doc. 5315).

In a February 19, 2026 Order, the Court granted Plaintiffs' Motion for Appointment of a Receiver after extensive briefing by the Parties and input from the Court's experts. (Doc. 5123.) In a July 17, 2026 Order, the Court accepted the Parties' Stipulation for the Appointment of Ms. Annette Chambers-Smith and outlined the authority, duties, and responsibilities of the Receiver. (Doc. 5307.) The Court permitted a short stay of the Order so that Defendants could seek a stay pending appeal. Defendants now seek a stay of the Court's Order appointing a Receiver pending appeal.

## I. Legal Standard

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). "It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (internal quotation omitted). "The party requesting a stay bears

the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (citations omitted). In exercising its discretion, the Court must consider "four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (citation omitted). These factors overlap with the factors governing preliminary injunctions "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.*

In the Ninth Circuit, "[a] party must ordinarily move first in the district court for" "a stay of the judgment or order of the district court pending appeal." *See* Ninth Circuit Rule 8.

## II. Discussion

Defendants assert that they are likely to succeed on the merits because a Receivership is an extreme remedy and the focus of the Receivership Order was incorrect. In short, Defendants' argument is that the Court's careful findings should be reconsidered and the Court should rethink Defendants' previous arguments that a Receivership was not an appropriate remedy. For example, Defendants assert that the Court has not considered its performance under the injunction, but this assertion is simply untrue. The Court "exercised caution and critical reflection," including relying on the well-supported findings and opinions of the monitors, and found Defendants' performance under the Permanent Injunction insufficient and unconstitutional. Likewise, Defendants rely on their own methodologies for calculating their percentage of compliance with the Injunction, which the Court previously identified as significantly flawed. Furthermore, Defendants' claim that "the Court did not attempt any intermediate remedies" since entry of the Permanent Injunction in 2023 is both inaccurate and unavailing. In the Order granting the Motion for a Receiver, the Court identified numerous measures intended to spur compliance, including the assistance of monitors, hearings and status conferences, and implementation of a Pilot

Program to reach compliance in staffing. (Doc. 5123 at 5-2, 56-58). In short, the Court has already carefully considered Defendants' arguments in finding that a Receivership is an appropriate remedy, and does not agree with Defendants' contention that the Court's reasoning is in error. The Court's full analysis is set forth in detail in the Order finding that a Receivership is necessary. Accordingly, Defendants have not shown they are likely to succeed on the merits.

Defendants next assert that they will suffer irreparable harm in the absence of a stay because of concerns with federalism and the costs of a receiver that will not recoverable. Again, the Court has carefully weighed these considerations based on its extensive experience with this case, the arguments of the Parties, the detailed, well-supported expert opinions, and the repeated failures of Defendants to comply with the Injunction. Accordingly, the Court cannot find that Defendants will suffer irreparable harm in the absence of a stay where the Court has already found that a Receiver is necessary to correct Defendants' ongoing constitutional violations.

In assessing the public interest and harm to the opposing party, these factors merge when the Government is the opposing party. *Nken*, 556 U.S. at 435. Defendants assert that the public interest lies with maintaining the status quo and the balance of harms favors Defendants because of the costs they will incur. Any harm to Defendants, however, is significantly outweighed by the harm that will occur the longer the unconstitutional provision of healthcare within Arizona's prisons continues. *See, e.g*, *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) ("it is always in the public interest to prevent the violation of a party's constitutional rights."). Defendants attempt to argue the opposite—the "significant harms that the State will suffer without a stay outweigh the uncertain harms that Plaintiffs raise," and that "the only countervailing harm Plaintiffs identify is the risk of continuing harm. But that possibility is present regardless whether the receivership is stayed." (Doc. 5326 at 4). It is indisputable that Plaintiffs and other parties interested in the proceeding continue to be harmed by the unconstitutional health care conditions in Arizona state prisons, and the longer the conditions are allowed to persist, the more injury

Plaintiffs suffer. The Court has found appointment of a receiver will provide a relatively quick remedy to the violations of Plaintiffs' constitutional rights compared to leaving the matter in Defendants' hands, and Defendants have presented no argument or evidence that indicates this finding was error. Thus, issuance of a stay that will delay the Receiver's needed remedial work will substantially injure Plaintiffs.

For the foregoing reasons, Defendants have not met their burden of demonstrating their entitlement to a stay pending appeal, and their Motion will be denied.

The Court will allow a short additional stay of its Order Appointing a Receiver (Doc. 5307) for Defendants to apply to the Court of Appeals for a stay. *See* Ninth Circuit Rule 27-2 ("If a district court stays an order or judgment to permit application to the Court of Appeals for a stay pending appeal, an application for such stay shall be filed in the Court of Appeals within 7 days after issuance of the district court's stay.").

**IT IS ORDERED** Defendants' Motion for Stay of Order Appointing a Receiver (Doc. 5307) Pending Appeal (Doc. 5315) is **denied**.

**IT IS FURTHER ORDERED** the Court's Order Appointing a Receiver (Doc. 5307) is stayed for 7 days of the date of this Order so that Defendants may apply to the Court of Appeals for a stay. If Defendants do not apply to the Court of Appeals within the time mandated by the Court of Appeals, the Court's Order Appointing a Receiver (Doc. 5307) will go into effect at the expiration of the deadline for such an application.

Dated this 5th day of August, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge