**No. 26-1746**
**(consolidated with 26-5060)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SHAWN JENSEN, ET AL,

*Plaintiffs-Appellees*,

v.

RYAN THORNELL, ET AL,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Arizona, Phoenix
No. 2:12-CV-00601-ROS
Hon. Roslyn O. Silver

# APPELLEES' RESPONSE TO APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

Donald Specter
Sophie Hart
Rosalind Dillon
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621

Corene T. Kendrick
**ACLU NATIONAL PRISON PROJECT**
425 California St., 7th Floor
San Francisco, CA 94104
(202) 393-4930

David C. Fathi
Maria V. Morris
**ACLU NATIONAL PRISON PROJECT**
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
(202) 393-4930

Lauren Beall
**ACLU FOUNDATION OF ARIZONA**
2712 North 7th Street
Phoenix, AZ 85006
(602) 650-1854

*Attorneys for Prisoner Class Plaintiffs-Appellees*

Maya S. Abela
Rose Daly-Rooney
**DISABILITY RIGHTS ARIZONA**
4539 E. Fort Lowell Rd.
Tucson, AZ 85712
(520) 327-9547

*Attorneys for Plaintiff-Appellee Disability Rights Arizona*

# TABLE OF CONTENTS

**INTRODUCTION** ........ 1

**BACKGROUND** ........ 3

I. Stipulation and Enforcement ........ 3

II. Trial and Permanent Injunction ........ 3

III. Post-Injunction Compliance Efforts ........ 5

A. First Interim Report (February 2024) ........ 5

B. Special Report on Five Suicides (October 2024) ........ 6

C. Second Interim Report (January 2025) ........ 6

D. Staffing Pilot Project (July 2024 to January 2025) ........ 7

IV. Motion for Receiver ........ 8

A. Third Interim Report (July 2025) ........ 8

B. Appointment of Receiver ........ 9

**LEGAL STANDARD** ........ 10

**ARGUMENT** ........ 11

I. A Stay Is Not In The Public Interest And Will Substantially Injure Plaintiffs. ........ 11

II. Defendants And Amici Overstate The Extent They *May* Be Injured. ........ 13

III. The District Court Did Not Abuse Its Discretion. ........ 17

A. The District Court Did Not Err In Finding Less Extreme Measures Have Been Exhausted And Proven Futile. ........ 18

B. The Appointment Of A Receiver Three Years After The Injunction Issued Was Not An Abuse of Discretion. ........ 20

C. The District Court Did Not Err In Concluding That Defendants' Compliance Efforts Were Insufficient. ........ 22

D. Defendants' Remaining Arguments Fail. ........ 24

**CONCLUSION** ........ 29

## TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020)........13

*Allen v. Ornoski*,
435 F.3d 946 (9th Cir. 2006)........24

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*,
885 F.3d 560 (9th Cir. 2018)........27

*Can. Life Assurance Co. v. LaPeter*,
563 F.3d 837 (9th Cir. 2009)........17

*District of Columbia v. Jerry M.*,
738 A.2d 1206 (D.C. Cir. 1999)........20, 24

*Dixon v. Barry*,
967 F. Supp. 535 (D.D.C. 1997)........16

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020)........11, 14, 16

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021)........10, 14

*Hernandez v. Cnty. of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015)........12

*Hook v. Ariz. Dep't of Corr.*,
107 F.3d 1397 (9th Cir. 1997)........15

*Jensen v. Thornell*,
2026 WL 2043607 (9th Cir. June 5, 2026)........2, 18

*L.T. v. U.S. Immigration & Customs Enforcement*,
No. 26-4902, Dkt. 22.1 (9th Cir. Aug. 20, 2026)........14, 17

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011)........13, 17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)........13

*Newman v. Alabama*,
466 F. Supp. 628 (M.D. Ala. 1979)........13

*Nken v. Holder*,
556 U.S. 418 (2009)........10

*Parker v. Hooper*,
171 F.4th 736 (5th Cir. 2026)....................................................................23

*Parsons v. Ryan*,
912 F.3d 486 (9th Cir. 2018) ............................................................ 17, 19, 25

*Plata v. Schwarzenegger*,
No. C01-1351 THE, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005). ........... passim

*Rio Verde Plantas, LLC v. O&S Holdings, LLC*,
No. 3:25-cv-00098-JR, 2025 WL 1368639 (D. Or. Mar. 21, 2025). .................24

*Roe v. Critchfield*,
137 F.4th 921 (9th Cir. 2025)....................................................................13

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992).....................................................................16

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*,
583 U.S. 387 (2018)..................................................................................22

*United States v. Hinds Cnty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) ....................................................................21

*Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer*,
444 N.W.2d 549 (Mich. Ct. App. 1989)................................................... 21, 24

**Statutes**

18 U.S.C. § 3626(a)(1)(B) ..........................................................................15

## INTRODUCTION

For over a decade, the district court "exercised restraint" and "forborne imposing the harshest penalties," while Appellants-Defendants ("Defendants") "dragged their feet, delayed, exploited ambiguity, and fought compliance at every turn." APP018, APP097. The consequences have been borne by the people incarcerated in Arizona's prisons, who "are dying. Unnecessarily." Dkt. 4755 at 2. This remains true despite a settlement in 2015, countless remediation plans, numerous enforcement orders, millions of dollars in contempt fines, appointment of Rule 706 experts, a 15-day bench trial in 2021, 181 pages of findings of fact and conclusions of law in 2022, an agreed-upon Injunction in 2023, and the dedication of hundreds of hours from the court-appointed monitors. APP019–038.

