**No. 26-1746**
**(consolidated with No. 26-5060)**

**United States Court of Appeals**
**for the Ninth Circuit**

SHAWN JENSEN, ET AL.,

*Plaintiffs/Appellees*,

v.

RYAN THORNELL, ET AL.,

*Defendants/Appellants*.

**On Appeal from the United States District Court for the District of Arizona, Phoenix, Case No. 2:12-cv-00601-PHX-ROS**

# DEFENDANTS/APPELLANTS' OPENING BRIEF

KRISTIN K. MAYES
ARIZONA ATTORNEY GENERAL
Joshua D. Bendor (031908)
Luci D. Davis (035347)
2005 N. Central Avenue
Phoenix, Arizona 85004
(602) 542-8958
joshua.bendor@azag.gov
luci.davis@azag.gov
ACL@azag.gov

Mary R. O'Grady (011434)
Andrew G. Pappas (034432)
John S. Bullock (034950)
Daniel Bowman (038094)
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
mogrady@omlaw.com
apappas@omlaw.com
jbullock@omlaw.com
dbowman@omlaw.com

**Attorneys for Defendants/Appellants**

# TABLE OF CONTENTS


**Page**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

JURISDICTION ........ 4

ISSUES PRESENTED ........ 4

STATEMENT OF THE CASE ........ 6

I. The Stipulation era ends in rescission and a trial (2012–2022). ........ 6

II. The 2023 Injunction opens a new remedial phase. ........ 8

III. The Department rebuilds: funding, staffing, facilities, and programs. ........ 10

IV. The Staffing Plan is not finalized until June 2025; the court declares violations in 2024. ........ 13

V. The Receivership Order. ........ 14

VI. The Appointment Order. ........ 16

VII. These appeals. ........ 18

SUMMARY OF ARGUMENT ........ 19

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 22

I. The district court's decision to appoint a receiver violates the PLRA for four independent reasons. ........ 22

A. The district court appointed a receiver without weighing the Department's substantial progress, and the record of progress forecloses a least-intrusive-means finding. ........ 25

B. The district court did not give Defendants a reasonable time to comply with the Injunction. ....29

C. The district court bypassed every intermediate remedy, relying on Stipulation-era history that cannot support its futility finding....33

D. No clear and convincing evidence establishes that a receivership is the only viable means of achieving compliance....38

1. The court's threat-of-harm analysis rests on a compliance rubric that treats near-perfect performance as a violation, and on a selection-biased sample of adverse outcomes. ....39

2. The bad-faith finding penalizes the adversarial process itself....44

3. The lack-of-leadership finding cannot be reconciled with what the same leadership accomplished. ....46

E. The receivership should be reversed. ....48

II. The powers conferred on the receiver exceed the limits of the PLRA and federal courts' equitable authority....51

A. To the extent the Appointment Order authorizes the receiver to bypass state law without meeting the PLRA's high standard for doing so, it is unlawful. ....52

B. To the extent the Appointment Order contemplates that the receiver or district court can commandeer Arizona's constitutional appropriations process, it is unlawful....55

CONCLUSION ....57

STATEMENT OF RELATED CASES ....59

CERTIFICATE OF COMPLIANCE....60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................22, 44

*Armstrong v. Schwarzenegger*,
622 F.3d 1058 (9th Cir. 2010) ....................4, 22, 43

*Bracco v. Lackner*,
462 F. Supp. 436 (N.D. Cal. 1978) ....................23, 33

*Brown v. Plata*,
563 U.S. 493 (2011) .................... *passim*

*Coleman v. Newsom*,
2024 WL 3385911 (E.D. Cal. July 12, 2024) ....................37

*Dist. of Columbia v. Jerry M.*,
738 A.2d 1206 (D.C. 1999) .................... *passim*

*Gordon v. Washington*,
295 U.S. 30 (1935) ....................49

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund*,
527 U.S. 308 (1999) ....................57

*Horne v. Flores*,
557 U.S. 433 (2009) ....................56

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ....................35

*L.A. All. for Hum. Rts. v. City of Los Angeles*,
792 F. Supp. 3d 1049 (C.D. Cal. 2025) ....................23, 33

*Lewis v. Casey*,
518 U.S. 343 (1996) ....................43

*Meriwether v. Garrett*,
102 U.S. 472 (1880) ....................50, 57

*LaShawn A. ex rel. Moore v. Barry*,
144 F.3d 847 (D.C. Cir. 1998)....33, 54

*Nunez v. City of New York*,
No. 25-1723, 2025 WL 4053408 (2d Cir. Nov. 13, 2025)....38

*Nunez v. N.Y.C. Dep't of Corr.*,
782 F. Supp. 3d 146 (S.D.N.Y. 2025)....32, 37, 45

*Parker v. Hooper*,
171 F.4th 736 (5th Cir. 2026)....*passim*

*Parsons v. Ryan*,
289 F.R.D. 513 (D. Ariz. 2013)....6

*Parsons v. Ryan*,
949 F.3d 443 (9th Cir. 2020)....4, 6

*Plata v. Schwarzenegger*,
2005 WL 2932253 (N.D. Cal. Oct. 3, 2005)....33, 45, 46, 47

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010)....49

*Preiser v. Rodriguez*,
411 U.S. 475 (1973)....23

*Shaw v. Allen*,
771 F. Supp. 760 (S.D.W. Va. 1990)....37

*Spallone v. United States*,
493 U.S. 265 (1990)....56

*Stone v. City & County of San Francisco*,
968 F.2d 850 (9th Cir. 1992)....*passim*

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....49, 50, 57

*Turner v. Safley*,
482 U.S. 78 (1987)....23

*United States v. Ayres*,
166 F.3d 991 (9th Cir. 1999) ....................................................................34

*United States v. Hinds Cnty.*,
128 F.4th 616 (5th Cir. 2025) ................................................23, 37, 51

*United States v. Hinds Cnty.*,
2023 WL 1186925 (S.D. Miss. Jan. 30, 2023) ..........................................32, 45

*Wayne County Jail Inmates v. Wayne County Chief Executive Officer*,
444 N.W.2d 549 (Mich. Ct. App. 1989)...........................................................32

*Woodford v. Ngo*,
548 U.S. 81 (2006)..........................................................................................23

**Constitutional Provisions**

Ariz. Const. art. IV, pt. 1, § 1.....................................................................56

Ariz. Const. art. IV, pt. 2, § 20...................................................................56

U.S. Const. amend. VIII..............................................................4, 6, 7

**Statutes**

18 U.S.C. § 3626 ............................................................................*passim*

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1292 .................................................................................4

28 U.S.C. § 1331 .................................................................................4

42 U.S.C. § 1983 .................................................................................4

**Other Authorities**

Robert E. Buckholz, Jr., et al., *The Remedial Process in Institutional Reform Litigation*, 78 Colum. L. Rev. 784 (1978) ...........................................44

## INTRODUCTION

Three years ago, the district court entered a permanent injunction designed to transform the healthcare system in Arizona's state-run prisons. Crafted by the court's experts and entered just months after new leadership took over the Arizona Department of Corrections, Rehabilitation and Reentry, the Injunction imposes 154 discrete healthcare requirements and mandates a fundamental restructuring of how the Department delivers care around an entirely new Patient Centered Care Model (PCCM).

The 2023 Injunction was a watershed. It closed the era of the parties' 2014 settlement—a negotiated stipulation that ended in rescission and trial—and opened a new remedial phase based on adjudicated constitutional findings, a far more prescriptive decree, and a new administration that set about implementing it. The Department's performance in that new phase has not been perfect. But its progress has been substantial and sustained. Since the district court's 2022 findings, the State has more than doubled annual prison healthcare spending, from $220.4 million to a budgeted $458.1 million. Overall healthcare staffing has increased 56%, staff physicians have tripled, and midlevel providers—the front line of primary care under the Injunction—have nearly doubled. The Department has built or renovated clinical space at most of its complexes, expanded inpatient and residential mental-health capacity, treated thousands of patients for Hepatitis C and opioid use disorder, and

extended the PCCM to 31 of 43 prison units. And on the same Injunction's custody side—addressing conditions of confinement in isolation areas—the Department's progress was pronounced enough that Plaintiffs never sought a receiver over it at all.

Despite that trajectory, the district court granted Plaintiffs' motion for a receiver in February 2026—less than three years after the Injunction took effect—and in July 2026 appointed a receiver for a minimum of five years. The receiver will hold every statutory power of the Department's Director relating to healthcare, as well as standing mechanisms for asking the court to "waive" any Arizona law she determines interferes with the receivership and to bypass the ordinary appropriations process. (1-ER-6–15.)

General limits on equitable power and the Prison Litigation Reform Act (PLRA) prohibit this. It is well established that a receivership must be a remedy of last resort. Likewise, the PLRA restricts courts to granting only "prospective relief" that is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The statute never mentions receivers, though it expressly contemplates, and closely confines, special masters. *Id.* § 3626(f). Whatever room the PLRA may leave for such an extraordinary remedy, a receivership must at least satisfy the statute's requirements. This one cannot.

Because the receivership was imposed for noncompliance with the Injunction, the statutory questions must be answered by reference to the Injunction period—the operative decree, and the officials charged with implementing it over the last three years. Measured that way (or any other way), the receivership fails: the Department is measurably improving conditions; the court gave the State less time to comply than it gave its own receiver, who will inherit the Department's improvements to date; the court imposed no intermediate remedy under the operative injunction; and no clear and convincing evidence shows that a receivership is the only viable path to compliance. The district court reached a contrary conclusion only by blurring the line between the two phases of this litigation—measuring the current administration by the failures of its predecessors under an irrelevant settlement, discounting or recharacterizing every category of progress under the operative decree, and treating the adversarial process itself as evidence of bad faith.