Faced with "the evidence compiled over the past decade," the district court concluded that appointment of a receiver was necessary to remedy these "pervasive constitutional violations" and the "risk of grave harm to the prisoners that has persisted since the outset of the litigation." APP044, APP096–097. The court emphasized that "the implementation of a receivership is extraordinary," and that it had "exercised caution and critical reflection in making the decision." APP018. That thoughtful deliberation is patent in the court's 83-page order considering years of evidence, extensive briefing, and the "factually well-supported, reliable opinions" of the neutral experts. *See* APP017–144.

Defendants now seek to undo that meticulous and comprehensive order, and seek an "emergency" stay from this Court while they do so. But to succeed, they must show a likelihood of success on appeal or that the balance of hardships tilts sharply in their direction. Defendants do neither. Further life-threatening harm to Appellees-Plaintiffs ("Plaintiffs") is virtually certain and the court's order was not an abuse of discretion.

Defendants' claims to the contrary fail under the slightest scrutiny. Defendants' proclamation that the court acted "reflexively" requires ignoring not only years of "delays, noncompliance, and contempt," *Jensen v. Thornell*, 2026 WL 2043607, at *2 (9th Cir. June 5, 2026), but uncontested evidence of their abysmal performance implementing the 2023 Injunction and related court orders. And contrary to their assertions here, the court *did* consider the evidence of what Defendants call "substantial progress." The court found it overstated and unpersuasive, when weighed against voluminous evidence showing they had made very little progress implementing the Injunction.

The district court determined a receivership was the only viable remedy left to address the "grave and immediate threat of continuing harm and suffering," APP070, APP098, and appointed an experienced prison administrator to serve as receiver, APP002–016. A stay would delay the receiver's urgently-needed remedial work and unquestionably harm Plaintiffs. This Court should deny the motion.

## BACKGROUND

### I. Stipulation and Enforcement

Plaintiffs filed this suit in 2012, alleging the health care provided in Arizona's state prisons violated the Constitution.[1] APP018. In 2014, the parties entered into a settlement ("the Stipulation"), designed to remedy those constitutional violations. APP019; APP145–213. "[A]lmost immediately," the district court found, "Defendants failed to perform [their] obligations [under the Stipulation] and continued in that failure." APP418.

Between 2015 and July 2021, the district court engaged in exhaustive enforcement efforts. The court held numerous evidentiary hearings and status conferences. APP019. Twelve motions to enforce were resolved against Defendants. *Id.* The court appointed two investigative experts and issued "dozens of Orders" designed to spur remedial action. *Id.* Defendants were held in contempt twice and ordered to pay $2.2 million in fines, which were upheld on appeal. *Id.*; APP011.

### II. Trial and Permanent Injunction

In July 2021, the district court determined that continued efforts to enforce the Stipulation would be fruitless because Defendants had "deflected their failures and employed scorched-earth tactics to oppose every attempt to resolve outstanding

---

[1] Plaintiffs also brought claims on behalf of a subclass of prisoners confined to their cells for more than 22 hours a day. That portion of the case is not at issue here.

noncompliance" and "[t]here does not appear to be a contempt sanction robust enough to coerce compliance." Dkt. 3921 at 33. The court rescinded the Stipulation and set the case for trial. *Id.* at 2–37.

After a 15-day bench trial, the court issued a 181-page order, finding that Defendants "failed to provide, and continue to refuse to provide, a constitutionally adequate medical care and mental health care system for all prisoners" and their "years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference." APP215. The court "employ[ed] an expert to assist with crafting an injunction that remedies the constitutional violations—no more and no less." APP392.

Defendants nominated Dr. Marc Stern, highlighting his expertise and prior work in the case. Dkt. 4339 at 3, 4. The court appointed Dr. Stern, and additional experts, including Dr. Bart Abplanalp to advise on mental health matters. Dkt. 4352; Dkt. 4362. The court shared a detailed draft injunction with the parties in January 2023. Neither party objected, and instead jointly stipulated to the draft, with a few agreed-upon modifications. APP416–417; Dkt. 4402 at 2; *see also* Dkt. 4405; Dkt. 4408. In April 2023, the court issued the stipulated Permanent Injunction. APP414–480. Neither party appealed. The court appointed "its own experts to serve as neutral

monitors to evaluate Defendants' performance." APP419.[2]

## III. Post-Injunction Compliance Efforts

Monitoring began in April 2023. In November 2023, the parties jointly asked the court to direct its experts to provide written reports, agreeing that "[t]he experts' opinions are critical because they are independent, neutral, and are based on expertise that the parties themselves lack." Dkt. 4507 at 5–6. In February 2024, October 2024, and January 2025, Dr. Stern and his team filed comprehensive reports documenting both Defendants' failure to make meaningful progress implementing the Injunction and the unabated risk of harm to Plaintiffs. Dkt. 4539; Dkt. 4691; Dkt. 4755.

### A. First Interim Report (February 2024)

In the February 2024 report, the experts found that "the quality of care provided by NaphCare remains woefully inadequate," and warned: "Patients are in daily danger." Dkt. 4539 at 30.[3] They found "pervasive dangers in the delivery of [mental health] care," "significantly deficient" clinical documentation, and "inadequate conceptualization of the patients' mental illness, functional impairment, and suicide risk." *Id*. at 10. Critically, they found that Defendants were still unable

---

[2] We refer to these Rule 706 experts as both "experts" and "monitors."