Additionally, the receiver's powers and duties independently exceed the PLRA's limits. The district court order authorizes the receiver to seek to bypass state budgetary controls and creates a state-law waiver mechanism—with two Arizona laws already identified for potential override—without any of the findings the PLRA requires before a federal court may displace state law.

This Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). *Parsons v. Ryan*, 949 F.3d 443, 473 (9th Cir. 2020); *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1064–65 (9th Cir. 2010) (jurisdiction over post-judgment orders). The district court entered the order granting Plaintiffs' motion for a receiver (the "Receivership Order") on February 19, 2026 (1-ER-98–99), and the order appointing a receiver (the "Appointment Order") on July 17, 2026 (1-ER-16). Defendants timely appealed both orders.

## ISSUES PRESENTED

**1.** A receivership is a remedy of last resort, and the PLRA permits prospective relief only if it "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Did the district court err by appointing a receiver over the healthcare system for Arizona's state-run prisons where:

**a.** Defendants have materially improved the Department's provision of healthcare since the Injunction was entered in 2023;

**b.** the district court did not allow Defendants a reasonable time to achieve compliance, giving the State less than three years while giving the receiver a minimum of five;

**c.** the district court imposed no intermediate remedy under the Injunction—no contempt finding, no fine, no sanction with an opportunity to purge—before imposing the remedy of last resort; and

**d.** the record contains no clear and convincing evidence that a receivership is the only viable means of achieving compliance?

**2.** Is the scope of the powers conferred by the Appointment Order impermissible under the PLRA and in excess of the district court's equitable authority where the order:

**a.** authorizes a standing mechanism by which the receiver can ask the district court to waive compliance with state laws without making the findings the PLRA requires; and

**b.** creates a bypass around the ordinary appropriations process ordained by the Arizona Constitution?

## STATEMENT OF THE CASE

### I. The Stipulation era ends in rescission and a trial (2012–2022).

This case began in 2012, when a class of prisoners challenged the Department's healthcare and conditions of confinement under the Eighth Amendment. The district court certified a class of all inmates in the Department's custody with respect to medical, dental, and mental healthcare, and a subclass of inmates held in isolation. *Parsons v. Ryan*, 289 F.R.D. 513 (D. Ariz. 2013), *aff'd,* 754 F.3d 657 (9th Cir. 2014).

In 2014, the parties settled. The Stipulation contained 103 negotiated "performance measures" governing healthcare at the Department's state-run prisons. (7-ER-1406–1413; 1-ER-19.) It was a compromise, not an adjudication: the parties agreed the Stipulation "shall not be construed or interpreted as an admission of any wrongdoing or liability by any party" (7-ER-1379 ¶ 5), and the district court, in approving it, observed that it could not "foresee what would have happened at trial" and that "there was litigation risk on both sides" (7-ER-1376).

The Stipulation failed. Between 2015 and 2021, twelve enforcement motions were resolved against Defendants, the court issued dozens of orders directing compliance, and the court twice held Defendants in contempt, imposing roughly $2.2 million in fines. (1-ER-19); *see Parsons v. Ryan*, 949 F.3d 443 (9th Cir. 2020).

In July 2021, the district court rescinded the Stipulation. It found that the Department's then-leadership had "employed scorched-earth tactics to oppose every attempt to resolve outstanding noncompliance," and that "[t]here does not appear to be a contempt sanction robust enough to coerce compliance" with the Stipulation. (6-ER-1364.) The court set the case for trial. Defendants do not relitigate any of that history here. They recount it because the district court would later make it the foundation of the receivership—treating conduct under the superseded settlement as proof of what the current administration would do under a fundamentally different decree.

The court held a fifteen-day bench trial in late 2021, and in June 2022 issued an order of roughly 200 pages finding that the Department's healthcare system violated the Eighth Amendment. (6-ER-1164–1363.) The court identified inadequate staffing as the "core issue"—staffing levels were "so inadequate that the provision of constitutionally mandated care is impossible" (6-ER-1184)—found the practice of using nurses as the first line of care "medically unacceptable" (6-ER-1207), and identified failures in mortality review, mental healthcare, translation services, and the electronic health record (6-ER-1204–1207, 1233–1268). Defendants did not appeal.

## II. The 2023 Injunction opens a new remedial phase.

To craft a remedy, the district court appointed experts, including Dr. Marc Stern. (Docs. 4339 at 3–4; 4352; 4362.)[1] In August 2022, before any injunction existed, the court held a hearing that included discussion of a receivership, stating it was "not prepared to consider, at [that] time, a receivership," but that one was not "off the table forever in this case." (6-ER-1098 n.1 (quoting Doc. 4358 at 4).)

In January 2023, the court circulated a draft injunction. (*See* Doc. 4380.) That same month, a new Governor took office and appointed Dr. Ryan Thornell as Director of the Department. (5-ER-892, 920–923.) After negotiated modifications, the court entered the Order and Permanent Injunction on April 7, 2023, with the parties' agreement. (6-ER-1099.) In doing so, the court restated its view of the Department's litigation history in unsparing terms—"Defendants have fought every aspect of this case at every turn"—and warned that any failure "to meaningfully comply with this injunction will revive consideration of appointing a receiver." (6-ER-1101, 1098 n.1.)

The Injunction did not extend the Stipulation; it displaced it with something categorically different. The Stipulation was a negotiated settlement that set 103 performance measures and left the Department's model of care intact. The

---

[1] Citations to "Doc." refer to entries on the district court's docket, No. 2:12-CV-00601-PHX-ROS (D. Ariz.).

Injunction, in contrast, is an adjudicated decree of "unusual scope," reflecting the court's demand that "the changes necessary to redress the failings will be substantial." (6-ER-1100.) Across 67 pages, it imposes 154 discrete substantive requirements on every state-run prison, governing every aspect of care from intake through release. (See 6-ER-1107–1146; 1-ER-44.) Some provisions state broad, systemwide standards—for example, requiring that all care must be "clinically appropriate." (6-ER-1107 § 1.1.) Others are minutely operational: for instance, paper documents must be scanned into the electronic health record within two business days, reviewed by a practitioner within four, and scanned "right-side up." (6-ER-1118 §§ 4.4.1–4.4.3.)

As a whole, the Injunction mandates a comprehensive reordering of healthcare delivery that the Stipulation did not: an assigned primary-care provider for every inmate (6-ER-1120–1121 §§ 6.1–6.3), a primary therapist for everyone on the mental-health caseload (6-ER-1135 § 13.1), and—with narrow exceptions—initial care by licensed practitioners rather than nurses (6-ER-1123 § 7.4.7). The court's experts would later describe the resulting model of care as "a wholesale shift" requiring "extensive changes to many processes of care, clinical roles, and workflows" (5-ER-1056–1057)—a rollout whose "scale ... is massive" and whose complexity is "difficult to overstate" (5-ER-1066). The Department's new leadership accepted this reordering and began implementing it.

Two features of the Injunction are particularly relevant to this appeal.

First, while the Injunction required Defendants to fill every healthcare position under the existing vendor contract within three months (6-ER-1109 § 1.16), it deferred the central question—how many staff the new model of care would actually require—to a court-appointed expert's "staffing analysis and plan" (6-ER-1110 § 1.17), an expert-driven process that ultimately took more than two years.

Second, the court retained its experts—Dr. Stern among them—as "neutral monitors to evaluate Defendants' performance." (6-ER-1102.) The same individuals who drafted the Injunction's requirements would now grade compliance with them.

## III. The Department rebuilds: funding, staffing, facilities, and programs.

What followed the Injunction was not stagnation. By every objective systemwide measure in the record, the Department's healthcare system today is larger, better funded, better staffed, and more capable than the system the district court condemned in 2022.

*Funding.* With the support of the Governor and Legislature, the Department more than doubled annual healthcare spending—from $220.4 million in FY2022, to $382.1 million in FY2024, to $425.9 million in FY2025, with a FY2026 budget of $458.1 million. (3-ER-290, 300; 5-ER-892.) The Department accomplished this through the ordinary appropriations process, without a court order compelling a single dollar.

*Staffing.* The court's 2022 findings identified understaffing as the root of every other deficiency. (6-ER-1184.) Since those findings, overall healthcare staffing has grown from 851.94 full-time equivalents to 1,332.1 as of July 2025—a 56% increase, while the inmate population declined roughly 7%. (3-ER-293–295.) The gains are largest where the 2022 findings located the gravest deficiencies: staff physicians have tripled per inmate (5.5 FTEs to 15.3); midlevel providers—who serve as primary care providers for non-complex patients under the Injunction—are up 93% per inmate, already exceeding the court-approved Staffing Plan's requirement; and mental-health staffing is up 40% per inmate. (3-ER-294; *see* 6-ER-1120–1121 § 6.3.)

*Facilities.* The Department increased special-needs-unit and inpatient-care bedspace by 66%, opened 160 new skilled-nursing beds and 172 inpatient mental-health beds, expanded residential mental-health capacity by 31%, and built or renovated clinical space at complexes across the State. (5-ER-893–895; 3-ER-290, 296–297.) The monitors found the Department compliant with the special-needs-unit requirements: "ADCRR has done a very good job," with bed capacity that "exceeds their current need by about 45%, which reflects planning for future need." (4-ER-675.)

*Programs.* The Department built a statewide medication-assisted-treatment program serving roughly 7,000 inmates with opioid use disorder and spent more than

$60 million treating approximately 4,500 patients for Hepatitis C—programs even the monitors' first report called "sea-change improvements." (5-ER-895–896, 1093.) It also substantially increased offsite specialty-care appointments and launched suicide-prevention, dementia-companionship, and self-injury-reduction programs. (5-ER-893–896.)