[3] Defendants currently contract with NaphCare to provide healthcare to people incarcerated in the prisons. Since 2012, Defendants have had four such contractors. APP222.

to identify problems with healthcare accurately and reported repeated examples of "dangerous care being judged as adequate as part of self-assessments." *Id.* at 21; *see, e.g.*, *id.* at 11–15.

**B. Special Report on Five Suicides (October 2024)**

In October 2024, Dr. Abplanalp filed a report on five suicides that occurred over the first three months of 2024. Dkt. 4691. He found that "adherence to the [Injunction] would have decreased the probability of, if not prevented, these deaths." *Id*. at 1. He highlighted three main areas of deficiencies: inadequate evaluation of mental health needs, inadequate treatment encounters, and lack of continuity of care. *Id.* at 1, 6. He observed that none of these areas are "unique to the cases under review" and that "these same deficiencies have contributed to, and continue to contribute to, risk of, and actual morbidity and mortality since monitoring began in April of 2023." *Id*. at 1, 4, 6, 7.

**C. Second Interim Report (January 2025)**

In January 2025, Dr. Stern and his team filed another report, finding that healthcare in the state prisons "remains poor, has shown little improvement since the start of the Injunction, and continues to place the residents at significant risk of serious harm, including death." Dkt. 4755 at 2. The experts found that "little progress has been made in the vast majority of key operations," and ended with a grim and unflinching conclusion: "And patients are dying. Unnecessarily." *Id.*

The experts again found that Defendants were unable or unwilling to monitor their compliance accurately, even when the experts "informed [them] of [a] methodological flaw" leading to inflated and "obviously absurd" results. *Id.* at 3–4. When Defendants were made aware of a serious error, they "made no plan to understand how this error occurred" and "failed to implement any recommendations or plan to prevent its recurrence." *Id.* at 7.

**D. Staffing Pilot Project (July 2024 to January 2025)**

To address the court's finding that "staffing is woefully insufficient," APP240, the Injunction also required the court to appoint experts to develop a plan for healthcare staffing in Arizona's prisons, APP427 § 1.17; Dkt. 4425 at 1. In April 2024, the court's experts filed their staffing analysis and plan, recommending it be tested on a pilot basis. Dkt. 4599 at 2–3. The court ordered the pilot be implemented at two sites chosen by Defendants and their healthcare vendor, Dkt. 4637; Dkt. 4599 at 3, 37, pursuant to a schedule developed by the experts, Dkt. 4642-2 at 2, with specific modifications agreed to by the parties, Dkt. 4642; Dkt. 4643.

The pilot "ran" for 28 weeks between July 2024 and January 2025. Dkt. 4761 at 3. The experts filed reports about the pilot in September 2024, November 2024, and January 2025, documenting myriad ways in which Defendants were unable or unwilling to implement the pilot. Dkt. 4681; Dkt. 4700; Dkt. 4761. At one of the sites, "[t]he pilot operated for just eight days." Dkt. 4761 at 4, 13. Ultimately, of the

court-ordered requirements, the experts found only 22% were fully completed, 63% were not completed, and 14% were partially completed. *Id*. at 6. They concluded: "ADCRR lacks the human resources, the space and the administrative and professional project management capacity to successfully implement the [staffing plan] statewide or at any individual prison." *Id.* at 16.

## IV. Motion for Receiver

In February 2025, Plaintiffs filed a motion requesting appointment of a receiver to oversee healthcare in Arizona's prisons, citing Defendants' failure to make meaningful progress implementing the Injunction and the disastrous staffing pilot. Dkt. 4792. After briefing, the court ordered its experts to complete "a comprehensive Report addressing material issues concerning the Motion for a Receiver." Dkt. 4867.

### A. Third Interim Report (July 2025)

In July 2025, the court experts filed another report cataloging "ADCRR's profound lack of compliance with the vast majority of individual elements of the Injunction two years after its implementation," "the daily risk to which patients are subjected," and "the lack of improvement since monitoring began." Dkt. 4942; 4968 (revised) at 39. They again found that "multiple fundamental system level failings in ADCRR's health care operation persist," causing avoidable suffering and death. Dkt. 4968 at 4.

In the largest section of the report, the monitors reported on each requirement of the Injunction. *Id.* at 44–306. They found Defendants were noncompliant with 131 of 154 healthcare requirements. *See id.*; APP044, APP100–144. Moreover, they found that "[m]ost of the provisions where non-compliance poses the highest risk" were noncompliant. Dkt. 4968 at 38–39. They further found "Defendants' own data shows their overall lack of improvement" and "does not reflect any significant improvement over time." *Id.* at 39.

### B. Appointment of Receiver

In February 2026, the court issued an 83-page order granting Plaintiffs' motion. APP017–144. It concluded:

> To declare a government will not accept the constitutional responsibility to provide adequate healthcare is huge. Ordering the implementation of a receivership is extraordinary, and the Court has exercised caution and critical reflection in making the decision. But since the beginning of the case, the Court has forborne imposing the harshest penalties, opting instead to guide Defendants with the help of the Monitors towards comprehensive constitutional compliance. But now after nearly 14 years of litigation with Defendants having not gained compliance, or even a semblance of compliance with the Injunction and the Constitution, this approach has not only failed completely, but, if continued, would be nothing short of judicial indulgence of deeply entrenched unconstitutional conduct. Plainly, only the imposition of the extraordinary can bring an end to this litigation and the reasons it was brought. An end to unconstitutional preventable suicides. An end to unconstitutional preventable deaths. An end to unconstitutional failures to treat those in severe pain.