*Custody.* Under the same Injunction, the Department integrated more than 1,000 maximum-custody inmates into general population, reducing the maximum-custody population by 78%. (5-ER-896–897.) Plaintiffs' receivership motion expressly declined to seek relief as to the isolation subclass, citing "demonstrable and meaningful improvements." (5-ER-1027 n.1.)

None of this made the system perfect. The monitors' interim reports remained sharply critical of the pace of change, the Department's self-monitoring methodology, and individual instances of deficient care. And the statewide Medical Director position sat vacant from August 2024 until January 2026 despite recruiting efforts, and is presently vacant again. (5-ER-1093, 1077; 1-ER-81.) But the question this appeal raises is not whether the Department achieved perfection in under three years—it is whether terminating the State's own reform effort was the least intrusive means of correcting the violation.

## IV. The Staffing Plan is not finalized until June 2025; the court declares violations in 2024.

The staffing-plan process unfolded on the timeline expert-driven reform requires. The court's experts filed their proposed statewide staffing analysis in April 2024—a year after the Injunction—and recommended testing it through a pilot, which the court ordered in June 2024 and which ran for 28 weeks at two units housing roughly 8% of the population. (5-ER-1056–1058, 1086–1087.)

The pilot was, by any measure, rocky. The monitors' final report found that only 22% of the court-ordered pilot tasks were fully completed, that the pilot was suspended at one of the two sites after eight days for lack of clinical space, and that the Department then lacked the project-management capacity to implement the PCCM statewide. (5-ER-1059, 1061, 1068–1071.) Defendants have acknowledged those failures and the court's criticism of their objections during that process. (5-ER-897, 909.) But the pilot did what pilots are designed to do: it identified the space, staffing, and management problems that had to be solved before statewide implementation. After full briefing on the final Staffing Analysis and Plan, the court approved the Plan on June 11, 2025, and ordered it "implemented immediately." (5-ER-887; *see also* Docs. 4858; 4869; 4870; 4900.)

Only then—26 months after the Injunction issued—did the Department have a court-approved answer to the question the Injunction had deferred: how many staff, in which roles, at which locations, the new model of care requires. The Department

began the statewide rollout at once, despite appealing from the staffing order. By November 2025, the PCCM was operating at 13 units spanning all nine complexes; as of July 2026, it was operating at 31 of 43 units (72%), with the goal of statewide implementation by the end of 2026. (2-ER-170–171, 188–190, 194.)

The district court, however, had announced that its "patience ha[d] run out" two years earlier, in June 2024—one year into the Injunction, one month before the pilot began, and a full year before the court approved the Staffing Plan whose implementation would become the centerpiece of the receivership analysis. (5-ER-1080.) At a hearing in May 2024, the court had already declared, before the pilot generated any data, that "75 percent of" the Injunction's provisions "have been violated already" and that "the state is already clearly in violation of the injunction." (5-ER-1081–1082.)

**V. The Receivership Order.**

Plaintiffs moved for a receiver in February 2025, just 22 months after the Injunction issued, and four months before the final Staffing Plan existed. (5-ER-1022–1055.) Defendants opposed the motion, detailing the progress described above and presenting evidence that California's two-decade prison-healthcare receivership had consumed more than $222 million in receiver's-office expenditures alone, and that under it the State's annual inmate-healthcare budget had grown 353% despite a

prison population that fell by roughly half—all without achieving full compliance. (5-ER-892–897, 910–914, 1021.)

The court directed its monitors to prepare "a comprehensive Report addressing material issues concerning the Motion for a Receiver." (5-ER-888.) The resulting Third Interim Report concluded that Defendants were not compliant with 131 of the Injunction's 154 healthcare Quality Indicators and presented the monitors' review of eight deaths—four from 2023 and four from 2025—as a "lens" on the system. (4-ER-581–592; 4-ER-621–5-ER-884.) Defendants responded with more than 200 pages of declarations and exhibits, including a physician's declaration disputing the monitors' clinical conclusions in specific mortality reviews and a methodological critique of a compliance rubric under which performance of 96%, 97%, or even 99.5% on a given indicator is scored "non-compliant." (3-ER-289–537.) The monitors filed a 17-page response largely reiterating their conclusions (2-ER-208–224), and Defendants replied (2-ER-192–207).

On February 19, 2026, the district court granted the motion. (1-ER-98–99.) The court placed "[g]reat weight" on "the factually well-supported, reliable opinions of the Monitors" (1-ER-39–40); characterized Defendants' evidentiary objections to those opinions as showing Defendants are "amnestic, or duplicitous, or both," and as "border[ing] on bad faith" (1-ER-41); found a grave and immediate threat of harm principally based on the Department's imperfect compliance with most Quality

Indicators, the eight mortality reviews, and individual patient narratives drawn from the monitors' reports (1-ER-42–70); found less extreme measures exhausted based on the contempt sanctions and enforcement orders of the 2015–2021 Stipulation era, reasoning that "the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation" (1-ER-70–74); found a lack of leadership and bad faith resting heavily on the failed pilot and on Defendants' objections (1-ER-75–91); addressed the Department's doubled healthcare funding under the heading "Waste of Resources" (1-ER-91–93); and held up California's decades-long receivership as a model of "marked success" (1-ER-95). The order's PLRA analysis is a single paragraph, reciting that the receivership is "narrowly drawn," extends "no further than necessary," and is "the least intrusive means necessary to correct and prevent violations." (1-ER-97–98.)

## VI. The Appointment Order.

Both parties proposed Annette Chambers-Smith, the former director of Ohio's corrections department, as receiver, while Defendants preserved their opposition to any receivership. (1-ER-2–3.) On July 17, 2026, the court appointed her for a minimum five-year term that "shall be extended as necessary." (1-ER-13.)

The Appointment Order transfers to the receiver "[a]ll duties and authorities vested by law in the Director of ADCRR relating to the health care of the class members," and correspondingly enjoins the Director's own exercise of those duties.

(1-ER-6.) The receiver may "hire, fire, suspend, supervise, promote, transfer, discipline, and establish compensation for all ADCRR employees and contract staff who perform services related to the health care of class members," and may create, abolish, or transfer positions. (1-ER-6–7.) She is "responsible for formulating and establishing the annual ADCRR health care budget," holds "all authority vested by law in the Director of ADCRR relating to the financing of the prison health care system," and may negotiate, terminate, or renegotiate the Department's healthcare contracts. (1-ER-8–9.) She is paid a $500,000 annual salary, may hire staff and consultants, and is sole signatory and fiduciary of a "Receiver's Office Fund Account" that Defendants must replenish. (1-ER-9–11.) "All costs incurred during the Receivership shall be borne by Defendants"—without cap. (1-ER-11.)

Two provisions of the Appointment Order address Arizona law directly. If the receiver "determines compliance with state laws, regulations, or contracts will interfere with, or preclude" her objectives, she "shall request the Court waive compliance with those laws, regulations, and contracts." (1-ER-12–13.) A footnote identifies two Arizona laws—the law requiring privatized correctional healthcare and the law capping specialist compensation—as "persistent barriers to provision of constitutional health care." (1-ER-12 n.4.) Separately, whenever the receiver determines the fiscal year's appropriated funds "are inadequate to accomplish the Receiver's authorities and duties," she must consult the Director and notify the

Legislature and Governor; if funding is still not provided, the receiver or either party "may request resolution by the Court, which may prompt the Court to order the waiver of Arizona State laws, regulations, and contracts that interfere with the requirements and desired outcome of the Receivership." (1-ER-15.)

**VII. These appeals.**

Defendants timely appealed the Receivership Order (8-ER-1451), and this Court stayed that appeal pending the district court's appointment proceedings. (No. 26-1746, Dkt. 10.1.) After the district court entered the Appointment Order and denied Defendants' motion for a stay pending appeal (2-ER-149), Defendants timely appealed the Appointment Order (8-ER-1447), and this Court consolidated the appeals. (Dkt. 20.1.) On September 1, 2026, this Court denied Defendants' emergency motion for a stay pending appeal. (Dkt. 16.1.) In the same order, the Court also expedited the appeals and noted that "[t]his denial [of the stay] is subject to reconsideration by the panel assigned to decide the merits of these appeals." (*Id.*) Judge Forrest "would [have] grant[ed] an administrative stay and refer[red] the stay motion to the panel assigned to decide the merits of these appeals on an expedited basis." (*Id.*)[2]

---

[2] The district court subsequently extended its stay of the Appointment Order until October 19, 2026. (Doc. 5363.)

## SUMMARY OF ARGUMENT

I. The PLRA permits "prospective relief" only if it is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Assuming a receivership is available in this context, any receivership must satisfy § 3626(a)(1)(A)'s requirements, together with the longstanding equitable rule that a receivership is a "remedy of last resort" to be imposed "only when absolutely necessary." *Dist. of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999). The statute and the case law impose at least four limits. Because the receivership was imposed for noncompliance with the 2023 Injunction, each limit must be measured against that operative decree and the administration implementing it—not against the superseded 2014 settlement administered by prior officials. The Receivership Order transgresses all four limits.

A. First, a receivership is not the least intrusive means of correcting a violation or a remedy of last resort when the defendant is actively and measurably improving conditions. The Department doubled funding, raised staffing across every clinical category, built facilities, launched treatment programs, and rolled out the new model of care. Yet the Receivership Order never weighed that evidence. It acknowledged the progress only glancingly, recharacterized increased spending as "waste," and dismissed two concededly successful programs. That is the kind of analysis the Fifth

Circuit condemned in *Parker v. Hooper*, 171 F.4th 736, 757–58 (5th Cir. 2026) (en banc).