APP018.

The court requested nominations and briefing from the parties on the scope of

the receiver's authority. APP098–099. Defendants nominated Annette Chambers-Smith, the former Director of the Ohio Department of Rehabilitation and Corrections. Dkt. 5193. The court appointed Ms. Chambers-Smith and issued an order setting out the scope of her authority. APP002–016.

Defendants appealed and sought a stay of the court's order. Dkt. 5135. The district court denied the request for a stay. APP481–484.

## LEGAL STANDARD

"A stay [pending appeal] is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify [a stay]." *Id*. at 433–34. That burden is heavy. *E.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021) (asking for stay pending appeal is an "extraordinary request"). Courts consider the four so-called *Nken* factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426.

## ARGUMENT

### I. A Stay Is Not In The Public Interest And Will Substantially Injure Plaintiffs.

Ignoring the district court's findings of "appalling healthcare conditions" and "callous, inhumane indifference displayed on a regular basis," APP043–044, APP049, Defendants assert Plaintiffs merely "face the harm of a delay in the appointment of a receiver" and that the public interest "lies with maintaining the *status quo* while the appeal is pending," Appellants' Emergency Mot. For Stay Pending Appeal ("Mot") at 24–25 (quoting *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020)); *see also* Br. of *Amici Curiae* of Arizona House of Representatives Speaker Steve Montenegro and Arizona State Senate President Warren Petersen ("Amici Br.") at 11.[4] This grievously minimizes Plaintiffs' risk of harm. Plaintiffs face the risk of injury up to and including death—harm that is happening *now*, and has been ongoing for over a decade precisely because of Defendants' demonstrated inability to provide minimally adequate care.

Defendants claim Plaintiffs' harms are "unsubstantiated" and "speculation." Mot. 25. Defendants ignore the evidence. The district court spent over a third of its order detailing the "overwhelming evidence" showing Defendants fail to "deliver[] clinically required healthcare"—including "the factually well-supported, reliable"

---

[4] We cite to the page numbers imprinted on the ECF header.

conclusions of the court monitors that "Defendants were non-compliant with 131 of 154 Quality Indicators relating to healthcare," and "appalling" death reviews illustrating "callous, inhumane indifference displayed on a regular basis." APP040, APP044–045, APP048–049. The court detailed evidence of patients dying after experiencing extreme delays in accessing specialty care, being denied higher levels of care, and receiving incompetent treatment. *See id.*; *see also* APP058–070 (recounting numerous additional examples of seriously deficient care and finding they reflected that "prisoners still remain exposed to an intolerable grave and immediate threat of continuing harm and suffering").

Critically—and after a decade of noncompliance in the face of external monitors, sanctions, and repeated efforts by the court to resolve the serious constitutional violations—the court concluded "no lesser measure" than a receiver "will suffice to remedy the pervasive constitutional violations present in Defendants' healthcare delivery system." APP095, APP097–098. A stay would necessarily "delay the Receiver's needed remedial work" and unquestionably injure Plaintiffs. *See* APP483–484.

By contrast, Defendants' and Amici's purported harms are speculative and overstated. *See* Argument Section II., *infra*. They do not outweigh the imminent, life-threatening harm to Plaintiffs. *See Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 942–58 (N.D. Cal. 2015) (finding class of prisoners faced risks of physical harm

related to woefully deficient medical care and that "it is always in the public interest to prevent the violation of a party's constitutional rights" (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); *see also Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (holding "inadequate medical care that poses a threat to life" is "a state of emergency demanding decisive action"). The balance of harms and the public interest favor declining a stay. *See Roe v. Critchfield*, 137 F.4th 921, 922 (9th Cir. 2025) (observing the third and fourth *Nken* factors—the balance of hardships and the public interest—"merge when the Government is the opposing party").

## II. Defendants And Amici Overstate The Extent They *May* Be Injured.

For a stay to issue, irreparable injury to the moving party must be "the more probable or likely outcome," *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011), and it must be "likely to occur during the period before the appeal is likely to be decided," *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). Defendants and Amici assert that they will suffer irreparable harm because the order violates "[p]rinciples of federalism," and the administrative and fiscal costs of the receivership "are not recoverable." Mot. 22–24; Amici Br. 8, 12. These claims fail on the law and facts.

***First***, the court did not give the receiver "unreviewable budget authority" or permit the receiver to "bypass the appropriations process." Amici Br. 12–14. The

court's order was targeted and careful: the receiver "shall be responsible for formulating and establishing the annual ADCRR health care budget," but has only the "authority vested by law in the Director of ADCRR relating to the financing of the prison health care system." APP008. The receiver thus must "engage in essential efforts to secure adequate funding in consultation with Plaintiffs and Defendants, the Governor, *and the Legislature*." APP005 (emphasis added). If that process fails and the receiver determines budgeted funds "are inadequate to accomplish the Receiver's authorities and duties," she is required to "first consult the Director" and then "notify[] the Legislature and the Governor's Office of such deficiency." APP015. If additional funding is still not provided, the parties or receiver "*may* prompt the Court to order the waiver of Arizona State laws, regulations, and contracts that interfere with the requirements and desired outcome of the Receivership." *Id.* (emphasis added). *If* all of those processes fail and the court orders the State to expend funds over Defendants' objection, Defendants can seek this court's review. Amici's concerns are speculative and premature.