B. Second, relief "extends … further than necessary," § 3626(a)(1)(A), and is not a last resort when the court has not given the defendant a reasonable time to comply. The district court gave the Department less than three years to implement a 154-requirement restructuring of a statewide healthcare system—and then gave its own receiver a minimum of five years to accomplish the same task. The court's own statements show it did not really afford Defendants that time anyhow: it warned at the Injunction's entry that noncompliance would "revive consideration of appointing a receiver," declared 75% of the Injunction violated absent any supporting data, and announced its patience "run out" a year before the final Staffing Plan existed.

C. Third, a receivership is not the least intrusive means or a last resort when the court has skipped every intermediate remedy. Between April 2023 and February 2026, the district court never held Defendants in contempt of the Injunction, never imposed a fine, and never entered a remedial order with an opportunity to cure. It leapt from monitoring to receivership, reasoning that contempt had failed during the Stipulation era—a period involving different leadership, a different vendor, half the funding, and a negotiated settlement rather than an adjudicated injunction based on constitutional findings. Every receivership decision the district court invoked

involved coercive intermediate measures under the operative decree, including contempt findings and failed opportunities to purge. This one involved none.

D. Fourth, a receivership is not the least intrusive means or a last resort unless clear and convincing evidence establishes that a receivership is "the only viable option to effectuate compliance." *Jerry M.*, 738 A.2d at 1213. The court's threat-of-harm finding rests on a compliance rubric that scores 96%, 97%, and even 99.5% performance as "non-compliant"—and that by its architects' own account gives no weight to effort or improvement—and on eight adverse-outcome cases selected from a population of 25,000. Its bad-faith finding penalizes Defendants' exercise of the adversarial process. And its lack-of-leadership finding is irreconcilable with what the same leadership accomplished in three years, including custody-side progress so substantial that Plaintiffs sought no receiver over it.

E. Whether a federal court has the authority to order a receivership over a non-consenting state prison at all is questionable. The PLRA does not expressly authorize receivers. And there are serious questions about whether receiverships over non-consenting state institutions have any sufficiently analogous founding-era precedents that support their availability as equitable remedies.

II. The Appointment Order independently violates the PLRA and exceeds the district court's equitable authority. The court created a standing waiver process for the receiver to seek displacement of any Arizona law she deems an obstacle—with

two laws already identified for waiver—without making any of the findings that *Stone v. City & County of San Francisco*, 968 F.2d 850, 864–65 (9th Cir. 1992), and § 3626(a)(1)(B) require before state law may yield. Additionally, the court exceeded its equitable authority by creating a bypass around the appropriations process required by the Arizona Constitution, to be used whenever the receiver finds an appropriation insufficient.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions de novo, its factual findings for clear error, and the scope of its remedial order for abuse of discretion. *Armstrong v. Brown*, 768 F.3d 975, 979 (9th Cir. 2014). Whether prospective relief complies with the PLRA's needs-narrowness-intrusiveness requirements is a question of law. *See id.* at 983–87; *Schwarzenegger*, 622 F.3d at 1070–72. A district court necessarily abuses its discretion when it applies an incorrect legal standard, rests its decision on clearly erroneous findings, or fails to make findings the law requires. *See Stone*, 968 F.2d at 855–56, 864.

## ARGUMENT

### I. The district court's decision to appoint a receiver violates the PLRA for four independent reasons.

The PLRA strictly limits prospective relief in prison-conditions litigation. A court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the

violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Congress enacted those requirements to "eliminate unwarranted federal-court interference with the administration of prisons," *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)—a domain in which the State's sovereign interest is at its apex, *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973), and which is an "inordinately difficult undertaking" that is "peculiarly within the province of the legislative and executive branches of government," *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).

Whether a federal receivership over a non-consenting state institution is available at all is questionable. *See infra* § I.E. But assuming one is, the PLRA bars federal courts from placing a state prison under a receivership unless it is the narrowest and least intrusive remedy available. *See United States v. Hinds Cnty.*, 128 F.4th 616, 636 (5th Cir. 2025) (the PLRA's requirements apply to "any prospective relief, which would include a receivership appointment"). This demanding standard accords with the equitable principle that a receivership is "the remedy of last resort," to be "undertaken only when absolutely necessary," *Jerry M.*, 738 A.2d at 1213; *accord Bracco v. Lackner*, 462 F. Supp. 436, 456 (N.D. Cal. 1978) ("a receiver should not be appointed if a less drastic remedy exists"); *L.A. All. for Hum. Rts. v. City of Los Angeles*, 792 F. Supp. 3d 1049, 1092 (C.D. Cal. 2025).

This Court's precedent does not articulate standards for when this remedy of last resort is appropriate. But at minimum, § 3626(a)(1)(A) and the last-resort principle impose at least four limits on a district court's authority to appoint a receiver. First, a receivership is not the "least intrusive means necessary" or a remedy of last resort where the defendant is improving conditions and actively working toward compliance. 18 U.S.C. § 3626(a)(1)(A); *see Parker*, 171 F.4th at 757–60.

Second, relief "extend[s] no further than necessary" and is a last resort only if the defendant has first been given a reasonable time to comply—a requirement the PLRA makes express for the only last-resort remedy it recognizes. *See* 18 U.S.C. § 3626(a)(3)(A)(ii) (no prisoner-release order unless a less intrusive order has failed and "the defendant has had a reasonable amount of time to comply with the previous court orders").

Third, a receivership is not the least intrusive means or a last resort where the court has not attempted—or even evaluated—intermediate measures under the operative decree. *See Stone*, 968 F.2d at 864.

Fourth, because the remedy strips a State of a core sovereign function, it must rest on clear and convincing evidence that a receivership is "the only viable option to effectuate compliance with the laws and orders of the court." *Jerry M.*, 738 A.2d at 1213; *cf. Stone*, 968 F.2d at 856 n.9; 18 U.S.C. § 3626(a)(3)(E).

The district court's decision to appoint a receiver violates these principles. And one overarching error reaches all four inquiries here: the period that matters is the Injunction period, but the district court reached a decade beyond it. The district court appointed a receiver because, in its view, "Defendants have continuously violated the Injunction." (1-ER-44.) The PLRA in turn permits only the least intrusive means necessary to correct "the violation" for which relief is imposed. 18 U.S.C. § 3626(a)(1)(A). Each statutory question must therefore be answered by reference to the operative decree. What happened under the superseded 2014 settlement, at the hands of prior administrations and prior vendors, is context; it cannot substitute for present-tense findings about the officials that have been implementing the Injunction since 2023. *See Jerry M.*, 738 A.2d at 1214 (the pertinent question is the capability of "new leadership," judged on its own record); *Parker*, 171 F.4th at 757–58 (remedial analysis must incorporate current improvements). As shown below, however, the Receivership Order repeatedly substitutes the first phase of this litigation for the second and exceeds all four limits.

### A. The district court appointed a receiver without weighing the Department's substantial progress, and the record of progress forecloses a least-intrusive-means finding.

Where an institutional defendant is measurably improving conditions, terminating its role in the compliance process is not a last resort or the least intrusive means of achieving compliance—it is the most intrusive response available. The en

banc Fifth Circuit applied that principle in *Parker*, vacating a PLRA remedial order because the district court "fail[ed] to incorporate significant medical care improvements" that "related directly to deficiencies that the court found in its Liability Opinion." 171 F.4th at 757–58. The same principle animates *Jerry M.*, which reversed a receivership where "several important criteria were omitted from the trial court's consideration," including the capability and early record of new leadership. 738 A.2d at 1213–14.

Here, the record of improvement was extensive, recent, and directed precisely at the deficiencies underlying the 2022 findings—above all staffing, the "core issue." (6-ER-1184.) By the time the court ruled on the receivership motion, the evidence showed:

- Overall healthcare staffing up 56% since the 2022 findings—851.94 FTEs to 1,332.1—while the inmate population fell 7%. (3-ER-293–295.)
- Staff physicians tripled per inmate (5.5 to 15.3 FTEs), midlevel providers up 93% per inmate (47.15 to 84.5)—already exceeding the approved Staffing Plan's requirement—and mental-health staffing up 40% per inmate. (3-ER-294; 5-ER-885.)
- Healthcare spending more than doubled, from $220.4 million (FY2022) to $425.9 million (FY2025), with $458.1 million budgeted for FY2026—secured through the ordinary appropriations process. (3-ER-290, 300.)
- Special-needs and inpatient bedspace up 66%; 160 new skilled-nursing beds; 172 inpatient mental-health beds; residential mental-health capacity up 31%; new or renovated clinical space across the system. (5-ER-893–895; 3-ER-290, 296–297.)

- Roughly 7,000 patients receiving medication-assisted treatment for opioid use disorder; more than 4,500 patients treated for Hepatitis C at a cost exceeding $60 million. (5-ER-895–896.)
- The PCCM in operation at 13 units spanning every complex within five months of the Staffing Plan's approval, and at 31 of 43 units (72%) as of July 2026. (2-ER-194, 170–171, 188–190.)

This is not the record of an agency that "will not accept the constitutional responsibility to provide adequate healthcare." (1-ER-18.) It is the record of Defendants' correcting, at scale, the specific deficiencies the court identified.

Yet the Receivership Order did not weigh this evidence. Nowhere in its 83 pages does the order assess the systemwide staffing, funding, facilities, or program data as evidence bearing on whether displacing the State's control was necessary. The analysis the order does contain follows a consistent pattern: progress was minimized, recharacterized as fault, or discounted.

*Minimized.* The order's only general acknowledgment of the Department's evidence is a single sentence summarizing Defendants' response brief: Defendants "have expended additional funds on healthcare, have made some improvements on certain types of healthcare in certain facilities, and have had success in the opioid use disorder program and Hepatitis-C treatment." (1-ER-37–38.) The order nowhere discusses the systemwide staffing increases—the metric the court itself had called the "core issue" in 2022. Where it touches staffing, it recounts only the shortfall against the vendor contract and discounts filled physician positions for lack of board

certification. (1-ER-46–48.) A court cannot find that displacing the State is the *least intrusive* remedy for understaffing without ever addressing evidence that staffing had grown by half and physicians had tripled.