Moreover, "economic harm is not generally considered irreparable." *E. Bay Sanctuary Covenant*, 993 F.3d at 677; *see Doe #1*, 957 F.3d at 1060 ("Monetary injury is not normally considered irreparable." (cleaned up)); *L.T. v. U.S. Immigration & Customs Enforcement*, No. 26-4902, Dkt. 22.1 at 5–6 (9th Cir. Aug. 20, 2026) (denying Government's motion for a stay of a preliminary injunction

issued to address Plaintiffs' claims of unconstitutional conditions in detention center, and finding "the potential, unsecured, cost of implementing certain provisions of the injunction" did not entitle the Government to a stay "where the other *Nken* factors do not weigh in its favor"). And Defendants and Amici ignore that any economic harm experienced during the pendency of the appeal can be offset by the use of contempt funds. The parties agreed and the court ordered that the previously-collected and unspent $2.2 million of contempt fines could be used "to support the Receiver in the execution of her duties." APP011.

***Second***, the district court did not order the receiver to violate any state law. Amici Br. 11 ("[T]he Order contemplates nullifying at least two statutes."). To the contrary, the order directs the receiver to "endeavor to perform all responsibilities and duties in accordance with Arizona state laws, regulations, and contracts." APP012. If the receiver determines a waiver of state law is necessary, she must request it, and "the Court shall solicit input from Defendants and Plaintiffs before rendering a decision." APP012–013. *If* that occurs, Defendants can seek this Court's review.

These mechanisms are not "constitutionally impermissible." Amici Br. 14. The PLRA expressly contemplates that a court-ordered remedy may violate state law if "[f]ederal law requires such relief to be ordered in violation of State or local law," "the relief is necessary to correct the violation of a Federal right," and "no other

relief will correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(B); *see also Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1402–03 (9th Cir. 1997) (holding the Supremacy Clause preempted an Arizona law prohibiting the payment of a special master).

To be sure, there are "federalism concerns in institutional reform litigation involving correctional facilities," but, critically, "state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861–62 (9th Cir. 1992) (cleaned up); *see also Dixon v. Barry*, 967 F. Supp. 535, 551 (D.D.C. 1997) ("When dire facts justify the use of the receivership power, considerations of federalism and comity do not warrant withholding a necessary remedy."). Here, the facts are dire: the risk to the health and lives of Plaintiffs is as extraordinary as it is longstanding. And for more than a decade, the district court exercised restraint, giving Defendants numerous opportunities to address their "deeply entrenched unconstitutional conduct" before resorting to receivership. APP018. The court was also careful to craft a remedy that intruded on the State's authority only where necessary. *See* APP002–016.

Defendants' federalism concerns do not require this Court's urgent intervention. *See Doe #1*, 957 F.3d at 1059 (noting a similar "perceived institutional

injury" could "be resolved at the merits stage" and thus was "not irreparable").[5]

## III. The District Court Did Not Abuse Its Discretion.

To satisfy the remaining *Nken* factor—that the appeal is likely to succeed—"a petitioner must show, at a minimum, that [they have] a substantial case for relief on the merits." *Leiva-Perez*, 640 F.3d at 967–68. The Ninth Circuit applies an "abuse of discretion standard" when "reviewing a district court order appointing a receiver." *Can. Life Assurance Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009). Under that standard, this Court "will reverse only if the district court made an error of law, or reached a result that was illogical, implausible, or without support in the record." *Parsons v. Ryan*, 912 F.3d 486, 495 (9th Cir. 2018).

The district court's 83-page order was comprehensive, meticulously detailed, and supported by the well-researched and thorough opinions of the neutral court experts. It was not an abuse of discretion.

---

[5] Defendants' citation to *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), is unavailing. *CASA* concerned the legality of universal injunctions: the Supreme Court found such injunctions are categorically impermissible and thus cause irreparable injury. *Id*. at 859–60; *see also L.T.*, No. 26-4902, Dkt. 22.1 at 3–4 (9th Cir. Aug. 20, 2026) (preliminary injunction that is not "universal or nationwide" "does not implicate" *CASA*). Moreover, in *CASA*, the injunctions were issued within a few months of the challenged action; here, the remedial order was issued after more than a decade of litigation.

### A. The District Court Did Not Err In Finding Less Extreme Measures Have Been Exhausted And Proven Futile.

Defendants describe the district court's decision as "precipitous," and claim the court "reflexively imposed" this remedy, "bypassing intermediate measures to achieve compliance." Mot. 8, 15, 18.

Defendants' position is untenable. As the district court observed, "rather than imposing the most punitive sanctions, the Court has painstakingly sought to and imposed the least restrictive measures and requirements on Defendants to incentivize compliance with the Constitution." APP070; APP097 ("The Court has exercised restraint for much of this litigation, to the point that anymore tolerance of unconstitutional healthcare becomes judicial indulgence."); *see also* Background Sections I.–III., *supra* (describing enforcement efforts from 2015 through 2025). But those "efforts have proven to be an exercise in futility." APP074.