*Recharacterized.* The order's only discussion of the Department's doubled healthcare funding appears under the heading "Waste of Resources," where the court reasoned that because compliance remained incomplete, "[a]llowing this to continue would waste enormous sums of money." (1-ER-91–93.) That inverts *Brown v. Plata*, where it was California's refusal to commit resources that helped justify relief. 563 U.S. 493, 528 (2011). Here, increased resources—the remedy courts ordinarily struggle to compel—became a factor supporting federal takeover.

*Discounted.* The order dismissed the Hepatitis C and opioid-use-disorder programs—successes the monitors themselves called "sea-change improvements" (5-ER-1093)—as "among the only improvements the Department continues to emphasize," and as provisions that entered the Injunction "at Defendants' behest." (1-ER-81–82.) It did not mention the monitors' finding of compliance on the special-needs-unit buildout. (4-ER-675.) A remedial analysis that credits the defendant's failures in full and its successes not at all is not the "weighing" the PLRA requires; it is the "antiquated conception of institutional-reform litigation" the PLRA displaced. *Parker*, 171 F.4th at 754.

Plaintiffs defended this approach below by noting that the order "acknowledged" various improvements in scattered passages. But mere glancing acknowledgment is not analysis. *Parker* did not fault the district court for failing to *mention* improvements; it vacated because the court failed to "incorporate" them into the remedial calculus. 171 F.4th at 757–58. And omission of "important criteria" is itself an abuse of discretion. *Jerry M.*, 738 A.2d at 1214. Nor could the order's compliance metric supply the missing analysis: by design, it excluded the Department's "effort to be compliant" and gave improvement over time no "weight." (4-ER-617–618; *see infra* § I.D.1.)

On this record, a properly conducted least-intrusive-means analysis could not have resulted in the State's wholesale displacement in favor of a receivership.

### B. The district court did not give Defendants a reasonable time to comply with the Injunction.

Prospective relief is a last resort and "extend[s] no further than necessary" only if the defendant has first had a reasonable opportunity to comply with less intrusive relief. The PLRA makes that principle explicit for prisoner-release orders, which require both a failed less-intrusive order and "a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(ii). The same principle must govern the decision to appoint a receiver, which is the only comparably drastic remedy in this field. *See Jerry M.*, 738 A.2d at 1213–14 (reversing receivership imposed without giving new leadership a meaningful

opportunity to perform); *Stone*, 968 F.2d at 864 (court should have "waited until the threat of sanctions failed to induce compliance" before escalating).

Here, the time the district court allowed cannot be reconciled with the scale of the task it ordered. The Injunction demands a ground-up restructuring of healthcare delivery for roughly 25,000 patients across nine complexes, carried out by thousands of clinical and custody staff: new models of care, staffing levels, facilities, and information systems, with 154 discrete requirements audited monthly. The court's own experts described just one byproduct of the Injunction's requirements—statewide PCCM implementation—as "massive," warning it was "difficult to overstate the complexity of this roll-out and the resources that will be required to plan and execute it." (5-ER-1066.) And the Injunction's own design contemplated a long runway: it deferred comprehensive staffing targets to an expert study (6-ER-1110 § 1.17), which grew into a pilot (June 2024), a final report (January 2025), and a court-approved Staffing Plan ordered into effect on June 11, 2025 (5-ER-886–887). For most of the Injunction period, the central operational blueprint of the Injunction did not yet exist in final form.

The district court itself at times recognized the enormity of the task required. At oral argument on the receivership motion, the court observed that "everybody who is involved here knows that you can't have a quick fix in a prison setting," and that "this is going to take a lot of time and a lot of resources." (2-ER-268.) Yet eight

months after approving the Staffing Plan—and while the Department was implementing it statewide—the court removed the Department from the process. In all, the court gave the State roughly 34 months to comply with the Injunction, and roughly eight months to implement its staffing centerpiece, before concluding the State's opportunity was exhausted. Yet the court gave its receiver "five years," a term that "shall be extended as necessary," to accomplish the same objectives with the head start provided by the Department's substantial progress to date. (1-ER-13.) If five years is the floor for full compliance under court-appointed leadership, the record cannot support a finding that less than three years was a reasonable opportunity for Defendants. Relief premised on Defendants' failure to achieve what the court's own orders treat as a five-year-minimum undertaking necessarily "extends … further than necessary," § 3626(a)(1)(A), and is not a remedy of last resort.

In any event, the court's own statements confirm that Defendants never really received that opportunity in the first place. Before the Injunction issued, the court raised the specter of a receivership at the August 2022 remedies hearing, and the Injunction's second page warned that any failure to "meaningfully comply" would "revive consideration of appointing a receiver." (6-ER-1098 n.1.) The court would later describe Defendants as "already in violation of the Injunction" within three months of its effective date because the Department had not yet "fill[ed] all positions

required by the current contract with the healthcare vendor" within 90 days. (1-ER-22–23, 26–27; 5-ER-1089.) Thirteen months in—before the pilot had begun, and a year before the Staffing Plan was approved—the court announced from the bench: "I think that 75 percent of [the Injunction's provisions] have been violated already," and "the state is already clearly in violation of the injunction." (5-ER-1081–1082.) When defense counsel asked to respond to the 75-percent figure and requested an evidentiary hearing if one were required, the court answered that it had "heard enough," while allowing that it would hear a response presenting "something new." (5-ER-1082, 1085.) One month later the court declared in a written order: "The Court's patience has run out." (5-ER-1080.) That sequence is not the reasonable opportunity to comply that the PLRA requires before a court may impose more intrusive relief.

The receivership case law confirms how far outside the mainstream this timeline lies. Courts that appointed receivers did so after remedial regimes measured in decades, not months: 18 years of noncompliance in *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d 549, 551–54 (Mich. Ct. App. 1989); a 10-year-old consent judgment under which conditions were "demonstrably worse than when the Consent Judgment went into effect," *Nunez v. N.Y.C. Dep't of Corr.*, 782 F. Supp. 3d 146, 161 (S.D.N.Y. 2025); a facility "where terror reigns" and staffing was "getting worse" despite two contempt findings, *United States v.*

*Hinds Cnty.*, 2023 WL 1186925, at *5, *7 (S.D. Miss. Jan. 30, 2023); and in *Plata* itself, after the State conceded it could not fix its system, *Plata v. Schwarzenegger*, 2005 WL 2932253, at *26–27 (N.D. Cal. Oct. 3, 2005). Arizona's post-Injunction record is the opposite of stagnation or decline. Cutting that trajectory short, and restarting it under a private receiver on a five-year timeline, is not the least intrusive means of completing it.

### C. The district court bypassed every intermediate remedy, relying on Stipulation-era history that cannot support its futility finding.

Under the PLRA and ordinary equitable principles, a court may not leap straight from monitoring to receivership, as the district court did here. "[T]he remedy should begin with what is absolutely necessary. If [such] measures later prove ineffective, more stringent ones should be considered." *LaShawn A. ex rel. Moore v. Barry*, 144 F.3d 847, 854 (D.C. Cir. 1998) (citation omitted). This Court applied that principle in *Stone*, vacating a state-law-override remedy because the district court neither "waited until the threat of sanctions failed to induce compliance" nor "ma[de] findings that other alternatives were inadequate." 968 F.2d at 864. Receivership comes only "after all other less intrusive remedies have been exhausted." *L.A. All.*, 792 F. Supp. 3d at 1092; *accord Bracco*, 462 F. Supp. at 456.

This did not occur here. Between the Injunction's entry in April 2023 and the Receivership Order in February 2026, the district court imposed no intermediate remedy of any kind. It never held Defendants in contempt of any Injunction

provision. It never imposed a fine. It never entered a remedial order identifying specific violations with a defined opportunity to cure. Defendants pointed this out at oral argument on the receivership motion, noting that "since 2023 there have not been other … remedies … imposed in the healthcare area," and "nothing has been tried." (2-ER-270.) Neither Plaintiffs nor the court identified any. The measures that did occur in that period—status conferences, monitor reports, the staffing pilot, the Staffing Plan—were not sanctions. Instead, every one was a component of or flowed from the Injunction's own monitoring-and-planning machinery. The court repeatedly warned that contempt was available (5-ER-1091–1092; 1-ER-29–30), but never used it. And when Defendants proposed concrete intermediate alternatives in opposing the receivership motion—remedial-plan orders of the kind the court itself had just entered on custody staffing (*see* Doc. 4950), a restructured monitoring arrangement, or a special master—the court adopted none of them before turning to the remedy of last resort. (3-ER-320; 1-ER-73–74.)

The court's omission of contempt is not a formality. A civil contempt proceeding would have obligated the court to identify the specific provisions Defendants violated, to find violations by clear and convincing evidence, and to give Defendants the ability to purge—that is, to "carr[y] the keys of [its] prison in [its] own pocket." *United States v. Ayres*, 166 F.3d 991, 997 (9th Cir. 1999) (citation omitted). That process tells a sovereign precisely what it must fix and harnesses its

own institutions to fix it. A receivership, in contrast, dissolves the sovereign's responsibility altogether. The district court understood the contempt sequence: it warned that Defendants would have to show they "took *all* reasonable steps to comply." 5-ER-1091 (quoting *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016)). But the court never held a hearing at which such a showing would have been tested.