Defendants brush over the court's six years of case management prior to the Injunction, and insist that the court should have overlooked them, too. Mot. 18–20. But Defendants' noncompliance with prior court orders is plainly relevant to whether Defendants are likely to comply with court-ordered remedies short of a receivership. Try as they may to narrow the timeframe of their noncompliance to the past three years, Defendants' attempt to sweep under the rug what this Court has characterized as a "long and regrettable history of delays, noncompliance, and contempt," *Jensen*, 2026 WL 2043607, at *2, is not supported by the law.

Defendants claim the district court "skip[ped] over the contempt and purge process." Mot. 19. But a contempt finding is not a necessary predicate to appointing a receiver. *See Plata v. Schwarzenegger*, No. C01-1351 THE, 2005 WL 2932253, at *27 (N.D. Cal. Oct. 3, 2005). And the court *did* previously find Defendants in contempt, twice, and thereafter concluded "[t]here does not appear to be a contempt sanction robust enough to coerce compliance." Dkt. 3921 at 33; *see also* Background Section I., *supra* (describing previous contempt findings). The court was not required to ignore that experience.

Defendants insist the court should have disregarded their prior conduct because "[t]he stipulation was fundamentally different from the Injunction." Mot. 18. Defendants' efforts to distinguish the two are unpersuasive, and ultimately immaterial.[6] Defendants do not dispute the court's determination that during those six years they offered "erroneous and unreliable excuses for non-performance,

---

[6] *See* APP072 (explaining "the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation"). Defendants assert that the Stipulation is meaningfully different from the Injunction because "Defendants had not conceded that there were unconstitutional conditions" when agreeing to the Stipulation. Mot. 18. But as this Court previously observed,

> [i]n approving the Stipulation, the district court held . . . the Stipulation was "necessary to correct the violations of the Federal right of the Plaintiffs." This conclusion necessarily required a finding of a constitutional violation—that is, if there were no violation of a federal right, there would be nothing for the Stipulation to "correct."

*Parsons*, 912 F.3d at 501.

asserted baseless legal arguments, and in essence resisted complying with the obligations they contractually knowingly and voluntarily assumed." Dkt. 3921 at 1; APP418 ("Instead of acknowledging their failures, Defendants kept inaccurate records and unreasonably misread the settlement's requirements to their advantage."). Nor do they dispute that the court "repeatedly used the remedies authorized by the Stipulation and often exercised forbearance rather than imposing sanctions" and that those "remedies and tolerance" were ultimately "ineffective" in changing Defendants' conduct. Dkt. 3921 at 1. The court did not abuse its discretion in considering this egregious conduct.

Moreover, the court did not confine its analysis to enforcement efforts prior to 2022. The court acknowledged "that alone, a historical failure to fully comply may not warrant the extraordinary remedy of a receivership," APP097, and reviewed, in detail, the efficacy of the court's efforts since the Injunction issued, *see* Argument Section III.B., *infra*. Defendants' claim that "[s]ince the Injunction was entered in 2023, the district court did not attempt intermediate measures before ordering a receivership," Mot. 18, is "is both inaccurate and unavailing," APP482.

### B. The Appointment Of A Receiver Three Years After The Injunction Issued Was Not An Abuse Of Discretion.

Next, Defendants claim the district court erred by "impos[ing] a receiver without allowing [them] a reasonable time to address unconstitutional conditions." Mot. 14 (citing *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. Cir.

1999)).

*Even if* the relevant time frame were three years, the district court did not mince words about Defendants' performance in that timeframe: "[S]ince entry of the Injunction, Defendants' paltry efforts to remedy the constitutional violations in the provision of healthcare have been in substantial conformity with their behavior throughout the litigation." APP072; *see also* APP072–074 (detailing Defendants' noncompliance with the 2023 Injunction despite repeated court intervention and "feedback, instruction, and coaching from the neutral Monitors").

This conclusion was supported by Defendants' "abject failure to implement" the staffing pilot, APP080–081 (finding this "clearly demonstrative of their inability to achieve full compliance"), as well as a detailed, 15-page account of Defendants' failure to implement the Injunction, despite exhaustive efforts of the court and monitors, APP022–038. Those efforts included multiple status conferences, six reports by the court monitors, and the monitors' dedication of "hundreds of hours evaluating Defendants' performance and engaging with Defendants to assist them with compliance." *Id.*

Courts have appointed receivers within similar time frames. *See Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer*, 444 N.W.2d 549, 638–42 (Mich. Ct. App. 1989) (less than two years); *Plata*, 2005 WL 2932253, at *3, *19 (three years); *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 623–25 (5th

Cir. 2025) (less than three years). Defendants have not shown that the district court erred factually or legally with respect to the wide latitude it gave them to comply with the Constitution before appointing a receiver.

### C. The District Court Did Not Err In Concluding That Defendants' Compliance Efforts Were Insufficient.

Defendants next claim that the court committed "legal error" by not "credit[ing]" their "substantial progress" or discussing their evidence at a "granular" level. Mot. 15–16; *see also* Amici Br. 14–15. But the evaluation and analysis of evidence is fundamentally a factual determination, which can be reversed only for clear error. *See U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018) ("[F]actual findings are reviewable only for clear error—in other words, with a serious thumb on the scale for the [district] court."). There was no such error here.