The district court excused this omission on the ground that intermediate measures had already been "exhausted or would prove futile" (1-ER-39), but the court erroneously focused on the Stipulation era. Its analysis of this factor is devoted almost entirely to 2014 through 2021: the twelve enforcement motions, the orders to show cause, the two contempt findings and fines, and Magistrate Judge Duncan's six years of enforcement work under the Stipulation. (1-ER-70–74.) The court bridged that history to the present with a single premise: "the obligations of the Injunction are the same as those required of Defendants in the 2014 Joint Stipulation." (1-ER-72.)

That premise fails as a matter of law and of fact, and the futility finding fails with it. As a matter of law, futility is a forward-looking finding. It considers whether lesser remedies would fail *now*, against the decree actually being enforced and the officials actually implementing it. That is why *Stone* demands findings that "other alternatives were inadequate" before a court escalates, 968 F.2d at 864, and why

*Jerry M.* holds that past noncompliance, however "compelling," cannot alone carry the analysis when circumstances and leadership have changed, 738 A.2d at 1213–14. A court cannot discharge that obligation by declaring the old decree and the new one interchangeable.

As a matter of fact, the 2014 Stipulation and 2023 Injunction are not interchangeable, as the district court's own orders confirm. The Stipulation was a 16-page negotiated settlement with 103 performance measures, expressly providing that it was not "an admission of any wrongdoing or liability by any party" (7-ER-1379 ¶ 5), approved by a court that acknowledged "litigation risk on both sides" (7-ER-1376–1377), and that left the Department's underlying model of care in place. The Injunction, in contrast, is a 67-page adjudicated decree of "unusual scope" (6-ER-1100) with 154 requirements, grounded in constitutional findings, that mandates the structural reordering of the Department's healthcare delivery statewide—the primary-care and primary-therapist models, the end of nurse-driven initial care, and an expert-designed statewide staffing plan whose implementation the court's own experts called "massive" (5-ER-1066). The Injunction requiring "substantial" changes to the Department's entire healthcare operation (6-ER-1100) is miles apart from the 2014 Stipulation, and the failure of contempt to secure compliance with that contested settlement says little about whether contempt would secure compliance with an adjudicated injunction in 2026.

Further, the Stipulation-era record was made by prior officials, working through prior healthcare vendors, on roughly half the funding. The officials the receivership displaces took office in 2023, and their record under the Injunction is the one described above. When the question is whether lesser remedies would prove futile *now*, the relevant conduct is that of the "new leadership," not its predecessors. *Jerry M.*, 738 A.2d at 1214. The current administration stipulated to the Injunction, doubled its funding, and—unlike the era in which "[t]here d[id] not appear to be a contempt sanction robust enough to coerce compliance" (6-ER-1364)—has never been found in contempt of the operative decree.

The court's remaining rationale—that Defendants squandered the "less extreme measure" of the Injunction itself, and effectively had a special master in Magistrate Judge Duncan (1-ER-72–74)—only restates the error. The Injunction is the relief being enforced, not an intermediate sanction for violating it; and Judge Duncan's service ended years before this administration took office. Every receivership decision the district court relied upon featured coercive intermediate measures under the operative decree: two contempt findings in *Hinds County*, 128 F.4th at 622; years of contempt orders and fines in *Coleman v. Newsom*, 2024 WL 3385911, at *5 (E.D. Cal. July 12, 2024); contempt orders in *Nunez*, 782 F. Supp. 3d at 156; three contempt proceedings "to no avail" in *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D.W. Va. 1990). The district court cited those cases while skipping the

step that justified them. Moreover, only *Hinds County* has undergone appellate review, and the Fifth Circuit there vacated the receiver's budget authority. 128 F.4th at 638–39. The *Nunez* order was remanded within six months of entry and remains unreviewed on the merits. *See Nunez v. City of New York*, No. 25-1723, 2025 WL 4053408, at *1 (2d Cir. Nov. 13, 2025).

Under § 3626(a)(1)(A), a remedy imposed before less intrusive remedies have been tried—or found, on record evidence, to be inadequate—is not "the least intrusive means necessary." *See also Stone*, 968 F.2d at 864.

### D. No clear and convincing evidence establishes that a receivership is the only viable means of achieving compliance.

Even setting aside the errors above, the receivership cannot stand unless the record establishes, by clear and convincing evidence, that this remedy is "the only viable option to effectuate compliance with the laws and orders of the court." *Jerry M.*, 738 A.2d at 1213. Civil contempt, a far less intrusive sanction, requires clear and convincing evidence, *Stone*, 968 F.2d at 856 n.9, as does the PLRA's other last-resort remedy, 18 U.S.C. § 3626(a)(3)(E). A remedy that displaces a State's authority altogether cannot rest on less. But under any standard, the district court's three core findings—an ongoing grave threat requiring this remedy, bad faith, and incapable leadership—do not withstand scrutiny.

### 1. The court's threat-of-harm analysis rests on a compliance rubric that treats near-perfect performance as a violation, and on a selection-biased sample of adverse outcomes.

The court cited two bases for its finding of a "grave and immediate threat": (1) the monitors' conclusion that Defendants were non-compliant with 131 of 154 Quality Indicators, and (2) the monitors' narrative reviews of eight deaths and other adverse-care examples. (1-ER-42–70.) Neither can bear the weight placed on it, and the district court failed to engage either of Defendants' central methodological objections.

*The compliance count.* The 131-of-154 figure is the output of a scoring convention the monitors themselves defined: "we treated compliance as a dichotomous conclusion, compliant or not compliant, where compliant means that ADCRR performed as it was ordered 100% of the time"—even while acknowledging that "no non-heavenly system ever performs perfectly all the time." (5-ER-1078.) The Department's "effort to be compliant," the monitors explained, "does not enter into our determination of compliance." (4-ER-617.) And where percentage performance can be calculated, "the Monitors do not give these [percentages] any weight at this point," because "it is the absolute current level of performance that is relevant," not whether performance "has improved from month to month." (4-ER-618.) The metric on which the Receivership Order placed "[g]reat

weight" (1-ER-39–40) was thus constructed to exclude two considerations the PLRA makes central to the choice of remedy: effort and trajectory.

The QI scores illustrate the problem. The Department was rated non-compliant on history-and-physical examinations at a performance level of 96%—a figure the monitors called "accurate." (4-ER-663.) It was rated non-compliant on keep-on-person medication refills at 96%, where the monitors "calculated a similar percentage." (4-ER-859.) It was rated non-compliant on Hepatitis C disease-staging at 96% and on treatment of advanced-fibrosis patients at 91%—the monitors' own figures. (4-ER-697–701.) Its document scanning was self-assessed at 97% (5-ER-870–871), and care in the patient's preferred language was self-assessed at 99.5%.[3] (5-ER-882.) In the 131-of-154 tally that headlines the Receivership Order, each of those provisions is weighted the same as one performed at 10%. Such a metric cannot distinguish a failing system from an improving one.

The same perfection benchmark surfaced at oral argument, where the court framed the question for Defendants' counsel as whether, given a month, the Department would comply with the Injunction one "hundred percent." (2-ER-269.)

[3] These are just a few of many "non-compliant" QIs for which the Department was more than 75% compliant. (*See also, e.g.*, 4-ER-655 (76%); 4-ER-671 (76%); 4-ER-673 (94%); 4-ER-686 (80%); 4-ER-690 (83%); 4-ER-749 (94%); 4-ER-759 (88%); 4-ER-768 (96%); 4-ER-828 (80%); 4-ER-842 (88%); 5-ER-884 (89%).)

Defendants objected to this methodology below. (3-ER-304–307.) But the district court's order does not address the objection; it reasons that because prison healthcare involves life-and-death situations, "a percentage of compliance is consistently inadequate." (1-ER-48.) This just restates the binary premise; it is not a finding that the observed performance levels evince a grave systemwide threat. And it disregards the governing deliberate indifference standard: "[W]hen prison officials have attempted to care for a prisoner's medical needs, even if the care falls short, they have not exhibited subjective deliberate indifference." *Parker*, 171 F.4th at 756.

The district court similarly did not address the monitors' unexplained scoring reversals where the monitors found the Department was compliant in January 2025 yet "continue[d] to be non-compliant" in July 2025, or the eight provisions on which the Department achieved compliance between reports without acknowledgment. (3-ER-305–307.) Further, the district court found the "Monitors' opinions" were "[c]orroborat[ed]" by a declaration from Plaintiffs' own staff cataloging the Department's self-reported scores on selected indicators over two months. (1-ER-44; Doc. 4838 ¶¶ 2–3.) Plaintiffs' calculations, however, were based on a small snapshot of the very data the monitors gave no weight. (4-ER-618.) The district court erred by assigning great weight to a methodology whose binary nature and acknowledged anomalies betray the PLRA's required analysis.

In short, the PLRA requires courts to look at the Department's efforts to improve and its actual, ongoing improvement. Instead, the district court here relied on the monitors' binary approach to evaluating compliance (100% compliant or non-compliant) and thus necessarily did not consider effort and progress.

*The mortality reviews.* The order's harm narrative centers on the monitors' reviews of eight deaths—four from 2023 and four from 2025—in a system caring for roughly 25,000 patients. (1-ER-49–57.) Mortality reviews are, by design, examinations of the worst outcomes. Defendants submitted unrebutted expert testimony that reviewing only adverse-outcome cases "guarantees" a finding that the system is dangerous; that retrospective chart reviews identify high error rates "even when applied to the best of providers" (a published study found adverse events in more than one-third of charts at three referral hospitals); and that the monitors made no attempt to benchmark observed error rates against any comparator. (3-ER-312–313, 483–484 ¶¶ 7–9.) Defendants' physician declarant also disputed the monitors' clinical account of specific deaths, identifying, for example, a medication-record entry indicating that an aspirin order the monitors described as left in place for 10 days had in fact been discontinued upon the patient's return from the hospital. (3-ER-313–314, 485–486 ¶¶ 16–18.) The Receivership Order acknowledged these disputes only in a footnote and adopted the monitors' account without resolving them. (1-ER-50 n.48.)