The claim that the court ignored Defendants' efforts "is simply untrue." APP482. The court acknowledged this evidence. *See id*. at APP038, APP077, APP081, APP090 (Hepatitis-C and opioid use disorder treatment); APP038, APP092 (expenditures); APP038, APP047 (staffing increases); APP038 (facility improvements); APP090 (PCCM). Ultimately, the court found this evidence unpersuasive when weighed against the substantial evidence of Defendants' noncompliance. The court credited the neutral monitors' conclusion that "taking into account the nature, number, and speed of improvements," Defendants' progress

"'does not change [the] core findings' that non-compliance with the Injunction persists and poses serious risks of harm to the prisoners." APP077–078. The court concluded: "[E]ven if Defendants have some commitment to forthwith enforcing the Injunction, the record is rife with examples of their willful inability to institute constitutionally adequate healthcare in compliance with the Injunction." APP086; *see also* APP092 (noting Defendants allocate "millions of dollars towards inmate healthcare" and that "[a]llowing this to continue would waste enormous sums of money" and has done "nothing to improve healthcare conditions").

This conclusion was amply supported by the record. Contrary to Defendants' bold assertions of "substantial progress," Mot. 16, the court credited its experts' findings that more than two years after the issuance of the Injunction, Defendants were still noncompliant with 131 of the 154 healthcare requirements, *see* APP044, APP100–144, including those provisions at "the core of the Injunction," APP046, and those that "could have been implemented soon after the Injunction was issued," APP082–083.

The Fifth Circuit's opinion in *Parker* is inapposite. There, prison officials sought to supplement the record with evidence of significant new improvements. The Fifth Circuit found the court's refusal to admit this evidence "a few months after the remedial trial—but more than a year before it issued its Remedial Opinion and Order" was error. *Parker v. Hooper*, 171 F.4th 736, 751, 757 (5th Cir. 2026).

Defendants make no such claim here, nor could they. The parties agreed that no evidentiary hearing was necessary to resolve Plaintiffs' motion for a receiver, and Defendants were not deprived of any opportunity to submit evidence. Dkt. 4850 at 2. The court did not abuse its discretion. *See Plata*, 2005 WL 2932253, at *31 (appointing receiver even though defendants spent over $1 billion annually on health care, noting that the existing system "is a massive waste of money and, more importantly, life"); *Wayne Cnty. Jail Inmates*, 444 N.W.2d at 561 (finding no error in court's determination "that more expenditures by the sheriff would not produce adequate compliance with the final judgment").

**D. Defendants' Remaining Arguments Fail.**

Lastly, according to Defendants, "a district court must find, by clear and convincing evidence, that a receivership is 'the only viable option to effectuate compliance with the laws and orders of the court.'" Mot. 14 (quoting *Jerry M.*, 738 A.2d at 1213). They insist the court did not support its findings on each receivership factor by clear and convincing evidence. *Id.* at 20–22.

Defendants' newfound focus on a "clear and convincing" evidentiary standard is not only belated, but they also point to no case applying that standard in the context of a receivership.[7] This Court has "not articulated an evidentiary standard" for the

[7] This Court does not ordinarily consider arguments on appeal not raised before the district court. *Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006).

factor test a court uses to determine whether it should exercise its discretion to appoint a receiver. *See Rio Verde Plantas, LLC v. O&S Holdings, LLC*, No. 3:25-cv-00098-JR, 2025 WL 1368639, at *3 (D. Or. Mar. 21, 2025), *report and recommendation adopted*, 2025 WL 1141184 (D. Or. Apr. 17, 2025). Even assuming a clear and convincing standard applies, it is plain from the district court's order that the court understood the extraordinary remedy it was ordering and held itself to a heightened evidentiary standard. APP018 ("Ordering the implementation of a receivership is extraordinary, and the Court has exercised caution and critical reflection in making the decision."); APP096 ("The Court is cognizant that the appointment of a receiver is an extraordinary remedy that should be reserved for the most extreme circumstances. From the evidence compiled over the past decade, the Court is convinced the situation at ADCRR is such an extremity."); APP042, APP045, APP049, APP083 (finding the evidence in the record "substantial," "overwhelming," "voluminous," and "ample" in analyzing the receiver factors). The court's resulting findings are not "illogical, implausible, or without support in the record." *Parsons*, 912 F.3d at 495.

***Ongoing Harm***. Defendants did not meaningfully dispute the record evidence of harm below, nor do they attempt to do so on appeal. Instead, they take aim at the district court's weighing of the evidence, saying the court erred by "ignoring" their progress and improperly focusing on isolated "cases with an adverse outcome." Mot.

20. But the court *did* consider Defendants' progress and found it overblown and insufficient to tilt the balance of factors in Defendants' favor. *See* Argument Section III.C., *supra*. And the court did not improperly focus on isolated incidents of harm. Instead, it reviewed, among other things, the monitors' comprehensive assessment of every provision of the Injunction, as well as Defendants' own self-reported noncompliance data. The court went on to conclude that Defendants' violations of the Injunction "are brought to life—or death—by the individuals who experienced profound delays in receiving treatment or who failed to receive treatment at all." APP045, APP046–049. The court's conclusions were undergirded by the "factually well-supported, reliable opinions" of the neutral, court-appointed monitors. APP040; *see Plata*, 2005 WL 2932253, at *3 ("The extensive and disturbing findings of the Expert's reports are essentially uncontested, and the Court finds that they accurately describe an extreme crisis in CDCR's medical delivery system.").