The Supreme Court's and this Court's precedents do not permit systemwide findings—much less the most intrusive remedy in equity—to rest on isolated incidents unmoored from systemic proof. *See Lewis v. Casey*, 518 U.S. 343, 349, 360 n.7 (1996) (two instances of actual injury could not support a systemwide remedial order); *Schwarzenegger*, 622 F.3d at 1073–74 (vacating systemwide relief resting on evidence "composed largely of single incidents that could be isolated"). Eight tragic outcomes among 25,000 patients, examined through a methodology that concededly cannot generate a system-level error rate, are not clear and convincing evidence that Defendants continue to be deliberately indifferent to prisoners' medical needs in a way *that only a receiver can abate*.

That final step deserves emphasis, because the order omits it. Even a fully supported finding of ongoing serious harm identifies a problem, not the remedy. The PLRA's question is comparative: whether a receivership—as against contempt, targeted orders, enhanced monitoring, or the State's ongoing reforms—is the least intrusive means of correcting the violation. The record points the other way: the Appointment Order gives the receiver 180 days just to file an operational plan (1-ER-4), while the Department's statewide implementation of the Staffing Plan is already underway. Nothing establishes that a receiver, who would be dependent on the same labor market, facilities, and appropriations process, would abate any risk

faster than the officials she displaces. California's experience, discussed below, suggests the opposite.

### 2. The bad-faith finding penalizes the adversarial process itself.

The court found Defendants acted in bad faith, and that finding pervades the order. (1-ER-86–91.) That finding does not withstand scrutiny.

First, the court repeatedly cited Defendants' objections to the monitors' reports—their timing, their vigor, and their invocation of Federal Rule of Evidence 702—as proof of duplicity. In the court's view, because Defendants had once endorsed the monitors' appointments, their later challenges showed they were "amnestic, or duplicitous, or both," and "border[ed] on bad faith." (1-ER-40–41; *see* 1-ER-86–87.) But monitors are capable of error, and a party does not act in bad faith by testing monitors' opinions through the procedures the law provides. Court-appointed experts' findings are "subject to review by the district court," *Armstrong*, 768 F.3d at 987, and monitoring results, produced without adversarial safeguards, "should not enjoy [a] presumption of legal validity," Robert E. Buckholz, Jr., et al., *The Remedial Process in Institutional Reform Litigation*, 78 Colum. L. Rev. 784, 829 (1978). A party cannot obtain judicial review of expert findings without objecting to them. And Defendants' objections were substantive and in part conceded: the monitors corrected, among other things, a count of backlogged

appointments overstated by a factor of two. (1-ER-36 n.33.) Endorsing an expert's appointment does not waive the right to later contest the expert's conclusions.

Second, incomplete compliance is not bad faith. Courts that have appointed receivers have declined to equate the two even on records far starker than this one. *See Hinds Cnty.*, 2023 WL 1186925, at *12 (observing "[t]he question of motive is complicated" and declining to find ill will (citation omitted)); *Plata*, 2005 WL 2932253, at *30 (declining to "ascribe ill will" despite systemic collapse); *Nunez*, 782 F. Supp. 3d at 165 (same). A contrary rule would find bad faith in every case in which a receivership is sought—that is, in every case of substantial noncompliance—and would read the bad-faith factor out of the analysis.

Third, the staffing pilot does not supply the missing proof. The pilot's shortcomings are documented, and Defendants have not minimized them. But the pilot was a first-of-its-kind test of a new care model at two units, undertaken jointly with the monitors for the express purpose of identifying implementation problems before statewide rollout. (5-ER-1087, 1057.) The Department learned those lessons and proceeded with the implementation the Plan required: weekly implementation meetings, unit-by-unit monitoring, and rollout to 31 of 43 units (72%) within 13 months of the Plan's approval. (2-ER-170–171, 188–190 ¶¶ 3–7, 194.) State officials implementing a 154-requirement decree are entitled to "considerable latitude" in finding workable mechanisms of compliance. *Brown*, 563 U.S. at 543. And

disagreement over implementation of a plan still in development is the ordinary friction of institutional reform, not clear and convincing evidence of official bad faith.

**3. The lack-of-leadership finding cannot be reconciled with what the same leadership accomplished.**

Finally, the court found the Department's leadership incapable of "turn[ing] the tide within a reasonable period of time." (1-ER-39, 80–86); *see Plata*, 2005 WL 2932253, at *23. The proper focus of that inquiry is "the availability of new leadership" and its capability, not the record of officials no longer in office. *Jerry M.*, 738 A.2d at 1214.

The leadership the receivership displaces is the leadership that, in three years, secured a doubling of healthcare appropriations; grew clinical staffing across every category; built or renovated clinical space across the system; stood up the Hepatitis C and opioid-treatment programs the monitors called "sea-chang[ing]"; achieved compliance on the special-needs-unit buildout; and carried the PCCM from a two-unit pilot to 31 of 43 units. (*See* 3-ER-290, 293–300; 1-ER-81; 2-ER-170–171; 4-ER-675; 5-ER-892–897, 1093.) It is also the leadership whose custody-side performance under the same Injunction was strong enough that Plaintiffs declined to seek a receiver over the isolation subclass. (5-ER-1027 n.1.) The same officials, operating under the same alleged incapacities, were capable of "turning the tide" on the half of the decree where substantial progress is conceded. That record cannot

coexist with a finding, by clear and convincing evidence, that the same officials cannot succeed on the other half of the Injunction.

The Receivership Order's contrary examples do not close the gap. The Medical Director vacancy was real, but it was a hiring challenge the Department solved, only to re-encounter it. (*See* 1-ER-81.) But hiring challenges are not evidence of incapacity. The pilot's project-management failures were identified in January 2025; the statewide rollout that followed was structured to correct them. (2-ER-188–190 ¶¶ 3–7.) And the observation that improvement has come more slowly than hoped restates the compliance gap; it does not establish that the officials closing that gap are incapable of finishing the job within a reasonable time, particularly when the court's own remedy assumes the job will take five more years under a receiver. *See Plata*, 2005 WL 2932253, at *25 (correctional-healthcare reform is a "polycentric problem" in which progress is necessarily incremental (citation omitted)).

California's receivership—which the district court invoked as a "marked success" (1-ER-95)—confirms that displacing state leadership is no shortcut to success. Two decades on, California's receivership remains in place; the State's annual inmate-healthcare budget has grown 353% while its prison population fell by roughly half; its office consumed more than $222 million; clinical vacancies persist; and California's inmate mortality rate exceeds Arizona's. (5-ER-910–914, 1021.)

The district court here knew as much. When defense counsel observed at oral argument that a receiver must eventually "transition back to state officials," the court responded, "Yeah, that hasn't happened in California," and added, "But they have a new receiver for mental health." (2-ER-270.) Five months later, the Receivership Order held California out as a success. (1-ER-91–92.) A remedy that takes 20 years to begin unwinding—and that was expanding, not concluding, when the court invoked it—is no basis for a clear-and-convincing finding that a receiver offers a "relatively quick and efficient" path to compliance, or that nothing less intrusive could work here.

**E. The receivership should be reversed.**

Each of the four defects above independently requires reversal under the PLRA. Additionally, it is questionable whether a federal court may ever impose a receivership to transfer a State's sovereign authority over its prisons to a private, politically unaccountable individual.

To start, the PLRA's text never mentions receivers, although Congress addressed other court appointees there expressly: the statute authorizes special masters, and strictly limits them. *See* 18 U.S.C. § 3626(f).[4] The statute says nothing

[4] Section 3626(f) permits the appointment of a special master only upon a finding that the remedial phase is "sufficiently complex"; requires selection from party-submitted lists, subject to interlocutory appeal; confines the master to conducting hearings, preparing proposed findings, and assisting with remedial plans; forbids ex parte communications; caps compensation, which must be "paid with

comparable about receivers, and receivers are different in kind from special masters. Unlike a special master, a receiver does not direct state officials to comply with the Constitution; she replaces them and assumes their powers. No textual evidence in the PLRA supports that Congress contemplated receiverships as an available remedy.

Defendants acknowledge this Court's holding in *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093–96 (9th Cir. 2010), that the PLRA does not displace courts' equitable authority to impose a receivership on a state prison. But *Plata* did not address whether receiverships over non-consenting state prison systems are among or similar to the "sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citation omitted). Until the 1960s, federal courts imposed receiverships only on *private* parties, and even then, only to preserve discrete, identifiable property, such as corporate assets, partnerships, railroads in reorganization, and decedents' estates. *See, e.g.*, *Gordon v. Washington*, 295 U.S. 30, 36–39 (1935) (discussing different instances of receiverships). And tellingly, federal courts cannot impose traditional, fiscal receiverships over States, as the Supreme Court has held in cases involving the appointment of receivers to rectify municipal debts by levying and collecting

funds appropriated to the Judiciary"; and requires review of the appointment every six months. 18 U.S.C. § 3626(f)(1)–(6).

taxes. *See Meriwether v. Garrett*, 102 U.S. 472, 515–21 (1880) (surveying relevant precedent).

To be sure, "[a] modern device need not have an exact historical match, but … it must have a founding-era antecedent" in order to be within federal courts' equitable authority. *CASA*, 606 U.S. at 846–47. The lack of clear historical practice regarding the assertion of equitable authority at issue here—*i.e.*, an order from a federal court imposing a private receiver over a non-consenting state prison healthcare system—raises serious questions about whether a sufficient "founding-era antecedent" exists. *Id.* at 847. Assuming a receivership is a viable option at all, that uncertainty reinforces what the PLRA and established principles of equity make clear: a district court may order a receivership over a state prison system only as a true remedy of last resort, where it is a "necessary" and "least intrusive means" of "correct[ing]" an identified constitutional violation. 18 U.S.C. § 3626(a)(1)(A).