***Bad Faith***. The court's bad faith findings were similarly well-supported, despite Defendants' insistence to the contrary. *See* Mot. 20–21. Evidence of Defendants' bad faith, the court explained, is pervasive and includes the "particularly salient example" of the failed staffing Pilot, as well as "Defendants' regular overstatement of their 'progress,' intransigence regarding key aspects of compliance, and reporting of inaccurate data." APP086–091.

In arguing the court's analysis of bad faith is flawed, Defendants

mischaracterize its findings. Mot. 20–21. They argue the court based its finding on Defendants' failure to comply with the Injunction and their objections to the experts' conclusions. *Id*. at 21. That's wrong. The court noted that many of Defendants' arguments boiled down to belated objections to the Injunction—which they helped draft and agreed to—and this behavior was evidence of bad faith, APP087–088; found Defendants' abandonment of the pilot after agreeing it was necessary evinced bad faith, APP088; and concluded that, "[r]egardless of assurances of good faith, Defendants have repeatedly failed to implement necessary changes as directed by the Court and Monitors, both throughout the lengthy history of this case and since the issuance of the Injunction," APP091.

***Lack of Leadership***. The court's finding that Defendants displayed "a stark lack of leadership able to effectively implement the requirements of the Injunction," is also well-supported. *Compare* Mot. 21 *with* APP080–086. Defendants' lack of leadership, the court found, was evinced in part by their recent "grim performance" in implementing the staffing pilot, APP080; Defendants' tendency to "deflect responsibility to their [healthcare] vendor," and "actively avoid leadership and responsibility" regarding the provision of healthcare to patients, APP083; as well as "their apparent need for constant micromanagement" "rather than proactively taking steps to enforce their [healthcare] contract with [their vendor]," APP084.

Defendants' perfunctory argument to the contrary is unavailing.[8] They say only that because "leadership has made meaningful progress, the court's finding that those same officials are incapable presents a serious question for review." Mot 21. But Defendants' proclamation, with no supporting caselaw, does not make it so. Defendants also omit that they have been unable to fill a critical leadership position—since August 2024, the statewide Medical Director position has been vacant outside of a brief, four-month period, and remains vacant today. APP081; Dkt. 5239. Defendants' continued promises about what their leadership will do in the future are insufficient to tilt the balance of factors in their favor. *Dixon*, 967 F. Supp. at 553 ("The Court is respectful of the District's attempt to effectuate real change in its mental health system. Unfortunately, this is a song that the District has sung many times before.").

***California Receivership***. Defendants and Amici also claim the receiver appointed to oversee medical care in the California prisons demonstrates "a receivership . . . is not certain to remedy constitutional problems." Mot. 22; *see also* Amici Br. 15–17. That's because, they point out, California has not yet achieved full compliance. *Id*. It is unclear from this argument what error they believe the district

---

[8] *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) ("Inadequately briefed and perfunctory arguments are . . . waived." (citation omitted)).

court made by noting—correctly—that, in California, "healthcare has been significantly improved under the receiver." APP092, APP095. In fact, the receiver has been so successful that the State of California requested that the *Plata* receiver also be appointed to oversee mental health care (in addition to medical care) in the state prisons. Dkt. 4793-1 at 5. Amici throw out different figures related to costs in the California prison system, Amici Br. 15–16, but without necessary context that amounts to little more than fearmongering. In California, both the state legislature and the district court have retained oversight over the receiver's budget, and "no party has ever suggested that [the receiver]'s budget is excessive or that the funds are not being spent wisely." Dkt. 4793 at 4 ¶ 12; *see also Plata*, 2005 WL 2932253, at *33.

## CONCLUSION

Defendants' Motion for Stay should be denied.

Date: August 24, 2026

Respectfully submitted,
*/s/ Sophie Hart*
Sophie Hart
Rosalind Dillon
Donald Specter
**PRISON LAW OFFICE**
*Attorney for Prisoner Class Plaintiffs-Appellees*

*/s/ Maya S. Abela*
Maya S. Abela
**DISABILITY RIGHTS ARIZONA**

*Attorney for Plaintiff-Appellee Disability Rights Arizona*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee Disability Rights Arizona certifies that it is a registered 501(c)(3) nonprofit organization, has no parent corporation, and no publicly held corporation holds ten percent (10%) or more of its stock.

Date: August 24, 2026

**DISABILITY RIGHTS ARIZONA**

*/s/ Maya S. Abela*
Maya S. Abela
4539 E. Fort Lowell Rd.
Tucson, AZ 85712
(520) 327-9547
*Attorney for Plaintiff-Appellee Disability Rights Arizona*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of Ninth Circuit Rule 27(d)(2), which requires responses to motions not exceed 5,200 words, and Rule 32-2(b), which permits an extra 1,400 words automatically where a single brief is responding to "multiple briefs" (here, Appellants' Motion for an Emergency Stay Pending Appeal and the Amici Brief filed by Arizona House of Representatives Speaker Steve Montenegro and Arizona State Senate President Warren Petersen). This brief contains 6,593 words, excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: August 24, 2026

*/s/ Sophie Hart*
Sophie Hart
**PRISON LAW OFFICE**
*Attorney for Prisoner Class Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing System.

Date: August 24, 2026

*/s/ Sophie Hart*
Sophie Hart
**PRISON LAW OFFICE**
*Attorney for Prisoner Class Plaintiffs-Appellees*