Again, the four errors discussed above require reversal, on their own. The district court selected the most intrusive remedy available without conducting the comparative, evidence-weighing analysis the PLRA compels and without any clear and convincing evidence that a receivership is the least intrusive option. It resorted to this invasive remedy without first attempting lesser remedies, such as contempt with a chance to purge. And it divested the State's control less than three years into the process, only to grant the receiver *at least* five years to hit the same target.

Despite these legal errors, the district court believed that its extraordinary use of equitable power comports with the PLRA, reciting in a single paragraph that the remedy is "narrowly drawn" and "the least intrusive means necessary." (1-ER-97–98.) The PLRA requires more than recitation, *Hinds Cnty.*, 128 F.4th at 638–39; it requires careful, fair-minded deliberation establishing that this remedy of last resort is "absolutely necessary," *Jerry M.*, 738 A.2d at 1213.

The Receivership Order should be reversed.

## II. The powers conferred on the receiver exceed the limits of the PLRA and federal courts' equitable authority.

The Appointment Order should be reversed as well. The scope of a receiver's powers, like the decision to appoint one, "must be determined with reference to the constitutional violations established by the specific plaintiffs before the court," *Brown*, 563 U.S. at 531, must itself be narrowly drawn, § 3626(a)(1)(A); *Hinds Cnty.*, 128 F.4th at 639, and otherwise be consistent with principles of equity. Moreover, under the PLRA, a court may not order relief requiring an official to violate state law unless federal law requires it, the relief is "necessary to correct the violation of a Federal right," and "no other relief will correct the violation." 18 U.S.C. § 3626(a)(1)(B).

Here, however, the Appointment Order creates standing mechanisms for the receiver to circumvent state law or the district court to override it in violation of the

PLRA and the limits of federal courts' equitable power. Those aspects of the Order independently warrant reversal.

### A. To the extent the Appointment Order authorizes the receiver to bypass state law without meeting the PLRA's high standard for doing so, it is unlawful.

The Director is required to follow state law. But under the Appointment Order, the receiver evidently must only "endeavor" to do so. (1-ER-12.) And whenever the receiver "determines compliance with state laws, regulations, or contracts will interfere with, or preclude" her objectives, she "shall request the Court waive compliance." (*Id.*) This requirement does not meet the high standard that governs court directives to disregard state laws.

The PLRA allows "a government official to exceed … her authority under State or local law or otherwise violate[] State or local law" only if three conditions are met: (1) "Federal law requires such relief to be ordered in violation of State or local law," (2) "the relief is necessary to correct the violation of a Federal right," and (3) "no other relief will correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(B). But the Appointment Order's waiver mechanism requires none of those findings and entails none of those constraints. Instead, its trigger appears to be the receiver's own determination that a state law "will interfere with" the "desired outcome of the Receivership" (1-ER-12, 15)—a standard measured against the receiver's subjective perspective rather than constitutional necessity, requiring no

consideration of less intrusive alternatives before Arizona law yields. That the court will "solicit input" from the parties before ruling (1-ER-12–13) supplies process, not standards.

The Appointment Order also identifies two Arizona laws—the correctional-healthcare privatization requirement and the specialist-compensation cap—as "persistent barriers" already in the waiver mechanism's contemplation. (1-ER-12 n.4.) As a threshold matter, if those laws were already identified as possible barriers to constitutional compliance, that issue should have been addressed before imposing a receivership. Instead, this Order displaces the state official lawfully responsible for healthcare at the state prisons and, after doing so, invites the receiver replacing him to disregard state laws that he was charged to follow.

To the extent the Appointment Order effectively authorizes the Court to override state law merely upon the receiver's request, *Stone* forecloses that approach. There, the district court authorized a single county official to override state law in one regard—early release from one overcrowded jail—and this Court vacated the authorization because the district court had not "waited until the threat of sanctions failed to induce compliance" and "did not make any findings that other alternatives were inadequate." *Stone*, 968 F.2d at 864. Such findings "are essential," and any override authority must be "tailor[ed] … as narrowly as possible," granted "only as a last resort and only as essential to achieve compliance." *Id.* at 864–65.

The Court thus vacated the unlawful override authorization in that case without waiting for future developments or application of the provision. *Id*.

The D.C. Circuit reached the same conclusion where a receiver rather than an accountable official held the power. An authorization to disregard local law that "unreasonably interfere[s]" with a receiver's responsibilities was too broad, the court explained, because "[d]isregarding local law … is a grave step," and so each contemplated override must be justified case-by-case, with alternatives considered. *LaShawn A.*, 144 F.3d at 853–54 (the remedy was "even more troubling" than *Stone*'s because the receiver could "disregard District law in a whole host of areas").

These cases support reversing the Appointment Order's waiver mechanism now, rather than deferring review until the mechanism is invoked. That deferral would leave the unlawful waiver mechanism operating in the interim—as leverage in every funding exchange with the Governor and Legislature—while inverting the sequence the PLRA commands: the findings must come before the authorization, not after.

The Appointment Order's standing waiver mechanism cannot be understood as a hypothetical safety valve that may never come to fruition, either. Rather, it appears to be a pre-planned route around the Arizona Legislature, with the order already identifying two laws as expected candidates. As further evidence of what is likely coming, at oral argument on the receivership motion—where the court's own

example was the specialist-payment statute—Plaintiffs' counsel confirmed that "the receiver should look into this as one of the first issues," because "it would be prudent to allow the receiver to do an assessment … and come to a conclusion on their own about that issue." (2-ER-247.) But again, under the PLRA, whether Arizona law must yield is a question for the court that must be answered under the standard § 3626(a)(1)(B) prescribes—not a matter for a receiver's "own" assessment.

In sum, to the extent the Appointment Order purports to authorize the receiver or the district court to waive these two identified state laws (or others) under any lesser standard than what the PLRA requires, it must be reversed.

### B. To the extent the Appointment Order contemplates that the receiver or district court can commandeer Arizona's constitutional appropriations process, it is unlawful.

The Appointment Order similarly paves a bypass around the appropriations process. Importantly, though, the constitutional appropriations powers of the Arizona Governor and Legislature are not powers that the district court or receiver has the authority to usurp and redirect.

The Appointment Order confers sweeping budgetary and financial power on the receiver. (*See* 1-ER-6–8.) When the Director executes such responsibilities, he must comply with state law, including contending with and operating within the ordinary constraints and political realities of the State's appropriations process. So, if the Director believes the Department did not receive sufficient funds through the

annual appropriations process, he must seek additional funding through that process. The Appointment Order, however, purports to free the receiver from the State's ordinary appropriations process. Unlike the Director under state law, if the receiver is not satisfied with her appropriation, after notifying the Legislature and Governor's Office of the "deficiency," she (or other parties) may "request resolution by the Court." (1-ER-15.) Under the Appointment Order, then, the district court appears to have assumed authority itself to resolve budget disputes that would otherwise be resolved through Arizona's constitutional and political appropriations process.

If that is what the Appointment Order intends, then it improperly usurps the state appropriations process mandated in Arizona's Constitution. *See* Ariz. Const. art. IV, pt. 1, § 1; *id.* pt. 2, § 20. That usurpation deprives the State's elected officials responsible for budget and policy decisions of their authority whenever the receiver believes her legislative appropriation is insufficient, and it effectively diverts funds "away from other important programs" the State must fund. *Horne v. Flores*, 557 U.S. 433, 448 (2009). The admonition that courts of equity "must exercise [t]he least possible power adequate to the end proposed," *Spallone v. United States*, 493 U.S. 265, 280 (1990) (citation omitted), is a statutory command under the PLRA. It forecloses the Appointment Order's transfer of authority over the appropriations process.

Even putting aside the PLRA, the district court cited no authority to support that it has the equitable power to commandeer a state's constitutional appropriations process and wrest such determinations from the State's elected officials and representatives. Any such "expansive view of equity must be rejected." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund*, 527 U.S. 308, 321 (1999); *CASA*, 606 U.S. at 841–42. Indeed, given that federal courts cannot impose a traditional fiscal receivership over States, *Meriwether*, 102 U.S. at 515–21, surely a district court cannot *itself* take over the appropriations decisions for the State when the receiver disagrees with the amount available.

Thus, at minimum, this Court should vacate the Appointment Order's state-law waiver provisions and its budgetary provisions usurping the State's appropriations process, and remand with instructions to reevaluate the scope of any receivership de novo under § 3626(a)(1)(A) and (B).

## CONCLUSION

The Court should reverse the Receivership Order and the Appointment Order and restore control of the Department's healthcare system to the State officials accountable for it.

RESPECTFULLY SUBMITTED this 15th day of September, 2026.

OSBORN MALEDON, P.A.

By s/ Andrew G. Pappas
Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
Daniel Bowman
2929 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

OFFICE OF THE ATTORNEY GENERAL
Joshua D. Bendor
Luci D. Davis
2005 N. Central Avenue
Phoenix, Arizona 85004

**Attorneys for Defendants/Appellants**

## STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**: Nos. 26-1746 & 26-5060

The undersigned attorney or self-represented party states the following:

☐ I am unaware of any related cases currently pending in this court.

☐ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**: s/ Andrew G. Pappas **Date**: 9/15/26
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: Nos. 26-1746 & 26-5060

I am the attorney or self-represented party.

**This brief contains 12,805 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties;
- ☐ a party or parties are filing a single brief in response to multiple briefs; or
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated ______________.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**: s/ Andrew G. Pappas **Date**: 9/15/26